UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GREAT LAKES INSURANCE SE,

      Plaintiff

vs.                                                       CASE NO. 4:20-cv-40020-DHH

MARTIN ANDERSSON,

      Defendant


Defendant Martin Andersson (hereinafter "Andersson") hereby provides his Answer, Affirmative Defenses, and Counterclaim to the Complaint filed by Plaintiff Great Lakes Insurance SE (hereinafter "Great Lakes").

## <u>ANSWER</u>

1.     Admitted.

2.     Admitted that the policy was delivered by Defendant's Florida agent to Defendant.

3.     Admitted.

4.     Denied that Great Lakes is a United Kingdom Corporation.

5.     Denied, however Andersson voluntarily submits to the jurisdiction of this Court.

6.     Admitted.

7.     Admitted that the Policy Schedule and policy form attached as Exhibit A are true and correct. Denied that Exhibit A constitutes the complete policy.

8.     Admitted.

9. Admitted.

10. Admitted with the exception of the date of the loss, which occurred on December 17, 2019.

11. Denied as to the date of the incident. With respect to the remaining allegations, Defendant is without sufficient knowledge and therefore the allegations made in this paragraph are denied.

12. Denied.

13. Denied.

14. Admitted that Defendant maintains his claim. Denied as to the facts allegedly "established" by the investigation.

15. Defendant acknowledges Plaintiff's alleged repetition of the preceding facts and reasserts his responses herein.

16. Denied that the stated language is accurately quoted or that it is the "pertinent part." The policy should be read as a whole and speaks for itself.

17. Denied that the stated language is accurately quoted as the punctuation differs.

18. Denied.

19. Admitted that the Defendant has made demand for payment of his claim. Denied as to the alleged lack of coverage.

20. Denied.

21. Admitted that a justiciable issue exists but otherwise denied.

22. Defendant acknowledges Plaintiff's alleged repetition of the preceding facts and reasserts his responses herein.

23.     Admitted that the quoted language is accurate. Denied that it is the "pertinent part." The policy should be read as a whole and speaks for itself.

24.     Denied.

25.     Denied.

26.     Denied.

27.     Denied.

28.     Admitted that Defendant demands payment of his claim and otherwise denied.

29.     Denied.

30.     Admitted that a real and justiciable issue exists and otherwise denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE:  UNCLEAN HANDS

Great Lakes comes to this Court with unclean hands, and should therefore be barred from receiving the benefit of this Court's equitable remedies, including the remedy of declaratory judgment.

### SECOND AFFIRMATIVE DEFENSE:  FAILURE TO STATE A CLAIM

Plaintiff's claim for declaratory relief is not supported by the facts of the claim or the applicable laws.

### THIRD AFFIRMATIVE DEFENSE:  ESTOPPEL

Through its own or its surveyor's acts and omissions, Great Lakes led Andersson to believe it had taken the GPS, which was the best source of proof regarding the path taken by the vessel, into its custody. Great Lakes was aware of Andersson's belief, yet

never informed him it did not have the GPS until after the vessel and its parts were no longer accessible. Andersson acted to his detriment in reliance upon the belief that Great Lakes had taken the GPS because it prevented him from obtaining and protecting the GPS and its data. Great Lakes should not be allowed to benefit from the absence of this crucial evidence through its claim that Andersson violated the navigational warranty, and should be estopped from voiding the policy or denying coverage on that basis.

## COUNTERCLAIM BY MARTIN ANDERSSON AGAINST GREAT LAKES INSURANCE SE

### JURISDICTION AND VENUE

1.      This action is subject to Federal Diversity Jurisdiction pursuant to 28 U.S.C. § 1332.

2.      At the time the insurance policy at issue was purchased, Andersson was a resident of the Commonwealth of Massachusetts.

3.      Great Lakes Insurance SE (hereinafter "Great Lakes") is a German corporation which is registered and authorized to do business in London, United Kingdom.

4.      Great Lakes regularly and frequently sells insurance policies to Massachusetts residents and to insure vessels docked and used in the waters of Massachusetts.

5.      The amount in controversy exceeds $75,000.

6.      Great Lakes selected the Massachusetts venue in filing this action.

7.      Andersson voluntarily submits to the Massachusetts venue and the jurisdiction of this Court for the purposes of both the main claim and the counterclaim in this action.

## THE PARTIES

8.      When the insurance policy at issue was purchased, Martin Andersson was a resident of the Commonwealth of Massachusetts residing in Bolton, MA. Prior to the grounding incident at issue in this action, Andersson moved from Massachusetts and is currently a resident of the State of New Jersey.

9.      Melody, the catamaran owned by Andersson which is insured by the subject policy, was docked primarily in the U.S. Virgin Islands and was insured for use in Florida, the Bahamas, and the Caribbean Sea subject to certain limitations. The vessel was never docked or used either in Massachusetts or in New Jersey.

10.     Great Lakes is a German corporation licensed to do business in London, United Kingdom.

11.     Great Lakes does a significant amount of business selling insurance policies to residents of the Commonwealth of Massachusetts and to non-residents that insure vessels maintained and used in the waters of the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

12.     In late 2018 Andersson purchased "Melody," a 47' Catana catamaran sailing vessel, for use cruising in the Bahamas and the Caribbean islands.

13.     Great Lakes issued a private and pleasure yacht insurance policy, #CSRYP/172119, to cover Melody with the effective dates of December 21, 2018 through December 21, 2019.

14.    The policy provided up to $365,000.00 in coverage for the hull, as well as several additional coverages including $5,000 in personal property limits and a $1,000,000 third party liability limit including up to $1,000,000 in pollution coverage.

15.    In addition to these enumerated coverages, the policy covered an amount up to 50% of the hull coverage less the deductible (in this case up to $167,900) for "reasonable expenses incurred by you in attempting to minimize or mitigate a loss incurred and covered by this insuring agreement … whether successful or not.  These will be paid in addition to the sum insured under Sections A and F."

16.    A true and correct copy of the Great Lakes Policy, along with its endorsements and claims guidance pamphlet included in the policy packet delivered to the insured are attached as Exhibit A.

17.    Andersson was the Named Operator on the policy.

18.    The policy did not require sailing with additional crew.

19.    On this particular voyage, Andersson did bring additional crew, a gentleman named Ronald Naranjo.

20.    Naranjo was recommended to Andersson as a capable sailor.

21.    Andersson was not informed of any proclivity on Naranjo's part to seasickness.

22.    On December 14, 2019, Andersson and Naranjo left the port of Varadero in Aruba with the plan of sailing to St. Maarten after clearing immigration.

23.    The vessel checked out from immigration in Barcadero, Aruba at approximately 5:30 p.m.

24.     The course was to be East-Northeast heading toward Grenada while staying north of the Venezuelan islands.

25.     The insurance policy at issue warrants that the vessel will be "confined to Florida, the Bahamas, and the Caribbean Sea (excluding Cuba, Colombia, Haiti and Venezuela) – not to exceed 150 miles offshore."

26.     Knowing that the policy contained this navigational warranty, Andersson set out upon a course with a plan to keep the vessel well within the navigational limits.

27.     Andersson checked the radio prior to departing the port of Varadero and it was working properly, as were all navigational instruments.

28.     When the voyage began the conditions were good, with around 15 knot winds out of the east and 4' to 6' wave heights.

29.     Sunday afternoon, after 18 or 20 hours of sailing, the conditions deteriorated significantly, and instead of shifting the course due east toward Grenada as planned, Andersson was forced to continue sailing in a more northeasterly direction.

30.     At this point, Mr. Naranjo began to be seasick.

31.     By Sunday night (December 15), the weather got worse and Mr. Naranjo became incapacitated with seasickness.

32.     At this point, the wave heights were 10 to 12 feet and the wind velocity was around 25 knots with stronger gusts.

33.     Andersson became concerned about the medical condition of his crewmember and about the safety of the vessel in such treacherous conditions.

34.     The vessel was sailed using a partially furled headsail and no mainsail.

35.     To avoid swells that could damage the boat and to make the seasick crewmember as comfortable as possible until they could get him to shore and to medical attention, Mr. Andersson proceeded in a more northerly course that should have brought them to Ponce, Puerto Rico.

36.     Due to the weather and a wind shift, the vessel was forced over time to head off and sail farther west, toward the Dominican Republic.

37.     The generator would not start on the morning of Tuesday, December 17.

38.     As the vessel approached Santo Domingo, Dominican Republic, Mr. Andersson discovered the VHF radio was not functioning properly as Melody approached the Dominican Republic. The unit could receive transmissions but was unable to transmit them.

39.     Andersson utilized a satellite phone to contact the broker who had sold him the boat for advice regarding the best and closest port for repairs to the VHF and the generator, and the broker recommended the marina at Boca Chica, east of Santo Domingo.

40.     The Garmin GPS Chartplotter continued to work properly throughout the trip and was relied upon for navigation.

41.     On the broker's advice, Andersson contacted the marina in Boca Chica, Dominican Republic and arranged for someone from the marina to come out and lead Melody into the harbor.

42.     While awaiting the arrival of the guide from the marina, the vessel was pushed by a wave onto a manmade breakwater which sat approximately one foot above the level of the water.

43.     The breakwater did not show up on the chartplotter.

44.     It was dark, the breakwater was unmarked, and it was not visible at the time, which was approximately 6:30 p.m.

45.     There were other markers between the breakwater and the shore, approximately 50 to 75 meters closer to shore than the breakwater, but nothing on the outside to warn incoming vessels.

46.     After the grounding, Andersson and his crewmember were taken to shore and greeted by Navy and law enforcement personnel.

47.     Arrangements were made immediately to install security guards on the vessel to prevent looting.

48.     Melody was severely damaged.

49.     At shortly after 6:00 a.m. the next morning, December 18, Andersson contacted his insurance agent, who provided a first notice of the claim to Great Lakes before 8:00 a.m. (7:43 a.m. GMT).

50.     By that afternoon, Great Lakes had advised Andersson to "Please act as a prudent uninsured and immediately take all possible steps to minimize the loss and protect the Scheduled Vessel from further loss."

51.     Great Lakes quickly put Andersson in touch with a marine surveyor who arranged to arrive in Boca Chica on December 20 and inspect the damage on December 21.

52.     After surveying the wreck Mr. Ball, the surveyor, verbally informed Andersson that the vessel was a "constructive total loss."

53.     When asked on December 21 about reimbursement for that expense, which was $1,200 up to December 23, Great Lakes' adjuster asked for receipts and told Andersson she had not received a report from Mr. Ball.

54.     The practical meaning of the vessel being a "constructive total loss" pursuant to the terms of the policy is that the insurer must pay the total hull value covered, without a deductible, and has the right to ownership of the salvage.

55.     For reasons that are unclear to Andersson, the insurer's communications indicate that the date of the loss was December 16. This date is incorrect. The loss occurred on December 17.

56.     In a December 23 email to Great Lakes, Andersson states, "I understand from CMS [the marine surveying company] that they have submitted the report so would appreciated [sic] it if you can process this as soon as possible."

57.     On December 24, Great Lakes' adjuster responds by telling Andersson to seek guidance from the marine surveyors and to take steps to protect the vessel. The adjuster does not deny the receipt of the surveyor's report.

58.     On December 27, 2019 Great Lakes issued a letter to Andersson reserving its right to deny coverage. It did not indicate a claim decision had been made or ask for further information.

59.     Also on December 27, Andersson indicates to Great Lakes that, due to its delay in making a coverage decision, he has been unable to pay for salvage. He informs them the salvor requires $50,000, but also offered to take title to the vessel and its contents in exchange for salvage services.

60.     Great Lakes' adjuster responded, "You may proceed to accept the offer on an entirely without prejudice basis. We are unable to confirm coverage at this time."

61.     On December 31, the salvor began removing smaller items of value and emptying tanks to make the vessel lighter.

62.     Acting "as a prudent uninsured," Andersson retained the services of an attorney to advise him regarding what to do next.

63.     On January 2, 2020, Great Lakes' adjuster requests a response to the issues raised in the December 27 reservation of rights letter, and tells Andersson that the surveyor has determined the vessel has very little residual value and a high salvage cost, and therefore Great Lakes has no objection to proceeding with Andersson's suggestion of transferring title to the vessel in exchange for salvage.

64.     On January 3, Andersson retained the services of a Dominican maritime attorney to participate in the drafting of a contract with the salvor that would require the salvor to remove the vessel from the breakwater while minimizing the risk of environmental damage or damage to the breakwater upon which the vessel was grounded, and that would provide indemnity to Mr. Andersson if in the course of the salvage such damage occurred.

65.      On January 10, 2020, Andersson and the salvor executed a contract and the title of the vessel was transferred. One provision of the contract required the salvor to retain the vessel and to provide access to it upon request so that, if the insurer sought further inspection, the vessel would be available.

66.     On January 11, Andersson went home to New Jersey and salvage operations were begun in earnest.

67.     Andersson sent correspondence to Great Lakes' adjuster on January 16 responding to the issues raised in Great Lakes' reservation of rights letter. In the letter, Andersson informed Great Lakes of his new address in New Jersey, attached a copy of the salvage agreement and informed Great Lakes of its right to access ending February 10, and also clearly expressed Andersson's understanding that the Garmin GPS was taken by the surveyor on Great Lakes' behalf.

68.     There was never a response to Mr. Andersson's correspondence, nor any communication either denying that the GPS had been taken or requesting access to the vessel.

69.     On January 28, having had no response from Great Lakes, Andersson asked for confirmation that his correspondence had been received.

70.     In a response received the same day, the Great Lakes adjuster confirmed receipt and responded, "We have asked our surveyors for comments."

71.     Having still received no response from Great Lakes, on February 19 Andersson asked Great Lakes' adjuster when Great Lakes would be able to return his GPS unit, as well as requesting that it be sent to him at the New Jersey address.

72.     In response to Andersson's inquiry, Great Lakes' adjuster suggested he contact the surveyor.

73.     On February 20, Andersson emails the surveyor and asks that the GPS be returned to him at his New Jersey address.

74.     Later that day, the surveyor responds, informing Andersson for the first time that the GPS was not received from the salvors. Had Andersson been informed before

February 10, during the time the salvor was required to maintain the vessel and its parts for inspection, Andersson could have obtained the GPS from the salvor.

75.     Andersson asked the surveyor if he knew who the salvors were, and whether he had contacted the salvor to get the GPS, and pointed out that, had he known there was a problem obtaining the unit he (Andersson) was in Boca Chica until January 11 and could have helped.

76.     In response to Andersson's questions, Mr. Ball stated, "Beyond the meeting you and I had with the salvors on the beach when I was there, we have had no further involvement with salvors. Once we reported to Underwriters our file was closed."

77.     It was clear from prior correspondence with Great Lakes that the report from the surveyors was sent on December 23 and probably received at Great Lakes by email that day, but in any case no later no later than January 2, when Great Lakes' adjuster informed Andersson that the surveyor concluded the vessel had very little residual value and so Great Lakes would not object to the title being exchanged for salvage services.

78.     Based upon the closure of the surveyor's file on or about December 23, Great Lakes' January 28 representation that the surveyor had been asked for comments to Andersson's response had to be untrue.

79.     On February 27, this declaratory judgment action was filed by an attorney representing Great Lakes in the District of Massachusetts.

80.     Presumably, had the attorney been shown Andersson's response to the reservation of rights letter, which was emailed to Great Lakes on January 16 and informed Great Lakes of his change of address, Great Lakes' counsel would have been aware that

Andersson no longer resided in Massachusetts and would not have incorrectly alleged that residence.

81.     Based upon these facts, it is clear that Great Lakes misrepresented the status of its claims decision to Andersson so that it could proactively file a declaratory judgment action in admiralty, depriving Andersson of his right to a trial by jury, while leading Mr. Andersson to believe no decision had been made and that his response was being considered by the surveyor.

82.     A necessary element to any declaratory judgment action is uncertainty on the part of the insurer regarding its rights.

83.     On March 3, 2020, five days after telling the Court it was uncertain about its rights and obligations and therefore needed a declaratory judgment and two months after it received its surveyor's conclusion that the vessel had little residual value, Great Lakes sent an email to Andersson attaching a denial letter dated March 2 claiming, with certainty, that there was no coverage due to the alleged violation of the navigational and seaworthiness warranties, along with an endorsement rescinding the policy and a copy of the Complaint filed in this action.

## COUNT I:     BREACH OF CONTRACT

84.     Andersson incorporates and realleges those allegations contained in paragraphs 1 through 83.

85.     Great Lakes' policy, #CSRYP/172119, insured Andersson's catamaran, Melody, with the effective dates of December 21, 2018 through December 21, 2019.

86.    The policy provided $365,000.00 in coverage for the hull, as well as several additional coverages including $5,000 in personal property limits and third-party liability coverage including up to $1,000,000 in pollution coverage.

87.    In addition to these enumerated coverages, the policy covered an amount up to 50% of the hull coverage less the deductible (in this case up to $167,900) for "reasonable expenses incurred by you in attempting to minimize or mitigate a loss incurred and covered by this insuring agreement … whether successful or not.  These will be paid in addition to the sum insured under Sections A and F."

88.    Melody was grounded on a manmade breakwater outside of Boca Chica harbor, Dominican Republic, at approximately 6:30 p.m. on December 17, 2019.

89.    The vessel was severely damaged and was determined by Great Lakes' surveyor on or before January 2, 2020 to be a constructive total loss with "little residual value."

90.    Great Lakes refused to take responsibility for the salvage, ultimately agreeing to Andersson's request for permission to transfer title to the vessel in exchange for the salvage because Andersson could not afford to pay the $50,000 demanded by the salvor.

91.    The $50,000 charge for salvage would have been covered by the policy in addition to the hull limits had the claim been paid.

92.    In addition to the value of the salvage which was not paid by Great Lakes, the policy covers additional sue and labor expenses including the retention of attorneys to assure that the contract for salvage required it be done carefully to mitigate any

potential property or environmental damages that could have resulted during the salvage and to limit Andersson's liability exposure if such damage occurred.

93.     Great Lakes denied coverage for the loss, also refusing to pay the $365,000 insured hull value for the loss of Melody.

94.     As the basis for denying coverage, Great Lakes claimed Andersson had violated the navigational warranty contained in the policy during the voyage, voiding the policy.

95.     Further, Great Lakes argued that the warranty of seaworthiness was breached because the VHF radio transmitter broke during the voyage.

96.     There is no basis for either of these arguments.

97.     Andersson plotted a course intended to keep the vessel well within the navigational limits required by the policy, and sailed for 18 to 20 hours on that course with all systems operational and in good sailing conditions.

98.     Conditions worsened after sailing for approximately 18 to 20 hours, and the vessel was forced to take a more northeasterly course instead of turning east.

99.     Even with the deviation caused by bad conditions, it is Andersson's understanding that the vessel was within 150 nautical miles of land during the entirety of the voyage.

100.    Andersson's crew member became ill as conditions worsened significantly.

101.    Concerned both about getting medical attention for his crew and about the safety of the vessel in the rough conditions, Andersson was forced to head in a northerly direction, toward Ponce, Puerto Rico.

102.   This course should not have taken the vessel outside of the navigational limits.

103.   Had the vessel strayed outside of the navigational limits as a result of the change in course to seek medical assistance for the crew member or to save the vessel from dangerous conditions, the breach of the warranty should be excused.

104.   Great Lakes had no right to void the policy.

105.   The loss did not occur outside of the navigational limits, nor was it caused by the vessel being a distance from shore. The loss occurred within sight of shore in an area contained within the policy's navigational limits.

WHEREFORE, Martin Andersson demands this Court enter a judgment in his favor awarding damages against Great Lakes Insurance SE for the constructive total loss of the vessel, security services, the cost of the salvage as if he had not been forced to transfer ownership of the vessel to the salvor, the legal fees he incurred to negotiate and draft a contract for the salvage and transfer of the vessel, interest, attorney's fees and costs in this case, and any other sums found by the Court.

## COUNT II:   EQUITABLE ESTOPPEL

106.   Andersson incorporates and realleges those allegations contained in paragraphs 1 through 83.

107.   The only way to prove Melody's exact course would be with the tracking contained in the memory of the Garmin GPS, which is no longer available due to the negligent or intentional omissions of Great Lakes.

108.    To legitimately void coverage based upon a violation of the navigational warranty, Great Lakes would have had to review the track of the vessel and determined the vessel violated the navigational limits.

109.    Great Lakes' surveyor requested and obtained Mr. Andersson's agreement for him to take the GPS from the salvor, leading Andersson to believe the GPS was in Great Lakes' possession.

110.    During the claims process, Great Lakes was informed on multiple occasions of Mr. Andersson's belief that the GPS was in Great Lakes' possession.

111.    In negotiating the contract with the salvor, Andersson assured that Great Lakes would have 30 days to inspect the vessel and its parts after title was transferred to the salvor.

112.    Throughout that time, neither Great Lakes nor its surveyor ever requested the GPS again or informed Andersson that it did not receive the GPS from the salvor.

113.    Great Lakes was aware of the sale of the wreck and its contents to the salvor and knew that the salvor only had to keep them available until February 10.

114.    Great Lakes waited to inform Andersson, through its surveyor, that it never received the GPS until it was too late to obtain the GPS from the salvor.

115.    Due to Great Lakes' and/or its surveyors delays, omissions, and possibly intentional misrepresentations, Andersson was led to believe the GPS was safely in the hands of the surveyor or the insurer, and as a result was prevented from taking possession of it or safeguarding its data.

116.    Shortly after informing Andersson that it did not have the GPS unit, Great Lakes issued an endorsement voiding the policy from its inception based upon the alleged violation of the navigational warranty.

117.    Having deprived Andersson of access to the best evidence of the vessel's course, Great Lakes should not now be allowed to benefit by asserting that the policy is void due to a violation of the navigational warranty.

WHEREFORE, Martin Andersson hereby requests that this Court exercise its equitable power of estoppel to bar Great Lakes from voiding its policy or from denying coverage based upon the alleged breach of the navigational warranty.

### COUNT III:   VIOLATION OF MA UNFAIR TRADE PRACTICES ACT

118.    Andersson incorporates and realleges those allegations contained in paragraphs 1 through 83.

119.    Pursuant to Mass. Gen. Laws. ch. 176D § 3(9), the following acts or omissions constitute an unfair claim settlement practice:

> (a) misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
> (b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;
> (c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
> (d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
> (e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
> (f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear …

120.    Through its own or its surveyor's acts or omissions, Great Lakes failed to obtain or inspect the Garmin GPS unit from the vessel, and in so doing failed to look at

the most basic evidence of the course taken by the vessel. That in itself constituted a violation of subsection (d).

121.   Great Lakes failed to act promptly upon communications, particularly Mr. Andersson's January 16 correspondence responding to Great Lakes' reservation of rights letter, violating subsection (b) and resulting in, among other things, the loss of access to the GPS.

122.   Great Lakes failed to affirm or deny the claim promptly after the surveyor's report was received on or about January 2, instead misrepresenting the status of the claim to Andersson to allow time for its attorneys to file suit before informing Mr. Andersson of its decision to deny the claim.

123.   On several occasions after having been asked about the need to submit a claim form, Great Lakes' representative responded that he did not need to worry about the claim form, violating subsection (e).

124.   In addition to the covered damages that were not paid by Great Lakes, and because of Great Lakes' unfair and deceptive acts, Andersson was forced to stay in the Dominican Republic from the night of the grounding on December 17, 2019 until January 11, when he was able to execute the salvage contract and transfer title to the salvor.

125.   This lengthy stay resulted in hotel and meal and incidental expenses that he would not otherwise have incurred.

126.   Andersson had to retain counsel both in the United States and in the Dominican Republic to assist him in protecting his rights as he was "acting as a prudent uninsured" due to Great Lakes' delay and ultimate refusal to acknowledge coverage.

127.    Pursuant to Mass. Gen. Laws ch. 93A § 9(3A), Great Lakes violations of Mass. Gen. Laws. ch. 176D § 3(9) entitle Andersson to a claim for money damages, including double or treble damages, attorneys' fees and costs incurred in connection with this action.

WHEREFORE, Martin Andersson hereby demands judgment be entered in his favor awarding the insured value of Melody, the cost of security, the cost of attorney's fees related to negotiating the salvage contract, the value of the salvage and any other covered losses, his hotel, meal and incidental expenses during the time he was forced to stay in the Dominican Republic, interest, attorney's fees and costs incurred in this action, and double or treble damages as allowed by Mass. Gen. Laws ch. 93A § 9(3A), and any other sums found by the Court.

## JURY DEMAND

Martin Andersson respectfully requests a trial by jury on Counts I and III of the Counterclaim.

Respectfully Submitted,
Martin Andersson
By his attorney,


 _/s/ Harvey B. Heafitz_____
Harvey B. Heafitz, Esq., BBO# 227400
Davagian Grillo & Semple LLP
365 Boston Post Road, Suite 200
Sudbury, MA 01778
Telephone:  (978) 443-3773
Email: harvey@dgslawllp.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this **12th day of May, 2020**, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing is being served this day upon all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

_/s/ Harvey B. Heafitz_____
Harvey B. Heafitz, Esq.
BBO# 227400