UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
IN ADMIRALTY

GREAT LAKES INSURANCE SE,      :
                                    :     **Case No. 4:20-cv-40020-DHH**
                                    :
      **Plaintiff,**                 :
                                    :
**vs.**                                    :
                                    :
**MARTIN ANDERSSON**        :
                                    :
      **Defendant.**             :
_____:

## GREAT LAKES INSURANCE SE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT UNDER FED.R.CIV.P 56

COMES NOW the Plaintiff, GREAT LAKES INSURANCE SE, by and through its undersigned counsel, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1 of the United States District Court for the District of Massachusetts, and for its memorandum of law in support of its motion for summary judgment, respectfully states as follows:

### Statement of Undisputed Facts

On November 15, 2018, Defendant MARTIN ANDERSSON (hereinafter "ANDERSSON") submitted a request for a quote to Concept Special Risks Ltd., the underwriting and claims handling agent for Plaintiff GREAT LAKES INSURANCE SE (hereinafter "GLI"). The Request for Quote is attached hereto as Exhibit 1. The Request For Quote disclosed that ANDERSSON was seeking coverage to operate his vessel in Florida, the Bahamas, and the Caribbean. Ex 1, p. 2 (Andersson_UF000002).[1] On December 21, 2018, ANDERSSON submitted to Concept an executed application. The Application is attached hereto as Exhibit 2. The

---

[1] The Dominican Republic is in the Caribbean. *The New Oxford American Dictionary* (Oxford University Press, 2005).

Application disclosed that ANDERSSON was seeking coverage to operate his vessel in Florida, the Bahamas, and the Caribbean, as well as Grenada in the summer.   Ex 2, p. 4 (Andersson_UF000054).

On December 21, 2018, in reliance on the material facts disclosed by ANDERSSON in the course of applying, GLI issued to ANDERSSON a policy of marine insurance bearing number CSRYP/172119 (hereinafter "the Policy").  The Policy is attached hereto as Exhibit 3.  The Policy afforded $365,000.00 in first-party property damage coverage for the vessel named "Melody," a 2000 47' Catana with Yanmar twin 55hp engines (hereinafter "the Vessel").   Ex 3, p. 1 (Andersson_UF000083).

The Policy stated: "**Navigational Limits:** Warranted that the Scheduled Vessel is confined to Florida, the Bahamas, and the Caribbean Sea…"  Ex 3, p. 2 (Andersson_UF000084).

The Policy stated: "**1. Definitions**… k. 'Seaworthy' means fit for the Scheduled Vessel's intended purpose.  Seaworthiness applies not only to the physical condition of the hull, but to all its parts, equipment and gear and includes the responsibility of assigning an adequate crew.  For the Scheduled Vessel to be seaworthy, it and its crew must be reasonably proper and suitable for its intended purpose."  Ex 3, p. 3 (Andersson_UF000085).

The Policy stated: "**9. General Conditions & Warranties**… b. It is warranted that the Scheduled Vessel is seaworthy at all times during the duration of this insuring agreement.  Breach of this warranty will void this insuring agreement from its inception."   Ex 3, p. 12 (Andersson_UF000094).

The Policy stated: "**9. General Conditions & Warranties**… t. Where any term herein is referred to as a 'warranty' or where any reference is made herein to the word 'warranted', the term shall be deemed a warranty and regardless of whether the same expressly provides that any breach

will void this insuring agreement from inception, it is hereby agreed that any such breach will void this policy from inception."  Ex 3, p. 14 (Andersson_UF000096).

The Policy stated: "**11. Service of Suit, Choice Of Law And Forum**… **It is hereby agreed that any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice but where no such well established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York.**"  Ex 3, p. 17 (Andersson_UF000099) [emphasis in original].

On December 14, 2019, the Vessel departed Aruba bound for St. Maarten.  ECF no. 9, p. 6.  Deposition of Martin Andersson, attached hereto as Exhibit 4, p. 22.

On December 17, 2019, the Vessel ran aground on the breakwater in the harbor of Boca Chica in the Dominican Republic.  Email from ANDERSSON to Samantha Thomas at Concept, December 18, 2019, attached hereto as Exhibit 5 (Andersson_CF000004).

In his deposition, ANDERSSON testified that, during the Vessel's final voyage from Aruba to the Dominican Republic, he had on board paper charts for the Leeward Islands, the Windward Islands, and Aruba.  Ex 4, p. 22.[2]

At the inception of the Policy and at the time of the grounding, the Vessel had on board two functioning GPS devices, one manufactured by Garmin and the other manufactured by Raymarine.  Ex 4, p. 24.

Following the report of the grounding, Concept appointed Andrew Ball (hereinafter "Ball") of Caribbean Marine Surveyors Ltd. to investigate the causes and circumstances of the loss.  Email to Andrew Ball attached hereto as Exhibit 6 (Andersson_CF000008).

---

[2] The Dominican Republic is not Aruba, nor is it part of either the Leeward Islands or the Windward Islands.  *The New Oxford American Dictionary*.

On December 23, 2019, Ball sent a report to Concept detailing the facts uncovered in his investigation. Ball's report of December 23, 2019 is attached hereto as Exhibit 7. Ball reported Andersson's verbal account of the grounding, which included the statement that "[t]he breakwater was not shown on the electronic charts onboard" and "[t]here were no paper charts on board." Ex 7, p. 3 (Andersson_CF000040).[3] However, the current electronic charts available at that time, on both the Garmin and the Raymarine, showed a breakwater at the entrance to the harbor at Boca Chica. Ex 7, pp. 4-5 (Andersson_CF000041-42.).

In April 2021, the Garmin and the Raymarine were examined by ANDERSSON's expert, Michael Cooley (hereinafter "Cooley"). Report of Michael Cooley, attached hereto as Exhibit 8, p. 1, Deposition of Michael Cooley, attached hereto as Exhibit 9, p. 14. The Garmin contained a supplemental map chip for the Caribbean which was current as of 2015. Ex 8, p. 4, Ex 9, p. 17, picture taken by Cooley showing the Garmin's display, attached hereto as Exhibit 10. Unlike newer charts available in December 2019, the supplemental map chip in the Garmin, only current as of 2015, did not show a breakwater in the harbor of Boca Chica. Ex 8, p. 4, Ex 9, p. 26, Ex 10. The Raymarine contained no supplemental charts, provided no detail for the Dominican Republic, did not show a breakwater in the harbor at Boca Chica. Ex 8, p. 5, Ex 9, p. 28.

**Memorandum of Law**

a. Standard for Granting Summary Judgment

"Summary judgment is appropriate when there are no genuinely disputed material facts and the moving party is entitled to judgment as matter of law." _New Hampshire Ins. Co. v. Dagnone_, 475 F.3d 35, 37; 2007 A.M.C. 334 (1st Cir.2007) (affirming the district court's award of summary judgment to the marine insurer based on the vessel owner's breach of a lay-up

---

[3] As alleged in ANDERSSON's counterclaim, the breakwater on which the Vessel ran aground was not identified on the Vessel's Garmin or Raymarine. ECF no. 9, p. 9.

warranty).  "A fact is material if it 'might affect the outcome of the suit' under governing law[.]" *Markel American Ins. Co. v. Diaz-Santiago*, 674 F.3d 21; 2013 A.M.C. 2303 (1st Cir.2012), *quoting*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the burden of proving it is entitled to summary judgment.  *Atlantic Specialty Insurance Company v. Karl's Boat Shop, Inc.*, 480 F.Supp.3d 322, 329 (D.Mass.2020) (awarding summary judgment to a marine insurer based on the insured's breach of the federal admiralty law duty of *uberrimae fidei*), *Northern Assur. Co. of America v. Keefe*, 845 F.Supp.2d 406, 411; 2012 A.M.C. 958 (D.Mass.2012) (awarding summary judgment to a marine insurer based on a passenger exclusion), *St. Paul Fire and Marine Ins. Co. v. Halifax Trawlers, Inc.*, 495 F.Supp.2d 232, 236; 2007 A.M.C. 2183 (D.Mass.2007) (awarding summary judgment to a marine insurer based on the insured's breach of the federal admiralty law duty of *uberrimae fidei*), *Underwriters at Lloyd's v. LaBarca*, 106 F.Supp.2d 205 (D.P.R.2000) (awarding summary judgment to the marine insurer based on the insured's breach of the second implied warranty of seaworthiness) *aff'd*, *LaBarca*, *infra*.  Once the moving party carries its burden, the non-moving party has the burden of producing evidence creating a "genuine issue" of dispute.  *Id*.

Summary judgment is appropriate in the present matter because, as detailed above, there is absolutely no dispute as to the only dispositive facts:

(1) At the inception of the Policy and at the time of the loss, ANDERSSON's vessel did not have paper charts of the entire Caribbean Sea and did not have paper charts of the Dominican Republic.

(2) At the inception of the Policy and at the time of the loss, ANDERSSON's vessel had only out-of-date electronic charts.

**Memorandum of Law – Lack of Updated Charts Rendered the Vessel Unseaworthy**

ANDERSSON's vessel was unseaworthy, meaning that it was unfit for its intended use, at the inception of the Policy and at the time of the grounding, because it had no paper charts of the Dominican Republic and did not have up-to-date electronic charts. ANDERSSON's vessel never had any charts showing the breakwater in Boca Chica. Ex 8, p. 4, Ex 9, pp. 26-28, Ex 10. These deficiencies rendered the Vessel unfit for its intended use at the inception of the Policy and at the time of the loss.

Under federal admiralty law, every policy of marine insurance contains an implicit warranty that the insured vessel is seaworthy at the inception of the policy. _Employers Ins. of Wausau v. Occidental Petroleum Corp._, 978 F.2d 1422; 1993 A.M.C. 1460 (5th Cir.1992). "[F]ederal maritime law implies two warranties of seaworthiness in a time hull insurance policy. The first of these warranties—the implied warranty of seaworthiness at the inception of the policy—is absolute in nature. The second one, which applies only after the policy attaches, is a modified, negative warranty, under which the insured promises not to knowingly send a vessel to sea in an unseaworthy condition. Although the second implied warranty of seaworthiness requires knowledge on the part of the insured, the first does not. The insured breaches this first warranty if the vessel is in fact unseaworthy when the policy becomes effective." _Id_, at 1431-32, _McAdam v. State Nat. Ins. Co., Inc._, 28 F.Supp.3d 1110, 1122 (S.D.Cal.2014), _Axis Reinsurance Co. v. Resmondo_, 2009 A.M.C. 2597 (M.D.Fla.2009), _Royal Indem. Co. v. Deep Sea Intern._, 619 F.Supp.2d 14, 26; 2007 A.M.C. 1872 (S.D.N.Y.2007), _The Connecticut Indem. Co. v. Palivoda_, 2005 A.M.C. 2047 (M.D.Fla.2005), _Certain Underwriters at Lloyd's, London Subscribing to Policy 200-451-8464 v. Johnston_, 124 F.Supp.2d 763, 771; 1999 A.M.C. 1452 (D.P.R.1999), _Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)_, 952 F.Supp. 1046, 1068; 1997 A.M.C. 1099 (S.D.N.Y.1997), _aff'd_, 134 F.3d 103; 1998 A.M.C. 964 (2d.Cir.1998). To show a breach of

the first implied warranty of seaworthiness, there is no need to show that the insured is at fault for the unseaworthy condition or that the unseaworthy condition played any role whatsoever in the loss.  _Id_.  Under the first implied warranty of seaworthiness, if a vessel is unseaworthy at the inception of the policy of marine insurance, coverage is absolutely barred.  _Id_.

In addition, the Policy also contains its own express warranty of continuing seaworthiness. The Policy states, "It is warranted that the Scheduled Vessel is seaworthy at all times during the duration of this insuring agreement.  Breach of this warranty will void this insuring agreement from its inception."  Ex 3, p. 12.  By it terms, breaching this express warranty of seaworthiness does not require GLI to show that the ANDERSSON was at fault for the unseaworthy condition or that the unseaworthy condition caused the loss.  _Id_.  Under the Policy's express warranty of seaworthiness, if ANDERSSON's vessel was unseaworthy, coverage is absolutely barred.  _Id_.

Based on the express and implied seaworthiness warranties, the only question before this Court is this: did the total lack of updated, accurate charts render ANDERSSON's vessel unseaworthy at any time?  If the answer is "yes," then coverage is absolutely barred under the express and implied terms of the Policy.

Under federal admiralty law, the determination of whether a vessel is seaworthy is a question of law which for the court to decide.  For instance, the case of _Martinez v. United States_ arose out of an injury suffered by a seaman when the vessel parted from her moorings.  705 F.2d 658; 1983 A.M.C. 1925 (2d Cir.1983).  In order to determine the condition of the vessel, the district court considered evidence pertaining the strength of the current, the vessel's equipment, and the emergency procedures of the crew.  _Id_, at 660.  Based on these facts, the district court held that the vessel was not unseaworthy.  _Id_.  On appeal, the Second Circuit held that the district court applied

the wrong legal standard for seaworthiness.  *Id*.  Applying the correct standard, the Second Circuit reversed the district court and held that the vessel was unseaworthy as a matter of law.  *Id*.

For precisely this reason, courts have rightly rejected attempts by litigants to usurp the court's role and to submit expert opinions as to seaworthiness.  For instance, in the case of *Thalji v. Teco Barge Line*, which concerned an injured seaman, the Western District of Kentucky refused to allow an expert to opine that "[t]he crew was provided with a reasonably safe and seaworthy place to work."  2007 WL 7702719, p. 2 (W.D.Ky.2007).  The court held that the admission of such an opinion "would permit [the expert] to give a legal conclusion."  *Id*.  Similarly, in the case of *Newill v. Campbell Transportation Company, Inc.*, the Western District of Pennsylvania considered this issue in a Jones Act case.  2015 WL 222332 (W.D.Pa.2015).  When the defendant attempted to present the opinion of an expert that the barge was a "seaworthy vessel," the district court granted the plaintiff's motion to strike the expert's opinion and held that stating the conclusion that the vessel was seaworthy "cross[ed] the line into an impermissible legal conclusion."  *Id*, at p. 2.  To give another example, the case of *Francois Diamond Offshore Company* concerned a crane operator who was injured when he fell through a missing section of gangway.  2013 WL 654635 (E.D.La.2013).  Before trial, the district court considered whether to admit the opinion of the operator's expert that the vessel was unseaworthy.  *Id*, at p. 2.  The district court allowed the expert to present testimony as to industry standards and the defendant's compliance with those standards.  *Id*.  However, the district court did not allow the expert to state any opinion as to whether the vessel was or was not seaworthy because such testimony would be an impermissible legal conclusion.  *Id*.  These cases demonstrate that it is an invasion of the court's prerogative for an expert to opine on the seaworthiness of a vessel.  *Id*.

Since seaworthiness is a legal issue, and since it is an issue not appropriate for expert resolution, it is proper to resolve the question of seaworthiness on summary judgment.  This is precisely what happened in the case of _Underwriters at Lloyd's v. Labarca_, 260 F.3d 3; 2001 A.M.C. 2409 (1st Cir.2001).  _Labarca_ was a marine insurance coverage dispute arising out of vessel which sank at its dock.  _Id_, at 5.  On summary judgment, the facts were undisputed that the vessel sank due to the intrusion of water through an uncapped hose in the vessel's air conditioner. _Id_, at 6.  Therefore, the district court gave summary judgment to the marine insurer and held that a vessel in that condition was unseaworthy as a matter of law.  _Id_.  On appeal, the First Circuit affirmed the ruling of the district court and held that a vessel which was left with an uncapped hose was temporarily unfit for its intended purpose and was therefore unseaworthy as a matter of law. _Id_, at 8.

Turning to the facts directly at issue in the present matter, the federal courts have long held that a vessel which lacks adequate, up-to-date charts is unseaworthy as a matter of law.  _Union Oil Company of California v. M/V Point Dover_, 756 F.2d 1223, 1229 (5th Cir.1985), _Director General of India Supply Mission for and on Behalf of President of Union of India v. Steamship Maru_, 459 F.2d 1370, 1372; 1972 A.M.C. 1694 (2d Cir.1972).  This rule has been recognized as far back as 1937.  _The Maria_, 91 F.2d 819; 1937 A.M.C. 934 (4th Cir.1937).  _The Maria_ began exactly like the present case, with a vessel which became stranded on shoals off the mouth of Cape Fear.  _Id_, at 820.  The trial court found that the vessel had not been equipped with accurate sailing charts or other navigational equipment correctly setting out the position of a lightship and a buoy marking the shoals.  _Id_.  On appeal, the Fourth Circuit wrote, "Our view of the law, now that the point has been definitely raised, is that charts, light lists, and similar navigational data are essential

equipment for the safe navigation of a ship, ***that she is unseaworthy without them***, and it is the duty of her owner to supply them." *Id*, at 824 [emphasis added].

The next year, the Second Circuit applied this rule in *The W.W. Bruce*, 94 F.2d 834; 1938 A.M.C. 232 (2d Cir.1938).  *The W.W. Bruce* began when two vessels collided in Craighill Channel in Chesapeake Bay.  *Id*, at 835.  As part of the ensuing litigation, the owner of one of the vessels sought indemnification from the owner of the cargo being carried.  *Id*, at 836.  Such indemnification was conditioned on a showing that the vessel was seaworthy.  *Id*.  However, the established facts showed that, when the vessel departed, it did not have an up-to-date chart which accurately showed the positions of the channel buoys.  *Id*.  Therefore, since the vessel lacked the necessary up-to-date charts, the Second Circuit held that the vessel was unseaworthy, and that the vessel owner could not seek indemnification from the owner of the cargo.  *Id*, at 837.

Two years later, this rule was repeated by the District of Oregon in *The Iowa*, which concerned a vessel that ran aground on Peacock Spit at the mouth of the Columbia River.  34 F.Supp. 843; 1941 A.M.C. 111 (D.Or.1940).  The facts found at trial established that, even though the master of the vessel had many years of experience navigating these waters, the vessel remained unseaworthy because it lacked up-to-date charts showing the river's aids and hazards to navigation. *Id*, at 847.

In 1972, this issue arose in another grounding which occurred in the channel of Freeport, Grand Bahama Island.  *Steamship Maru*, *supra*.  It was established at trial that the vessel's charts were almost twenty years old and inaccurate.  *Id*, at 1372.  Therefore, the Second Circuit held that the vessel was unseaworthy.  *Id*.

The next year, the Western District of Kentucky applied this rule in a subrogation case arising out of an allision on the Ohio River.  *Protection Maritime Ins. Co. Ltd., of London, England*

_v. U.S._, 368 F.Supp. 690 (W.D.Ky.1973).  The vessel at issue was a tug that was pushing barges down the Ohio River when it struck an underwater mooring cell.  _Id_, at 690-91.  The evidence at trial showed that the owner of the vessel had received a "Notice of Navigation Interests" in 1969 identifying the underwater mooring cells.  _Id_, at 691.  However, this notice was never placed aboard the vessel.  _Id_.  The only charts aboard the vessel at the time of the allision were seven years old.  _Id_.  The insurer of the vessel brought suit against the United States to recover as subrogee of the vessel's owner.  _Id_.  However, the district court held that the insurer could not recover because the absence of current, accurate charts rendered the vessel unseaworthy.  _Id_, at 692.

The District of Puerto Rico reached the same conclusion in 1978 in another case involving a vessel which lost its way and "ran out of water[.]"  _Commonwealth of Puerto Rico v. The S.S. Zoe Colocotroni_, 456 F.Supp. 1327, 1332; 1979 A.M.C. 21 (D.P.R.1978).  Among several variables at issue, the district court held that the vessel was unseaworthy due to the lack of paper charts of the area where the vessel was navigating.  _Id_, at 1333, _aff'd in part_, _vacated in part_, 682 F.2d 652, 1981 A.M.C. 2185 (1st Cir.1980), _cert. denied_, 450 U.S. 912, 101; 1981 A.M.C. 2099 (1981).

In 1980, this issue was addressed by the Southern District of New York in a case involving a cargo vessel that departed Venezuela on December 5 bound for Massachusetts.  _In the Matter of Complaint of The Thebes Shipping Inc._, 486 F.Supp. 436; 1908 A.M.C. 1686 (S.D.N.Y.1980).  When the vessel departed Venezuela, it was carrying a chart of the waters surrounding Nantucket which was issued in November 1976.  _Id_, at 441-42.  The November 1976 chart showed that the currents south of Nantucket Lightship generally ran west to east.  _Id_, at 458.  However, the December 1976 chart showed that the currents south of Nantucket Lightship generally ran east to

west.  *Id*.  Based on fact, a chart which was a single month out of date, the district court found that the vessel was unseaworthy, and that the vessel owner was therefore not entitled to limitation of liability.  *Id*.

This issue arose again the next year in the case of *In the Matter of Complaint of Delphinus Maritima*, a case which concerned a vessel overloaded with cargo.  523 F.Supp. 583; 1981 A.M.C. 2362 (S.D.N.Y.1981).  The last voyage of the *M.V. Mari Boeing* began when the vessel departed from Houston, intending to stop at various East Coast ports before sailing to the Middle East.  *Id*, at 586.  Shortly after departing Newport News, VA, some of the cargo on deck was seen to move, and the vessel altered course to Bermuda to rearrange the cargo.  *Id*.  The next morning, the vessel ran aground on a coral reef off the northern coast of Bermuda.  *Id*.  At the time of the grounding, there was no large-scale map of the waters surrounding Bermuda.  *Id*, at 590.  Therefore, the Southern District of New York held that "[t]he vessel was unseaworthy in that it failed to have a large scale map of Bermuda on board."  *Id*, at 594.

Similarly, the case of *Traylor Bros., Inc. v. Tug Robert Greene* arose out of allision between a tug, which was pulling barges, and a cofferdam on the Mississippi River.  1986 WL 12229 (E.D.La.1986).  The tug's chart was three years old and had not been updated to show the cofferdam.  *Id*.  Therefore, the Eastern District of Louisiana held that "the M/V ROBERT GREENE was unseaworthy because of its lack of updated charts."  *Id*, at p. 4, *citing*, *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140; 1971 A.M.C. 2131 (5th Cir.1971).

The Eastern District of Louisiana issued the same ruling in the case of *In re TT Boat Corp.*, 1999 A.M.C. 2766; 1999 WL 223165 (E.D.La.1999).  *TT Boat Corp*. arose out of a tug which allided with a fixed oil drilling platform.  *Id*, at p. 1.  At the time of the allision, the vessel was only equipped with an out-of-date version of Chart 11358, which did not show the fixed oil drilling

platform.  *Id*, at p. 3.   However, the then current version of Chart 11358 did show the fixed oil drilling platform.  *Id*.   Therefore, the Eastern District of Louisiana held that, "[w]ithout a current 11358 on board, the GULF CAJUN was unseaworthy when it began its voyage."  *Id*, at p. 5.

Finally, the same conclusion was reached in the case of *Matter of Complaint of Supreme Towing Co., Inc.*, 2010 WL 11561150 (E.D.La.2010).  *Supreme Towing* began with a tug, the M/V CAPTAIN BRENNAN, which was equipped with a paper chart issued in 1982 and an electronic chart in the vessel's GPS system issued in 2004.  *Id*, at p. 3.   Just like ANDERSSON's GPS in the present matter, the GPS aboard the M/V CAPTAIN BRENNAN was never updated with current charts.  *Id*.   When the vessel struck an oil well, the owner of the vessel filed a limitation of liability petition in the federal court.  *Id*.   At the time of the allision, the vessel's GPS chart was three years out of date.  *Id*.   Based on the undisputed evidence that the M/V CAPTAIN BRENNAN had an outdated paper chart and an outdated GPS chart, the Eastern District of Louisiana denied the limitation petition because these deficiencies rendered the tug unseaworthy.  *Id*, at p. 22.

In the light of this clear caselaw, the present matter is entirely resolved by these indisputable facts:

1.  The electronic chart in the Garmin had not been updated since 2015 and was four years out of date.

2.  The Raymarine contained no detailed charts of the Dominican Republic.

3.  ANDERSSON's vessel had no paper charts for the Dominican Republic.

Applied to the present matter, the inescapable conclusion is that ANDERSSON's vessel was not fit for its intended purposes; that is, to navigate in the Caribbean.

Finally, one other fact should be noted.  The caselaw above makes clear that, under the first implied warranty of seaworthiness, as well as the Policy's express warranty of seaworthiness, fault

and causation are irrelevant.  *See cases analyzed supra*.  It makes no difference whatsoever whether ANDERSSON is, or is not, at fault for failing to have updated charts.  It makes no difference whatsoever whether the loss in the present case might, or might not, be attributable to the Vessel's lack of updated charts.  *Id*.  All that matters is that, at the inception of the Policy and at the time of the loss, the Vessel had inadequate paper charts and had only out-of-date electronic charts.  A vessel so inadequately equipped is unseaworthy.

WHEREFORE, GLI asks that this Court find that ANDERSSON's vessel was unseaworthy at the inception of the Policy and at the time of the loss and that the Policy is void from its inception, and award all such further relief as may be appropriate in the premises.


Dated: June 3, 2022
Brookline, Massachusetts

GOLDMAN & HELLMAN
Attorneys for Plaintiff
233 Harvard Street
Suite 211
Brookline, MA 02446
Tel (617) 566-4200
Cel (617) 671-8657
Fax (617) 566-4292

By:        /s/ Michael I. Goldman
           MICHAEL I. GOLDMAN ESQ.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Court using the CM/ECF System which will provide and electronic notice to all counsel, of record.

Dated: June 3, 2022
Brookline, Massachusetts

GOLDMAN & HELLMAN
Attorneys for Plaintiff
233 Harvard Street
Suite 211
Brookline, MA 02446
Tel (617) 566-4200
Cel (617) 671-8657
Fax (617) 566-4292

By: _____/s/ Michael I. Goldman_____
MICHAEL I. GOLDMAN ESQ.