# CARIBBEAN ADJUSTERS AND MARINE SURVEYORS LTD.

BVI OFFICE - NANNY CAY, TORTOLA  
+1 (284) 346-2091  
info@caribsurveyors.com  

FAX: +1 (800) 851-2754  
WWW.CARIBSURVEYORS.COM  

GRENADA OFFICE - CLARKE'S COURT  
+1 (473) 457-1576  
grenada@caribsurveyors.com  

Monday December 23rd, 2019

Underwriters Concerned  
Concept Special Risks  
Unity House  
2 Station Court, Station Road  
Leeds, LS20 8EY, UK

## DAMAGE DUE TO STRANDING

| | |
|---|---|
| Vessel name: | Melody |
| Registered port: | St John, USVI |
| Assured: | Martin Andersson |
| Hull identification number: | CAT47120B000 |
| Vessel description: | 2000 model Catana 471 FRP sloop rigged catamaran with twin auxiliary diesel engines. Approximate dimensions 47'L x 25'B x 5'D (measurements not taken). |
| Policy #: | CSRYP/172119 |
| Status: | Recommended to Underwriters as a Constructive Total Loss pending coverage. |

This is to certify that the undersigned marine surveyor did attend the subject vessel on Saturday December 21st, 2019 where stranded on a breakwater in Boca Chica, Dominican Republic in order to determine the extent of damages due to stranding and make relevant recommendations to Underwriters.

**INCIDENT**

At some time between approximately 1700 and 1900 on Tuesday December 16th, 2019, the vessel Melody struck a breakwater outside Boca Chica while waiting for guided assistance into the harbor. The vessel was subsequently stranded on the breakwater.



**MASTER'S PROTEST**

The following verbal statement was taken from the reported Master of the vessel on December 21st, 2019 in a café in Boca Chica, Dominican Republic. At the time of this report, it has not been verified in writing, although the same has been requested.

It is reported that:

The vessel departed Varadero, Aruba at approximately 1730 on Saturday December 14th, 2019. There were two people on board, Martin Andersson (Master) and Ronald Naranja (crew). The wind was approximately 18kts out of the east and the seas were approximately 4ft.

The vessel motored east towards the lighthouse at the exit of Varadero and once around the point made a northeasterly heading with an intended destination and course to steer of 050° to St Martin.

Shortly after departure, it was found that the vessel was not making good way to windward and that the crew was becoming seasick. The course of the vessel was adjusted to a more northerly course to Ponce, Puerto Rico.

Although the weather was not forecast to deteriorate, the winds picked up to an estimated 22-24kts with a heavier swell on Sunday the 15th. The crew member, Ronald Naranja, was incapacitated due to seasickness. During Sunday the 15th and Monday the 16th, the wind picked up to approximately 25kts with gusts to 30kts during squalls. The vessel was sailed using a partially furled headsail and no mainsail.

The generator was working on Saturday, Sunday, and Monday, however on Tuesday it would not start.

On Tuesday, the vessel arrived offshore of Santo Domingo. Course corrections were required to head further west in order to maintain as comfortable conditions as were possible. Here, it was discovered that the VHF radio on board would receive transmissions, but could not transmit.

The Master made a telephone call using his satellite telephone to the broker which sold him the vessel in order to determine the best port of call for repair. The time was now approximately 1200 on Tuesday December 16th. The broker recommended that he head to Boca Chica as it was the closest marine capable of performing these repairs and the Master agreed. The Master then used the satellite telephone to contact the marina in Boca Chica an arrange for slippage with an English-speaking person. At this time it was also agreed that someone from the marina would be present to guide the vessel in, as there were no local cruising guides on board the vessel.

At just after 1700 on December 16th, the vessel arrived offshore from Boca Chica. At this point the crewmember was beginning to feel better as the vessel had been in lee (and calmer seas) of the Dominican Republic for some time. It was beginning to get dark. Repeated phone calls to the marina received no answer. When someone finally answered, they did not speak English. The crew of the vessel did not speak Spanish. Although it was understood that someone was on the way to guide the vessel in, nobody was seen.

The vessel was moving at approximately 1-2kts while maintaining what was thought to be a safe distance from the shore while looking for entrance lights.

Suddenly, the depth beneath the vessel rapidly decreased as per the depth sounder. Both engines were placed in full power astern. The vessel was taken onto a low-lying



breakwater by the swell. The breakwater was not shown on the electronic charts on board. There were no paper charts on board.

The vessel was stranded. The Master sent an SOS signal on his Iridium Go device. He also sent SOS signals to the shore via morse code with a light. The Master spoke to Iridium's SOS center via telephone, but was not provided with much assistance.

Alex Cottier, a local dive shop operator (Tropical Sea Divers) waded out to the vessel. The area behind the breakwater is a maximum of approximately 5' deep, however it spans at least 200'. At this point, the Master agreed to evacuate the vessel. He and his crew waded ashore and were greeted by officers from the local Navy and Police forces. The Navy took a statement and the Police walked the crew to a hotel. Two security guards were arranged to stay on board by the Master to prevent looting as of the night of the incident.

One Wednesday December 17th, 2019 the Master and crew cleared immigration in the Boca Chica. They met with local salvors and notified insurers of their intent to make a claim.





**GEOGRAPHICAL AREA**



Satellite view of breakwater. Red arrow denoting approximate location of stranded vessel. The entrance to the harbor is on the far left.



Breakwater shown on the latest Navionics chart data





>2 year old chart data taken from our company vessel.

The breakwater is unlit at night.



**COMMENTS REGARDING INCIDENT**

While we would essentially consider this to be a case of navigational error, the crippled communications and lack of adequate charts on board has brought the issue of potential seaworthiness into question. We also question the original course plotted and the coverage of the policy.

COMMUNICATIONS

The lack of a functional VHF radio on board the vessel is clearly listed as a contributing factor to this loss.

It is reported that the VHF radio was working when the vessel departed Aruba, however it was discovered upon arrival in Santo Domingo that the radio would receive but not transmit. This is common with an antenna fault, or the like and it is quite possible that the seas encountered along the way may have jostled the antenna or associated wiring causing this fault.

With no reported handheld backup unit, we would have considered this to be a condition that made the vessel potentially unseaworthy, however when supplemented by the satellite and cellular telephones on board, we would only consider this to be a factor in ship to ship communications and not ship to shore communications.

NAVIGATIONAL IMPAIRMENT

The area of most concern with regards to potential seaworthiness is the procedure into a port in the dark with no local paper charts, no local cruising guide, no local knowledge, and what appear to be either defective, outdated, or absent electronic charts. The Master reports that the breakwater did not show up on the Raymarine Chartplotter. However, we have compared both current Raymarine charts and ones that are over two years old. The breakwater is clearly shown on both, as well as the entrance and marks to the harbour. We have asked that salvors take possession of the GPS unit and send it to us for further testing and determination of this fact.

While a local guide was requested, one reportedly did not arrive. We see this as an attempt to mitigate the risk associated with the lack of knowledge and information available. We understand that this was not the intended original port of destination. We maintain, however, that there is no reason that the vessel could not have stood offshore until the arrival of said guide, or daylight, when conditions would have been safer to proceed into the harbor.

We also estimate that with the clear conditions, breaking seas, and extensive lights in the tourist area on shore that the breakwater should have been clearly visible.

CREW IMPAIRMENT

The crew was reported to have been seasick shortly after leaving Aruba and the situation is reported to have continually worsened until arrival at Santo Domingo. We estimate that the crew would have been severely fatigued and subsequently ineffective on arrival in Santo Domingo. We question the decision not to turn back long before arrival in Santo Domingo, but we also question the decision to proceed beyond Santo Domingo to Boca Chica.



COVERAGE AREA

We note that the policy states that coverage is based on the vessel not exceeding 150NM offshore. A direct course from Aruba to St Martin would take the vessel far beyond these bounds, and proceeding further west to Santo Domingo would do the same. Although the initial loss did not happen 150NM from shore, the voyage is arguably outside the bounds of the policy as the vessel did not make port prior to the loss.

CAUSE OF LOSS

Navigational error potentially caused by unseaworthy condition due to lack of geographical information.

SALVAGE

See our comments on estimated cost of repair below. We recommend that Underwriters consider this vessel as a Constructive Total Loss. In the event that coverage applies, we recommend that removal of wreck is considered over salvage.

Local salvors had offered a salvage price of $100,000.00USD. Initially, this was thought to be high and unreasonable. However, after examining the harsh landscape and environmental conditions, as well as the coral nursery to leeward of the stranding site, we understand that salvors' plan to use a hydraulic trailer to preserve and remove the vessel from the breakwater is reasonable based on the conditions present and equipment available. We still believe that the price is rather high, but not completely unreasonable. We would expect a more reasonable price for this work to be in the realm of $80,000.00USD. Based on the salved value likely to be obtained by this method, this does not seem economical.

Local salvors have offered a removal of wreck price of $70,000.00USD. We find this to be high and unreasonable, however there are few other options. Based on the complexity of the operation, we believe that a reasonable cost would be in the realm of $50,000.00USD.

SUE & LABOUR

Security guards have been placed on the vessel to prevent looting at a cost of $300.00USD/day. We find this cost to be fair and reasonable.

PERSONAL INJURY

None reported.

ENVIRONMENTAL DAMAGE

None reported at this time. The risk of environmental damage is increasing as time progresses and the condition of the vessel continues to deteriorate. The amount of fuel on board is not known, however given the distance travelled, we estimate that remaining fuel levels are minimal. Removal of wreck should proceed as soon as possible in order to prevent environmental damage.

The vessel is stranded on a breakwater upwind of a mangrove nursery and busy public beach in a tourist destination.



**DAMAGES & RECOMMENDATIONS**

<u>HULL</u>
- The bottoms of both hulls are severely damaged. The breakwater is clearly visible from the inside of the vessel.
- The topsides are broken in large areas and badly deformed in others.

<u>MACHINERY</u>
- Both engines have been broken from their mounts by forces from below. They lie on their sides partially submerged.
- It is our opinion that the damages to the engines are beyond those of economical repair.

<u>INTERIOR</u>
- The water level is approximately 1.5' above the cabin soles in both hulls. The continuous pounding from the swell has caused much of the cabinetry to break apart.
- All soft goods on the interiors of the hulls are also now wet.
- Only the area on the bridgedeck remains dry.

<u>ELECTRICAL</u>
- The water level is approximately 1.5' above the cabin soles in both hulls. All electrical components below this waterline will require replacement and some above are also likely to require the same.

These findings are preliminary in nature only, as the true condition of the vessel can only be assessed once the vessel is removed from the water and stabilized.

**SURVEYORS ESTIMATED COST OF REPAIR**

| | |
|---|---|
| FRP repairs to hull | $300,000.00USD |
| Machinery replacement | $35,000.00USD |
| Interior repair | $80,000.00USD |
| Electrical repair | $40,000.00USD |
| TOTAL | $455,000.00USD |

These findings are preliminary in nature only, as the true condition of the vessel can only be assessed once the vessel is removed from the water and stabilized.

Based on these preliminary estimates, we have confidence to recommend that Underwriters consider this vessel as a Constructive Total Loss.



**SURVEYOR'S CERTIFICATION**

I certify that, to the best of my knowledge and belief: The statements of fact contained in this report are true and correct. The reported analysis, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions. I have no present or prospective interest in the vessel that is the subject of this report, and I have no personal interest or bias with respect to the parties involved. My compensation is not contingent upon the reporting of a predetermined value or direction in value that favours the cause of the client, the amount of the value estimate, the attainment of a stipulate result, or the occurrence of a subsequent event. I have made a personal inspection of the vessel that is the subject of this report. This report should be considered as an entire document. No single section is meant to be used except as part of the whole. This report does not constitute a warranty, either expressed, or implied, nor does it warrant the future condition of the vessel. It is a statement of the condition of the vessel at the time of survey only.

ATTENDING SURVEYOR:

Andrew G. Ball
SAMS SA   |   IAMI# 04122   |   MCA Master 200GT

PRINCIPAL SURVEYOR:

W. J. Bailey
SAMS AMS# 461