UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
IN ADMIRALTY

GREAT LAKES INSURANCE SE,

    Plaintiff,

vs().

CASE NO. 4:20-cv-40020-DHH

MARTIN ANDERSSON,

    Defendant.

_____/

## MOTION FOR PARTIAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

COMES NOW Defendant MARTIN ANDERSSON (hereinafter "ANDERSSON"), by and through his undersigned counsel and pursuant to F.R.C.P. 56 and Local Rule 56.1 of the United States District Court for the District of Massachusetts and files this Motion for Partial Summary Judgment.[1]

### I.    INTRODUCTION

Great Lakes Insurance, SE (hereinafter "GLI") cannot prove the claims it has made through its declaratory judgment action (DE 1) and conversely, the undisputed facts prove Martin Andersson's (hereinafter "Andersson") Breach of Contract counterclaim against GLI. (DE 9). With no issues of material fact in dispute, this Court must grant partial summary judgment to Andersson on Count I of the Counterclaim (Breach of Contract) and against GLI on Counts I and II (both for Declaratory Judgment) of the Complaint in this matter.

### II.    CONCISE STATEMENT OF MATERIAL FACTS

The following material facts are not in dispute:

---

[1] This Court's dismissal of Count III of Andersson's counterclaim through plaintiff's motion for judgment on the pleadings is the subject of a pending interlocutory appeal. It is Andersson's position that Count III can be addressed by the Court after resolution of this motion for summary judgment.

In December of 2018, Andersson purchased a catamaran with the goal to live aboard about 7 months a year and travel the islands of the Caribbean Sea. [Andersson Affidavit attached as Ex. 1 at para. 3]. Andersson spoke with an insurance broker about his long-term plans for the use of the boat and the broker prepared an application for insurance that had some blanks to be filled in by Andersson. [Ex. 1 at para. 6-9; Andersson Deposition, Ex. 2 at 11/1 – 12/9]. The broker selected the areas of coverage to apply for, which included several areas such as Florida, the Bahamas, and the Caribbean Sea. Andersson did not intend to sail in all of these areas during the first year of using the boat. [Ex. 1 at para. 9].

Andersson's intention for the first year of the boat's use was to have maintenance and improvements made in Grenada, where the boat was delivered, and then to sail to Aruba and stay through hurricane season. He then planned to sail from Aruba to Sint Maarten before the holidays on a course intended to stay within the navigational limits while avoiding piracy in Venezuela. [Ex. 1 at para. 4-5; Ex. 2 at 180/9-15; Geiger Deposition, Ex. 3 at 22/18 through 23/4; Usher Deposition, Ex. 4 at 65/1-19; Ball June 2, 2021 Deposition, Ex. 5 at 69/14 through 70/3 ("If I were asked to handle a claim in Venezuela, I would be asking for a security team.")].

Andersson purchased updated paper charts for everywhere he intended to visit as well as an Eastern Caribbean overeview chart. The boat also had basic charts on the Raymarine GPS chartplotter located in the cabin of the boat and a supplemental Eastern Caribbean chart chip in the Garmin GPS chartplotter located in the starboard steering station. [Ex. 1 at para. 11-12; Ex. 2 at 22/9-13].

Andersson met Ronald Naranjo in Aruba and invited him to act as crew on the trip from Aruba to Sint Maarten. Naranjo had small boat experience and wanted to get experience on bigger boats. He was not paid.[2] Crew duties included handling lines at Andersson's direction, maintaining

---

[2] In Andersson's deposition a question was asked about when Naranjo was "hired," and Andersson responded about meeting Naranjo's family and having them aboard. There is no evidence suggesting Naranjo was paid crew, nor has

watch while Andersson slept, monitoring the GPS, radar and autopilot at the steering station and looking for other boats. If a vessel approached or something went wrong, Naranjo was to wake Andersson who was never more than ten feet away. [Ex. 1 at para. 15-21; Ex. 2 at 18/10-15].

On December 14, 2019 before leaving Aruba, Andersson checked the weather for the trip using NOAA and PocketGrid [Ex. 2 at 23/1-8]. The weather was not prohibitive. [Ex. 2 at 20/6-16]. Before leaving Aruba, he checked the electronics and other systems to make sure they were in working order [Ex. 1 at para. 28; Ex. 2 at 19/24 to 20/5]. His habit was to enter the trip into the GPS chartplotter and engage the autopilot. Andersson made course changes from the autopilot, which could be done in increments as small as one degree. [Ex. 1 at para. 24-25]. Andersson "planned to clear the southeastern tip of Aruba and then sail northeast and get far enough north to clear the Venezuelan Islands with some distance to avoid piracy, then head as close to east as possible toward Grenada. Because the wind was expected to come from the east, we would have tacked toward the southeast at some point, and then later tacked toward the northeast. Once within about 100 miles of the islands of the eastern Caribbean, the plan was to head north toward Sint Maarten which is in the northeastern part of the Caribbean Sea." [Ex. 1 at para. 27]. Upon departure and throughout the evening of the 14th, the wind was from the east and so were the waves. The weather was good and was expected to remain that way [Ex. 1 at para. 29; See also Ex. 2 at 27/19-23, 31/7-13, 42/18-20, 46/15-24, 51/14-16]. Sometime between 10 p.m. and midnight on the 14th, the vessel rounded the southeastern tip of Aruba and changed course to a bit east of northeast, about 55 to 60 degrees [Ex. 1 at para. 30; Ex. 2 at 60/24 – 61/9, 64/12-15]. At that time, Andersson had no way of knowing that due to the convergence of two unexpected occurrences; a significant wind shift and worsening of wind speed and wave heights and his crew member becoming seasick, he would be forced to make a significant westward shift in his course over time to avoid damaging

---

that been raised as a coverage defense by GLI either in its reservation of rights letter or in the Complaint filed in this action. [See Ex. 2 at 17/3-10; Ex. 18; DE 1].

the boat as well as for the comfort of his seasick crew. The journey would end in the Dominican Republic 693 kilometers west of its intended destination. [Ex. 1 at para. 26-29; Distance calculated using Google Maps].

The wind was coming from the east/northeast beginning in the morning of Sunday, December 15, 2019 [Ex. 2 at 132/3-6]. At that time, the boat was still holding a course of approximately 55 degrees and Andersson did not make any course changes. [Ex. 2 at 131/14-20]. Like the slow shifting of the wind, Naranjo's descent into a state of seasickness began gradually. In his letter to GLI dated January 15, 2020, Andersson in a brief description of the events indicated that Naranjo became seasick as early as ten hours after departure, which would coincide with the wind shift. [See Ex. 22]. In his deposition Andersson more specifically described Naranjo's condition in that earlier timeframe as "queasy." [Ex. 2 at 150/3-17]. Later in the afternoon of December 15, there was a wind shift and the wind and wave heights increased. The boat was being battered by the waves coming from the east and Mr. Naranjo had begun to be seasick. During this time and until the late afternoon of Monday, December 16, Andersson made small northerly adjustments to the course over time, ending up at a northeast by north (somewhat less than 45 degree) course. [Ex. 1 at para. 34 and para. 55; See also Ex. 2 at 169/17 to 170/8, 174/2-176/9, 177/20-178/19, 188/9-14, 194/13-195/17, 202/20-203/1, 210/12-19].[3] On Monday, December 16, there was a point when Naranjo became so seasick as to appear to Andersson to be incapacitated. That drove Andersson to make a much more drastic change in course, to head north or slightly northwest to Ponce, Puerto Rico. [Ex. 1 at para. 36-37 and para. 55]. Once headed north, the boat was at a more comfortable angle to the waves and Naranjo's condition improved. [Ex. 1 at 38]. There was never a time that Naranjo got so seasick that he was not able to maintain a watch, and Andersson was able to sleep enough not to be sleep-deprived. [Ex. 1 at para. 37; Ex. 2 at 168/13-

---

[3] GLI failed to complete Andersson's deposition. Andersson's deposition testimony regarding his course ends at the timeframe ending at 4:00 p.m. on Monday, December 16.

21, 192/6-193/3, 205/1-207/18]. The boat was being pushed westward by the waves and current while sailing north, and Andersson decided to sail further to the west toward the Dominican Republic [Ex. 1 at para. 39].

When they arrived outside the inlet for Santo Domingo around noon on Tuesday, December 17 [*Id.*] Andersson learned the VHF radio was not transmitting. [Ex. 1 at para. 40]. Andrew Ball, GLI's marine surveyor and disclosed expert witness, acknowledged that the VHF antenna could have been damaged in the rough seas on the voyage. [Ex. 5 at 243/6-23; Ex. 6]. In fact, in his January 31 report to GLI, Ball indicated the satellite was a sufficient substitute and it was not an issue. [See Ex. 22]. After having been used the other days, the generator would not start that morning. Expert Otto Geiger opined the generator's failing to start could also have been caused by the rough seas. [Ex. 3 at 15/6-17 and Ex. 7 at para. 3 and 4]. Captain Geiger, who has significant experience sailing catamarans in the Caribbean Sea and worldwide, blew out the trampolines from a catamaran in similar conditions. [Ex. 7 at para. 3].

Needing a place to have the VHF and the generator checked out, Andersson contacted the broker who sold him the boat by satellite phone and the broker recommended he go to Boca Chica, east of Santo Domingo. [Ex. 1 at para. 42]. Arrangements were made for the marina to meet Andersson outside the harbor and guide him in. [Ex. 1 at para. 42-43]. By the time he arrived it was dark and rough [Ex. 1 at para. 44]. Andersson contacted the marina and, while waiting for someone from the marina to meet them outside the harbor, the boat was lifted by a wave and went aground on an unmarked breakwater. [Ex. 1 at para. 44]. Based upon the weather conditions reported by Setzer and Andersson's testimony, Geiger opined that it would have been unlikely Andersson could see the breakwater. [Ex. 7 at para. 14-16]. Furthermore, although the breakwater was not clearly marked on the 2015 supplemental chart chip Andersson had in the Garmin GPS, it was shown in a sense through a lack of depth markings between two marked islands. [Ex. 19, deposition of Michael Cooley at 26/8-27/12, Ex. 20 at pp. 9, Ex. 21 at i(f)].

GLI sent marine surveyor Andrew Ball to inspect the damage in the morning of December 21 and then Ball met with Andersson to discuss what happened. [Ex. 1 at para. 51]. GLI's corporate representative testified there was never a recorded statement or an examination under oath taken regarding Andersson's claim and expressed the best evidence of the vessel's path would be the GPS. [Ex. 4 at 91/1-92/6]. Normally, the corporate representative would have expected to see an audio recording in the claim file. [Ex. 4 at 105/1-11]. On December 23, Ball asked for permission to take the GPS from the boat, which permission Andersson gave to him but Ball did not get the GPS from the boat. [Ex. 1 at para. 52; Ex. 15; Ex. 5 at 222/9-230/17]. No one contacted the salvor on GLI's behalf to obtain the GPS. [Ex. 4 at 111/2-15]. Andersson did nothing to safeguard the GPS while it was still accessible to him because he believed it had been taken by GLI. [Ex. 1 at para. 60].

On December 27, 2019 GLI issued a reservation of rights letter. The letter raised two possible justifications for avoiding coverage: 1) an alleged violation of the navigational warranty and 2) an alleged violation of the warranty of seaworthiness.  [See Ex. 18].

In concluding the navigational warranty had been violated, GLI assumed Andersson took a direct course to Sint Maarten, an inference taken from a written statement prepared by Ball. The statement was signed by Andersson, who does not speak English as his first language and was under both a great deal of stress and a time constraint when he signed it [Ex. 1 at para. 53-54]. There were subtle but significant differences between handwritten notes taken by Ball and the typewritten statement sent to Andersson for his review. [Compare for example Ex. 13 at 322/12-328/7 and Ex. 14; Ex. 13 at 222/1-223/23; 254/12-256/18; Ex. 15; Ex. 16; Ex. 17].  The handwritten notes did not say when Naranjo became seasick or when Andersson changed course, but the typewritten statement said those events occurred "shortly after departure." [Compare Ex. 14 to Ex. 16]. The handwritten notes said Andersson changed course "north to Ponce" but the typewritten report said "[t]he course was adjusted to a more northerly course to Ponce, Puerto

Rico." [Compare Ex. 14 to Ex. 16]. Ball's handwritten notes were not disclosed to Andersson's counsel until their existence was revealed by Ball in his deposition. [See Ex. 183/9-184/20 and Ex. 13 at 319/19-321/20]. Ball admitted he failed to ask crucial questions about the voyage and to include those details in the report, such as the details of Andersson's course over the three-day voyage, the timing of when the conditions changed and of Andersson's course changes, the timing of Naranjo's seasickness, whether seasickness prevented Naranjo from standing watch, and whether the course change to north alleviated Naranjo's seasickness. [See Ex. 1 at 55; Ex. 12 at 127/18-133/7].

Andersson responded to the reservation of rights letter through correspondence dated January 15, 2020. [See Ex. 4 at 185/4-14; Ex. 22]. In preparing this response, Andersson was only aware of the cryptic information provided through the reservation of rights letter. [Ex. 4 at 185/15-186/6]. Ball provided an opinion regarding Andersson's letter through an email to GLI on January 31, 2020 [See Ex. 4 at 185/4-14 and Ex. 23]. Neither Ball nor anyone else acting on GLI's behalf followed up with Andersson about the details of the claim, contacted Naranjo, or took any other action to confirm the facts of the claim. [Ex. 4 at 118/1-119/14; Ex. 5 at 287/9-24].

Without the tracking data from the GPS, Andersson sought expert opinions from a licensed Captain with extensive catamaran sailing and delivery experience both worldwide and in the Caribbean, Otto Geiger [See Ex. 7] and Craig Setzer, a meteorologist who is an experienced sailor and provides meteorology and expert witness services related to planning sailboat races and voyages as while as litigation support. [See Ex. 9]. It is the opinion of Geiger [Ex. 7 at para. 5] and Setzer [Ex. 8, Deposition of Craig Setzer at 22/2-14; Ex. 10 at p. 1 and Ex. 11 at p. 13] that Melody's 72-hour journey beginning in Aruba and ending at Boca Chica, Dominican Republic could have been made without violating the policy's navigational limits. In further support of this conclusion, GLI's expert acknowledged his opinion related to the navigational limits would have to be recalculated because he had not taken Venezuelan-claimed "Isla de Aves" into account when

calculating the distances from land defining the navigational limit. He admitted, "It would certainly place the validity of this calculation in question, yes.  My opinion based on this calculation. Whether or not my opinion would differ based on a different calculation, I can't say without doing the calculation." (Ex. 12 at 116/19-24). No further report was disclosed by GLI and the expert witness disclosure deadline has long passed.

The GLI policy and its attachments as it was delivered to Andersson is attached as Exhibit 24. It contains the following key provisions:

> Insuring Agreement:
>
> If a sum insured is shown for Section A of the insuring agreement declaration page, we provide coverage for accidental physical loss of or damage to the Scheduled Vessel which occurs during the period of this insuring agreement and within the limits set out in the insuring agreement declaration page, subject to the insuring agreement provisions, conditions, warranties, deductibles and exclusions. … Reasonable expenses incurred by you in attempting to minimize or mitigate a loss incurred and covered by this insuring agreement will be paid by us whether successful or not. These will be paid in addition to the sum insured under Sections A and F. Our maximum liability for these expenses is 50% of the sum insured under Sections A and F. … We will pay salvage charges incurred by you in pursuance of 'your duties in the event of a loss' as set out in Section 10 of this insuring agreement, up to the limit of the sum insured under Section A of this insuring agreement less the deductible shown under Section A … The deductible shown under Section A of the insuring agreement declaration page shall apply to each claim under the insuring agreement **except for claims for actual and/or constructive and/or compromised total loss of the Scheduled Vessel …** "

[Ex. 24 at 6, emphasis added].  The policy provided $365,000 in coverage A, the coverage for the hull. [Ex. 24 at 2].

Navigational Limits: "Warranted that the Scheduled Vessel is confined to Florida, the Bahamas and the Caribbean Sea (excluding Cuba, Colombia, Haiti and Venezuela) – not to exceed 150 miles offshore." [Ex. 24 at 3].

> Choice of Law:
>
> It is hereby agreed that any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice but where no such well established,

entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York.

[Ex. 24 at 18].

Warranty of Seaworthiness: "It is warranted that the Scheduled Vessel is seaworthy at all times during the duration of this insuring agreement. Breach of this warranty will void this insuring agreement from its inception." [Ex. 24 at 13]. "Seaworthy" is defined as:

> fit for the Scheduled Vessel's intended purpose. Seaworthiness applies not only to the physical condition of the hull, but to all its parts, equipment and gear and includes the responsibility of assigning an adequate crew. For the Scheduled Vessel to be seaworthy, it and its crew must be reasonably proper and suitable for its intended use.

[Ex. 24 at 4].

## II.     LEGAL ARGUMENT

### A.     Burdens of Proof and Standards for Summary Judgment

Rule 56 (c) of the Federal Rules of Civil procedure entitles a party to the benefits of summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Summary judgment is appropriate if there is no genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A fact is 'material' if, based on the substantive law at issue, it might affect the outcome of the case. A material issue is 'genuine' if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor." *CORALations v. United States EPA,* 477 F.Supp.2d 413, 415-16 (D.Puerto Rico 2007) (internal citations omitted).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the movant has met this initial burden, "the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir. 1997). Like the First Circuit, this Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir. 1995).

*Southern Union Company v. Liberty Mutual Insurance Co.*, 581 F. Supp. 2d 120, 123 (D. Mass. 2008).

> To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. Hudson Ry. Co. v. Cons. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

*Insurance Co. of North America v. Zaglool*, 526 F. Supp. 2d 361, 364 (E.D.N.Y. 2007).

> A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *See id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not `implausible.'" Id. at 211 (citing *Matsushita*, 475 U.S. at 587).

*Insurance Co. of North America v. Zaglool*, 526 F. Supp. 2d 361, 364 (E.D.N.Y. 2007).

### B. New York Law Regarding Insurance Contract Interpretation

The contractual issues raised by this motion for summary judgment are governed by New York law.[4]

---

[4] It is undisputed that the GLI policy contains a choice of law provision which is binding under federal admiralty law. It is Andersson's position that, where there is not entrenched federal admiralty precedent, New York law applies to contract interpretation only and, for those issues that are not directly related to the insuring agreement, the law of the forum state, Massachusetts law, applies. This Court has ruled that New York law applies to all aspects of the entire dispute not governed by established principles of admiralty law, including extra-contractual causes of action. That ruling is currently the subject of an interlocutory appeal to the 1st Circuit.

> The insured bears the initial burden of showing that the insurance contract covers the alleged loss. *See Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000). If the insured meets that burden and the insurer seeks to avoid coverage, the insurer bears the burden of showing that an exclusion to the coverage applies. *Id.* at 276 n.1; *see also Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311 (1984) ("[B]efore an insurance company is permitted to avoid policy coverage, it must satisfy the burden which it bears of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation." (citations omitted)). Any exclusions from coverage "must be specific and clear in order to be enforced" and "are to be accorded a strict and narrow construction." *See Pioneer Tower Owners Ass'n v. State Farm Fire & Cas*. Co., 12 N.Y.3d 302, 306-07 (2009) (internal quotation marks omitted). If the exclusion is ambiguous, "the ambiguity must be interpreted in favor of the insured." *Vill. of Sylvan Beach*, 55 F.3d at 115; *see also* 2 Couch on Insurance § 21:1 (3d ed. 2014).

*Bamundo, Zwal & Schermerhorn, LLP v. Sentinel Ins. Co.*, No. 13-cv-6672 (RJS), at *6-7 (S.D.N.Y. Mar. 26, 2015). In the context of the issues raised in this summary judgment motion, Andersson is not aware of any dispute related to the policy language, the parties' dispute has to do with the application of the policy language to the facts surrounding the claim.

### C. Under NY Law, GLI may only raise defenses to coverage that are included in its reservation of rights letter.

New York law places a high burden on insurance companies regarding the specificity of their reservation of rights letters and letters conveying a denial of coverage. ""[U]nder the law applicable to insurance policies, an insurer may be barred from raising defenses not asserted in communications to the insured denying coverage." *Juliano v. Health Maintenance Organization of New Jersey, Inc.*, 221 F.3d 279, 288 (2d Cir. 2000)." *Doe v. Cigna Life Insurance Company of New York*, 00-CV-1018S(F), at *19 (W.D.N.Y. Sep. 11, 2003). As stated previously by the 2nd Circuit:

> This court has unequivocally recognized the rule set out in this line of cases and has previously held that "[i]t is settled that "[w]hen one specific ground of forfeiture is urged against the claim, and a refusal to pay is based upon a specific ground, all other grounds are waived."' *Luria Bros. Co. v. Alliance Assurance Co.,* 780 F.2d 1082, 1090 (2d Cir. 1986) (quoting 16C Appleman Appleman, "Insurance Law and Practice," § 9260 at 393 (1981)).

*New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1432 (2d Cir. 1991).[5]

GLI only raised two defenses to coverage in its reservation of rights letter. First, GLI raised the alleged breach of the navigational warranty providing the following very specific explanation: "A direct course from Aruba to St. Martin takes the Vessel far beyond these bounds, proceeding further West to Santo Domingo would do the same." [See Ex. 17 at p. 1]. Andersson has testified and GLI has subsequently admitted through Ball's testimony that Ball did not ask about the specific details of the trip [[See Ex. 1 at 55; Ex. 12 at 127/18-133/7]. GLI's reservation of rights letter was based upon a misunderstanding of the facts and is clearly invalid. Further, although Andersson's response was requested, GLI's corporate representative admitted the reservation of rights communication did not provide a copy of Ball's report and so Andersson was unaware of GLI's incorrect assumptions to meaningfully respond. [ See Ex. 4 at 185/15-186/6]. Further, GLI's corporate representative admitted the GPS track was the best evidence of the route taken by the vessel. [Ex. 4 at 91/1-92/6]. It is undisputed that the GPS track is unavailable.[6] Second, the letter raised the issue of seaworthiness, and stated:

> Secondly, our investigation determined the Vessel may not have been seaworthy **at the time of the loss;**
>
> *"Seaworthy" means fit for the Scheduled Vessel's intended purpose. Seaworthiness applies not only to the physical condition of the hull, but to all its parts, equipment and gear and includes the responsibility of assigning an adequate crew. For the Scheduled Vessel to be seaworthy, it and its crew must be reasonably proper and suitable for its intended use."*
>
> The lack of a functional VHF radio on board the Vessel was a contributing factor to the loss however the area of most concern with regards to potential seaworthiness

---

[5] Although some of the caselaw raised above addresses defenses to coverage raised in the denial of coverage, it should be noted that in this case there was no denial letter issued until AFTER this lawsuit was filed. The only notice Andersson had regarding the possibility GLI might deny coverage was the reservation of rights letter. GLI's failure to deny coverage before suing him is a part of the basis for Andersson's chapter 93A claim which is the subject of the pending interlocutory appeal.

[6] Andersson is not seeking the Court's ruling on summary judgment regarding his equitable estoppel claim because it raises unavoidable questions of fact. Were this case to go to trial, it would be Andersson's position that GLI should be estopped from asserting the navigational warranty because GLI's request for permission and representation the unit would be taken by GLI, and GLI's later failures to obtain the unit or to inform Andersson that it had not done so prevented Andersson from safeguarding the best evidence of the route of the vessel. This issue will be moot if the Court grants summary judgment.

> is the procedure into a port in the dark with no local paper charts, no local cruising guide, no local knowledge, and what appear to be either defective, outdated, or absent electronic charts.
>
> In addition to the above, the crew was reported to have been seasick shortly after leaving Aruba which became worse until arrival at Santo Domingo. The surveyor is of the opinion that as a result, the crew were subsequently ineffective on arrival in Santo Domingo.

[Ex. 18 at 1-2, bold emphasis added]. First, the policy's focus on the "time of the loss" is extremely important. Every damaged vessel at some point becomes "unseaworthy." If the time of the loss is the incident that set the events leading to the loss in motion, then that time was when Andersson was forced to make a course change due to the unexpected wind shift, worsening conditions, and Naranjo's seasickness. Second, with regard to the VHF, GLI's expert Ball admitted the VHF antenna could have broken as a result of those rough conditions and there is no evidence the VHF was not working prior to that time. [Ex. 5 at 243/6-23; Ex. 6]. Although the boat did not have a working VHF transmitter when it arrived at Santo Domingo, it was still capable of communication through a satellite phone. [See Ex. 1 at para. 42]. Third, GLI's comments regarding "the procedure into a port in the dark with no local paper charts, no local cruising guide, no local knowledge, and what appear to be either defective, outdated, or absent electronic charts" again refers to activity that was driven by the original incident, the significant change in course due to unanticipated circumstances outside of Andersson's control. He would not have been there had the unexpected weather change not happened. Navigation in the Dominican Republic was not part of Andersson's intended use of the vessel, and so the lack of detailed charts for Boca Chica was not a required element of "seaworthiness." Also, and most importantly, Andersson was not "proceeding into a port" without local knowledge. He had arranged for an escort from the marina and was awaiting that escort outside the harbor when the grounding occurred. [Ex. 1 at para. 42-45]. Finally, with regard to the condition of the crew the reservation of rights letter states: "the crew was reported to have been seasick shortly after leaving Aruba which became worse until arrival at Santo Domingo.

The surveyor is of the opinion that as a result, the crew were subsequently ineffective on arrival in Santo Domingo." Ball has admitted he never asked Andersson whether Andersson slept, whether Naranjo was able to maintain watches, or whether Naranjo's condition improved after the course change. [See Ex. 1 at para. 55; Ex. 12 at 127/18-133/7]. The facts as cited above prove these assumptions were wrong.

> D. Warranties are Not Unlimited, and the Line Drawn is the Incident that Led to the Loss

"[I]n its 1955 decision *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, the Supreme Court held that no federal admiralty rule required "strict and literal performance" of warranties in marine insurance contracts." *New Hampshire Insurance Company v. Dagnone*, 394 F. Supp. 2d 480, 485 (D.R.I. 2005), citing *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. at 319-21, 75 S.Ct. 368 (1955). Citing *Dagnone,* a District of Rhode Island case decided under New York law, the Court indicated that "New York Insurance Law § 3106(c) exempts marine insurance contracts from the general rule that a breach of a warranty must be material in order for the insurer to disclaim coverage. *See Commercial Union Ins. Co. v. Flagship Marine Servs.*, 190 F.3d 26, 32 (2d Cir. 1999)." *Cunningham v. Insurance Company of North America*, 521 F. Supp. 2d 166, 170 (E.D.N.Y. 2007). The Court in *Cunningham* went on to include an interesting nuance in the context of a lay-up warranty. It said:

> However, the purpose of the lay-up warranty is to avoid the risks of transit during the winter months. *See N.H. Ins. Co. v. Dagnone*, 394 F.Supp.2d 480, 486 (D.R.I. 2005) ("The Lay-Up Warranty . . . is a warranty in a marine insurance policy that pertains to a risk of navigation, transit or transportation. Consequently, New York law forecloses any coverage . . . if [plaintiff] was in breach of the Lay-Up Warranty **at the time of the accident**, irrespective of the relation between the breach and the damage.").

*Cunningham v. Insurance Company of North America*, 521 F. Supp. 2d 166, 170 (E.D.N.Y. 2007)(emphasis added).  The Court's limitation of the warranty to the time of the accident makes sense, as *Cunningham* involved the breach of a winter layup warranty that would have been related

to weather-related risks of winter. The navigational warranty contained in Andersson's policy involves the risks related to piracy and theft in unstable nations [See Ex. 4 at 64/8-67/4] as well as the risks associated with sailing far from shore, such as the unavailability of assistance if something were to go wrong. Melody's grounding took place on a breakwater wading distance from shore in the Dominican Republic, an area inside the navigational warranty, so the terms of the Insuring Agreement were met. The policy also contains the following general condition, however, extending the reach of a warranty beyond the time of the loss itself:

> t. Where any term herein is referred to as a 'warranty' or where any reference is made herein to the word 'warranted', the term shall be deemed a warranty and regardless of whether the same expressly provides that any breach will void this insuring agreement from inception, it is hereby agreed that any such breach will void this policy from inception.

[Ex. 24 at 15]. So, according to the GLI policy and its arguments, and in spite of the New York law expressed in *Cunningham* to the contrary, any breach of a warranty at any time renders the policy void from its inception.

> GLI's condition "t," taken to its extreme, would render the policy illusory.
>
>> … [E]xclusionary policy language should not be enforced when it defeats the main object of the purchased coverage, or virtually nullifies the coverage sought for anticipated risk. However, exclusions by their nature modify the scope of coverage provided in an insurance policy and "[a]n insurance policy is not illusory if it provides coverage for some acts; it is not illusory simply because of a potentially wide exclusion" (*Associated Community Bancorp, Inc. v. St. Paul Mercury Ins. Co.,* 118 A.D.3d 608, 989 N.Y.S.2d 15 1st Dept.2014 [internal quotation marks omitted] [alteration in original] ).

*Lend Lease (Us) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 136 A.D.3d 52, 60 (N.Y. App. Div. 2015). In this case, if a warranty were breached at any time, that happened because of unexpected circumstances out of Andersson's control, specifically the unexpected wind shift and worsened wind and wave conditions coupled with Naranjo's seasickness. Using a potential warranty violation forced by unexpected conditions out of the Captain's control to void the policy from its inception would be the definition of illusory coverage. Voiding a policy from its inception nullifies

every bit of coverage and places the insured in the position of having no insurance. What GLI seeks through its breach of warranty arguments is not a "potentially wide exclusion" as is referenced in New York caselaw finding coverage not to be illusory but a complete elimination of the existence of the policy.

EVERY boat that sinks or is significantly damaged becomes unseaworthy at some point in the process of that loss, and the purpose of having hull coverage is to reduce the risk of loss or damage to the vessel. Policyholders like Mr. Andersson pay thousands of dollars a year for this protection. If the policy's warranty of seaworthiness were strictly applied, no loss would ever be paid because every vessel would have become unseaworthy at the time of the loss, rendering the policy void from inception. GLI's corporate representative discussed this situation in his deposition:

```
72:9    Q.  Okay.  Now, at some point, every boat that
72:10   sinks is unseaworthiness at some point in its voyage,
72:11   correct?  It's unseaworthy; it sank --
72:12   A.  Correct.
72:13   Q.  -- is that correct?
72:14       So when -- is there a line you draw where you
72:15   decide when something has to be seaworthy to satisfy
72:16   the warranty of seaworthiness?
72:17   A.  Yes.  It has to be seaworthy at the --
72:18   throughout the policy and -- and -- and/or until the
72:19   time of the incident.
72:20   Q.  How do you define what the incident is?  Is
72:21   there policy language that tells you when, in a chain
72:22   of events, something has happened that would now
72:23   change that seaworthiness situation?
72:24   A.  Yeah, an external event.
73:1    Q.  Can weather be an external event?
73:2    A.  Yes.
```

[Ex. 4 at 72/9-73/, emphasis added]. It should be noted that there is no definition or other policy provision that creates this line-drawing at an "incident" or a requirement of an "external event" in the insuring agreement, but the practice does create a logical way to separate the event causing the loss to avoid the coverage being swallowed whole by the violation of a policy warranty that

happened because of that event. Likewise, with respect to the navigational warranty, there are times when an unexpected incident outside the Captain's control (in this case the confluence of two factors: 1- an unexpected wind shift from east to northeast and the simultaneous worsening of wind and wave conditions, and 2- the unexpected seasickness of the crew) causes the Captain to have no choice but to change from his planned course. The point at which the line should be drawn, or the "incident" as GLI's corporate representative described it, would be the time of those unexpected circumstances, the "incident" in Usher's explanation.

### E.     GLI Cannot Prove Andersson Violated the Navigational Warranty

GLI alleges without support that Andersson violated its navigational warranty. The GPS, which would have been the best evidence of the vessel's route, was broken and destroyed by saltwater corrosion, so that source of evidence is gone. Andersson's recollection of the conditions and the path he traveled is consistent with the performance capabilities of the boat and the weather conditions at the time. Otto Geiger and Craig Setzer opined that Andersson had time to have stayed within the navigational warranty. [See Ex. 3, Ex. 7, Ex. 8, Ex. 10, Ex. 11]. Andrew Ball admitted his failure to consider Isla de Aves in his calculations and said his opinion regarding the navigational warranty would have to be recalculated. [Ex. 12 at 116/19-24]. No follow-up report was provided and the deadline for that has passed. Even if Andersson had violated the navigational warranty after the "incident" occurred (ie: the unexpected change in weather and Naranjo's seasickness), this should not be considered a breach of the warranty based on GLI's own practices as described by its corporate representative. Finally, a violation of a navigational warranty to seek medical care for a crew member excuses the violation. See *The Iroquois*, 194 U.S. 240 (1904). Thankfully, medical assistance was not needed for Naranjo because the course change Andersson made resulted in his condition improving. Since GLI cannot prove a violation of the navigational warranty, summary judgment should be granted against GLI with respect to Count I of its Complaint.

F. **GLI Cannot Prove a Violation of the Warranty of Seaworthiness**

For the reasons discussed above, the "incident" creating the line to be drawn in the consideration of warranties in this action was the unexpected weather change coupled with Naranjo's seasickness that drove Andersson's planned course to head north toward Ponce, Puerto Rico and then further west to the Dominican Republic instead of continuing on his planned route to Sint Maarten.

There is no evidence Melody was unseaworthy up to that point in time. Andersson checked all the systems prior to departure and they were functional. The fuel tanks were full. Andersson had current paper charts on board and had checked the weather forecasts from both NOAA and PocketGrid. He had plotted his planned route in the GPS. Anderson had no way of knowing the conditions would worsen or Naranjo would become seasick, nor did he have control over those events.

GLI's relied on assumptions made by Ball that are not borne out by the evidence. Ball admitted he never asked Andersson about whether Andersson was able to sleep during the voyage or whether Naranjo was able to stand watch. He also never asked when or if Naranjo's seasickness improved. Andersson testified Naranjo was capable of standing watch and they each slept during the voyage. He also testified when asked in more detail that Naranjo's illness began as being "queasy" and over time the seasickness became worse until a point where Naranjo appeared to Andersson to be "incapacitated." Andersson made a significant course change to the north then to make the angle to the waves more comfortable and Naranjo's condition did in fact improve.

Finally, GLI places emphasis on the lack of detailed charts for the Dominican Republic. This would have mattered if, when Andersson set out on his journey, he intended to sail to the Dominican Republic, but he did not. Andersson's intended trip was 693 kilometers east of where the unexpected weather and seasickness incident caused him to end up. He had the navigational aids necessary to be "seaworthy" on his intended voyage. Furthermore, after arriving in the

Dominican Republic and knowing he did not have a local cruising guide or local knowledge, Andersson had contacted his broker for a by satellite phone for a recommendation about where to go and then made arrangements with the marina at Boca Chica to send a boat to meet him and guide him into the harbor. He had contacted the marina by phone and was waiting outside the harbor for them to arrive when he ran aground awaiting that assistance.

Since the undisputed facts prove there was no violation of the Warranty of Seaworthiness, this Court must grant summary judgment against GLI with regard to Count II of its Complaint in this action.

### D.    GLI Breached its Contract with Andersson

There is no dispute GLI issued an insurance policy to cover Melody's hull value of $365,000 or that the vessel was a constructive total loss [Ex. 24]. GLI cannot prove the defenses to coverage contained in its reservation of rights letter or its Complaint in this action. GLI's failure to pay the claim constitutes a breach of the insuring agreement. For this reason, Andersson respectfully requests this Court enter summary judgment in his favor on Count I of his Counterclaim (DE 9).

### III.    CONCLUSION

For the reasons discussed herein, Andersson respectfully requests this Court: 1) Grant Summary Judgment in Andersson's favor and against GLI with respect to First Cause of Action and Second Cause of Action contained in GLI's Complaint (DE 1); and 2) Grant Summary Judgment in Andersson's favor with regard to Count I of Andersson's Counterclaim, rendering moot the issues raised in Count II; and 3) retain jurisdiction over the calculation of damages in the breach of contract claim as well as over Count III of Andersson's Counterclaim pending the resolution of Andersson's interlocutory appeal.

Respectfully Submitted,

/s/ *Michelle Niemeyer*
Michelle Melin Niemeyer
Counsel for Defendant Martin Andersson
Michelle M. Niemeyer, P.A.
244 Biscayne Blvd. #3009
Miami, FL 33132
Telephone: (305) 443-1818
Email: mniemeyer@paymyclaim.com

Harvey Heafitz, Esq.
Attorney for Defendant Martin Andersson
Davigian, Grillo & Semple LLP
365 Boston Post Road, Suite 200
Sudbury, MA 01778
Telephone: (978) 443-3773
Email: Harvey@dgslawllp.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 17, 2022 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send an electronic Notice of Filing to all counsel of record.

/s/ *Michelle Niemeyer*
Michelle Melin Niemeyer
Counsel for Defendant Martin Andersson
Michelle M. Niemeyer, P.A.
244 Biscayne Blvd. #3009
Miami, FL 33132
Telephone: (305) 443-1818
Email: mniemeyer@paymyclaim.com