1

1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2
                CASE NO. 4:20-cv-40020-DHH
3
--------------------------------x
4
GREAT LAKES INSURANCE SE,
5
        Plaintiff/Counterdefendant
6
vs.
7
MARTIN ANDERSSON,
8
        Defendant/Counterplaintiff
9
--------------------------------x
10

11

12

13              DEPOSITION OF ANDREW BALL

14                 Conducted Remotely

15          Caribbean Marine Surveyors Ltd.

16                     Nanny Cay

17                      Tortola

18              British Virgin Islands

19                   June 2, 2021

20            10:03 a.m. to 5:43 p.m.

21

22

23

24  Reporter:  Laurie J. Berg, CCR, RPR, CRR, CLR, CER

⌂                                                                    2

1                    A P P E A R A N C E S

2

3        Michael I. Goldman, Esquire

4        GOLDMAN & HELLMAN

5        8751 West Broward Boulevard

6        Suite 404

7        Fort Lauderdale, Florida  33324

8        954.356.0460

9        michael@goldmanandhellman.com

10       (Present via videoconference.)

11       COUNSEL FOR PLAINTIFF/COUNTERDEFENDANT

12

13       Michelle Melin Niemeyer, Esquire

14       MICHELLE M. NIEMEYER, P.A.

15       244 Biscayne Boulevard

16       #3009

17       Miami, Florida  33132

18       305.443.1818

19       mniemeyer@paymyclaim.com

20       (Present via videoconference.)

21            -and-

22

23

24

⬆                                                                3

1              A P P E A R A N C E S

2                   (continued)

3

4         Harvey B. Heafitz, Esquire

5         DAVAGIAN, GRILLO & SEMPLE LLP

6         365 Boston Post Road

7         Suite 200

8         Sudbury, Massachusetts  01778

9         978.443.3773

10        harvey@dgslawllp.com

11        (Present via videoconference.)

12        COUNSEL FOR DEFENDANT/COUNTERPLAINTIFF

13

14

15

16

17

18

19

20

21

22

23

24

⌃                                                                          4

1                          I N D E X

2

3  DEPONENT:  ANDREW BALL

4              (Present via videoconference.)

5  EXAMINATION                                    PAGE

6  (BY ATTORNEY NIEMEYER)                          8

7

8                    E X H I B I T S

9  NO.                                            PAGE

10  Exhibit 16   Notice of Deposition Pursuant to

11               Fed. R. Civ. Proc. 30 (2nd Corrected)   9

12  Exhibit 17   Résumé, Andrew Ball, Andersson_AB000387

13               to Andersson_AB000389                10

14  Exhibit 18   Caribbean Adjusters & Marine Surveyors

15               Ltd, Invoice #423, 1/8/2020,

16               Andersson_AB000052 to

17               Andersson_AB000053                 200

18  Exhibit 19   E-mail Chain, Wednesday, December 18,

19               2019 9:41:32 AM, Andersson_AB000091

20               to Andersson_AB000093              209

21  Exhibit 20   E-mail Chain, Wednesday, 19 December,

22               2019 14:47, and Attachment,

23               Andersson_CF000014

24              to Andersson_CF000015              210

&#9650;                                                     5

```
 1                    E X H I B I T S

 2                      (continued)
```

 3   NO.                                          PAGE

 4   Exhibit 21   E-mail Chain, Friday, December 20,

 5                2019 12:01:04 PM, MA000143 to

 6                MA000145                         215

 7   Exhibit 22   E-mail, Saturday, December 21,

 8                2019 8:25:04 AM, and Attachment,

 9                Andersson_AB000198

10                to Andersson_AB000199            215

11   Exhibit 23   E-mail Chain, Saturday, December 21,

12                2019 11:23:43 AM, MA000143 to

13                MA000144                         218

14   Exhibit 24   E-mail Chain, Monday, December 23,

15                2019 11:08:31 AM, Andersson_AB000214

16                to Andersson_AB000216            222

17   Exhibit 25   Statement as Recorded Presently,

18                23/12/19, Andersson_AB000224 to

19                Andersson_AB000225               232

20   Exhibit 26   E-mail Chain, 23 December 2019 20:05

21                and Report, Monday December 23rd,

22                2019, Andersson_CF000037 to

23              Andersson_CF000051                    254

24

♠                                                     6

1                    E X H I B I T S

2                      (continued)

3   NO.                                        PAGE

4   Exhibit 26A  E-mail Chain, 27 January 2020 16:35

5               and Attachment, Andersson_CF000144 to

6               Andersson_CF000148                    283

7   Exhibit 27   E-mail Chain, 27 December 2019 12:21

8               and Attachment, Andersson_CF000055 to

9               Andersson_CF000057                    287

10  Exhibit 28   E-mail Chain, 19 February 2020 16:34,

11              Andersson_CF000157 to

12              Andersson_CF000158                    294

13

14     (Original exhibits marked electronically

15        and retained with the transcript.)

16

17

18

19

20

21

22

23

24

⬧                                                                                          7

1                    P R O C E E D I N G S

2

3                    MADAM COURT REPORTER:  This is Laurie

4    Berg.  I am a Registered Professional Reporter and a

5    Certified Realtime Reporter with the National Court

6    Reporters Association, a Certified eDepoze Reporter,

7    as well as a Certified Court Reporter with the State

8    of New Hampshire.  I am a Notary Public in the State

9    of New Hampshire and the Commonwealth of

10   Massachusetts.

11            The attorneys participating in this

12   proceeding acknowledge that I am not physically

13   present in the proceeding room, nor am I physically

14   present with the witness, and that I will be reporting

15   this proceeding remotely via videoconference.

16            They further acknowledge that, in lieu of an

17   oath administered in person, the witness will verbally

18   declare his testimony in this matter under the penalty

19   of perjury.

20            The parties and their counsel consent to this

21   arrangement and waive any objections to this manner of

22  reporting the proceeding.

23          Will the attorneys now please indicate your

24  agreement by stating your name and your agreement on

⌃                                                                        8

1  the record, after which I will swear in the witness

2  and we may begin.

3          MR. GOLDMAN:  My name is Michael Goldman,

4  I'm counsel for the plaintiff, Great Lakes Insurance

5  SE, and we agree.

6          MS. NIEMEYER:  Hi.  Michelle Niemeyer,

7  counsel for Defendant Martin Andersson and we also

8  agree.

9          (Off the record at 10:05 a.m.)

10          (Discussion off the record.)

11          (Back on the record at 10:05 a.m.)

12          (Deponent sworn.)

13          MADAM COURT REPORTER:  Thank you very

14  much.  You may begin.

15

16                  ANDREW BALL

17

18          having been satisfactorily identified and

19  duly sworn remotely by the Notary Public, was examined

20  and testified as follows:

21                  DIRECT EXAMINATION

22          BY MS. NIEMEYER:

23     Q.   Hi, Mr. Ball.  For the record, I'm Michelle

24  Niemeyer.  I represent Mr. Martin Andersson in this

⬆                                                          9

 1  matter.

 2          And the first question I have for you is --

 3  I'm going to just put up a document for you.  Okay.

 4  Let's see.  Sorry.  I have to get into the share

 5  screen mode here.

 6          (Pause.)

 7              MS. NIEMEYER:  This document will be

 8  marked as Exhibit 16.  It's the notice of deposition

 9  for today.

10              (Exhibit 16 marked for identification.)

11          BY MS. NIEMEYER:

12     Q.   Mr. Ball, I'm just going to ask if you could

13  take a peek at this document and let me know whether

14  you've seen that and whether that's the notice

15  pursuant to which you're here today?

16     A.   (Deponent viewing exhibit.)  It is, indeed.

17     Q.   Okay.

18     A.   And I have seen it.

19     Q.   That's all I need to ask on that one.

20          Is Mr. Goldman acting as your attorney

21   representing you here today?

22      A.   No, he's not.

23      Q.   Okay.  Thank you.

24           All right.  And the second thing I want to go

♠                                                              10

1   to is a résumé of yours, which was shared with us in

2   discovery.  Let me just grab that real quick.

3           (Pause.)

4               MS. NIEMEYER:  Okay.  And, Laurie, I'm

5   going to ask that you mark this as Exhibit 17.

6               (Exhibit 17 marked for identification.)

7               MADAM COURT REPORTER:  It's all set,

8   ma'am.  It's all marked.

9           BY MS. NIEMEYER:

10      Q.   Okay.  So, Mr. Ball, I'm looking at a résumé

11   which has the Bates number AB000387, and I believe

12   it's three pages, so it goes through 389.

13           And my first question to you is just whether

14   this is actually your résumé?

15      A.   (Deponent viewing exhibit.)  It is my résumé,

16   yes.

17      Q.   Is this a current version of your résumé?

18      A.   (Deponent viewing exhibit.)  I do not believe

19   it is, at this point.  It's been updated a few times

20   over the COVID era, but it was up to date at the time

21  of loss, yes.

22      Q.   Okay.  Now, have you had anything change,

23  that's significant, that you'd like me to know about

24  since this résumé came out?

1       A.   I don't think so, no.

2       Q.   Okay.  I want to just go through a little bit

3   of your history, and since it's a little easier to go

4   from back to front, I'm -- I'm going to kind of start

5   at the back of this so that we can have an idea of

6   what your history's been over time.

7               MR. GOLDMAN:  Michelle, can I stop you

8   for one second with a procedural question --

9               MS. NIEMEYER:  Yes.

10              MR. GOLDMAN:  -- before you get into it?

11          Is there any way that myself or the witness

12  can scroll through the other pages of the document

13  technologically, or are we limited to looking at the

14  page that you're presenting?

15              MS. NIEMEYER:  Technologically, we can --

16  I can share the share.  Let me just see something

17  here.  We did do this before on the last one, but,

18  actually, Tony was on the wrong kind of technology and

19  couldn't use it when we tried to do that with him.

20          MR. GOLDMAN:  Okay.

21          MS. NIEMEYER:  So, yeah, I can definitely

22  -- I can't allow both of you to scroll through it at

23  once, but I can give over control of the document to

24  one of you --

⬆                                                          12

1          MR. GOLDMAN:  Okay.

2          MS. NIEMEYER:  -- which -- since you're

3  not representing Mr. Ball, I'll give it to him.  And

4  that should be able to work.

5          So, what we do is, we go to remote control

6  and then we go to Andrew Ball, and I just did that.

7          MR. GOLDMAN:  Michelle, I'm not sure --

8          MS. NIEMEYER:  Now, Andrew, you are now

9  the only --

10          MR. GOLDMAN:  -- if it's relevant that

11  I'm not representing him.  I'm entitled to look at the

12  exhibits as well.  I don't see --

13          MS. NIEMEYER:  Of course you are.

14          MR. GOLDMAN:  -- a particular issue in

15  this instant.  Oh, okay, fine, just as long --

16          MS. NIEMEYER:  It's --

17          MR. GOLDMAN:  -- as we're clear on that.

18          MS. NIEMEYER:  -- and -- and, Michael,

19  this document was produced by your office, so --

20          MR. GOLDMAN:  I understand, yes.

21          MS. NIEMEYER:  -- I can shoot you an

22 e-mail with a copy of it if you'd like.  It's right

23 here in front of me.

24          MR. GOLDMAN:  Not this minute.  I've got

⬆                                                    13

1 it myself.  Don't stress about it.  But I just wanted

2 to make the technological issue --

3          MS. NIEMEYER:  Okay.

4          MR. GOLDMAN:  -- now --

5          MS. NIEMEYER:  And -- and I'm trying to

6 do --

7          MR. GOLDMAN:  -- in case you have an

8 issue.

9          MS. NIEMEYER:  -- the best that I can,

10 but, unfortunately -- I -- I would be happy to give

11 both of you control, but I can't.  It's not --

12          MR. GOLDMAN:  I understand.

13          MS. NIEMEYER:  -- possible.

14      BY MS. NIEMEYER:

15   Q.  So, Mr. Ball, do you -- do you see a --

16 there's, like, a toggle, I think, on the far right

17 side of your screen that you can scroll through that.

18   A.  (Deponent viewing exhibit.)  No (laughs).

19   It's not letting -- oh, there we go.  Okay.

20       Q.   You're moving it.  Okay, so it's working.

21       A.   (Deponent viewing exhibit.)  Yeah.

22       Q.   Okay.  So if you could go back so that I can

23   ask the questions in the order that I was going to do

24   this, could you go to the next page -- the last page

⬆                                                        14

1   is empty, so --

2       A.   (Deponent complied.)  Oh.

3       Q.   -- so that middle page, that one.

4       A.   (Deponent viewing exhibit.)  There we go.

5       Q.   Okay.  Because I -- I just want to -- kinda

6   wanted to go back.  The first jobs that you list are

7   these jobs as -- as a freelance captain or as a

8   captain in 2008, roughly.

9            Is that the beginning of your career in

10   working, generally, Mr. Ball, or just your marine

11   career?

12       A.   My marine career.

13       Q.   Okay.  What -- what did you do prior to

14   working in the marine industry?

15       A.   Previous to that, I was mainly in private

16   security.  I was also a university student at the

17   time.  I got into this when I was about 20 years old,

18   so I'm not sure I would consider it so much a career

19  as a job, previously.

20      Q.  Okay.

21      A.  But, you know, it's -- that's what I did

22  before I got into the marine industry.

23      Q.  Okay.  So -- so is it fair to say then that

24  your first -- your first real job, quote/unquote, as a

⬆                                                    15

1  -- an adult outside of school would've been this

2  freelance captain job in 2008, or were you in school

3  then?

4      A.  No, I was out of school then.

5      Q.  Okay.

6      A.  So you -- you could say that my first sort of

7  post-secondary beginning of a career, yes, that would

8  be correct.

9      Q.  Did you have any sort of credential at that

10  time to be a captain when you worked as a freelance

11  captain for Festiva?

12      A.  Yes, I had a 200-ton masters license.

13      Q.  And how did you get that license?

14      A.  I attended the United Kingdom Sailing

15  Academy, and I went through their cadetship program.

16      Q.  And -- and -- and when did you finish that

17  program?

18      A.    That would've been earlier in 2009, I

19 believe.

20      Q.    Did that program require any level of -- or

21 -- or time -- did you have to have a certain amount of

22 time at sea or any kind of internship to get that

23 program --

24      A.    Yes.

⬆                                                                    16

1      Q.    -- credential?

2      A.    That's -- that's correct.  So the -- the RYA

3 Yachtmaster Program, which is commercially endorsed by

4 the MCA based on STCW certificates, medical

5 certificates, et cetera, that go with it, enables up

6 to 200 tons with up to 12 passengers.  And it is based

7 on a significant amount of sea time, some of which is

8 also measured in terms of night hours, offshore

9 distances, skippered passages, specifically.  Just

10 sitting on the deck won't get you there.

11         And so, along with that, in -- in that

12 program, I did my yachtmaster offshore, I did my

13 Powerboat Level II, which is also now -- at the time,

14 I don't think it was -- it could be commercially

15 endorsed, it can now, along with my STCW, which is

16 firefighting, sea survival.  There's sort of an ethics

17 course that goes with it.  Marine first aid.  STCW is

18   what's required for every commercial mariner.  It

19   doesn't matter whether you, you know, work at a shop

20   on a cruise ship, you still have to have that.

21        Q.   Can you explain what that acronym means and

22   who issues that, STCW?

23        A.   It's the Standards of Training and

24   Certification for Watchkeeping.  When I did it, it was

♠                                                           17

1    based on the 1995 convention, which has since been

2    updated.  There's a 2010 convention, which didn't come

3    into force, I don't think, until '11 or '12, in fact,

4    but that's through, I believe, the International

5    Maritime Organization, which is a branch of the UN.

6         Q.   Okay.  You mentioned something and, I'm

7    sorry, I -- I was writing and I didn't catch it.

8    You -- you mentioned that there were -- STCW was the

9    second of the acronyms you mentioned.  The first one

10   had three letters.

11             What was that?

12        A.   It was probably RYA or MCA.

13        Q.   M -- MCA, what is that?

14        A.   So I'll -- I'll go -- I'll go back a little

15   to give it some context.  My -- my certificate of

16   competency, my masters license, if you will, is issued

17    by RYA, which is the Royal Yachting Association.  And

18    then it is commercially endorsed by the MCA, which is

19    the Maritime Coastguard Agency.  It's equivalent to

20    the British version of the US Coast Guard.  However,

21    they are a -- a regulatory search and rescue body,

22    they are not a -- an endorse -- they're not a military

23    body --

24         Q.   Okay.

                                                           18

1         A.   -- like the US Coast Guard.

2         Q.   Good to know.

3              Okay.  So that -- so is it fair to just

4     generalize that as your credentials are through the

5     British government?

6         A.   Correct.

7         Q.   And a commercial --

8         A.   And the -- the MCA -- the MCA is then

9     audited, because we're going through that here in the

10    BVI right now.  The MCA is then audited by the

11    International Maritime Organization.  So it falls into

12    a structure of an international framework and

13    international convention.

14        Q.   Okay.  So I see on your résumé that you had

15    -- you had experience in -- in December through

16    February of -- December '08 through February of '09 as

17  a captain for a san -- Festiva Sailing Vacations.

18          Was that a charter operation where you would

19  be the captain with paid charter vacationers?

20      A.   Correct.

21      Q.   And it says you were the captain of a 40 --

22  44-foot crewed catamaran.

23          What kind of catamaran was that?

24      A.   That was a Lagoon 440 --

1       Q.   Did you have other --

2       A.   -- which is sailing catamaran.

3       Q.   Did you have additional crew other than

4   yourself on that boat?

5       A.   I had a -- a chef, but not one that we would

6   consider as deck crew.  So she wasn't responsible for

7   any of the operations of the boat.  She was -- well,

8   she was responsible for the meals.

9       Q.   So where -- is it fair to say that you were

10  the -- you were expected be to the only person sailing

11  that boat?

12      A.   Correct.

13      Q.   Okay.  And then you moved on to The Moorings

14  in February of 2009; is that correct?

15      A.   Correct.

16      Q.   Was your job at The Moorings, essentially,

17  the same as your job at Festiva?

18      A.   Correct.

19      Q.   And what kind -- it says a 46-foot crewed

20  catamaran.

21           What kind of -- kind of catamaran was that

22  boat?

23      A.   It was a Robertson & Caine Leopard 46, which

24  is --

                                                           20

1       Q.   Okay.

2       A.   -- also a sail --

3            MADAM COURT REPORTER:  I'm sorry.

4            BY MS. NIEMEYER:

5       Q.   So I --

6            MADAM COURT REPORTER:  Excuse me.  Hold

7   on one moment.  Which was a Robertson & Caine and then

8   I couldn't what you -- I think you said okay,

9   Michelle, and it cut him out.  I couldn't hear the

10  rest of his sentence.

11           If you can, please repeat your answer.

12      A.   A Robertson & Caine Leopard 46.

13           MADAM COURT REPORTER:  Thank you.

14           BY MS. NIEMEYER:

15      Q.   Again, that vessel -- the 46-foot Leopard,

16   were you the only sailing crew on that vessel being

17   the captain of the boat?

18        A.   Correct.

19        Q.   Where did those boats sail?

20        A.   The British Virgin Islands.

21        Q.   Did they stay within a fairly close range of

22   -- of the islands that you were sailing?  Can you

23   explain, did you have a path you followed?  What did

24   you do with those boats?

⬆                                                          21

1    A.   So, the -- the BVI is little bit of a sailing

2    theme park, if you will.  We consider it very low risk

3    here, because everything is line of sight,

4    everything's close together.

5             So, in terms of offshore passages, which is,

6    I assume, where you're going, no, we didn't go very

7    far.  Probably the furthest navigational limits that

8    we would've gone on a -- on a charter with those boats

9    is probably not more than ten miles from safe haven.

10   I think the longest offshore passage was less than 20

11   miles.

12        Q.   Let me ask you a question, when you were a

13   captain with The Moorings or with Festiva, were you

14   ever responsible for evaluating people who wanted to

15   bareboat charter?

16      A.   No.

17      Q.   Okay.  Now, your next job that you list on

18   here, and it looks like there's a -- it's from October

19   2010, so, after The Moorings --

20      A.   (Deponent nods head.)

21      Q.   -- until December of 2014, the

22   manager/captain/engineer of Sailing Yacht Ma Ha.

23      A.   Yes.

24      Q.   What kind of a vessel was that?

♠                                                            22

1       A.   It was a Lagoon 570 sailing catamaran.

2       Q.   And it appears as if you were the full-time

3    crew on a private vessel; is that correct?

4       A.   Correct, but I -- I will -- I will preface

5    that, that in -- in my world, there's a difference

6    between private and commercial.  It was privately

7    owned.  It was -- it's not in the chartered fleet, per

8    se, but it was a charter vessel, so we did charter it.

9    It wasn't commercial activity.

10      Q.   Okay.  So you were -- you were the captain

11   who was, again, taking tourist vacationers who were

12   paying to rent that vessel on their trip?

13      A.   Correct.

14      Q.   Was that vessel sailed in that same area of

15   the British Virgin Islands?

16      A.   No.  We went a lot further with that boat.

17   So, in the summer, we would go all the way up to

18   Cape Cod.  The owner had a house up there.  And in

19   season here, which is -- season here is sort of

20   November through, let's say, June, when it's not

21   hurricane season.  We would go -- I think we took that

22   boat as far as Antigua on charter, and we did -- we

23   did a couple charters that were sort of

24   Antigua/St. Martin/BVI, which were probably in terms

♠                                                         23

1   of navigational limits.

2            Again, the Antigua/St. Martin/BVI stuff would

3   take us probably about 60 nautical miles from safe

4   haven.  The -- the stuff up to -- up to Cape Cod,

5   obviously, took us almost 500 miles from save haven,

6   but we didn't have paying passengers on at that time.

7      Q.   Did you ever take that vessel farther south

8   in the Caribbean or farther west?

9      A.   No.  I mean, Antigua is -- sorry, yeah, no,

10   we didn't go further west.

11      Q.   And -- and when you say "Antigua is," what --

12   what were you about to say?  You didn't finish.

13      A.   I was about to say "west," and my brain's

14  going, no, that's east (laughs).

15      Q.   Oh, okay.  Okay.  And it's northeast,

16  correct?

17      A.   I would say it's a little bit southeasterly,

18  actually.

19      Q.   Okay.  What would you say is closest to

20  Antigua?  I'm not -- I'm -- I have a picture in my

21  head, but I'm not sure exactly where it is in relation

22  to other islands.

23      A.   Antigua kind of makes up the -- the top of

24  the L at the Caribbean between the Windward and the

⌖                                                              24

1  Leeward Islands.  So, St. Martin -- St. Martin, Saba,

2  Nevis, St. Kitts, that's all the same area.

3      Q.   Okay.  So is it fair to say it's in that sort

4  of -- in that line of islands that would start with

5  the Dominican Republic and then Puerto Rico, and then

6  you go east and you end up to Antigua?

7      A.   Correct.  It makes pretty much the end of the

8  line before it starts going south.

9      Q.   Okay.  And, again, in the context of that

10  vessel the SY Ma Ha, did you ever have any opportunity

11  to evaluate the sailing skills or the ability of any

12  other person to captain or charter that vessel

13  bareboat?

14      A.   Not while I was on that boat, but, during

15   that period, I did freelance for a few -- I do

16   apologize, it's not on the résumé -- I freelanced for

17   a few of the local bareboat companies, one of which

18   started out working with Ma Ha as our shoreside

19   management.

20           And they had a -- a bareboat side, and I did

21   do what we called checkout sales, which, basically --

22   when the tourists arrive, you go out, you spend the

23   first day with them.  It may be their first charter or

24   the charter company may be unsure about their

♠                                                      25

1   credentials, and you sort of evaluate their -- their

2   capability to manage the vessel safely.  And at the

3   end of the day, you kind of say, all right, you're

4   either going to need a captain, or you're good to go

5   on your own.

6      Q.   All right.  And -- and in -- in that context

7   -- so -- so, with the Ma Ha, I guess I have one

8   question I just want to circle back to, which was, on

9   that boat, it says manager/captain/engineer.

10          Was there any other sailing crew with you on

11   that vessel?

12      A.   Yes.  Yes, I had a chef with me on the boat,

13   but she was also deck crew at that point.

14        Q.   Did she have any sort of credential for being

15   deck crew?

16        A.   She did.  She had Competent Crew

17   Certification and RYA Day Skipper Certification.

18   Those are both Royal Yachting Association credentials.

19        Q.   Now, when you went to -- after December of

20   2014, you worked at -- it looks like SAR Tech, Virgin

21   Islands Search and Rescue, which appears to be a

22   long-term volunteer position.

23            Is that a fair way of describing it?

24        A.   (Deponent viewing exhibit.)  It is correct.

⬆                                                           26

1    I'm --

2         Q.   Okay.

3         A.   -- (inaudible) through it here.

4              MADAM COURT REPORTER:  I'm sorry, I

5    didn't hear what you just said, sir.  You said

6    something --

7         A.   I just said, I'm trying to --

8              MADAM COURT REPORTER:  -- through it.

9         A.   -- to scroll to it, but it's on the same

10   page.

11        Q.   Yeah.  I'm just going backwards up the page

12   instead of coming down.

13          So, in that capacity, again, was there ever

14   any -- did you have any obligation to evaluate people

15   or decide what made them capable or incapable of -- of

16   captaining a vessel?

17      A.   I am -- I am one of the search-and-rescue

18   crew trainers, as well as a -- as well as a responder,

19   and I'm one of the people that signs off on people

20   actually being able to function as crew for us.

21          To put that into context, we -- we have two,

22   approximately, 35-foot rigid inflatables.  They've

23   got, you know, 700 horsepower each.  They're --

24   they're high-speed offshore response boats, and we do

1    go, at times, up to 60 miles, probably, from here,

2    rain or shine.

3           We engage in helicopter operations, and we

4    have a full medical team on board, so we train our

5    medics to one level below the par -- below a

6    paramedic, and we deal with everything from diver

7    injuries to missing person searches to heart attacks

8    to allergies to, you know, a missing -- missing

9    fingers.

10          In a -- in a normal tourist season here --

11   obviously, we haven't had one of those in the last two

12  years, we would average, probably, five to seven calls

13  per week --

14       Q.   Wow.

15       A.   -- and it's sort of the basis of, when the

16  phone rings, if you're available, you go.

17       Q.   Got it.  And so you train people and -- and

18  decide who's the captain.

19            Are you involved in any other type of

20  capacity with that group?

21       A.   Well, I'm also a responder myself, yes.

22       Q.   Okay.  I have a question about these -- I'm

23  going to call them island hopper charter vessels that

24  you worked on; the Festiva, The Moorings and Ma Ha

⬆                                                        28

1  when it was in that area in the islands.

2            What is the typical behavior of those boats?

3  Where -- where do they go?  What -- what do people do

4  with the boats when they're in those areas?

5       A.   I'm -- I'm not entirely sure my answer's

6  going to be what you're asking.  It's somewhat of a

7  broad question.  But the -- the average week, you

8  know, you wouldn't -- you wouldn't move at night, for

9  instance.  You're -- you're doing short sails, and

10  it's really more about where the boat is stopped.

11            It's a hospitality business, and it's almost

12  like a floating resort.  A lot of it is about diving,

13  water sports.  There's obviously a sailing aspect on

14  the -- on the most part.  If the -- if the weather is

15  terrible, people don't want to go out.  Of course, you

16  know, that is what I trained and certified for, but

17  that's not what we're offering out here to tourists.

18      Q.  They might never come back, right?

19      A.  Right.  Sometimes people get -- looking at

20  boats.

21          (Laughter.)

22          BY MS. NIEMEYER:

23      Q.  So, let me ask you -- now, your next job

24  or -- I'm not going to say "next job," because the SAR

1  Virgin Islands Search and Rescue seems to be -- that's

2  a consistent volunteer position that you've held and

3  you continue to hold, correct?

4      A.  Correct.

5      Q.  Okay.  So, post-sailing Yacht Ma Ha, you left

6  in December 2014, and it appears you went to a

7  position with a company called Parts & Power Limited

8  as a service manager until February of 2016; is that

9  correct?

10      A.  Correct.

11     Q.   Did -- now, was that a power or a sail

12  organization?

13     A.   No.  It was an engineering organization.  So,

14  in -- I think it was 2014 that I got married, I

15  decided I needed to be land-based for a little while

16  and be at home.  So I joined a -- a local engineering

17  firm, which they handle marine propulsion, power

18  generation, air conditioning, we did a lot of

19  different things with boats.

20        But it was -- it was a -- call it a school of

21  engineering for me.  I got thrown in the deep end.  I

22  learned a lot in a short period of time.  But I was

23  not on the water during that period, not in a

24  commercial sense.  Obviously, we -- you know, I live

⬆                                                              30

1   in the BVI, we -- we go sailing on weekends here, but

2   I was not commercially on the water in that period.

3      Q.   Okay.  And -- and let's pop up to the next

4   page, which is the first page.  All right.

5      A.   (Deponent complied.)  Yeah.

6      Q.   So now we go to October 2018.

7           Why did you leave Parts & Power?

8      A.   I got divorced, that was part of it (laughs),

9   and I -- I -- I somewhat missed the water, but I

10  really didn't like what I was doing.  There wasn't a

11  lot of challenge to it, and I didn't like who I was

12  working for, to be honest.  I -- I'm somewhat focused

13  on ethics in business, and I wasn't very happy with

14  the way that my employer was -- was doing things.  But

15  similarly, you know, I enjoy -- I enjoy a challenge,

16  I enjoy new problems to solve, and I wasn't finding

17  them there.

18       Q.   Okay.  Now -- so you left there, and you --

19  it looks like, in October of 2018, you have Relief

20  Captain on Sailing Yacht Necker Belle.

21            Was that a -- a temporary position?

22       A.   It was somewhat -- it is somewhat of a

23  permanent position.  I, obviously, haven't been able

24  to get to the boat due to COVID concerns in over a

♠                                                    31

1  year and a half.  I'm still their relief captain, but

2  they -- they don't have a need for one, because the

3  crew's not really being tasked.

4            So the purpose of the relief captain is,

5  effectively, that when the captain needs a break or

6  the captain needs to go to a wedding or go on vacation

7  or whatever, they call up the relief captain and off

8  you go.

9            And so I've got Necker Belle on there.  She's

10  actually called Bella Vita now.  She's been sold.  I'm

11  still -- I'm still part of the relief crew.  She used

12  to belong to Sir Richard Branson.  So she was based

13  here, but we also took her up as far as

14  Fort Lauderdale and Georgia.

15      Q.   Well, that must have been pretty interesting

16  working with him.

17      A.   I -- I still work with him.

18      Q.   Excellent.

19      A.   You asked me a little earlier about stuff

20  that's not on this résumé.  The -- the COVID period

21  has been a little bit interesting and, if you'd like,

22  I can elaborate on that a little bit, because it may

23  give it context for you --

24      Q.   Okay.

1      A.   -- to get to that point.

2      Q.   We'll get there.

3      A.   Okay.

4      Q.   We'll get there.  Remind me if I forget.

5      A.   Okay.

6      Q.   So -- so that Necker Belle was an

7  on-again, off-again, is that a fair way of putting it?

8  You were relief captain when you were called upon?

9      A.   Correct.  It's -- it's as-needed.  It's not a

10  full-time deal.

11      Q.   Okay.  And where is that boat now?

12      A.   I believe she's in St. Thomas right now.  So

13  she's -- she's less than 50 miles away.  I just can't

14  get to her.

15      Q.   Okay.  So the islands are still -- they're

16  not allowing any movement because of --

17      A.   We're -- we're open --

18      Q.   -- COVID?

19      A.   -- we're -- we're open, but there are

20  significant restrictions to crossing the borders.

21  They don't -- it's not a very friendly process.

22  There's a lot of testing involved, there's quarantine

23  involved and a high level of expense through all of

24  that --

⬆                                                      33

1      Q.   Okay.

2      A.   -- as well.

3      Q.   Okay.  So, again, also in 2018, August of

4  2018, I see Relief Captain, Motor Yacht The

5  Collection.  And can you tell me a little bit about

6  that boat?  And that says "to present."

7           So is it fair to say you're -- you're

8  on-again, off-again acting as relief captain on both

9   of those vessels to date, if there were no COVID?

10       A.   That actually ended in February.

11       Q.   Okay.

12       A.   It's been sold to a new owner, and I decided

13   not to stay.  Obviously, I can't even get there, so

14   I -- I can't enter into a new agreement reasonably.

15            So The Collection is a hundred-and-three-foot

16   or hundred-and-five-foot Mangusta, which is a

17   fiberglass motor yacht.  She does about 40 knots.

18   It's a bit like driving a cigarette boat, except it's

19   a hundred and five feet long.  She's got somewhere

20   between three and 5,000 horsepower, so she's a big

21   girl and she goes fast.

22            She is -- she is -- you know, she's Italian

23   finished, four guest cabins on board.  At any given

24   time, we'd take up to 12 passengers.  However, when

                                                    34

1   we're on the dock, when we're not underway, you know,

2   at some points, the owner would have up to 30 people

3   aboard for dinner parties and what have you.

4       Q.   Okay.  And -- and, finally, I see Marine

5   Surveyor, Caribbean Marine Surveyors, Limited,

6   February 2016 to present.

7            Are you still with them?

8       A.   Correct.

9    Q.   Is that your company?

10   A.   I am, indeed.

11   Q.   Um --

12   A.   It's not my company.  I'm -- I'm not a

13   partner in the company --

14   Q.   Okay.

15   A.   -- but it's who I work for, yeah.

16   Q.   And the reason I ask is, somewhere in the

17   paperwork, it appeared there were two different

18   company names, and I wasn't sure if you were

19   subcontractor to Bill Bailey or if you were part of

20   his organization?

21   A.   So we do have two different company names,

22   mainly for tax purposes.  So there's Caribbean Marine

23   Surveyors, which is the entity that functions in the

24   British Virgin Islands, and we use that for work that

35

1    we do in the British Virgin Islands, the taxable work.

2         And then there's Caribbean Adjusters & Marine

3    Surveyors, which is a BVI-registered company, but we

4    use it for all of our offshore work.  So, anything

5    that's not in the BVI.

6         And, probably, I think it's happened since

7    this loss, we also have Caribbean Adjusters & Marine

8  Surveyors Grenada, because we have an office in

9  Grenada, which is taxable in Grenada and trading in

10  Grenada.

11      Q.  Okay.  So help me out again, with that second

12  entity that does the offshore, what's that called

13  again?

14      A.  Caribbean Adjusters & Marine Surveyors.

15      Q.  Now, this particular claim involved a vessel

16  that went aground in the Dominican Republic.

17      So was -- was that, technically, under

18  Caribbean Adjusters & Marine Surveyors?

19      A.  Correct.

20      Q.  Okay.  Do you have any kind of a contract

21  or -- or does the company have a contract with Great

22  Lakes or with Concept, so that you have some sort of

23  arrangement with them that's more than just a one-off

24  deal?

&#9650;                                                          36

1      A.  I -- I believe we do.  We work with them

2  regularly.  That's somewhat above my pay grade.

3      Q.  Okay.  In your experience working with this

4  company, what percentage of your work would you say is

5  on behalf of Concept or their insurance company

6  clients?

7      A.  On behalf of Concept, probably less than

8  10 percent, I should think.  Probably a lot less than

9  10 percent.  There's a lot of -- a lot of different

10  things that we do.  So we do -- we obviously do damage

11  claims, and, pre-COVID, that's what I would spend a

12  lot of my time doing.

13      Q.  Mm-hmm.

14      A.  I also split those out between catastrophe

15  response and normal damage claims.  I've spent a lot

16  of times responding to hurricanes in disaster zones,

17  which is kind of a different type of work.  It's a bit

18  like triage.

19          We obviously also do condition and valuation

20  for purchase, for people that are buying boats.  We do

21  the same thing for insurance, for owners that are

22  trying to obtain coverage.  We do phase-out

23  inspections for boats that have been in a -- in a

24  charter fleet and are being released from the fleet

♠                                                           37

1  back to the owner.

2          I do coding as well.  So I do commercial

3  certification of -- of vessels as -- as a certifying

4  authority for the MCA, the Maritime Coastguard Agency

5  in the UK, and a number of other flag states.

6          So the -- the -- the MCA one would cover all

7   of the Red Ensign states; so, places like BVI, Cayman,

8   Guernsey, Jersey, the UK.  I've also been enabled by

9   the Marshall Islands.  As an office, we also work with

10  Transport Canada and a number of other flag states and

11  entities?

12      Q.   Okay.  So February 16th [sic] I see is when

13  you started working there.

14           Was that your first experience as a marine

15  surveyor?

16      A.   That's correct.

17      Q.   And at that time had you gone to school or

18  done anything to become qualified to be a marine

19  surveyor?

20      A.   Beyond preexisting experience, no.

21      Q.   Okay.  So I'm going to -- there's -- there's

22  a method to my madness here.  When I -- I looked you

23  up in the 2016 SAMS and NAMS directories, and I didn't

24  find you, but I did find you online with SAMS.

1           So --

2      A.   Yes.

3      Q.   -- I just wanted to ask; could you explain

4   what that is and what you needed to do to become a

5   member of SAMS?

6      A.   So there's multiple levels within -- SAMS is

7  the Society of Accredited Marine Surveyors.  There's

8  multiple levels within SAMS.  There's what they call

9  an SA, which is what I am, Surveyor Associate.

10      And there's what they call an Accredited

11  Marine Surveyor.  So, to become an accredited marine

12  surveyor, you have to show that you have five years of

13  experience as a marine surveyor or in relative fields.

14  So, relevant -- relevant previous experience.

15      And so, when I joined SAMS, they gave me a

16  couple of years of previous experience.  And if --

17  I've had a little disagreement with SAMS, because they

18  are an international organization; however, they're --

19  they're US-based, and they have a -- they have a

20  little issue with our -- the way our -- we write our

21  reports, because we operate in the BVI, which is a

22  separate legal jurisdiction.  And so there's some --

23  some boilerplate they don't like, but, of course, one

24  of the requirements to become an AMS is that five

                                                    39

1  years' experience.

2      Another -- along with continuing education

3  credits, which we do every year, there is a

4  requirement that you attend one of their annual

5  general meetings every five years, and, obviously, for

6  almost the last two years, we've been unable to do

7  that because of COVID.

8      Q.   Okay.  So were you an AMS and lost the

9  credential, or have you not yet reached that level?

10     A.   I have not yet had the opportunity to reach

11  that level.

12     Q.   Okay.  And -- and to do that, you would need

13  them to acknowledge more credit for time; is that

14  correct?

15     A.   I would -- I would need to attend a -- an

16  annual general meeting in the US.

17     Q.   Which isn't possible right now because of

18  COVID --

19     A.   Right.

20     Q.   -- right?

21     A.   Correct.

22     Q.   Okay.  If -- if it was possible, would -- is

23  that the last thing that you would need to do, or is

24  there anything else?

↑                                                        40

1      A.   I'm waiting on an approval on -- on yet

2  another report, but that's it.

3      Q.   When you said that there are things about the

4  reports that they don't agree with, can you elaborate

5  on that?

6       A.   They have some standard wording, some

7   boilerplate that they like to see from a -- from a

8   legal liability standpoint in the, sort of, standard

9   SAMS reports.

10          I think some of that stems from the fact that

11  they do offer some B&O and some general liability

12  insurance through SAMS.  We carry our own.  The issue

13  that we have -- we actually have somewhat in-house

14  counsel here as well, but we operate under UK law or

15  BVI law, which is based on UK law, which is a little

16  bit different.  And so we have -- we have our own

17  boilerplate, which doesn't quite match up with what

18  they want.

19      Q.   Are you -- is that boilerplate contrary to US

20  laws?

21      A.   I don't believe so, no.  It's just -- it's

22  just not the -- the verbiage that SAMS wants.

23      Q.   Okay.  I --

24      A.   And -- and just to clarify, that boilerplate

⌂                                                           41

1   is relevant to condition and valuation surveys, not

2   damage surveys.

3       Q.   Okay.  So let's go back to what we talked

4   about before.  You had mentioned, when we were talking

5   about the Necker Belle, that there was some later

6   development that you --

7       A.   Sure.

8       Q.   -- wanted to mention.

9       A.   So it -- it may or may not be relevant, but

10  just in case it is, I'll -- I'll sort of update the

11  résumé here, verbally.

12          Obviously, since COVID hit, the country's

13  been closed.  There hasn't exactly been a whole lot

14  going on in the marine surveying world, and I have

15  since fallen into this, sort of, role of helping the

16  country develop its COVID protocols.  I was elected

17  last year as the Chair of the Marine Association,

18  which represents all of the marine businesses in the

19  BVI.  Main -- it mainly serves an advocacy role with

20  the government.

21          I have also been appointed in the last year

22  to the Premier's Economic Advisory Counsel, which, I

23  think, there's somewhere between seven and nine of us

24  which are personal advisors to the Premier, the leader

♠                                                    42

1   of the country.  And my specific role is to advise on

2   marine matters.  So I've -- I've fallen into a --

3   let's call it a marine consult -- consulting role for

4   both the industry and the government here.  Some of it

5  is in terms of economic policy.  Some of it is in

6  terms of, for instance, our -- our safety standards.

7          So we talked a little bit about the MCA and

8  different flag states.  One of the governing documents

9  for different flag states -- or for -- for MCA flag

10  states is a document called MGN280.  It is the -- the

11  standards of safety for small commercial vessels.

12  Then there's a little bit of a gap in the way that the

13  BVI government have applied this over the years and in

14  the way that it's written.  And that, obviously, has a

15  significant economic drawback to just start enforcing

16  the rules overnight when they haven't been enforced

17  for 15 years.

18          So, probably, the -- the more significant

19  part of -- of these new roles relevant to this is that

20  I've been appointed to, sort of, advise the government

21  on -- on how they can mitigate their risk while

22  working within the rules and -- and make things work

23  economically for the businesses as well.

24      Q.   Now, when you're talking about small

⬆                                                        43

1  commercial vessels, are you talking about these kind

2  of sailing charter vessels like you worked on?

3      A.   So, under the MCA rules, a small commercial

4    vessel would be anything under 24 meters and anything

5    under 12 passengers or 12-and-under passengers.   And

6    that's 24 meters in load line length, so that's -- in

7    simple terms, that's water line length, not overall

8    length.

9        Q.    And when you -- so, again, the vessels that

10   you were the charter captain for, are -- do they fall

11   under that rule?

12       A.    Everything except Necker Belle and

13   The Collection.   They --

14       Q.    Okay.   Those were --

15       A.    -- would be classed as what we call --

16              (Technical difficulties.)

17              MADAM COURT REPORTER:   I'm sorry, sir,

18   you broke up.

19           Can you please repeat what you just said,

20   they were something?

21              THE DEPONENT:   Sure.

22       A.    I said, everything except the Necker Belle

23   and The Collection, they would be classed as large

24   yacht, under the MCA code.

1        Q.    Is there a different code in the United

2    States for that type of a vessel?

3        A.    Correct.

4      Q.   Are there any highlights you could give me

5   about how those might be different?

6      A.   US code isn't -- isn't particularly my

7   specialty.  I don't generally deal with US commercial

8   vessels.  I know there are a number of CFRs and Coast

9   Guard standards that would be applied.  Anything under

10  six passengers in the US can go uninspected, I

11  believe.  They have an uninspected passenger vessel

12  system, but I wouldn't want to advise you on that too

13  far.  Like I said, it's not really my field.

14     Q.   Are the -- are there different roles for

15  private vessels as opposed to the commercial ones?

16     A.   Correct.  Private -- private vessels have

17  very few rules beyond what -- what safety equipment

18  they need to carry on board --

19     Q.   Okay.

20     A.   -- and the US Coast Guard standards on that

21  are very relaxed, in -- in my view.

22              MS. NIEMEYER:  Laurie, how are you doing?

23              MADAM COURT REPORTER:  I'm doing great.

24  I can go for another 15 minutes, if you'd like.

45

1              MS. NIEMEYER:  Okay.  All right.  I just

2   wanted to make sure.

3                    MADAM COURT REPORTER:  Thank you.

4             BY MS. NIEMEYER:

5        Q.   So, Mr. Ball, what is a marine surveyor, in

6   your words?

7        A.   Like I said before, there are a number of

8   different types of marine surveyor.  In -- in my view,

9   it would be somebody with subject-matter knowledge

10  that would make an assessment of a vessel, or, in this

11  case, an incident, and offer a professional opinion

12  and assessment, if you will.

13       Q.   Okay.  And as a marine surveyor, is there any

14  kind of a written description that -- for instance,

15  with SAMS, where you're accredited, is there any kind

16  of a specific written description that says what you

17  can and can't do?

18       A.   There are a number of ethical standards; one

19  of which is, obviously, don't -- don't work beyond

20  your means, your qualifications, your experience.

21  Don't work when you're in conflict.

22            SAMS certainly has an ethical policy.  So

23  does NAMS, so does IMS.  There are a number of

24  different -- obviously, in the US, you have SAMS and

⬧                                                           46

1   NAMS.  In the UK, we have the Royal Institute of

2   Naval -- Naval Architects, we've got the National

3    Institute of Marine Surveyors.  It depends where you

4    go in the world.  There are a number of them.  Some

5    are more respected, and some are less respected than

6    others.

7         Q.   Okay.

8         A.   I -- I would -- I would hope that they all

9    follow the same sort of general ethics standards.

10        Q.   And -- and can you, in a broad brush, explain

11   what those ethical standards are?

12        A.   I think I just did, but, you know, the -- the

13   -- the two main broad strokes, I would say, are,

14   obviously, not working when you're in conflict and not

15   working beyond your skills and ability.

16        Q.   Okay.  Now --

17        A.   On that note, actually --

18        Q.   Okay.

19        A.   -- I should probably elaborate a little on

20   how this office works.

21             So we don't -- we don't work as, sort of,

22   singular surveyors, per se.  Obviously, when we attend

23   overseas, we work as singular surveyors, but you'll

24   notice in all of our reports that there are two

1    signatures.  Almost everything we do in this office is

2   reviewed by another one of our surveyors.

3         So we have the benefit -- you know, I see

4   that you're -- you're going down the résumé here.  In

5   reality, there are two résumés, at least, that would

6   be part of the assessments that we've made in these

7   reports.  So we have a -- a review system.  We call it

8   internal quality control, if you will.

9   Q.   Okay.  So I was going to get to that when I

10  pull out your report.

11        But -- so Mr. Bailey also signs that report?

12  A.   Correct.

13  Q.   What level of review did he have when he

14  pulled out that report?

15  A.   So we generally discuss these things either

16  in the office or on the phone.  When I'm attending a

17  claim overseas, he -- he probably hates me because of

18  my phone bill, but we -- we speak verbally, you know,

19  more than once a day.  When I return, we go over the

20  case, we go over the photographs, we go over all the

21  details.  So, you know, on -- on one level, I can say

22  that he's intimately aware of what's going on in the

23  case.  On the other side, I can say, well, he wasn't

24  there, I was.

⬩                                                      48

1         So I do believe that Bill, as the principal

2    surveyor here, who is doing most of the reviewing

3    work, had as much detail as -- as he could have before

4    he signed off on this report.  He obviously had the

5    opportunity to review what was written in the report,

6    review the photographs, review, you know, whatever

7    evidence we have on each individual case and ask

8    questions.

9        Q.   Okay.  Again, I'm going to ask for a

10   definition in your own words of what you understand

11   something to be.

12            What is an insurance adjuster?

13       A.   It's somebody that reviews and quantifies the

14   claim in relation to the insurance contract.

15       Q.   Is it your understanding that an adjuster

16   makes a decision about whether there's coverage?

17       A.   No.

18       Q.   What is your understanding about that?

19       A.   It's my understanding that the adjuster would

20   make recommendations to the underwriter.

21            And just to be clear, in -- in this case, we

22   are not working as adjusters.

23       Q.   Okay.  That was going to be my next question.

24            What, exactly, was your role in this case?

1      A.    We were there as surveyors.

2      Q.    What -- what kind of a relationship were you

3  expected to have in rel -- like, vis-a-vis, you and my

4  client, Mr. Andersson?

5      A.    I would -- I -- I believe I was expected to

6  take a statement as to what happened, which I did, and

7  to advise him on what his next steps could be, who his

8  points of contact were.  One of the things that we

9  would do in advance of working towards adjustment

10  would be -- and I'm sure this is going to come up in a

11  minute -- to determine a reasonable cost of salvage,

12  if that's necessary.

13          In this case, we did, but we never got around

14  to appointing salvors.  But it -- it -- in a large --

15  in a large sense, you know, our relationship on

16  initial attendance is to get a grip of what is

17  happening on the ground and assess the -- the next

18  steps, the next reasonable steps, to mitigate loss.

19  And --

20      Q.  Did you ever --

21      A.   -- of course --

22      Q.   -- convey the --

23              MADAM COURT REPORTER:  I'm sorry.

24

1          BY MS. NIEMEYER:

2     Q.   -- fair and reasonable cost to --

3               MADAM COURT REPORTER:  Michelle --

4               MS. NIEMEYER:  I'm sorry.

5               MADAM COURT REPORTER:  -- he said

6    something after something after to mitigate cost

7    [sic].  I didn't hear what you said, sir.

8     A.   I said to mitigate loss and, of course, to

9    quantify loss.

10    Q.   Okay.  You mentioned that you had calculated

11   the fair and reasonable cost of salvage; is that

12   correct?

13    A.   I had discussed with salvors as to a fair and

14   reasonable price to remove the vessel from the reef,

15   yes, to salve the vessel.

16    Q.   And when did that happen?

17    A.   That was on the beach the same day I

18   attended.  We went out and had a look at the wreck and

19   then we sat on the beach, Mr. Andersson and a salvor

20   and myself.

21    Q.   Do you recall who that salvor was?

22    A.   Not off the top of my head I'm afraid.

23    Q.   Okay.  Did you have -- ever have any

24   conversation with any other salvor than that one that

1  you talked to on the beach?

2      A.   No, and we never had any further conversation

3  either.

4      Q.   Do you remember what he said?

5      A.   Not anything that I would want to testify to,

6  not that clearly.  Unfortunately, there's quite a lot

7  of time between then and now.

8      Q.   What do you remember?

9      A.   Again, nothing -- nothing clear enough that I

10  would want to -- I would want to risk putting it on

11  the record.

12      Q.   Okay.  So you're -- is it fair to say at this

13  point, you're just -- you're not sure?

14      A.   Correct.

15      Q.   Okay.

16      A.   I -- I would be guessing if I were to say

17  anything, and I don't think that's fair to anybody.

18      Q.   Okay.  Did you, at the time or around the

19  time of that situation, communicate with Mr. Bailey in

20  writing?  I know you said you spoke on the phone; did

21  you have any written communications with him about

22  what was going on when you were there to inspect the

23  boat?

24      A.   Again, a long time ago.  I -- I would doubt

1  it.  We speak often enough on the phone that, you

2  know, I wouldn't have any real reason to write

3  anything, especially since, you know, I'd be heading

4  back here fairly imminently.  I won't say it's

5  impossible, but I -- I think it's unlikely.

6      Q.   Is it fair to say your standard business

7  practice was to talk on the phone?

8      A.   When -- when I have phone service and I'm

9  afar, yes.

10     Q.   Are you aware of whether Mr. Bailey took any

11 notes related to this particular survey and --

12     A.   I am not.

13     Q.   -- his conversations with you?

14     A.   I am not aware, no.

15     Q.   In your experience in your office, was it

16 standard for Mr. Bailey to take notes on phone

17 conversations?

18     A.   No.  I mean, if there's -- if there's broad

19 strokes with action points, absolutely.  You know,

20 it's a method of -- for us to, sort of, remember what

21 we need to do.  But in terms of, you know, the phones

22 -- the phones ringing, and I'm going to write myself a

23 -- you know, a broad transcript of what's considered

24 on the phone, no, it's not.

1      Q.    Okay.  Do you use a note function on your

2  phone when you do things like this?

3      A.    Sometimes I use a note function on my phone.

4  More often than that not, if I'm out in the field,

5  it'll be -- it'll literally be me writing on paper.

6            You know, as an example, when we took

7  Mr. Andersson's statement, I wrote it on paper

8  (indicating) and then I later sent him an e-mail that

9  transcribed what was there and asked him if he would

10  be willing to sign that it was accurate.

11           But we -- we have some -- some constraints,

12  depending on where we are.  You know, sometimes we're

13  in a very remote location.  You know, I -- I -- I did

14  a job in Cuba a few years ago where we didn't even

15  have electricity for three days, so the note function

16  on a note doesn't really work, you've got to do it on

17  paper, you know.

18           And then we swam out to the wreck, so there

19  wasn't really a way to keep -- to keep anything dry.

20  So, you know, we took a waterproof -- a waterproof

21  camera, a photo's kind of worth a thousand words, and

22  I have somewhat of a way of taking photos to remind me

23  as to what I want to write in my report as well.

24     Q.    Okay.  Okay.  So when you said you swam --

⬆                                                                    54

1  not in Cuba -- in this survey, you swam to the boat?

2     A.    Yes.

3     Q.    Okay.

4     A.    We waded out, let's say.  It was about neck

5  deep.

6     Q.    Okay.  And I want to just back up a bit so

7  that we don't miss things here.

8           Are you an insurance adjuster?

9     A.    No.

10     Q.    Okay.  So you were not in this capacity and

11  you are not.

12           Are you becoming one, or have you done any of

13  the education to become an insurance adjuster?

14     A.    No, Bill is.  And in -- in the BVI, Caribbean

15  Marine Surveyors is licensed as a loss adjuster.  It's

16  a little bit strange here.  They license the company

17  and not the individual.

18     Q.    Do you know for how long Bill and the company

19  have had those credentials?

20     A.    I don't know specifically, but if I were to

21  give an estimate, it would probably be at least 15

22  years.  I think -- I think part of reason that the

23  company is licensed instead of the individual is -- is

24  grandfathering, so that would've been some time ago.

1        We have a -- you know, the -- the largest

2  part of our economy here is financial services, so the

3  -- the regulation thereof has, obviously, increased

4  over the last decade or so.

5     Q.   Okay.  Are there any parts of the report and

6  -- and I'll get to the actual report, but you

7  mentioned we'd talked about that both you and Bill

8  Bailey signed off on a report that went to Great

9  Lakes, correct?

10    A.   Correct.

11    Q.   And, in that context, are any parts of that

12  report written by Bill as opposed to written by you?

13    A.   No.  I wouldn't say so.  There are aspects of

14  the report where he will say, you know, is that -- are

15  you sure that's what you want to say?  It might be

16  better said like this.  There's definitely an

17  editorial license, but there is nothing that he would

18  change without my permission.

19    Q.   Okay.

20    A.   So there's -- there's nothing in there that I

21  am not comfortable with my signature on.

22    Q.   Okay.  And there's nothing there that you

23   didn't write, and if there was a change made, it was

24   made with your understanding and having taken advice

1    from Bill; is that correct?

2         A.   Correct.

3         Q.   Okay.

4                   (Off the record at 11:01 a.m.)

5                   (Recess taken.)

6                   (Back on the record at 11:12 a.m.)

7              BY MS. NIEMEYER:

8         Q.   So we were talking about, in generalities,

9    the involvement of Mr. Bailey as -- as your coworker,

10   I'll say, on this -- on dealing with this report.

11             And I wanted to ask; did Mr. Bailey do

12   anything independently of what you did to gather

13   factual information?

14        A.   Not to my knowledge, no.

15        Q.   Do you know if he spoke with any witnesses?

16        A.   Not to my knowledge, no.

17        Q.   Do you know if he had any conversations

18   separate from yours with Mr. Andersson?

19        A.   Beyond the initial appointment while we were

20   setting up my travel and for me to travel to Dominican

21   Republic to meet Mr. Andersson, not to my knowledge,

22   no.

23     Q.   Does your company keep a file -- a -- a

24   central fine for every claim where you would have all

    ⬆                                                    57

1   of the information, regardless of whether it's yours

2   or Mr. Bailey's, put into that file?

3     A.   We do.   It's spread all over my desk right

4   now.

5     Q.   Does that include those kind of notes that

6   you would've taken or that he would've taken?

7     A.    It includes my handwritten notes.   What it

8   doesn't include is printouts of all the e-mail

9   transcripts, because those are -- we've got those

10   stored electronically.

11     Q.   Okay.

12     A.    (Deponent viewing documents.)   So, right in

13   front of me, I have some of the -- some of the

14   various, more prominent letters, the original

15   insurance survey, the signed statement from

16   Mr. Andersson, my -- my own résumé, the policy, our

17   reports, some of the legal documents, et cetera.   But,

18   some of the stuff, we would just leave on our server

19   as well.

20          So we have a -- a central paper file as well

21   as a central electronic file.   Most everything that's

22   in the paper file is stored electronically, aside from

23   my handwritten notes, obviously, and then the e-mail

24   correspondence would be separate on our e-mail server.

↟                                                            58

1     Q.   Does --

2     A.   And I believe that we -- I believe we created

3  a bundle of this to provide for discovery as well.

4     Q.   Okay.  So, when you -- when you keep your

5  e-mails, are they generally all mixed up, or do you

6  keep them in folders based on what the claim is?

7     A.   No.  We keep them in folders based on the

8  claim.

9     Q.   Okay.  There's a method to this madness.

10         Do you know if Mr. Bailey made any decisions

11  related to coverage on this case?

12    A.   I don't, no.

13    Q.   Do you know if he did any sort of an analysis

14  of the provisions in the policy with respect to the

15  claim that was being made?

16    A.   I think -- we definitely, obviously, looked

17  at the navigational limits on the policy.  Beyond

18  that, I don't believe so, no.

19    Q.   And did you, independently, do any kind of

20  evaluation as far as reviewing the policy in

21  comparison with the facts in this case?

22    A.   Absolutely.  Yeah, we always -- we always

23 look at the policy, and we might make recommendations

24 on it.  Obviously, in this case, we're not working as

1 adjusters, so, you know, we're -- we're offering our

2 -- our review, but not specifically advice as an

3 adjuster.

4    Q.   Do you do work for other insurance companies

5 besides Great Lakes?

6    A.   We do, indeed.

7    Q.   And who are the other insurance companies you

8 do work for?

9    A.   Probably most notably, Guardian and Massy,

10 which are Caribbean-based.  I think Guardian is

11 actually reinsured again by Willis Towers Watson, who

12 we also work for.  A number of the insurers that we

13 used to work for stopped writing marine policies in

14 the Caribbean after Hurricane Irma or after Hurricane

15 Dorian.

16       So, in the past, there's been Falvey Yacht

17 Insurance, Flagship's still around, Caribbean

18 Alliance.  We've done stuff for Geico Boat US.

19       We -- we make a -- a lot of relationships

20 with a lot of different underwriters through

21  catastrophe response, so we're generally one of the

22  first teams on the ground after a big hurricane comes

23  and wipes everything out in the Caribbean which is,

24  unfortunately, a fairly regular occurrence.  So,

1   obviously, once -- once these guys find out we're

2   there, they say, okay, you know, let's see if you can

3   do some work for us.

4           So we do -- we represent a -- a wide range of

5   underwriters.  There is a, sort of, core group that

6   insures some of the larger fleets, and there's --

7   there's very few insurers now that will offer

8   reasonable coverage through hurricane season.

9           So the -- the pool of -- of, sort of, working

10  insurers in the Caribbean has been getting smaller and

11  smaller.

12      Q.   Now, is -- is that also true for outside of

13  hurricane season?

14      A.   No, it's not.  I mean, you know, obviously,

15  boats move, so there's a -- there's a fair number of

16  private boats that will come down seasonally and

17  either go down to Grenada or up -- up north of the

18  Carolinas for hurricane season.  Or, you know, some of

19  them have policies that they say they can hole out in

20  Florida.

21        But, certainly, since we had Irma and Maria

22   here in 2017, the -- the number of underwriters

23   willing to offer, you know, reasonable coverage

24   without, you know, crazy-named storm deductibles or

⬆                                                          61

1    depreciation policies, et cetera, has gone down.  And

2    so it -- it leaves a much smaller pool.

3         I mean, if we look, we've got somewhere

4    around 750 bareboats in the BVI, which are --

5    they're -- they're commercial boats, they don't have a

6    crew on them, and it's a bit like renting an RV, but

7    it's a boat.  And those boats are in 12 or 13

8    different charter fleets.  Probably, at least, seven

9    or eight of them are insured by -- by one underwriter,

10   which was the case before Hurricane Irma, it was a

11   different underwriter, which no longer writes.  But

12   it -- it makes -- it makes the -- the pool relatively

13   small, locally.

14        Obviously, pre-COVID, we would work all over

15   the Caribbean.  So we would go -- we have -- we have

16   an office in Grenada, as I previously mentioned, but

17   we would go everywhere from, sort of, Grenada up to

18   Florida.  It's a bit strange that people would want us

19   to go to Florida, given that there's an -- an ample

20   supply of surveyors there, but, occasionally, a, you

21   know, a claim will start here and repair will be done

22   in Florida, and they want to have somebody that's

23   already familiar with the claim.

24         You know, I do -- I do new build work as far

↑                                                          62

1   as Poland, so we -- we travel all over the place.

2         To go back to your original question, which I

3   digressed on, there are a number of underwriters we

4   work for, yes.

5   Q.   Okay.  And -- and you mentioned that you

6   usually look at navigational limits, so that -- that

7   leads me to another question, which is, is it -- how

8   -- how does this navigational limit provision compare

9   to what you generally see for boats that are in the

10   Caribbean?

11   A.   I -- it's -- it's comparable to what I see on

12   most policies.  At least for private vessels.  So, for

13   a -- a bareboat charter boat, they will have

14   provisions that say things like, they can't move at

15   night unless it's an emergency, you know, they're not

16   -- they're not supposed to go more than 20 miles from

17   land.  But that's, obviously, an entirely different

18   risk model.

19         There's no -- there's nobody qualified on

20  board.  And the vessel isn't -- the vessel isn't set

21  up to go that far either.  So we were talking a little

22  bit before about the MCA standards and the different

23  categories.

24          The MCA has Category 0 through 6; zero being

⬆                                                           63

1   you can take paying passengers anywhere in the world,

2   you can sail around the poles -- that's based on some

3   very extensive structural engineering requirements, as

4   well as safety equipment -- all the way down to

5   Category 6, which is, sort of, daytime-only inland

6   waterways.

7           So a hundred and fifty nautical miles from

8   shore would be classed under the MCA's Category 1.

9   Our average charter boat in the Caribbean is what we

10  call Category 4, which is daytime only.

11      Q.   Okay.  So I'm a little confused because

12  you -- you said the hundred and fifty nautical miles

13  from shore would be Category 1, but you also said

14  that --

15      A.   Correct.

16      Q.   -- you could go anywhere in the world, cross

17  oceans (laughs), that doesn't work, right?

18          So what would that --

19     A.   That category --

20     Q.   -- re -- what -- what would you do --

21     A.   -- that category --

22     Q.   -- is there a --

23               MADAM COURT REPORTER:  I'm sorry.

24

                                                        64

1          BY MS. NIEMEYER:

2      Q.   I'm sorry?

3               MADAM COURT REPORTER:  Can you please

4   repeat that, sir?  I --

5               THE DEPONENT:  Yes.

6               MADAM COURT REPORTER:  -- couldn't hear

7   you.

8               THE DEPONENT:  Sure.

9      A.   I -- I was saying, that's Category 0.

10     Q.   Okay.

11     A.   So it starts with Category 0, which you can

12   go anywhere in the world, cross oceans.  And -- and

13   let's keep in mind as well that these are commercial

14   standards, so this is for when you have paying

15   passengers on board.

16          At the same time, I would -- I would view

17   them as a, sort of, minimum reasonable standard in

18   terms of safety equipment and, you know, it -- if it

19    -- if it's -- if it's a minimum standard of safety to

20    take paying passengers as far as your duty of care,

21    why would it not be the minimum standard for you as a

22    private operator.

23          Does that make sense?

24    Q.   It -- it makes sense on -- from a logical

⬆                                                              65

1     perspective, yes.  (Laughs.)  It may or may not be the

2     legal standard, but it makes sense from a logical

3     perspective --

4     A.   Yeah.

5     Q.   -- so I understand what you're saying.

6     A.   (Deponent nods head.)

7     Q.   So, the hundred and fifty nautical miles, is

8     that something that's crafted, so to speak, that -- is

9     that something that's used worldwide for any kind of a

10    Category 1 vessel, or is that something that's

11    specific to the Caribbean?

12    A.   It would -- the categ -- the different

13    category numbers I gave you are specific to the MCA,

14    which is specific to Red Ensign flags.  So,

15    unfortunately, every flag has their own, sort of,

16    model, if you will.  I'm sure that the US Coast Guard

17    would have different -- let's call them dividing

18  lines, as far as navigational limits.

19      Q.   All right.

20      A.   As far as how underwriters assign this, I

21  don't know.  You know, not my department.

22      Q.   Okay.  Now, let me ask you another question

23  kind of related to this, the navigational limits both

24  refer to the miles from shore, as well as referring to

⬆                                                          66

1   the specific countries that the vessel is not allowed

2   to go to, correct?

3       A.   Correct.

4       Q.   And, in particular, in this -- this policy,

5   relevant to this matter, the vessel was precluded from

6   going to Venezuela or Colombia; is that correct?

7       A.   I could check the policy, but I'm sure you --

8   I'm sure you're right.

9            (Deponent viewing document.)  I won't

10  question -- yes, Cuba, Colombia, Haiti and Venezuela.

11      Q.   Do you have any understanding about why the

12  vessel was not allowed to go to Venezuela?

13      A.   I don't want to speak on behalf of

14  underwriters, but, if I'm to give an opinion,

15  sometimes it is about crime rates, risk of theft,

16  piracy, et cetera.  Sometimes it's a little bit more

17  about diplomatic relations.

18          As an example, I handled a claim in Cuba a

19  few years ago where the Cuban government decided to

20  effectively arrest the vessel that had run aground,

21  but also would not allow the captain to leave, because

22  they claimed that it would be abandonment if he left,

23  even if he left somebody in his stead as his agent.

24  He had a heart condition, and he was kept on the beach

♠                                                          67

1  there for three months.

2          So, obviously, that -- you know, an incident

3  like that would be a huge risk to underwriters.  And

4  the -- and the diplomatic relations between the -- the

5  British Embassy and the Cubans and the -- in this

6  case, the Canadian Embassy was involved as well.  You

7  know, it gets -- it gets very expensive and very

8  complicated.

9          You know, the Cuban government, sort of,

10  tried to rake us over the coals on the salvage, and,

11  subsequently, you know, if I was an underwriter, I

12  would just say, that's not a risk I want to take on.

13  Q.   Particular to Venezuela, do you have any

14  personal experience in dealing with Venezuela in the

15  last, let's say, five years?

16  A.   I don't, but I am -- I believe I'm aware that

17  they have some sort of a political upheaval going on

18  right now and -- and a bit of a migrant crisis as

19  well.

20       Q.   Have you been asked to go to Venezuela to

21  handle any claims in that time frame?

22       A.   No.  And I -- I would not want to go there.

23       Q.   Why not?

24       A.   It doesn't sound like a very safe place to be

&                                                      68

1  right now.

2       Q.   Does Mr. Bailey go to Venezuela for claims?

3       A.   I'm sure not in the last ten years.

4  Previously, if we look back, sort of, 20, 30 years in

5  Caribbean history, Venezuela and Trinidad used to be

6  very favorable places to take boats for repairs.

7            So, for instance, if you had a

8  hurricane-damaged boat that had significant, let's

9  say, water damage to the interior, you could go down

10  to the Venezuela and get some beautiful woodwork done

11  that was very high quality at a very low price.  And

12  so there was a bit of a market of people taking broken

13  boats from up here down there, repairing them and

14  bringing them back, but it's -- it's not the case

15  anymore.

16       Q.   Okay.

17      A.    So I -- I can't speak to what Bill did before

18  I met him, but he -- but we haven't done a claim in

19  Venezuela since I joined this company.

20      Q.    Okay.  If you were asked by someone whether

21  they should cruise to any of the islands north of

22  Venezuela, would you recommend that they go there?

23      A.    Yes, absolutely.  I've spent a fair amount of

24  time in Bonaire and Aruba, lovely places, very safe.

⬆                                                          69

1   I actually took a vacation to Bonaire a few years ago

2   when the Venezuelan situation was just starting to

3   heat up, and I was somewhat amazed that we were -- we

4   were only something like 90 miles from Venezuela, and

5   they had a huge migrant crisis, and there was no -- no

6   need for security, no nothing.  I can only assume that

7   the Dutch Navy was out there, but very -- it seemed

8   very secure, lovely place.

9       Q.    Okay.  Now, Aruba is not part of Venezuela,

10  correct?

11      A.    Correct.

12      Q.    Is Bonaire part of Venezuela?

13      A.    No.

14      Q.    And there are a number of islands as you head

15  east from Aruba that do belong to Venezuela, correct?

16      A.    Some closer to Venezuela, yes.

17      Q.    Would you recommend someone go to those

18 islands?

19      A.    No.

20      Q.    Why not?

21      A.    The same reason.  Venezuela doesn't seem like

22 a very friendly place to be right now.

23      Q.    Would you consider it a -- factor for your

24 personal safety?

                                                    70

1       A.    Yes, absolutely.  If I were asked to handle a

2 claim in Venezuela, I would be asking for a security

3 team.

4       Q.    Would you go to port in Venezuela for your

5 crew member who had a minor -- minor medical

6 situation?

7       A.    For a minor situation, I would not.

8       Q.    Okay.

9       A.    If I believed that my vessel, my life or my

10 crew's life were in grave or imminent danger,

11 obviously, absolutely.  Any port is good in a storm.

12 But, you know, every -- every risk has to be weighed

13 up, and I would say, you know, as long as nobody's in

14 grave danger, crack on, let's go a little bit further

15 to our closest safe port.

16    Q.   Okay.  I -- I have a question for you, and

17  this is a sailing question.  It seems you've had a

18  great deal of experience sailing catamarans and

19  sailing, generally.

20         If you were in heavy seas with heavy winds,

21  would you sail a catamaran straight downwind?

22    A.   Yes.  There are --

23    Q.   And also --

24    A.   -- a num -- there are a number of

⬆                                                        71

1   contributing factors here.  If you are -- I mean, if

2   you're in the middle of a hurricane, let's say,

3   sailing downwind may not be your -- your safest angle

4   of approach.  You may be better off dropping a sea

5   anchor and just weathering the storm.  You have to --

6   you have to sail to the ability of the vessel.

7          However, and I -- I feel like I can kind of

8   see where you're going with this particular situation.

9   My opinion would be that the best thing that you could

10  do is get as close to downwind as possible.  The

11  reason being is the sea state.  The sea state is -- is

12  arguably what led to the sea sickness issue on board.

13         If you think about -- the analogy I like to

14  use about waves and heading into the sea versus with

15  the sea, imagine a -- a three-lane highway with cars

16  all running in the same direction on it.  You want to

17  pass as few cars as possible, would you drive against

18  the traffic or would you drive with the traffic?  You

19  want to go with the traffic, right?  You want to --

20  you want to go over as few wave crests as you can and

21  then show the motion of the sea against the boat.

22          Does that -- does that analogy kind of ring

23  through?

24      Q.  Sort of.  So --

                                                        72

1       A.  It doesn't for everyone.

2       Q.  -- sort of.

3       A.  The --

4       Q.  So I -- I understand that the waves may or

5   may not have the same direction as the wind, correct?

6       A.  Correct.

7       Q.  So does that answer really depend upon the

8   angle of the waves to the wind?

9       A.  Yes.  I'm -- I'm specifically speaking to the

10  sea state here.

11          So there's a number of environmental factors

12  at play.  One is the direction of the -- the sea

13  surface, the waves, another is the direction of the

14  current, the actual water under the waves.  Because

15  waves are created by a number of different factors;

16  they may be the weather on the surface, they may be a

17  swell that's generated by weather on the surface far,

18  far away.  But there may also be a local current in

19  another -- in another direction.  And then, of course,

20  you have the wind as well.  So, generally --

21      Q.   So -- and I -- and I know this is kind of a

22  -- you know, getting into Chapmans and boat handling

23  on heavy waters and all that.  I -- I almost, and this

24  is a personal thing and I'm not going to make a big

♠                                                        73

1   point of that, but I almost saw a friend's ocean pitch

2   pole in a certain sea condition where he went in a

3   trough and the wave just happened to be in a funny

4   angle (indicating).

5           Is it possible to have that --

6       A.   Yup.

7       Q.   -- happen if you're going downwind and the --

8   the angle of the waves isn't the right angle --

9       A.   Not --

10          -- of the waves?

11      A.   -- not in -- not in the sea state described

12  in this event.  I mean, if you're out -- if you're out

13  sailing downwind in the middle of a Category 3

14    hurricane, yes.

15        Q.    Now, how much familiar -- familiarity do you

16    have with the Catana 47 vessel?

17        A.    I've surveyed a few of them in the past.

18    I've seen a lot around.  Read -- read a lot about

19    them.  They're marketed as performance cruisers; in

20    other words, a lightweight cruising boat that goes

21    faster than the others.  Their performance, when

22    they're actually put into a -- into a cruising

23    situation, has been very slightly above average, but

24    certainly not the way that they advertise the boat.

↑                                                      74

1            And I'll preface that with, the way that

2    manufacturers advertise performance boats, they will

3    run a boat with no equipment on it, no ship stores,

4    tank's empty, as light as they can get it, with racing

5    sails on it, in perfect sea conditions, on the perfect

6    wind angle, probably with the current with them, just

7    -- just because, and they'll try and get maximum speed

8    out of it.

9            But what you see advertised as maximum speeds

10   on these boats is not what you're going to achieve

11   in -- in a -- in an ocean-going state.  You might

12   achieve it on an inland lake, but once you've -- once

13   you've got some sea state against you, I mean, a cubic

14  meter of water is the metric ton and that's fresh

15  water.  Salt water's just a little bit heavier.  So

16  every wave that you hit letters a massive amount of

17  force against you.

18      Q.    Now, how about the construction of that sort

19  of vessel, is it constructed less heavily, let's say,

20  to be faster, as opposed to be sturdier?

21      A.    In terms of "heavily," because you used that

22  word, yes, I would say so, because the -- the vessel

23  is designed to be lighter.  In terms of strength, I

24  would say that it is just as strong as any other

↑                                                      75

1  cruising catamaran.

2          The -- the builders of this boat are French,

3  and it is from an era -- well, they don't build them

4  like they used to.  When this boat was built, there

5  was more of a feeling towards building a cruising

6  catamaran for an owner, something that would last.

7          If we look in the last, sort of, let's say,

8  five -- five to eight, five to ten years, the cruising

9  catamaran market has changed significantly in that

10  most of these boats are built to go into charter

11  fleets.  They're built to be floating condos.  They're

12  not made to really go to sea anymore.

13          And the greatest example of this, I can think

14   of, is that the majority -- ten years ago, the

15   majority of the cruising catamarans that came into our

16   fleets were delivered on their own bottoms.  They were

17   sailed here from, generally, South Africa or France.

18          Now, they are shipped.  They're a lot

19   thinner.  They're a lot less strong.  They're a lot

20   less durable.  This boat, I would say, by design --

21   obviously, I didn't see it before most of the bottom

22   of it was gone, but my history with the Catana 47 or

23   the 471 is that they are well-built, quality boats.

24          (Pause.)

↑                                                          76

1          MS. NIEMEYER:  All right.  I'm going to

2   close down this document.  Actually, you need -- do

3   you --

4          THE DEPONENT:  Yeah.

5          MS. NIEMEYER:  -- need to give me control

6   back?

7          I can stop sharing it.  No --

8          THE DEPONENT:  (Viewing computer.)  Ahh

9   --

10          MS. NIEMEYER:  -- you don't have control

11   anymore.  I took it away (laughs), so let's just go to

12   something different here, which -- let's see.  I'm

13  going to show you my screen.  And this time, I'm going

14  to show you a folder.

15          BY MS. NIEMEYER:

16      Q.   Can you see that?

17      A.   (Deponent viewing computer.)  Yup.

18      Q.   Okay.  This is a folder actually from my

19  files which contains the copies of the documents that

20  came on two CDs to me from the counsel --

21      A.   Okay.

22      Q.   -- for Great Lakes.  And I'm going to --

23  particularly -- we're going to go through these

24  documents.  I'm going to give you control so you can

⬆                                                      77

1  page through each of them.

2          These are large groupings of documents,

3  mostly.  And I have to assume, but I don't know for

4  sure, that the ones with the Bates labels that say AB

5  came from you.

6          You mentioned that you had provided a file

7  and that, you know, you had -- your file, presumably,

8  they're -- I don't see any reason, other than your

9  initials are AB, why those documents would be labeled

10  AB, and that was, at least, what Mr. Usher's

11  understanding was as well when we took his deposition

12   and, you know, he wasn't able to give me an answer

13   about are these exactly the documents that Mr. Ball

14   provided.

15          So I want you to take a look, and the

16   question I have for you on each of these groups, we'll

17   just go through them one -- one by one, is first of

18   all, whether they are documents that came from your

19   file that were kept by you in the ordinary course of

20   business.  And, second, if you happen to notice that

21   anything is missing from those groups of documents, if

22   you'll let me know that.

23          MR. GOLDMAN:  Michelle, this is Michael.

24   I don't want to --

                                                        78

1           MS. NIEMEYER:  Yes.

2           MR. GOLDMAN:  -- interrupt or say

3    anything that might be construed as giving information

4    or testifying, but would you like to ask me anything

5    about them?

6           MS. NIEMEYER:  Nope.

7           MR. GOLDMAN:  All right.  There you go.

8           MS. NIEMEYER:  (Laughs.)  Mr. Ball is --

9           MR. GOLDMAN:  No.  No.  No.  I -- I don't

10   mean --

11          MS. NIEMEYER:  -- the one who is --

12             MR. GOLDMAN:  -- asking what's in them.

13   I mean, asking about the Bates format.

14             MS. NIEMEYER:  When we get to --

15             MR. GOLDMAN:  That's all I meant.

16             MS. NIEMEYER:  Yeah.  I mean, if you want

17   -- if you want to answer the question what AB means,

18   I'd appreciate that.

19             MR. GOLDMAN:  Yes.  He gave me his file,

20   I organized it into that format and put the Bates

21   number.  It means my organization of Andrew Ball's

22   file.

23             MS. NIEMEYER:  Okay.  So --

24             MR. GOLDMAN:  I'm sorry.  I didn't mean

⬆                                              79

1    to suggest I was going to testify.

2              MS. NIEMEYER:  No, but --

3              MR. GOLDMAN:  -- on something in the

4    documents, just the Bates number.

5              MS. NIEMEYER:  -- but it's a -- it's a

6    straightforward answer.  And -- and to the -- to

7    the -- to the degree you're comfortable answering this

8    or we could have a stipulation on it, to your

9    understanding, were all the documents produced --

10             MR. GOLDMAN:  Yes.

11          MS. NIEMEYER:  -- or are there --

12    everything that was given to you, to your

13    understanding, was produced to us?

14          MR. GOLDMAN:  Yes.

15       BY MS. NIEMEYER:

16    Q.   Okay.  So it -- so, Mr. Ball, the purpose of

17    this is just, essentially, to make sure that

18    everything that you know you have actually ended up in

19    Mr. Goldman's office and produced to us, so that if

20    there's anything missing, we know.  But also to

21    confirm that these really are the documents you kept

22    in the course of business in your offices or on your

23    computers.

24    A.   Okay.

                                                    80

1    Q.   Okay.  So we'll start with --

2    A.   Good.

3    Q.   -- start with this one, which is a Bates

4    range of AB001 to 90.  And I'm just going to give you

5    control and ask you to page through that and let me

6    know if those are documents that were part of your

7    file kept in the ordinary course of business.

8    A.   (Deponent viewing computer.)  Sure.  Am I

9    able to click on this (indicating)?

10    Q.   You should be at this point.

11      A.   (Deponent viewing computer.)  Okay.  Here we

12   go.

13           Is this working?

14      Q.   Is it not working?

15      A.   (Deponent viewing computer.)  Well, I've

16   double clicked on it, and I'm and getting the -- the

17   little, swirly, round, I'm-working-on-it symbol.

18      Q.   Okay.  Okay.  It's -- it's a large document,

19   so it might take a little longer for you to get

20   control over it.

21      A.   Okay.

22      Q.   These came as PDFs and sometimes multiple

23   hundreds of pages, so this one's 90.

24      A.   (Deponent viewing computer.)  I'm still

1   getting the same flashing cursor.  I wonder if it

2   might be easier if you take control and open the

3   document and then I page through it.

4      Q.   Okay.  Let's see.  Let's see how I can do

5   this.  Abort control.  I just aborted control.

6      A.   (Deponent laughs.)

7      Q.   Okay.  So, what I will do is, I'm just going

8   to scroll and stop -- tell me if you need me to stop.

9   Okay?  Just tell me.

10    A.    Sure.  Yes.

11    Q.    And I'm just going to scroll it with my

12 cursor like this (indicating).

13          Is that okay?   Can you see that?

14    A.    (Deponent viewing computer.)  No.  What I can

15 see right now is a cursor with a -- a little blue

16 circle next to it.

17    Q.    Okay.  So it's -- it's not showing you

18 everything.  Let's try something else.  I am going to

19 put this on -- maybe it's easier if I'm not scrolling.

20          All right.  So I'm on Page 1, can you see

21 that now?

22    A.    (Deponent viewing computer.)  No, what I can

23 see is still the file table.

24          Can we just ask what somebody else can see,

♠                                                          82

1 and then we can see if it's --

2    Q.    Oh, you're not seeing the document, you're

3 seeing the folder.

4          MR. GOLDMAN:  This is Michael Goldman.

5 I'm seeing exactly the same thing as Andrew.

6          BY MS. NIEMEYER:

7    Q.    All right.  So I need to change what I'm

8 showing you.  Hold on a sec.  I can do that.  We're

9 going to stop sharing that.  We're going to do another

10  share screen, and we're going to pick that page.  I'm

11  sorry about that.  It didn't -- it stayed on the

12  folder.

13        Okay.  So, now, you should see the policy

14  which is Page 1 of 90?

15    A.  (Deponent viewing document.)  Yup.

16    Q.  Okay.  So I'm just going to page through.

17  Tell me to stop, and I'll try to do it in a

18  reasonably, you know, quick enough, but not like

19  so-fast-you-can't-see-it fashion.

20    A.  (Deponent indicating.)

21    Q.  Okay.  So is that -- can you see me as I go

22  through those pages?

23    A.  (Deponent viewing document.)  Going through,

24  yup.

                                              83

1    Q.  We're not going in detail here, so I'm just

2  showing you the pages.

3    A.  (Deponent viewing document.)  That all looks

4  familiar.

5    Q.  Okay.  So I just paged through the 90 pages.

6        And did you see those as I was going?

7    A.  Yup.  I saw the policy -- the policy, the

8  sheet on -- on how to hand -- how to register your

9    claim as an insured, I saw our two reports, I saw

10   Jon Sands' report from when the vessel was purchased

11   or when it was insured, and I saw -- I saw it all.

12   It's all -- it's all stuff I have anyways.

13       Q.   Okay.

14       A.   I saw a letter with Mr. Andersson --

15       Q.   So -- so it's fair to say that all of the

16   documents that I just showed you, or all the pages,

17   are part of the file that you maintain in the ordinary

18   course of business in your offices?

19       A.   Correct.

20       Q.   And did you, personally, review all of those

21   in the course of creating your report?

22       A.   Correct.

23            MS. NIEMEYER:  Okay.  So let's go on to

24   the next one.

♠                                                    84

1            (Off the record at 11:46 a.m.)

2            (Discussion off the record.)

3            (Back on the record at 11:46 a.m.)

4            MS. NIEMEYER:  Okay.  Okay.  Here we go.

5    So I've just opened a collection of documents.  We're

6    not marking this as an exhibit, Laurie.  I just want

7    to -- I'll get the Bates numbers on -- on the record.

8            MADAM COURT REPORTER:  (Nods head.)

 9              MS. NIEMEYER:  The Bates numbers are

10   AB000091 through 265, so it's a 175-page document.

11              BY MS. NIEMEYER:

12      Q.   And, Andrew, I'm going to do the same thing

13   on -- for things that I want to ask you --

14      A.   Sure.

15      Q.   -- detailed questions, I'm going to come back

16   to those.

17      A.   Yeah.

18      Q.   But, obviously, if you want me to stop so you

19   can see something, feel free to ask.  But I'm just

20   going to page through that again, so that you can look

21   at it and tell me whether or not this is the record

22   that's kept in your file.

23              First of all, I'll ask you, you mentioned you

24   kept a separate file for electronic documents being

♠                                                        85

 1   your e-mails, does this appear to be what that is?

 2      A.   (Deponent viewing document.)  It is, yes, and

 3   this is part of what we've bundled up for Mr. Goldman.

 4      Q.   Okay.  So I'm going to go ahead and just page

 5   through so you can confirm that for me.  I'm sorry, I

 6   just -- procedurally, I need to do that.

 7      A.   (Deponent viewing document.)

8      Q.   Okay.  We just got through those 175 pages.

9      A.   (Deponent nods head.)

10     Q.   To your understanding, is that the e-mail

11   record that was kept in your file in the ordinary

12   course of business?

13     A.   Correct.

14     Q.   Do you know whether there were any additional

15   e-mails that were kept in a different location?

16     A.   No, I don't believe there were.  Obviously,

17   we just scrolled through that rather quickly.  Without

18   doing a comparative analysis, I can't say for sure,

19   but I have no reason to believe that anything has been

20   excluded there.

21     Q.   Were you, personally, involved in collecting

22   the information that was sent to Great Lakes --

23     A.   Yes.

24     Q.   -- or to their counsel?

⬆                                                    86

1      A.   Yeah.

2      Q.   Did you look for e-mails from Mr. Bailey as

3   well as your own?

4      A.   No, he looked for his.  So we -- we opened

5   a -- a folder to share with them, and we all did our

6   -- our individual data dumps, which probably resulted

7   in a lot of duplication, unfortunately, but everything

8    should be there.  So we also dumped from our

9    administrative desk as well if there was anything

10   there.

11       Q.   Okay.

12       A.   The -- the three people that would've been

13   involved on behalf of Caribbean Marine Surveyors --

14   well, Caribbean Adjusters & Marine Surveyors, would be

15   myself, Bill Bailey and our office manager at the

16   time, Lenroy Quashie, who -- I don't recall him doing

17   anything specific with this case; however, he -- you

18   know, he handled -- he was our office manager, so he

19   may have -- if he was involved, we would've included

20   it, and we certainly would've asked him to dump

21   anything if there -- if there was anything relevant to

22   this case in this file.

23       Q.   Okay.  Were you asked to exclude any kind of

24   communications from the case file?

                                                    87

1        A.   No.  Absolutely not.

2        Q.   Now, when you did that collection procedure,

3    did you look also or ask about whether there were any

4    kinds of, for instance, messaging communications like

5    Whatsapp or SMS texting?

6        A.   No, we didn't.  That's a good question.  I

7   don't -- I don't think we would've been using Whatsapp

8   on this case.  We may have done.  That's a very good

9   question, but, no, we didn't look into that.

10      Q.   Did you have any communications with anyone

11  that you can recall, in your investigating this case,

12  that was not either Mr. Andersson or someone at Great

13  Lakes or -- not Great Lakes, but at Concept on their

14  behalf?

15      A.   Well, we, obviously, had the meeting with the

16  salvor on the beach, and I also spoke to a man at a

17  dive shop, which is directly adjacent to the wreck

18  site, recently to confirm that the wreck was actually

19  still there.

20      Q.   And -- and just -- you mentioned "a man."

21           Was that Alex Cottier?

22      A.   That's the one.

23      Q.   Have you ever had a conversation with Shaun

24  Farmer?

⬆                                                    88

1       A.   I don't believe so.

2       Q.   Do you know him?

3       A.   No, I don't recognize the name.

4       Q.   Okay.  And besides having communicated with

5   the diver that you just mentioned, what was the

6   purpose of speaking with the diver?

7       A.   We were -- we were trying to track down the

8   GPS following -- well, once we found out that

9   Mr. Andersson hadn't recovered it, we thought, well,

10  we'd better take steps to figure out if it's still

11  there, and so I was trying to ascertain as to who he

12  might have appointed to salve the vessel.

13          Obviously, we never got to a state where

14  underwriters appointed salvors.  And so, you know, in

15  order to figure out where the GPS may have gone, we

16  wanted to find out who had salved the vessel.  We

17  weren't there that period, so, given that his office

18  is directly adjacent to the -- to the wreck site,

19  generally, salvors will rebuild dive boats, et cetera.

20          And in an area like this, everybody kind of

21  knows each other, so it seemed like a good point of

22  contact to sort of say, well, you know, who came and

23  got it?  Who came and got the boat?  Unfortunately,

24  nobody did, so that kind of answered that.

↑                                                    89

1       Q.   Okay.  Now, did you ever receive copies of

2   communications from Mr. Andersson to Concept that had

3   photographs of the things that came off the boat in

4   early January?

5       A.   I don't believe so, no.

6      Q.    Okay.  Did you ever -- did any of them ever

7  give you any indication about what was going on with

8  the salvage before --

9      A.    No.

10      Q.    -- you made that call to Mr. Cottier?

11      A.    No.

12      Q.    Okay.

13      A.    No.  There had been a -- a few questions

14  raised as to whether or not we had retained the GPS,

15  which we had not.  Other than that, you know, once --

16  once we've attended, you know, if an underwriter

17  doesn't request further work from us, you know, it's

18  not really our business.  We kind of stay out of it.

19      Q.    Okay.  And -- and did you make any effort at

20  all -- you, not -- not anyone on your behalf, but that

21  you know of from your company, did anybody make any

22  effort to track down the GPS, other than your recent

23  communications with the divers?

24      A.    No.

↑                                                                    90

1      Q.    When were those communications with the

2  divers?

3      A.    I'd have to go back and look.  If you can

4  stay on for a minute, I can look right now if you'd

5  like.

6    Q.    Okay.

7    A.    (Deponent viewing computer.)  That would've

8  been the beginning of May, this year.  So May 2nd is

9  when I received the last e-mail from Alex Cottier.

10  That's -- and the 5th of February is the first one I

11  got.

12    Q.    Did you speak with him or just communicate by

13  e-mail?

14    A.    We just e-mailed.  The -- the primary

15  language in the DOR, of course, is Spanish, and I

16  believe Mr. Cottier is mostly French.  My French and

17  my Spanish aren't great.  So being able to run things

18  through Google translator is somewhat beneficial for

19  us all.  Obviously, there's a -- a written record

20  there as well.

21    Q.    Did Mr. Cottier give you information about

22  who ultimately did the salvage?

23    A.    He said that nobody came and did the salvage.

24  He actually sent me a picture of the wreck still on

⬆                                                              91

1  the -- or what's left of it, still on the breakwater.

2    Q.    Does that --

3    A.    I was a little -- go ahead.

4    Q.    Does the wreck have a mast in the picture he

5    sent you?

6       A.   I don't believe it does.  Let me just scroll

7    back.

8            (Deponent viewing photograph.)  No.  It's --

9    well, I mean, not -- not upright, anyways.  It's sort

10   of half at one hull and half of a bridge deck.

11      Q.   Okay.  And at this point, we were in COVID,

12   so you couldn't travel there, correct?

13      A.   Correct.

14      Q.   I'm going to move on in this process of going

15   through documents --

16      A.   Sure.

17      Q.   -- so we can get what we need done.

18            MS. NIEMEYER:  So I'll stop sharing,

19   we'll go to the next -- hold on one sec.  Close that

20   one.

21            MR. GOLDMAN:  Michelle, I'm not --

22            MS. NIEMEYER:  Yes.

23            MR. GOLDMAN:  -- wanting to get in the

24   way, but, at some point, do you or anyone else want to

♠                                                        92

1    take a lunch break?

2            MS. NIEMEYER:  I'd rather plow on for a

3    little longer.

4            MR. GOLDMAN:  Fine with me.

5    MS. NIEMEYER:  Why don't we go -- is --

6 is everybody okay with going another hour?  Laurie, if

7 you need a short break, because I think, at least,

8 then I can get through significant stuff.  I'd -- I'd

9 rather not take a lunch break if we don't have to.

10    MR. GOLDMAN:  Fine by me.

11    (Off the record at 11:58 a.m.)

12    (Recess taken.)

13    (Back on the record at 12:03 p.m.)

14    MS. NIEMEYER:  Okay.  Let's go back on

15 the record.

16    BY MS. NIEMEYER:

17  Q.   And I am going to share the next document

18 that was in the production that we received, which is

19 actually a video clip, and it has a Bates number

20 associated with it which is AB000266.

21    And can you see that?

22  A.   (Deponent viewing video.)  I can see that,

23 yes.

24  Q.   I'm just going to play that for you so that

&#10003;              93

1 you can -- Andrew, can you describe what that is?

2  A.   (Deponent viewing video.)  It's a video of

3 the breakwater and some of the fluxom [phonetic]

4    that's on it, as well as, I believe, that's the

5    vessel's dinghy.  And now, we're looking at the deck

6    of the vessel that is sitting on top of the

7    breakwater.

8        Q.   Is that a video that you took while you were

9    there?

10       A.   Honestly, I can't remember, but it seems more

11   than likely that I would've taken that, yes.

12       Q.   Did you have any video or other documents

13   that you utilized, like pictures, that you did not

14   take?

15       A.   I don't believe so, no.

16       Q.   Okay.  So is it -- is it fair to say that

17   this document, which has been labeled as an AB

18   document, was provided by you and was maintained by

19   you in the ordinary course of business?

20       A.   Yes, that's -- that's more than likely.  I

21   have no objection to that.

22       Q.   Okay.  Now, let's go to the next one.  Sorry.

23   It's a little clunky doing this with going from one to

24   another.  I'm going to go from full to partial screen

                                                          94

1    mode.

2            (Pause.)

3            BY MS. NIEMEYER:

4      Q.    So, okay.  Here's the next one, and this is a

5  one-page document with the Bates number AB000267.

6      A.    (Deponent viewing document.)  Yeah.

7      Q.    It appears to be an e-mail from Mr. Andersson

8  to Samantha Thomas, Sarah Delacey-Simms and Andrew

9  Ball.

10          Mr. Ball --

11     A.    (Inaudible.)

12     Q.    -- do you recall this document?

13          MADAM COURT REPORTER:  I'm sorry, I

14  couldn't hear what you said, Mr. Ball --

15          THE DEPONENT:  Ahh --

16          MADAM COURT REPORTER:  -- what you just

17  said while Michelle was --

18          THE DEPONENT:  I --

19          MADAM COURT REPORTER:  -- asking.

20          Can you please repeat it?

21     A.    I --

22     Q.    I was just asking Mr. --

23     A.    -- I said --

24     Q.    Okay.  I'm going to start (laughs).  I was

♠                                                        95

1  just asking Mr. Ball if he recognizes this document.

2      A.    (Deponent viewing document.)  I do.

3      Q.   Okay.  And do you know what the video is

4  that's attached to this document?

5      A.   Offhand, no.  I would -- I would venture a

6  guess that it is from the video of the wreckage again.

7      Q.   I can attempt to go through that link and we

8  can see what happens.

9      A.   (Deponent viewing document.)  Yeah, see

10  what's in there.

11      Q.   It's an HTML connection.  It doesn't seem to

12  be willing to show me anything.

13      A.   (Deponent viewing document.)  No, it -- it's

14  looking for something on the computer, so I think --

15      Q.   Right.

16      A.   -- it probably --

17      Q.   I'm -- I'm not sure.  That one -- you know,

18  it was -- it has a link embedded in an e-mail that was

19  produced to us, but I'm not sure what that is.

20           Is the e-mail itself something that you --

21  you would identify as having been produced in the

22  ordinary course of business?

23      A.   Yes.

24      Q.   Okay.  I'm just going to go to the next one.

⬆                                                      96

1  That one is really not that important coming from you.

2           But I -- did you -- you received copies of

3    things sometimes from Mr. Andersson, I gather?

4        A.   Yeah, I mean, with these claims, it's -- it's

5    generally -- it's generally a little bit here and

6    there with some people.  They don't necessarily

7    understand what everybody's roles are.  They're just a

8    -- you know, an insured that's had a bad day, and

9    they're trying to get information to everybody.  So,

10   sometimes, we get copied into things that aren't for

11   us.  Sometimes, other people get copied into things

12   that aren't for them.

13       Q.   Okay.  So I'm going to go to the next

14   document, which is in these documents that were

15   produced.  This one is another video.  It has a Bates

16   label associated AB000268.  And let me just pop over

17   to the screen sharing again so we can get that one to

18   you.

19            Can you see this?

20       A.   (Deponent viewing video.)  I see it.  This

21   looks like the same video, almost, as the last one.

22       Q.   Okay.  Yeah, they're -- they're very similar.

23       A.   Yeah.

24       Q.   It might even be a duplicate.  They look very

⬆                                                          97

1    similar, but they were produced with different

2  numbers.

3      A.   Okay.

4      Q.   So is that also one that you recognize as

5  being kept in the ordinary course of business?

6      A.   It is.

7      Q.   And is it -- do -- do you believe you took

8  that video?

9      A.   I -- I think it's fair to assume that I did,

10  yes.

11              MS. NIEMEYER:  Okay.  Now I'm going to go

12  to a grouping of documents.  This is a -- a Bates

13  range of AB269 to 289.

14              THE DEPONENT:  (Nods head.)

15              MS. NIEMEYER:  Let me just get that

16  shared for you.  Where'd it go?  Sorry.  Hold on.  I

17  have to go back.  I think I closed it by accident.

18          (Pause.)

19              MS. NIEMEYER:  Okay.  That's really

20  weird.  It's open on my screen, and it should be

21  showing you what's open on my screen, but it isn't, so

22  give me one second to revitalize that.

23          BY MS. NIEMEYER:

24      Q.   You're not looking at anything, right, except

1  my face right now?

2     A.    (Deponent viewing computer.)  Correct.

3     Q.    Okay.  So -- let's give that another try.

4           (Pause.)

5           BY MS. NIEMEYER:

6     Q.    Yeah, here it is.  For some reason, it didn't

7     come up.

8           Can you see that now?

9     A.    (Deponent viewing document.)  Yes.

10    Q.    Okay.  So this is a document, it starts with

11    269 and ends with -- AB269, ends with AB289, I'm

12    leaving the zeros out, and it appears to be an e-mail

13    dated December 24th.  Dear Martin, thank you for your

14    e-mail.  Please contact Bill at Caribbean Marine

15    Surveyors for guidance.  And if you go down a little

16    farther, it seems to follow a series of e-mails.

17    A.    (Deponent nods head.)

18    Q.    And my question to you here is, are you aware

19    of any conversations where Mr. Andersson communicated

20    with Mr. Bailey for guidance related to the claim?

21    A.    Not specifically, but I -- I'm sure there was

22    some guidance that Bill would've given as to, you

23    know, what we should be doing to mitigate his loss and

24    act as a prudent uninsured.  That's pretty standard

1  for us.

2      Q.   All right.  Now, you have worked for

3  Mr. Bailey for quite a while.

4           Do you know whether it was typically his

5  practice to provide written guidance, or did he do it

6  verbally, how did he -- then to provide his

7  information to the insured?

8      A.   I think either/or.  I'm sure there were a

9  number of phone conversations going on at that time,

10  and I vaguely remember that I had sort of said, you

11  know, it's Christmas, I had a Christmas dinner to

12  throw and sort of left it with Bill for a couple of

13  days.  But I -- I don't -- I don't think he would

14  really choose one or the other.  It would depend on

15  how the -- the communication came to him.

16      Q.   Okay.  Now, how did you -- how did your

17  company bill for your services?

18      A.   We bill -- when we're away, we bill on a day

19  rate plus expenses, and then when we're here in the

20  office, we bill on an hourly rate.

21      Q.   Is it Mr. Bailey's practice to provide his

22  hourly work for free?

23      A.   To an extent, yes.  His -- his work is seen

24  as an extension of the service that I'm providing.

1  It's -- let's say, it's somewhat rolled into the bill.

2  If he were to become heavily involved in the claim,

3  then he would start billing for his time.

4      Q.  Okay.  And -- and so was it your understand

5  -- now, let me just make sure we're clear on this.

6  So, if he was providing independent guidance to a

7  insured, that would be considered part of the work you

8  were doing as a surveyor?

9      A.  Correct.

10     Q.  Okay.  And what -- what kind of a threshold

11  would you have to reach before Bill would start also

12  billing for his time?

13     A.  That -- that really depends on the amount of

14  time that Bill was putting in.  I think if he found

15  that the majority of his days were taken up with this,

16  or if he was providing, for instance, written reports,

17  then he'd start billing for his time.

18         But, of course, you know, we're -- we do --

19  we do list who the surveyor is on the invoice, but,

20  ultimately, we're billing for the company's time.  And

21  our hourly rate does take into account work -- for

22  instance, if we're billing for me, our hourly rate

23  takes into account the work it would take for the

24  review process that we have in the office, all of the

1  administrative processes, et cetera.  So that would be

2  considered to be -- small -- small bits would be

3  considered to be somewhat included in our acc -- in

4  our billings already.

5        Does that sort of make sense?

6  Q.   Sort of.  Sort of.  It's very fair, I have to

7  tell you.  It's extremely fair.

8  A.   (Deponent laughs.)

9  Q.   It really is.

10  A.   I was just told that.

11  Q.   So, this particular document, I'm just going

12  to scroll through a little bit so you can see what's

13  here.  So we have e-mails again.  And in this e-mail

14  dated the 28th -- can you see that?

15  A.   (Deponent viewing document.)  Yes, it's a

16  little bit blurry, but I can read the content.  Yeah.

17  I can read -- I can see Bill's e-mail there, yeah.

18  Q.   Okay.  So it -- it -- it documents here that

19  Mr. Bailey is saying that he spent some time, on the

20  24th, advising the insured of his responsibilities and

21  how he should act, prudent uninsured and exactly what

22  that meant, removal of wreck and disposal, et cetera.

23  A.   (Deponent viewing document.)  Yup.

24  Q.   Did he have, like, standard information he

1  would provide when he said those things?

2      A.   In terms of, sort of, standard written

3  boilerplate, no.  No.  He would've -- he would've, you

4  know, advised as to what a standard marine policy

5  says, in terms of the insured's obligation to act as a

6  prudent uninsured.  But, beyond that, no, there's

7  nothing, sort of, verbatim.  There's no -- we don't

8  have, for instance, like a -- a PDF,

9  here's-how-you-handle-your-claim-type deal.  That's

10  something that I think Concept has --

11      Q.   Okay.

12      A.   -- or Great Lakes.

13      Q.   All right.  Is there any kind of a claims

14  manual or any sort of documentation from Concept that

15  your company has that tells you how you're supposed to

16  do these things for Concept's claims?

17      A.   Beyond -- beyond the one that's included -- I

18  think we -- we scrolled past it already, which -- it

19  came after the policy schedule, the one you previously

20  went through.  It's just really written for an

21  insured, but it obviously guides us as to how to deal

22  with them as well, the claims guide that they sent

23  through here (indicating).  I think we saw that in

24  both of the packs that you went through already

1  (indicating).

2      Q.   Okay.  So there's not a separate document for

3  the surveyor that they provide to you?

4      A.   No.

5      Q.   Okay.  I'm going to just continue to pass

6  through this, so just -- to make sure we're clear.

7           So this -- this is Sep -- September or -- I'm

8  sorry, December 28th, during --

9      A.   Right.

10     Q.   -- the time between Christmas and New Year's.

11          And -- and is it your understanding that,

12  during this entire time, Mr. Andersson has been

13  sitting in the Dominican Republic and attempting to

14  deal with the situation?

15     A.   I believe so, yeah.

16     Q.   Okay.  I'm just going to pass through this,

17  because we're going to see these things in more

18  detail.  But, again, I'm going to ask if you just

19  recognize these as part of the record that you --

20     A.   (Deponent viewing document.)  Yup.

21     Q.   -- had in your office.

22     A.   (Deponent viewing document.)

23     Q.   Do you recognize these documents, or the

24  pages of this collection of documents, as e-mail

1  communications that came from your office?

2      A.   (Deponent viewing document.)  Could you --

3  could you go back to the heading on this e-mail?

4      Q.   (Attorney complied.)  Yes.

5      A.   (Deponent viewing document.)  Okay.  Yup.

6      Q.   Okay.  And this is another one.

7      A.   (Deponent viewing document.)  Yup.

8      Q.   And -- and you see at the bottom of this one

9  where, on Page 286, Mr. Andersson asks, to you, when

10  he can expect his GPS unit to be returned, and you

11  responded and said you weren't in possession of the

12  unit, as it was never received from the salvors?

13      A.   (Deponent viewing document.)  Yes.

14      Q.   Did you expect to receive it from the

15  salvors?

16      A.   If we -- if we had been involved in

17  appointing salvors, then we would've requested that

18  they retain it and send it to us.  But because the

19  underwriters never accepted the claim, we never moved

20  to a point where we would've helped him to appoint

21  salvors.

22      Q.   Did you ever recommend to them that they

23  obtain the GPS as part of the claims investigation?

24      A.    We did have that discussion on the beach,

1  yes.

2       Q.    That's not what I meant.

3             Did you have that discussion with -- not with

4  the salvors, but with someone at -- at Great Lakes or

5  at Concept?

6       A.    We may not have had that discussion,

7  directly.  That's something that we would normally

8  take the lead on anyways.  I don't know.  I can't say

9  definitively either way on that --

10      Q.    Okay.

11      A.    -- not for the purposes of the deposition.

12      Q.    I'm -- I'm -- I'm a little confused here, and

13  I just -- I'd -- I'd like to clarify this, because you

14  explained to me before that it was your understanding

15  that a claims adjuster doesn't make a decision about

16  coverage, the underwriter does; is that correct?

17      A.    Correct.

18      Q.    Is it the adjuster's job, though, to provide

19  all the information necessary to the underwriter so

20  that they can make that decision?

21      A.    Yes.

22      Q.    And in this case, who do you consider the

23   underwriter to be?

24        A.   Great Lakes -- well, sorry -- Concept Special

1    Risks.

2         Q.   Okay.  So -- and Concept Special Risks was

3    also the claims adjuster here, correct?

4         A.   I believe so, yes.

5         Q.   Who -- who was the claims adjuster?

6         A.   I don't know.  We submitted our reports to

7    Concept Special Risks as surveyors.

8         Q.   Okay.  And do you know who -- who you were

9    supposed to send that stuff to, at Concept?

10        A.   It would've been either Sarah Delacey-Simms

11   or -- oh, I can't remember her name now, I'm sure

12   she's copied on a lot of those e-mails, but, Samantha

13   Thomas.

14        Q.   Okay.  Okay.  And -- and to your

15   understanding, is Sarah Delacey-Simms a claims

16   adjuster at Concept?

17        A.   I don't know.

18        Q.   Okay.

19        A.   She's our point of contact at Concept.

20        Q.   Okay.  So -- so, is it fair to say, you do

21   not know who the actual claims adjuster is within

22   Concept?

23    A.    Correct.

24    Q.    Okay.  Did -- do you recall having any

                                                        107

1  conversation with anyone at Concept about the GPS?

2     A.    Offhand, no.  I'd have to go back to the -- I

3  mean, you have all of the e-mails in front of you, but

4  I'd have to go back through and read them again.  This

5  was quite some time ago.

6     Q.    Okay.  And we'll do that.  So I'm going to

7  get off of this document.  You have confirmed that

8  this document is e-mails that were kept in the

9  ordinary course of business, and that's really what we

10 needed on this one, so let's move on.

11    A.    Sure.

12    Q.    I'm going to stop sharing that one, and let

13 me just close that baby down.

14          And we have another couple videos, so let me

15 just open this one real quick and back to, let's see.

16 Big screen.  Start share.  Video, optimize.  Share.

17          Can you see this video?

18    A.    (Deponent viewing video.)  Yup.

19    Q.    And, for the record, I'm going to --

20    A.    I do.

21    Q.    -- say this video has a Bates number of

22  AB000290, and I'll just play that a bit.

23      A.  (Deponent viewing video.)

24      Q.  Okay.  Mr. Ball, do you recognize that video?

1       A.  I do.

2       Q.  Were you the photographer who took that

3   video?

4       A.  I was, indeed.

5       Q.  And was that also taken in the ordinary

6   course of business in your role as a surveyor?

7       A.  It was, indeed.

8       Q.  Okay.  Can you tell us what it is?

9       A.  (Deponent viewing video.)  It's a video of

10  the interior of the starboard hull.  Obviously, with

11  the -- the reef sticking out through the sole of the

12  vessel, Melody.

13      Q.  Okay.  And when you say "the starboard hull,"

14  was that -- that was in the below-decks cabin area,

15  correct?

16      A.  Correct.

17          MS. NIEMEYER:  Okay.  I'm going to take

18  that one down, we'll move along here.

19          Let's see.  Okay.  The next collection here

20  is a large grouping of photographs.  And, actually,

21  this might be the perfect time for a lunch break,

22 because it's several pages, and it's a good contextual

23 stop point.

24                    Is everybody good with taking our lunch

⬆                                                                          109

1 break now?

2                    MR. GOLDMAN:  We're fine.

3                    THE DEPONENT:  Sure.

4                    (Off the record at 12:26 p.m.)

5                    (Recess taken.)

6                    (Back on the record at 1:01 p.m.)

7          BY MS. NIEMEYER:

8      Q.   Okay.  So I believe we were -- we were about

9  to start talking about the collection of photographs.

10 And I'm just going to tell you for the record, the

11 Bates numbers in that collection of photographs start

12 with AB000291 and end with 351.  Okay.  And I'm just

13 now -- I'm getting to where I will share that screen.

14 Hold on.

15         (Pause.)

16         BY MS. NIEMEYER:

17     Q.   Okay.  Do we have Andrew back?

18     A.   I'm here.

19     Q.   Can you see the pictures?

20     A.   (Deponent viewing photograph.)  I can,

21  indeed.

22     Q.   Okay.  As we go through these, Andrew, I'm

23  going to ask you if you recognize these as pictures

24  you took while you were at Boca Chica doing the survey

✦                                                          110

1  on the boat, or if they were taken by you at some

2  other time or what you can tell me about them.

3     A.   Sure.

4     Q.   So why don't we start at this one.  They came

5  as one big giant collection PDF to me.

6     A.   I hope we didn't include any photos that

7  aren't relevant to the case (laughs).

8     Q.   Nothing embarrassing.

9     A.   Sometimes they end up in the wrong folder.

10     Q.   Nothing embarrassing, if that's what you're

11  asking.

12     A.   Good.  Good.

13          (Laughter.)

14          BY MS. NIEMEYER:

15     Q.   Can you describe what this --

16     A.   (Deponent viewing photograph.)  So this

17  photo --

18     Q.   -- is?

19     A.   (Deponent viewing photograph.)  So this photo

20  was taken from the beach.  I'd have to look at the

21  time stamp on the metadata, but I'm pretty sure this

22  was in the morning where I was about to go and start

23  to get ready to look at the wreck.  It looked more

24  like sunset -- sunrise than sunset.

♠                                                    111

1           Anyways, this is from -- from the beach.

2   Looking over, you can just see the -- the mast, the --

3   the furthest mast to the left is the -- the wreck of

4   Melody sitting on the -- on the breakwater.  And it

5   gives a little bit of a context, it's kind of a

6   diagonal look, I suppose, but of the distance between

7   the breakwater and the shore.  And you can kind of see

8   how flat the water is on this side of the breakwater

9   versus out to sea.

10      Q.   Okay.  So I'm -- I'm --

11      A.   That was where --

12      Q.   -- going to just ask --

13      A.   -- your mouse --

14           MADAM COURT REPORTER:  I'm sorry.

15           BY MS. NIEMEYER:

16      Q.   -- that you --

17           MADAM COURT REPORTER:  Hold on one

18  moment.  I didn't hear what he said.

19           You said something after Michelle said okay,

20  so I'm.  I couldn't hear you, sir.

21              THE DEPONENT:  That was -- I -- I -- I

22  said that's it, where your mouse is.  Michelle had her

23  house over the wreck.

24

⬆                                                      112

1              BY MS. NIEMEYER:

2       Q.   Oh, okay.  Is it here (indicating)?

3       A.   (Deponent viewing photograph.)  Correct.

4       Q.   Okay.  So it's very -- it's -- it's distant

5   in this picture, correct?  And it appears as if there

6   might be like a wharf or some kind of pier in between

7   where you took the picture from and the boat you see

8   on the horizon in the background that you've

9   identified as Melody; is that correct?

10      A.   (Deponent viewing photograph.)  Correct.

11  And, I think, as we get further down through the

12  photos, they'll be some that are sort of more

13  perpendicular to the wreck site which will show a

14  little bit of a closer distance that this photo

15  represents --

16      Q.   Okay.

17      A.   -- from the shore on the other side of the

18  pier.

19      Q.   So you said this was taken in the morning.

20   It looks like very early.

21         Do you -- do you have any recollection of the

22   timeline of your visit to that area?

23   A.   Not directly.  I think I probably -- I'd have

24   to look back at the plane tickets, which, I think, are

⬆                                                          113

1   in that pack of documents.

2   Q.   Okay.

3   A.   I remember I had a little troubling getting

4   there.  I think I had a flight that got canceled or

5   delayed, which is not uncommon with regional carriers

6   in the Caribbean.  And I remember that we started very

7   early the day that we went to look at the wreck.  I

8   vaguely remember walking down the beach and thinking,

9   oh, man, it's early, it's cold, I'm not excited to get

10   in the water.

11         (Laughter.)

12         BY MS. NIEMEYER:

13   Q.   Okay.  Okay.  So I'm going to just scroll

14   through here and -- so, I see here, we're no longer

15   seeing that -- that pier in between us and the boat.

16         Is this as -- did you walk along the beach to

17   get there?

18   A.   (Deponent viewing photograph.)  Correct.  So

19   I'm -- I'm a bit photo happy, generally speaking.  So,

20   as I walked along the beach, I took various pictures

21   of the wreck as I got closer to it.

22          And I -- I -- I can see in this photo that it

23   seems to be a bit brighter, so I -- I'm going to

24   suggest that these photos are likely in chronological

&#8686;                                                                 114

1    order, and they were taken in the morning.

2       Q.   Okay.  So I'm just going to just keep moving

3    on.

4           So, this one; when was this taken, do you

5    think?

6       A.   (Deponent viewing photograph.)  The same

7    time, and this would've shown it to be -- this

8    would've been pretty perpendicular to it.  I think

9    what we can see in the middle there, is actually

10   Saragassum seaweed, not a shoreline.

11      Q.   Okay.

12      A.   (Deponent viewing photograph.)  You can see

13   the, sort of, line in the photo.

14      Q.   Mm-hmm.  You mean just past the swimmers?

15      A.   (Deponent viewing photograph.)  Correct.

16      Q.   And is -- are those sticks in the water

17   between the shoreline and where you see the boat?

18      A.   (Deponent viewing photograph.)  So they're on

19   -- they're on the -- the shoreline side of the

20   breakwater, and it looks -- if I remember correctly,

21   it's a mangrove nursery.  So you see this a lot out

22   here, you'll see bits of PVC pipe, basically, plugged

23   into the reef and sticking out of the surface.  And

24   it's a -- it's a safe environment so that mangroves

⬆                                                          115

1   can grow.  And then they will stabilize the seabed --

2       Q.   Okay.  Okay.

3       A.   -- because it's -- it's sort of them getting

4   the bottom to stop from shifting.

5       Q.   Interesting.  All right.  So those are not --

6   they're not intended to be any kind of navigational

7   marker?

8       A.   (Deponent viewing photograph.)  No, what --

9   what you can see on the left side of the picture, sort

10   of above the Saragassum seaweed, but below the

11   horizon, I believe, is one of the inshore markers, or

12   it might be a swim buoy.  So, along this beach, there

13   are a number of, sort of, resorts and hotels, and

14   there's various water sports that was coming out of

15   those hotels.  Of course, there's a swim area as well.

16          So it -- it -- it serves to keep everybody

17   separate and probably provide a -- a deep-water mark

18   for some boats transiting inside the breakwater.

19      Q.   Okay.  So I'm going to go on.

20      A.   Sure.

21      Q.   So this is another -- it looks like that

22   farther view again.

23      A.   (Deponent viewing photograph.)  Yup.

24      Q.   Does this tell you maybe those weren't

↑                                              116

1    chronological?

2       A.   (Deponent viewing photograph.)  Yeah, it

3    tells me that this one definitely isn't chronological

4    with the rest.

5       Q.   Okay.  And what is this?

6       A.   (Deponent viewing photograph.)  This, again,

7    is -- I can't really zoom in here.  I think we might

8    find --

9       Q.   Oh, I might be able to zoom in.

10      A.   (Deponent viewing photograph.)  Sure, a

11   little bit.  So this is --

12      Q.   Is that better?

13      A.   (Deponent viewing photograph.)  Yeah.  So

14   this is looking to the left of the wreck site.  The

15   left would've been off the right-hand side of the

16   photo.  I'm not quite sure what I was taking a photo

17   of there.  Maybe just a nice sunset.

18      Q.   Okay.  And, again -- so this -- are we

19   looking -- we're looking east where the sun is coming

20   up; is that correct?

21      A.   (Deponent viewing photograph.)  I believe so,

22   yes, because this is a south-facing shore.

23      Q.   Okay.  And I'm just going to get to that --

24   I'd like you to see the whole picture if you can.

♠                                                        117

1            Can you see the whole picture?

2      A.   (Deponent viewing photograph.)  Yeah, I can

3   see the whole picture.  I'm a little curious as to why

4   I took this.  I'm pretty sure the wreck site is off to

5   the right, outside of the frame.

6      Q.   Okay.

7      A.   (Deponent viewing photograph.)  It may have

8   been to show the entrance to the breakwater which

9   would've been right about where the sun is.  There

10   was, sort of, an entrance at each end, depending on

11   the draft of the vessel.

12           So I think the other thing that I was

13   probably trying to -- trying to document, and it

14   would've been better from -- from the breakwater, my

15   -- my mind was sort of going through, well, how -- how

16   do you not see this breakwater?  It's -- it's -- it's

17   very low to the surface, yes, but when you're

18   approaching in the dark, all of these resorts, hotels,

19   bars, et cetera, have lots of lights on them, and the

20   sea is very flat on the inside of the breakwater,

21   which, obviously, makes it quite highly reflective.

22            And my -- my thought would be that, you know,

23   if I was approaching in rough weather in the dark, I'd

24   be a little bit curious about why the sea I was in was

⬆                                                        118

1   so rough and why the sea not so far away was so flat,

2   unless something was in between.

3       Q.   Now, were you actually there at night?

4       A.   Yes, I was.

5       Q.   And when you were there at night, did you go

6   out to where the boat was?

7       A.   No.  I -- I didn't go swimming in the dark.

8       Q.   Did you ever go on a boat beyond the

9   breakwater to see what it looked like out there?

10      A.   Well, I mean, I went to the breakwater and

11   saw the other side of the breakwater while I was on

12   it, but not in the dark.

13      Q.   Okay.  But while you were on it, you didn't

14   go out in a boat beyond it?

15      A.   No.  No.  No.

16      Q.   Okay.

17    A.   No.

18    Q.   I'm going to go to the next one here.

19         So the -- the breakwater was very long,

20   correct?

21    A.   (Deponent viewing photograph.)  It is.  It's

22   very long, and it's not very tall.

23    Q.   And are you aware of how that breakwater is

24   in relation to the tides, as in a high tide, is it --

⬆                                              119

1   is it submerged?

2    A.   It was very low to the water so, it -- I

3   mean, it depends which day of high tide, but I could

4   see how, on a spring tide, it certainly would be

5   submerged, but it would also be awash in any kind of

6   weather.

7         So, I mean, when I was out there, the highest

8   point was probably a foot or two above sea level.  And

9   in the Caribbean, we don't have a whole lot of tidal

10  variance.  And so, you know, I mean, I could see how,

11  on a high spring tide, it must be mostly submerged,

12  but, at the same time, with any kind of a sea state

13  other than, you know, flat mirror calm, it's going to

14  be awash.  You're going to have breaking -- breaking

15  water there.

16     Q.   All right.  Let me go to the next one here.

17  So you're getting a gorgeous -- I have to tell you,

18  you're a very good photographer.  Gorgeous sunrise

19  picture here.

20          I'm assuming that's also the sunrise,

21  correct?

22     A.   Correct.

23     Q.   Okay.  Same thing, now you're by the little

24  boat we kept seeing it in the pictures.

♠                                                    120

1           Are -- is this also to the left of the area

2   where the boat was on the breakwater?

3      A.   (Deponent viewing photograph.)  It is.  So

4   the wreck would've been probably just a bit to the

5   right of where your mouse is.

6      Q.   Okay.

7      A.   (Deponent viewing photograph.)  But I think,

8   actually, what you see in the foreground of this

9   photo, you can't -- you can't really see it very well,

10  but that sign that you see, it has a diver flag on it.

11  It's got -- it's got -- it's a red sign with a white

12  slash through the middle (indicating), and I believe

13  what I was trying to do here was document the location

14  of the dive shop, which is Alex Cottier's dive shop.

15     Q.   Okay.  Was he involved, in some way, with

16   your inspection?

17      A.   No, he was not.

18      Q.   So why -- why did you document his dive shop?

19      A.   Because when salvors arrive, they will

20   generally use the services of a local dive shop to

21   refill their tanks.  So we generally try and make a

22   note of anybody around that might be of use to us if

23   we need additional information, and this would be

24   somebody that is, you know, directly there.  And

                                                    121

1   divers are easy to look up because they're generally

2   all PADI registered.

3      Q.   Okay.  I -- I was curious to know if you were

4   aware, at that point in time, that Mr. Cottier was the

5   person who helped Mr. Andersson get off the boat after

6   it went aground.

7      A.   I think he did say that in his statement, but

8   I don't think I ever interviewed with Cottier about

9   it.

10      Q.   Okay.

11      A.   And, of course, this was morning.  I hadn't

12   actually met Mr. Andersson at the time of taking these

13   photos.

14      Q.   Okay.  Okay.  All right.  So I'm going to

15   move on.

16         Another picture, essentially the same area,

17   correct?

18        A.   (Deponent viewing photograph.)  Correct.  And

19   it --

20        Q.   Okay.

21        A.   -- it shows a -- a small dock on the left

22   there, which is part of a resort.

23        Q.   Okay.  And that would've been to the left of

24   where the boat was?

⬆                                                        122

1         A.   (Deponent viewing photograph.)  Correct.

2         Q.   Okay.  And this, it looks like, is roughly

3    the same with a different exposure?

4         A.   (Deponent viewing photograph.)  Correct.

5         Q.   And, again --

6         A.   I know --

7         Q.   -- is this now -- do you play with exposure

8    because you're having fun being a photographer or

9    is --

10        A.   (Deponent viewing photograph.)  Well --

11        Q.   -- is this chronological and no different?

12        A.   No, this is chronological and no different.

13   I think the camera probably plays with automatic

14   exposure, but I'm -- I'm not that -- I'm not that

15   camera happy.

16      Q.   Okay.  So some -- something knocked down

17   your -- your exposure if --

18      A.   Yes.

19      Q.   -- if it's chronological.

20           That was, kind of, my badly-stated question

21   was, it appears as if these are backwards, if this is

22   the sunrise --

23      A.   Yes.  Yes.

24      Q.   -- and where it -- so we have confirmed this

♠                                                          123

1   is a sunrise, not a sunset photo, and you believe

2   they're chronological, there may have been some sort

3   of automatic change in the exposure on the camera?

4      A.   Correct.

5      Q.   What kind of camera do you use?

6      A.   In this case, it would've been a -- probably

7   -- I've get a couple of them, but either an Olympus or

8   it's probably my Nikon.  It's just a little

9   submersible point-and-shoot (indicating).

10      Q.   Okay.

11      A.   I knew I had to swim out, so I didn't want to

12   take anything that couldn't get wet.

13      Q.   All right.  And here we have -- let's just

14    confirm for the record, what is this picture?

15         A.    (Deponent viewing photograph.)   This is

16    Melody, stranded on the breakwater, and I think this

17    photo was likely taken over my head as we were wading

18    out.   Because it looks a lot closer to the vessel than

19    the shoreline would have been.

20         Q.    And it appears as if there are waves breaking

21    on the far side of the breakwater, correct?

22         A.    (Deponent viewing photograph.)   Correct.   She

23    was -- she was getting picked up and dropped down

24    again on the reef.   So she was moving while we were on

⬆                                                            124

1    board.

2         Q.    It hurts to see that.

3               Okay.   Closer picture of Melody, correct?

4         A.    (Deponent viewing photograph.)   Correct.   And

5    you can, sort of, see the height of the breakwater

6    above the water in that photo.

7         Q.    And just to confirm, you're not sure what the

8    tide was at the time when you took these photos,

9    right?

10         A.    Correct.

11         Q.    Okay.

12         A.    We could -- we could go back and look.

13    That's not that difficult to do, but I'm not sure what

14    it was at that particular time, no.

15        Q.   Okay.  Now, it appears this is another -- it

16    looks like it got rougher.

17            Is it possible you took this after you were

18    leaving or --

19        A.   (Deponent viewing photograph.)  This would've

20    been at the same time, but waves do come in sets.

21        Q.   Okay.

22        A.   (Deponent viewing photograph.)  Not every

23    wave is the same height, and so I -- it's likely why I

24    took this picture.

⬆                                                        125

1             One of the hardest things that we find to

2     document, especially for underwriters, is -- is the

3     conditions of the sea, because it generally looks a

4     lot -- a lot nicer than it actually is.  It's kind of

5     hard to get a photo that really shows the destructive

6     power of a wave, which is one of the reasons that we

7     use some video as well.

8             The video is harder to transmit, but

9     sometimes it's the only way that he can really capture

10    the -- the severity of the situation.

11        Q.   Would you consider this to be a severe

12    situation?

13    A.   Given the position of the vessel, yes.  I

14  mean, once a boat is -- is awash like this, aground,

15  it's going to sit there and bounce up and down until

16  it breaks apart.  So time is of the essence in terms

17  of saving the asset, and, obviously, by -- by the time

18  we got out there, it had been out there for quite a

19  while, because we had had time to travel to the DR.

20         But in terms of making -- making a

21  recommendation towards, you know, to salve it or -- or

22  just remove the wreck and do a -- a less surgical

23  operation for cheaper, you know, part of that is, how

24  much time do we have and how much damage is already

&#9650;                                          126

1  done.

2    Q.   Okay.  Would you say that, in the position

3  you see the boat in now, and -- and the kind of wave

4  action et cetera, was -- was there water entering the

5  cockpit area and affecting things there?

6    A.   (Deponent viewing photograph.)  Yes.  So, at

7  this point, we'll get to the photos as far as what we

8  had determined the condition to be when I got on

9  board, but, you know, I've looked enough of these

10  that, when I got to this point, you know, both hulls

11  -- both hulls are whole.  She would've been bounced up

12  there pretty hard.

13          And so the interior of both sides would have

14   been -- I mean, one's obviously high and dry, but

15   would've been compromised, and there would've been an

16   opportunity for water to get in there.  And with her

17   stern to the sea, or, at least, partially to the sea

18   like this, there was plenty of water, sort of, getting

19   sprayed and washed into the cockpit as well.

20       Q.   Let's go on.

21       A.   I actually ended up erecting some -- some

22   tarpaulins for the security guys that were sleeping on

23   board.

24       Q.   Okay.  So now we have -- it looks like --

---

⬆                                                      127

1       A.   (Deponent viewing photograph.)  That's --

2       Q.   -- is this the dinghy that was associated

3   with the boat?

4       A.   (Deponent viewing photograph.)  Yeah.  And

5   I'm not -- I'm -- I'm not positive how it -- exactly

6   it got launched and got to there on the inside of the

7   breakwater.  But, obviously, that was a -- a pretty

8   good place to put it, in terms of salving its value

9   and keeping it safe.  So I imagine I took this picture

10   just in terms of, you know, showing that the dingy was

11   intact and not lost.

12     Q.   Okay.  Now, let's go, another photo of the

13 dinghy.

14          And --

15     A.   (Deponent viewing photograph.)  Yeah, the

16 outboard --

17     Q.   -- was this the document that the outboard

18 was there and its condition (indicating)?

19     A.   (Deponent viewing photograph.)  Correct.

20 Yeah, just to show --

21     Q.   Okay.

22     A.   -- that it was present.

23          MADAM COURT REPORTER:  I'm sorry, just to

24 show that it was, I couldn't hear the last word, sir.

                                                    128

1          THE DEPONENT:  Just to show that it was

2 present.

3          MADAM COURT REPORTER:  Thank you.

4     A.   (Deponent viewing photograph.)  And then, of

5 course -- and then, of course, this is a -- a photo of

6 the serial number, just to show which -- which

7 outboard we're speaking about.

8     Q.   Okay.  And what is this?

9     A.   (Deponent viewing photograph.)  This is the

10 hull identification number on the dinghy.  So every --

11     Q.   Okay.

12     A.   -- every boat, theoretically, under -- under

13  convention, is given a specific number.  You know, the

14  first -- the first letters account for the builder of

15  the boat, the last four characters count for the --

16  the build date and the model year.  It's a bit like a

17  VIN number for a car.

18     Q.   Okay.  So let's see.  Another picture, it

19  looks like you took this from when you were standing

20  by the dinghy.

21     A.   (Deponent viewing photograph.)  Yeah.

22     Q.   Okay.  And another --

23     A.   (Deponent viewing photograph.)  I think -- I

24  think this -- this photo served two purposes for me.

⬆                                                    129

1   One was to show that the anchor was -- had been

2   dropped, or, at least, partially.  It's been -- it

3   looks like it's been recovered on the deck, actually,

4   and the chain's in the water, but somebody probably

5   tried to use it to get the boat off the reef.

6           The other, which is a little bit harder to

7   see, if you see where the wooden ladder, the makeshift

8   ladder is alongside --

9      Q.   Mm-hmm.

10     A.   -- there's actually a big deformity in the

11  hull there, in the top side.

12      Q.   Okay.

13      A.   (Deponent viewing photograph.)  And that was

14  to show, you know, the beginning of some -- some

15  structural breakdown, a lot of delamination on the top

16  sides, just to quantify some of the -- the damages

17  beyond the hulls.

18      Q.   Okay.  And let's go on to the next one.

19           So what are you showing us here?

20      A.   (Deponent viewing photograph.)  That would be

21  more of the anchor chain, which is in the water, but

22  you can see that the anchor is up on the trampoline.

23               (Technical difficulties.)

24      A.   Do you see --

                                                    130

1      Q.   Okay.

2      A.   -- how the chain wraps over --

3               MADAM COURT REPORTER:  Excuse me.  That

4  --

5               BY MS. NIEMEYER:

6      Q.   Yes.

7               MADAM COURT REPORTER:  -- that -- that --

8  I didn't hear --

9               BY MS. NIEMEYER:

10      Q.   And --

11              MADAM COURT REPORTER:  Excuse me.  You

12  froze when you said, but you can see that the anchor

13  is up on the -- I couldn't hear the next word.

14              (Technical difficulties.)

15              THE DEPONENT:  On the trampoline.

16              MADAM COURT REPORTER:  Trampoline.  Okay.

17              THE DEPONENT:  The trampoline, like --

18  like the one that children --

19              (Technical difficulties.)

20              MADAM COURT REPORTER:  Thank you.

21          BY MS. NIEMEYER:

22      Q.   Okay.  And -- and here, you can see there's,

23  actually, it looks like the breakwater is partially

24  submerged in this area (indicating), correct?

⬆                                                    131

1       A.   (Deponent viewing photograph.)  Correct.  So

2   the -- the port hull, the one on the left side, the

3   one closest to us, had been washed up high -- we call

4   it high and dry.  It was -- it was on the -- above the

5   water level on the shore.

6               The starboard hull was awash.  So when we

7   were on board, it still had a little bit of buoyancy

8   in it.  It was -- it was mostly full of water, but, of

9   course, every time a wave would hit the boat, the

10   whole boat would move.

11        And so what you see -- if you see, on this

12   photo, there's a -- a blue stripe just above the water

13   line --

14   Q.   Yeah.

15   A.   -- that indicates that -- that the front end

16   of this hull is at about the same height that it would

17   be if the vessel was afloat.  What you can't see in

18   this photo is that the reef is actually inside the

19   boat as well, so it's, clearly, not fully afloat --

20   Q.   Okay.

21   A.   -- but it hasn't -- it hasn't lost any

22   altitude, I guess.

23   Q.   Okay.  And this one (indicating)?

24   A.   (Deponent viewing photograph.)  This was --

♠                                                      132

1   this just shows a little bit more of the inside of the

2   starboard hull.  The photo doesn't show it very well,

3   but the intent was to show where the reef is and how

4   shallow it is all the way along that hull.

5        You know, one of the things that we think

6   about in terms of the possibilities for salvage is,

7   obviously, just how -- just how complex and how

8   difficult it is, and that's about how much -- how much

9   water you have to work with.  You know, is it just the

10   bow that's aground?  Is it the whole boat?  Is it both

11   hulls?

12           You know, had -- had this boat not been

13   significantly damaged enough that we would recommend

14   it as a -- a constructive total loss, it would've been

15   the kind of job that we would probably look to, for

16   instance, use a crane to save the vessel rather than

17   drag it off the reef, because, of course, the hull's

18   in the bottom.  If you drag it off, it takes on more

19   water, you have more damage.

20       Q.   Okay.  And this is just -- for the record,

21   we're looking at Number 313 right now.  So let's go on

22   to 314.

23           It looks like this is just a closer-up

24   version of the picture of the starboard hull, correct?

↑                                                        133

1        A.   (Deponent viewing photograph.)  Indeed.  And

2   you can see just -- or to the right of the escape

3   patch that you can see in the middle of the photo

4   there, I think you can actually see where a -- part of

5   the reef has broken the water line.

6           You see where the blue stripe is interrupted?

7        Q.   Yes.

8        A.   (Deponent viewing photograph.)  So, again,

9    that sort of shows just how far up the damages have

10   come.

11        Q.   Okay.  And 315 --

12        A.   (Deponent viewing photograph.)  No, this

13   photo -- go ahead.

14        Q.   Is this still the starboard, or is this the

15   port hull?

16        A.   (Deponent viewing photograph.)  This would be

17   -- I believe this is -- no, this is the port hull.  So

18   what you see on the top left of the photo is the

19   anchor chain roller --

20        Q.   Mm-hmm.

21        A.   -- and below you see the wave breaker on the

22   bow.

23             To the right side of the photo, you see the

24   escape hatch that would've been on the port hull.  So

⬆                                                      134

1    it's probably fairly obvious, but for the sake of the

2    record, what I'm trying to show here is the --

3    probably 10-foot-long by three-foot-tall flap of

4    fiberglass that has been ripped out of the hull skin

5    there, by the reef.

6         Q.   Okay.

7         A.   (Deponent viewing photograph.)  Do you see

8    that in the middle of the photo --

9    Q.   Yes.

10   A.   -- it's laid out?

11   Q.   Yes.  Okay.  And 316, it appears, is just a

12   slightly farther-away version of that similar

13   viewpoint, correct?

14   A.   (Deponent viewing photograph.)  Correct.

15   Q.   Okay.  317, what is this?

16   A.   (Deponent viewing photograph.)  This is a --

17   this is a closer-up version of the starboard hull, the

18   photo that we -- we were just talking about where the

19   water line was broken.

20   Q.   Oh, okay.

21   A.   This is a close-up photo.

22        (Technical difficulties.)

23        MADAM COURT REPORTER:  I'm sorry, this

24   was a what?  I couldn't hear.

♠                                                        135

1    A.   (Deponent viewing photograph.)  This is a

2    close-up photo of the starboard hull, and it's in the

3    area that we -- we referenced in the previous photos

4    of the starboard hull where the water line has been

5    broken.

6    Q.   And 318, is this the portside again?

7    A.   (Deponent viewing photograph.)  That's,

8   again, the portside.  I -- I think what I was doing

9   here was, sort of, slowly waddling my way back

10  underneath the boat and trying to snap as many

11  pictures as I could before another wave came.  It

12  wasn't long after this that I got a sea urchin in my

13  leg.

14        Q.   Oh, ouch.

15        A.   (Deponent laughs.)

16        Q.   319, is that --

17        A.   (Deponent viewing photograph.)  That's

18  that --

19        Q.   -- that same place on the starboard hull, but

20  closer to it?

21        A.   (Deponent viewing photograph.)  It is,

22  indeed.

23        Q.   And 320, is -- it appears to be that flap of

24  the port hull again; is that correct?

⬆                                                    136

1        A.   (Deponent viewing photograph.)  Correct.

2        Q.   And -- and -- and it looks like, now, you're

3   -- you're under the solid part of this -- which is

4   probably the salon walking through -- between the two

5   pontoons, correct?

6        A.   (Deponent viewing photograph.)  Almost.  What

7   you see at the top of the photo, see the -- the rust

8    streaks coming down?

9       Q.   Sort of --

10      A.   (Deponent viewing photograph.)  On -- on the

11   top left there you can see about four brown lines that

12   are working down --

13      Q.   Mm-hmm.

14      A.   -- right above your mouse.  So that would --

15   that would likely have been from a fitting at the aft

16   end of the trampoline.  So it would've been right at

17   the front of the salon.  So that area, more than

18   likely, would be a storage locker.

19      Q.   Okay.  Now -- now, we're back outside.

20           Where are we here?

21      A.   (Deponent viewing photograph.)  This is

22   looking down the outboard side of the starboard hull,

23   and this, sort of, shows the wave action coming in.

24      Q.   Okay.  So this is the outside of the boat

♠                                                    137

1    closest to the ocean, not closest to the breakwater,

2    correct?

3       A.   (Deponent viewing photograph.)  Correct.

4               MS. NIEMEYER:  And -- and, for the

5    record, this is 321.

6               BY MS. NIEMEYER:

7    Q.   322 appears to be similar, but the wave has

8  gotten closer?

9    A.   (Deponent viewing photograph.)  Yup.  Just

10  documenting the force of the wave.

11    Q.   Do we get to see you be hit by this, because

12  it looks like you're going to be.

13         Let's see, here we go.  323.  So, is this a

14  good description of the just -- at least the -- that

15  morning you were there, what kind of wave action was

16  hitting the exterior of the vessel?

17    A.   (Deponent viewing photograph.)  Correct.  And

18  -- and so, you know, we talked a little bit earlier

19  about, you know, how much water weighs and just --

20    Q.   Okay.

21    A.   -- the amount of force behind water.  I think

22  this picture kind of sums it up.

23    Q.   And this is 323.

24         Were you -- are you aware if -- was this kind

⬆                                                        138

1  of the normal weather conditions in the Dominican at

2  that time of year?  Was it more rough, less rough?  Do

3  you have any idea?

4    A.   I would say that this was a particularly flat

5  day, actually.  The -- the South Shores of the -- of

6  the Caribbean are generally a little bit more

7    protected.  The big swells that we have in the winter

8    season generally come out of the north, and they're

9    generated by weather further north.  So this is on the

10   south side of the island, and it's protected from a

11   lot of swell.  But, still, in -- in regards to the

12   open ocean, I would say that this is a -- a reasonably

13   calm day.

14        Q.   Okay.  Let's go to 324.

15        A.   We have a -- we have a phenomenon -- it's not

16   really a phenomenon, but it's a -- a weather pattern

17   that comes through around Christmas that we call the

18   Christmas winds.  And so the weather does generally

19   come up around Christmas, sort of, you know, some

20   years, it's a little bit earlier than others, but late

21   December, early January, it gets particularly windy.

22        Q.   Okay.  So we were right around that time

23   frame, correct, in this situation?

24        A.   Yeah.

                                                      139

1         Q.   Okay.  So, this next picture, 324, just to

2    clar -- I'm going to be quick here and say that I

3    believe, and I'll ask you to confirm; this is, again,

4    the portside of the boat where that one ladder was?

5         A.   (Deponent viewing photograph.)  Correct.  And

6  it -- it shows the deformity -- I mean, that -- that

7  should be a nice contiguous curve all the way through.

8  You can, sort of, see how the side of the boat has

9  been indented there as it comes ashore.

10      Q.   Right.  It -- it appears as if it's caved in

11  a bit there.

12      A.   (Deponent viewing photograph.)  Correct.

13      Q.   Okay.

14      A.   (Deponent viewing photograph.)  And, of

15  course, the delamination of the fiberglass radiating

16  around it as well.

17      Q.   Now -- okay.  And here's another photo,

18  essentially, of that same area, correct?

19      A.   (Deponent viewing photograph.)  Correct.

20      Q.   Okay.  326 --

21      A.   (Deponent viewing photograph.)  That would be

22  --

23      Q.   -- that --

24      A.   (Deponent viewing photograph.)  That would be

⬆                                                     140

1  Mr. Andersson.

2      Q.   I couldn't hear you.

3      A.   (Deponent viewing photograph.)  I said, that

4  would be Mr. Andersson running his hand along the

5  deformity --

6    Q.   Okay.

7    A.   -- on the portside.

8    Q.   Okay.  Now, Mr. Andersson was there with you

9  when you did this inspection.

10         Was anybody else there with you?

11    A.   Yes, there were a number of -- of men

12  sleeping in the salon when we got there, and they were

13  the security guards that Mr. Andersson had appointed,

14  instructed.

15    Q.   Okay.  And this Picture 327, what is this?

16    A.   (Deponent viewing photograph.)  So this is

17  the stern of the boat, or the two sterns, if you like.

18  The closest to us is the portside, and it -- it

19  doesn't really show the wave action.  I think there

20  might be some further photos that do, but, obviously,

21  I'm -- I'm standing on the bottom when I take this

22  picture, so it gives an idea of depth.

23    Q.   Okay.  328.  And it appears, at this point,

24  you've gotten water on your camera lens; is that

                                                      141

1  correct?

2    A.   (Deponent viewing photograph.)  That's

3  correct.  So I took this photo with purpose.  The --

4  the yellow flag that you see there is a lot better

5  known to people now that we've had COVID; it's the

6  quarantine flag.  So it's the flag that you fly when

7  you enter a new country before you have cleared

8  customs.  So that was my way of reminding myself that

9  the vessel likely hasn't cleared customs yet.

10      Q.   Okay.  What's the relevance of that?

11      A.   If we had moved towards salvage, the -- the

12  vessel would've had to be cleared at -- well, it

13  should be cleared in anyways, in fact, and, obviously,

14  Mr. Andersson's immigration status would be relevant

15  to that as well, just in terms of the -- the, sort of,

16  legality of -- of the boat and it being there and how

17  that works.  Obviously, he didn't get a chance to

18  clear customs.

19      Q.   Okay.  Do you know if he did actually clear

20  customs?

21      A.   I don't, no.

22      Q.   Okay.

23      A.   My -- my experience with Caribbean nations is

24  that there -- there is a lot of officialdom.  And

                                                    142

1  given that he reported that the authorities had

2  already been involved and were wondering about, you

3  know, how they were going to take care of the wreck,

4  I'm sure somebody would've asked questions about his

5   immigration status.

6       Q.   Okay.  Now, 329 appears to be taken on the

7   deck of the port pontoon; is that correct?

8       A.   (Deponent viewing photograph.)   Correct.   So

9   this is -- this is on the portside on the side deck

10  looking forward.

11      Q.   Is there anything of note there that we

12  should know about?

13      A.   (Deponent viewing photograph.)   I think the

14  intent of this photo was really just to show that it

15  was slightly bow up on the portside, that, you know,

16  the bow was further up the breakwater than the stern.

17  And, specifically, just to document the vessel's

18  position in relation to the breakwater.   It doesn't

19  always tell us, but it often tells us a little bit

20  about how the vessel hit the breakwater.

21          So it would be the difference of, you know,

22  did you drag anchor and -- and float backwards into

23  the breakwater?   Did you drive forwards over the

24  breakwater?   You know, sort of what -- what happened,

❦                                                        143

1   what is -- what does the evidence tell us.

2       Q.   Okay.  And, presumably, however you've hit

3   it, if there's wave action, that would affect it, too,

4   correct?

5       A.   Correct.

6       Q.   Did you come --

7       A.   And so, you --

8       Q.   -- up with --

9       A.   -- know -- go ahead.

10      Q.   Were there any conclusions that you came up

11  with based on this?

12      A.   There -- there weren't any conclusions, but

13  it contradicted Mr. Andersson's statement.  You know,

14  if -- if he were -- hypothetically, if he were to say,

15  you know, I -- I dragged anchor and hit it, but,

16  meanwhile, he ran over it straightforward, then we

17  would start asking some more questions.  But in this

18  case, you know, he said, you know, I -- I drove into a

19  breakwater.  I'm not going to argue with that.

20      Q.   Okay.  330.  It appears to be taken from the

21  bow on the portside looking back; is that correct?

22      A.   (Deponent viewing photograph.)  That's

23  correct.  And you can see that there's --

24      Q.   Again, is there anything -- is there anything

                                                        144

1   you take from this or any relevance to this photo to

2   you?

3       A.   (Deponent viewing photograph.)  Yes, the wave

4    action on the starboard side there.  You can -- you

5    can see the height and the breaking wave coming at the

6    vessel.

7        Q.   Okay.  Now, let's go to 331.

8             And can you describe what this picture is of?

9        A.   (Deponent viewing photograph.)  So this is

10   looking around the starboard bow from -- from the

11   deck, through the trampoline, down at the reef.  And

12   it just shows, again, you see, on the left side of the

13   photo, how the water is -- is breaking?  It's not

14   really a raised wave, but it's breaking.  It's

15   disturbed water.

16            And so this -- this speaks a little bit to

17   the -- the visibility of the breakwater, even in the

18   dark.  I'm sure you're coming to that, so I'll leave

19   that.

20       Q.   I -- I want to ask you, and I'm just going to

21   -- we've been using a lot of nautical terms that, to

22   you and I may not seem nautical, but, just to clarify,

23   when we say "bow," we mean the front of the boat,

24   correct?

♠                                                      145

1        A.   Correct.

2        Q.   And this -- where you see this white bar that

3  runs through the center of the picture, and it -- it

4  touches part of the boat, is that the -- that's a

5  structural piece of the boat that holds the two

6  pontoons together, all the way at the front of the

7  boat, correct?

8      A.   (Deponent viewing photograph.)  Yes, it's the

9  forward crossbeam.  It -- it functions more in terms

10  of the rigging than reinforcing the hulls.  It does

11  reinforce the hulls a little bit, but, more so, you

12  see coming straight up from it --

13      Q.   Mm-hmm.

14      A.   -- that's the -- that's the forestay.  So

15  that's the cable that holds the mast up.  And so it

16  provides a -- a central point from which to attach

17  that.

18      Q.   Okay.  And let me just go to the next one,

19  then; 332, can you describe that?

20      A.   (Deponent viewing photograph.)  So this is

21  looking from the port bow over to the starboard side

22  of the vessel, and you can see the spray coming from

23  the waves as they hit the side of the boat.  Again, I

24  took this just to, sort of, document the -- the power

⬆                                                      146

1  of the sea and the timeliness of salvage.

2      Q.   Okay.  How about this here, 333?

3       A.    (Deponent viewing photograph.)  This is --

4   this is looking, again, off the starboard side out to

5   sea and it -- it actually -- it shows a relatively

6   flat sea, but with a -- what looks to be a groundswell

7   coming in.

8       Q.    Okay.  I see a daggerboard up, is that what

9   that is?

10      A.    (Deponent viewing photograph.)  Yes, that's

11  correct.

12      Q.    Do you know if that was up or down at the

13  time of the incident that put the --

14      A.    No.

15      Q.    -- vessel on the breakwater?

16      A.    I don't know.  They would certainly work

17  themselves up as the -- as the vessel was bounced on

18  the bottom, if they weren't broken in advance --

19      Q.    Okay.

20      A.    -- but I think it stands to reason that they

21  probably were up.

22      Q.    Okay.  And this is 334.

23            Is this, again, the starboard side of the

24  boat showing the waves?

⬆                                                       147

1       A.    (Deponent viewing photograph.)  That's

2  correct.

3      Q.   Is there anything else about that picture

4  that means anything to you?

5      A.   (Deponent viewing photograph.)  I don't think

6  so.

7      Q.   Okay.  And 335, is there anything in that

8  picture that you want to tell us about?

9      A.   (Deponent viewing photograph.)  This is the

10  starboard side deck looking aft, towards the back of

11  the boat.  And it -- it just, again, sort of, shows

12  the wave -- the wave height and the wave direction

13  affecting the vessel.  You know, the -- the -- the

14  swell was consistently pushing that boat further up

15  the reef.

16      Q.   Okay.  And let's go to 346 [sic], anything of

17  note here?

18      A.   (Deponent viewing photograph.)  No.  We're,

19  again, looking at the starboard side and the wave

20  action hitting the starboard side.  I think -- I think

21  what we may be suffering from here, like I said

22  before, we often find it very difficult to document

23  wave action and wave height in a way that -- that, you

24  know, folks really understand just how good or bad it

                                                            148

1  is.  And so, you know, they say a picture is worth a

2   thousand words.  I take a lot of pictures in that

3   regard.

4       Q.   Okay.  And -- and I'm going to correct what

5   I -- when I said "346," that's effectively in the page

6   in the PDF, but it's -- 336 is the Bates number.

7            Let's go on to the next one.  337, what is

8   this photograph?

9       A.   (Deponent viewing photograph.)  This is an

10  engine room.  I believe that this is probably the

11  starboard engine room.  What you see on the top left

12  is the steering ram for the autopilot.

13           And so, at the top of the picture, I believe,

14  is the main bulkhead in front of the engine room.

15  What you see, the -- the big silver block there, is

16  the engine, but it has been broken free of its mounts,

17  and that, sort of, circular ring, just to the left of

18  center of the photo, is where what we would call a

19  saildrive goes through the hull.

20           So the -- the transmission with the propeller

21  on it, similar to the bottom of an outboard motor on a

22  sail drive, protrudes through the bottom of the boat.

23  And when they're grounded, they're often broken off

24  and pushed upwards, which would break engine mounts as

1  well.

2      Q.   Okay.

3      A.   So, ultimately --

4      Q.   So, just to clarify, does that saildrive come

5  down to the lowest point of the hull where it comes

6  out of the hull?

7      A.   No.  It would -- it would likely draw less

8  water than the keel or the rudder of the boat.

9      Q.   Okay.

10     A.   (Inaudible) and lower --

11              MADAM COURT REPORTER:  I'm sorry.

12     A.   -- but it does --

13              MADAM COURT REPORTER:  Hold on one

14  moment.

15     A.   -- hang below the bottom of the hull.

16              MADAM COURT REPORTER:  Rudder of the

17  boat, okay, and I couldn't hear the next word that you

18  said.

19              Can you please repeat it?

20     A.   I was saying that it -- it would likely hang

21  out -- the keel and the rudder of the boat would draw

22  more water.  It would be deeper; however, this does

23  hang below the bottom of the -- of the hull, again, so

24  it does protrude from the bottom of the boat.

1      Q.   Okay.

2      A.   The fact that this is broken would suggest

3   that this the keel and rudder are already long gone.

4      Q.   338, what is this?

5      A.   (Deponent viewing photograph.)  This may be

6   the same engine room.  I believe it is.  Yeah, I

7   believe this is still likely the starboard engine

8   room.

9             (Technical difficulties.)

10             MADAM COURT REPORTER:  I'm sorry, this is

11   still likely the, something, engine room.  It -- there

12   was, like, a technical difficulty.

13             THE DEPONENT:  The starboard engine room.

14             MADAM COURT REPORTER:  Thank you.

15        BY MS. NIEMEYER:

16      Q.   Okay.  And now we have 339?

17      A.   (Deponent viewing photograph.)  Yup, that's

18   the -- that's the generator in the -- in the

19   foreground there.  And I likely took the photo, just

20   in terms of salve value, to show that the generator

21   was still above the water.

22      Q.   Okay.  Now we're at 340.

23      A.   (Deponent viewing photograph.)  Okay.

24      Q.   Not looking good for the engine.

1      A.    (Deponent viewing photograph.)  No.  I

2  believe that this is the other engine room, simply

3  just by looking at what's around it.  It's clearly a

4  different environment.  And based on the water level,

5  I want to say that I was probably incorrect in the

6  last engine being the starboard, simply because we

7  know that the starboard hull was deeper in the water,

8  and the water level in here is higher.

9            So this is likely the starboard engine, and

10  the other engine was likely the port engine.

11     Q.   Okay.  But is it -- is it fair to say that

12  both sides of the engines were no longer going to

13  be --

14     A.   Yeah.

15     Q.   -- functional?

16     A.   The -- the issue with -- with save -- you can

17  save an engine that's been under water, as long as it

18  stays under water.  Once it's exposed to oxygen,

19  that's when the corrosion sets in.

20            You know, I have -- I have a colleague who --

21  who submerged an outboard motor, and when he brought

22  it back, the first thing we did was chuck it back off

23  the dock and say, we'll get it when we're ready to fix

24  it.

1        The electronic components, like the starter,

2   the alternator, the wiring harness, et cetera, they

3   don't like water, they'll be dead anyways.  But in

4   terms of -- of declaring or recommending an engine as

5   a constructive total loss, that's really more about

6   air exposure than it is about water exposure.  It's

7   about how much air it's been exposed to for how long

8   after it's been submerged in salt water.

9        Obviously, these are semisubmerged and they

10  had been at that point for, you know, a couple of

11  days.  So, you know, my -- my assessment of these

12  would that be they're -- they're far beyond being

13  exposed to air at this time.

14     Q.   341?

15     A.   (Deponent viewing photograph.)  This looks

16  like a high pressure pump for a water maker.

17     Q.   Is that something else you were looking at,

18  considering potential salvage value?

19     A.   I think it was -- you know, I -- I have a

20  habit of, when I get in an engine room, just flash

21  pictures of everything in case there's anything that

22  you -- you want to reference later.  I don't really

23  consider this particularly relevant to salve value.

24  It's not a high value item, but it helps to show, at

1  least, where the -- the water level was, maybe --

2      Q.   Okay.

3      A.   -- or wasn't.

4      Q.   And this one, 342, what is this?

5      A.   (Deponent viewing photograph.)  Those would

6  be the -- the prefilters for the water maker, again,

7  for the desalination plant on board which shows

8  significant corrosion, but they've, obviously, also

9  been somewhat submerged.

10         In relation to the last photo or, in general,

11 one of the reasons that we take a lot of photos of

12 these things is to be able to make a comment on the

13 general maintenance of the vessel.

14         So, in some claims, we might have, for

15 instance, somebody that put a vessel up a reef, and

16 that happened because, you know, the -- the steering

17 failed or some component failed, which was due to lack

18 of maintenance.  And so we would generally make some

19 effort to show the general standard of maintenance

20 applied to the vessel, especially, of course, if we

21 observed that there was poor maintenance being carried

22 out.

23         In this case, I don't recall any poor

24  maintenance or any evidence thereof.  So it wasn't a

⬥                                                            154

1  particular concern, but it's something that we do look

2  for.

3      Q.   Okay.  So let's pop past this one, which we

4  already looked at, and go to 343.

5      A.   (Deponent viewing photograph.)  Here we are

6  again on the stern.  What you see in that -- in that

7  little -- call it flap there, that's the inflatable

8  life raft in there.  And so I -- I imagine I took this

9  photo as a reminder to say it's still on there.  If

10  salvage happens, we should remove that before we start

11  removing the vessel just so we don't deploy it.

12      Q.   Okay.  Let's go to the next one, 344.

13           Can you explain what this is?

14      A.   (Deponent viewing photograph.)  This is the

15  hull number for the vessel.  It's not particularly

16  clear, but, just like the one we showed on the -- on

17  the dinghy, it's a bit like a VIN number for a boat.

18      Q.   Okay.

19      A.   We always take this, as long as it's visible

20  on the boat, just to confirm that we are handling a

21  claim on the right boat.

22      Q.   Okay.  Great.  Now 55 -- or 345, what is

23  this?

24     A.   (Deponent viewing photograph.)  So this is

1 the interior of the starboard forward cabin and this

2 is the -- the -- the breakwater showing up inside the

3 boat.  This is where the -- the hull had been broken

4 away so far that there -- there was no bottom.

5     Q.   Okay.  Next.  346.

6     A.   (Deponent viewing photograph.)  This is the

7 -- I believe this is the starboard aft cabin.  And,

8 again, it shows the level of destruction.  What --

9 what the photo doesn't show is that all of that stuff

10 was moving up and down.  I think that's documented in

11 the video that we already looked at a little earlier.

12          At the bottom left, it looks like a -- like a

13 -- like a storage bin.  Across the top of that

14 would've been a bed.  But at the bottom left, you can

15 see what looks to be a -- a rotomolded plastic tank,

16 could have been the water tank, the waste tank, but

17 it's obviously floating up and down, which -- which

18 shows that the -- the bottom in that area has been

19 broken out and it's full of water.

20     Q.   Had any of those tanks been compromised when

21 you came there?

22     A.   Not to my knowledge, there was no -- there

23  was no sheen in the water, so there didn't seem to be

24  any leakage of fuel.  The -- the fuel tanks on these

1  boats, if I remember correctly, are up in the bridge

2  deck, so they would've been reasonably protected.

3  I'll -- I'll have to -- I'd have to double-check on

4  that, but I'm near positive that's how Catana does it.

5  The rest is -- is water and waste tanks.

6           Unfortunately, in terms of sewage discharge

7  in the Caribbean, people aren't so great about that

8  anyways, but, given that the boat had just been at

9  sea, I would've expected that the boats would've been

10  emptied anyways.

11      Q.   Okay.  This one, 347, what is that?

12      A.   (Deponent viewing photograph.)  Ahh,

13  honestly, that is so vague, I couldn't tell you.  I --

14  I would -- if I were to venture a guess, I would say

15  that is, again, in that starboard aft cabin, because

16  that's where everything was -- was most broken apart

17  and there was, you know, loose cabinetry.

18      Q.   Okay.  And --

19      A.   (Deponent viewing photograph.)  And I --

20      Q.   -- 348?

21      A.   (Deponent viewing photograph.)  This is,

22  again, the -- the starboard forward cabin.

23    Q.   Okay.  Let's go on to the next one, 349.

24    A.   (Deponent viewing photograph.)  I think this

♠                                                          157

1  is even further starboard forward, so I would've been

2  standing on the rock that we saw in the last photo,

3  looking through the door.

4    Q.   Is that a nav station?

5    A.   (Deponent viewing photograph.)  No.  This

6  is -- well -- well, I mean, it's a desk in a cabin.

7  Again, what -- what you see at the top of the photo is

8  -- is the rack for a bed, which is almost like a box

9  spring, and the gray thing is the mattress.  So the --

10  the nav station on this boat was up on the bridge

11  deck, so it was up -- up high.

12    Q.   Okay.  Okay.  So let's keep going, then, 350.

13    A.   (Deponent viewing photograph.)  I think this

14  is, again, looking -- looking aft on the starboard

15  side, I believe.

16    Q.   And you can see the water in the bottom part

17  of that picture.

18    A.   (Deponent viewing photograph.)  Yeah.  And --

19  and the reason I -- I say "looking aft" is because, if

20  we look at the cabinetry, we see that the cabinetry on

21  the right-hand side of the photo is up high.

22     Q.   Mm-hmm.

23     A.   (Deponent viewing photograph.)  That's

24  because that was overhanging into the bridge deck.

⬆                                                   158

1     Q.   Okay.  And 61 [sic]?

2     A.   (Deponent viewing photograph.)  This, again,

3  is -- is at the doorway, starting to look -- I think

4  this is probably on the portside --

5     Q.   Okay.

6     A.   -- on the door, perhaps.

7     Q.   And to correct, I -- I meant 351, not 61,

8  which is the number on the PDF.

9          So that would be -- are those stairs your --

10  is that your --

11     A.   (Deponent viewing photograph.)  Mm-hmm.

12     Q.   -- foot standing on stairs?

13     A.   (Deponent viewing photograph.)  Yeah, so this

14  is going down one of the companion ways into the hull.

15     Q.   Okay.

16     A.   (Deponent viewing photograph.)  I could only

17  see this being the starboard side, to be honest,

18  because there was that -- that much water in it.  The

19  portside was high and dry.

20     Q.   Okay.

21     A.   (Deponent viewing photograph.)  The other

22  thing -- the reason that I feel a little thrown off by

23  that is because, I remember when I went down the

24  starboard companionway, there was a lot of cabinetry

↑                                                       159

1  on the steps.  So it may be that, since this is the

2  last photo in the lot, that we had removed all of that

3  mess by that time.

4       Q.   Oh, okay.

5       A.   Yeah.

6       Q.   Okay.  And I'm going to close this and move

7  on to -- let's just look for the next one here.  Hold

8  on one second.

9       A.   Sure.

10       Q.   So we're going to close out that document,

11  and we're going to go to the next AB -- we're getting

12  close to being done with all the documents with your

13  initials on them.

14       A.   (Deponent laughs.)

15       Q.   I'm going to go to another movie.

16       A.   Sure.

17       Q.   Hold on one second.  I'll share that with

18  you.  Okay.  Share screen.  Share the movie.

19  Technology is great.

20            Do you see that?

21     A.    (Deponent viewing video.)

22     Q.    Okay.  I'm going to just back up here a

23 little.

24     A.    (Deponent viewing video.)  So that

♠                                                            160

1 actually --

2              MADAM COURT REPORTER:  Excuse me.  Excuse

3 me.  Can you please not talk while the video is going

4 on?  I can't hear, because all I can hear is the

5 video.  I just want to make you aware of that.  You

6 started to say, so that actually, and all I could hear

7 was them talking on the video.

8              BY MS. NIEMEYER:

9     Q.    Okay.  Okay.  Why don't we just play the

10 video through, and then we can talk about it after.

11     A.    (Deponent nods head.)

12     Q.    I'm going to start it again.

13     A.    (Deponent viewing video.)

14              MS. NIEMEYER:  Okay.  Can you hear me

15 now?

16              MADAM COURT REPORTER:  (Nods head.)

17              THE DEPONENT:  Yup.

18              BY MS. NIEMEYER:

19     Q.    Okay.  Just to -- for the record, that video

20 that we just played was AB000352.

21          And, Mr. Ball, I want to ask you, just so

22 that we have this authenticated, is this another of

23 the things that -- that you took while you were there

24 to inspect the vessel?

⬆                                                            161

1    A.   It is, indeed.

2    Q.   And was this, sort of, your attempt to do a

3 walkabout and show the condition in one fell swoop?

4    A.   Yeah, it was -- it was mainly a way just to

5 show that both hulls were badly compromised, and it --

6 it speaks a little bit to the photos before, in terms

7 of port versus starboard --

8    Q.   Mm-hmm.

9    A.   -- because all of -- all of those areas were

10 very quickly captured in this video.  And so, for the

11 record, I started on the portside.  I stopped.  You

12 can see there's a quick shot of the nav desk there,

13 the navigation desk and the GPS, or, at least, the

14 Raymarine one, and then I moved across to the

15 starboard side and just looked fore and aft.

16   Q.   Okay.  And I'm just going to freeze there.

17 So this -- and it's -- and I'm just going to say for

18 the record, this is at 47 seconds into the that video.

19          You can see -- can you describe that for a

20   moment?

21      A.   (Deponent viewing video.)  So, in the center

22   of the frame is a cover, and, obviously, presumably,

23   behind it is -- is -- is the multifunctional display,

24   which is a GPS unit.  It's a Raymarine unit.  It's an

⬆                                                                162

1    E120, which is a 12-inch unit.  Also, notably, at the

2    bottom right, is a Furuno GPS unit.

3           So, if you look at the original survey that

4    Mr. Andersson commissioned when he purchased the

5    vessel, it was done by a man named John Sands, it

6    references three different GPS units on board.  One is

7    the Raymarine E120 in the middle of frame there.  One

8    is the Furuno GPS navigator at the bottom right, which

9    would likely not save any information.  That is a

10   very, very basic unit.  And the other, I believe, was

11   a Garmin unit -- yes, it was a Garmin 721 unit --

12      Q.   Okay.

13      A.   -- and that --

14      Q.   Now, this just -- I'm going to stop you right

15   there.

16           This area where this Raymarine was, was

17   inside the salon of the vessel (indicating); is that

18   correct?

19      A.   (Deponent viewing video.)  Correct.  It is

20    the port aft corner of the salon.

21         Q.    And was it high up above the water?

22         A.    It is, yes.

23         Q.    And was it in the interior of the boat?

24         A.    That's correct.

⬆                                                          163

1          Q.    When you were there, did you make any effort

2     to turn on that Raymarine?

3          A.    No.   There was no power on the vessel.   Both

4     the battery banks had been submerged at that point.

5          Q.    Okay.  Did you bring any kind of an auxiliary

6     power so that you could turn things on if you needed

7     to?

8          A.    No.   We -- we waded out to the vessel, so,

9     no.

10         Q.    Okay.  Was there ever any attempt to have

11    somebody do that later?

12         A.    No.   This is something that we would normally

13    do during salvage, but, of course, we never moved to

14    that point.

15         Q.    Now, I'm going to forward -- I'm not going to

16    play it, I'm just going to kind of scroll forward

17    here, so that we can get back to the other part I

18    wanted to ask you a question of, which is really right

19   at the end.  This part here (indicating).  So at about

20   -- interesting, it also looks like 47, so this isn't

21   really helpful.

22         But all the way at the end, there's -- it

23   stops at a photo of what appears to be the helm; is

24   that correct?

⬆                                                              164

1    A.   (Deponent viewing video.)  Yeah, that -- if I

2    remember correctly, there are two helms on this boat.

3    There's one on each side, but it is one of them, yes.

4    Q.   Do you have any recollection about where the

5    Garmin GPS was located?

6    A.   I don't, no.

7    Q.   Okay.  So it would've been at -- at -- do you

8    know whether -- was there any indication to you about

9    which of these two helms would've been the helm that

10   was used most frequently?

11   A.   Without seeing the other helm, no.  However,

12   it's quite common that, on a catamaran with two helms,

13   only one of them will have engine controls.  It -- it

14   just costs more to put a second set of controls on.

15   So if that was the case on this boat, then I would

16   obviously say that this is the primary helm, because

17   it has engine controls.

18   Q.   Okay.  And if you only had one GPS, would you

19   expect that to be found at the primary helm?

20        A.   I will answer that with yes and no.  I'll

21   qualify the answer.

22             It's a sailing vessel, so engine control is

23   only really important when you're coming alongside a

24   dock, at which point you don't need GPS.

⬆                                                      165

1              The other -- the other part of this is that

2    these GPS units and navigational equipment run on a --

3    a network system, so they share information.  There's

4    actually a software language called NMEA, the National

5    Marine Electronics Association.  And so all the

6    different manufacturers will share sentences through a

7    common language, let's say.  They -- they have their

8    own proprietary sentences as well.

9              But if I wanted to buy a speed transducer

10   from Furuno and a wind transducer from B&G and have

11   the -- the information shown on a Raymarine screen, I

12   could do that.  The reason that this is relevant is

13   that, if I were to install an after-market GPS device

14   at an exterior helm on the boat, I may be motivated to

15   do -- to choose that location based on the power and

16   the network available to me in that area.

17             So if, for instance, in this case, there was

18  a transducer or a power supply or something on the

19  portside that made it more attractive to install

20  there, that would be a motivation as well.

21      Q.   Okay.  So is it -- I -- I'm gathering from

22  this, that, as we sit here today, you don't remember

23  where the GPS was located, the -- the Garmin?

24      A.   That's correct.  That's correct.

                                                    166

1       Q.   Okay.  Did you do anything to confirm that in

2   your investigation?

3       A.   I mean, after we were at the boat, no.

4       Q.   Okay.

5       A.   There -- there -- the Raymarine one at the

6   navigation station there would obviously be the safest

7   bet, because it is in a -- in a protected area.  And

8   the Raymarine system is a little bit more complex in

9   the sense that you can -- you can save a track on it

10  if you choose to save it.

11          So it's -- it's somewhat SOP for us if we

12  move to a point of salvage to retain a GPS, and we

13  call it interrogating it, it's not really

14  interrogating it, look for -- look for any evidence of

15  a saved track on the unit.  That saved track is a

16  function that the user has to turn on.

17          So there's no guarantee that it will be

18   there.  It's not -- it's not like it's always tracking

19   you and recording where you've been.  It's a useful

20   feature for some.  Others choose not to use it.  It's

21   not something that is turned on by default at the

22   factory.  So, you know, it becomes an aid in our

23   investigation, but it's not something that we can rely

24   upon.

❦                                                        167

1        Q.   Okay.  And the last question I have for you

2    about both of those GPSes; to your knowledge, did you

3    check to see if they had chips in them?

4        A.   I did not.  The chips in them contain the

5    chart data.  So when you enter the chip into the GPS

6    receiver, it is, generally, a secured chip with the

7    Navi -- well, in the Raymarine case, it has what's

8    called Navionics data on it.  There's a company called

9    Navionics that makes the chart cards for Raymarine GPS

10   devices.

11            If you want to save a track, it is saved onto

12   the -- the hard memory on the GPS unit, and then you

13   have to insert a different card to save it to the

14   card.  But the -- the chart cards are generally set up

15   as read only so that they can't be pirated.

16       Q.   Okay.  And -- and, to your recollection, what

17  was the era of the electronics on this vessel?

18      A.   The E120 has been replaced two, if not three

19  times now.

20           You know, I had a boat that was built in 2009

21  that had an E120 on it, so that's -- that's a decade

22  old now.  I feel old all of a sudden.  However, the --

23  the age of the electronics is less relevant than the

24  age of the chart card.

                                                    168

1           So there are methods of updating some chart

2   cards.  You know, the more modern GPSes actually have

3   Wi-Fi connectivity in them, so it can connect to an

4   online server and download chart updates.  Much like,

5   you know, a -- a prudent mariner, in fact, on a

6   commercial vessel, it's required.  If you have paper

7   charts, you are required to go through the list of

8   updates and mark them on your charts.

9           So the charts are updatable.  There's --

10  there's no -- no real reason that the chart should be

11  out of date unless it hasn't been updated.  The age of

12  the electronics is -- is really only relevant, in my

13  sense, to functionality.  You know, does it work or

14  does it not?

15      Q.   Oh, okay.  And just a -- I'm going to go back

16  to the concept of the chip.

17          Is it your understanding that, at the time --

18     A.     Yup.

19     Q.     -- in the era of these electronics, was it

20 more likely that a chip would've provided the chart?

21     A.     So there are -- there are two ways to

22 purchase these electronics.  One -- and I'm not sure

23 if this was the case with the E120, but it was certain

24 with the E120W that followed it.

⬆                                                          169

1          You could purchase the -- there are a number

2 of different chart packs depending on where you are in

3 the world.  You could purchase the unit with a chart

4 pack preloaded on its internal memory.

5          A great example of that would be if you had a

6 boat that spent half of its year in the Mediterranean

7 and half of its year in the Caribbean, you could buy

8 one with a Caribbean chart backloaded and insert a

9 card from a Mediterranean and you'd never have to swap

10 anything around.  The other option is to buy it with

11 nothing loaded and buy the charts, and the charts are

12 quite expensive.

13     Q.     So if -- if there was a chart chip in these

14 units, would the chip be something that would be

15 worthy of stealing if you were a person who wanted to

16  take things off of a boat like this?

17      A.   If you were a looter, yes, absolutely.

18  However, I think, if you -- my experience is that --

19  that looters, when it comes to -- especially in this

20  area, the Dominican Republic, Cuba, Haiti, you know,

21  as soon as we have a wreck there, there are --

22  there's, almost immediately, looting if we don't put

23  security on board.

24          The looters aren't quite so discerning about

♠                                                      170

1  what they take.  If it's shiny and electronic, they'll

2  take it.  If it looks -- you know, if it looks like

3  it's made of bronze and worth money or something they

4  could use or sell, they'll take it.  I mean, I suppose

5  it's all theory, really, but I -- I wouldn't expect a

6  looter to know that there's value in that card without

7  just stealing the entire GPS.

8      Q.   Now, are you aware of whether things were

9  stolen off the vessel while it was sitting there with

10  security?

11      A.   Well, I -- I should hope not, with security.

12  Obviously, there was security there when I got there.

13  I'm -- I'm not aware of how long it may have sat

14  without security.  I'm obviously, not aware of what

15  happened afterwards.  But, you know, I think you could

16    see in the video there, there were -- there were at

17    least three people on board as, quote/unquote,

18    security.  I should hope that the people weren't

19    looting things at that -- at that time.

20        Q.   Are -- do you recall, when you were in the

21    vessel, seeing a brand new oven?

22        A.   No.

23        Q.   Okay.

24             (Off the record at 2:12 p.m.)

1             (Recess taken.)

2             (Back on the record at 2:20 p.m.)

3             MS. NIEMEYER:  Okay.  So are you guys

4    seeing a picture with the Bates number AB000353?

5             MR. GOLDMAN:  Correct.

6             THE DEPONENT:  Yes.

7             MS. NIEMEYER:  Okay.  And just for the

8    record, that is part of a ten-page collection, which

9    was also produced and we're just going to document

10    what that is.

11            BY MS. NIEMEYER:

12        Q.   And, Mr. Ball, to your recollection, is this

13    a picture that you took while you were there to

14    inspect the vessel?

15    A.   (Deponent viewing photograph.)  It sure looks

16  like it --

17    Q.   Is this the --

18    A.   -- and it's -- go ahead.

19    Q.   Is this the tarp setup you were talking about

20  that you put together to -- for the security guards?

21    A.   (Deponent viewing photograph.)  Yeah, so this

22  is -- this is in the cockpit, looking off the port --

23  the port transom, the port stern, which shows the

24  other -- the other helm station.  Unfortunately, it's

⬆                                                        172

1  got a cover on it, so it doesn't tell us a whole lot

2  about it.

3        But what you see on the left side of the

4  picture is -- there are actually screens that are made

5  for creating some shade which have been -- they

6  normally stick out on a slightly more horizontal

7  fashion, in order that there's still some airflow and

8  there's shade in the cockpit.  In this case, they've

9  been laid down to help break the waves that were

10  entering the cockpit.

11    Q.   Okay.  And I'm going to move on to the next

12  page of those photos, the one numbered 354.

13        What is this?

14    A.   (Deponent viewing photograph.)  This is --

15  this is the center of the bridge deck, looking aft.

16  So that's -- that's the main sheet wrench that you see

17  in the middle there.  The piece of wood, it looks like

18  a bed frame, but, given that it's in somewhat of a

19  V-shape, I would bet that it's out of one of the

20  forward cabins.

21      Q.   Would that be the slots from one of the

22  bunks?

23      A.   Yeah, exactly.

24      Q.   Okay.  355, can you describe that?

♠                                                    173

1       A.   (Deponent viewing photograph.)  So this is

2   the -- this is inside the cockpit, looking out towards

3   the starboard stern.  And what you can see on the top

4   left there is a bed sheet that's been rigged up to

5   help break some of the waves coming in.

6       Q.   Okay.  And 356?

7       A.   (Deponent viewing photograph.)  So this is a

8   seemingly random photo that I took from the cockpit,

9   looking in towards the salon, but also slightly

10  looking out over the -- the deckhouse as well.

11      Q.   Okay.  So -- so would I be correct in

12  assuming that, on this vessel, the cockpit was

13  elevated and you took steps down to go into the salon?

14   A.   (Deponent viewing photograph.)  That is

15   probably accurate, yes.

16   Q.   Okay.  357?

17   A.   (Deponent viewing photograph.)  Okay.  So

18   this is in the salon, looking towards the starboard

19   forward corner, which shows the galley.  The oven you

20   mentioned is probably there in the shadows, but not

21   very clearly shown.

22   Q.   Okay.  And -- and I think you'll see there's

23   a more clear version of that picture, I believe.

24        Okay.  And this --

⬆                                                        174

1   A.   (Deponent viewing photograph.)  This is in

2   the salon looking towards the port forward corner

3   from, sort of, half -- halfway forward on the

4   starboard side.

5   Q.   Okay.

6   A.   Just showing that -- that -- I think I took

7   this to show the amount of alcohol that was being

8   consumed by the security guards.

9        (Laughter.)

10        BY MS. NIEMEYER:

11   Q.   Okay.

12   A.   It's the Dominican Republic.

13   Q.   Yeah.  Yeah, it is.  It is.

14          All right.  And this is 359.

15     A.   (Deponent viewing photograph.)  So this is

16  taken --

17     Q.   Are these the guards that -- the men that you

18  see in this picture, are they the security guards?

19     A.   (Deponent viewing photograph.)  Correct, they

20  were described to me as security guards.

21     Q.   Okay.  And 360?

22     A.   (Deponent viewing photograph.)  Here's --

23  here's the galley again, at the starboard forward

24  corner of the salon, and there's your shiny new oven.

⌂                                                     175

1     Q.   Okay.  So -- so we can establish from this

2  picture that, at least on the day that you were there,

3  there was still an oven on the boat?

4     A.   Correct.

5     Q.   Okay.  All right.  Not that it's relevant to

6  the work you did, but, later, that oven walked away

7  while security guards were on the boat.

8     A.   Interesting.

9     Q.   Yeah.  So, 361?

10     A.   (Deponent viewing photograph.)  This is,

11  obviously, as we're leaving.  We've gotten down off

12  the boat.  I likely took this photo -- it's not so

13   much of an issue in the Dominican Republic, but, you

14   know, if we were, for instance, in Puerto Rico,

15   environmental impact would be a big issue and cost of

16   -- of cleanup for that as well.

17          And so I think I just probably took this

18   picture to; A, show that there was no significant oil

19   on the breakwater, but also that there was some fluxom

20   out there.  And, obviously, you can see Mr. Andersson

21   on the right there, with his sexton in his left hand.

22   Q.   And then 362 appears to be about the same,

23   just a little bit different timing; is that correct?

24   A.   (Deponent viewing photograph.)  Correct.  I

                                                        176

1   think I just double hit the button.

2   Q.   Okay.  Do you have any recollection, as

3   you're sitting here today, of a -- of how much time

4   you actually spent on the boat?

5   A.   Not particularly, no.

6          In this case, it likely wouldn't have taken

7   that long.  You know, certainly less than an hour.

8   You know, the -- that vessel was, in my opinion, so

9   far gone.  You know, in terms of its condition and its

10   state, as far as whether it was worth salving or not,

11   you know, I was -- I was pretty confident in my

12   recommendation to underwriters that it be considered

13  as a constructive total loss.

14      Q.   Okay.  I'm going to close that one.  Okay.

15  Give me a sec.  We'll get to the next one quickly.

16  Okay.  I have to go to full-screen view to share with

17  you.  That's why I keep taking so long to get back and

18  forth between these things.

19          Okay.  So here we have another collection of

20  documents.  This one's about 24 pages.  It starts with

21  AB000363 and ends with AB000386.

22          Mr. Ball, are these also photos, to your

23  understanding, that you took in the ordinary course of

24  business when you went to inspect the vessel?

                                                        177

1       A.   (Deponent viewing photograph.)  I believe so,

2  yes.

3       Q.   And are these taken as you were leaving the

4  vessel after your inspection?

5       A.   That's correct.

6       Q.   Is -- is there a reason that you took these,

7  at that point in time, as opposed to the others?

8       A.   Probably just because we were dealing with

9  the sunrise on the way out there.  You know, one -- my

10  experience is that you can never have enough pictures,

11  because once you -- once you leave a foreign country,

12   it's very expensive to go back and take more.  So some

13   of it is probably just habit.

14        Q.   Okay.  So I see there's a little boat there

15   (indicating).

16             Was that -- you -- you mentioned you waded in

17   and out, correct?

18        A.   (Deponent viewing photograph.)  Correct.

19        Q.   Okay.  So that --

20        A.   (Deponent viewing photograph.)  So that boat

21   -- that boat was likely one of the resort boats.  You

22   can kind of see under the -- under the bow, it looks

23   like it's pushing water.  It looks like it's underway.

24   I know we can't see the stern.

                                                        178

1         Q.   Okay.  It's like a ghost boat with no people

2    on it in this picture.

3              Okay.  So 366, there's the person all the way

4    in the back.

5         A.   (Deponent viewing photograph.)  Yeah.

6         Q.   Okay.  So that boat's not related to your

7    inspection?

8         A.   Not at all.

9         Q.   And -- and it does appear, though, that in

10   the back corner of the boat, there's a nice line of

11   waves there that shows what the waves were like on the

12   starboard side, correct?

13        A.   (Deponent viewing photograph.)   Correct.   And

14   I think one of the -- one of the important references

15   here is you can kind of see how flat it is on the

16   inside of the breakwater, but just how rough it is on

17   the outside.

18             And, again, one of the things that I touched

19   on earlier was the idea that if -- if you're

20   approaching the shore from the sea at night, you've

21   got all this light on the shore where all the resorts

22   are, and then you've got this nice flat reflective

23   water, and then all of a sudden you've got breaking

24   water and rough water.

⬆                                                            179

1              To me, as a mariner, that says there's

2    something bad between me and the shore.   I probably

3    don't want to go near it.   So it's just -- it's -- I

4    know that, you know, the -- the -- the lack of

5    markings on this breakwater have come into question.

6    And that is something, I think, that would speak to

7    its visibility, even though the breakwater itself is

8    not visible, the change in the sea state would've been

9    highly visible in, my opinion.

10        Q.   So, in your opinion, would that be negligence

11   on the captain's part not to see that?

12        A.   The -- I'm going to fall back to something

13   called the International Regulations For the

14   Prevention of Collision at Sea.  They -- they speak to

15   keeping a proper watch.  And I would say that that is

16   something that you should be picking up on if you're

17   keeping a proper watch.  I have no doubt that there

18   was some significant fatigue involved, so I can

19   understand why it wouldn't have been seen.  But I

20   think it should've been seen by a prudent mariner,

21   yes.

22        Q.   Okay.  So, just to clarify, is it your

23   opinion that negligence on the part of the captain

24   could've contributed to his ending up on that

↑                                                      180

1   breakwater?

2        A.   I believe it could've contributed, yes.

3        Q.   Okay.

4        A.   And -- and to -- to qualify that, again, I

5   would -- I would go back to the ability to maintain a

6   proper watch.  And based on the information that --

7   that we have, you know, it looks like Mr. Andersson

8   was effectively in command and control of the vessel

9   for, it looks like, over 48 hours without any real

10   help.  I wouldn't expect a -- a mariner to hold a

11   watch longer than, sort of, four to six hours and be

12   able to maintain a -- a reasonably alert capacity.

13       Q.   We're going to get back --

14       A.   There -- there -- there's obviously --

15       Q.   We'll get to that.

16       A.   Yeah.

17       Q.   I want to --

18       A.   Okay.

19       Q.   -- get through the pictures, and then we're

20   going to go to your report.  So we'll get to that

21   stuff.

22       A.   (Deponent nods head.)

23       Q.   Okay.  So this is just another picture of the

24   same view, correct, at 367?

♠                                            181

1        A.   (Deponent viewing photograph.)  Correct.

2        Q.   Okay.  368, a little more breaking wave

3    action, same picture?

4        A.   (Deponent viewing photograph.)  Correct.

5        Q.   Okay.  It looks like 369, again, similar

6    view, a little more wave action?

7        A.   (Deponent viewing photograph.)  Yup.

8        Q.   And 370, what is that in the foreground

9    in 370?

10       A.   (Deponent viewing photograph.)   Those are

11  buoys.  They're floating -- floating buoys.  I mean,

12  they could be fish pots.  They could be swim markers.

13       Q.   Okay.

14       A.   They could be anything.

15       Q.   Okay.  And 371 appears to be the same thing,

16  correct?

17       A.   (Deponent viewing photograph.)  Correct.

18       Q.   Okay.  372, same thing?

19       A.   (Deponent viewing photograph.)  Correct.  And

20  I likely shot this string, again, just trying to catch

21  wave crests, trying to document the ports, again.

22       Q.   Okay.  And let's see another similar photo

23  on 373, correct?

24       A.   (Deponent viewing photograph.)  Correct.

⬆                                                          182

1       Q.   Okay.  I'm just going to go through these

2  until we see something different, and -- and if you

3  want to tell me that you see something different, let

4  me know.

5            I don't want to waste everybody's time on a

6  bunch of the same, essentially, picture, but you have

7  -- you did take these pictures, correct?

8       A.   That's correct.

9       Q.   Okay.  Now, this picture appears to show that

10  mangrove sanctuary, again, or growth area; am I right?

11      A.   (Deponent viewing photograph.)  Correct.

12  Correct.

13      Q.   Okay.  And there's more and more and more of

14  those.  I'm going through 78, 79, 80.

15           What is this picture here with the cargo ship

16  in the background?

17      A.   (Deponent viewing photograph.)  This is just

18  another angle.  I've obviously walked further to the

19  east along the beach, and there happens to be a cargo

20  ship in the background.

21      Q.   Okay.  And so this is 381.

22           Now, how far away was that cargo ship, would

23  you estimate?

24      A.   (Deponent viewing photograph.)  Oh, probably

                                                      183

1  least a half mile.

2      Q.   So, at -- at -- at least, at a half mile out,

3  there was significant depth, correct, or that cargo

4  ship wouldn't have been going through there?

5      A.   Correct.

6      Q.   Okay.  All right.  And this photograph here,

7  which is marked as 386, it looks like --

8      A.   (Deponent viewing photograph.)  Yup.

9       Q.   -- this photograph, it looks like you took a

10  picture of -- of a business card, and is this the

11  diver you mentioned before?

12      A.   (Deponent viewing photograph.)  It is.  So

13  Mr. Andersson gave me this card.  If -- if you see in

14  the background, it's actually my -- my handwritten

15  notes here (indicating) from the statement that he

16  gave me.  And you can also see in the background,

17  that's the cafe table where I met him to take the

18  statement.

19      Q.   Okay.  And -- cafe table, so I'll -- I'll get

20  to that part.

21           But these handwritten notes, did you keep

22  those?

23      A.   Yup, right here (indicating).

24      Q.   Did you provide those notes to either

♠                                                        184

1   Mr. Goldman's office or to Great La -- or to Concept

2   at any point?

3       A.   That's -- that's a very good point.  We may

4   not have done.

5       Q.   Okay.

6       A.   I'd have to go back and check.  I am happy to

7   provide them.

8       Q.   Okay.  They would be responsive to some of

9  our discovery.

10          MS. NIEMEYER:  So, yes, I would like to

11  ask that any notes -- Michael?

12          MR. GOLDMAN:  Michelle, if there's been a

13  snafu -- if there's been a snafu, and those weren't

14  part of the file he sent me, yes, they'll be produced.

15          MS. NIEMEYER:  Yeah, we weren't -- we

16  didn't receive any notes all --

17          MR. GOLDMAN:  Okay.

18          MS. NIEMEYER:  -- so they were not.

19          THE DEPONENT:  And that would be entirely

20  our fault as well, if they weren't.

21          MS. NIEMEYER:  Okay.  Now, let me just --

22  I'll get done with authenticating these things, and

23  then we'll get back to that meeting you had.  So let

24  me just close this and exit full screen and close the

⬆                                                185

1  document.  This is rather tedious, but it works.

2          Okay.  So -- no, we don't need the résumé.

3  All right.  Guess what?  We're done with all the

4  documents -- those documents.  We've got plenty more

5  where those came from, but not those ones.  I'm going

6  to close this folder and -- all right.  I'm sorry.

7  Let me go back now, I'm just going to take a peek at

8    some notes, but there's plenty of stuff for us to

9    cover here.

10          (Pause.)

11          BY MS. NIEMEYER:

12    Q.   Okay.  I wanted to ask you just about a

13    specific timeline of the boat inspection.  You

14    mentioned that you were delayed, and I'm going to show

15    you an e-mail later, I'll just tell you this now, that

16    -- that said you were delayed.

17          Did you have any contact with Mr. Andersson

18    the night before the inspection?

19    A.   Not as far as I recall.  I mean, there might

20    have been something to say, you know, I'm -- I'm here,

21    I'll see you in the morning, perhaps.

22    Q.   Okay.  Nothing of any substance is --

23    A.   I -- I don't recall meeting him or anything

24    in that time frame.

                                                    186

1    Q.   Okay.  So the first time you met

2    Mr. Andersson, or -- or really had a substantive

3    conversation, would've been the morning of your

4    inspection, correct?

5    A.   Correct.

6    Q.   Were there any significant phone

7    conversations prior to that where you would've taken

8    notes about what he told you?

9        A.   No.

10       Q.   Okay.

11       A.   The -- the way that we -- if I -- if I

12   remember correctly, and -- and, at least, correct me

13   if I'm wrong, because that was a long time ago.   But

14   if I remember correctly, I had just come back from a

15   dismasting claim in Dominica, which is different from

16   the Dominican Republic.

17            And so, in the normal market, I spend a lot

18   of time on the road, and so the office would -- would

19   handle, you know, sort of, taking on the job, and then

20   they'll pass it on to me and say, you know, off you

21   go, go figure it out.  So I would imagine that almost

22   all of that communication, prior to me going out

23   there, would've been handled by Bill or by the office

24   here.

                                                    187

1        Q.   Okay.  So just to -- to clarify from -- to

2    understand where you were at that moment, had you

3    reviewed any documentation at all before you got to

4    the boat?

5        A.   Yes, I would've reviewed everything on the

6    flight, on the way.

 7     Q.    Okay.  So you got there, presumably, in the

 8   evening, correct?

 9     A.    Yeah, I think -- I think, actually, in -- in

10   that file that you pulled up were my flight

11   arrangements, saying that probably doesn't reflect the

12   delayed flight.

13     Q.    Oh.

14     A.    It might be --

15     Q.    Yeah.

16     A.    -- because it should be the new -- new

17   bookings, but -- yes.

18     Q.    Well, there's --

19     A.    I -- I would've gotten there sometime in the

20   evening.

21     Q.    Okay.  And then, so the first thing in the

22   morning, when it's barely getting light from your

23   pictures, you walked along the beach from your hotel,

24   I gather?

⬆                                                      188

 1     A.    Yup.

 2     Q.    And you went to the vicinity of the dive

 3   shop, correct?

 4     A.    Correct.

 5     Q.    And then you walked out -- you waded to the

 6   boat.

7            Did -- did you meet Mr. Andersson at the dive

8    shop?

9        A.   I believe I met him on the beach with the --

10   with the salvor.  There's a -- there's a resort there.

11   We -- when we were going through the photos, I

12   mentioned that there was a little dock on the

13   left-hand side where a resort was, I guess to the east

14   of the where the dive shop was, sort of, the end of

15   the beach, if you will, and we met on the beach there

16   to proceed to the boat.

17       Q.   Do you remember the name of the salvor that

18   was with you at that inspection?

19       A.   No.  I wish I did.

20       Q.   Was he there the whole time?

21       A.   Yeah, he came out with us, I believe, to the

22   boat.  If he wasn't there when we went out to the

23   boat, he was definitely there when we came back,

24   because we sat on the beach and chatted with him a

                                                        189

1    little bit about his capabilities and about his

2    pricing.

3        Q.   Do you have any recollection of that

4    conversation?

5        A.   In the back of my head, I want to say that he

6   quoted 70,000, but I -- honestly, I wouldn't -- I

7   wouldn't back that up too far, because I wasn't in a

8   position to take any notes.  I just walked out,

9   obviously, through the water, so I didn't exactly have

10  a notepad on me.

11      Q.   Okay.  And -- and that would've been a ch --

12  that would be his charge if he charged you for the

13  salvage, as opposed to doing it, for the right to sell

14  the parts off the vessel?

15      A.   Correct.  So that would -- that would've been

16  for salvage, not for removal of wreckage.  So salvage

17  is obviously done with an eye to save as much as

18  possible if you want -- if you wanted to retain sell

19  -- that sell value of the vessel.

20           If we move to wreck removal, it's obviously a

21  lot cheaper and it's less surgical.  And because of

22  the position of this wreck and the sea state around

23  this wreck, it would've been a very fairly hairy

24  salvage job to try and remove anything intact, or it

⬆                                                       190

1   would've involved some very expensive equipment.

2       Q.   Okay.  So you looked at the boat, you sat on

3   the beach with the salvor, what happened after that?

4       A.   I believe I went back to my hotel room and --

5   and got showered off so that I could then meet with

6  Mr. Andersson and get his statement.

7      Q.   Is it your practice to voice-record

8  statements?

9      A.   No, not generally.  In this case, I --

10  I transcribed the statement, which is in this document

11  (indicating), which we'll make sure -- we didn't get

12  to you, which is then typed up into this document that

13  you should have (indicating) --

14     Q.   Okay.

15     A.   -- which is a signed --

16     Q.   We'll being looking at that.

17     A.   Okay.

18     Q.   We'll be looking at that.

19         So -- okay.  So, the handwritten notes that

20  you wrote, what's your process when you do a

21  statement?  Because it -- did you ever ask

22  Mr. Andersson to write out for you what happened?

23     A.   No.  No.  So I -- I make a point of not

24  asking leading questions.  But if -- you know, we

♠                                                        191

1  basically say, all right, let -- let's start with

2  where you left off from, your -- your last port, let's

3  say, and explain to me, you know, what happened, when

4  it happened, who was there.  We'll ask questions along

5   the way, you know, what was the weather like?  Were

6   you feeling tired?  When was the last time you

7   maintained this piece of equipment, et cetera?

8           But, certainly, as part of our investigative

9   process, we -- we do avoid leading questions.  We

10  don't try to lead anybody in their statement.

11      Q.  Okay.  But that's not the question I asked

12  you.

13          Did you ask him to write down, himself --

14      A.  No.

15      Q.  -- what happened?

16      A.  No.

17      Q.  Okay.

18      A.  No.  He --

19      Q.  Okay.

20      A.  -- would've submitted that directly to --

21          MADAM COURT REPORTER:  I'm sorry.

22      A.  -- the insurers.

23          MADAM COURT REPORTER:  Excuse me.  I

24  didn't hear the very first two words that you just

                                                192

1   said.

2           Can you start over?

3           THE DEPONENT:  Me?

4           MADAM COURT REPORTER:  Yes.

5                THE DEPONENT:  Sure.

6        A.   I said, he would've submitted that directly

7   to his insurers in his -- in his claim form.  So part

8   of -- part of our process is, generally, to compare

9   the statement that we get with what's on the claim

10  form.

11       Q.   Okay.  Are you aware that, in this case,

12  Mr. Andersson had asked the claims representatives at

13  Concept whether he needed to submit the form before or

14  after you got there, and they had said he could wait

15  to submit a claim form?

16       A.   No.

17       Q.   Okay.  I'm going to show you something.

18  We'll -- we'll go over that later.

19            So just to get into this process of how you

20  go about getting the statement; so you -- do you have

21  a format that you follow, generally, when you're

22  asking somebody what happened?

23       A.   A chronological format, yeah.

24       Q.   Okay.  And is that led by him?  How does that

                                                   193

1   work?

2        A.   Yeah, I mean, you know, I -- I will generally

3   sit somebody down and say, okay, let's start with

4   where you left from.  What time was it?  What was the

5   weather like?  Who was on board?  Where did you go?

6   What happened next?  You know, tell -- tell me your

7   story.

8           As questions come up, we will wait for an

9   appropriate time and ask questions, you know, like I

10  said before, you know, when's the last time you did

11  maintenance on this thing that broke?  Or how many

12  people were on board?  Or did you feel tired?  You

13  know, anything that we think may be relevant.

14          But the -- the general practice is to sort of

15  let people get their story out first.

16      Q.  Okay.  At this point, when you took the

17  statement from Mr. Andersson, you'd spent some time

18  with him wading to the boat and being on the boat,

19  correct?

20      A.  Correct.

21      Q.  Had you had much conversation with him at

22  that point?

23      A.  I wouldn't exactly say we're friends.  Beyond

24  -- beyond his case, no.

                                                      194

1       Q.  Okay.

2       A.  We -- you know, we had some conversation

3   about what I thought about the damages to the boat,

4  and I had said that I would be recommending to

5  underwriters that I considered it as a -- a

6  constructive total loss.  You know, we had discussed

7  how -- how salvage works.  Beyond that, I -- I can't

8  recall any significant conversation, no.

9      Q.   Did you have a sense, at that point, about

10  his mental state?

11      A.   I had no reason to believe that he was not --

12  he was not compos mentis.  I mean, I'm not sure -- I'm

13  not sure what you're asking me.

14      Q.   Just if there was anything you noticed about

15  his mental state.

16      A.   I didn't see any significant red flags

17  beyond, you know, someone who's been through a

18  somewhat trans -- a negative experience, a -- a -- I'm

19  searching for the right word.  You know, losing --

20  losing your boat is never a pleasant experience.

21      Q.   Would you consider the circumstances he was

22  in to be pretty highly stressful?

23      A.   Absolutely.

24      Q.   Okay.

♠                                                    195

1      A.   I don't think anybody could deny that.

2      Q.   Do you know whether he spoke Spanish?

3      A.   I believe -- I could be wrong here, it's been

4   a long time.  I think he said he sort of spoke

5   survival Spanish, but not great Spanish.  I think he

6   said something to that in his statement.

7      Q.   Do you know whether -- and I'm going to go

8   back to your process.

9           When you're taking the statement, do you take

10   it down -- you said you -- you have handwritten notes;

11   and when you took those notes, did you take the

12   statement down verbatim?

13      A.   Correct.  Yes.

14      Q.   And then -- so you took down every word that

15   was said?

16      A.   Well, yeah, I mean, probably give or take.

17   It might not be perfect.  I mean, I didn't take it

18   down like a court reporter.  I can't -- I can't write

19   that fast, unfortunately.  But I believe I've captured

20   all of the -- you know, all of the material that he

21   spoke, yes.

22      Q.   Did you ask him questions during the

23   statement?

24      A.   We did, yes.  And I did not write down the

                                                    196

1   questions.

2      Q.   Okay.  So there's -- could you -- is there a

3  way that you can tell, as you go through, it what --

4  let me ask you first.

5         Okay.  So there's this handwritten note that

6  you created, is that exactly word for word what

7  ultimately ended up in your report?

8     A.   Yes.  Yeah.  So, I mean, the -- the --

9  there's, sort of, check and balance on this is

10 obviously sending the -- I think you've got the e-mail

11 where it went, I think I saw it earlier, where I send

12 the statement that I have transcribed and said, you

13 know, if you think this is fair and accurate, would

14 you sign your name to it, and, if not, please let us

15 know.

16    Q.   Okay.  Was -- at that point in time, did you

17 talk to Mr. Andersson about how that statement would

18 be used or what the relevance of it was?

19    A.   No, other than a recording of, sort of, what

20 happened, not at all.

21    Q.   In your -- to your knowledge, did -- did you

22 have any sense of confusion or, sort of, mishmash in

23 the way that things were being said when Mr. Andersson

24 was giving his statement?

                                                      197

1     A.   Nope.  No.  I mean, like I said before, he --

2  he seemed like he was reasonably -- well -- put

3  together's not the right word, but he -- he was -- you

4  know, cognitively present.  He -- he didn't seem

5  confused.  He didn't seem particularly tired.  He

6  seemed like he was very much there, present and -- and

7  alert with me.

8      Q.   Did you have any conversations with anyone

9  other than Mr. Andersson to confirm the facts that he

10  said in the statement?

11     A.   I don't believe so, no.

12     Q.   Did you ever speak with Mr. Naranjo?

13     A.   No.

14     Q.   Okay.  So let's go to some of these

15  documents.  Give me a second.

16          (Pause.)

17          BY MS. NIEMEYER:

18     Q.   I want -- I want to confirm, just before I

19  forget about this, I know from other communications

20  that Mr. Andersson did use Whatsapp.

21          Is it possible that you could've had Whatsapp

22  communications with him prior or --

23     A.   It's --

24     Q.   -- after -- during the claim?

🖰                                                          198

1      A.   -- it's entirely possible.  I wouldn't say

2   it's impossible.  It's not my usual MO.

3          At the same time, you know, when we're --

4   when we're traveling around the Caribbean, there's not

5   -- there's not always a great line of communication.

6   If it's something that an insured chooses, and it's

7   readily available, we may use it.  The issue that I

8   generally have with Whatsapp is that, when I travel,

9   data is incredibly expensive.  Caribbean cellular

10  providers are not quite as great as the American ones,

11  and so I generally keep my data off so I don't rack up

12  a huge bill.  So Whatsapp is -- is less than ideal,

13  because I'm limited to Wi-Fi on that.

14      Q.   So what would be the most likely way that you

15  would communicate if it wasn't e-mail?

16      A.   Verbally by telephone.

17      Q.   Okay.

18      A.   The roaming bill is, at least, controllable

19  on that one.

20      Q.   Yeah, I mean -- (laughs).  I was on a cruise

21  in Bermuda, and a local Wi-Fi picked up my phone and

22  started downloading things.  I had a $300 bill because

23  of it, so I understand.

24      A.   I haven't left the country.

⬧                                                          199

1     Q.   We talked about --

2     A.   Sorry.

3     Q.   -- we talked about whether there were notes

4  on your phone or your computer.

5          Primarily, you said you take notes on paper,

6  correct?

7     A.   Correct.

8     Q.   And -- and if there was anything on your

9  computer, would it have been in the file that we

10  received?

11    A.   That's correct.

12    Q.   Okay.  Let me just grab some of this fun

13  stuff for us to look at together.

14         (Pause.)

15         BY MS. NIEMEYER:

16    Q.   All right.  I'm going to sh -- can you see

17  this document now?

18    A.   (Deponent viewing document.)  I can, indeed.

19    Q.   Okay.  I'm showing you, for the record --

20         MS. NIEMEYER:  And we will mark this --

21  we're on, what?

22         MADAM COURT REPORTER:  Eighteen.

23         MS. NIEMEYER:  Eighteen?

24         MADAM COURT REPORTER:  Yes.

1          (Exhibit 18 marked for identification.)

2          BY MS. NIEMEYER:

3     Q.   So Number 18 is the invoice.  Give me one sec

4  so I get that in my notes, since this has been a

5  problem in the past (laughs).

6          Okay.  So it's an invoice dated January 8th,

7  2020, and it begins with AB000052, ends with, I

8  believe it's 53.  Yes.

9     A.   (Deponent viewing exhibit.)  Yup.

10    Q.   To your knowledge, is this the only invoice

11 related to your work on this particular loss?

12    A.   Related to my attendance, it's probably the

13 only invoice.  I'm sure there would've been interim

14 invoices for the time spent reviewing and answering

15 questions later, since then.  I think there's -- I

16 think there was another one in the file, at least one.

17    Q.   Who were -- who were your contacts that you

18 spoke with or -- or communicated with on this loss?

19    A.   That would've been Sarah Delacey-Simms at

20 Concept, probably Sarah [sic] Thomas as well,

21 obviously, Michael and his team, and our team in the

22 office here.

23    Q.   Were Michael and his team involved in the

24 claims-handling end of it?

1    A.   No.

2    Q.   When --

3    A.   That would've been --

4    Q.   -- do you recall them becoming involved?

5         MADAM COURT REPORTER:  I'm sorry, can you

6    finish your answer and then you state your question

7    again, Michelle?  I couldn't hear either of you.  It

8    was at the same time, part of it.

9         THE DEPONENT:  I do apologize.

10   A.   I -- I said that -- that would've been much

11   later.

12        MADAM COURT REPORTER:  Thank you.

13        BY MS. NIEMEYER:

14   Q.   When do you consider the work that you did --

15   and, well, let me -- let me change that question.

16        You've been named as an expert witness in

17   this case, and -- and I -- I will not ask you a lot of

18   questions about that right now, because you'll do a

19   report and we'll want to talk about that.

20        But this particular question I -- I do want

21   to know the answer to, which is; do you have a

22   separate file in your office that -- so that your

23   surveyor work ends at a certain point, and then you

24   have a separate file for your work as an expert

1  witness?

2      A.   No.  It's all the same file.

3      Q.   Was it billed --

4      A.   We -- we file --

5      Q.   -- separately?

6      A.   Yes, ev -- ev -- everything is billed

7  separately after this point.  So the way that we file

8  things in this office is by the vessel, by the

9  incident, not by the client.  The reason for that,

10 mainly, goes not so much to damage claims, but

11 condition and valuation claims where we get the same

12 boat that changes hands multiple times, and we need to

13 be able to reference the same boat.

14     Q.   Okay.  So I'm going to go back to the

15 question that I asked, just to make sure we have that

16 clear on the record.

17          This -- this invoice that we're looking at

18 right here, which is Invoice 423, and it's dated

19 January 8th, 2020 --

20     A.   (Deponent viewing exhibit.)  Correct.

21     Q.   -- does that capture all of the work that you

22 did as a surveyor in relation on this claim?

23     A.   (Deponent viewing exhibit.)  I believe so.

24 That captures -- ahh, no, it doesn't, I don't think.

⬥                                                                      203

1            We did -- we did two reports, one was on the

2    damage due to stranding, which would've come from this

3    invoice and my attendance in the Dominican Republic,

4    and we did another report about the navigational

5    limits of the policy, which was -- yeah, that was for

6    Mr. Goldman.  So that would -- that would be on a

7    separate invoice, but, physically, we keep it in the

8    same file.

9        Q.   Do you recall approximately when you did that

10   second one about navigational limits?

11       A.   (Deponent viewing document.)  Ahh, that is

12   dated September 4th, 2020.

13       Q.   Okay.  So part of what I'm -- I'm a little

14   confused about here is that, we will ultimately get to

15   an e-mail from you which is dated in the end of

16   January, in response to some correspondence, and it

17   doesn't appear that there's anything billing for that,

18   unless there's another invoice.

19       A.   It's entirely possible that we just didn't

20   bill for it.

21       Q.   Okay.  So this here -- what we see here is,

22   we see travel from Tortola to Boca Chica on

23   December 29th -- 21st -- or on the 20th, it appears,

24   attend the vessel on the 21st.

1           So does that clarify for you when you were

2   there?

3      A.   (Deponent viewing exhibit.)  Yup.

4      Q.   Okay.

5      A.   There was three days --

6      Q.   All the times --

7               MADAM COURT REPORTER:  I'm sorry.

8               BY MS. NIEMEYER:

9      Q.   All the --

10              MADAM COURT REPORTER:  There three days

11  -- there was three days.  You said something after

12  that, sir.

13              THE DEPONENT:  I apologize.

14     A.   I said, there's three days billed there.

15     Q.   Okay.

16     A.   (Deponent viewing exhibit.)  So it looks like

17  I traveled from here on the 20th, and I attended on

18  the 21st, but I was gone from the office for a total

19  of three days.

20     Q.   Okay.  And then the office time spent on the

21  report, you said, is two hours.  That was drafting the

22  report?

23     A.   (Deponent viewing exhibit.)  Correct.  And

24  that's --

                                                                                205

1       Q.   Okay.  So that includes everything;

2  Mr. Bailey's time and everybody's time on this was two

3  hours?

4       A.   (Deponent viewing exhibit.)  That's correct.

5  One thing to remember is that I -- you know, I'm

6  billing here for three days at a day rate where I'm

7  away.  Obviously, there's a limited amount of time

8  that I'm on board the vessel, a lot of time where I'm

9  in transit.  I -- I don't really think it's fair to

10  bill additional for my time when I can -- I can write

11  some of this stuff while I'm underway, or when I'm

12  sitting in a hotel waiting for a flight.

13      Q.   Okay.  And that totally makes sense.

14           Okay.  So, then, you have expenses here,

15  the -- the airfare to get there, baggage fee, and

16  then, let's see, hotel accommodations for two nights.

17           So that would --

18      A.   (Deponent viewing exhibit.)  Yup.

19      Q.   -- confirm that you stayed there overnight

20  the 20th and the 21st, correct?

21      A.   Correct.

22      Q.   Okay.  So -- so is it your assumption, based

23  on this, that that follow-up work, you just, kind of,

24  considered it part of what had been already billed for

♠                                                              206

1  because of the three days, and you billed a lot on

2  that front end?

3      A.   Yeah, it's -- it's quite common that we will

4  do that, or we'll say, you know, it's a little bit

5  here.  If turns it into more, then we'll bill for it,

6  but, otherwise, you know, it's -- -- it's just sort of

7  part of the service.

8      Q.   Okay.  All right.  I'm going to close that

9  one then.  Give me a second, I have to pop back and

10  forth again.

11          (Pause.)

12          BY MS. NIEMEYER:

13      Q.   All right.  This is more of a

14  let's-just-confirm-what-happened-here thing.  All

15  right.  So I've got a document open here.  Let me just

16  get it in front of you.

17          All right.  Can you see that document?

18      A.   (Deponent viewing document.)  Yes, I can.

19      Q.   Okay.  So this -- this document, for the

20  record, has Bates numbers AB000091 through, I believe,

21  it's 93.

22          Can you describe what this is?

23     A.   (Deponent viewing document.)  This is our

24 letter of instruction from Concept to Bill Bailey, in

⬆                                                              207

1 my office.

2     Q.   Is that typically the way that you would be

3 assigned work?

4     A.   Generally, as time goes on, there would be a

5 little bit more definition than that, but, often, you

6 know, in a -- in a somewhat emergency or rapid

7 situation, our clients would come to us and basically

8 say, get ready to mobilize and hash out the details

9 before we get there.  So this is somewhat typical,

10 yes.

11     Q.   Okay.  So when you see -- there's a report of

12 survey and attached -- there's a group of PDFs

13 attached.  We'll be going through some things, and you

14 can let me know what, you know, you believe was

15 attached.  They came to us in an order.

16     A.   (Deponent viewing document.)  I can tell you

17 right now, if you'd like.

18     Q.   Sure.

19     A.   So the report of the survey would've been the

20 report from John Sands the --

21     Q.   Mm-hmm.

22     A.   -- (inaudible) evaluation from the

23   (inaudible) vessel.

24           (Technical difficulties.)

                                                    208

1            MADAM COURT REPORTER:  I'm sorry, excuse

2   me.

3     A.   Um --

4            MADAM COURT REPORTER:  Please -- please

5   stop.  The report from John Sands, question, mm-hmm,

6   question, I couldn't hear what -- I mean, back to the

7   answer, I couldn't hear what you said, the first

8   couple of words, sir.

9            Can -- can you both really try to speak one

10   at a time?  It's making it really frustrating for me.

11           THE DEPONENT:  I do apologize.

12     A.   So the report of survey would've been the

13   original condition and valuation from the purchase of

14   the vessel by John Sands, which came up in the

15   documents earlier.

16           The other attachments would have been the --

17   the -- a copy of the policy, the -- I've got it in the

18   -- the policy schedule.  There were a couple of

19   documents provided by the insured, which looks like a

20   renewal application and probably the -- the claims

21   advice form from Concept.

22          But those are the sort of standard documents

23     that we'll get with an instruction as far as, here's

24     the policy, here is what the vessel is, or, at least,

1      what the previous condition of the vessel is.

2          Q.   Okay.  And this -- the date on this is

3      December 18th, Wednesday morning, correct?

4          A.   (Deponent viewing document.)  Correct.  And

5      I'm guessing that that is our time zone, because it

6      came from us.  Because, of course, Concept is in the

7      UK, so we only generally get correspondence from them

8      in the morning, because our morning is their

9      afternoon.

10         Q.   And -- and just to be clear, what time zone

11     are you in?

12         A.   We are -- (laughs) -- so, at this very

13     moment, we are in Eastern Standard Time and, in fact,

14     arguably, we are on Eastern Standard Time the year

15     round.  The point being that we do not have daylight

16     savings time here.  We're too close to the equator.

17     So when you guys roll your -- your clocks back, in --

18     in New York or in Massachusetts, our clocks stay the

19     same.

20         Q.   Just -- just to avoid confusion -- (laughs).

21          MS. NIEMEYER:  Okay.  So let me just ask

22  Laurie to mark this as exhibit 19.

23          (Exhibit 19 marked for identification.)

24          MADAM COURT REPORTER:  It's all set.

♠                                                        210

1          MS. NIEMEYER:  Okay.  And I'm going to

2  move on.

3       (Pause.)

4          MS. NIEMEYER:  This is starting to give

5  me all kinds of suggestions I want to give to Zoom.

6          MR. GOLDMAN:  Michelle, would it be

7  convenient to take a break at 3:30?

8          MS. NIEMEYER:  Only if it's convenient

9  for Laurie, because she needs a break soon anyway, I

10  can tell.  Laurie, are you okay?

11          MR. GOLDMAN:  I could do sooner if she

12  likes.  That's fine.

13          MS. NIEMEYER:  Laurie, how are you doing?

14          MADAM COURT REPORTER:  Soon would be

15  good.

16          MS. NIEMEYER:  I can kind of hear it in

17  your voice.  I've got back problems, too.

18          (Off the record at 3:10 p.m.)

19          (Recess taken.)

20          (Back on the record at 3:16 p.m.)

21          MS. NIEMEYER:  Okay.  I'm going to mark

22   this as Exhibit 20, the next document.  It has the

23   Bates numbers CF000014, and, I believe, 15 -- yes, 15.

24          (Exhibit 20 marked for identification.)

♠                                                        211

1          MADAM COURT REPORTER:  All set.

2          BY MS. NIEMEYER:

3     Q.  And, Mr. Ball, I understand that you were not

4   included in this e-mail chain, so I'm not expecting

5   it's part of your communications, but the reason I am

6   bringing this one up is, you talked about duties that

7   were sent to the insured that were, essentially, the

8   guidelines that you, as well, had in handling the

9   surveys on claims for Great Lakes.

10          Is this the document you were talking about?

11    A.  (Deponent viewing exhibit.)  No.  So the

12   document that -- it may be -- without reading it, it

13   may be the same thing.  But the document I'm talking

14   about comes with the -- comes with the policy cover

15   (indicating) and it says claims guidance --

16    Q.  Okay.  All right.

17    A.  -- so it (inaudible) in the event of a loss.

18    Q.  I wasn't --

19          MADAM COURT REPORTER:  Excuse me.  Excuse

20  me.

21          BY MS. NIEMEYER:

22     Q.   I wasn't sure what you meant --

23          MADAM COURT REPORTER:  Hold on, please.

24          You cut out.  You said, so something in the

⬆                                                      212

1   event of a loss.  I couldn't hear the next -- the

2   words in between.

3          Can you please repeat exactly --

4          THE DEPONENT:  Yeah.

5          MADAM COURT REPORTER:  -- what you just

6   said, sir?

7          THE DEPONENT:  Who cut out?

8          MADAM COURT REPORTER:  You cut out, sir.

9   You said claim status, okay, all right, so -- and then

10  there were a couple of words I couldn't hear, and

11  then, in the event of a claim.

12     A.   Okay.  So -- so what -- what we work on, I --

13  you know, I -- I was saying that the words in this

14  document may be the same or they may not, but what --

15  what we reference in the, sort of, duties in the event

16  of a loss is the -- is the claims guidance part of the

17  policy paperwork (indicating).  So this -- this

18  document in front of us is not the one that -- you

19  know, in this format, is not something that I'm --

20  I've seen.

21      Q.   Okay.  Let me just move on, then, because

22  that's not really relevant to you.

23          (Pause.)

24          BY MS. NIEMEYER:

♠                                                         213

1       Q.   Okay.  Okay.  We have an e-mail here.  It has

2   Bates numbers MA000143 through 145.  145 is actually a

3   blank page.

4           And I'm just -- the only reason I'm showing

5   this to you is to ask whether this refreshes your

6   recollection at all about your delay and anything

7   about the timing of that inspection or when you

8   arrived?

9       A.   (Deponent viewing document.)  Well, it sure

10  does.  If I remember correctly, I sent this from the

11  airport in San Juan.  So, given that was at 12:30, you

12  know, give probably an hour on top of that, plus the

13  three hours I said, I means, I wouldn't have flown

14  until, you know, early to mid-afternoon.  And based on

15  the taxi fee that was on the -- the invoice that you

16  just showed me, we had a -- a bit of a distance from

17  the airport to go as well, so I -- I would've been

18  there in the evening.

19    Q.   Do you have any recollection at -- at that

20  time of the year, December 20th, about what time was

21  it getting dark?  Did you have any daylight when you

22  got there?

23    A.   I don't believe so, but I don't have specific

24  recollection.  Our -- our days -- unlike your days up

✦                                                                214

1  north, our days don't actually vary that much in

2  length.  I mean, they do vary, but, you know, we don't

3  -- we don't sort of have light at eight o'clock at

4  night in the summer or anything.  You know, six, 6:30

5  the sun's down here no matter what time of year, and a

6  little bit earlier in the winter.

7             MS. NIEMEYER:  Okay.  Laurie, clarify for

8  me, I have marked this, correct?

9             MADAM COURT REPORTER:  Hold on one

10  moment.  Let me just look up.

11             No, you did not mark this one.  The last one

12  you marked was 20, so the next one would be 21.

13             MS. NIEMEYER:  And 20 was?  Tell me the

14  Bates number just so I don't mess this up for you

15  later.

16             MADAM COURT REPORTER:  Hold on one

17  moment.

18             MS. NIEMEYER:  Sorry, I didn't get it in

19  my notes.

20          MADAM COURT REPORTER:  That's okay.

21      (Pause.)

22          MADAM COURT REPORTER:  Twenty was CF00 --

23  I can't really see the screen very good, but I think

24  it is 0000014 [sic] and 15.

⬆                                                          215

1           MS. NIEMEYER:  Okay.  And 21 is going to

2   be this document, and it is, let's see, MA000143

3   through 145.

4           (Exhibit 21 marked for identification.)

5           MADAM COURT REPORTER:  It's all marked.

6           MS. NIEMEYER:  Okay.  All right.  Let's

7   go to the next one then.

8       (Pause.)

9       BY MS. NIEMEYER:

10      Q.  Okay.  Mr. Ball, can you see this document?

11      A.  (Deponent viewing document.)  I can see a --

12  what looks like a blank e-mail right now.

13      Q.  Okay.  And -- and the first page of it is a

14  blank e-mail, that's why it looks that way.

15      A.  (Deponent nods head.)

16          MS. NIEMEYER:  So I'm going to mark this

17  one as Exhibit 22.

18                    (Exhibit 22 marked for identification.)

19                    MADAM COURT REPORTER:  It's all set.

20                    MS. NIEMEYER:  And it has Bates numbers

21   AB000198 through -- it doesn't -- I can't see a Bates

22   number that's a second Bates number, but these were

23   together when they were produced.  It --

24                    MR. GOLDMAN:  Michelle, because --

⬆                                                              216

1                    MS. NIEMEYER:  -- should be 199.

2                    MR. GOLDMAN:  -- it's a picture.  The

3    Bates number is extremely small, but it is --

4                    MS. NIEMEYER:  Okay.

5                    MR. GOLDMAN:  -- I'm pretty sure it's

6    down at the bottom right, if you zoom in there.

7                    MS. NIEMEYER:  It's -- it's going to be

8    199, because it's only two pages.

9                    MR. GOLDMAN:  Let me verify on my

10   computer.  Just a moment.  One nine nine?

11                   MS. NIEMEYER:  Yes, AB199.

12                   MR. GOLDMAN:  Yes, that's correct,

13   it's 199.  It's just because of the size of the --

14   that particular photo converted to a PDF was so much

15   larger than the others that the Bates stamp just wound

16   up very small, but it's 199.

17                   MS. NIEMEYER:  Okay.

18          BY MS. NIEMEYER:

19     Q.   So my question to you, Mr. Ball, is just, do

20 you recognize this, and can you tell me what it is?

21     A.   (Deponent viewing document.)  It's a -- it's

22 a photo of a claim form, I guess, provided by

23 Mr. Andersson to -- it looked like me and Sam when you

24 scrolled up there.  I recognize it, yes.  It's -- I

♠                                                    217

1 think it's in our files.

2     Q.   Okay.  And -- and it looks like it's

3 hand-dated December 20th, and it's saying that the

4 date of the incident is December 17th, correct?

5     A.   (Deponent viewing document.)  That looks like

6 a 19th to me, but it could well be -- sorry, yeah,

7 2019, December 17th.

8     Q.   American.

9          (Laughter.)

10          BY MS. NIEMEYER:

11     Q.   So -- okay.  Let me just move on from that.

12          I just wanted to -- so is this the claim form

13 that -- when you mentioned you would typically compare

14 somebody's statement to the claim form?  Is this what

15 you're talking about?

16     A.   (Deponent viewing document.)  Yes, where it

17  says provide details of the loss.  Normally, there

18  would be more information than see e-mail to somebody

19  else or, of course, it would be accompanied by an

20  e-mail with that information.  And that --

21      Q.   And assuming there was an e-mail, did you --

22  would you have had that forwarded to you by them?

23      A.   Yeah, I'm sure.  If we did, it's in the file.

24  If we didn't, it's not.

⬆                                                      218

1       Q.   Okay.  All right.  Let's go to the next one.

2            (Pause.)

3            BY MS. NIEMEYER:

4       Q.   Okay.  This document, it looks like you were

5   BCCed on it.  It was produced in this case by

6   Mr. Andersson as MA000143 to 144.

7            My question to you is just whether you

8   recognize that document, first of all, and would've

9   received it in the ordinary course of business?

10      A.   (Deponent viewing document.)  Yes.

11      Q.   Okay.  And in this document --

12           MS. NIEMEYER:  And -- and why don't we

13  mark this as Exhibit 23.

14           (Exhibit 23 marked for identification.)

15           MADAM COURT REPORTER:  It's all set.

16           BY MS. NIEMEYER:

17      Q.   Okay.  All right.  So the question I had for

18  -- about this, really, was just whether -- there were

19  some questions that were being asked, were you asked

20  to get involved in that type of thing where there were

21  questions being asked by Mr. Andersson, were you asked

22  to get involved in answering his questions at all?

23      A.   In which questions?

24      Q.   Questions by Mr. Andersson about things like,

&#10096;                                                      219

1  you know, in this case, how long does he need

2  security, and how long is he going to have to stay?

3      A.   No, not really.  In terms of answering the

4  questions, you know, I -- I'm always quite happy to

5  tell an insured what my expectation would be and,

6  obviously, what my recommendation to underwriters

7  would be, but I'm not there to make decisions on

8  underwriters' behalf.  I always --

9      Q.   Do you --

10      A.   -- make recommendations.

11          Go ahead.

12      Q.   -- do you recall whether you did give

13  Mr. Andersson any indication of what your

14  recommendation would be regarding this claim?

15      A.   I have very little doubt that I would've told

16  him when we were on the board the vessel that I would

17  be recommending it to underwriters as a constructive

18  total loss.

19      Q.   Did you give him any advice about what he

20  should do, related to salvage?

21      A.   Well, he was there when we met with the

22  salvors, so we would have likely discussed the

23  different methods for salvage and what we would be

24  trying to salve had the -- had underwriters not

♠                                                        220

1   accepted that it was a CTL.  But as -- as far as

2   advising him, no, I -- I wouldn't say so.

3       Q.   Did you consider that your role, to give that

4   kind of advice?

5       A.   No.

6       Q.   Who would you expect would advise the insured

7   about how to deal with that sort of thing, being

8   things like salvage?

9       A.   That would likely come from Bill in our

10  office here.

11      Q.   Okay.  Okay.  And -- and just -- I'm going to

12  point you down -- this was part of the e-mail chain

13  that was blind copied to you.  At -- at this 19th of

14  December at 14:02, it appears, Mr. Andersson to

15  Ms. Thomas.  It appears that he asked whether it was

16  acceptable to get the claim form completed after the

17  insurance assessment is done and talked about when you

18  were scheduled to arrive.

19        Does -- does that refresh your recollection

20  about whether there was any kind of arrangement

21  related to the claim form?

22        A.   (Deponent viewing exhibit.)  Sure.  I mean, I

23  -- yeah.

24        Q.   Okay.  And -- and the response to that is

⬆                                                      221

1  also above this, saying, yes, that's fine, don't worry

2  about the claim form.

3        So does that give you the information you

4  need to know that he -- that's why he had not done

5  that?

6        A.   (Deponent viewing exhibit.)  Yup.

7        Q.   Close that one.  Let's go to the next one.

8  All righty.  Just let me hold on one sec.

9        (Pause.)

10        BY MS. NIEMEYER:

11        Q.   Okay.  Let me just get you on to this

12  document here.

13        Okay.  Is this the document you referred to

14  previously when you talked about an e-mail and the

15   statement?

16       A.   (Deponent viewing document.)  Yes.  I believe

17   so.  If you can scroll down, it will probably show an

18   attachment or show me --

19       Q.   (Attorney complied.)

20       A.   (Deponent viewing document.)  Yes, so that is

21   the -- that is this in typed form (indicating).

22       Q.   Okay.  And we are going to want that

23   handwritten note.

24       A.   Yup.

♠                                              222

1              MS. NIEMEYER:  So we're going to mark

2    this as an exhibit, I guess it'll be what, 22?

3              MADAM COURT REPORTER:  Twenty-four.

4              MS. NIEMEYER:  Twenty-four.  I'm bad at

5    this.  You have to -- numbers and me, we're not real

6    good friends.  So...

7              (Exhibit 24 marked for identification.)

8         BY MS. NIEMEYER:

9         Q.   Okay.  Exhibit 23 [sic] and it's an e-mail

10   dated December 23rd, 2019.  The timing is somewhat

11   relevant here.  It's 11:08 a.m.

12            Mr. Ball, are you aware -- this is coming

13   from Mr. Andersson to you, presumably, that's Eastern

14   Standard Time, but I don't know that for sure, do you?

15      A.   (Deponent viewing exhibit.)  Well, that --

16   that would have been pulled from my e-mail, I think,

17   so it should be in Eastern -- Eastern -- Eastern

18   Standard Time, I believe, or --

19      Q.   Okay.

20      A.   -- yeah, we're -- we're Standard all the way

21   --

22      Q.   Okay.  All right.

23      A.   He would've been in Eastern Daylight.

24      Q.   Yes.  And this was actually Bates-numbered

♠                                                      223

1   twice, because it was produced to us, and then it was

2   produced in response to a request for production back.

3   From your file, it was AB000214 through 216.  We'll

4   use those numbers for simplicity's sake.

5          So this -- can you describe what's going on

6   in this communication?

7      A.   (Deponent viewing exhibit.)  So, after we met

8   at the cafe and I took this statement here, I e-mailed

9   him and just said, you know, can you confirm that this

10   is your statement, and would you put a signature to it

11   just so that we know it's your statement, along with a

12   couple of pieces of information I had asked questions

13   about, which he didn't necessarily have the answers to

14    while we were sat there.

15            So there's some questions about the fuel

16    tanks, which is something that we generally check on

17    in case of environmental damage and, obviously, before

18    salvage happens, the salvors generally want to know

19    how much fuel is on board.

20            We had asked about the contact details for

21    his crew member so we could try and get his story, but

22    we couldn't find him.  And this is where we had asked

23    if we had his permission to take the GPS as well.

24    Q.   Okay.  So let's -- let's start with -- I'll

                                                    224

1    just -- I'm going to look at this list here.

2            With relation to the crew member, if we

3    scroll up, and we look at use -- right now, in this

4    middle page, we're looking at -- we're looking --

5    actually, there's a response from Mr. Andersson to

6    you, and, then, below, is what he's responding to.

7    So, first of all, can you confirm, is that the case --

8    is -- is he responding above to the questions you

9    asked below?

10    A.   (Deponent viewing exhibit.)  That's correct.

11    Q.   Okay.  And it appears that you had asked

12    about contact information for Mr. Naranja in Number 1.

13            Did you confirm, or did anybody confirm the

14   spelling of the man's name?

15       A.   No.  We didn't -- we didn't get any further

16   than this with him, because there was no e-mail or

17   phone or any other contact details.

18       Q.   Did you ever contact -- did you ever go --

19   circle back to Mr. Andersson and say, can you give us

20   his e-mail or his phone number?

21       A.   No, we did not.

22       Q.   Do you know if anyone at -- at Great Lakes

23   ever did?  Or at Concept?

24       A.   I have no idea, I'm afraid.

❦                                                          225

1        Q.   Do you know if Bill Bailey did?

2        A.   I'm positive that he didn't.

3        Q.   Okay.  Do you have the capacity in your

4    office to look somebody up or to contact someone who

5    could help you if you have someone's passport number,

6    for instance, or their home address to figure out what

7    the missing links are?

8        A.   I mean, beyond the Internet, no.

9        Q.   Would it be your normal practice to speak to

10   the crew member who was on the vessel when you're

11   deciding or giving advice about a claim?

12       A.   When we're assessing the claim, yes.  We

13   want, you know, as many -- as many sources of

14   information as we can reach.

15       Q.   Okay.  Can you explain what you meant when

16   you said "when we're assessing the claim"?  What did

17   you mean by that?

18       A.   If I'm -- like in this instance, if I'm

19   trying to find out what happened, one of the things

20   that we see a fair amount is -- it's not even that

21   people aren't -- are intentionally dishonest, it's

22   that people remember things different ways, let's say.

23   And so, the more sources of information, the clearer

24   picture we can get.

⬆                                                    226

1        Q.   The way that you said when we're assessing a

2    claim implied to me that you didn't consider yourself

3    to be assessing the claim; is that true?

4        A.   In terms of surveying the loss and trying to

5    find cause of loss, that's absolutely what we're

6    assessing.

7        Q.   Okay.  Is there anything that you were not

8    assessing?

9        A.   Well, the -- the -- the application and the

10   coverage of the policy beyond, you know, sort of, our

11   recommendations.  I think what you're -- you're coming

12   around to is, were we acting as loss adjusters in this

13  case; is that correct?

14      Q.   Not really.  I'm just trying to understand,

15  the way that you said, "when we're assessing the

16  claim," it sounded like you were implying that you

17  might have done more in a different context.

18      A.   Yes.  Absolutely.  Had we -- had we been

19  instructed to do more, we would've done more.

20          In a -- in a different context, for instance,

21  if the -- if the vessel had been salved and there were

22  repairs to be done, then we may want to know more

23  about what is incident related and what is not, for

24  instance.  And the testimony -- or the statement from

♠                                                   227

1  somebody that is obviously not the owner of the

2  vessel, that's just stepped on board the vessel is

3  very useful in that regard.

4      Q.   In a circumstance like this when you have two

5  people on the vessel during the cau -- the course of

6  the journey, and you're trying to learn what the

7  detailed facts were, and you -- you just mentioned

8  sometimes people just remember things differently;

9  would you normally want to talk to both of those

10  people?

11      A.   That's correct.

12    Q.    Can you tell me, as you sit here today, why

13 there was no further attempt to get information from

14 Mr. Naranjo?

15    A.    Once -- once underwriters had chosen not to

16 follow up with the claim, we weren't instructed to do

17 anything further.  So, at this point, we don't really

18 know if it's in somebody else's hands or whether it's

19 our place to continue until we are instructed to

20 discontinue.

21    Q.    Do you know if anyone at the insurance

22 company or at Concept, separately from you, made any

23 attempt to find or contact or speak with Mr. Naranjo?

24    A.    I don't know.  I have -- I haven't -- I can't

⬆                                                                    228

1 remember what I said in my report, but I'm sure I

2 noted that he was there, and probably that I couldn't

3 make efforts to contact him.  I'm sure we'll get to

4 the report in a minute.

5    Q.    Okay.

6    A.    You know, at that point, once we've issued

7 our report, it's -- it's sort of a okay, here's where

8 we stand, what are our next instructions, are there

9 next instructions?  It varies, depending on the -- the

10 instruction in the case.  But in this case, we didn't

11 feel that we had been instructed to go any further.

12      Q.   If you had been in this situation, and I know

13  you're not an insurance adjuster, but Mr. Bailey is,

14  if your firm had been doing an insurance

15  adjustment-type of role where you were asked to make

16  the decision about a claim, would you have wanted to

17  have Mr. Naranjo's statement?

18      A.   I would imagine that Bill would've wanted

19  that, yes.

20      Q.   We've already discussed a little bit about

21  the environmental risks.

22          Is that why you were asking about how much

23  fuel was in each tank?

24      A.   Partially.  But as I'm sitting here reading

⬆                                                    229

1   it, I remember a second reason; and that was really to

2   determine just how much of this voyage had been under

3   sail, and how much of it had been under power.  And so

4   we can see that -- that most of the fuel is still on

5   board.  Obviously, there -- there were some questions

6   about making way to windward, which is a time where,

7   at best, you would want to motor sail, if not just

8   motor, and the fuel consumption is not reflected at

9   that.

10      Q.   So what do you take away from that knowledge

11   or that information, exactly?

12        A.   I take away that the majority of the voyage

13   was completed under sail.  You know, at -- at no point

14   has Mr. Andersson stated that he stopped somewhere to

15   refuel or cleared into another country.  So we know

16   that, you know, he -- he -- there's not a whole lot of

17   extra capacity in those tanks.  So he -- he may have

18   left with -- well, anything above a hundred and fifty

19   gallons, but we know he can only carry 211 gallons,

20   based on this e-mail.

21        Q.   The third thing you asked him about was you

22   mentioned that the underwriters wanted to take

23   possession of the GPS unit on board and asked for his

24   permission to do that.

⬆                                                               230

1             Why did you do that?

2        A.   That's somewhat of our SOP.  When we move

3   towards salvage, we would then take control of the GPS

4   so that we could look at -- if there was any data on

5   that, we could look at the track and just see if, you

6   know, sort of, if he was where he said he was.

7        Q.   Would you want to see that if you were making

8   a decision based on navigational limits?

9        A.   I'd want to know if there was any evidence

10   there, yes.

11    Q.    Is it your understanding that that GPS was

12  never obtained by Concept or anyone on Concept's

13  behalf.

14    A.    It's my understanding that it was left on

15  board.  I don't think anybody obtained it.  More than

16  likely, it was probably looted, but that's -- that's

17  speculation.

18    Q.    Okay.  And, just to confirm, you do not have

19  a recollection -- and based on our review of your

20  file, it wasn't there -- of having any documentation

21  forwarded to you in early January, which included

22  e-mails that were sent by Mr. Andersson to Concept and

23  numerous photographs of things taken off the vessel by

24  a salvor?

♠                                                        231

1    A.    I am not aware of that, no.

2    Q.    Okay.  Okay.  And then the fourth question

3  you asked here was, you said, "I have attached a

4  written copy of the statement we discussed on Saturday

5  morning.  Could you please take a look at it, and if

6  you agree return a copy with your signature certifying

7  it.  If there are changes [sic], please don't hesitate

8  to let me know."

9          Is that what you were talking about when you

10   said you had sent it to him and asked for his comment?

11      A.   Yes, that's correct.  So that's the -- the

12   statement that we took at the cafe following our

13   attendance on the boat.

14      Q.   Okay.  And he says up here, other -- he says,

15   as for crew, Ron didn't -- he did not speak any

16   Spanish or at least he did not show it; otherwise,

17   your report seems okay as far as I remember.

18      A.   (Deponent viewing exhibit.)  Correct.

19      Q.   Okay.  And then it says he'll get the

20   document printed.

21           And why don't we go on to the next one,

22   because I just want to follow through this --

23      A.   Okay.

24      Q.   -- so we have your comments here.

⬆                                                        232

1              MS. NIEMEYER:  Okay.  So we're closing

2   that.

3           (Pause.)

4              MS. NIEMEYER:  Okay.  Let me just get

5   this -- okay.  So I'm showing you this statement.

6   We're going to mark this as --

7           What are we on, 24?

8              MADAM COURT REPORTER:  Twenty-five.

9              MS. NIEMEYER:  -- 25 and we're at the

10    statement.  It's two pages, and it begins with

11    AB000224, ends with AB0025.  It was also marked as --

12    with MA numbers, again, because it was produced.

13                    (Exhibit 25 marked for identification.)

14              BY MS. NIEMEYER:

15         Q.   Do you recognize this as the identical

16    language to what's in that e-mail?

17         A.   I do.

18         Q.   Were any changes made?

19         A.   (Deponent viewing exhibit.)  I believe the

20    part about the crew speaking Spanish was made.  I've

21    got a copy of what you've got on the screen in front

22    of me, and it says "The crew of the vessel did not

23    speak Spanish."  I don't have the other one in front

24    of me, so I can't compare it side by side, but I have

⬆                                                        233

1     no knowledge of any other changes.

2          Q.   Okay.  And I'm trying to find where that --

3     where is it on there that it talks about the crew

4     didn't speak Spanish?

5          A.   (Deponent viewing exhibit.)  It's at the very

6     top of Page 2.

7          Q.   Got it.  Okay.  "The crew of the vessel did

8     not speak Spanish."

9          And does this confirm your understanding

10 about whether Mr. Andersson spoke Spanish?

11     A.   Yes.

12     Q.   In what way?

13     A.   (Deponent viewing exhibit.)  Well, it says

14 that the crew didn't speak Spanish, and he signed it.

15     Q.   Okay.  Does -- I'm -- I'm just unclear what

16 that means, whether I -- and it's my understanding he

17 doesn't speak any Spanish, but you had said earlier

18 that you thought he did.

19          So my question to you was whether this gave

20 you any information about that at all?

21     A.   No.  I -- I said earlier that I was under the

22 impression that he spoke survival Spanish.  When I say

23 survival Spanish, I mean enough to say hello, good-bye

24 and thank you and maybe ask for a beer or the

                                                    234

1 bathroom.

2     Q.   Yeah, cerveza, por favor.

3     A.   Exactly.

4          (Laughter.)

5     A.   But not enough to -- to adequately

6 communicate, you know, my boat is sinking, and I need

7 help, beyond, you know, mayday.

8     Q.   When you took the statement -- and you

9   mentioned that you pretty much wrote down verbatim

10   while you sat there, what Mr. Andersson said, but you

11   said you thought -- you know, you had asked questions.

12        Do you have any recollection, as we sit here

13   today, where, in this conversation, you had asked

14   questions, and what he said was in response to your

15   questions as opposed to just being things he said?

16   A.   (Deponent viewing exhibit.)  Well, in terms

17   of speculating a little bit, if we just read down it,

18   I'm sure I can think of where I might have asked

19   questions.  I mean, the -- the beginning is indicative

20   of my first question, which is, you know, tell me

21   where you started and where things went from there --

22   Q.   Mm-hmm.

23   A.   -- tell me how many people were on board and

24   what the weather was like.

♠                                                     235

1   Q.   Okay.

2   A.   (Deponent viewing exhibit.)  So that's pretty

3   much your first paragraph, and -- and then what

4   happened.

5   Q.   Okay.  So -- so we have that, we have the

6   rough -- the time that they left and, roughly, what

7   the weather was like, the wave height and the 18-knot

8   winds out of the east at that point in time.  I -- I

9   want to ask you about this next paragraph where it

10  says the vessel motored east toward the lighthouse at

11  the end of Varadero and, once around the point, made a

12  northwesterly, heading with an intended destination

13  and course to steer of 50 degrees to St. Martin.

14          It appears to me, from your report, that you

15  understood that Mr. Andersson had intended to go on a

16  straight course, without tacking, from Aruba to

17  St. Martin; is that correct?

18  A.   That's correct.

19  Q.   Did you ever ask him to spell out what his

20  planned course was in detail?

21  A.   No.

22  Q.   Is it possible that he could've started at a

23  50 degree heading, but then turned east to clear the

24  Venezuelan islands?

⌂                                                        236

1   A.   Not under sail, no.  That would've been

2   straight into the weather, so you can't sail straight

3   into the wind.  You have to tack off of the wind.

4   Q.   Okay.  So you're saying that a 50-degree

5   course wasn't possible to sail, because he would've

6   been sailing straight into the wind?

7   A.   No.  I'm saying to go east would not have

8   been possible.  So I actually have a -- I pulled it

9   off of Wind Gear earlier, a record of the weather in

10  Bonaire on the 19th of May, and the wind was 16 knots

11  straight out of the east, moving forward into the next

12  day, whatever day it was, and it goes up to 20 -- 20

13  knots out of the east.

14          So, to go east, you would be going directly

15  into the wind.  A sailing vessel can sail upwind to an

16  extent, depending on the boat.  A catamaran like this,

17  I would expect in a -- in a reasonably calm sea to

18  make 40 to 45 degrees to the wind.

19                  (Technical difficulties.)

20                  MADAM COURT REPORTER:  I'm sorry, you

21  broke up when you said to make, and then a number, 45

22  degrees to the wind.

23          Can you please repeat that number?

24                  THE DEPONENT:  Forty to 45 degrees to the

                                                            237

1   wind.

2                  MADAM COURT REPORTER:  Thank you.

3       A.   So the only way that a sailboat can go up

4   wind is to tack, so you zigzag your way up the wind.

5       Q.   Okay.  And -- and when you -- I -- I wasn't

6   clear, you said you have a record of whether, in

7    Bonaire, on 19th of May --

8        A.   Sorry, I can't --

9        Q.   -- I'm not sure what you mean --

10       A.   -- that --

11       Q.   -- by that.

12       A.   Sorry.  That's -- that's another date on the

13   top of the page.  It's the 14th of December 2019.

14   Obviously, that's something I looked up out of

15   curiosity this morning.  I'm happy to send that

16   through with my handwritten notes as well --

17       Q.   Okay.  Now, did you look that up while you

18   were doing the investigation for the claim?

19       A.   No.  I -- at the time I was writing the

20   report, I would've been relatively familiar with the

21   weather that had just come through and whether the

22   report was accurate or not.  Given the time that's

23   lapsed, I didn't have the report in front of me, and

24   this was the quicker way to look up what the weather

❧                                                      238

1    had been.

2        Q.   Okay.  So the morning of the 14th -- the 14th

3    was the day that they left at 5:30 in the afternoon,

4    correct?

5        A.   Correct.  And the -- the weather station I

6    pulled this from is Bonaire.  I know they left from

7  Aruba, but Bonaire is the -- is the, sort of, next

8  island to the east, so it's what they would've

9  encountered shortly into the voyage as they got a

10  little bit further form Aruba had they headed east.

11      Q.   Okay.  And you said, at that point, the wind

12  was coming out of the east?

13      A.   (Deponent viewing document.)  Correct.  And

14  this records it as coming out of the east all the way

15  until 8 a.m. on the 15th, which is where the -- where

16  the report ends.  I didn't look any further.

17          But, certainly, in terms of what

18  Mr. Andersson reports, in terms of wind strength and

19  wind speed and how it was relatively calm when they

20  left and the weather came up, this certainly reflects

21  that.

22      Q.   Okay.  Let me ask you a question on the -- so

23  you -- you state here in the next paragraph, "Shortly

24  after departure, it was found that the vessel was not

                                              239

1  making good way to windward and that the crew was

2  becoming seasick."

3      A.   Correct.

4      Q.   For the people who are not sailors who may be

5  reading this, can you explain what you mean -- what it

6    means when you say it's not "making good way to

7    windward"?

8         A.   So it means that the vessel is not making

9    good way upwind.  So what -- what I understand

10   Mr. Andersson as -- as having been doing is trying to

11   get as close to the wind as he could sail, which is

12   quite normal when you're sailing upwind, but he wasn't

13   making as much way as he thought he would.  And that's

14   pretty understandable, given that he may have not --

15   may not have been aware of the Caribbean current,

16   which runs through at about a knot, and that would've

17   been against him, and the sea state would've been

18   slowing down the boat as well.

19        Q.   Okay.  And at this point, it says, "The

20   course of the vessel was adjusted to a more northerly

21   course to Ponce, Puerto Rico."

22        A.   (Deponent viewing exhibit.)  Correct.  So --

23   so that would've steered him further away from the

24   wind, making the sails more efficient.

                                                    240

1         Q.   So is it your understanding that he -- he

2    headed directly toward Ponce or that he was -- did he

3    give you any more detail than that?

4         A.   It's -- it's my understanding from this

5    statement that his initial intention was to sail

6    towards St. Martin, and when he couldn't make way

7    towards the wind, when he -- when he realized he was

8    sailing too close to the wind and he couldn't sail

9    that close upwind, he fell off the wind a little bit

10   and changed his course to Puerto Rico.

11        Q.   So was it your assumption all along that he

12   had intended to sail in a straight line from Aruba to

13   St. Martin?

14        A.   That was my understanding, yes.

15        Q.   Did you ask him to clarify that, being a

16   sailor who understood that that probably wouldn't be

17   possible?

18        A.   No.  At the time, as I took the statement, my

19   brain went, well, that's pretty close to the wind,

20   but, you know, it could've been possible.

21             And now, having looked at the conditions that

22   he reported, the weather reports and, indeed, taking

23   into account the Caribbean current, which isn't

24   something I would normally think about unless I was

⬆                                                        241

1    actually planning a passage, as you would to do this,

2    I realized that that's -- it's just simply not

3    possible.

4        Q.   So let's go to the next paragraph.  It says,

5  although the weather was not forecast to deteriorate,

6  the winds picked up to an estimated 22 to 24 knots

7  with a heavier swell on Sunday the 15th.  And then it

8  says, the crew member was incapacitated due to

9  seasickness.  During Sunday the 15th and Monday the

10  16th, the wind picked up to approximately 25 knots

11  with gusts to 30 knots during squalls.  The vessel was

12  sailed using a partially furled headsail and no

13  mainsail.

14       Did you get any detail or ask for any detail

15  about when -- because Sunday and Monday is a pretty

16  long period of time, when did those winds actually

17  pick up and the weather -- and the conditions

18  deteriorate?

19  A.   Other than the day, no.

20  Q.   Okay.  So you know that it was sometime

21  during a 24-hour period which we call "Sunday"?

22  A.   Yes, that's what he said.

23  Q.   Okay.  And then he mentions that -- he talks

24  about the generator working Saturday, Sunday and

242

1  Monday; however, on Tuesday, it wouldn't start.

2       So that would tell you he was still underway

3  on Tuesday, correct?

4  A.   Correct.

5    Q.   Okay.  "On Tuesday, the vessel arrived off

6  shore of Santo Domingo.  Course corrections were

7  required to head further west in order to maintain as

8  comfortable conditions as were possible.  Here, it was

9  discovered that the VHF radio on board would receive

10  transmissions, but could not transmit."

11       Did you ask any kind of detailed questions

12  about why he ended up so far off course from where he

13  intended to go?

14    A.   No, but that seemed relatively apparent from

15  the inability to point to the wind.

16    Q.   Did you ask why there was never a tack to

17  head further east?

18    A.   Well, he wouldn't have been able to head

19  further east.  He would've been able to go southeast.

20  So that would -- that would actually take him almost

21  perpendicular to his intended destination, or, at

22  least, what he reported to be --

23    Q.   He --

24    A.   -- his intended destination.

♠                                                    243

1    Q.   Do you know whether there was ever a wind

2  shift where the wind stopped being -- coming out of

3  the east and started coming out of the northeast?

4        A.    No, but that would've taken him even further

5    west.

6        Q.    Okay.  Let's -- let's go to the next part

7    here.  Actually, I want to ask you about the VHF

8    radio.

9        A.    Sure.

10       Q.    Did you talk to Mr. Andersson at all about

11   whether that radio was functioning at the time when he

12   left?

13       A.    He did say that it was working when he left,

14   yes.

15       Q.    And is it possible for things to break in

16   rough conditions?

17       A.    Oh, absolutely.  If you -- if you look at the

18   way that a -- a VHF radio is set up on a -- on a

19   sailing yacht, the majority of them keep the antennae

20   at the very top of the mast, which is, obviously, the

21   part of the boat that moves the most in a rough sea.

22   So, if the boat's getting beaten up, it's entirely

23   possible that the antenna would break.

24       Q.    Okay.  So in that kind of a situation and --

↑                                                                244

1    and I'm going to say, when I say "situation," I'm

2    talking about when you have you leave port and the

3    conditions deteriorate, and, while you're on your

4    voyage, you start running into some very rough seas

5    and heavy winds and then damage happens.

6         Can that -- is that damage itself something

7    that you would consider evidence of unseaworthiness

8    when the boat left the dock?

9    A.   Without -- without prior evidence of lack of

10   maintenance, no.

11   Q.   Okay.  And you mentioned in this -- in this

12   case, you didn't see evidence of lack of maintenance,

13   correct?

14   A.   That's correct.  I didn't -- I didn't go up

15   the mast, because the vessel was already structurally

16   impaired anyways.  It -- it wasn't in a great position

17   for me to go up there.

18   Q.   Okay.  Then you -- it -- it mentions that --

19   when you say "the master," you're referring to

20   Mr. Andersson, correct?

21   A.   No, the -- the mast, the mast on the boat.

22   The mast --

23   Q.   Oh, no, I'm sorry.  I'm looking at the --

24   A.   -- on the boat.

♠                                                    245

1    Q.   I'm looking at the --

2    A.   Oh, I see.

3      Q.    -- on the report.  I'm looking at the report.

4            So the report says in the next paragraph,

5   "The Master made a telephone call using his satellite

6   telephone to the broker."  And it talks about finding

7   the best port of call for repair, and then it mentions

8   that the time was now approximately noon on Tuesday,

9   December 16th.

10           Do you see that?

11     A.    (Deponent viewing exhibit.)  Yup.

12     Q.    Did you ever -- did you ever recognize that

13  if Saturday is the 14th, Sunday's the 15th, Monday's

14  the 16th, Tuesday's the 17th, that Tuesday wasn't the

15  16th?

16     A.    I did not, but I do recognize it now.

17     Q.    (Attorney laughs.)  Okay.  Was any of your

18  consideration of the course, or what you believed the

19  course to be, involving the fact that you believed

20  that this was a three-day trip, when, in fact -- or, I

21  should say, a four-day trip -- no, 14 to 16 would've

22  been a two-day trip, right?

23     A.    Ahh, let's see.  He left on the 14th, and he

24  arrived on the 17th, so that's a three-day trip.

                                                     246

1      Q.    But this -- this paragraph here says that he

2   arrived on the 16th.

3           Was it --

4      A.   That's correct, but --

5      Q.   Is it possible --

6      A.   -- it is incorrect.

7      Q.   -- is it possible that part of your

8  consideration in making your recommendation was that

9  you believed that the trip had been from the 14th to

10 the 16th?

11     A.   No.

12     Q.   It mentions, again, in the next paragraph --

13 it, again, mentions, on December 16th, the --

14     A.   (Deponent viewing exhibit.)  Yes.

15     Q.   -- vessel arriving from Boca Chica, or

16 arriving offshore from Boca Chica, and it mentions, at

17 this point, the crew member was beginning to feel

18 better as the vessel had been in lee of the Dominican

19 Republic.  Did you have any understanding, it --

20 earlier, it's mentioned that the crew member was

21 incapacitated at some point.

22          Did you have any conversation about whether

23 the crew member was capable of maintaining a watch

24 during the voyage?

1      A.   Yes.  I was -- I was told that he was

2  incredibly unwell.  That's not -- that's not verbatim,

3  obviously.  We briefly discussed it, and the -- the

4  impression I was given, that he was bedridden.

5     Q.  Did you def -- did you seek to clarify a

6  timeline on how long the crew member was sick like

7  that?

8     A.  Well, he stated at the beginning that he

9  became sick as soon as they had come around the point

10  at, what, Varadero or shortly thereafter.  So that was

11  right at the beginning of the trip.  My experience, in

12  someone that's seasick for two and even three days, is

13  that they're not in great shape if they're still

14  seasick at the end of three days.  You're getting into

15  -- into at least partial dehydration.

16     Q.  When this says -- it says shortly after

17  departure, it was found the vessel was not making good

18  way and the crew was becoming seasick.

19        I think I asked you this question before, but

20  I'm going to ask you again; did you ask anything of

21  Mr. Andersson to confirm how far he actually went

22  before that was the case?

23     A.  No.

24     Q.  So is it fair to say that -- that you really

1  don't know that happened right after he left?

2      A.   Well, absolutely.  I wasn't there, so all I

3 can go on is his statement.

4      Q.   Did you ask any questions regarding whether

5 or not the crew member was participating and assisting

6 during the time frame when they were wading offshore

7 in Boca Chica?

8      A.   I believe he was.  I believe, at that point,

9 he was starting to feel just a little bit better,

10 because they were in the lee of Dominican Republic.

11 But, again, this is so long ago, it is difficult to

12 remember.

13      Q.   When it says here that -- that it was -- he

14 felt better as the vessel had been in the lee of the

15 Dominican Republic for some time; are those your words

16 or Mr. Andersson's words?

17      A.   Those are his words.

18      Q.   So is it -- is it your understanding that --

19 that Mr. Andersson was completely single-handing this

20 vessel with no help for three days?

21      A.   That is my understanding, yes.

22      Q.   Would you find that kind of unusual?

23      A.   Absolutely.

24      Q.   Did you follow up with him and ask any kind

1  of questions to clarify that situation?

2      A.  No, not after our report.

3      Q.  Was it in your interest or your client's

4  interest to clarify that information?

5      A.  Beyond this statement, I don't believe so,

6  no.  I -- I believe we asked that question, and he

7  gave his statement.

8      Q.  Okay.  I want to get to this part where we

9  talk about the depth beneath the vessel rapidly

10  decreased, both engines were placed in power astern.

11  The vessel was taken onto a low-lying breakwater by

12  the swell.  The breakwater was not shown on the

13  electronic charts on board.  There were no paper

14  charts on board.

15          Did you write that, or did Mr. Andersson

16  write that or say it just like that when you were

17  talking to him in a cafe?

18      A.  That was his response to my questioning as to

19  me asking was -- did it show up on your GPS?  Did you

20  have any charts that showed the breakwater?

21      Q.  Now, with regard to the GPS, I think we've --

22  we've confirmed that you did not check to see if there

23  was any chart chip in that GPS, correct?

24      A.  Correct.

1    Q.    Do you know what the expected use of this

2 vessel was?

3    A.    Expected use in what regard?

4    Q.    In regard of the cruising destination, the

5 area that it was intended to cruise?

6    A.    Beyond what's written on the policy cover,

7 no, I don't know Mr. Andersson's history with the

8 vessel or what he intended to do with it.

9    Q.    Are you -- did you ask whether there were

10 paper charts on board for areas that were not in the

11 Dominican Republic?

12    A.    Yes, and there were paper charts for areas

13 that were not in the Dominican Republic.

14    Q.    Okay.  So when you say there were no paper

15 charts on board in this, you were really talking about

16 there were no paper charts on board for the area that

17 was hundreds of miles west from where he intended to

18 sail, correct?

19    A.    That's correct.

20    Q.    And that would be -- that would be true --

21 let me rephrase that.

22          Did you ask about the status of the GPS

23 regarding charts for the areas where Mr. Andersson

24 intended to sail as opposed to where he ended up due

1  to the weather conditions?

2      A.   No, I didn't.  But there's not much point in

3  having a -- having a chart plotter if you don't have a

4  chart plotter for it.  Obviously, he -- he had spent

5  some time in the Caribbean, and the chart card that

6  covers Aruba would generally cover all the way up to

7  the US.

8      Q.   Okay.  So -- so are you say -- now, when you

9  say that, I want to clarify and make sure we

10  understand.

11         You mentioned that there are different

12  charts?

13      A.   (Deponent nods head.)

14      Q.   And that the chips you -- you would purchase

15  chips for different charts, correct?

16      A.   Correct.

17      Q.   Okay.  And he had two different GPSes on

18  board; one of them was a Garmin that was at -- that

19  was in the cockpit; and one was a Raytheon that was in

20  the nav station inside the salon, correct?

21      A.   I've seen the Raytheon one in the salon.  I

22  don't know where the Garmin one was, other than it's

23  listed on Jon Sands' report.

24      Q.   Okay.  Do you see a GPS outside in the

1  cockpit?

2      A.   No.

3      Q.   Okay.  Did you look for one?

4      A.   No, because I found the one inside.

5      Q.   If you're sailing the vessel and steering the

6  vessel, are you going to use the one inside when

7  you're looking for things that might bump in the

8  night?

9      A.   No, but it's -- no, but it's quite common

10 that there isn't one outside.  It's quite common that

11 when boats are built -- especially in this size range,

12 that people only put them inside.  It keeps them out

13 of the elements.  Much as the chart table would only

14 be inside, sometimes the display is only inside.

15     Q.   Based on your knowledge of the GPSes that

16 were listed in that prepurchase survey --

17     A.   Yeah.

18     Q.   -- particularly, the Garmin that was listed,

19 is it your understanding that that Garmin would've had

20 a chip for the entire Caribbean, if it had a chip that

21 would've been good for St. Martin?

22     A.   Yup.  That's quite likely.

23     Q.   Is it possible -- let's -- we're going to go

24 to your report.  I've got a question for you about

1   that but I'll -- we can do it better on the report.

2      A.   Okay.

3      Q.   Okay.  So we also have here -- it looks like,

4   on that same day, Mr. Cottier, this is where -- where

5   we get -- Mr. Cottier waded out to the vessel?

6      A.   (Deponent viewing exhibit.)  Yup.

7      Q.   And at this point, the master agreed to

8   evacuate the vessel.

9           So does that refresh your recollection about

10  how Mr. Cottier was connected to this situation?

11     A.   Yes.

12     Q.   Okay.  And -- and it says, he and his crew

13  waded ashore and were greeted by officers from the

14  local Navy and police forces.  The Navy took a

15  statement and the police walked the crew to the hotel.

16  Two security guards were arranged to stay on board by

17  the master to prevent looting as of the night of the

18  incident.

19          So does this indicate to you that

20  Mr. Andersson did what he could to protect the vessel

21  at that point?

22     A.   (Deponent viewing exhibit.)  Yes.

23     Q.   And --

24     A.    That's what -- go ahead.

                                                                    254

1      Q.    -- having mentioned that the Navy took a

2  statement, did you ever make any effort to speak with

3  the local Navy people?

4      A.    No, they generally don't release those

5  statements.

6      Q.    Do you know if anyone from Concept attempted

7  to contact the local Navy?

8      A.    I have no knowledge of that.

9      Q.    Okay.  And do you know whether Mr. Bailey

10 did?

11     A.    I'm sure he didn't.

12          MS. NIEMEYER:  All right.  So I'm going

13 to close this down and open up a new document.

14          (Off the record at 4:18 p.m.)

15          (Recess taken.)

16          (Back on the record at 4:23 p.m.)

17          (Mr. Harvey no longer present at

18 deposition proceeding.)

19          (Exhibit 26 marked for identification.)

20     BY MS. NIEMEYER:

21     Q.    Okay.  So the next document that's marked

22 as 26, it's actually an e-mail and your report, but

23 they both serve their purpose.  I'm just going to do

24  it together.  So it's an e-mail from Mr. -- from Bill

1  at -- on 23rd December 2005, which I have to assume is

2  Samantha Thomas' time of 8 p.m.  And it says, "Here it

3  is and seasons greetings," and it is followed by the

4  report.

5          Is this the report that you wrote and

6  Mr. Bailey edited and signed, Mr. Ball?

7      A.  (Deponent viewing exhibit.)  It appears that

8  it is.

9      Q.  Okay.  So this is the report dated

10  December 3rd [sic], 2019, and the report begins on

11  Page CF000038 and --

12      A.  (Deponent viewing exhibit.)  Wait a minute.

13      Q.  -- ends on --

14      A.  (Deponent viewing exhibit.)  It's dated

15  December 23rd.

16              (Technical difficulties.)

17              MADAM COURT REPORTER:  I'm sorry, sir, I

18  couldn't hear you.  You said, It's dated December, and

19  I couldn't hear the day.

20      A.  I said, it's dated December 23rd, not

21  December 3rd.

22      Q.  Oh, I'm sorry.  I thought I said 23rd.  I

23   might've cut out.  CF000051 is the last page, and

24   we'll just go through that.  Hold on.

1          (Pause.)

2          BY MS. NIEMEYER:

3      Q.   So let me ask you first if, Mr. Ball, this

4   report is the information you presented as a result of

5   your inspection of the vessel and your conversation

6   with Mr. Andersson to the claims adjuster at Concept?

7      A.   (Deponent viewing exhibit.)  Correct.

8      Q.   Here it states under incident, "At some time

9   between approximately 1700 and 1900 on Tuesday,

10   December 16th, 2019, the vessel Melody struck a

11   breakwater."

12      A.   (Deponent viewing exhibit.)  I --

13      Q.   As we --

14      A.   (Deponent viewing exhibit.)  I think It -- go

15   ahead.

16      Q.   As we sit here today, we all know that's

17   the 17th, correct?

18      A.   Correct.

19      Q.   It's, then, followed by a -- it says,

20   Master's Protest, the following verbal statement was

21   taken from the master.  And it starts -- goes -- "It

22   is reported that," and from that point, going down

23  through that page, it appears to be the same statement

24  that we just talked about.

⬆                                                                    257

1           Is that your understanding?

2       A.   (Deponent viewing exhibit.)  It is, but it's

3   not, because I note at the top, it says it's been --

4   it's not been verified.  So, I think, at that point,

5   maybe Mr. Andersson had not signed and suggested the

6   change regarding language.  I'm just looking for the

7   -- the bit about speaking Spanish to see if that

8   change is in there.  I don't think it is.

9           Yeah, that part is -- oh, no, the crew of the

10  vessel did not speak Spanish, so, perhaps, that is in

11  there.  But I -- I -- I don't believe that this is the

12  time version of that signed statement, simply because

13  I've stated at the top here that he hasn't signed it

14  yet.

15      Q.   Okay.  Is there a reason that you forwarded

16  an unsigned statement in a report?

17      A.   That's the information that we had at the

18  time, in order to get a report through, so that the

19  underwriters could, hopefully, start moving towards

20  making a decision.

21      Q.   And as we go through this, I'm not going to

22   go back over that language, because it's pretty -- it

23   appears to be -- and I'll represent to you that I

24   compared the two; it appears to be the same or very

⬆                                                    258

1    substantially similar --

2       A.   It is.

3       Q.   -- including the mis -- including the

4    mistakes about December 16th.

5            Did you ever have any conversation with

6    anyone at Concept clarifying to them that this

7    incident occurred a full 24 hours later than

8    December 16th?

9       A.   When we started looking at the navigational

10   limits, that -- that error did come up, and we did

11   clarify the 17th.

12      Q.   When you looked at those navigational limits,

13   though, that was during the litigation, essentially,

14   less than six months ago or about six months ago,

15   correct?

16      A.   I believe so, yes.

17      Q.   You said October, I believe?

18      A.   (deponent viewing document.)  The report is

19   dated September 4th.

20      Q.   Okay.  But is it fair to say, long -- long

21   after a decision was made on this and a lawsuit was

22  filed?

23      A.   Correct.  I believe so.

24      Q.   Is it -- is it fair to state that, at the

⬆                                                          259

1   time when a decision was made in late February of

2   2000, that this information is what the claims

3   adjuster had to work with?

4       A.   I would believe so, yes.

5       Q.   Okay.  I want to look at these photographs

6   that you included on Page CF000041.  One of them is a

7   satellite view of the breakwater, and one is a

8   Navionics chart.  It looks like Navionics chart data.

9   The Navionics --

10      A.   The --

11      Q.   -- chart da --

12      A.   -- the Nav -- the Navionics --

13      Q.   Okay.

14      A.   -- the Navionics chart data is -- is via a --

15  when I do the report and put the Navionics data in, I

16  pull that off of the Navionics app, just because it's

17  easy to pull it up and screenshot it, and those charts

18  are always updated.  It -- it downloads the chart when

19  you look at it.  It's live.

20           The next picture that you see is of a

21    two-year-old chart card on a private boat that has not

22    been updated, which also shows the breakwater.

23        Q.   Okay.  So I'm -- let's -- let's start where

24    we are now.  So we have a satellite photograph --

♠                                                            260

1        A.   Yes.

2        Q.   -- and we can see in that satellite

3    photograph that there's definitely a difference in the

4    color of the water and -- and it appears that you can

5    -- you put an arrow where you could see -- what is

6    that arrow?

7        A.   (Deponent viewing exhibit.)  The arrow is the

8    location of the wreck site --

9        Q.   And --

10       A.   -- so that's the -- the approximated location

11   where Melody stranded herself on the reef.

12       Q.   So you see that, and then you go to the one

13   below it, and you have where it says, "Breakwater

14   shown on the latest Navionics chart data," I have a

15   question for you about that photograph.

16            And the question is, I see that -- it appears

17   that land is yellow, correct?

18       A.   (Deponent viewing exhibit.)  Correct.

19       Q.   And it appears that there are these land

20   masses of sorts (indicating), little islands or

21  something, that -- that are visible as yellow.

22      A.   (Deponent viewing exhibit.)   Yup.

23      Q.   And then there's this green mass

24  (indicating), and it doesn't appear to have any kind

⬆                                                       261

1   of information about depth or anything related to

2   that.

3           Is that the standard way to show that there's

4   a hazard or a -- some kind of --

5       A.   It is.

6       Q.   -- a -- a reef?

7       A.   Yeah, it -- it would show a reef in an area

8   where it's more than likely breaking the surface, so

9   it couldn't be surveyed in terms of its depth.

10      Q.   Okay.  The reason I've asked that is, I've

11  seen South Florida charts that show submerged sea

12  grass looking like that, and it's -- I wasn't sure, as

13  -- I wasn't sure if that was a standard or what the

14  average Joe would think --

15      A.   Yeah.

16      Q.   -- when they saw that green.

17      A.   (Deponent viewing exhibit.)   This is the

18  Navionics standard.  What you do have, in the ability

19  to control there, is, you see that the -- the light

20   blue area --

21      Q.   Yes.

22      A.   -- you can actually add another area,

23   depending on how you program it.  So you have the

24   option to program your chart plotter for the depth of

⬆                                                              262

1   your vessel.  So you can basically show a color

2   difference between good water and bad water.

3   Obviously, I haven't set that up, because I am on a

4   variety of different vessels.

5                (Technical difficulties.)

6                MADAM COURT REPORTER:  I'm sorry, you

7   broke up, sir, after you said, you can show a

8   difference between the good water and bad water, and

9   then I couldn't hear you, sir.

10      A.   I said, obviously, I haven't set that up,

11   because I use a variety of different vessels.

12                MADAM COURT REPORTER:  Thank you.

13           BY MS. NIEMEYER:

14      Q.   Okay.  And then we have, on Raymarine here,

15   on the next page, two-year-old chart data taken from

16   our company vessel.

17           So that's your company's actual vessel, and I

18   believe you said that this is the next most recent

19   version of that Raymarine instrument, correct?

20      A.    (Deponent viewing exhibit.)  This -- this is

21   two versions since then.  So the cover we saw denoted

22   an E120, which was then replaced by the E120W, which

23   has now been place -- replaced by the Axiom 12, which

24   is what we have.

⬆                                                          263

1      Q.    Okay.

2      A.    The -- the chart software is the very same.

3      Q.    And in the E120, if you were to add chart

4   information, would you do that with a chip or an

5   upload or how would that have worked at that time?

6      A.    No, it's on the chip.  So, if they're not --

7   if they're not preprogrammed into the GPS when you buy

8   it, through which you would update a chip, they are on

9   the chip when you purchase the chip.

10      Q.    Okay.

11      A.    And you can have the dealer update the chip.

12            (Technical difficulties.)

13            MADAM COURT REPORTER:  I'm sorry, and you

14   can have the something chip.  I couldn't --

15      A.    You can --

16            MADAM COURT REPORTER:  -- hear the words

17   --

18      A.    You can have the dealer update the chip.

19          MADAM COURT REPORTER:  Thank you.

20          BY MS. NIEMEYER:

21     Q.   Now, we have the next page here, Comments

22  Regarding Incident, and you say here, "While we

23  essentially -- we would essentially consider this to

24  be a case of navigational error, the crippled

⬆                                                          264

1   communications and lack of adequate charts on board

2   has brought the issue of potential seaworthiness into

3   question.  We also question the original --

4      A.   Yes.

5      Q.   -- course plotted and the coverage of the

6   policy."

7           You mentioned that you were not asked to be

8   adjusters here, is there a reason that you're looking

9   at coverage?

10     A.   Really, just to fill the gap between

11  surveyors and adjusters.  Generally, the -- the

12  communication with adjusters from us here in the

13  Caribbean and as surveyors isn't -- isn't as great as

14  it could be.  And so, where we can fill the gap, we

15  will try and fill the gap.

16     Q.   Were you asked to conduct your investigation

17  with an intention of finding things that could be used

18  to deny coverage?

19      A.   Absolutely not.

20      Q.   Is that what you were doing?

21      A.   No, it's not.

22      Q.   Did you look for facts that would have helped

23  with coverage, after you learned of things you thought

24  might eliminate coverage?

⬆                                                        265

1       A.   I'm -- I'm not sure what you're pointing at

2   or what you're asking.

3       Q.   Okay.  When you learned of facts that, in

4   your opinion, might have indicated there was a lack of

5   coverage, did you look for clarification so that you

6   could determine, for sure, whether that was the case?

7       A.   No, not particularly.  I -- I don't -- I

8   don't suggest that we went out with the intention to

9   find facts that would deny coverage either.

10      Q.   Okay.  You talk about communications, and you

11  refer to the lack of a functional VHF on board as a

12  contributing factor.  And you also mention that it's

13  possible the seas jostled the antenna or associated

14  wiring.

15           You do also say that, when supplemented by

16  the satellite and cellular telephones on board, you

17  would only consider that to be a factor to a ship or

18   in ship-to-ship communications, not ship-to-shore

19   communications, correct?

20        A.   (Deponent viewing exhibit.)   That's correct.

21        Q.   Now, in saying that, do you consider having

22   those multiple backup systems adequate for a vessel

23   that's a -- a personal-use vessel intended to be used

24   essentially island hopping and near shore?

                                                        266

1         A.   No.   Even for a personal vessel, that's

2    island hopping and near shore, I would expect it to

3    have a VHF radio.

4         Q.   And this --

5         A.   I do understand that it broke underway.

6         Q.   This vessel did have a VHF radio, correct?

7         A.   That's correct, yes.

8         Q.   By the standards of catamarans you've worked

9    on, did this vessel have a functional amount of

10   communication equipment that you'd expect to see on a

11   boat like that?

12        A.   Yes.   When it left harbor, absolutely.

13   Obviously, through no fault of Mr. Andersson's that we

14   can see, when he arrived at his destination, some of

15   that equipment didn't work, and that may have

16   frustrated this incident.

17             You know, we note in his statement that he

18   speaks to waiting around for somebody to guide him

19   into Boca Chica and having difficulties with

20   communications there.  The lack of a VHF, I'm sure,

21   contributed to that.

22       Q.   Now, you then go on to Navigational

23   Impairment and you talk about "The area of most

24   concern with regard to potential seaworthiness is the

♠                                                      267

1   procedure into a port in the dark with no local paper

2   charts, no cruising guide, no local knowledge, and

3   what appeared to be either defective, outdated, or

4   absent electronic charts."  And -- and we've talked

5   about this.

6            The question I have for you here is, where a

7   vessel has been pushed out of its intended course, by

8   many miles, is it your expectation that that vessel

9   owner has had a failure, as far as seaworthiness or --

10   or is it your understanding that that is something

11   that, then -- you know, something caused the boat to

12   change course and end up in the wrong place?  Let's

13   say, for wind conditions or weather that wasn't

14   expected, where do you draw the line?  How do you

15   decide whether the incident is the catastrophic --

16       A.   It --

17     Q.    -- sort of, change in weather conditions or

18   whether the incident is what happens afterwards?

19     A.    Weather changes and boats break.  There's no

20   denying that.  There are, of course -- there's always

21   an option to turn back or go -- or change course to a

22   harbor where there were charts, but that's -- that's

23   not even -- I think that would be, sort of, going out

24   another way to resolve the situation.

1          I think the real thing here is, you don't do

2   -- pilot it, you don't enter a harbor that you don't

3   know, with no information in the middle of the night.

4   I see no reason that he couldn't have just dropped

5   anchor or -- or just hoved to outside the harbor and

6   waited until there was daylight or waited until there

7   was assistance.

8     Q.    And based on -- based on your understanding

9   of the situation, wasn't Mr. Andersson waiting for a

10   pilot to lead him into the harbor when this happened?

11     A.    He was, but he was waiting incredibly far in

12   shore.

13     Q.    Would you consider that negligence?

14     A.    In the eyes of a professional captain, yes.

15   In the eyes of a recreational captain, I think it's

16   the act of a prudent mariner.  What you're asking me,

17   in terms of if it's negligence, I may need to think

18   about that for a minute.

19         (Pause.)

20   A.   I'm going to go ahead and say no at this

21   point --

22   Q.   What would you call that?  In that -- from

23   the perspective of a -- a recreational sailor who

24   believes he's waiting for a pilot to come, and that's

⬆                                                        269

1   the safe way to get into the harbor; how to you

2   characterize what he was doing out there?

3   A.   I -- I -- I mean, in one word, inexperience.

4   But -- but I understand that can be a synonym for

5   negligence.  I'm not sure how I would answer that.  I

6   know that's -- I know that's not the definitive answer

7   you're looking for, but I would have to pay that a lot

8   -- a lot more thought, I think.

9   Q.   Now, we have a -- a section about Crew

10   Impairment.  We've kind of already talked about that,

11   but I just want to touch on it again.  You mention

12   that "The crew was reported to have been seasick

13   shortly after leaving Aruba and the situation is

14   reported to have continually worsened until arrival at

15   Santo Domingo."

16          Where did you get that it continually

17  worsened, because that's not in the written statement?

18      A.   It's not in the written statement, no.  I,

19  obviously, gathered that from my conversation with

20  Mr. Andersson.  I didn't have any other information to

21  go on, but it's not recorded in the statement.

22      Q.   Isn't that something you would've recorded in

23  the statement, given the circumstances, if it was in

24  there, if -- if it was part of what you took notes on

⬆                                                      270

1  and --

2      A.   If -- if it's something that he said while I

3  was taking the statement, absolutely, it's something

4  that I would've reported in the statement.  It my have

5  been something that he said on the beach or while we

6  were on the boat, I don't know.  I mean, I certainly

7  didn't make it up out of thin air, and I'm not

8  suggesting that you're suggesting that I did.

9      Q.   No.  But -- but I'm -- I'm -- I'm questioning

10  it, because you sent him a written statement and asked

11  for his confirmation, but that statement did not

12  characterize the timing or the details of

13  Mr. Naranjo's condition over time in any specific way.

14  And I -- it's unclear to me what that exact

15  circumstance was, and it -- and it's unclear to me how

16  you got that information that was included here in --

17  in the report.

18      A.   Yeah.  I mean, honestly, after -- after this

19  period of time, I don't think I could give you a

20  definitive answer on that, other than, you know,

21  obviously, that was the impression I was left with

22  after seeing Mr. Andersson.

23      Q.   Could that have been your assumption based on

24  the things that he said?

&                                                             271

1       A.   I think that's very unlikely.  I do my best

2   not to make assumptions in these cases.

3       Q.   Isn't this --

4       A.   I don't think I -- I don't think I would make

5   such a -- a broad and damning assumption just --

6       Q.   -- isn't that --

7       A.   -- out of nowhere.

8       Q.   -- the kind of thing you would've wanted a

9   written confirmation of when you're including that in

10  the report?

11      A.   Well, obviously, I agree with that now.

12              (Technical difficulties.)

13              MADAM COURT REPORTER:  I'm sorry, you

14  sort of broke up.

15          Well -- can you please repeat exactly what

16  you just said?

17      A.   I said, well, obviously, I agree with that

18  now.

19              MADAM COURT REPORTER:  Thank you.

20          BY MS. NIEMEYER:

21      Q.   Okay.  So then you say, "We question the

22  decision not to turn back long before arrival in Santo

23  Domingo, but we also question the decision to proceed

24  beyond Santo Domingo to Boca Chica."

⬆                                                      272

1           What is your understanding about why

2   Mr. Andersson did not go into port at Santo Domingo?

3       A.   My understanding is that he wanted to

4   continue to Boca Chica for repairs.  I believe that's

5   what he said.  Let me check his statement.

6           (Deponent viewing document.)  Yes.  He had

7   said that he wanted to continue to Boca Chica to

8   repair, I guess, the -- the generator or the VHF or

9   both.

10      Q.   Do you have any understanding of where there

11  might have been a factor of an appropriate harbor for

12  his kind of boat and having people who could help him

13  into the harbor there?

14      A.   You mean into Santo Domingo or into Boca

15  Chica?

16      Q.   Into Boca Chica.

17      A.   No.  Not in comparison to Santo Domingo, no.

18  I mean, Santo Domingo offers safe harbor and, of

19  course, there would be people who could take him in

20  there as well.

21      Q.   Did Mr. Andersson say that, or is that based

22  on your knowledge?

23      A.   That's based on my local knowledge.

24      Q.   Okay.  Now, we mentioned the Coverage Area

⬆                                                        273

1   here.  You mentioned that the coverage is based on the

2   vessel not exceeding 150 nautical miles offshore, and

3   you talk about the direct course from Aruba to

4   St. Martin and -- and then mention, "Although the

5   initial loss didn't happen 150 nautical miles [sic]

6   from shore, the voyage is arguably outside the bounds

7   of the policy as the vessel did not make port prior to

8   the loss," correct?

9       A.   (Deponent viewing exhibit.)  Correct.

10      Q.   Okay.  What is the relevance of the vessel

11  not making port prior to the loss?

12      A.   Well, arguably, if the loss was part of a

13  voyage that exceeded the navigational limits, insurers

14  may not see it as covered.  That's really their

15  decision to make, but if I -- if -- sorry, go ahead.

16      Q.   Finish your answer.

17      A.   No, I was -- I was going to say, if -- if I

18  look at -- I believe you are in receipt of a chart

19  which shows the courses through the Caribbean within

20  the navigational limits; is that correct?

21      Q.   I'm sorry?

22      A.   I said, I believe you are in receipt of a

23  chart which shows the course through the Caribbean --

24            MR. GOLDMAN:  Andrew --

♠                                                    274

1       A.   -- within the navigational limits.

2            MR. GOLDMAN:  -- no, those are work

3   product and have not be -- not been produced yet, but

4   will likely be produced as part of expert disclosures

5   soon.

6            BY MS. NIEMEYER:

7       Q.   So I'm assuming --

8            THE DEPONENT:  Okay.

9            BY MS. NIEMEYER:

10      Q.   -- you're saying that under your -- based on

11  your understanding, it is feasible that this boat

12  could've had a voyage within navigational limits?

13      A.   No, that is -- that is not my opinion at all.

14  The minimum course within a hundred and fifty nautical

15  miles of safe harbor, from Aruba to Santo Domingo, was

16  just over 775 nautical miles.  That would -- over

17  three days, just taking into account our dating error,

18  that would cause this vessel -- this vessel would have

19  to be able to do, at least, 11 and a half knots,

20  average, to do that in that time period.

21          MR. GOLDMAN:  You broke up, sir.

22          How many knots?

23  A.   I actually have a --

24          THE DEPONENT:  11 -- 11 and a half, or

⬆                                                        275

1  thereabouts.

2      A.   And so I have a -- a video of this boat

3  doing 11 knots on a beam reach, which means the wind's

4  coming from the side of the boat, that's its most

5  efficient point of sail, in a flat sea -- or it's

6  actually on YouTube, it's from when the boat was

7  listed for sail -- and it was doing 11 knots.

8          My experience with the Catana 47s is that,

9  while they are performance cruising boats, they are

10  still cruising boats.  And once you've loaded them

11  with up with fuel and water and generators and all of

12  your -- all of your stuff, because you're living on

13  board, and you're not in a -- in a testing scenario,

14  they're a little bit slower.  And I would expect, in a

15  fair sea on a beam reach, probably, about 10 knots out

16  of this boat.

17        Now, what -- what complicates that further is

18  the path within the navigational limits would take

19  you -- almost for the first leg of it, would take you

20  almost directly into the Caribbean current, which is a

21  knot against you.  It would take you directly into the

22  wind, so you wouldn't be able to sail it, and we see

23  that Mr. Andersson didn't use a whole lot of fuel.

24        And, of course, it's into the sea, and he's

⬆                                                          276

1  already stated that the sea was incredibly rough.  And

2  so there's no way that you would be able to make, even

3  close to, the necessary amount of speed on that

4  voyage, in these conditions, to make it in three days.

5     Q.   How did you define the hundred and fifty

6  nautical miles from shore?

7     A.   I took a compass from all of the, sort of,

8  closest points to the -- the Caribbean sea on each

9  island and I drew it out, and then I measured the --

10  the shortest course within those radii.

11    Q.   Do you know what you used as the islands that

12  you defined as "shore"?

13    A.   (Deponent viewing computer.)  Pretty much all

14  of them (laughs).  Offhand, I couldn't -- I couldn't

15  tell you which ones, because, of course, it doesn't

16  show me where the pointer dropped.  But there are

17  probably at least 20 radii --

18    Q.   Okay.

19    A.   -- on the chart that I drew.

20    Q.   Okay.  Okay.  And that's something that will

21  probably be produced as part of your expert discovery,

22  so we'll see that when we see it.

23          MR. GOLDMAN:  Michelle, it goes without

24  saying, if we do produce it and he's an expert on that

♠                              277

1  point, so that -- you can depose him again, obviously.

2  They'll be no -- no arguments about that.

3          MS. NIEMEYER:  Okay.  And that's fine.

4  I -- I totally understand.  It was not produced at

5  this point.

6          BY MS. NIEMEYER:

7    Q.   And is it your testimony, Mr. Ball, that this

8  was work that you did outside of your capacity as the

9  surveyor and as part of the report that you did for

10  Mr. Goldman in September?

11    A.   That's correct.

12    Q.   Okay.  So I want to go forward a little here;

13  we talk about the cause of loss, navigational error

14  potentially caused by unseaworthy condition due to

15  lack of geographical information.  It's kind of a

16  mishmash.

17    A.   (Deponent viewing exhibit.)  It is.

18    Q.   So is it your -- is it your position that

19  Mr. Andersson's change in course, that caused him to

20  end up in so -- in the Dominican Republic instead of

21  in St. Martin, was caused by a lack of geographical

22  information?

23    A.   No.  No.  No.  I -- I'm speaking specifically

24  to landing on the breakwater, in that regard.

⬆                                                        278

1     Q.   Does -- does the -- the change in course that

2   had to have happened at that point, lead to the loss?

3     A.   Yes, I believe so.  Obviously, if -- if -- if

4   he hadn't ended up at an unintended port, he,

5   hopefully, would've had charts to safely make it into

6   anchorage.

7     Q.   We talk about salvage then, afterwards, and

8   this is where you gave the estimate about what it

9   would cost to salvage the boat, correct?

10    A.   (Deponent viewing exhibit.)  Yeah.  And I was

11  obviously incorrect -- okay.  I see it.  I see 70,000

12  listed as a -- as a removal of wreck price, not a

13  salvage price.  I had said earlier today that I

14  remembered a number of 70, and I guess that's where it

15  came from.

16      Q.   So -- so is it fair to say my client did a

17  pretty good job when he got a thousand dollars from

18  the salvor, and the salvor promised to take the wreck

19  and take responsibility for everything?

20      A.   Yes, except the -- the remainder of the wreck

21  is still there.  I -- I get that, obviously -- I

22  didn't know that until you just said it.  I -- I get

23  that he's managed to sidestep the liability, perhaps,

24  if there is such a thing in the Dominican Republic.

                                                    279

1       Q.   There's -- there's a -- there's a hold

2   harmless agreement.

3            (Pause.)

4            BY MS. NIEMEYER:

5       Q.   Okay.  So then we have "Sue & Labor," and you

6   mentioned the security guards, and you mentioned that

7   the cost was fair and reasonable.  No personal injury.

8            Did -- did you ever at -- again, it's my

9   understanding you never had any follow-up

10  communication with Mr. Naranjo, so you wouldn't know

11  if he had any kind of injury or loss or any kind of

12  claim?

13      A.   No, if he had -- if he had anything following

14  -- following me meeting him in the Dominican Republic

15  to report, I wouldn't know about it.

16      Q.   Okay.

17      A.   He didn't report anything at the time.

18      Q.   And I'll represent to you, it's my

19  understanding there wasn't, but there -- it's -- would

20  that normally be something you'd want to know when

21  you're -- when you're doing the claim investigation;

22  whether a crew member, in this kind of circumstance,

23  would have any claim, potentially?

24      A.   Yes, absolutely.  If we go out for the survey

                                                    280

1  following the loss, we will ask the question, you

2  know, do you have any injuries, do you -- you would

3  like to report any injuries.  Obviously, once the

4  survey's over and it's handed to the loss adjuster,

5  then we would leave that with them because, you know,

6  if we're there -- if we're there to do a survey, once

7  that's done, that's done.

8      Q.   Okay.

9      A.   Unless we have an ongoing instruction, you

10  know, we -- we file our report then here you go, we're

11  out.

12      Q.    Right.

13      A.    It's a little frustrating, because we don't

14  know what happens, how cases are resolved.

15      Q.    Okay.  So you've mentioned now -- you've

16  mentioned the environmental damage part, that there

17  was a risk.  I don't think we need to really go there

18  in any major way.

19          Damages and Recommendations:  Essentially --

20  and I'm just going to, sort of, summarize this; is it

21  fair to say that your -- your opinion was that the

22  boat was a constructive total loss?

23      A.    That's correct.

24      Q.    Okay.  And you mention an estimated cost of

♠                                                    281

1  repair, which exceeded the value of the vessel by

2  about a hundred thousand, correct?

3      A.    (Deponent viewing exhibit.)  Yes.  And

4  that's -- that's the very -- you know, we note below,

5  that's preliminary-nature only, simply because, every

6  now and then, somebody wants to contest it and we go,

7  that's what we can see right now, there'll be more.

8      Q.    Okay.  And then there's a certification by

9  you, "The statements in [sic] fact contained in this

10  report are true and correct.  The reported analysis,

11  opinions, and conclusions are limited only by the

12  reported assumptions and limiting conditions, and are

13  my personal, unbiased professional analyses, opinions,

14  and conclusions.  I have no present or prospective

15  interest in the vessel," et cetera.  I'm not going to

16  read all of it.

17      A.   (Deponent viewing exhibit.)

18           (Deponent nods head.)

19      Q.   Is it your position, as you sit here today,

20  that, based on the knowledge you have today, that

21  that's still true?

22      A.   Correct.  Yes.

23      Q.   Is there anything, as you sit here today,

24  that you would change in that report, based on the

⬆                                                    282

1   knowledge have you now as opposed to before?

2       A.   Well, I would certainly change the dates that

3   were wrong.  Without reading the report again, I can't

4   -- I can't think of anything glaring that I would

5   change, based on the information that I had at the

6   time.

7       Q.   Okay.  And then these photographs --

8       A.   (Deponent viewing exhibit.)  These are --

9       Q.   -- presumably are --

10      A.   (Deponent viewing exhibit.)  These are --

11      Q.   -- photographs from your inspection, correct?

12      A.   (Deponent viewing exhibit.)  Correct.  And

these are the same -- the same batch of photographs

that we reviewed earlier.

15           MS. NIEMEYER:  Okay.  Okay.  So we're

done with that one.  We're not done.  We're done with

that one.  We're getting close to done.  We're --

we're done with the big stuff.  Let me just take a

peek at what I've got left here.  I can get rid of

that one.

21           (Pause.)

22           BY MS. NIEMEYER:

23      Q.   Okay.  Let me just -- I want to give you

another document to look at here.

⬆                                                    283

1            MS. NIEMEYER:  And what are we on now,

Exhibit 26?

3            MADAM COURT REPORTER:  Yes.

4            MS. NIEMEYER:  Okay.  Let's mark this

as 26.  And it's an e-mail, it's five pages long.  It

starts with Andersson.  It's CF000144 and it's

followed by correspondence.  The e-mail's a cover

e-mail, one page.  It's followed by correspondence

9   dated January 15th, 2020 from Mr. Andersson to Sarah

10   Delacey-Simms, and the last page of the collective

11   document is CF148.

12               (Exhibit 26A marked for identification.)

13          BY MS. NIEMEYER:

14   Q.   This e-mail is requesting comments from Bill,

15   related to the attached correspondence.

16          Mr. Ball, did you ultimately end up being the

17   person who was asked to give that response?

18   A.   (Deponent viewing exhibit.)  I don't recall.

19   I do have a copy of the letter that you've just

20   referenced, but I don't recall giving a response to

21   it.

22   Q.   Okay.

23   A.   And I know --

24   Q.   Now, let me just say, I'm going to -- we'll

♠                                                    284

1   get to that, but you -- okay.  So Bill was asked, on

2   January 27th, to respond to the correspondence from

3   the 15th of January.

4          Do you have any recollection of receiving

5   that 15th of January correspondence any time prior to

6   the 27th of January?

7   A.   No, I don't have any recollection of that.

8   That would've been -- I mean, in honestly, January

9   2020, I probably couldn't tell the difference between

10  December and March 2020 --

11       Q.   Had there been --

12       A.   -- you know, it's quite a --

13       Q.   -- had -- had there been a prior transmission

14  of that document, would you have had it in the e-mail

15  records that you provided?

16       A.   That's correct.  Yes.

17       Q.   Okay.  So you mentioned you did have a

18  recollection of seeing this letter?

19       A.   That's correct.  I don't know -- I don't know

20  when I first saw it, but I have it here (indicating),

21  so I've definitely seen it.

22       Q.   Okay.  Did you review this correspondence in

23  detail?

24       A.   Not to my recollection, no.

♠                                                    285

1            (Deponent viewing exhibit.)  Oh, we may have

2   done -- let's have a look.  Yeah, I believe I've seen

3   this before, I just can't remember when.

4        Q.   Okay.  I'm not going to go into this in great

5   detail because you -- you responded to it, but I do

6   want to go into --

7        A.   I -- I responded to it or Caribbean Marine

8   Surveyors responded to it?

9       Q.   We'll look at a document and you can tell me.

10      A.   Okay.

11      Q.   I want to look at this part about the

12  navigational limits in the response.  And -- and

13  Mr. Andersson discussed his intended course and it --

14  and discussed in more detail, his recollection of --

15  of the course.

16          Do you recall looking at that?

17      A.   (Deponent viewing exhibit.)  I do recall a

18  change -- well, a -- a different statement to what I

19  had collected.  I thought that that was in the court

20  documents, but that may have been in here as well or

21  vice versa.  So, yes, I do remember, at some point, a

22  statement that was contradictory to what I believed I

23  had collected being brought forward.

24      Q.   Would you consider what you see here

⬆                                                        286

1   contradictory to what you put in the statement that

2   you asked Mr. Andersson to sign on the 23rd?

3       A.   (Deponent viewing exhibit.)  Yes.  I believe

4   -- I believe, if I remember correctly, there are a

5   number of points in here that contradict that

6   statement.

7       Q.   Do you consider it contradictory or is it --

8   is it more detailed?

9      A.   Again, if I remember correctly, there were

10  some things that I would consider to contradict it.

11  I'd have to put them side by side and go through it

12  all again to confirm.

13     Q.   Did you ever talk with Mr. Andersson, when

14  you saw this letter, to ask further questions and

15  clarify any of that information?

16     A.   No.

17     Q.   Were you asked to speak with Mr. Andersson

18  about it?

19     A.   No.

20     Q.   Were you asked to provide your -- your

21  opinion about how the new factual information affected

22  your report?

23     A.   I'm sure that would be the purpose of sending

24  it.

                                                287

1           MS. NIEMEYER:  Okay.  So let me go to the

2   next document.

3           (Pause.)

4           MS. NIEMEYER:  Okay.  We're going to mark

5   this one also as Exhibit 27.

6           (Exhibit 27 marked for identification.)

7            MADAM COURT REPORTER:  All set.

8            BY MS. NIEMEYER:

9       Q.   It is a two-page e-mail.  It has Bates

10   numbers CF000152 and 153, and it is dated

11   January 31th, 2020, from Mr. Ball to

12   Ms. Delacey-Simms.

13            Mr. Ball, does this refresh your recollection

14   about whether you responded to that correspondence?

15       A.   (Deponent viewing exhibit.)  It does, and I

16   clearly did.

17       Q.   Is there any information that you sought

18   beyond that written correspondence that fed into what

19   you provided in this e-mail?

20       A.   No.

21       Q.   Okay.  So there was no further investigation

22   to confirm any details or to ask any questions of any

23   witnesses or anything like that, correct?

24       A.   That's correct.

♠                                              288

1       Q.   When you wrote your original report, I

2   believe we established that it was your understanding

3   that Mr. Andersson's crew member became a com --

4   seriously seasick almost immediately after leaving the

5   harbor; is that correct?

6       A.   That's correct.

7    Q.   Did you -- when you met with Mr. Andersson

8  and that was your understanding, did you ask him why

9  he would not turn around if he was -- he had just left

10  the harbor and he had a sick crew member?

11    A.   I did not, no.

12    Q.   Did you ever ask anything about -- I believe

13  I asked this, but I want to confirm it, about whether

14  Mr. Naranjo did stand watch during the voyage?

15    A.   I did not.  When I -- when I understand that

16  somebody's incapacitated, I understand that they're --

17  they're not able to hold the watch.

18    Q.   Is it possible to recover from a level of

19  seasickness that makes you incapacitated when the

20  vessel has changed attitude toward the wind and waves?

21    A.   Yes, absolutely.

22    Q.   Did you ask Mr. Andersson whether

23  Mr. Naranjo's illness changed as he changed course?

24    A.   Well, short of changing course more than 90

⬆                                                      289

1  degrees, it wouldn't have made much of a difference.

2  It's the difference between going into the weather or

3  going with the weather and, of course, as he reports,

4  almost his entire trip was into the weather, because

5  he was doing what we called pitching, he was trying to

6  get as close to the wind as he could, which is why he

7  ended up in Santo Domingo.

8      Q.   Does it say that in the statement that he

9  signed?

10     A.   The word pinching, definitely not, but it

11  says that he was trying to head upwind and he

12  eventually got blown off.  And, certainly, a course

13  change from St. Martin to Puerto Rico and then to

14  Santo Domingo suggests that he was trying to hug the

15  wind as close as he could.

16     Q.   Did you look at weather reports, other than

17  the one you mentioned that was on the 14th, into the

18  morning the 15th, did you follow continuous weather

19  reports to see what the weather looked like during the

20  course of the voyage and see where he was in relation

21  to the wind?

22     A.   I did not.  I -- I would suggest that the

23  Caribbean isn't that big of an area, so it won't be

24  vastly different.  There will be differences, but not

↑                                                      290

1  vast differences.

2      Q.   As you sit here today, do you know whether

3  there were any wind shifts after that morning report

4  that you had from Bonaire?

5      A.   I do not.  No.

6     Q.    And I think we established before, you --

7  it's not certain, based on what you know, when exactly

8  Mr. Naranjo became ill, correct?

9     A.    Yeah, we -- there are a number of different

10  statements, I suppose.  Obviously, Mr. Andersson has

11  signed one that said he became sick relatively

12  quickly.  That's the letter which you just referenced,

13  which says something slightly different.  And then, I

14  believe, there's a -- a court report, which either

15  references that letter or says something different

16  again.

17     Q.    I think, with regard to the part of this

18  where we talk about -- you talked about the VHF radio

19  and the Garmin charts or the -- the Raymarine charts,

20  is it fair to say we've -- we've covered that

21  information previously when we were talking about your

22  report?

23     A.    I believe so, yes.

24     Q.    You do mention here, something about a -- you

                                                           291

1  said, at the end of the paragraph numbered six, you

2  say, "As the systems are not approved ECDIS systems

3  with independent power supplies, we would argue that

4  the absence of paper charts to supplement the

 5  electronic charts affects the vessel's potential

 6  seaworthiness negatively."

 7          Do you see that?

 8      A.  (Deponent viewing exhibit.)  Yes, so where

 9  does the (inaudible) -- a commercial vessel would be,

10  which, you know, just as far as --

11              (Technical difficulties.)

12              MADAM COURT REPORTER:  I'm sorry.  Before

13  you said -- after you said the -- a commercial, I

14  couldn't -- the word was broken up.

15          Can you please start over again?

16              THE DEPONENT:  Sure.

17              MADAM COURT REPORTER:  Sorry.

18      A.  Sure.  We're just a commercial vessel, and

19  just using that as a -- as a measure of, sort of, good

20  practice, electronic -- ECDIS means Electronic Chart

21  Display and Information System, so it's a fancy name

22  for a chartplotter on a commercial boat.  The only way

23  in -- in --

24              (Noise interruption.)

⬆                                                    292

 1              MS. NIEMEYER:  The Google product, that

 2  shall not be named, heard you say something --

 3              THE DEPONENT:  Okay.

 4              MS. NIEMEYER:  -- and decided it heard

5    its name.

6              THE DEPONENT:  That's okay.  I'll

7    continue.

8              (Laughter.)

9        A.   So, on -- on a commercial vessel, in most

10   flag states, electronic chart information systems are

11   allowed in lieu of paper charts, but only in the

12   instance that there is 100 percent redundancy and a

13   separate power supply.  So the point that we were

14   getting at there is that, most insurers, a lot of flag

15   states, don't recognize electronic charts as having

16   appropriate charts on board.

17             As far as what the US Coast Guard allows, I

18   -- you know, we'd have to reference the CFRs to figure

19   that out, but, certainly, in terms of good practice, I

20   -- I, myself, would never rely on an electronic chart

21   alone, simply because you never know what's going to

22   happen.  You don't know if you're going to get hit by

23   lightning, you don't know if you're going to lose

24   power, all sorts of -- you know, it's a boat, it

                                                    293

1    breaks.  And so, call me an old soul, but paper charts

2    are kind of the way to go, and that is an accepted

3    industry practice.

4     Q.    Okay.  And -- and this paragraph does not say

5   to the underwriter that Mr. Andersson did have paper

6   charts, just not paper charts for the Dominican

7   Republic, correct?

8     A.    That's correct.

9     Q.    So -- and -- and as you look at this right

10  now, could you imagine that it's possible that the

11  underwriter understood what you said to imply that

12  there were zero paper charts on board and that the

13  boat only had a chartplotter?

14    A.    Yes, I could understand that somebody might

15  interpret it that way, absolutely.

16    Q.    Did anyone ever ask you to clarify that?

17    A.    No.

18    Q.    So it's reasonable to understand that they

19  may have relied upon a misunderstanding, being that

20  there were no charts at all on the boat, and that

21  might imply that the boat was unseaworthy?

22    A.    That -- that's -- that's a possible

23  assumption that they could've made, yes.

24    Q.    Okay.  Okay.  I'll close this one down.

                                                        294

1   We're getting there.

2           (Pause.)

3                MS. NIEMEYER:  Okay.  Let me just -- I'm

 4    going to share another one.  Let's mark this one as

 5    28.

 6                   (Exhibit 28 marked for identification.)

 7                   MADAM COURT REPORTER:  All set.

 8              BY MS. NIEMEYER:

 9         Q.   It is an e-mail dated 19 February 2020, from

10    Ms. Delacey-Simms to Mr. Andersson.  It has Bates

11    numbers CF000157 through 158.

12              Mr. Ball, you are not listed on this, but

13    I -- I just wanted to ask you about your understanding

14    here.  So this e-mail chain begins with an enclosed

15    res -- response to the December 27th letter from

16    Mr. Andersson.  He then forwards that message on the

17    -- it looks like the 28th of January, so a month and a

18    day later, and asks for confirmation of the receipt of

19    that e-mail.  And then the response he gets is that

20    Ms. Delancey -- Delacey-Simms can confirm receipt.

21    And he then turns around and, on February 19th, which

22    is about a month later, says, when can you return my

23    GPS unit?  This being based on the understanding from

24    the communications that the insurance company had

♠                                                        295

 1    taken or would be taking the GPS unit.

 2              Now, the response that Mr. Andersson received

3  was, "Thank you for your e-mail.  I would suggest that

4  you contact the surveyor."

5          Mr. Ball, does that indicate to you that it's

6  possible that Ms. Delacey-Simms believed that you had

7  taken possession of the GPS?

8      A.    It's possible.  I -- I would suggest that it

9  definitely means that she thinks we would be the

10  people that would know if anybody had it --

11      Q.    Okay.

12      A.    -- and I believe --

13      Q.    Never --

14      A.    -- in the --

15      Q.    Do you recall -- outside of the e-mails that

16  -- that we've received, do you recall any

17  communications by telephone with her about the GPS or

18  whether you were going to be getting it?

19      A.    No.  I was --

20      Q.    Okay.

21      A.    -- I was just about to touch on -- on -- that

22  there are other e-mails in the pack between us and

23  Mr. Andersson clarifying that we didn't have the GPS.

24              MS. NIEMEYER:  Okay.  Let's go pop out of

⬆                                                          296

1  full screen again.  Okay.  I'm not going to bother

2  with the policy with you, because you weren't the

3    claims adjuster.

4           I'm going to just ask you, Laurie, Exhibit 10

5    from Mr. Usher, was that same response that we just

6    talked about as Exhibit 27.  Could you strike that?

7    Don't mark it as 27 and we're just going to call that

8    Exhibit 10?

9                   MADAM COURT REPORTER:  Okay.

10                  MS. NIEMEYER:  Is that -- do you

11   understand what I'm saying?

12                  MADAM COURT REPORTER:  Yeah.

13                  (Exhibit 27, CF000152 to CF000153,

14   withdrawn.)

15                  MS. NIEMEYER:  I just -- I -- I had two

16   copies of it in here for some reason.  Let's see.

17   What is this?  All right.  Share screen.

18          BY MS. NIEMEYER:

19   Q.   Okay.  Mr. Ball, can you see this

20   correspondence of March 2nd, 2020?

21   A.   (Deponent viewing document.)  I can, indeed.

22   Q.   And just for the record, this was marked as

23   Exhibit 9 in Mr. Ush -- Usher's deposition, and it's a

24   denial letter from Sarah Delacey-Simms to

⬆                                                    297

1    Mr. Andersson.

2        And my only question to you, Mr. Ball, on

3   this is, were you asked to contribute in any way or to

4   participate in the drafting of this letter?

5        A.   (Deponent viewing exhibit.)  No.

6        Q.   Were you involved in any way in the decision

7   about whether or not to accept the claim?

8        A.   No.  I don't believe so.  Beyond -- beyond

9   our report and our -- the information we provided, no.

10       Q.   And you see that the date of loss is listed

11  as 16 December 29 -- 2019?

12       A.   (Deponent viewing exhibit.)  I do.

13       Q.   Was there ever any time where you became

14  aware that the company had -- had a confused

15  perspective on the date of loss that seems to have

16  continued into the file and onto correspondence?

17       A.   Yes, as -- as -- as this became a litigation

18  issue, obviously, it was raised.  We -- we became

19  aware and I -- I think it originates from that very

20  first statement that just, sort of, got carried

21  through.

22       And -- and to be clear, I don't think any of

23  us were obviously -- you can see the date name as

24  well.  I don't think any of us were really of the

                                                    298

1   impression that this was a two-day voyage.  We just

2  got the numbers wrong.

3      Q.   Are you positive about that?

4      A.   I'm -- I'm -- I mean, I'm not -- how hundred

5  percent is a hundred percent?

6      Q.   Okay.

7      A.   I -- I -- let's say I'm 80 percent positive

8  about that.

9      Q.   Okay.  And -- and from your own perspective,

10 that's the case, but I guess my question is; are you

11 positive that that's the case with regard to the

12 decision-makers who looked at the claim in the end and

13 made a decision about it?

14     A.   Well, I -- I can't speak to somebody else's

15 thoughts.

16          MS. NIEMEYER:  Okay.  Okay.  We're going

17 to mark as, Exhibit 27, this e-mail of -- it's dated

18 27 December 2019, from Samantha Thomas to

19 Mr. Andersson, and the attachment, which is a

20 reservation of rights letter, so it ends up being a

21 three-page document.  It has the Bates number CF000055

22 through 57.

23          (Exhibit 27 marked for identification.)

24

1          BY MS. NIEMEYER:

2     Q.   Mr. Ball, I know you're not included in this

3  e-mail chain, but I wanted to ask whether you were

4  ever asked to provide any kind of an input in the --

5  in the drafting or in editing or reviewing or

6  providing any feedback related to this December 27th,

7  2019, reservation of rights letter?

8     A.   No.  Again, beyond -- beyond our report and

9  the documents you've already gone through, I'm not

10  aware of anything additional with this.

11     Q.   I just exed out of it, but I'm going to ask

12  you, before I call it a document we're not looking at;

13  other than the listing of what kind of GPS equipment

14  was on the vessel, that kind of thing, was there

15  anything on the prepurchase survey that you considered

16  important to your report or something that you think

17  that we should know about?

18     A.   (Deponent viewing document.)  Obviously, I

19  didn't when I wrote the report.  I haven't -- I

20  haven't gone through it again.  I obviously would've

21  done when I did the report.  I'm happy to review it

22  again and -- and offer another opinion.  But,

23  obviously, when I wrote the report, I didn't think

24  there was anything too exciting there looking at his

1  own report.

2      Q.   Is it fair to say that -- that -- and -- and

3  I think your answer just told me what I need to know.

4  Is it fair to say that -- and that prepurchased survey

5  was -- was, just for the record, that was Exhibit 12

6  in Mr. Usher's deposition.

7           Is it fair to say that the prepurchase

8  survey, then, was not something that you relied upon

9  heavily or that there's any facts in it that were

10  determinative of what you gave as your opinion?

11     A.   Yes.  That's absolutely correct.

12     Q.   Okay.  Okay.  Let me just see -- we have --

13  okay.  One more document.  Hold on.

14           (Pause.)

15           BY MS. NIEMEYER:

16     Q.   I'm going to show you a document that's been

17  marked in Mr. Usher's deposition already as

18  Exhibit 14.  It's a 59-page compilation of e-mails and

19  photographs, and it starts with CF000075.  As you can

20  see, this was sent by Mr. Andersson to Sarah

21  Delacey-Simms and Ms. Thomas and is dated January 6th

22  of 2020.  Mr. Ball, I'll represent, this was not

23  produced as an AB document coming from your office.

24           But do you have any recollection of seeing

1  e-mails that looked like this, that may have been

2  forwarded to you?

3      A.   (Deponent viewing exhibit.)  No.

4      Q.   They were essentially --

5      A.   So far it --

6      Q.   -- collections of photographs.

7           MADAM COURT REPORTER:  I'm sorry,

8  I didn't hear what you said, sir.  I didn't hear after

9  you said --

10     A.   No, I -- I had said that so far -- I had said

11 that so far, it was blank e-mails.  We've gotten

12 through two blank pages at that point.

13     Q.   Okay.  Yeah, it's the cover and then

14 attachments.

15          So, on the January 6th, 2020, the first

16 grouping here, this is where I learned about the

17 stove, which you can see there's a photograph, and it

18 says here, it's got a picture, "New Force 10 stove

19 with gas bottle - stolen onboard while 'security'

20 present!"  So there was a photo of it still in the

21 boat and it appears to just be there in a document

22 that it existed.

23          So you don't recall seeing this?

24     A.   (Deponent viewing exhibit.)  No, not at all.

1    Q.   Okay.  And -- and you said by January 6th,

2  other than being asked to give that -- that response

3  on -- that you gave, dated January 31st, you really

4  didn't do any other work, correct, on this claim?

5    A.   I believe that's correct, yes.

6         MS. NIEMEYER:  Okay.  Let's take a short

7  break, about five minutes.  I just want to go through

8  my notes.  I believe we're done or very close to it.

9         THE DEPONENT:  Sure.

10         (Off the record at 5:29 p.m.)

11         (Recess taken.)

12         (Back on the record at 5:33 p.m.)

13         MS. NIEMEYER:  I've just got a couple of

14  little questions, nothing major.

15         BY MS. NIEMEYER:

16    Q.   So one of the questions I have is whether --

17  to your knowledge, were there any photographs taken

18  that you did not produce; as in, I know you didn't do

19  the production that came to me, but were there any

20  photographs that you remember that you didn't see in

21  what we showed you today?

22    A.   No.  You --

23    Q.   And --

24    A.   -- you showed me some that I hadn't seen

1  before, if that's what you're asking.  But I'm not

2  aware of any photographs that you haven't shown me

3  today.

4      Q.   Okay.  Other than your handwritten notes that

5  you showed us that ultimately led to that written

6  statement, are there any other handwritten notes that

7  you took in the course of the work that you did that

8  we don't have?

9      A.   No.

10     Q.   And we don't have any.

11     A.   (Deponent nods head.)

12     Q.   So are there any other handwritten notes?

13     A.   I've got -- I've got what's left of the file

14  that's not spread across my desk here (indicating),

15  and that's the only handwritten note in there.

16     Q.   And so is that one note from the -- from the

17  meeting?

18     A.   (Deponent nods head.)

19     Q.   Is that the only note?

20     A.   Correct.

21     Q.   How many pages --

22     A.   It's the only handwritten note.

23     Q.   -- long is that?  How many pages is that?

24      A.   (Deponent viewing document.)  It is -- it's

                                                                304

1  one.  It might be one double-sided.  Let me see where

2  I put it.  Sorry.  I've spread this file all over my

3  desk today, so...

4           (Deponent viewing document.)  Yes, it's a

5  single -- single page (indicating).

6           MS. NIEMEYER:  Okay.  Michael, we'd like

7  a copy of that, please.

8           MR. GOLDMAN:  (Inaudible.)

9           MADAM COURT REPORTER:  Michael?  If

10 you're talking, Michael, you're on mute.

11          MR. GOLDMAN:  Oh, of course.  Andrew,

12 send it to me, and I'll forward it to them.

13          MS. NIEMEYER:  Okay.  Thank you.

14          THE DEPONENT:  Yes, I will do that.  I'll

15 send it immediately following this -- this call.

16      BY MS. NIEMEYER:

17      Q.   Mr. Ball, are you still doing work with Great

18 Lakes?

19      A.   Well, I mean, I believe so.  We haven't had

20 any claims in a while.  Due to -- due to COVID,

21 there's -- there's not a whole lot of claim activity

22 in the Caribbean now.  But I have no reason to believe

23 that Great Lakes has discontinued using our services.

24      Q.   Okay.  This is a ludicrous comparison, but

⬆                                                              305

1  apparently, like the flu, marine losses have gone down

2  because of COVID.  A happy by-product, I guess.

3           Less travel, less tourists, less crashes,

4  right?

5      A.   It would be a great year to be in marine

6  insurance, that's for sure.

7      Q.   Yup.  Not a great year to be somebody who

8  owns a fleet of boats, though.

9           So --

10     A.   Well --

11     Q.   -- to your knowledge --

12     A.   -- I represent --

13     Q.   -- is -- and -- so, in your work that you're

14 doing in Tortola, that's part of what you're doing,

15 right, is representing that industry?

16     A.   Yeah.  I -- I am effectively the spokesperson

17 for the industry here.

18     Q.   Wow.

19     A.   It's -- it's been an interesting year.  I

20 used to have more hair (indicating).

21     Q.   Yeah.  It -- my heart goes out to them.

22          To your knowledge, as we sit here today, is

23  Sarah Delacey-Simms still an complete of Concept?

24      A.   As far as I'm aware.

♠                                                        306

1       Q.   Okay.  And the only other thing --

2       A.   I think so.

3       Q.   -- I just wanted to clarify -- there's two

4  things, actually.  One of them is, we talked about

5  communications between you and Concept.

6       A.   (Deponent nods head.)

7       Q.   And we talked about your communications with

8  Mr. Andersson and I think --

9       A.   (Deponent nods head.)

10      Q.   -- we talked about your -- your traditional

11  way of communicating with Mr. Bailey tended to be on

12  the phone; is that correct?

13      A.   That's correct.  On -- on the phone and in

14  the office, you know, we're -- we're -- we talk to

15  each other probably five, six, seven times a day if

16  we're not sitting in the same room, in which case,

17  it's more.  So there's a --

18      Q.   The reas --

19      A.   -- there's, sort of, a constant line open

20  there.

21      Q.   -- the reason I ask is because there really

22  weren't e-mails between you and Mr. Bailey in the

23  things that you produced.

24          Is that just kind of how do you business;

♠                                                            307

1  you're just not sending a lot of e-mails between each

2  other?

3      A.   That's correct.  If I look at where I'm

4  sitting right now, his -- his desk is less than 20

5  feet away from me.  And, obviously, when -- when I'm

6  overseas dealing with a claim, I -- I likely don't

7  have connectivity in the field.  And by the time I do

8  have connectivity, we want to communicate fast.  I

9  want to give him the opportunity to ask questions and

10  guide any way he needs to.  So, verbally, is the --

11  the easiest way to do that, obviously.

12      Q.   One more question.

13      A.   Sure.

14      Q.   As the captain of a sailing catamaran, if you

15  have someone who's quite seasick, and you have a

16  choice between changing direction and attempting to

17  help that person feel better by the attitude of the

18  vessel in relation to the waves and the wind or going

19  into port in Venezuela, which would you choose?

20      A.   That's really a measure of how seasick this

21  person is.  Again, if -- if I believe that they are in

22   -- in real serious danger, then, you know, you have to

23   weigh your risk.

24          You know, it -- there would definitely be a

⬆                                                              308

1   point at which I would say, this is getting too bad, I

2   have to go to my closest safe port.  Although, I think

3   that Venezuela's a particularly safe port, but it's

4   safer than the alternative.  That's a pretty dire

5   situation, and I'm not under the impression that we

6   got to this stage in terms of -- in terms of what was

7   happening on board Melody.

8          For somebody to be that seasick, you really

9   have to be at sea for, you know, a -- a good four or

10   five days.  However, you know, the -- there is a -- a

11   benefit to turning back for the person's comfort,

12   obviously, but not for the person's safety.

13          Does that, sort of, make sense?

14   Q.   Sort of, yes.

15   A.   An example I would give -- an example I would

16   give was, when I was in the UK, I ended up running a

17   boat where we had yachtmaster students that were doing

18   their sea time.  So we spoke a little bit about how

19   you have to spend time at sea in order to get your

20   license, so you have to log a certain number of miles

21   off shore, skippered passengers, night hours,

22  et cetera.

23       And so one of the courses we used to do is

24  from the south coast of the UK, at the Isle of Wight,

1  up to Ireland, to Dún Laoghaire.  And that was, you

2  know, really nasty, cold, wet, tired stuff, but it

3  built a good sailor.

4       And we had a guy that got so sick as soon as

5  we had left the Isle of Wight on the south coast of

6  England that, you know, we -- we knew he wasn't going

7  to be in good shape.  He was bedridden for the entire

8  trip.

9       When we got to Dún Laoghaire, we actually

10  turned around and said, you're going to have to go

11  away and get a doctor to you clear you to come back

12  with us.  You know, at that point, he had some blood

13  in his vomit.  You know, he was -- he was in pretty

14  bad shape, and that would've probably been five or six

15  days out there.

16       He did, in fact, get a doctor to clear him.

17  When we left Dún Laoghaire again, to head back to the

18  Isle of Wight, he became sick again, and we did change

19  our course.  We put into Holyhead in Wales, which is a

20  lot further north on the -- on the west coast of

21  England, and put him off the boat.  We sent him to

22  hospital and said, find your own -- find your own way

23  home, but we can't have you on the boat.

24          So there -- there is definitely a time and a

⬆                                                          310

1   place for changing course and putting crew off the

2   boat.

3           Do I believe that, in terms of sea sickness,

4   you can get there in three days, in relation to the

5   person's safety?  No.  But in terms of -- of

6   maintaining a watch, I still believe that the -- the

7   prudent thing to do would have been to turn to the

8   closest, safe, and obviously, accessible port.  So

9   that would not include -- that would -- I -- my -- my

10  risk analysis would not include going to Venezuela.

11          MS. NIEMEYER:  Thank you.  I appreciate

12  that.  And -- and I'm done, with that answer.

13          MR. GOLDMAN:  Okay.  I have nothing.

14          MADAM COURT REPORTER:  This is Laurie

15  Berg, the court reporter.  I'm just going to do orders

16  on the record, and then I have some spelling questions

17  for Mr. Ball.

18          I'll just ask if the attorneys want the same

19  orders that they had at the last deposition, if the

20  ten-business-day turnaround time, which is the regular

21   turnaround time, is okay, and if you need anything

22   special like a rough, you can let me know.

23             And can we please start with Michelle?

24             MS. NIEMEYER:  As far as I know, it's

♠                                                    311

1   fine.

2             MADAM COURT REPORTER:  Okay.

3             MS. NIEMEYER:  If it changes, Laurie,

4   I'll let you know.

5             MADAM COURT REPORTER:  You got it.  Okay.

6             MR. GOLDMAN:  Ten days is fine for us.

7             (DEPOSITION OF ANDREW BALL concluded at

8   5:43 p.m.)

9             (Exhibit 26A, Andersson_CF000144 to

10   Andersson_CF000148, was marked during the deposition

11   as Exhibit 26 and, by agreement of the parties, was

12   changed to Exhibit 26A after the conclusion of the

13   deposition proceeding.)

14

15

16

17

18

19

20

21

22

23

24

⬆                                                                    312

1  COMMONWEALTH OF MASSACHUSETTS

2  MIDDLESEX, SS.

3

4          I, Laurie J. Berg, Certified Court Reporter,

5  Registered Professional Reporter, Certified Realtime

6  Reporter, Certified LiveNote Reporter, Certified

7  eDepoze Reporter and Notary Public, in and for the

8  Commonwealth of Massachusetts, do hereby certify that

9  pursuant to appropriate notice of taking deposition,

10 there remotely appeared before me the following named

11 person, to wit:  ANDREW BALL, who was by me duly

12 sworn; that he was thereupon examined upon his oath

13 and his examination reduced to writing by me; and that

14 the deposition is a true record of the testimony given

15 by the witness.

16          IN WITNESS WHEREOF, I have hereunto set my

17 hand and seal this 12th day of June, 2021.

18

19 My commission expires:

20   September 14, 2023

21

22

23         _____

24               Notary Public

⬧                                                    313

1   ERRATA SHEET DISTRIBUTION INFORMATION

2   DEPONENT'S ERRATA AND SIGNATURE INFORMATION

3

4   ERRATA SHEET DISTRIBUTION INFORMATION

5           The original of the errata sheet has been

6   delivered to Michael I. Goldman, Esquire.

7           When the errata sheet has been completed by

8   the deponent and signed, a copy thereof should be

9   delivered to each party of record and the ORIGINAL

10   delivered to Michelle Melin Niemeyer, Esquire, to whom

11   the original deposition transcript was delivered.

12

13   INSTRUCTIONS TO DEPONENT:

14           After reading this volume of your deposition,

15   indicate any corrections  changes to your testimony

16   and the reasons therefor on the errata sheet supplied

17   to you and sign it.  DO NOT make marks  notations on

18   the transcript volume itself.  Add additional sheets

19   if necessary.  Please refer to the above instructions

20   for errata sheet distribution information.

21

22

23

24

⬆                                                           314

1      PLEASE ATTACH TO THE DEPOSITION OF ANDREW BALL

2         CASE:  Great Lakes Insurance SE

3               V. Martin Andersson

4   DATE TAKEN:  June 2, 2021

5

6                    ERRATA SHEET

7   Please refer to Page 313 for errata sheet instructions

8   and distribution instructions.

9   PAGE   LINE   CHANGE/REASON

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   I have read the foregoing transcript of my deposition

18   and except for any corrections  changes noted above, I

19   hereby subscribe to the transcript as an accurate

20   record of the statements made by me.

21   Executed this _____ day of _____, 2021.

22

23                    _____

24                    ANDREW BALL

⬆