### Report of Expert Witness, Otto Geiger

This report is being provided pursuant to Fed. R. Civ. Proc. 26(a)(2)(B). The required disclosures follow:

**(i)    A complete statement of all opinions the witness will express and the basis and reasons for them.**

For the reasons discussed below it is my expert opinion that:

1. Mr. Ball's report says the vessel was "unseaworthy at the outset." I see no evidence supporting that statement. In fact, the vessel proved its seaworthiness by making it through very rough conditions to the Dominican Republic, where it was swept by a wave onto a reef in Boca Chica, Dominican Republic. That incident was caused by the conditions at the time, not the vessel or its crew.

2. In his September 4, 2020 report on page 2-3 Mr. Ball takes Mr. Andersson's statement that he was headed to Sint Maarten as a course heading and says following that heading directly to Sint Maarten would have taken the vessel out of the navigational limits. The facts do not support Mr. Ball's conclusion about the heading the vessel actually took. The conditions on board as described by Mr. Andersson to Mr. Ball and in his deposition, considered with the weather information during the voyage, show that the course steered was probably more easterly as the wind was coming out of the east at 18 knots and he was motor sailing with a partially furled headsail. The boat was also going almost directly into the swell and prevailing current which would have made for a very uncomfortable ride.

3. If, as stated in Mr. Ball's report, Mr. Andersson had opted for the safer more direct bearing to Sint Maarten, with the wind blowing out of the east he would have been on a close reach under sail with both the mainsail and headsail up and engines off. The fact that the vessel took a more easterly route is supported by Mr. Andersson's deposition testimony. The conditions encountered on a more easterly route would account for the VHF antennae shaking loose, the generator cutting out and a whole host of other issues as the vessel would be slamming into the waves. I myself blew both trampolines off a catamaran in similar conditions. This more easterly course would also keep the vessel within the policy's 150 navigational limit.

4. The failure of the VHF to transmit is highly possible to the excessive vibration and violent shaking of the vessel during about the first 24 to 36 hours of the journey and these conditions would explain the seasickness experienced by the crewmember Mr. Ronald Naranjo. As the vessel bore off from the wind, the ride of the vessel would have become far more comfortable and Mr. Naranjo would most likely have recovered from his seasickness and felt a lot better as stated.

5. Based upon the information provided by Mr. Andersson through his deposition and to Mr. Ball about his voyage, as well as the weather and sea conditions during the voyage, it is my opinion Melody's course did not violate the insurance policy's navigational warranty. Mr. Ball's calculations ignored the existence of Isla de Aves, a Venezuelan-held island which brings the navigational limit significantly further west than where Mr. Ball's charts and report represent it to be. Based upon my knowledge of the vessel's capabilities as well as what we know about the course from Mr. Andersson's testimony and the weather conditions, Melody should have remained within the navigational limits during its entire voyage.

6. The Garmin GPS chart plotter unit which was utilized in the starboard helm station of the vessel would have been the best evidence of the vessel's track during the voyage. It is highly unlikely that the GPS would have been damaged during the voyage or while the vessel was on the reef. That model is made to withstand being used outside in rough conditions. It is most likely it was broken while being removed from the vessel by the salvors or afterwards where it was apparently broken and stored wet, resulting in salt water corrosion that make its data inaccessible.

7. The Melody was a recreational sailing vessel and as such is not subject to the same equipment and other standards as a commercial shipping or passenger

vessel. Mr. Ball's opinion contains several statements imposing commercial standards upon this recreational sailing vessel and its crew, which could mislead the Court about what is expected of a recreational sailor. For example:

- Mr. Ball implies in his report that a sailor should maintain a paper log recording numerous details such as the time, boat speed, wind speed, the vessel's compass heading, and its location every half hour. Much of this information is recorded by the vessel's GPS and there are virtually no recreational sailors who would maintain such a log or would know how to use it to navigate were their electronics to fail. Presumably, the insurance policy did not require the vessel to have a sextant on board or the owner to be trained in celestial navigation. The Caribbean Sea is surrounded by land masses and islands making it highly unlikely for a sailor with a compass to be unable to find shore if electronic navigational instruments failed. Mr. Andersson's practice of tracking the voyage on his GPS chartplotter and having a backup unit on board is common practice and within the standard of seamanship expected of a recreational sailor.
- Mr. Ball raises the expectation that the vessel should have had paper charts on board to be "seaworthy." It is my understanding from Mr. Andersson's deposition that there were paper charts on board for all of the areas where the vessel was expected to sail. He should not have been expected to carry paper charts of the Dominican Republic, several hundred miles west of his intended destination of Sint Maarten. Although there was not a paper chart for the Dominican Republic, the supplemental chart chip in the Garmin GPS chartplotter did have detailed charts of the Dominican Republic including Boca Chica where the grounding occurred.
- The satellite phone provided a secondary mode of communication to the VHF. There was no lack of "seaworthiness" with respect to the VHF. Further, it is my understanding from the materials I reviewed that the VHF worked when the vessel left Aruba.

8. With regard to sailing conditions, the insurance policy's navigational limit forces sailors into dangerous conditions to the vessel and to the crew by requiring sailors to stay 150 nautical miles from land in the area where Mr. Andersson was sailing. This is both due to the generally rough sea conditions and the piracy dangers where Mr. Andersson was forced by the navigational warranty to sail. The recommended course to avoid Venezuelan pirates is to stay at least 200 miles from Venezuela, but the policy requires mariners to stay within 150 miles of land, including Venezuela and its islands. Further, the prevailing wind direction comes from the East and sailboats cannot sail directly into the wind. Catamarans cannot sail nearly as close to the wind as monohull sailboats. What this means in practical terms is that to comply with the navigational limits, sailors are forced to sail at a very uncomfortable and potentially dangerous angle to the wind and waves, which in my opinion is what caused Melody's crew member to become seasick and the vessel to be at risk physically. As mentioned before, I have blown both trampolines off a catamaran in similar conditions and ripped out the salon table from waves hitting the hull between the pontoons, and the failure of the VHF transmitter and the generator were likely caused by those rough conditions. Ultimately, Mr. Andersson would have had no choice but to bear off to avoid damage to the boat, and so his crew member could be more comfortable and able to stand watch. The choice he made to bear off was the choice of a prudent mariner.

9. In my experience, a change in course like Mr. Andersson made would result in the improvement of a seasick crew member's condition. I do not doubt that he would have been capable of maintaining watch once his seasickness subsided.

10. It is my understanding from Mr. Andersson's deposition that the crew member's condition did improve, that he was able to maintain watch, and that Mr. Andersson was able to sleep while he was on watch. Even if the crew member had not improved, leaving Mr. Andersson to sail the vessel singlehandedly, that would not have rendered the vessel unseaworthy. Sailors frequently sail alone and use autopilot to navigate their vessels while they take naps during long voyages in the open sea.

11. Mr. Ball's report comments on leeway and implies that the vessel would have experienced a significant degree of "slippage" to the west. The Catana 471 is a high performance cruising catamaran with daggerboards. It is a very fast boat compared to the typical catamarans seen in the Caribbean, and the daggerboards

prevent the type of slippage Mr. Ball refers to in his report. It is my understanding that Mr. Andersson was using the daggerboards while the vessel was sailing. A daggerboard can be seen in one of the photographs Mr. Ball took while surveying the vessel.

12. Mr. Ball's report refers only to one weather station near Sint Maarten for the entire voyage, which showed 17 knot winds. The Melody experienced significantly stronger winds and waves on its voyage, compounded by the current and swell from the east while sailing closer to the wind in the portion of the voyage before Mr. Andersson bore off to make the ride more comfortable.

13. Mr. Ball's suggestion that Mr. Andersson should have returned to Aruba or another downwind location does not make sense. Mr. Andersson was quite far from Aruba by the time he changed course late in the second day of the trip. Bearing off in the way Mr. Andersson did put the vessel in a safer point of sail and allowed him to get further from the piracy risk of Venezuela. There was no need to turn around and go back.

14. With regards to the boat running up onto the reef at Boca Chica – Mr. Andersson says he arrived there in the dark. Low tide was at 16:34 on December 17th, 2019 at Boca Chica, Sunset was at 18:05, nautical twilight was at 18:57 and moonrise was at 23:43. So at 7pm on December 17th it would have been pitch-black out there.

15. A carnival cruise ship 60 miles SE of Boca Chica reported 7ft swells and 30 knot winds at 20:00. With the conditions listed above and from looking at the photos taken of the vessel on top of the reef, it is highly unlikely that Mr. Andersson would have been able to easily identify the reef with the naked eye, as with the 7ft swell running and approaching mid tide at 19:00 and 30 knots of wind blowing the reef would have been submerged or awash and the bay would have been full of white horses from the wind making it impossible to distinguish the reef.

16. Mr. Andersson's Garmin GPS chart shows the shallow reef as an absence of depth information, but does not shade it in green like the newer charts. Typically, land is shown in yellow on charts. Neither version noticeably warns of a navigational hazard, of a reef, or other danger.

17. Mr. Andersson states that he was motoring around looking for the channel marker lights, but in the conditions stated above they would have been very difficult to make out if they existed and were actually working. Trying to find channel markers at night can be extremely difficult to distinguish from lights ashore as you have streetlights, car headlights and tail lights, same for motorcycles, street signs. Shop signs and traffic lights. In the dark it is very easy to get disoriented. This is the reason why I think Mr. Andersson ended up on the reef where he did. The fact that the vessel was so high up on the reef indicates a strong storm surge and he was caught off guard and dumped there by a large wave without even seeing it coming. The photos taken by the surveyor in the calm waters the morning he surveyed the vessel are a little disingenuous as they do not reflect accurately the conditions of the sea that would have been necessary to make it possible for the vessel to get that high up on the reef.

18. Any vessel, motor or sail, traveling in an easterly direction in most parts of the Caribbean can sustain damage due to prevailing wind, wave and current action. The safest direction of travel is generally north, south or west, while staying further off the wind if the destination is to the east. It would not have been possible for Mr. Andersson to take this safer course while complying with the insurance policy's navigational warranty.

(ii)    **The facts or data considered by the witness in forming them.**

- Martin Andersson's deposition
- Mr. Ball's depositions and his written reports dated December 23, 2019, January 31, 2020, September 4, 2020 and August 16, 2021.
- Photographs and other supporting information such as charts provided by Mr. Ball.
- The handwritten notes and typed statement related to Mr. Ball's meeting with Mr. Andersson.

The Counterclaim filed in this lawsuit.

- The deposition of Mike Cooley, his report, and the exhibits to his deposition including photographs of the Garmin GPS, the supplemental chip information and related chart, and the more recent Garmin chart.
- Information related to weather and conditions provided by Mr. Craig Setzer.
- Online cruising forums on recommended safe distances to remain off Venezuela.

(iii) **Any exhibits that will be used to summarize or support them.**

Other than the items listed above, not at this time.

(iv) **The witness's qualifications, including a list of all publications authored in the previous 10 years.**

See attached resume.

(v) **A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition.**

This is my first time testifying as a witness in any case, whether as an expert or as a fact witness.

(vi) **A statement of the compensation to be paid for the study and testimony in the case.**

My day rate is $500 for testimony or attendance at trial, deposition or hearings. For written work and document review, I charge $75/hour.

The information contained herein is based upon my personal observations, the materials listed above, and my knowledge based upon 25 years' experience as a professional mariner and licensed Captain.

02/28/2022

Dated

Otto Geiger

Otto Armin Geiger

Personal Information

Nationality:  USA/Austrian
Drivers Licence:  Yes
Passport           : USA
Date of Birth :
Weight:  265 lbs
**COVID 19 Status – Vaccinated**
Height             : 6'2"
Language       : English
Tattoos            : None
NON-SMOKER
Cell Phone : +1 908 391 3832
Email         : otto.geiger@me.com
Current Location:  Ft. Lauderdale



Maritime Qualifications

➢ MCA/RYA Master 200T (2011)
➢ SAS Master Ocean (1998)
➢ Open Water 1 (NAUI, 1996)
➢ Advanced Open Water ( PADI, 2009)
➢ Rescue Diver (PADI, 2009)
➢ Dive Master (PADI, 2009)
➢ STCW95

 **Maritime areas of experience.**
Knowledge of the Bahamas, Turks and Caicos.
South and central Caribbean.
Mediterranean and Indian Ocean islands
Africa-Southern, East and West coasts
Brazil and Atlantic Ocean Islands
Panama, Central America and Mexico
USA East, West, and Gulf coasts
Pacific Ocean islands.

Career Objective

I have been sailing for over 25 years with over 300 000 nautical miles logged on coastal and offshore passages. I learnt to sail on one of the world's most unforgiving and treacherous coastlines, South Africa.
This is a place where the weather can turn really bad in an hour and the distance between safe harbors is in excess of 200 nautical miles.

I have multiple transatlantic crossings on both power and sailboats and used to deliver catamarans direct from the factory in Cape Town, South Africa to various Moorings bases around the world and to private owners in the USA.

I have sailed around the world on catamarans and monohulls. I have extensive experience on both power and sailboats worldwide.
Due to the fact that I have sailed great distances and in remote locations I have developed very strong engineering and troubleshooting skills.

I'm available for sea trials, long and short term deliveries, vessel management, relief work and permanent work

 Maritime Experience

Aug 2020 – present
Captain/engineer on a Viking Princess 75' towing a 31' center console

Jan 2020 – July 2020
Various deliveries and sea trials for the major yacht brokerages and private individuals

Dec 2018 – Dec2019
Ferretti Custom Line 94. Duties include minor refit,
Maintenance, engineer and captain. Owner liaison and boat prep pre owner arrival and
Trip/ passage planning. Hiring of crew where and when needed.
Towing a 36' center console

M/Y Dare to Dream.   Arno Leopard 75'         Captain.                Oct  2016 – Dec 2018
Towing 26' Regulator
Captain and engineer on this private boat, owner use only. Trips to keys and Bahamas, Summers in Connecticut and New England.

Denison Yachts / Just Catamarans    Captain                        May 2016 – Present
Responsible for delivery of boats for clients, captain for surveys and offshore closings.
Vessel wash downs and maintenance.

M/Y Eloina (Private) Captain/Engineer     Dec 2013- Apr 2016
Build – Hatteras 100'
Towing 40' Intrepid

Responsible for vessel maintenance, deck crew, guest safety and watchkeeping.


M/Y Tivoli (Private/Charter)            Captain/ Engineer            Mar 2011-Oct2013
Build – Doggersbank 90'
Towing 32' Century
Dive Master
Private and Charters- 1 week plus
Location – Caribbean – USA East Coast
2 Crew and 8 Guests

Tradewinds Cruise Club         Captain/ Engineer            Oct 2008 -Mar 2011
                               Dive Master

Charter Company in Caribbean and Med

Captain on a 105 ft vessel doing all inclusive charters of one week duration from charter bases throughout the Caribbean, Greece & Turkey. Responsible for crew and eight guests.
On average we did 25 charters per year.

 Robertson & Caine                    Delivery Captain/ Engineer        Oct 1997-Sep 2008
Leopard Catamaran Factory

Responsible for providing crew and delivery of new vessels from factory in Cape Town to destinations
Worldwide. +/- 6 vessels per year. Private vessels to Ft. Lauderdale and Annapolis.
Charter vessels to Sunsail/ The Moorings bases worldwide

 Interests & Hobbies
Outdoor activities - Sailing, SCUBA diving, polo cross and sky diving
Reading – knowledge and pleasure
I often compete in the Antigua Classics Regatta.