```
0001
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MASSACHUSETTS
 3                      IN ADMIRALTY
 4
 5
 6   *****************************
 7   GREAT LAKES INSURANCE SE
 8         vs.                        4:20-cv-40020-DHH
 9   MARTIN ANDERSSON
10   *****************************
11
12
13
14        DEPOSITION BY ZOOM OF CRAIG SETZER, a witness
15   called on behalf of the Plaintiff, pursuant to the
16   Rules of Civil Procedure, before Karen D. Pomeroy,
17   Registered Diplomate Reporter and Notary Public in
18   and for the Commonwealth of Massachusetts, at 952
19   Tulip Circle, Weston, Florida, on Friday, March 25th,
20   2022, commencing at 8:59 a.m.
21
22
23
24
0002
 1   APPEARANCES:
 2   MICHAEL I. GOLDMAN, ESQUIRE
 3   Goldman & Hellman
 4   233 Harvard Street, Suite 211
 5   Brookline, Massachusetts 02446
 6   For the Plaintiff
 7
 8
 9   MICHELLE M. NIEMEYER, ESQUIRE
10   Michelle M. Niemeyer, PA
11   244 Biscayne Boulevard No. 3009
12   Miami, Florida 33132
13   For the Defendant
14
15
16
17
18
19
20
21
22
23
24
```

```
0003
   1                         INDEX
   2    DEPOSITION OF CRAIG SETZER                  PAGE
   3    Examination by Mr. Goldman                    4
   4    Examination by Ms. Niemeyer                  28
   5
   6
   7
   8
   9
  10
  11
  12
  13                        EXHIBITS
  14    Number                                      Page
  15    Exhibit 45   Curriculum Vitae of Craig Setzer   32
  16    Exhibit 46   Setzer Report of Expert Witness    32
  17    Exhibit 47   Weather Conditions 12/14-18/19    32
  18
  19
  20
  21
  22
  23
  24    Exhibits Attached
0004
   1                      STIPULATIONS
   2         It is stipulated by and between counsel for
   3    the respective parties that the deposition
   4    transcript is to be read and signed by the
   5    deponent under the pains and penalties of
   6    perjury; and that the sealing and filing thereof
   7    are waived; and that all objections, except as to
   8    form, and motions to strike are reserved until
   9    the time of trial.
  10                        * * *
  11                     CRAIG SETZER,
  12    having been duly remotely sworn by the
  13    reporter, was deposed and testified as
  14    follows:
  15                      EXAMINATION
  16    BY MR. GOLDMAN:
  17    Q.  Good morning, Mr. Setzer.  Would you please state
  18        your full name, date of birth, and residential
  19        address for the record.
  20    A.  It is Edwin Craig Setzer.  Date of birth is
  21        ███████████████      And I live at ███████
  22        ███████████ Weston 33327.
  23    Q.  Okay.  Well, my name is Michael Goldman.  I'm
  24        from the law firm of Goldman & Hellman, and I
```

```
0005
 1          represent Great Lakes Insurance in this matter
 2          and, as you know, we're here to take your
 3          deposition today.
 4               And as Michelle has heard me say several
 5          times now, I have a bit of a speech to give just
 6          to make sure we get everything right and to make
 7          sure that we get a good record.
 8               First, we have to obey certain courtesies.
 9               We have to work as hard as we can to speak
10          slowly and clearly and to wait patiently for
11          everyone to finish and then to speak in our own
12          turn.
13               Of course, this is even more vital in our
14          Zoom age.
15               I'll ask you to wait patiently until I'm done
16          phrasing my question, and I'll do my very best,
17          of course, to patiently wait for you to give your
18          full answer.
19               All your answers have to be verbal.  You
20          can't nod your head.  You can't say uh-huh.  You
21          can't shrug your shoulders.
22               Please don't guess.  If you know the answer,
23          say so.  And if you don't know the answer, just
24          say so.
0006
 1               Similarly, if you don't understand my
 2          question, please don't struggle with it.  Ask me
 3          to ask you a better question.  It doesn't help if
 4          we get -- if I ask lousy questions, we'll get
 5          lousy answers; and nobody needs that.
 6               If at any point you want to take a break,
 7          just ask.  It's not meant to be an endurance
 8          test.
 9               Is everybody's cell phone off?
10     A.   Yes.
11     Q.   Turning off my beeps.  Just a moment.
12          Mr. Setzer, what's your date of birth?
13     A.   October 25th, 1961.
14     Q.   Are you married?
15     A.   No.
16     Q.   Are you employed?
17     A.   Not presently.
18     Q.   Who was your last employer?  Or let me rephrase
19          that better.
20               When were you last employed?
21     A.   My last day of employment was February 1st of
22          2022.
23     Q.   Who was your employer?
24     A.   CBS Television Stations.
```

```
0007
 1   Q.   Why did you cease being employed there?
 2   A.   New management came in, and we didn't see eye to
 3        eye on hurricane coverage; and I decided it was
 4        time to protect my brand and also try some new
 5        things.
 6   Q.   Excellent.  Good luck to you in those.
 7   A.   Thank you.
 8   Q.   Have you ever been a plaintiff or a defendant
 9        before in any litigation?
10   A.   No.
11   Q.   Have you ever been convicted of a crime?
12   A.   No.
13   Q.   Have you ever pled guilty to a crime?
14   A.   No.
15   Q.   Have you ever pled no contest to a crime?
16   A.   No.
17   Q.   Are you a high school graduate?
18   A.   Yes.
19   Q.   Where did you graduate from?
20   A.   Parkway Central Senior High School in
21        Chesterfield, Missouri.
22   Q.   Do you have any post-high school education?
23   A.   I do.
24   Q.   What did you do immediately after?
0008
 1   A.   I went to the University of Oklahoma for three
 2        years pursuing a degree in meteorology.
 3   Q.   Did you get your degree in meteorology?
 4   A.   I did.
 5   Q.   Do you have any formal schooling after the
 6        University of Oklahoma?
 7   A.   I attended part time St. Louis University for two
 8        years and then after that, completed my degree at
 9        Metropolitan State College in Denver.
10   Q.   What degree did you get there in Denver?
11   A.   Bachelor of science degree in meteorology.
12   Q.   What degree did you get from the University of
13        Oklahoma?
14   A.   I didn't get a degree.  I was doing coursework at
15        the University of Oklahoma.
16   Q.   Do you have any degrees beyond a bachelor's
17        degree?
18   A.   No.
19   Q.   Let's turn to what we're going to mark as
20        Exhibit 45, which is your curriculum vitae.
21            Do you have that in front of you, sir?
22   A.   Yes, I do.
23   Q.   Who drafted this document?
24   A.   I did.
```

```
0009
 1   Q.  In the category of your curriculum vitae that
 2       lists professional experience, do any of the
 3       items on those lists involve working aboard a
 4       sailing vessel?
 5   A.  No.
 6   Q.  Does anything on that list involve even being
 7       present ever on a sailing vessel?
 8   A.  On that list, no.
 9   Q.  In any of those positions where it says
10       professional experience, did you ever perform any
11       evaluation on the handling characteristics or
12       capabilities of a sailing vessel?
13   A.  No.
14   Q.  Do you know if you were ever even aboard a
15       sailing vessel at any time between the present
16       day and the year 2000?
17   A.  Could you rephrase or be more specific on that
18       question.  You dropped that a little bit.
19   Q.  Between the present day and January 1st, 2000,
20       have you ever even been aboard a sailing vessel?
21   A.  Yes.
22   Q.  When was the last time?
23   A.  The last time was December of 2021.
24   Q.  What vessel were you aboard?
0010
 1   A.  I was aboard a 46-foot Beneteau.
 2   Q.  Were you captain, crew, or passenger on that
 3       vessel?
 4   A.  I was crew and helmsman and tactician.
 5   Q.  Where was the vessel located at that time?
 6   A.  Fort Lauderdale.
 7   Q.  What was the vessel doing?  Or why were you there
 8       with the vessel?
 9   A.  I was participating in a near-shore sailboat
10       race.
11   Q.  What was the distance of the race?
12   A.  Approximately ten miles.  However, to start the
13       race, ten miles was traveled to get to the
14       starting point.
15   Q.  And what was the name of the race?
16   A.  Hillsborough -- I'm not sure.  It was based out
17       of the Hillsborough Inlet Sailing Club.
18   Q.  How many people were aboard the vessel?
19   A.  Five.
20   Q.  And can you just remind me.  I know you already
21       said it, but can you tell me again what your
22       position was aboard the vessel.
23   A.  I was the helmsman, tactician, and crew.
24   Q.  What does the tactician aboard a sail vessel
```

```
0011
 1        do?
 2   A.   During a sailboat race, you have to choose
 3        courses or tactical maneuvers to position
 4        yourself better with respect to the other boats;
 5        so the tactician makes decisions on -- as to
 6        where the boat would go.
 7   Q.   What was the weather like that day that you were
 8        on that sailing boat?
 9   A.   It was mostly sunny.  The winds were light at the
10        start, and they became southeasterly averaging
11        about 10 knots.
12   Q.   On that day, was your vessel generally sailing
13        with the wind or against it?
14   A.   The vessel was sailing on different points of
15        sail; so for a time, the vessel was sailing
16        upwind; and then for a time, the vessel was
17        sailing downwind.
18   Q.   What was the vessel's maximum speed when it was
19        sailing upwind?
20   A.   Upwind, the maximum speed was 7 knots.
21   Q.   And what was its maximum speed when sailing
22        downwind?
23   A.   The downwind speed was approximately 10 knots.
24   Q.   Was the vessel ever sailing -- and you'll have to
0012
 1        forgive me, my only experience at sea is aboard
 2        an amphibious assault ship.  There was no sailing
 3        involved.
 4            Was the vessel ever sailing at an angle to
 5        the wind?  Neither upwind nor downwind.
 6   A.   Yes.
 7   Q.   And what was its maximum speed when sailing at an
 8        angle to the wind?
 9   A.   The point where it was sailing at an angle to the
10        wind was when it was rounding a mark; so it never
11        achieved an optimal speed because it was only on
12        that crosswind or off-wind point of sail for a
13        short time, but it was approximately 6 knots.
14   Q.   Just one moment.  And that was in -- did you say
15        December 2021 you were in that race?
16   A.   That's correct.
17   Q.   When were you on a sailing vessel before that?
18   A.   I believe the time before that was in August of
19        2021.
20   Q.   Why were you aboard a sailing vessel?
21   A.   It was another off-shore race or near-shore race.
22   Q.   Where was the race?
23   A.   Same area location approximately.
24            Hillsborough Inlet off of the Broward/Palm
```

```
0013
 1          Beach County Line.
 2     Q.   What was the distance of the race?
 3     A.   Approximately ten miles.
 4     Q.   What kind of vessel were you on board?
 5     A.   I was on a 46-foot Beneteau.
 6     Q.   And what was your role on the vessel?
 7     A.   I was tactician and crew.  I did not do any helm
 8          work.
 9     Q.   I should have asked this question before, so I'll
10          ask with respect to both incidents, what did you
11          do as crew aboard the vessel, for both?
12     A.   For crew, it was basically sail trim.
13     Q.   That's in both cases?
14     A.   Yes.
15     Q.   When was the last time you were on a sailboat
16          before that?
17     A.   I believe it was July of 2021.
18     Q.   How many times did -- that year were you on board
19          a sailboat?
20     A.   Probably a total of four, because the sailing
21          last year with the pandemic was somewhat
22          limited.
23     Q.   On any of those times in 2021, did you sail a
24          vessel single-handed?
0014
 1     A.   When you say single-handed, you mean that I was
 2          the sole occupant aboard the vessel?
 3     Q.   Yes, that is what I mean.  Thank you for
 4          clarifying.
 5     A.   No.
 6     Q.   On any of those times that you were on a sailing
 7          vessel in 2021, did you ever sail with only you
 8          and one other person aboard?
 9     A.   No.
10     Q.   On any of those times that you were on a sailing
11          vessel in 2021, did you ever sail beyond the
12          sight of land?
13     A.   No.
14     Q.   When was the last time you were on a sailing
15          vessel and sailed beyond the sight of land?
16     A.   It was probably 2012 when I did a
17          Miami-to-Nassau, Bahamas, race.
18     Q.   What kind of vessel were you on?
19     A.   I was on a 58-foot Beneteau.
20     Q.   How many people were on board the vessel with
21          you?
22     A.   There was a total of eight.
23     Q.   And what was your job on the vessel?
24     A.   I was helmsman and crew.
```

```
0015
 1   Q.   What were your responsibilities as helmsman?
 2   A.   Maintaining a proper course for the boat; a
 3        proper heading as it would be called; asking for
 4        any sail trim -- in other words, adjustment of
 5        the sail to maintain the efficiency of the
 6        boat -- and to properly steer the boat to keep it
 7        in an optimal course, let's say.
 8   Q.   And what was your job as -- serving as crew?
 9   A.   I did some sail trim and -- and I think that was
10        about it.  Sail trim.
11             MR. GOLDMAN:  Let me pause for just one
12        moment.
13             (Pause in the proceedings.)
14   BY MR. GOLDMAN:
15   Q.   Turning to the second page of your resumé,
16        looking at the section that says Litigation
17        Expert Witness Experience, in any one of the
18        cases listed there, did you give an opinion about
19        the handling characteristics or capabilities of a
20        sailing vessel?
21   A.   No.
22   Q.   Did you give an opinion about the effects of
23        weather on the handling characteristics or
24        capabilities of a sailing vessel?
0016
 1   A.   No.
 2   Q.   Looking below that at Licenses, Endorsements,
 3        Qualifications, and Certifications, can you
 4        describe for me what instruction you received as
 5        part of the US Coast Guard OUPV Captain's license
 6        course.
 7   A.   That was the Coast Guard -- the US
 8        Coast Guard-approved class taught by a school
 9        called Sea School in Fort Lauderdale, and it met
10        the basic requirements to get a -- what's
11        commonly known as a 6-pack license.
12   Q.   What is a 6-pack license?
13   A.   Where you can take a vessel for hire but have no
14        more than six passengers.
15   Q.   Did you receive any sort of diploma or
16        certification for completing the course?
17   A.   I received a diploma; I passed the course.
18   Q.   Is that the sort of thing -- let me give some
19        background so you'll understand my question.
20             As a lawyer, I have to take continuing legal
21        education courses every year or every two years.
22        Is there anything like that that you have to do
23        to maintain that license?
24   A.   For the Coast Guard license, you have -- it's not
```

```
0017
 1          current.
 2              So you have to certify every few years -- I'm
 3          not aware of the time frame -- your sea time; log
 4          your hours at sea.
 5     Q.   Is your captain's license current?
 6     A.   No.
 7     Q.   When did it expire?
 8     A.   I never completed the captain's portion of it.  I
 9          completed the course.  I didn't go and get the
10          license.
11              That's why it says it was a license course
12          completion.  There was no license conferred.
13     Q.   Am I correct then that with respect to the next
14          two items, the auxiliary sail endorsement course
15          and the auxiliary towing endorsement course, you
16          completed the course but didn't receive the
17          certification?
18     A.   I didn't receive the license with that.
19     Q.   So do you have any current licenses with respect
20          to those three items on your resumé?
21     A.   I do not.
22     Q.   Do you have a current private pilot's license
23          from the FAA?
24     A.   I do.
0018
 1     Q.   When was it last renewed?
 2     A.   January of 2022.
 3     Q.   What did you have to do to renew it?
 4     A.   Fly with a certified flight instructor, get
 5          checked out, and also make my medical -- complete
 6          the medical side of the provision of the license.
 7     Q.   Is your FAA license for unmanned aircraft systems
 8          current?
 9     A.   Yes.
10     Q.   Can you describe for me what sort of unmanned
11          aircraft systems?
12     A.   Basically just a small drone.
13     Q.   What did you have to do to become licensed for
14          small drones?
15     A.   So you have to complete a provision under the FAA
16          called Part 107, which is the rules and
17          regulations for drone operation.
18              By being licensed to operate a drone as
19          opposed to being a recreational flier, you can
20          fly a drone for hire or for compensation.
21     Q.   All right.
22     A.   And if I could make one correction for the
23          record, if you don't mind.
24     Q.   Please do.
```

```
0019
 1   A.   I may have said the FAA single pilot license was
 2        '22.  It was January of 2021.  It was last year.
 3   Q.   Do they have to be renewed annually?
 4   A.   It's every two years.  It's biannually.
 5   Q.   Thank you for clearing that up.  Appreciate it.
 6             At any time in your sailing career, have you
 7        ever sailed on a three-day voyage?
 8   A.   Yes.
 9   Q.   When was the last time you did?
10   A.   Probably in 2002.
11   Q.   Were you the navigator aboard that vessel?
12   A.   Yes.
13   Q.   Where did you sail from?
14   A.   From Port of Miami to Grand Bahama and then to
15        the Abacos.
16   Q.   What was the total length of the voyage?
17   A.   The initial leg of the voyage was probably 100
18        miles.  The subsequent legs were within sight of
19        land, and they were less than a hundred miles.
20   Q.   How long did it take you to traverse that first
21        leg?
22   A.   Took approximately 12 hours.
23   Q.   What kind of vessel was that?
24   A.   It was a 35-foot Beneteau.
0020
 1   Q.   What were your responsibilities aboard the vessel
 2        as the navigator?
 3   A.   I was the ship's owner; so I was responsible for
 4        all of the responsibilities to captain, in this
 5        case, or skipper.  I was responsible for
 6        navigation and handling of the vessel.
 7   Q.   Did you have any paper charts aboard the
 8        vessel?
 9   A.   I did.
10   Q.   Did you have a GPS aboard the vessel?
11   A.   I did.
12   Q.   Before you left, did you make sure that your --
13        the maps in your GPS were up to date?
14   A.   Because I would do usually an annual update just
15        so that I knew it was updated, it was probably
16        updated in the Spring; and the voyage was during
17        the month of July.
18   Q.   Have you ever sailed on a voyage that long
19        single-handed?
20   A.   I have not.
21   Q.   Have you ever been deposed in any case that
22        wasn't listed on your resumé?
23   A.   I have not.
24   Q.   Let me ask it again just to make sure I'm a
```

```
0021
 1         hundred percent sure.
 2             Have you ever been deposed in any case, not
 3         just those where you were testifying as an
 4         expert, but even in cases where you yourself were
 5         a party or just a witness?
 6    A.   Like as in a family law matter?
 7    Q.   For instance.  Not restricted to that, but as an
 8         example, yes.
 9    A.   I have been deposed in a family law matter.
10    Q.   Can you tell me what that matter was?
11    A.   It was a divorce.
12    Q.   And I'm guessing yours?
13    A.   Yes.
14    Q.   I'm sorry about that.  How long ago were you
15         divorced?
16    A.   Eleven years ago.
17    Q.   I shouldn't have said I'm sorry.  It's none of my
18         business.  Who knows.  Excuse me.  I apologize
19         for that.
20    A.   Not necessary.
21    Q.   Before you drafted your conclusions for
22         Mr. Andersson in this matter, did you do any
23         research to determine the speed and direction of
24         the current during Mr. Andersson's voyage?
0022
 1    A.   I did not.
 2    Q.   All right.  Let's turn to the next exhibit, which
 3         we're going to mark as 46; and it is the one that
 4         says Report of Expert Witness Craig Setzer.
 5             Do you have it before you?
 6    A.   I do.
 7    Q.   Have you seen this document before today?
 8    A.   I have.
 9    Q.   Can you tell me what it is.
10    A.   It is the report that meets the Federal Rules of
11         Civil Procedure 26(a)(2)(B) which I believe is
12         required disclosures in a federal matter.
13             I'm not a lawyer; so I may not be saying that
14         correctly.
15    Q.   Do you know what the Melody's top speed was?
16    A.   I'm sorry.  Could you ask that again, please.
17    Q.   Do you know what the Melody's top speed was?
18    A.   I do not.
19    Q.   Do you know what point of sail was Melody's
20         theoretically fastest point of sail?
21    A.   I do not.
22    Q.   Do you know what the Melody's average speed was
23         during its trip from Aruba to the
24         Dominican Republic?
```

```
0023
 1   A.  I do not.
 2   Q.  Do you know what time the Melody departed Aruba
 3       on December 14?
 4   A.  So am I confined to just addressing everything
 5       with respect to this question on Exhibit 46?
 6   Q.  Let's enter your report as an exhibit, and you
 7       can refer to that to refresh your recollection
 8       because we're going to go through that as well.
 9           So let's turn to this document that says
10       Eastern Caribbean Marine Weather Conditions and
11       mark it as Exhibit 47.
12           Have you ever seen that document before
13       today?
14   A.  I have.
15   Q.  Can you tell me what it is?
16   A.  It is my report on the sailing conditions, the
17       weather conditions, and the sail course
18       provisions of the case that I'm working on.
19   Q.  Did you draft this report?
20   A.  I did.
21   Q.  You can use this report to refresh your
22       recollection if you'd like, but can you tell me,
23       do you remember what time did Melody depart Aruba
24       on December 14th?
0024
 1   A.  It was in the evening of December 14th.
 2   Q.  Between midnight on the 14th -- excuse me,
 3       between the time it departed on midnight on the
 4       14th, do you know what the Melody's maximum speed
 5       was?
 6   A.  I do not.
 7   Q.  Do you know what its minimum speed was?
 8   A.  I do not.
 9   Q.  Do you know its average speed over that time?
10   A.  I do not.
11   Q.  Between midnight on the 14th and 5:00 a.m. on the
12       15th, do you know what Melody's maximum speed
13       was?
14   A.  I do not.
15   Q.  Do you know what its minimum speed was?
16   A.  I do not.
17   Q.  Do you know what its average speed was?
18   A.  No.
19   Q.  Going back to the first period of time, there's
20       one more thing I want to ask.
21           Between departing Aruba and midnight on the
22       14th, do you know how many miles the Melody
23       traveled?
24   A.  I'm sorry.  Ask that again, please.
```

```
0025
 1   Q.  Going back to the first period of time, from the
 2       departure on the 14th until midnight on the 14th,
 3       do you know how many miles the Melody sailed?
 4   A.  I do not.
 5   Q.  Between midnight on the 14th and 6:00 a.m. on the
 6       16th [sic], do you know how many miles Melody
 7       sailed?
 8   A.  I do not.
 9   Q.  Between 6:00 a.m. on the 15th and noon on the
10       15th, do you know what Melody's maximum speed
11       was?
12   A.  No.
13   Q.  Do you know what Melody's minimum speed was?
14   A.  No.
15   Q.  Do you know what Melody's average speed was?
16   A.  No.
17   Q.  Do you know how many miles Melody traveled in
18       that time period?
19   A.  No.
20   Q.  Between noon on the 15th and 6:00 p.m. on the
21       15th, do you know what Melody's maximum speed
22       was?
23   A.  No.
24   Q.  Do you know what Melody's minimum speed was?
0026
 1   A.  No.
 2   Q.  Do you know what Melody's average speed was?
 3   A.  I do not.
 4   Q.  Do you know how many miles Melody traveled in
 5       that time period?
 6   A.  I do not know.
 7   Q.  Is there any period of time during the voyage
 8       until its termination in the Dominican Republic
 9       that you can tell me Melody's maximum speed?
10   A.  No.
11   Q.  Is there any period of time during that voyage
12       that you can tell me Melody's minimum speed?
13   A.  No.
14   Q.  Is there any period of time during that voyage
15       that you can tell me Melody's average speed?
16   A.  No.
17   Q.  Is there any period of time on that voyage that
18       you can tell me how many miles Melody traveled?
19   A.  No.
20   Q.  What time did Melody run aground in the
21       Dominican Republic?
22   A.  During the evening of the 17th.
23   Q.  On a voyage from Aruba to the Dominican Republic,
24       how many miles would a vessel have to travel to
```

```
0027
 1          keep within the navigational limits permitted by
 2          Mr. Andersson's policy?
 3     A.   Approximately 610.
 4     Q.   Based on your expert knowledge and opinion, is
 5          there any reason that Mr. Andersson's vessel
 6          could not have sailed back to Aruba?
 7     A.   I am unaware of any reason.
 8     Q.   Based on your expert knowledge and opinion, is
 9          there any reason that Mr. Andersson's vessel
10          could not have sailed to Curacao?
11     A.   Based on the angle of the wind, it would have
12          been a more difficult point of sail.
13     Q.   Would it have been possible?
14     A.   Yes.
15     Q.   Based on your expert knowledge and opinion, is
16          there any reason that Mr. Andersson's vessel
17          could not have sailed to Bonaire?
18     A.   Again, it would have been a more difficult point
19          of sail.
20     Q.   Would it have been possible?
21     A.   Yes.
22              MR. GOLDMAN:  Michelle, if you don't mind,
23          I'm going to take five minutes, use the head,
24          look over my notes, and then we will continue.
0028
 1              Everyone okay with a break?
 2              MS. NIEMEYER:  Yes, that's fine.
 3     (Recess was taken from 9:31 a.m. until 9:37 a.m.)
 4     BY MR. GOLDMAN:
 5     Q.   Are you aware of any facts on the record
 6          indicating that Mr. Andersson's vessel ever
 7          reached a speed of 8.3 knots?
 8     A.   No.
 9              MR. GOLDMAN:  That's all I have for today.
10          This deposition is done.
11              Michelle.
12              MS. NIEMEYER:  Okay.  I have some follow-up
13          questions.
14                     FURTHER EXAMINATION
15     BY MS. NIEMEYER:
16     Q.   Hold on.  And so I will not forget, I'm going to
17          ask the follow-up right now to the last question,
18          which is are you aware of any evidence that the
19          vessel did not reach or exceed a speed of 8.3
20          knots?
21     A.   No.
22     Q.   Okay.  I'm going to go back to there were some
23          questions about your Coast Guard license courses
24          and whether you obtained the Coast Guard license.
```

```
0029
 1            Is there any reason to obtain a Coast Guard
 2       license if you have no intention to use your
 3       business -- your boat for business purposes to
 4       take passengers for hire?
 5   A.  No.  I took the Coast Guard class just to better
 6       my knowledge of navigation, boat -- boating
 7       environments; just to -- just to increase my
 8       awareness of the necessities of being a boater.
 9   Q.  Okay.  So -- so it was a -- an extra level of
10       knowledge that you obtained in your sailing
11       skills; correct?
12   A.  That's correct.
13   Q.  And I want to ask, because it wasn't asked, about
14       your sailing skills.
15            Do you -- you talked a little bit about the
16       races you had sailed particularly in this recent
17       time which has been limited by the COVID
18       epidemic.
19            How many years have you been sailing on
20       offshore sailboat races?
21   A.  So the first crew offshore, which would be a
22       passage where you go from one point out of the
23       sight of land to another point, began in 2001
24       when I would take the vessel into international
0030
 1       waters from -- my vessel from Miami to Bimini;
 2       but I did sailboat racing starting in 1996 in the
 3       Tampa Bay area.
 4   Q.  And were you regular crew on sailboats?
 5   A.  I was, and I felt that the best way to learn
 6       the -- how to better handle a sailboat was to
 7       race it, because then you could optimize the
 8       performance; you learned about many different
 9       conditions because, as opposed to some sailors,
10       you go no matter what the weather if there's a
11       race, and so you learn in varying conditions.
12   Q.  Had you done offshore races where -- where the
13       vessel was taking long passages with people
14       sleeping; that kind of thing?
15   A.  Yes.
16   Q.  And how many races like that would you say you've
17       done?
18   A.  I've probably done a half a dozen.
19   Q.  Okay.  And have you ever done a -- a delivery or
20       some kind of passage like that that doesn't have
21       the full contingent of crew a racing sailboat
22       would have?
23   A.  Yes.
24   Q.  When have you done those?
```

```
0031
 1   A.   I've done some deliveries from Key West back to
 2        Miami and just a return voyage from the Bahamas
 3        to Miami.
 4   Q.   Okay.  And what's your understanding about the --
 5        the minimum number of sailors necessary on a boat
 6        to toggle offshore?
 7   A.   I don't have a -- an understanding.  I don't know
 8        that there is a set rule or anything that I'm
 9        aware of.
10            The previous owner to my boat single-handed
11        the boat throughout much of the Caribbean.
12   Q.   Okay.  Now, you were asked some questions about
13        whether you had knowledge of the specific speed
14        the vessel was going, an average speed the vessel
15        was going, et cetera, during specific time
16        frames; and did you review the deposition of
17        Mr. Andersson, the plaintiff in this case?
18   A.   I did.
19   Q.   Okay.  And you understand he was asked those
20        kinds of questions.
21            In your experience with -- as a sailor, would
22        you know the answers to those questions?
23   A.   I don't think I would know the answer with the
24        granularity to which the questions were being
0032
 1        asked.
 2            I would have an approximation of the boat's
 3        characteristics and its approximate speeds at
 4        different points of sail given different
 5        conditions.
 6   Q.   Okay.  And you gave an estimate -- or you gave an
 7        opinion that you believed that it's possible that
 8        the vessel, in this case the 47-foot Catana
 9        catamaran, could have sailed in compliance with
10        the navigational limits that are in the insurance
11        policy; correct?
12   A.   That's correct.
13   Q.   Does your opinion give your best estimate based
14        on the conditions, the characteristics of the
15        boat, and the testimony that you were able to
16        review?
17   A.   Yes.
18            MS. NIEMEYER:  Okay.  I have no further
19        questions.
20            MR. GOLDMAN:  That was great.  Let's call it
21        a day.
22            (Setzer Exhibits Nos. 45-47 were marked for
23        identification.)
24   (Conclusion of proceedings at 9:43 a.m. this date.)
```

```
0033
 1                       CERTIFICATE
 2       I, Karen D. Pomeroy, a Registered Diplomate
 3   Reporter and Notary Public in and for the
 4   Commonwealth of Massachusetts, do hereby certify that
 5   Craig Setzer, the witness whose deposition is
 6   hereinbefore set forth, was duly sworn by me and that
 7   such deposition is a true and accurate record, to the
 8   best of my knowledge, skills and ability, of the
 9   testimony given by such witness.
10       I further certify that I am not related to any of
11   the parties in this matter by blood or marriage and
12   that I am in no way interested in the outcome of this
13   matter.
14       IN WITNESS WHEREOF, I have hereunto set my hand
15   and affixed my seal of office this 30th day of March,
16   2022.
17
18
19                          _____
                                     Notary Public
20
21   My Commission expires:
     June 13, 2025
22
23
24
0034
 1                       ERRATA SHEET
 2       CHANGES TO THE DEPOSITION OF CRAIG SETZER
 3   INSTRUCTIONS TO WITNESS:  1) Please note any desired
     corrections to your testimony by page and line
 4   number.  2) Enter text as it appears in the
     transcript.  3) Enter text as it should appear.
 5
 6   PAGE    LINE                CORRECTION
 7   ____    ____   _____
 8   ____    ____   _____
 9   ____    ____   _____
10   ____    ____   _____
11   ____    ____   _____
12   ____    ____   _____
13   ____    ____   _____
14   ____    ____   _____
15   ____    ____   _____
16   ____    ____   _____
17       I, Craig Setzer, do hereby certify that I have
18   read the foregoing transcript of my testimony, and I
19   further certify that said transcript is a true and
20   accurate record of said testimony.
```

21       Dated at _____, this ____ day
22    of _____, 20____.
23
                         _____
24                              Craig Setzer