UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
IN ADMIRALTY

GREAT LAKES INSURANCE SE,

    Plaintiff,

CASE NO. 4:20-cv-40020-DHH

vs.

MARTIN ANDERSSON,

    Defendant.
_____/

## OPPOSITION TO GLI'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant MARTIN ANDERSSON (hereinafter "ANDERSSON"), by and through his undersigned counsel and pursuant to F.R.C.P. 56 and Local Rule 56.1 of the United States District Court for the District of Massachusetts and files this, his Opposition to GLI's Motion for Summary Judgment. Further thereto, Andersson respectfully states:

**I.**     **Response to GLI's Statement of Undisputed Facts – Material Issues of Fact Abound**

Andersson does not dispute there was a request for a quote sent by his insurance broker to Great Lakes Insurance SE (hereinafter "GLI") or that an application was submitted on his behalf. It should be noted, however, that most of the application was completed by the broker based on a conversation with Andersson about his intended long-term use of the vessel. See Andersson Deposition attached as Ex. 1 at 11/1-12/9 and Andersson Affidavit attached as Ex. 2, para. 7-9.[1] In the application, it states the waters to be navigated during the policy period are "FL Bah & Carib." See DE 98-2. This was completed by Andersson's broker. Andersson did not intend to travel to most of those areas during the first year he owned the boat. His intention was to perform

---

[1] The copy of the application attached as DE 98-2 does not have the same bates numbers as the version that was authenticated by Mr. Andersson in his deposition, but it does not appear to differ from the document marked as Exhibit 29 that is referenced in Andersson's deposition. See Ex. 1 at 8/16-9/2.

1

maintenance and improvements on the boat in a boatyard in Grenada, where it was delivered to him when the sale of the vessel closed, to sail to Aruba and stay in Aruba through at least the end of hurricane season (November 1), and then to sail from Aruba to Sint Maarten, where he would leave the boat and go home for the holidays. Ex. 2 at para. 4-5. The broad coverage sought for the vessel was based upon Andersson's long-term goals for the use of the vessel and to include any areas where he potentially could use the boat during the year. Andersson is not a native English speaker. He was born and raised in Sweden and came to the United States at 49 years old. Ex. 2 at para. 54. Mr. Andersson reviewed the application and understood it to be true and accurate. See Ex. 2 at para. 8 and at para. 54.[2]

Andersson does not dispute the policy language quotations included in GLI's Statement of Material facts except to point out that the entire policy must be considered, not just the quotes selected by GLI. The policy in its entirety is attached hereto as Ex. 13.

GLI states the vessel "departed Aruba bound for St. Maarten." Andersson agrees that Sint Maarten was his ultimate destination but not to any implication that he intended to sail on a direct course to Sint Maarten. GLI states, "On December 17, 2019, the Vessel ran aground on the breakwater *in the harbor* of Boca Chica …." Andersson disputes that the vessel went aground "in the harbor." The cited document does not say that. Andersson was awaiting assistance from the marina to guide him into the harbor when the vessel went aground. See 98-5, Ex. 2 at para. 43-44. GLI states that Andersson testified he had on board paper charts for the Leeward Islands, the Windward Islands and Aruba. Andersson also testified he had a paper chart for the ABC Islands (Aruba, Bonaire and Curacao). See Ex. 1 at 22. Later, Andersson recalled also having an overview chart of the Eastern Caribbean, which does include the Dominican Republic but not in detail. See

---

[2] Ironically, had the policy been limited to the areas Andersson planned to sail during the first year, it would probably have resulted in a lower premium. See e.g. Usher deposition, Ex. 3 at 50/18 – 51/23.

2

Ex. 1 at para. 11. GLI states the vessel had on board two functioning GPS chart plotter devices, a Garmin and a Raymarine. There was a third Furuno GPS device on board which did not have a working display. See Cooley deposition attached as Ex. 4 at 22/1-19. It is not clear what charts were in the Raymarine. See *infra.* Andersson testified he had charts for the entire Caribbean. Ex. 1 at 24/4-17. Andersson testified he primarily used the Garmin GPS for navigation, as it was in the cockpit convenient to the helm. Ex. 1 at 24/1-11.

At DE-98 p. 4, GLI references Ball's December 23 report and states that he "reported on Andersson's verbal account of the grounding" and "there were no paper charts on board." Ball's report included a statement that was signed by Andersson, for whom English is not his first language, under a time constraint and while under significant duress. There were numerous aspects of the statement that, in hindsight, Andersson realized could be understood differently than he understood them, as well as outright errors such as the incorrect date of the incident, which he failed to notice. See Ex. 2 at para. 51-55. See also Ex. 8 at 85/6-87/18. With regard to the paper charts, it is true there was no detailed paper chart on board for Boca Chica, Dominican Republic, but it is not true there were no paper charts on board up to the time of the grounding. Ball admitted in his deposition that his reference in the report was to whether there were paper charts for Boca Chica and acknowledged there were paper charts for the areas where Andersson intended to sail. Ex. 5 at 250/9-19.

As for the claim the report was on Andersson's verbal account of the grounding, it is a fairer characterization that the report selectively reported Andersson's statements while injecting suppositions made by Mr. Ball without having asked the relevant questions. See Ex. 2 at para. 55; Ex. 6 at 328/8-21; Although GLI's corporate representative testified it would be normal to find a transcript of a recorded statement in the file, he did not see one from Mr. Ball in the file. Ex. 3 at

105/1 to 106/2. Ultimately, Mr. Ball admitted in his deposition that he had handwritten notes which had not been produced in discovery. Ball deposition taken June 2, 2021 attached as Ex. 5, at 56/23-57/10. Those notes were subsequently produced and were the subject of a second deposition. See Ball deposition taken June 29, 2021 and attached as Ex. 6 at 319/19-321/11 and its Exhibit 30, attached hereto as Ex. 7. Due to Mr. Ball's challenging handwriting, he was asked to read the notes into the record. See Ex. 6 at 322/8-325/20. They differed in ways that, from a linguistic point of view were subtle, but that when viewed in the context of the insurance coverage issues now raised by GLI in this action, were highly significant. See Ex. 2 at para. 55.

With regard to the electronic charts, GLI indicates "the breakwater was not shown on the electronic charts onboard." This part of Ball's report came from Andersson's response that he didn't see the breakwater on the chart he was using at the helm, the Garmin GPS chartplotter. Ex. 5 at 249/8-24. Mr. Ball testified he never checked to see if there was a chart chip in the Garmin GPS. *Id.* In fact, he never saw the Garmin unit and didn't know where on the boat it was located. See Ex. 5 at 251/17 – 252/4. Mr. Ball testified that while inspecting the vessel he saw the Raymarine GPS Chartplotter, which was located in the navigation station in the cabin of the boat. Ex. 5 at 162/16-163/14. It is unclear whether the Raymarine unit had a chart chip at the time of the grounding or what that chip contained, but in a more general sense, Mr. Andersson testified that he had charts for the entire Caribbean. Ex. 1 at 24/2-17. By deduction, the electronic chart containing the entire Caribbean Sea must have been in the Raymarine. The Garmin chip was inspected by Andersson's expert and covered the Eastern Caribbean, which included the Dominican Republic. Ex. 4 at 24/8-13. In his handwritten notes taken in the ordinary course of business, Ball recorded, "Elec charts provided," which in his deposition he read as "electronic charts provided." Ex. 6 at 324/9 and Ex. 7. Ball's note about receiving the electronic charts was

not included in the statement he asked Andersson to sign that was part of his report to GLI. See DE 98-7 at pp. 2-3. When the GPS units were located and delivered to Andersson's marine electronics expert for inspection, the Raymarine unit had no chart chip inside, consistent with Ball's having taken the electronic chart chip. Ex. 4 at 27/21 – 28/2. Did Mr. Ball take the chart chip and lose it or forget he had it? This factual inconsistency about the Raymarine chart chip is a material issue of fact that must be considered by the Court.

Furthermore, expert testimony indicates the chart chip in the Garmin did show the breakwater, but not in a way that Andersson recognized as a sign of danger. In the Garmin chart chip, there is an area depicted between two islands that does not show any depth information where the breakwater (which has also been described as a shallow coral reef) is located. Mike Cooley, whose expertise is in marine electronics and not navigation, looked at the chart chip and expressed in his testimony he thought the chart it contained for Boca Chica should have shown something like the yellow color of the nearby islands if the breakwater extended out of the water. See Ex. 4 at 26/16 – 27/15.  According to expert witness Otto Geiger, a professional yacht Captain with significant experience navigating in the Caribbean, "Mr. Andersson's Garmin GPS chart shows the shallow reef as an absence of depth information but does not shade it in green like the newer charts. Neither version noticeably warns of a navigational hazard, of a reef, or other danger." See Geiger deposition attached as Ex. 9 at 15/6-13; Geiger report attached as Ex. 10 at para. 16.

When the box containing the Garmin GPS chart plotter was opened at Langer Krell Marine Electronics, the chart plotter was discovered to be broken open destroyed by saltwater corrosion. It could not be turned on and none of the data on its hard drive could be accessed. See Ex. 5 at

31/20-32/15.[3] This is especially problematic because GLI states as an undisputed fact that the chart contained in the Garmin unit was from 2015. This may be untrue and can't be proven. It is true that the chart chip taken from the damaged Garmin GPS was from 2015, but the charts can be and commonly are updated by recreational sailors. See Ex. 9 at 36/23-38/21; Deposition of Craig Setzer attached as Ex. 12 at 20/1-17; Ex. 5 at 167/16-168/14. Mr. Andersson purchased the vessel in December of 2018 three years after the issue date of the chip. Mr. Andersson testified he did not know if the charts were updated. Ex. 1 at 24/12-19. The prior owner could have updated the charts. GLI could have sought that information from the prior owner but did not, and discovery is closed. Since any updates to the Garmin chart would have resided on the hard drive, it is no longer possible to see whether the Garmin chart was updated or what would have been on the updated chart if it had been updated. See Ex. 9 at 38/5-21.

## II. <u>LEGAL ARGUMENT</u>

In simple terms, GLI's argument can be distilled into one premise: if the vessel was "unseaworthy" at any time from the inception of the policy until the grounding, there is no coverage. GLI bases this argument on both policy language and federal admiralty law. The burden is on GLI to prove the warranty applies to avoid coverage. *American Home Assur. Co. v. Merck Co., Inc.*, 462 F. Supp. 2d 435, 442 (S.D.N.Y. 2006) ("the insurer bears the burden of proving the applicability of any exclusions or limitations on coverage, since disclaiming coverage on the basis of an exclusion is an affirmative defense."); *Bamundo, Zwal & Schermerhorn, LLP v. Sentinel Ins. Co.*, No. 13-cv-6672 (RJS), at *6-7 (S.D.N.Y. Mar. 26, 2015). The policy states: "It is warranted

---

[3] GLI's failure to protect and preserve the Garmin GPS after leading Andersson to believe it had been taken as part of the investigation is the subject of Count II of Andersson's Counterclaim. Andersson has not sought summary judgment on that equitable estoppel account.

that the Scheduled Vessel is seaworthy at all times during the duration of this insuring agreement. Breach of this warranty will void this insuring agreement from its inception." [Ex. 13 at 13]. "Seaworthy" is defined as:

> **fit for the Scheduled Vessel's intended purpose**. Seaworthiness applies not only to the physical condition of the hull, but to all its **parts, equipment and gear** and includes the responsibility of assigning an adequate crew. For the Scheduled Vessel to be seaworthy, it and its crew must be **reasonably proper and suitable** for its intended use.

[Ex. 13 at 4, emphasis added]. The terms "parts, equipment and gear" are not defined by the policy. Interestingly and importantly to this matter, the policy provision injects a requirement of reasonableness.

In addition to this contractual warranty, GLI raises two types of warranties of seaworthiness under federal admiralty law. GLI refers to them as the "first warranty" and the "second warranty" of seaworthiness. To avoid confusion, this memorandum shall do the same. The first warranty requires that the vessel be seaworthy (fit for its intended purpose) at the inception of an insurance policy. The second warranty requires the shipowner to assure that the vessel is seaworthy for any given voyage at the time when it leaves port. See *McAdam v. State Nat. Ins. Co., Inc.,* 28 F.Supp.3d 1110 (S.D. Cal. 2014)(Denying summary judgment due to factual question regarding seaworthiness).

The first warranty does not require knowledge on the part of the shipowner and, contrary to GLI's arguments, does not appear from the caselaw to apply to charts. Although GLI has cited several decisions finding that a vessel failing to have updated charts on board was unseaworthy, the vast majority of the seaworthiness cases cited by GLI either were not decided in an insurance context or they were not considering the question of seaworthiness beyond a specific voyage. In most of those cases, the ship owner was seeking to avoid liability under federal admiralty statutes

7

to limit liability to the value of the vessel or otherwise escape responsibility for the harm caused by the ship, and a condition to receiving those statutory, or at times contractual, protections was proving the ship was seaworthy during the voyage. See, e.g. *Employers Ins. of Wausau v. Occidental Petroleum Corp.,* 978 F.2d 1422 (5th Cir. 1992)(subrogation action seeking to recover funds paid to policyholder after tug improperly coupled with barge sank, and addressing the two warranties of seaworthiness); *McAdam v. State Nat. Ins. Co., Inc.,* 28 F.Supp.3d 1110, 1122 (S.D. Cal. 2014)(considering warranties of seaworthiness where vessel's rudder snapped off); *Axis Reinsurance Co. v. Resmondo,* Case No. 08-cv-569 (M.D. Fla. Jun. 1, 2009)(denying summary judgment where there was a factual issue as to whether a gimbal ring that caused the sinking was broken before or after the policy became effective); *Royal Indem. Co. v. Deep Sea Intern.,* 619 F.Supp.2d 14, 26 (S.D.N.Y. 2007)(denying summary judgment in case where vessel sank in deep water due to leaking through the hull); *The Connecticut Indemnity Co. v. Palovida*, Case No. 04-cv-1044 (M.D. Fla. Jul. 25, 2005)(warranty of seaworthiness applied in situation where crew was incapable of operating a paddlewheel boat and it sank in deep water in the Gulf of Mexico); *Certain* Underwriters *at Lloyd's, London Subscribing to Policy 200-451-8464 v. Johnston*, 124 F.Supp.2d 763 (D.P.R. 1999)(Vessel flooded in a hurricane and fraud was discovered in the application process to cover up deficiencies in the vessel's condition); *Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F.Supp.1046 (S.D.N.Y. 1997)(Cargo ship sank due to structural problems caused by corrosion). None of the cases cited by GLI regarding the first warranty of seaworthiness in an insurance context involved a lack of updated charts at the inception of the policy.

GLI's argument regarding the first warranty appears to be that there should have been updated charts on board Melody at the policy's inception for every location the application stated

the vessel might travel. This is, in the language of the policy, not reasonable. The reasonable application of this warranty would be to look at the condition of the vessel at the inception of the policy and consider whether it is fit for its intended use. In this case, the boat was a 47' catamaran intended for island cruising and some extended sailing in that context. Was the hull sound? Did the engines work? Was the rigging secure? Were there any issues that needed to be addressed before the boat could safely sail? In short, is the boat safe, not leaking, with appropriate propulsion and steering, and crewed by a competent Master? In the words of Captain Geiger, "… the vessel proved its seaworthiness by making it through very rough conditions to the Dominican Republic, where it was swept by a wave onto a reef in Boca Chica, Dominican Republic. That incident was caused by the conditions at the time, not the vessel or its crew." Ex. 10 at para. 1.

If the Court were to accept GLI's argument, any boater who gets insurance would have to have detailed charts for the entire scope of their coverage, whether or not they travel there. For example, if the policy said, "East Coast of the United States," the vessel would be required to have updated charts for every harbor and island and shoreline along the east coast, even if the owner intended only to sail in and around Boston Harbor or had a dream of traveling the intercoastal waterway but no real plan yet. None of the cases cited by GLI impose this hyper-extensive requirement upon the first warranty, and nothing in GLI's argument raises a reasonable basis for voiding coverage under this absolute warranty.

GLI argues that a lack of up-to-date charts renders a vessel unseaworthy as a matter of law. Again, GLI cites to precedent that is unlike the case at hand. Most of the cases cited by GLI in support of this premise involve commercial shipping interests and focus on the particular voyage. Also, the majority of these cases are not insurance cases that place the burden of proof on the insurer like this case must. Many of them are admiralty cases involving ship owners seeking to

9

avoid financial responsibility for injuries or loss of cargo, or to place that responsibility on the cargo owners through contractual agreements or federal statutes. All of these cases address situations where the ship owner must prove the vessel was seaworthy at the outset of the voyage in order to prevail. See *Union Oil Company of California v. M/V Point Dover*, 756 F.2d 1223 (5th Cir. 1985)(limitation of liability action involving vessel chartered to transport supplies to drilling platforms that damaged the pipeline at one of the platforms it was serving due to lack of current chart information); *Director General of India Supply Mission for and on Behalf of President of Union of India v. Steamship Maru*, 459 F.2d 1370(2nd Cir. 1972)(action by shipper seeking recovery of losses under 46 U.S.C. §1304(2)(a) – COGSA -- which required the shipper to prove both unseaworthiness and that it caused the damage); *The Maria,* 91 F.2d 819(4TH Cir. 1937)(action by shipper to recover value of lumber under the Harter Act, 46 U.S.C. §192, focusing inquiry on whether the vessel had the correct charts for its intended course at the inception of the voyage); *The W.W. Bruce,* 94 F.2d 834 (2nd Cir. 1938)(court found vessel unseaworthy for not having updated chart showing re-numbered buoys in channel that was part of its planned voyage, resulting in a collision for which both vessels were found to be at fault); *The Iowa*, 34 F.Supp. 843, 847 (D. Or. 1940)(owner of ship petitioned for exoneration and limitation of liability related to grounding in which ship was lost with all hands and stating that the vessel would have been unseaworthy had the vessel not had updated navigation information on board, but stating there was no proof the information was not there); *Steamship Maru*, 459 F.2d at 1372 (finding vessel unseaworthy because charts of the area of the vessel's voyage were 20 years old in context of a COGSA claim); *Protection Maritime Ins. Co., Ltd., of London, England v. United States,* 368 F. Supp. 690 (W.D. Ky. 1973)(denying insurer's subrogation claim against the United States for damages when vessel struck a mooring cell in river which was the vessel's intended course, where

charts were not updated to show the mooring cell); *Puerto Rico v. SS Zoe Colocotroni*, 456 F.Supp. 1327 (D. P.R. 1978)(Subrogation case involving oil spill found vessel was unseaworthy due to failure to have detailed charts of planned destination); *In the Matter of Complaint of Thebes Shipping Inc.*, 486 F.Supp. 436 (S.D.N.Y. 1980)(limitation of liability action for oil spill from tanker – Court found vessel was unseaworthy because one month old chart showed opposite current to the newer one resulting in navigational error and grounding in course of planned voyage); *In the Matter of Complaint of Delphinus Maritima*, 523 F.Supp. 583 (S.D.N.Y. 1981)(in ship owner's petition for exoneration or limitation, Court found the vessel was unseaworthy where Bermuda was port of refuge on its planned transatlantic course and, in attempting to approach Bermuda to correct loading deficiencies, cargo vessel went aground due to lack of detailed chart of Bermuda); *Traylor Bros., Inc. v. Tug Robert Greene,* 1986 WL 12229 (E.D. La. 1986)(tug owner held responsible for allision with bridge on its planned route where vessel did not have current charts); *In re TT Boat Corp.,* 1999 WL 223165 (E.D. La. 1999)(case involving responsibility for an allision with a fixed oil platform; the cited ruling has absolutely nothing to do with charts); *Matter of Supreme Towing Co., Inc.,* 2010 WL 11561150 (E.D. La. 2010)(tug allided with an oil rig in its planned voyage; rig was on updated chart with notice to mariners and Court found vessel was unseaworthy).

The second warranty requires knowledge on the part of the ship owner. Pursuant to the second warranty, the owner of the vessel must assure the vessel is seaworthy at the outset of the voyage. *Employers Ins. of Wausau v. Occidental Petro*, 978 F.2d 1422, 1431-32 (5th Cir. 1992) ("The second one, which applies only after the policy attaches, is a modified, negative warranty, under which the insured promises not to knowingly send a vessel to sea in an unseaworthy condition."). Andersson did not knowingly send the vessel to sea in an unseaworthy

condition. Andersson purchased updated paper charts for everywhere he intended to visit as well as an Eastern Caribbean overview chart. The boat also had at least basic charts on the Raymarine GPS chartplotter located in the cabin of the boat and a supplemental Eastern Caribbean chart chip in the Garmin GPS chartplotter located in the starboard steering station. [Ex. 2 at para. 11-12; Ex. 2 at 22/9-13]. Andersson met Ronald Naranjo in Aruba and invited him to act as crew on the trip from Aruba to Sint Maarten. Naranjo had small boat experience and wanted to get experience on bigger boats. Crew duties included handling lines at Andersson's direction, maintaining watch while Andersson slept, monitoring the GPS, radar and autopilot at the steering station and looking for other boats. If a vessel approached or something went wrong, Naranjo was to wake Andersson who was never more than ten feet away. [Ex. 2 at para. 15-21; Ex. 1 at 18/10-15]. On December 14, 2019 before leaving Aruba, Andersson checked the weather for the trip using NOAA and PocketGrid [Ex. 1 at 23/1-8]. The weather was not prohibitive. [Ex. 1 at 20/6-16]. Before leaving Aruba, he checked the electronics and other systems to make sure they were in working order [Ex. 2 at para. 28; Ex. 1 at 19/24 to 20/5]. Since the vessel must be seaworthy for its intended purpose, Andersson does not dispute that the second warranty would require the vessel to have current charts for the planned voyage. Andersson had that. Ex. 2 at para. 11. However, due to conditions outside of Andersson's control, ie: a wind shift with significantly worse wind and wave conditions and his crew member's seasickness, Andersson was forced to change course. See Ex. 2 at para. 29-39.

Knowing he was unfamiliar with the area, Andersson sought the marina's assistance and was "standing off" awaiting an escort when the boat went aground. Ex. 6 at 323/20-324/11; Ex. 2 at para. 43-45. As has been stated in the section regarding material facts, there is evidence indicating that Mr. Ball removed a chart chip from the Raymarine GPS, and that the vessel had

electronic charts of the entire Caribbean, and there is also evidence that the Garmin GPS chip could have been updated but the means to determine whether it was is no longer accessible to the parties due to the post-loss saltwater corrosion to the unit, so the question of whether there were no updated electronic charts for Boca Chica, Dominican Republic is in dispute. There is also evidence that, although Andersson failed to recognize it as a reef, the Garmin chart chip in its 2015 form did show the breakwater area by containing no depth readings. Captain Geiger testified to this and that although the newer chart version had a green area on it, it also did not provide any sort of caution, danger, reef or other warning. If the reef was on the chart but Andersson failed to recognize its significance, then there was not a lack of seaworthiness, there was negligence on the part of the Captain.

In addition to the language quoted above, the policy contains the following general condition extending the reach of a warranty beyond the time of the loss itself:

> t. Where any term herein is referred to as a 'warranty' or where any reference is made herein to the word 'warranted', the term shall be deemed a warranty and regardless of whether the same expressly provides that any breach will void this insuring agreement from inception, it is hereby agreed that any such breach will void this policy from inception.

[Ex. 13 at 15]. So, according to the GLI policy and its arguments, any breach of a warranty at any time renders the policy void from its inception.

GLI's condition "t," taken to its extreme, would render the policy illusory.

> … [E]xclusionary policy language should not be enforced when it defeats the main object of the purchased coverage, or virtually nullifies the coverage sought for anticipated risk. However, exclusions by their nature modify the scope of coverage provided in an insurance policy and "[a]n insurance policy is not illusory if it provides coverage for some acts; it is not illusory simply because of a potentially wide exclusion" (*Associated Community Bancorp, Inc. v. St. Paul Mercury Ins. Co.,* 118 A.D.3d 608, 989 N.Y.S.2d 15 1st Dept.2014 [internal quotation marks omitted] [alteration in original] ).

13

*Lend Lease (Us) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 136 A.D.3d 52, 60 (N.Y. App. Div. 2015). In this case, if a warranty were breached at any time, that happened because of unexpected circumstances out of Andersson's control, specifically the unexpected wind shift and worsened wind and wave conditions coupled with Naranjo's seasickness. Using a potential warranty violation forced by unexpected conditions out of the Captain's control to void the policy from its inception would be the definition of illusory coverage. Voiding a policy from its inception nullifies every bit of coverage and places the insured in the position of having no insurance. What GLI seeks through its breach of warranty arguments is not a "potentially wide exclusion" as is referenced in New York caselaw finding coverage not to be illusory but a complete elimination of the existence of the policy.

EVERY boat that sinks or is significantly damaged becomes unseaworthy at some point in the process of that loss, and the purpose of having hull coverage is to reduce the risk of loss or damage to the vessel. Policyholders like Mr. Andersson pay thousands of dollars a year for this protection. If the policy's warranty of seaworthiness were strictly applied, no loss would ever be paid because every vessel would have become unseaworthy at the time of the loss, rendering the policy void from inception. GLI's corporate representative discussed this situation in his deposition:

```
72:9    Q.  Okay.  Now, at some point, every boat that
72:10  sinks is unseaworthiness at some point in its voyage,
72:11  correct? It's unseaworthy; it sank --
72:12    A.  Correct.
72:13    Q.  -- is that correct?
72:14        So when -- is there a line you draw where you
72:15  decide when something has to be seaworthy to satisfy
72:16  the warranty of seaworthiness?
72:17    A.  Yes.  It has to be seaworthy at the --
72:18  throughout the policy and -- and -- and/or until the
72:19  time of the incident.
```
(bold: **until the time of the incident**)

```
72:20    Q.  How do you define what the incident is?  Is
72:21  there policy language that tells you when, in a chain
72:22  of events, something has happened that would now
72:23  change that seaworthiness situation?
72:24    A.  Yeah, an external event.
73:1     Q.  Can weather be an external event?
73:2     A.  Yes.
```

Ex. 4 at 72/9-73/2, emphasis added. It should be noted that there is no definition or other policy provision that creates this line-drawing at an "incident" or a requirement of an "external event" in the insuring agreement, but the practice does create a logical way to separate the event causing the loss to avoid the coverage being swallowed whole by the violation of a policy warranty that happened because of that event, in other words, by including the concept of reasonableness. In this case, Andersson changed course due to an unexpected incident outside of his control (in this case the confluence of two factors: 1- an unexpected wind shift from east to northeast and the simultaneous worsening of wind and wave conditions, and 2- the unexpected seasickness of the crew). See Ex. 2. He had no choice but to change from his planned course, ultimately deviating to Boca Chica, Dominican Republic. See Ex. 2 at para. 29-45. The point at which the line should be drawn, or the "incident" as GLI's corporate representative described it, would be the time of those unexpected circumstances, the time when Andersson deviated from his planned course due to those conditions.

All the cases cited by GLI involve the lack of updated charts for the area of the subject vessel's planned voyage. Only one of the cases cited by GLI involves circumstances where the vessel was forced to change from its planned course due to circumstances out of the Captain's control, as occurred in this case. In that case, *In the Matter of Complaint of Delphinus Maritima*, 523 F.Supp. 583 (S.D.N.Y. 1981), the vessel had embarked on a transatlantic voyage and was forced to divert to Bermuda to correct problems with the loading of its cargo. There were no

detailed charts on board showing a reef off Bermuda, and the ship went aground. In finding the vessel was unseaworthy for its voyage, the Court pointed out that on such a transatlantic voyage, the only two ports of refuge are Bermuda and the Azores Islands. In other words, the Court considered Bermuda a necessary part of the vessel's planned route as far as preparations were concerned. This is quite different from the case at hand, where the combination of an unexpected wind shift, significantly worse wind and wave conditions, and the resulting seasickness of Andersson's crew forced him to change course and ultimately to arrive in the Dominican Republic, far from his planned course.

Finally, GLI's memorandum of law raises an argument that an expert may not opine on the seaworthiness of the vessel, and that the determination of seaworthiness is a matter for the Court. In support of its argument, GLI cited several unpublished opinions only available on Westlaw without providing copies of the opinions. They were from the W.D. Ky, the E.D. La., and the W.D. of Pa., none of which courts' rulings are binding on this court. See *In re Relafen Antitrust Litigation*, 360 F. Supp. 2d 166 at fn 4 (D. Mass. 2005)(discussing the troublesome impact of unpublished opinions). The one published opinion GLI cited on this subject did not directly address the question of whether an expert may opine on seaworthiness; the issue was simply decided by the court. *Underwriters at Lloyd's v. Labarca*, 260 F.3d 3 (1st Cir. 2001). Expert witness testimony may, at a minimum, educate the Court about the matters at hand and shed light about technical issues and elements of the witness's knowledge in their areas of expertise. As was stated in one of GLI's collection of unpublished opinions, "[w]hile an expert witness is permitted to give his opinions on an 'ultimate issue' of fact, assuming he is qualified to do so, he is not permitted to make credibility determinations or offer conclusions of law." *Francois v. Diamond Offshore Co.*, 2013 WL 222332 (E.D. La. 2013). It is up to the Court to decide whether to accept that testimony

recognizing that the Court included a deadline for the filing of *Daubert* motions in its Scheduling Order. DE 27, DE 70. None were filed by GLI.

WHEREFORE, for the reasons described herein, Defendant Martin Andersson respectfully requests that this Court deny the motion for summary judgment filed by Great Lakes Insurance SE.

/s/ *Michelle Niemeyer*_____
Michelle Melin Niemeyer
Counsel for Defendant Martin Andersson
Michelle M. Niemeyer, P.A.
244 Biscayne Blvd. #3009
Miami, FL 33132
Telephone: (305) 443-1818
Email: mniemeyer@paymyclaim.com

Harvey Heafitz, Esq.
Attorney for Defendant Martin Andersson
Davigian, Grillo & Semple LLP
365 Boston Post Road, Suite 200
Sudbury, MA 01778
Telephone: (978) 443-3773
Email: Harvey@dgslawllp.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 1, 2022 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send an electronic Notice of Filing to all counsel of record.

/s/ *Michelle Niemeyer*_____
Michelle Melin Niemeyer
Counsel for Defendant Martin Andersson
Michelle M. Niemeyer, P.A.
244 Biscayne Blvd. #3009
Miami, FL 33132
Telephone: (305) 443-1818
Email: mniemeyer@paymyclaim.com