## AFFIDAVIT OF MARTIN ANDERSSON

BEFORE ME, the undersigned authority, appeared Martin Andersson who, having been first duly sworn, deposes and states:

1.     I am over 18 years of age and mentally and otherwise competent to provide testimony in this matter.

2.     The testimony I am providing through this affidavit is known to me through my own personal knowledge.

3.     In December, 2018 I bought a 47' Catana catamaran named Melody with the goal of living aboard about seven months a year and traveling the islands of the Caribbean Sea.

4.     In the first year, my intention for the use of the boat was to have maintenance and improvements made to it at a boatyard in Grenada where it was delivered upon the sale being completed and then to sail it to Aruba and stay there at least through hurricane season.

5.     Before the holidays, I would sail from Aruba to Sint Maarten along a course that would head northeast far enough to get clear of the Venezuelan islands, then we would have tacked and headed southeasterly toward Grenada, and when closer to the islands of the eastern Caribbean we would have tacked again to sail in a north/northeast direction toward Sint Maarten.

6.     I purchased insurance for Melody through a broker named William Hodgens in Florida.

7.    I sent Mr. Hodgens the pre-purchase survey and had a phone conversation with him about the boat and how I intended to use it, and his office partially filled out the application form. They then sent it to me to fill in the blank parts.

8.    I reviewed the information and understood it to be true and accurate with the changes and additions I made.

9.    The broker selected the areas of coverage based on our discussion about how I wanted to use the boat over the long term, but I did not intend to sail in most of these areas at all during the first year I had the boat. For example, I had no plan or intention to sail the boat to Florida or the Bahamas during the first year. I also had no intention to sail the boat west of Aruba in the southern part of the Caribbean Sea or as far west as the Dominican Republic or even Puerto Rico in the northern part of the Caribbean.

10.    Ultimately, GLI issued the policy that's involved in this lawsuit.

11.    I purchased up-to-date paper charts for the areas I intended to sail, which were on the boat while I was sailing. These charts included the Leeward Islands, the Windward Islands, and what is referred to as the ABC Islands (Aruba, Bonaire and Curacao). I also had the overview chart of the Eastern Caribbean, which does show the Dominican Republic but not in detail.

12.    In addition to the paper charts, my boat had basic charts installed in the Raymarine chartplotter, which was located inside the cabin and mostly used as a backup, and a detailed supplemental chart chip for the Eastern Caribbean installed in the Garmin GPS chartplotter in the starboard steering station. That chip included detailed charts of the Dominican Republic.

13.    I do not know if the chart chip was updated in the time prior to my buying the boat in late 2018. If it was updated, it is my understanding the update would reside in the memory of the GPS, as opposed to in the chip itself.

14.    Finally, I used my iPad to assist in planning voyages and had access to the most up-to-date weather information through NOAA and an app called Pocket Grid.

15.    I met Ronald Naranjo in Aruba and he agreed to be my crew on the voyage from Aruba to Sint Maarten.

16.    I understood Mr. Naranjo to be a competent small boat sailor who wanted to gain more experience on larger boats.

17.    Mr. Naranjo's role would be limited to keeping me company, handling lines at my direction and maintaining watches while I slept.

18.    Mr. Naranjo was a volunteer and not paid as crew.

19.    In maintaining a watch, Mr. Naranjo was to watch for other boats and keep an eye on the autopilot and the chartplotter to assure they were on and nothing was out of the ordinary.

20.    If Mr. Naranjo saw another vessel approaching or something went wrong, he was to wake me up so I could address the situation.

21.    When I slept, I was never more than ten feet away from Mr. Naranjo.

22.    Mr. Naranjo never steered the boat or otherwise took the controls, nor did he enter any changes to the navigation I entered into the GPS chartplotter or the autopilot.

23.    The way Melody's systems were set up, while the autopilot was engaged it was not possible to steer the boat with the steering wheel.

24.     It was my habit to plan the trip, enter it into the chartplotter, and engage the autopilot. There was never a time when Mr. Naranjo was sitting behind the helm station while the vessel was underway that the autopilot was not engaged.

25.     Even when I was at the helm station, the autopilot remained engaged while we were at sea. I made course changes using the autopilot, which could change the course in as small as one-degree increments.

26.     My planned voyage from Aruba to Sint Maarten was expected to take about five days.

27.     We planned to clear the southeastern tip of Aruba and then sail northeast and get far enough north to clear the Venezuelan Islands with some distance to avoid piracy, then head as close to east as possible toward Grenada. Because the wind was expected to come from the east, we would have tacked toward the southeast at some point, and then later tacked toward the northeast. Once within about 100 miles of the islands of the eastern Caribbean, we would head north toward Sint Maarten which is in the northeastern part of the Caribbean Sea.

28.     Prior to our departure, I checked all the electronics and other systems and everything was in working order. I tested the radio and the VHF transmitter was working.

29.     When we left Aruba, the weather was good and we expected it to remain that way. The wind was from the east and so were the waves. We set off at about 5 or 5:30 p.m. from customs in Barcadero, Aruba and headed along the coast toward the southeastern tip of the island.

30.    When we cleared the tip of the island, I set the course to a bit east of northeast (about a 55 to 60 degree heading) for that first leg of the voyage. I am not sure exactly when this occurred, but I think it was sometime between 10:00 and midnight on December 14.

31.    When I was deposed in this case, the lawyer representing GLI asked me the same list of several questions over and over, in half-hour and then somewhat longer time increments.

32.    Some of these questions were about information the average sailor like me does not have while they are on the water, like the exact direction and speed of the current, the timing between the waves, exact wave heights and wind speeds, and the speed of the boat.

33.    On this sort of a sailing trip you plan your course, follow the plan, and sail. You are not constantly looking at your phone or computer or wall clock like you would do on land. The GPS tracks your position and records the route as the boat progresses on your journey and you look for ships, other boats, and potential hazards like floating debris. When you are sailing on a long trip like this, you are more likely to remember the timing of something related to nature like an event happening after it was dark, or right after sunrise, or the sun was overhead, or in relation to an event like passing the point at the end of the island and changing course, or seeing a ship.

34.    On Sunday, December 15, the second day of our trip, there was a wind shift in the afternoon and the wind and wave heights increased. Over time between then and the afternoon on Monday, December 16, Mr. Naranjo became seasick and the conditions deteriorated. The wind got a lot stronger and the waves higher. I could not tack and head more southeasterly because that would put us into the Venezuelan islands, which are known for piracy and which are prohibited by the insurance policy's navigational limits.  I could not

continue heading as easterly as I was because the boat was being battered by the waves coming from the east and Mr. Naranjo was not feeling well. I did not consider turning back toward Aruba because a downwind run in these conditions could be unstable and there would be a risk of capsizing. During that time, I made small more northerly adjustments to the course to try to keep as close to our planned course as possible while reducing the impact of the rough conditions on the boat and on Mr. Naranjo. By late afternoon on Monday the 16th, the course was northeast by north (somewhat less than 45 degrees).

35.    Mr. Goldman did not finish my deposition, so I did not get to tell him what happened after 4:00 p.m. on Monday, December 16.

36.    Later on the 16th, I decided to more significantly change course and head north or slightly northwest to Ponce, Puerto Rico instead of continuing to fight the conditions in a northeasterly route.

37.    There was never a time in the voyage when Mr. Naranjo got so sick that he could not maintain watch or that I was sleep deprived, but there was a point where he seemed incapacitated to me and my concern for his condition at that time and for the safety of the boat drove my decision to change course significantly from our intended, more easterly route.

38.    Once headed north, the boat was at a more comfortable angle to the waves and Mr. Naranjo's condition began to improve.

39.    Due to the shifting of the wind from east to northeast, however, and the westward current and waves, we were pushed west as we sailed north. Ultimately, I made the decision to aim for the Dominican Republic and we arrived outside the inlet for Santo Domingo at around noon on Tuesday, December 17.

40.    When I attempted to contact the harbor at Santo Domingo by VHF radio I realized for the first time that the radio wasn't transmitting.

41.    Although it had worked on Saturday, Sunday and Monday, when we tried to start the generator on Tuesday morning it wouldn't start, so we needed to have that checked out, too.

42.    I called the broker who sold me the boat on the satellite phone and asked if he could recommend a repair facility in or near Santo Domingo. He suggested a marina in Boca Chica, east of Santo Domingo.

43.    We made arrangements over the phone with the marina for them to meet us and guide us into the harbor at Boca Chica.

44.    When we arrived at Boca Chica, it was dark and rough. I could see lights on shore. We called the marina and were waiting in deep water away from shore for their boat to come guide us in when the boat was lifted by a wave and went aground on an unmarked breakwater. I did not see the breakwater on the GPS or see any markings for the breakwater itself. By the time I saw the depth readings rapidly, rising it was too late.

45.    We weren't there waiting for the marina's boat to come for very long when we went aground. It was not more than three to five minutes.

46.    After a while, someone from a local dive shop waded out to the boat and we went to shore with him.

47.    Local police and navy officials met us on the beach, and they recommended I immediately hire security to stay on the boat, which I did.

48.    The navy officials also told me I could not leave the island until the salvage was taken care of.

49.    First thing the next morning we cleared customs and I contacted our insurance broker to make a claim with GLI.

50.    GLI made arrangements to send a marine surveyor, Mr. Ball, to assess the damage.

51.    Mr. Ball and I went to the boat together early in the morning of December 21 and met later to discuss what happened.

52.    On December 23, Mr. Ball asked my permission to take the GPS off the boat and sent me a statement based on our discussion that he needed signed right away so the claim could be considered before the GLI offices closed for the holidays.

53.    During this time between the grounding on December 17 and December 23, I was under a huge amount of stress. My boat was destroyed. I was in a foreign country where I didn't speak the language and knew no one. The holidays were approaching and I was being told I couldn't leave until the salvage was dealt with. Salvors had told me they wanted from $50,000 to $80,000 to salvage the boat, and the insurance company wasn't helping me.

54.    I read the statement Mr. Ball sent me and, in general terms, it seemed OK to me. English is not my first language and sometimes my understanding of a word or phrase is different from a native English speaker's understanding. When that happens I don't know it unless someone points out the difference. I was born and raised in Sweden and came to the United States at 49 years old.

55.    There were some things in the statement I signed that, in hindsight, were wrong or should have been said differently. I didn't notice them at the time and now recognize the stress

I was under most likely contributed to that. For example, the statement said we left out of Varadero, which is correct in that it was where we were staying in Aruba prior to departing, but we cleared customs and left the island from Barcadero at around 5:30. Barcadero is east of Varadero on the southern coast of Aruba. The way the statement is written implies that we left Varadero, passed a lighthouse and immediately headed off on a 50 degree heading to Sint Maarten. This is not physically possible given the location of Varadero or, for that matter, Barcadero which are both located quite a bit northwest of the southeastern corner of the island. It says the vessel "once around the point made a northeasterly heading with an intended destination and course to steer of 050 degrees to St. Martin." While it is true our ultimate destination was Sint Maarten, it took several hours to get to the point at the southeast corner of Aruba – this can be confirmed by reference to any chart or Google Maps -- and our initial course after turning around the SE point of Aruba was about 55 to 60 degrees (close to 50 degrees). It was never our intention to stay on a direct course all the way to Sint Maarten as the statement implies.  It is a coincidence that our initial heading was 55 to 60 degrees, a more easterly course than one would take directly to Sint Maarten, but close. Over a long sail, that 5 to 10 degree difference is significant. I did not understand the implication in the statement until it was used to deny my claim. I also did not pick up on the fact that Mr. Ball made a mistake in the statement with the date, making it appear that the journey was shorter than it was. At some point in the statement he began to refer to "Tuesday, December 16" when Tuesday was the 17th, making it look like a two-day trip instead of the three days it actually was, and he later says we cleared customs on Wednesday, December 17 when Wednesday was the 18th. I also didn't pick up on the implication regarding the timing of Mr. Naranjo's seasickness and the turn

toward Ponce. In the statement it says, "Shortly after departure, it was found that the vessel was not making good way to windward and that the crew was becoming seasick. The course of the vessel was adjusted to a more northerly course to Ponce, Puerto Rico." I did not tell Mr. Ball that Mr. Naranjo got sick shortly after leaving or that we changed course so quickly. The adjustment of the course more northerly was gradual. By the time I more significantly adjusted the course to Ponce on Monday, we had sailed quite far east from Aruba and the course to Ponce was north or a bit northwest. This course change was made after almost two full days of sailing. Also, Mr. Naranjo did not begin to be seasick until the afternoon of the second day. I missed this detail when I reviewed the statement. I also did not recognize the implication in the statement about Mr. Naranjo's condition. After I changed course more significantly, Mr. Naranjo's condition had improved. Mr. Ball never asked if Mr. Naranjo got better or when, and never asked me if I was able to sleep during the voyage. Mr. Naranjo's worst condition was before I changed course to Ponce, and I believed he was incapacitated at that time, but he improved and was capable of maintaining his watches. He got better long before we got close to the Dominican Republic. I didn't understand that by saying Ron was better when we were there, which he was, that Mr. Ball was implying Ron had not improved earlier, which he had. Finally, the statement says the breakwater was not shown on the electronic charts on board and says there were no paper charts on board. It is true there was no detailed paper chart for the Dominican Republic on board, but during our voyage there were paper charts for all the areas I intended to sail, as I stated in my deposition. Boca Chica is 693 kilometers west of Sint Maarten, nowhere near where I intended to sail. It is possible the paper charts had been stolen by the time Mr. Ball inspected the vessel. A lot of things disappeared off the boat even with the

security guards who were recommended by the Dominican navy personnel. Someone even took the new stove while security was on board. In hindsight, I failed to notice the mistakes in Mr. Ball's report and the changes from what we talked about when I met him due to the extreme stress I was under and the limited time I had to get the signed statement to him so the claim could be considered before the holidays.

56.     Ultimately, GLI sent me a reservation of rights letter on December 27 and I was told by GLI to "act as a prudent uninsured" with regard to the salvage.

57.     I retained a lawyer and with my lawyer's assistance retained a Dominican attorney to negotiate a contract with a salvor that required the salvor to take responsibility for any environmental or other damage caused by the salvage.

58.     The salvor paid me $1,000 to buy the boat and all its contents from me and gave me the right to access the salvage or for GLI to access it for 30 days after the contract we signed was executed on January 10, 2020.

59.     I informed GLI of the time limitation to access the salvage.

60.     At that time, I believed GLI had taken the Garmin GPS as Mr. Ball had told me they would, and so did not take action to protect it.

61.     Shortly before the Covid shutdowns, I asked GLI for the Garmin GPS to be returned to me, and I was told to ask Mr. Ball. Mr. Ball told me he never got the GPS.

62.     I contacted the salvor and he said he would send it but never did. I believed it was gone. He did not send the GPS and didn't respond to my follow up communications.

63.     The most accurate evidence of the boat's path during our three-day voyage would be the track maintained by the Garmin GPS.

64.   At the time of the grounding, the Garmin GPS was in the starboard steering station, unbroken and functional.

65.   I now understand that the salvor sent the Garmin and Foruno GPS units, and later the Raymarine unit, to my attorney and they were inspected by Mr. Cooley of Langer Krell Marine Electronics in Miami and some marine electronics experts hired by GLI. As part of the costs of this case, I paid for the shipping of the two packages from Mr. Farmer, the salvor, and for Mr. Cooley's involvement in inspecting the units and writing his report. It is my understanding from Mr. Cooley's report that the Garmin GPS was broken and salt-water damaged, and that it couldn't be turned on. The track information was lost. Mr. Cooley wrote a report on the condition of the unit and confirmed that the supplemental chart chip was in the unit.

66.    Had I been informed by GLI or Mr. Ball that they were not taking the GPS as they told me they would, I would have removed it from the boat before leaving the Dominican Republic and made sure it was protected.

FURTHER AFFIANT SAYETH NOT.

Affiant, Martin Andersson

SWORN TO AND SUBSCRIBED before me this *15*th day of June, 2022, by Martin Andersson who DID/DID NOT take an oath and who:

_____ Is personally known to me; or

_X_ Produced as identification:

Notary Public, State of New Jersey

*CHAD SCANLON* (NOTARY PUBLIC)

(Print, Type or Stamp Commissioned Name of Notary Public)

Commission No.: 50156185

CHAD E SCANLON
Notary Public
State of New Jersey
My Commission Expires Mar. 29, 2026
I.D.# 50156185