1

1            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2
              CASE NO. 4:20-cv-40020-DHH
3
    --------------------------------x
4
    GREAT LAKES INSURANCE SE,
5
          Plaintiff/Counterdefendant
6
    vs.
7
    MARTIN ANDERSSON,
8
          Defendant/Counterplaintiff
9
    --------------------------------x
10

11

12

13   30(B)(6) DEPOSITION OF GREAT LAKES INSURANCE SE

14            BY BERIC ANTHONY USHER

15            Conducted Remotely

16            Pateley Bridge

17            Harrogate North

18            Yorkshire, England

19            May 20, 2021

20            8:05 a.m. to 12:58 p.m.

21

22

23

24   Reporter:  Laurie J. Berg, CCR, RPR, CRR, CLR, CER

⌘                                                                2

```
 1                    A P P E A R A N C E S

 2

 3          Steven E. Goldman, Esquire

 4          Michael I. Goldman, Esquire

 5          GOLDMAN & HELLMAN

 6          8751 West Broward Boulevard

 7          Suite 404

 8          Fort Lauderdale, Florida  33324

 9          954.356.0460

10          steven@goldmanandhellman.com

11          michael@goldmanandhellman.com

12          (Present via videoconference.)

13          COUNSEL FOR PLAINTIFF/COUNTERDEFENDANT

14

15          Michelle Melin Niemeyer, Esquire

16          MICHELLE M. NIEMEYER, P.A.

17          244 Biscayne Boulevard

18          #3009

19          Miami, Florida  33132

20          305.443.1818

21          mniemeyer@paymyclaim.com

22          (Present via videoconference.)

23          COUNSEL FOR DEFENDANT/COUNTERPLAINTIFF

24
```

1                          I N D E X

2

3   DEPONENT:  BERIC ANTHONY USHER

4              (Present via videoconference.)

5

6   EXAMINATION                                    PAGE

7   (BY ATTORNEY NIEMEYER)                          7

8

9                     E X H I B I T S

10  NO.                                            PAGE

11  Exhibit 1   Notice of Deposition Pursuant to

12              Fed.R.Civ.Proc. 30(b)(6) (Corrected)   10

13  Exhibit 2   Concept Special Risks Limited Rating

14              Form, Rate Sheet Details, 19/11/2018,

15              Andersson_UF000008 to

16              Andersson_UF000009                     50

17  Exhibit 3   Caribbean Adjusters & Marine Surveyors

18              Ltd, Invoice 423, 1/8/2020,

19              Andersson_AB000052 to

20              Andersson_AB000053                     95

21  Exhibit 4   Great Lakes Insurance SE's Responses

22              and Objections to Defendant Martin

23              Andersson's First Set of Request for

24              Production                              108

✦                                                        4

1                    E X H I B I T S

2                      (continued)

3   NO.                                          PAGE

4   Exhibit 5   Great Lakes Insurance SE's Responses

5               and Objections to Defendant Martin

6               Andersson's First Set of Requests for

7               Admission                            114

8   Exhibit 6   Great Lakes Insurance SE's Responses

9               and Objections to Defendant Martin

10              Andersson's First Set of

11              Interrogatories                      134

12  Exhibit 7   Concept Special Risks, Policy Schedule,

13              Policy Number:  CSRYP/172119,

14              Andersson_AB000135 to

15              Andersson_AB000163                   151

16  Exhibit 8   Concept Special Risks, Policy

17              Endorsement, Policy Number:

18              CSRYP/172119, MA000350               161

19  Exhibit 9   Correspondence, 2 March 2020, MA000348

20              to MA000349                          162

21  Exhibit 10  E-mail Chain, 31 January 2020 13:16,

22              Andersson_CF000152 to

23              Andersson_CF000154                   167

24

1                    E X H I B I T S

2                      (continued)

3    NO.                                          PAGE

4    Exhibit 11  E-mail Chain, 27 December 2019 12:21,

5                and Correspondence, 27th December 2018,

6                Andersson_CF000056 to

7                Andersson_CF000057                175

8    Exhibit 12  Report of Survey of a 2000 Catana 471

9                Prestige, "Melody", November 7th, 2018,

10               Andersson_AB000054 to

11               Andersson_AB000090                180

12   Exhibit 13  E-mail Chain, Thursday, January 2, 2020

13               12:48:11, MA000268 to MA000271       181

14   Exhibit 14  E-mail and Picture Compilation,

15               Andersson_CF000075 to

16               Andersson_CF000143                183

17   Exhibit 15  Correspondence, January 15, 2020,

18               Andersson_AB000034 to

19               Andersson_AB000037                185

20

21        (Original exhibits marked electronically

22          and retained with the transcript.)

23

24

🔺                                                                6

1                P R O C E E D I N G S

2

3              MADAM COURT REPORTER:  This is Laurie

4   Berg.  I am a Registered Professional Reporter and a

5   Certified Realtime Reporter with the National Court

6   Reporters Association, a Certified eDepoze Reporter,

7   as well as a Certified Court Reporter with the State

8   of New Hampshire.  I am a Notary Public in the State

9   of New Hampshire and the Commonwealth of

10  Massachusetts.

11          The attorneys participating in this

12  proceeding acknowledge that I am not physically

13  present in the proceeding room, nor am I physically

14  present with the witness, and that I will be reporting

15  this proceeding remotely via videoconference.

16          They further acknowledge that, in lieu of an

17  oath administered in person, the witness will verbally

18  declare his testimony in this matter under the penalty

19  of perjury.

20          The parties and their counsel consent to this

21  arrangement and waive any objections to this manner of

22  reporting the proceeding.

23          Will the attorneys now please indicate your

24   agreement by stating your name and your agreement on

⬧                                                              7

1   the record, after which I will swear in the witness

2   and we may begin.

3               MR. GOLDMAN:  Steven Goldman for the

4   plaintiff and we certainly consent.

5               MS. NIEMEYER:  Michelle Niemeyer for

6   Martin Andersson and we consent.

7               (Deponent sworn.)

8               MADAM COURT REPORTER:  Thank you very

9   much.  You may proceed.

10

11                    BERIC ANTHONY USHER

12

13          having been satisfactorily identified and

14   duly sworn remotely by the Notary Public, was examined

15   and testified as follows:

16                    DIRECT EXAMINATION

17          BY MS. NIEMEYER:

18   Q.   Mr. Usher, it's nice to see you again.

19   A.   Nice to speak to you, Michelle.

20   Q.   For the record, I'm Michelle Niemeyer.  I

21   represent Martin Andersson, the defendant in this

22  action.

23        And it is my understanding that you have been

24  presented as the corporate representative for Concept

⬆                                                                    8

1  Special Risks; is that true?

2      A.   No.  I'm --

3      Q.   Okay.

4      A.   -- here for Great Lakes.

5            (Whereupon, parties speaking at the same

6  time.)

7            MADAM COURT REPORTER:  I'm sorry, excuse

8  me.  I didn't hear what Attorney Goldman said.

9        Can you please repeat it, sir?

10            MR. GOLDMAN:  Yeah, I'm sorry.  Let me

11  also correct myself.  As Mr. Usher said, he's not here

12  as the corporate representative for Concept Special

13  Risks, Counselor.  As you well know, he's here as the

14  corporate representative for the plaintiff, Great

15  Lakes Insurance SE.

16            MS. NIEMEYER:  Okay.  I apologize for

17  speaking that way.  I...

18            BY MS. NIEMEYER:

19      Q.   Mr. Usher, can you describe -- this is

20  relevant down the road, so we might as well go there

21  now.

22          Can you describe the relationship between

23   Concept Special Risks and Great Lakes?

24      A.   Yes.  Concept Special Risks is the managing

1   general agent for Great Lakes Insurance SE.  As such,

2   we are responsible for underwriting risks, accounting

3   risks, issuing policies and dealing with claims.

4      Q.   Now, does Great Lakes have its own personnel

5   who are responsible for claims or for underwriting for

6   their marine claims, under the policies written like

7   the policy at issue in this case that Mr. Andersson

8   had?

9      A.   They do have a claims department.  They do

10   not have an underwriting department for this class of

11   business.

12      Q.   Was their claims department involved in any

13   way in the handling of this claim?

14      A.   Under the managing general agent agreement,

15   Concept Special Risks has claimed certain authority up

16   to $350,000.  However, in the event that we are going

17   to litigate or that we -- we are proposing the denial

18   of a claim and, therefore, bringing an action in the

19   name of Great Lakes, as a courtesy, we will always

20   refer that matter to them for their approval to; A,

21  seek legal opinion, and B, if -- depending upon that

22  legal opinion, to commence litigation.  Then, we would

23  always go to Great Lakes for their approval to proceed

24  in their name.

♠                                                          10

1      Q.   In this matter, was that procedure followed?

2      A.   Yes.

3      Q.   I'm going to show you a document, which we'll

4  mark as Exhibit Number 1.

5              MS. NIEMEYER:  Where is the share screen?

6  There it is.  Okay.  All right.  I have a lot of

7  documents open.

8              (Exhibit 1 marked for identification.)

9          BY MS. NIEMEYER:

10     Q.   Mr. Usher, can you see the document that I've

11 shared?

12     A.   (Deponent viewing exhibit.)  Yes.

13     Q.   Okay.  And you should be looking just at that

14 document, correct?

15     A.   (Deponent viewing exhibit.)  That's correct.

16     Q.   Okay.  So that's a notice of deposition,

17 which was sent for your deposition today.

18              Were -- did you review that notice?

19     A.   Yes, I did.

20     Q.   Okay.  And as the corporate representative,

21   what did you do to assure that you were knowledgeable

22   about the categories that are listed in the topics of

23   inquiry?

24       A.   I read the underwriting file and the claims

 1   file.

 2       Q.   When you say the underwriting and the claims

 3   file, who maintains those files?

 4       A.   Mmm, they're all done -- maintained

 5   electronically.   The underwriting file is maintained

 6   by an administrative team, and so, the underwriter,

 7   who would've quoted this original account, would've

 8   started the file, and then the administrative team

 9   would have continued maintaining the file and placed

10   all the documents in that file.

11            The claims file would have been opened, in

12   this instance, by Sarah Delacey-Simms and her

13   assistant, Samantha Thomas.   And from that point

14   onwards, they would've got -- put -- placed all the

15   documents in the claims electronic file.

16       Q.   Okay.   And -- and -- when I say who

17   maintained that file, partially, what I'm asking is,

18   is that file maintained at Concept Special Risks or at

19   Great Lakes?

20      A.    At Concept Special Risks.

21      Q.    Does Great Lakes have a different file?

22      A.    They would virtually have nothing in their

23  file beyond the request to seek legal opinion, a copy

24  of the legal opinion and their authority for us to

                                                      12

1   proceed towards litigation.

2       Q.    You mentioned that you had -- you, as

3   Concept, had a $350,000 authority level for claims.

4             Was Martin Andersson's claim considered to be

5   higher than $350,000?

6       A.    I believe it would've been 365.

7       Q.    And -- okay.  So -- and that was -- was that

8   the insured hull value?

9       A.    Yes, that's correct.

10      Q.    When -- when an authority exists for a level

11  of cost that's related to a claim, does that also

12  include the estimated salvage expenses or any other

13  expenses that are paid outside of that hull value?

14      A.    It would include salvage expense, but not --

15  obviously, not surveyor's costs or any other costs and

16  fees associated with the claims file.

17      Q.    Would it also include things like; any kind

18  of mitigation expenses or protection that's paid for

19  to prevent further damage to the vessel; for instance,

20  sort of, to prevent environmental harm?

21      A.   Yeah, if there -- if there were sewer and

22  labor expenses over and above the hull value, then

23  that would be taken into consideration in terms of the

24  quantum of the claim.

&uarr;                                                        13

1           And the approach, normally speaking, would

2   be, whilst we have some authority up to 350,000, the

3   -- the language is, if it's likely to exceed 350,000,

4   we would refer the matter to them.  So, generally

5   speaking, if it exceeds 300,000 and we believe it may

6   go above 350, we'd refer to -- refer to them as a

7   courtesy.

8           Having said that, they, Great Lakes, pure and

9   simply, reserve the right to approve litigation and/or

10  claim settlement.  They don't get involved in the

11  settlement process.

12      Q.   Okay.  So let me -- let me just be clear on

13  that.

14          So they don't get involved in the settlement

15  process at all, regardless of the value of the less

16  loss?

17      A.   That's correct.  We just -- as a courtesy,

18  because we only have claim settlement authority up to

19  350,000, if the claim is likely to exceed that, we

20  refer the matter to them just as a notification.

21  They, then, let us deal with the claim.  So it's not

22  as though, for example, if a claim exceeds 350,000,

23  they deal with it, it's just that, as a courtesy, we

24  advise them of it.

✦                                                           14

1       Q.   I understand.  So once that's done -- now --

2   now, this claim -- was this claim a claim that, from

3   its inception, due to the value of the hull, would've

4   been one of those claims that exceeded the value of

5   your -- of settlement authority?

6       A.   Yes.  We would've advised Great Lakes of the

7   incident pretty much as soon as the claim was reported

8   to us or as soon as the surveyor told us that it was

9   almost certainly a constructive total loss, we

10  would've advised Great Lakes at that stage of the loss

11  and they would've just said, thank you very much,

12  please proceed and keep us advised of any

13  developments.

14      Q.   Should that advisory notice be included in

15  your claim file?

16      A.   Probably.

17      Q.   Is there a person to whom those notices would

18  normally be sent?

19     A.    Yes.  It's Steve Sensibar at Grea -- Great

20  Lakes.  And, in fact, he's Munich Re.  But -- Munich

21  Re owns Great Lakes, but he's based in the Great Lakes

22  offices in London.

23     Q.    Okay.  And let me just ask you a quick

24  question regarding -- we'll go back to these topics of

⬆                                                          15

1  inquiry.

2          There were Rule 26 Disclosures that were

3  produced by Concept, by Great Lakes, through your

4  attorneys and as -- before we had the formal discovery

5  requests under Federal Rules, and those are the only

6  documents we've received in this case, because I was

7  told that that's all there is.

8          Do -- can -- did you review the documents

9  that were produced by your counsel?

10    A.    Well, only inasmuch as I looked at our file,

11  and we would've sent our entire file to counsel.

12    Q.    Are you aware of whether or not your entire

13  -- entire file was actually produced?

14    A.    I believe -- I assume so.

15    Q.    I'm going to have you take a look, just

16  because I want to make sure we can authenticate the

17  documents that were produced from the company as

18   having come from the company, being the business

19   records of the company kept in the ordinary course of

20   business.  I'm going to need for you to take a look at

21   those groupings of documents.

22          So why don't we do that first.  I'm sorry

23   it's going to be a little time-consuming, but I want

24   to make sure that, when I ask you that question,

1    you've had the opportunity to look and tell me that.

2            MR. GOLDMAN:  I'm not sure what you're

3    asking, Counsel.

4            Are you asking him to review this claim file?

5            MS. NIEMEYER:  Yes.  But I'm -- first,

6    I'm just letting him know, I'm going to be opening a

7    new document.  It will be the claim file, as was

8    produced as part of the Rule 26.  And I'd like for the

9    witness to take a look at that and confirm the source

10   of that documentation, whether it was your documents,

11   as included -- you know, maintained in the regular

12   course of business.

13           MR. GOLDMAN:  Go right ahead.

14           MS. NIEMEYER:  Okay.  So I'm going to

15   stop sharing this one, and let's just get the other

16   one.

17           (Pause.)

18          MR. GOLDMAN:  Which will be how many

19  pages, Counselor?

20          MS. NIEMEYER:  Oh, it's a great big giant

21  document, because you guys gave it to me all as one

22  (laughs), so it is --

23          MR. GOLDMAN:  Is it not better to have

24  scanned out and -- and e-mailed it to him last night

⬧                                                        17

1  or even this morning?

2          MS. NIEMEYER:  Well, we can do it right

3  here.

4          MR. GOLDMAN:  Go right ahead.

5          MS. NIEMEYER:  It's CF000001 through -158

6  and let me just get that there for you.

7          (Pause.)

8          MR. GOLDMAN:  Just a suggestion.

9  Perhaps, ask him to count the number of pages in his

10  copy of the claim file, and if it's a 158, you know

11  you're got the whole thing.  Just a suggestion.

12          MS. NIEMEYER:  Well, I'm not going --

13          MR. GOLDMAN:  Page 1 --

14          MS. NIEMEYER:  -- to do it --

15          MR. GOLDMAN:  Page 1 --

16          MS. NIEMEYER:  -- that way.

17          MR. GOLDMAN:  Page 1 looks the same.

18 Page 2 looks the same.  The file that you've got,

19 Counselor, is obviously 158 pages.

20          Can we agree on that?

21          MS. NIEMEYER:  Mr. Goldman, I don't know

22 if they're the same pages, so, no, we're not agreeing

23 on that.

24          MR. GOLDMAN:  It seems like it's 158

↑                                                      18

1 pages, but you go ahead --

2          MS. NIEMEYER:  Mr. Goldman --

3          MR. GOLDMAN:  -- and do it however you

4 want.

5          MS. NIEMEYER:  -- please.

6          BY MS. NIEMEYER:

7    Q.   Tony, can you see this document that starts

8 with -- it says Page 1 right now with Samantha Thomas'

9 name on it --

10    A.   (Deponent viewing document.)  Yes.

11    Q.   -- at the top?

12          Okay.  So what I'm going to do, when you came

13 onto the call this morning, we were playing with this

14 thing.  There's a remote control switch.  So, what I'm

15 doing, I'm giving you control of that document, so you

16 should be able to scroll through that document now and

17   take a look at it so that you can confirm to me that

18   this is, in fact, the claim file that's maintained by

19   Concept on behalf of Great Lakes.

20             MR. GOLDMAN:  Tony, if you can do that,

21   do that.

22             THE DEPONENT:  Okay.

23             MR. GOLDMAN:  That's an absurd request,

24   but go ahead if you can do it.  It's impolite, if

↑                                                                19

1   nothing else.

2             MADAM COURT REPORTER:  Sir, I can't

3   really hear you.

4         Can you please get closer to your microphone?

5             MR. GOLDMAN:  Sure.  I said, that's an

6   absurd request; impolite, if nothing else.

7         But Tony, go ahead and do it if you can.

8     A.   (Deponent viewing document.)  Well, I'll just

9   say, I mean, I'm not seem to be able to -- I don't

10   know how I can scroll.  I'm not -- that's clear,

11   that's the first document on the file, right, because

12   I'm looking at my claims file now, and the first

13   document was dated the 18th of December 2019, and it

14   was the claim notification, which is this document.

15             But are you asking me to now open every

16    document in my claim file and compare it with this

17    document?

18        Q.   If that's how you feel you need to do it.

19             And, you know, Steven's right, if yours is

20    the same number of pages, and you're comfortable

21    confirming that what I'm showing you is the claim

22    file, then that's fine.

23             I can represent to you this is what was

24    produced to me in the Rule -- you know, it was

1     produced to me as the Rule 26 production or part of

2     it.  There were a number of groupings of documents,

3     some from, I'm assuming, Andrew Ball.  They were --

4     they started with the Bates number AB, and there's

5     another grouping that starts with UF, which one would

6     assume is the underwriting file.  What I'm not --

7         A.   (Deponent viewing document.)  Well, I'm --

8     I'm quite happy to stipulate that -- that you have the

9     underwriting file, because I can't think of a reason,

10    other than attorney correspondence, because my -- I

11    mean, I can't go by number of -- because, of course,

12    in our claims file, we have all the correspondence

13    with the attorney, so, to give you an idea, ignore the

14    number of pages, I have 189 documents in my claims

15    file --

16    Q.    Mm-hmm.

17    A.    -- but the bulk of that is going to be

18    correspondence with the attorney.

19          All right.  So all I can -- what I can

20    stipulate is that our entire claims file was sent to

21    Mr. Goldman, and I'm absolutely confident that

22    Mr. Goldman forwarded all those documents with the

23    exception of items that were subject to

24    attorney-client privilege, all those documents

⬆                                                          21

1     would've been sent to you.

2     Q.    Now --

3     A.    The first document definitely is the first

4     document in our file.

5     Q.    Okay.  So should that claim file have

6     included communications with anyone outside of

7     Concept, Mr. Andersson and Andrew Ball or Bill Bailey?

8     A.    It will have everything -- anything that is

9     not addressed to or received from the attorney.

10          (Deponent viewing document.)  So, there

11    should, for example, there should be a document there,

12    I would think, right, that it said the 21st of

13    February 2020.  It says refer to Great Lakes, suggest

14    coverage opinion.  That's the heading of the document.

15  Now let me open document number 60, and I'll -- and

16  see if you have that document, because that's --

17      Q.   I just -- I don't.

18      A.    -- other than that, everything else is -- all

19  right.  It says -- it's addressed, as I say, on the

20  21st of February 2020, it's addressed to Steven

21  Sensibar at London Great Lakes UK, and it says please

22  see attached claim details for the above-mentioned

23  insured.

24      Q.   Okay.  And I can tell you right now that that

⬆                                              22

1  is not contained in the documentation we were

2  provided.

3      A.   I thought that's where you were going, see --

4      Q.   Oh.

5      A.    -- so there's no -- there's no relevance to

6  it, but I can send you the -- all it was, was

7  reporting it to Great Lakes and that we're proposing

8  getting a coverage opinion.

9      Q.   What was the date?

10          MR. GOLDMAN:  Mr. Usher?  Mr. Usher?

11          BY MS. NIEMEYER:

12      Q.   What was the date?

13          MR. GOLDMAN:  Mr. Usher, send nothing,

14  please.  Leave that to counsel.

15      BY MS. NIEMEYER:

16      Q.   That was the 21st of February?

17      A.   (Deponent viewing document.)  Twenty-first of

18 February.  And Mr. Sensibar came back to us on the

19 25th of February and said, I agree, counsel should

20 review this.  Who would you appoint?  Because we have

21 a panel of approved attorneys, to which Sarah

22 Delacey-Simms responded, Steve Goldman, because the

23 insured address is in Massachusetts.

24      Q.   Okay.

                                                    23

1      A.   Okay.

2      Q.   So was that --

3      A.   (Deponent viewing document.)  He responded,

4 noted, thanks.

5      Q.   Okay.  And -- and so, at that point, that was

6 when Mr. Goldman's law firm was retained, presumably,

7 to give a coverage opinion?

8      A.   That's correct.  And that is the extent of

9 correspondence with Mr. Sensibar.

10      Q.   Okay.  So there was never a notice with him

11 earlier, because it was above the -- the authorization

12 level?

13      A.   No.  Because we were still waiting for -- we

14   didn't receive the damage report and so on until, I

15   think it was, like, the middle of January, which was

16   the report from Caribbean Surveyors.

17       Q.   All right.

18       A.   It was originally received, and it was

19   password protected, so we had to get it sent -- sent

20   in open form.

21       Q.   Right.   That was December 23rd?

22       A.   Yeah.

23       Q.   So I would apprec -- now, let me just explain

24   to you, because I think you said that you weren't sure

♦                                                              24

1   how you could control this document.   If you look to

2   the right side, the far right edge of the document on

3   your view --

4       A.   (Deponent viewing document.)   I see.

5       Q.   -- there should be, like, a little line --

6       A.   (Deponent viewing document.)   I see it there.

7       Q.   -- line over there (indicating).

8       A.   (Deponent viewing document.)   I see.

9       Q.   And if you pull down on that, you can move

10   the -- through the pages, like --

11       A.   (Deponent viewing document.)   Well, I hear

12   what you say, but it's not moving.

13       Q.   Oh.   Are you on a tablet?

14      A.    Yeah.

15      Q.    Oh, maybe that's why.

16      A.    Yeah, because it would have to be

17   screen-sensitive.  Unfortunately, I don't have video

18   or audio on my main -- on my computer, and -- and

19   that's why I have my claim file open on my computer

20   right next to me --

21      Q.    Okay.  Okay.

22      A.    -- but I can't scroll through this.

23      Q.    And your claim file is broken into a bunch of

24   documents, so you can't give me a page count like

⬆                                                              25

1   Mr. Goldman suggested, right, because there's --

2      A.    That's correct, because I have 190 files in

3   here.  All right?

4      Q.    Okay.

5      A.    Some of them will be multiple pages.  Some

6   will be single page.  Much of it will be

7   correspondence with attorney and so on.  So there's no

8   way I can look at a page -- a document number.

9      Q.    Okay.  All right.  So I -- I hate to do this,

10   but I'm going to.  Would you mind if I just scroll

11   through slow -- I'm not going to do it super fast or

12   slow; I'll just kind of do it in a way that you can

13    scan it like this.

14            Is that okay?  Can you see that?

15    A.    (Deponent viewing document.)  Slow down.

16    Slow down.  Slow down.

17    Q.    All right.  And the reason I'm doing this is

18    because I am going to ask you about the authentication

19    of these documents, and I want to make sure that

20    you're not being asked to confirm something that

21    you're not aware of.

22            Your notice, one of the topics of inquiry on

23    the notice, was the documents provided in the Rule 26?

24    A.    (Deponent viewing document.)  Well, Michelle,

⬆                                                              26

1    what I would say is that everything that you have must

2    have come from us, because it's the only place it

3    could've come from.  So I'm certainly going to

4    recognize every document you've got.  The issue here,

5    I think, as far as you're concerned is, have you got

6    every document?

7    Q.    That's part of it.  And part of it is that

8    there's an evidentiary requirement in, if I use things

9    in -- for instance, in a summary judgment motion, if

10    the documents have been authenticated as being

11    maintained by you in the regular course of business,

12    they -- you're the source, you've -- you've told us

13  that, then --

14       A.  Right.

15       Q.   -- they can --

16       A.   I can stipulate that -- I can stipulate that,

17  because the only way you could've got these documents

18  is from us.

19       Q.  Okay.  All right.  You know, some of them I

20  have from my own client, because they're e-mails that

21  were on his e-mail as well, and they -- you know, they

22  exist in various forms with different numbers on them,

23  because I also produced some of the same things.  But

24  they're -- you know --

⬆                                                         27

1        A.   I understand.  But anything that has -- one

2   of mine has a Concept Special Risks or Special Risks

3   addressee.

4        Q.   Mm-hmm.

5        A.   Either the recipient or the author must have

6   come from us, and they will be in my file.

7        Q.  Okay.

8        A.   If there are other documents that I am not --

9   Concept were not -- they were not sent to Concept

10  Special Risks, then, obviously, those, I couldn't

11  attest to.  If there are documents in that file that

12   -- this -- that you've placed there because of

13   correspondence with your client, obviously, I won't

14   recognize those, but I'm assuming this is the file,

15   right -- this is --

16      Q.   Right.

17      A.   -- our claims file that we -- we represented

18   to you as a claims file.

19      Q.   Exactly.

20      A.   So I'm happy to stipulate it -- all those

21   documents appear perfectly fine, right --

22      Q.   Okay.

23      A.   -- and they appear on all of them, so I'm

24   happy to stipulate.

⬆                                                        28

1       Q.   Okay.  And I'm not sure it was ever

2    represented to me that that was the entire claims

3    file, but they were produced in the Rule 26 with a CF

4    prefix, which would imply to me that it -- they came

5    from the claims file.

6       A.   Sure.

7       Q.   I don't -- it's pretty clear they're not the

8    entire claims file, because if they were, I'd have

9    more pages.  So --

10      A.   Yeah.

11      Q.   -- you know --

12      A.   Well, only because of the -- only because of

13   the correspondence between ourselves and Goldman &

14   Hellman.

15      Q.   Possibly.  And that was the -- you know, the

16   other question I had was; are there any documents that

17   you know of, or communications that you know of

18   regarding this claim, that would've been with anyone

19   outside of Great Lakes, your people, my client and

20   Mr. Ball or Mr. Bailey?

21      A.   There was an e-mail to the broker, Melinda

22   Ackwith at WR Hodgens --

23      Q.   Okay.  Okay.

24      A.   -- in connection with the refund of the

⌂                                                    29

1   premium.

2      Q.   Really?

3      A.   Yes.

4      Q.   That has not been produced.

5           Okay.  I do have some communications

6   involving the broker, but those communications are

7   related to the early stage of the claim where the

8   claim was being made, and then there were a couple of

9   inquiries about the status that had to do with the

10   broker getting involved, but there had -- there was

11   not any kind of communication that we were produced

12   having to do with the refund.

13            MR. GOLDMAN:  Michelle, what I could

14   agree to do, off the top of my head, is, have

15   Mr. Usher download and, either by scanned or through

16   Dropbox, send me the entire thing that exists at the

17   present moment, which, apparently, is closer to

18   180-something pages.

19            MS. NIEMEYER:  Documents --

20            THE DEPONENT:  I have no i -- documents.

21            MR. GOLDMAN:  The entire claim file, as

22   it exists today, I can have that sent to me, and you

23   can come back and depose him on that another time.

24            MS. NIEMEYER:  It would be helpful,

⬆                                                        30

1   because I do think we're --

2            MR. GOLDMAN:  I think this is --

3            MS. NIEMEYER:  -- missing things.

4            MR. GOLDMAN:  This is a fool's errand

5   that -- and I mean no disrespect as a courtesy to you,

6   but this is a fool's errand to try to mix and match

7   now, especially under the circumstances of -- of Zoom.

8   If we were across the table from each other, it would

9   be very simple to compare the two files.

10            MS. NIEMEYER:  Okay.

11          MR. GOLDMAN:  But it's going to be

12 insanely difficult now and probably impossible.

13          So why don't you continue with the

14 deposition, assuming that you've got the claim file,

15 or 90-something percent of it.  I'll get you what

16 you've got.  You can compare the two and bring him

17 back for anything else.  But let's -- let's go on, you

18 using the claim file and anything else you want to use

19 to continue the deposition.

20          MS. NIEMEYER:  Well --

21          MR. GOLDMAN:  Is that satisfactory?

22          MS. NIEMEYER:  I -- I am -- Steven,

23 you're asking my questions for me, and I don't

24 appreciate that.  I will take you up on your offer to

⬧                                                    31

1 provide the full claim file and, you know, it may be

2 that what your firm has predated some of these things.

3          MR. GOLDMAN:  Has what?

4          MS. NIEMEYER:  Your firm's file may

5 predate some of the things that are in the claim

6 file --

7          MR. GOLDMAN:  Oh, I didn't understand

8 your --

9          MS. NIEMEYER:  -- like correspondence

10  about the --

11              MR. GOLDMAN:  -- (inaudible) --

12              MS. NIEMEYER:  -- premium --

13              MR. GOLDMAN:  I -- I --

14              (Whereupon, parties speaking at the same

15  time.)

16              MADAM COURT REPORTER:  Excuse me.  Excuse

17  me, please, wait a minute.

18          Mr. Goldman, she wasn't finished speaking and

19  I can't --

20              MR. GOLDMAN:  Okay.

21              MADAM COURT REPORTER:  I didn't hear one

22  word that you said.  I was writing Michelle.

23              MR. GOLDMAN:  I apologize to Michelle for

24  responding so quickly.  It sounded, to my biased ear,

⬆                                                    32

1  something of an accusation, but now I understand what

2  she meant.

3              MS. NIEMEYER:  Okay.

4              MR. GOLDMAN:  Proceed any way that you

5  want, Counselor, but I will obtain Mr. Usher's

6  complete file; hopefully before close of business

7  today, tomorrow morning at the latest.

8              MS. NIEMEYER:  Okay.  I appreciate that.

9      A.  (Deponent viewing document.)  Just -- sorry,

10   Michelle, just a point of clarification, I'm trying to

11   recall -- because we did not -- the issue of the

12   premium was not raised until, when we went to the

13   broker, until the 29th of December 2020, because

14   we --

15                    MR. GOLDMAN:  Only -- only after counsel

16   had been -- been instructed.

17                    THE DEPONENT:  Sure.

18        A.   Let me just clarify, right, for purposes of

19   expediency, we had refunded the premium to the broker,

20   and we requested, in confirmation from the broker,

21   that they had, in turn, refunded the premium to

22   Mr. Andersson.  So there may be items in our file now

23   that would not have been in our file when the claims

24   file was sent to you.

⬆                                                          33

1         Q.   Okay.  And you said that was December

2    of 2020, so a few months ago?

3         A.   That's correct.

4         Q.   Okay.  And, you know, I can represent to you

5    there wasn't a premium refund.

6         A.   Well, there was to the broker, which is your

7    client's agent, of course, so.  But as a courtesy, we

8    checked to see if he'd actually -- if the broker had

 9  refunded the money.

10     Q.   And, you know, what I'm telling you is, my

11  understanding, there was never money refunded.  I'm

12  not sitting on a check is what I'm telling you.  I

13  never saw one, and my client didn't either, so --

14            MR. GOLDMAN:  As you said, Counselor,

15  that's between your client or you and --

16            MS. NIEMEYER:  Yes.

17            MR. GOLDMAN:  -- and your client's

18  broker.

19            MS. NIEMEYER:  Well, maybe it is and

20  maybe it isn't at this point.

21            MR. GOLDMAN:  (Inaudible.)  That's not

22  between the client and --

23            MADAM COURT REPORTER:  Excuse me.  I'm

24  sorry, Steve, I didn't the first three words --

 1            MR. GOLDMAN:  Never mind.

 2            MADAM COURT REPORTER:  -- words -- okay.

 3            MR. GOLDMAN:  Never mind.

 4            MADAM COURT REPORTER:  Can you please

 5  just take a moment and let her finish because I'm

 6  missing the first few words of what you're saying?

 7  It's making it really hard to do my job, please.

 8  Thank you.

9              MR. GOLDMAN:  I asked counsel; under what

10   set of circumstances it could be possible, and it's

11   not between her client and her client's broker.

12   That's more of a rhetorical question than anything

13   else.  I don't really expect Ms. Niemeyer to answer.

14              MS. NIEMEYER:  All right.  Well, I won't.

15   And, you know, the circumstances I would see it as,

16   when you sue the client and you haven't paid the

17   money, so I would --

18              THE DEPONENT:  Just to --

19              MS. NIEMEYER:  -- hope -- I would hope --

20              THE DEPONENT:  Your client's agent hasn't

21   paid you.  That's the difference.

22              MS. NIEMEYER:  I would -- I would hope

23   that the documentation that comes with the claims file

24   has proof of that payment to the broker.

♠                                                    35

1              MR. GOLDMAN:  He has just explained to

2    you that the payment was in December of '20.  The

3    claim file that you got, long predates December

4    of '20, Counselor.  Perhaps, that's the explanation.

5         But can we get off of this tangential issue

6    and continue with the deposition, please?

7              MS. NIEMEYER:  Oh, we are continuing with

8   the deposition, Steven.  And I --

9             MR. GOLDMAN:  Yeah, we are, apparently.

10  We --

11            MS. NIEMEYER:  -- object again to your

12  interference.  If you have a legitimate objection,

13  please make your legitimate objection, but I don't

14  need to be told how to take a deposition by you.

15            MR. GOLDMAN:  Counselor, I wasn't telling

16  anybody what to do, and I wasn't putting words in your

17  mouth.  Let's please proceed with the deposition.

18            THE DEPONENT:  When I send the file,

19  Michelle, you will see a confirmation from the broker

20  that they did receive the premium -- the return of

21  premium.

22            MR. GOLDMAN:  Mr. Usher, it goes without

23  saying, you'll send it to me.

24            THE DEPONENT:  Sure.

⬆                                                        36

1        BY MS. NIEMEYER:

2    Q.   So I -- I want to just -- let's go through

3    these topics of inquiry and just knock that out,

4    because we need to do that.

5             Tony, when you were prepared and -- and

6    potentially prior to this, have you been prepared to

7    discuss all the factual representations that have been

8    made by Great Lakes in the pleadings related to this

9    lawsuit?

10       A.   Yes.

11       Q.   Did you review the complaint in this lawsuit?

12       A.   Yes.

13       Q.   Were you involved in that when the lawsuit

14   was filed, or was that something you just did recently

15   as -- as the 30(b)(6) witness?

16       A.   No.  I did that recently.  I was not involved

17   in the drafting of the complaint.  I reviewed it as

18   part of the claims file where the draft denial was

19   proposed, approved and then issued.

20       Q.   Mr. Usher -- and, you know, were these

21   documents the -- the original pleadings, were they run

22   by someone within Concept or within Great Lakes to

23   confirm the accuracy of the factual representations?

24       A.   Within Concept, yes.

1    Q.   Who were they run by?

2    A.   I believe it was Sarah Delacey-Simms.

3    Q.   And what is Ms. Simms' role in re -- in

4    relation to this claim?

5    A.   She's a claims manager.

6    Q.   What does that mean exactly?

7     A.    She's second in command on the claims

8  department, behind Mr. Alexander Mark Thomas, but they

9  deal with claims independently.

10          Ms. Delacey-Simms is also -- has her master's

11 at law and her legal exec qualifications, so,

12 technically, is that she's more qualified than

13 Mr. Thomas on paper, but doesn't have quite the extent

14 of experience, albeit that she has ten years of

15 experience, I believe, dealing with these matters.

16     Q.    Now, was she assigned to be the claims

17 adjuster handling this particular claim?

18     A.    That's correct.

19     Q.    Would she have been the person who made the

20 decision about whether to accept or deny coverage on

21 the claim?

22     A.    Well, the ultimate agreement to deny the

23 claim, that -- Sarah Delacey-Simms would've been

24 responsible for proposing a denial of the claim

♠                                                     38

1  following legal opinion.  The ultimate decision to

2  proceed to deny the claim would have been Great Lakes

3  because of the quantum of the claim.

4     Q.    Okay.  So was there anyone else who had any

5  kind of decision-making involvement at Concept

6  regarding this claim?

7    A.   No.

8    Q.   Was -- and you mentioned Steve Sensibar.

9         Was he the person at Great Lakes who had the

10   decision-making involvement on that end?

11   A.   That's correct.

12   Q.   What was the role of Bill Bailey in this

13   claim?

14   A.   He was the local surveyor that we employed --

15   appointed.  Bill Bailey works with Andrew Ball at

16   Caribbean Surveyors and Bill Bailey, I believe --

17   either Bill Bailey or Andrew Ball penned the initial

18   report about the incident and the extent of damages

19   and so on.  And we also referred various comments to

20   Bill Bailey for his comments and further comments.

21   Q.   Did Mr. --

22   A.   So he was --

23   Q.   It wasn't clear, but it seems like Mr. Ball

24   and Mr. Bailey each have independent businesses; is

✦                                                      39

1    that correct?

2    A.   I don't believe so.  I don't believe so.  I

3    think they both work for Caribbean Surveyors.

4    Q.   Okay.

5    A.   I think it's Mr. Bailey's company.  He's -- I

6  think he formed Caribbean Surveyors, and Mr. Ball

7  works with him at Caribbean Surveyors.

8      Q.   Okay.  And so the two of them were -- or

9  their organization was appointed to be the local

10 representation in the Caribbean; is that correct?

11     A.   That's correct.

12     Q.   And in that role, did they have any

13 decision-making authority with regard to the claim?

14     A.   No.

15     Q.   Would you categorize them as acting as claims

16 adjusters or as marine surveyors in this claim?

17     A.   Fact find -- marine surveyors.  Fact finders.

18     Q.   Fact finders.

19          Okay.  Do you know if Mr. Bailey had any

20 direct, active involvement other than, essentially,

21 being the person who passed the information to

22 Mr. Ball when he was asked a question, for instance,

23 or when --

24     A.   We -- we did have some direct contact, direct

↑                                                      40

1  e-mail correspondence, with Mr. Bailey.

2      Q.   Did Mr. Bailey give any independent opinions

3  or -- or tell you any kind of ideas about the

4  investigation that were his ideas or his opinions, as

5  opposed to just passing on what Mr. Ball had provided

6  or created?

7      A.   Yes.

8      Q.   Would those opinions have been part of the

9  claim file?

10     A.   Yes.

11     Q.   Did he give you any opinions that differed

12 from the opinions that were contained in Mr. Ball's

13 written summaries or his written reports?

14     A.   I can't recall who said what.  They worked in

15 concert.  I know that there was a specific e-mail

16 where we asked for Mr. Bailey's comments about

17 Mr. Andersson's responses to our reservation of rights

18 letter.

19     Q.   And did you receive a response from

20 Mr. Bailey --

21     A.   Yes.

22     Q.   -- regarding that?

23     A.   Yes, I did.  Yes, we did.

24     Q.   Did you also receive a separate response from

1  Mr. Ball?

2      A.   I don't believe so.  I would imagine Mr. Ball

3  knew what Mr. Bailey said.

4      Q.   When your -- when your attorneys responded to

5  the counterclaim in this case, did -- did someone in

6  your company verify the facts that were being

7  represented in that response?

8      A.   I'm not sure I entirely understand the

9  question.  The -- we -- we -- we checked our facts

10  before we issued our denial letter and our declaratory

11  judgment proceedings.  I'm not sure anything in your

12  counterclaim would've changed any of that.  The -- the

13  information has not changed, put it that way (laughs).

14      Q.   Oh, okay.  That's -- that wasn't really my

15  question, but -- I'll take that answer (laughs).

16          My question was whether anyone within Concept

17  or within Great Lakes reviewed the response to the

18  complaint to confirm that what was being said in that

19  response was correct.  It was --

20          MR. GOLDMAN:  Do you mean your response?

21          BY MS. NIEMEYER:

22      Q.   -- signed by your attorney.

23          MADAM COURT REPORTER:  I'm sorry, I

24  didn't hear you, Mr. Goldman.

1          MR. GOLDMAN:  Sorry.

2          Counselor, do you mean your response?

3          MS. NIEMEYER:  The answer to my

4  counterclaim.

5            MR. GOLDMAN:  Ahh, thank you.

6       A.   Almost certainly, yes, it would've been

7  referred -- it would've been -- it would be in our

8  file somewhere.  I'm sure Mr. Goldman would have sent

9  a copy to us or sent a report advising what his

10 responses would be.

11      Q.   Where is Great Lakes incorporated?

12      A.   Germany.

13      Q.   Okay.  And it sounds, from what you said,

14 like Great Lakes still does have a presence and an

15 office where they work in London; is that correct?

16      A.   That's correct.

17      Q.   Do they have a presence in Germany that way,

18 too, or is it just the site of their incorporation?

19      A.   No, they have a substantial office.  The

20 owner of Great Lakes, the 100 percent owner of Great

21 Lakes, is Munich Re that are based in Munich.  So

22 Great Lakes' head office is also in Munich in the same

23 building.

24      Q.   Okay.  So let me ask you again, as far as the

⬆                                                      43

1  -- the relationship between Great Lakes and -- and --

2  I'm saying Great Lakes Insurance SE, which is the

3  current name or the name in this lawsuit, correct?

4    A.   That's correct.

5    Q.   Okay.  Is there a contractual relationship

6  between Concept and Great Lakes?

7    A.   Yes.

8    Q.   Does that contractual relationship include

9  any level or -- or description of claims-handling

10  practices that are expected to be followed?

11    A.   Yes.

12    Q.   Is that something that's documented in

13  writing?

14    A.   It would form part of the managing general

15  agreement.

16    Q.   Is the denial of coverage to a claimant when

17  the investigation is complete, one of those

18  claims-handling practices contained in the agreement?

19    A.   Sorry, could you repeat that?

20    Q.   When an investigation is completed, is it

21  expected that the coverage -- if there's a coverage

22  denial to be made, that the insured be sent a denial

23  letter?

24    A.   Yes.

                                                      44

1    Q.   Is there any timing spelled out on that?

2    A.   No.

3    Q.   Is there an expectation on the timing of

4  that?

5    A.   No.  Each individual circumstance could be

6  wildly different.

7    Q.   Once the investigation is complete, in your

8  experience, when would you expect to send a denial

9  letter if you believe there's no coverage?

10    A.   Very soon after.  I would think, normally,

11  within a week.

12    Q.   Is there any kind of written communication

13  that Concept provides to outside representatives, like

14  Mr. Ball and Mr. Bailey, regarding the claims-handling

15  practices that you follow?

16    A.   I don't believe so, no.

17    Q.   Has there ever been any kind of training or

18  verbal instruction about claims-handling practices to

19  the representatives that are being used outside of

20  your offices in England?

21    A.   No.  I think we require the claims adjusters

22  and surveyors that we use, the local surveyors, to be

23  either licensed or have extensive experience and so

24  on.  We do not sort of -- we don't use the yellow

1  pages to find surveyors.  These are people that we've

2  known for many years.

3      Q.    And do you require that these surveyors also

4    have claims-adjusting experience or claims-adjusting

5    licensure?

6      A.    No, not always.  Sometimes, they will be both

7    surveyors and adjusters.  Sometimes, they will just be

8    surveyors.

9      Q.    In this case, were Mr. Bailey or Mr. Ball

10   adjusters as well as surveyors?

11     A.    They would have prepared an adjustment report

12   had there been coverage, but they would not have had

13   authority to settle the claim based upon that

14   adjustment.  Again, it would be a case of assessing

15   the damage, regional repair costs and such like and

16   putting it into written -- into a written report.

17     Q.    Okay.  I'm going to ask you, your use of the

18   word "adjustment" is, in some ways, different from

19   what I'm accustomed to in U.S. insurance practice

20   where we say claims adjuster.

21          When you say the adjustment report, in the

22   context you just used it, do you mean a report of the

23   damages?

24     A.    That's correct, but also taking into

↑                                                           46

1    consideration the policy language.

2      Q.    But the --

3     A.   So an adjuster -- a surveyor will just tell

4  you what the damage is, right?  An adjuster will tell

5  you what the reasonable repair costs are and how it

6  applies to the policy in terms of any depreciation,

7  deductible, recoverable, non-recoverable and so on.

8     Q.   Okay.  So -- so -- and I think you're getting

9  to the difference in understanding that -- that I

10  have, which is, in your experience, it sounds like you

11  make the determination about coverage first; am I

12  correct?

13     A.   That's correct, yes.

14     Q.   And the person who is the determiner of

15  coverage may or may not be the claims adjuster; is

16  that correct?

17     A.   That's correct.

18     Q.   So, in this case, a determination was made by

19  someone who was in Concept, right, Ms. Simms --

20  Delacey-Simms?

21     A.   The question of coverage was raised by

22  Concept.  The determination of coverage was following

23  legal opinion.

24     Q.   Okay.  But, ultimately, the person

↑                                                    47

1  responsible for this is -- is Great Lakes, not your

2  lawyer, correct?

3      A.   That's correct.  But Great Lakes made the

4  determination based upon the legal opinion of the

5  lawyer.

6      Q.   Okay.  And so, that decision was made by

7  Great Lakes, and, at that point, the decision was made

8  not to further look at things like how much does it

9  cost to remove the vessel from the reef, et cetera;

10 the parts of the coverage that would be calculated by

11 the adjuster?

12     A.   That's correct, yes.  Once we determined

13 there was no coverage, then the adjustment process

14 would've ceased.

15     Q.   I'm going to show you the underwriting --

16          MS. NIEMEYER:  Hold on one second.

17     (Pause.)

18          (Technical difficulties.)

19          MR. GOLDMAN:  Can everybody hear me?

20          THE DEPONENT:  Yes.

21          MR. GOLDMAN:  I think I may have -- I'm

22 getting a screen that's asking me -- that's inviting

23 me to launch the meeting.

24          MS. NIEMEYER:  Don't launch this one.

1  You've -- you've navigated away from your Zoom.  Click

2  on the thing that looks like a camera.

3          MR. GOLDMAN:  Here we are.  I'm back on.

4  I don't know why that showed up.

5          I apologize for interrupting, Michelle.

6          MS. NIEMEYER:  Oh, no worries.  It's

7  confusing at best.

8          BY MS. NIEMEYER:

9      Q.   Okay.  So I had a question for you.  This is

10  not -- this is a little breakout document of the

11  larger document.  But this is a two-page document

12  which was in the underwriting file that was produced

13  to us.

14          Tony, can you explain what this?

15     A.   (Deponent viewing document.)  Yes.

16  Basically, it's an internal document that shows what

17  the underwriter did to rate the account so that we

18  have a record of how he arrived at the premium and so

19  on, what ratings he applied, what credits he applied

20  and -- and -- and so on.  And that will sit -- we have

21  an electronic file on every single underwriting file

22  that shows what the calculation process was.

23     Q.   Okay.  So -- so, when you look at this, is it

24  possible that there were multiple versions of this

1    during the underwriting of the policy and, ultimately,

2    one was chosen and used?

3        A.    Almost certainly.  Let me check.

4              (Deponent viewing documents.)

5        Q.    While Tony is looking --

6        A.    (Deponent viewing document.)  I'm just

7    looking -- sorry.  I'm just looking at the doc -- I'm

8    just making sure that this is exactly the same

9    one, 6927 at the bottom.  Yeah, this is the only rate

10   -- rate sheet on there.  So, frequently, there would

11   be a situa -- or could be a situation where the broker

12   has asked an alternative quote or the information has

13   changed and so on.  In this case, that's the only

14   quote that's there.

15              MS. NIEMEYER:  Okay.  And so -- I just

16   want to -- let me take a quick break for Laurie and

17   ask her a question.

18              Laurie, I intended to mark that notice of

19   deposition as Exhibit 1.

20              Did you make a note?

21              MADAM COURT REPORTER:  I -- hold on one

22   moment.  I marked it in the transcript already.

23              MS. NIEMEYER:  All right.  Okay.  All

24   right.  Great.  I just wanted to make sure that we had

1  that.

2         And I'd like to mark this document as

3  Exhibit 2, and this document has the Bates

4  numbers UF000008 through -9.

5              (Exhibit 2 marked for identification.)

6              MADAM COURT REPORTER:  It's all set.

7              MS. NIEMEYER:  Okay.

8              THE DEPONENT:  Do you need a break,

9  Laurie?

10             MADAM COURT REPORTER:  I'm going to need

11 one --

12             THE DEPONENT:  We've been going for a

13 while.

14             MADAM COURT REPORTER:  -- one in, like,

15 ten minutes is fine.

16             THE DEPONENT:  Okay.

17         BY MS. NIEMEYER:

18    Q.   Okay.  So I had a couple of questions about

19 this rate sheet.  It names the Hull Sum Insured as

20 365,000.

21         That's the amount that was actually insured,

22 correct?

23    A.   (Deponent viewing exhibit.)  That's correct.

24    Q.   Okay.  And I notice there are a number of

1  credits with hull ratings.  For instance, navigation,

2  25, and then it says, sailboat credit, minus 20.

3          Is that -- are sailboats a lesser risk than

4  powerboats?  Is that why?

5      A.  On the liability side, yes.

6      Q.  Okay.  So this is a liability rating, I see.

7          And -- and on the left is the hull rating?

8      A.  (Deponent viewing exhibit.)  That's correct.

9      Q.  So, if it were zero, that would be a

10  standard.

11          Is that how that works --

12      A.  (Deponent viewing exhibit.)  Um --

13      Q.  -- it's higher or lower, depending on what

14  you're rating?

15      A.  (Deponent viewing exhibit.)  That's correct,

16  yes.  So, the navigation, for example, is plus 25

17  because it's in the Caribbean, with the south of 12

18  degrees fortly [phonetic] during the hurricane season.

19      Q.  Okay.

20      A.  If it had been in Central Caribbean, it

21  probably would've been plus 70.  Okay?

22      Q.  Got it.  Or in Florida (laughs)?

23      A.  Florida, plus 50 (laughs).

24      Q.  All right.  So I just wanted to -- there was

1  something here -- where is it -- okay.  There's one

2  consideration noted.  It says that the quotation

3  requires trip and/or contingent crew.

4      A.   (Deponent viewing exhibit.)  Yup.

5      Q.   And the ultimate policy that -- that came out

6  didn't have that kind of a requirement.

7           So how does that line up?  Do they make -- do

8  you make changes later, after the rate has been

9  created on the rate sheet?

10     A.   No.  It's -- on the original application

11  form, a trip premium, for example, is a fully-earned

12  premium for an extended navigation trip; i.e.,

13  Transatlantic, Transpacific, Bermuda.  And then you

14  charge -- in addition to the base premium, you charge

15  a trip premium for that particular trip.

16     Q.   Okay.  So if this -- and that -- if there

17  were a trip premium paid, for instance, Martin decided

18  to cross the Atlantic, you would charge a separate

19  premium for that trip; is that correct?

20     A.   Yes.  Correct.

21     Q.   And that would be possible for him to do; he

22  could approach you and ask for that and then pay a

23  separate premium?

24     A.   He could pay a separate premium, yes.  And

1  then, of course, that would raise a bun -- a bunch of

2  other questions as to what's the crew compliment, how

3  much experience have you had of Transatlantic

4  navigation.  And there's a whole -- it opens up --

5  opens up a whole new questionnaire for --

6      Q.   Okay.

7      A.   -- a trip.

8           All right.  So, effectively, if, for example,

9  a vessel is going to go more than 150 miles offshore,

10  occasionally 250 miles away, that normally has a

11  minimum crew requirement, but it -- over 250 miles,

12  that constitutes a -- an additional trip premium.

13      Q.   Okay.  Now, if you'll take a look up here at

14  the top, again, at Vessel Details (indicating),

15  there's an offshore limit there, and, it says, "250."

16      A.   (Deponent viewing exhibit.)  Yeah.

17      Q.   Why -- why -- why does that say 250?

18      A.   I have no idea.  I think the quote said 150.

19      Q.   On this document, it says 250.  That's why

20  I'm asking.  So --

21      A.   Yeah.

22      Q.   -- is it -- was the rating --

23      A.   (Inaudible) --

24          (Whereupon, parties speaking at the same

1  time.)

2          MADAM COURT REPORTER:  I'm sorry, sir --

3          BY MS. NIEMEYER:

4     Q.   Was the premium calculated --

5          MADAM COURT REPORTER:  Michelle, I didn't

6  hear what he just said.  The last thing --

7     A.   Somebody -- yeah, somebody looked at it and

8  said that that vessel's not going 250.

9     Q.   If there were that kind of a change in the

10  underwriting, would that have affected the premium?

11     A.   It would affected the crew requirements.  I

12  think the vessel, because it's a 47-foot Catana --

13     Q.   Mm-hmm.

14     A.   -- it probably -- it probably would be

15  capable of doing 250, but then you would've had

16  minimum crew requirements, because that's an

17  extended-navigation trip.

18     Q.   Okay.  So the 250 versus 150 is not a

19  premium-related event?

20     A.   No.

21     Q.   Okay.

22     A.   It's only, you know, what we would require is

23  additional information.

24      Q.   Got it.  All right.  So I'm going to take

1    that document away and go back to our notice.

2           Mr. Usher, did you have any personal

3    involvement in the investigation of the claim?

4      A.   No.

5      Q.   Did you speak with Mr. Ball regarding the

6    investigation of the claim?

7      A.   No.

8      Q.   Did you speak with Mr. Bailey regarding the

9    investigation of the claim?

10     A.   No.

11     Q.   Did you speak with Ms. Delacey-Simms

12   regarding the investigation of the claim?

13     A.   Possibly, but I don't recall.

14     Q.   As the corporate representative here today,

15   what is the basis of your knowledge about the

16   investigation of the claim?

17     A.   Having read the -- the claims file and agreed

18   with the steps taken and the fact that I am the --

19   what is referred to as the control person under the

20   Managing General Agreement, the MGA agreement.

21   Managing General Agency Agreement, should I say.  So,

22   as a consequence, I am responsible for everything that

23    is transacted under that managing general agency

24    agreement.

⬆                                                              56

1     Q.    That said, that does not give you personal

2     knowledge of the day-to-day or what happened in the

3     experience of Ms. Delacey-Simms or Mr. Ball or

4     Mr. Bailey, correct?

5     A.    Except that, see, everything has been done in

6     writing, so, as a consequence, I know exactly what

7     questions were asked and what answers were given.

8     Q.    Is it fair to say that no efforts were made

9     in the investigation that were not reflected in the

10    claims file?

11    A.    It is fair to say that, yes.

12    Q.    And is it a reasonable stipulation to ask for

13    that any work that was done or communications that

14    were made or anything done in that investigation would

15    be reflected in the part of the claims file that was

16    produced in this case to us?

17    A.    Other than documents that may have been

18    placed on the claims file after the claims file was

19    sent to Mr. Goldman and forwarded on to you.

20    Q.    Was there continuing active claims effort

21    once the claim was forwarded for a legal opinion?

22    A.    No.  I believe the only ongoing activity was

23   in relation to establishing if the broker had refunded

24   the money to Mr. Andersson.  We already were aware

♠                                                                57

1   and, indeed, was confirmed by the broker that we'd

2   sent the money to them, but it was raised, I believe

3   by the attorney, as to check to see if the -- probably

4   on the basis as to whether Mr. Andersson had cashed

5   the check, because we hadn't issued a check, we

6   refunded it to the broker to establish whether he

7   cleared the funds.

8           So we went to the broker to ask them when

9   they paid the money over, and they confirmed that

10  they'd received it, but I don't -- I believe they also

11  said that they hadn't sent the check out.

12      Q.   Had not sent the check out?

13      A.   Had not sent the check, at that time.

14      Q.   Mr. Usher, were you involved in the decision

15  to file suit in this action?

16      A.   No.  I approved it, but I wasn't involved in

17  the decision.

18      Q.   Is it a practice of Great Lakes to file suit

19  prior to informing their insured that a claim would be

20  denied?

21      A.   Simultaneous.

22    Q.    Simultaneous.

23          Is that a -- is that the normal procedure

24    that's followed by Great Lakes?

⬆                                                                          58

1     A.    Yes.  Well, I say "yes," I mean, we don't

2     always, but frequently, we issue a dec action, a

3     declaratory action under Rule 98 simultaneously with a

4     denial letter.  Sometimes, it's just a denial letter.

5     Q.    Why do you do that?

6     A.    Because we would rather be the plaintiff and

7     control the forum as regards jury.

8               (Off the record at 9:10 a.m.)

9               (Recess taken.)

10              (Back on the record at 9:18 a.m.)

11              MS. NIEMEYER:  So I'm going to go ahead

12    and share another file here, which was produced as

13    part of the Rule 26.  And this has the Bates numbers

14    UF000001 through UF000111.  And, again, this is the

15    full -- it appears to be what was presented to me as

16    the underwriting file.

17              BY MS. NIEMEYER:

18    Q.    The same question as before, Tony; can you

19    confirm that this underwriting file documentation is

20    the underwriting file that was maintained by Concept

21    in the ordinary course of business on Great Lakes'

22  behalf?

23      A.   That's correct.

24      Q.   And did Great Lakes keep a separate

1   underwriting file, to your knowledge?

2       A.   I -- to my knowledge, they definitely did

3   not.

4       Q.   Is all -- is -- what is the arrangement

5   between your company and Great Lakes with respect to

6   underwriting?

7       A.   We do it for them.

8       Q.   Is there any oversight, any kind of

9   limitation to that?

10      A.   No.

11      Q.   Okay.  Now, this underwriting file begins

12  with a request for a quote.

13           To your knowledge, is this all the

14  information that would form the basis of the

15  underwriting?

16      A.   (Deponent viewing document.)  No.  It --

17  well, it's enough to give an indication.

18      Q.   And --

19      A.   So we would, then, indicate what the terms

20  are likely to be, and then that will be subject to our

21  application form.

22      Q.   Okay.  So, just so that people who may read

23  this who may not understand the insurance business

24  would understand, what exactly is an indication?

1       A.   An indication is an offer to treat with

2   certain subjectivities.  If you look at the

3   application form that was sent by WR Hodgens, that

4   would be totally inadequate to form a -- a formal

5   quote, right.  So, what we do is, we work out what the

6   premium is likely to be, what the terms are likely to

7   be, the deductible and so on, and if that's of

8   interest, we list what it is we require in order to

9   form that into a final quotation and bind coverage.

10      Q.   Okay.  And this -- this e-mail that you see

11  now, which is on Page 10 of that collection of UF

12  documents, it refers to an attachment that says it's

13  Quote 39 -- 395722HO1 and a report of survey.

14           Would that be the quote -- would that be what

15  you mean by the indication?

16      A.   (Deponent viewing document.)  That's correct.

17      Q.   Okay.  And it says Quote B below here.

18           Is there typically a Quote A?

19      A.   (Deponent viewing document.)  Yeah, and I'm

20  looking for that, because I looked at the underwriting

21  file.  I don't even see a Quote B.

22      Q.   No, me neither (laughs).

23           So that was going to be my next question to

24  you is, where is the quote?  Ultimately --

1       A.   You're likely --

2       Q.   -- I do see --

3       A.   Yeah.

4       Q.   -- a quotation here on Page 12 of this

5   document.

6            Is this what you would typically issue as a

7   quote?  And this is --

8       A.   If you --

9       Q.   -- B at the end of the number (indicating).

10      A.   Right.  If you look at the original request

11  for terms sent in by Bill Hodgens -- William -- WG

12  [sic] Hodgens, right, it asked for an alternative to

13  include charter.

14      Q.   Okay.  So is this --

15      A.   Yeah.

16      Q.   -- the alternative that includes charter?

17      A.   (Deponent viewing document.)  That's correct,

18  which was not taken up, which is why only A exists.

19      Q.   Okay.  And do you have A in your file?

20      A.   I have A, yes, which is the one that was

21  bound.

22           MS. NIEMEYER:  Okay.  Mr. Goldman, when

23  you do your review of the files, I have not received a

24  Quote A, I don't believe, so it might be helpful to

1  have the quote that's tied to the actual policy.

2           BY MS. NIEMEYER:

3      Q.   And we have a survey here, this is -- has

4  been produced in a number of forms.

5           But is it your understanding that this is the

6  prepurchase survey that was used as the basis for that

7  underwriting?

8      A.   (Deponent viewing document.)  That's correct.

9      Q.   By Jonathan Sands?

10     A.   (Deponent viewing document.)  Yes.

11          Can I just assist you a little bit, Michelle,

12  as well, by saying that, remember you showed me a

13  quote sheet --

14     Q.   Yes.

15     A.   -- where the numbers were on and so on?

16     Q.   Yes.

17     A.   That was Quote A.

18     Q.   Okay.  Okay.  So, Quote A, the one that was

19  taken up, that is the quote sheet that has the

20  250-mile statement?

21      A.   The quote sheet does, but the actual quote

22  said 150.

23      Q.   Okay.  There should be a quote, then, an

24  actual quote that says A or doesn't say A because it

1  was the first one, correct?

2      A.   Well, it stood -- it should still say "A."

3      Q.   Okay.  So now we have an application form.

4           And this specifically says private use, no

5  crew, correct?

6      A.   (Deponent viewing document.)  That's correct.

7      Q.   Is that the form that you relied upon when

8  you created Quote A?

9      A.   That's correct.  Well, no.  We gave the

10  indication was Quote A.  This is what we relied upon

11  in order to bind the coverage.

12      Q.   Okay.  So you do the quote and then you ask

13  for the application?

14      A.   Yes.

15      Q.   Okay.

16      A.   That's why we call it -- that's why it's

17  referred to as an "indication."  We're saying these

18  are what the terms are going to be, providing you send

19  us the -- and then we'll have a subjectivity on there

20  saying, subject to completed Concept Special Risks

21  application form, because we only accept our

22  application form.

23      Q.  Got it.  Okay.  And we do --

24      A.  I'll tell you what --

↑                                                          64

1      Q.  -- have a quote right here.

2      A.  I'll tell you --

3      Q.  Okay.  So Page 56 has our Quote A, it has

4   the 6927, which is the premium that was on that form,

5   the rating form.

6      A.  (Deponent viewing document.)  Correct.

7      Q.  So, presumably that's --

8      A.  (Deponent viewing document.)  If you

9   scroll -- if you scroll up a bit, Michelle, you'll see

10  the mileage limitation on there.

11      Q.  I'm sorry, the what?

12      A.  The mileage limi --

13      Q.  The mile --

14      A.  (Deponent viewing document.)  The mileage

15  limitation --

16      Q.  Okay.

17      A.  -- is not to exceed 150 miles offshore.

18      Q.  Got it.  And -- and let's talk about that for

19  a second.

20      A.   (Deponent viewing document.)  It's confined

21  to Florida, the Bahamas and the Caribbean Sea.

22      Q.   And when you define "Caribbean Sea,"

23  essentially, you mean inside of the islands, correct?

24      A.   Yes.  Otherwise it's the Atlantic.

&uarr;                                                         65

1       Q.   Right.  Excluding Cuba, Colombia, Haiti and

2   Venezuela.

3            Why are those places excluded?

4       A.   Cuba, because it's a nightmare getting

5   anything done in Cuba.  Colombia, because -- Colombia

6   and Haiti, because of the political situation.

7   Venezuela was a new addition over the last couple of

8   years because of the political situation there as

9   well.  It's almost impossible to get a surveyor to go

10  to any of those places.  And, indeed, it's difficult

11  for them to get authority to go to Cuba as well, so we

12  think it is a lot easier just not letting them go

13  there.

14      Q.   Is there danger to people or to the vessel in

15  going to any of those places?

16      A.   Can be.

17      Q.   Can there be elevated risk of piracy, for

18   instance?

19        A.   Absolutely.

20        Q.   Is there an elevated risk of theft?

21        A.   Yes.

22        Q.   Is there an elevated risk of, potentially,

23   the passengers being harmed?

24        A.   Possibly.  I don't know.

⬆                                                                66

1             I mean, we all know what the circumstances

2    are -- I don't think that there's a likelihood of

3    somebody being harmed in Cuba, but there's a --

4    certainly an enhanced risk of the vessel being

5    arrested in Cuba, and it's non -- impossible to get

6    any salvage done in Cuba or repairs effected in Cuba.

7             Fortunately, because Great Lakes is not an

8    American company, it can transact; it can make

9    payments to Cuba, because there -- there's not a

10   sanctioned area.  But it's just a myriad of problems

11   and complexities associated with getting anything

12   achieved in Cuba, Colombia, Haiti or Venezuela.

13        Q.   How about Venezuela for -- specifically?

14        A.   There are problems in Venezuela.

15        Q.   Can you describe those problems for the

16   record in -- in relation to your business?

17        A.   Yeah, there's a much -- much greater en --

18  enhanced danger of theft.  It's not an area that

19  adjusters like to travel to.  There is political

20  unrest there.  There's poverty and starvation there.

21  We'd just rather our insured doesn't go there.

22      Q.   Why don't the surveyors want to go there?

23      A.   Because there's political unrest there.

24  Because it's not a very nice place to go.  Not much in

❦                                                         67

1   the supermarket.  It's a lot easier to just say, don't

2   go to Venezuela.

3       Q.   Do they feel unsafe there?

4       A.   I think so.  I would.

5       Q.   If you had a choice of staying out in the

6   water versus going to a Venezuelan island, would you

7   stay out sailing?

8       A.   I would prefer to stay out sailing, unless I

9   had a problem with the boat.

10      Q.   Okay.  So, as we move through here, we have a

11  temporary binder (indicating).

12           That's the binder under that quote, correct?

13      A.   (Deponent viewing document.)  That's correct.

14      Q.   And that would've been followed by the

15  issuance of an insurance policy, correct?

16      A.   Yes.

17     Q.   And is this the hurricane plan for this boat?

18     A.   (Deponent viewing document.)  I can't see

19  because you've scrolled too far.  If you could, scroll

20  up a bit.  It looks like it probably is, but you're

21  going to have to scroll up to see what the heading

22  was.

23     Q.   (Attorney complied.)  It's a --

24     A.   (Deponent viewing document.)  I'm sure it --

⬆                                                       68

1     Q.   -- it's a piece of paper (laughs).

2     A.   (Deponent viewing document.)  It says,

3  questionnaire and plan, yes.

4     Q.   Okay.  Okay.  All right.  So, now this here,

5  this is the survey recommendations compliance.

6          What is that?

7     A.   (Deponent viewing document.)  Effectively,

8  when the survey was conducted, there were a number of

9  recommendations made by the surveyor.  We require the

10  insured to comply with those recommendations or advise

11  us if there are any outstanding recommendations, which

12  is why --

13     Q.   And is it --

14     A.   -- there is a box --

15     Q.   Is it --

16     A.   -- there, to list --

17                    (Whereupon, parties speaking at the same

18   time.)

19         BY MS. NIEMEYER:

20   Q.   Is it your understanding --

21             MADAM COURT REPORTER:  Excuse me.  I'm

22   sorry, Michelle, I didn't get the end of his answer.

23             MS. NIEMEYER:  I'm sorry.

24             MADAM COURT REPORTER:  It's okay.  If

⬆                                                     69

1   there are any outstanding recommendations, then I

2   couldn't hear the next couple words.

3    A.   Which is why there is a box there, to list

4   any outstanding recommendations.

5             MADAM COURT REPORTER:  Thank you.

6         BY MS. NIEMEYER:

7    Q.   Okay.  So, if this is -- if this is signed

8   with that box empty, (indicating) would that imply

9   that there were no recommendations left?

10   A.   We wouldn't accept it if it was completely

11   empty.  But he specifically said that all items are

12   completed prior to the launch of the vessel.

13   Q.   Okay.  What is an LOC?

14   A.   Letter of compliance.

15   Q.   And it looks like here, that had to be done

16  over; is that correct?

17      A.  (Deponent viewing document.)  That's correct.

18  Because it had to refer to the survey, because the

19  letter of compliance links to the survey that was

20  conducted.

21      Q.  Okay.  And on a separate note, I think I

22  understand why the survey's signed on a different date

23  than the cover sheet for the survey has on it.  I

24  noticed that when I was looking at it.  So now we have

♠                                                          70

1  the 16th of January an urgent e-mail.

2          Why is this?  This is because you had not yet

3  received that new letter?

4      A.  (Deponent viewing document.)  No.  It

5  specifically says what's outstanding.  And what we're

6  asking of the -- yes, it is saying the letter of

7  survey recommendation compliance, right, the

8  application form for the name of the Operator

9  Number 1, right, we have to have a background check on

10  each operator, as it's a named-operator policy.

11      Q.  Okay.

12      A.  (Deponent viewing document.)  Then they're

13  saying that there's a new premium, because he's

14  declared that he's living aboard.

15      Q.  Okay.  And it appears -- it appears you have

16  another form here and another response; is that right?

17      A.   (Deponent viewing document.)  It looks like

18  it.

19      Q.   Okay.  And now I have another one (laughs),

20  and this is tied to the application, and now we have a

21  policy issued.

22           So, presumably, that last version was

23  accepted as sufficient, correct?

24      A.   (Deponent viewing document.)  That's correct.

&#10016;                                                          71

1      Q.   Okay.  Is it your understanding that the

2  policy that we have here at Page 83 of the

3  underwriting file is the policy that was issued and at

4  issue in this case?

5      A.   (Deponent viewing document.)  That's correct.

6      Q.   Okay.  It appears that the premium went up a

7  tiny bit.

8           Are you aware of why that might be?

9      A.   Because of the live-aboard.

10      Q.   Okay.  Wow, that's nothing.

11           That's less than a hundred dollars?

12      A.   Yeah.

13      Q.   Okay.  And this includes that navigational

14  limits warranty we discussed?

15    A.    (Deponent viewing document.)  That's correct.

16    Q.    As -- as well as the -- the hurricane

17 restriction?

18    A.    (Deponent viewing document.)  Correct.

19    Q.    And the survey recommendations requirement?

20    A.    (Deponent viewing document.)  Yeah.

21    Q.    I wanted to ask you about the word

22 "seaworthy" that's in this policy.

23          The policy defines seaworthiness, and, it's

24 my understanding, there's also a -- an admiralty legal

                                                    72

1 concept about seaworthiness, correct?

2     A.    Correct.

3     Q.    Is this -- is your definition intended to

4 reflect that admiralty legal definition, or does it

5 differ in some meaningful way?

6     A.    I -- I don't know whether we -- well, we

7 certainly -- I don't believe we paraphrased it, but as

8 far as we were content with that definition.

9     Q.    Okay.  Now, at some point, every boat that

10 sinks is unseaworthiness at some point in its voyage,

11 correct?  It's unseaworthy; it sank --

12    A.    Correct.

13    Q.    -- is that correct?

14          So when -- is there a line you draw where you

15  decide when something has to be seaworthy to satisfy

16  the warranty of seaworthiness?

17      A.   Yes.  It has to be seaworthy at the --

18  throughout the policy and -- and -- and/or until the

19  time of the incident.

20      Q.   How do you define what the incident is?  Is

21  there policy language that tells you when, in a chain

22  of events, something has happened that would now

23  change that seaworthiness situation?

24      A.   Yeah, an external event.

  &#9650;                                                                   73

1       Q.   Can weather be an external event?

2       A.   Yes.

3       Q.   Where in the policy does it say it needs to

4   be an external event?

5       A.   I don't believe that we specifically say

6   "external event."  It's -- as far as we're concerned,

7   it's a policy that covered accidents, so it's -- it's

8   a combination of various aspects.  For example, we

9   exclude wear-tear, gradual deterioration.  If the

10  vessel suddenly starts to take on water for no

11  apparent reason, if no external event that we can

12  determine, then it raises questions about the

13  seaworthiness of the vessel.

14      Q.   I'm -- I'm bringing you to the part, it's --

15   this is on Page 87, UF000087.

16             MS. NIEMEYER:  And, Laurie, I will mark

17   individual -- like an independent document that is the

18   policy, we'll -- we'll do that separately, because I'm

19   not going to have you mark this whole document.  But

20   while we're here, we'll talk about it and it'll be the

21   same numbers.  It just won't be the same.

22             MADAM COURT REPORTER:  (Nods head.)

23             BY MS. NIEMEYER:

24      Q.   So if we go to this part right here

♠                                                        74

1   (indicating); Coverage A, hull, machinery, equipment

2   and dinghy; is that the coverage that would be at

3   issue had you decided to cover this claim?

4      A.   (Deponent viewing document.)  Yes.

5      Q.   And where, here, does it say that there needs

6   to be an external event?

7      A.   (Deponent viewing document.)  It's basically

8   covered for accidental, physical loss or damage to the

9   scheduled vessel.

10      Q.   Okay.  And -- and so, would you -- would you

11   agree that the language that's in the first paragraph

12   of this section 3 (indicating) is the language that

13   defines when there would be coverage for something,

14   and then you would go to the exclusions to see if that

15   would be taken away by some sort of event; is that

16   correct?

17         A.   That's correct.  It -- well, effectively,

18   what we're doing is, we're saying, if there is an

19   event, right, an accidental event that occurs and --

20   subject to exclusions, then coverage will be afforded.

21              So, in this instance, what we're saying is,

22   there was an issue with seaworthiness -- seaworthiness

23   and the issue of the navigation.  All right.  Only if

24   the vessel is unseaworthy, right, at the commencement

❦                                                          75

1    of the voyage and throughout the currency of the

2    policy, then coverage will be voided.

3          Q.   And when you -- when you say it "will be

4    voided," is there policy language that voids the

5    policy when you have a -- a violation of a warranty

6    like seaworthiness?

7          A.   Yes.  It will be in the general conditions.

8          Q.   Okay.  They're above this part (indicating),

9    right?

10         A.   (Deponent viewing document.)  I'm going to --

11   because you're scanning very quickly there --

12         Q.   Sorry.

13      A.   -- I'm just going to pull up my own version.

14      Q.   Yeah, if you can tell me --

15      A.   (Deponent viewing document.)  It's your

16 Policy A, isn't it?

17      Q.   Tell me the page on your policy form.  We can

18 work off that.

19      A.   (Deponent viewing document.)  Okay.  Do-do,

20 do-do, do-do.  Okay.  Let's go to general conditions.

21 Right.  Under General Conditions and Warranties, it is

22 warranted that the scheduled vessel is seaworthy at

23 all times during the duration of this insuring

24 agreement.  Breach of this warranty will void this

⬆                                                     76

1 insuring agreement from its inception.

2      Q.   Okay.  So you now -- that warranty, as we

3 discussed before, at some point, any vessel that has a

4 claim for a hull damage has, you know, perhaps not

5 become unseaworthy in that it sinks, but it would be

6 considered probably unseaworthy, correct, at some

7 point?

8      A.   If -- if a vessel -- yes, obviously,

9 post-incident, the vessel would've become unseaworthy.

10 This is at the time of the incident.

11      Q.   Okay.  So, at some point, something happens.

12 I'm going to bring this a step farther.

13    A.    Correct.

14    Q.    One of the allegations that was made in some

15   of the correspondence I saw, the reservation of rights

16   and -- and in the later reports, involved the VHF.

17   And the argument was that because the VHF wasn't

18   transmitting in Santo Domingo, that the vessel was

19   unseaworthy.  When that --

20    A.    The ves --

21    Q.    It was also acknowledged in a report by

22   Mr. Ball that it's possible, given the heavy weather

23   conditions, that the VHF could've either had a wiring

24   issue or the -- that some kind of damage could've been

1    done to the antenna.

2     A.    Yes.

3     Q.    And so my question to you is, if -- assuming

4    that were the case, assuming there were damage to an

5    antenna as a result of weather conditions, but the

6    later event is a grounding, does that damage to the

7    antenna, is that the point where you start having a

8    problem?

9     A.    No.

10    Q.    If you have a weather condition that causes

11   you to change course, for instance, is that weather

12    condition the -- the point where the seaworthiness

13    question stops because you're in your incident, so to

14    speak?

15        A.    No.  What we're looking at here, when the --

16    if you're unable to navigate the vessel because of

17    prevailing weather conditions, the question now goes,

18    well, have you got adequate crew.  That's why you have

19    the definition of seaworthiness, which is that the

20    equipment of the vessel and the adequacy of the crew

21    also goes to the seaworthiness of the vessel.

22            What we're saying here is, it's not just the

23    vessel itself.  It is the vessel's ability for it to

24    safely undertake the voyage that is being commenced.

⬆                                                          78

1        Q.    If, at the time --

2        A.    In this instance, that means also having

3    adequate charts on board.

4            Now, in the event that the vessel was

5    perfectly seaworthy at the time that it departed,

6    right, the question mark is, why did it become

7    unseaworthy?  Now, if there was a situation on the

8    masthead, for example, that stopped the use of the

9    VHF, that would not, in of itself, be adequate for us

10    to deny coverage.

11            If, however, the vessel departed, all right,

12  with an inadequate crew and inadequate charts for it

13  to undertake the voyage or that the intended course of

14  the voyage would take it outside of its navigation

15  ordinance or that the weather conditions forced the

16  vessel outside of the navigational limits because of

17  the inadequacy of the crew, that would all render the

18  vessel unseaworthy.

19      Q.   When you say, if the weather conditions took

20  the vessel out of its intended course because of the

21  inadequacy of the crew, can you be more specific about

22  what you mean by that?

23      A.   Yes.  If, for example -- which is fairly

24  indicative in this case.  If, for example, one of your

⬆                                                       79

1  crew numbers became severely seasick and was unable to

2  assist you in the operation of the vessel, right, and

3  as a consequence, you have to steer with the wind

4  because you couldn't tack, because you didn't have a

5  second member of crew on board to assist you, then

6  your crew has now become inadequate in order for it to

7  embark and successfully complete the voyage that it

8  embarked upon, right?  So --

9      Q.   And can you -- are you aware of any

10  documentation or evidence in this case that says that

11  the vessel couldn't be tacked because of the crew's

12  medical condition?

13      A.   I believe the implication was that the sea

14  conditions and a 15- to 18-knot breeze, 12-foot seas,

15  15- to 18-knot breeze, encouraged the ship to take a

16  different voyage -- a different route, because he was

17  operating on his own.

18      Q.   Do -- are you aware of anywhere in the

19  documentation that it says because he was occupy --

20  operating on his own?

21      A.   The implication, because the other seaman --

22  the other crew member was severely seasick.  That was

23  comments made by your client.  And then because your

24  client responded to our reservation of rights letter

↑                                                          80

1  where these issues were raised.  And we then passed

2  your client's comments to Mr. Bailey for his comments,

3  as he has far more intimate knowledge of the waters

4  and had visited the vessel, was far more familiar with

5  the file.  And we, therefore, used his comments,

6  assisted us in making our determination.

7      Q.   Are you aware of whether your claims

8  investigation included any kind of consideration of --

9  of the weather and the wind direction and the shifting

10  in the wind direction related to that course and the

11    timing of the vessel -- the -- the timing of the wedge

12    [phonetic]?

13        A.    Mr. Bailey did take that into consideration

14    as well, yes.

15        Q.    Did he document that anywhere?

16        A.    He wrote it as an e-mail in response to

17    Mr. Andersson's comments, which were, in turn, in

18    response to our reservation of rights, which, of

19    course, preceded the denial letter.

20        Q.    You mentioned earlier that you weren't sure

21    if Mr. Ball had given a response.

22              I'll show you this later, but is it possible

23    that there were two responses that were relied upon,

24    or was there just one?

♠                                                              81

1        A.    It's possible there's two.  I believe that

2    Mr. Ball may have written the initial report.  The

3    initial report gave cause for concern.  We, therefore,

4    issued a reservation of rights.  Mr. Andersson

5    responded with some comments in response to our

6    reservation of rights.  We passed those comments, I

7    believe, to Mr. Bailey for him to comment on the

8    comments that were being made by Mr. Andersson.

9        Q.    Okay.  And my question is limited to that

10   secondary response; the response to the letter that

11   came from Mr. Andersson.

12        Is it your understanding that there was only

13   one response that was relied upon, or were there two?

14   Was there one from Mr. Bailey, or was there one from

15   Mr. Ball and Mr. Bailey in response to the

16   January 15th letter?

17   A.   I believe it was from Mr. Bailey.  I don't

18   recall seeing one from Mr. Ball as well.

19   Q.   Okay.  We'll look at those so you can see

20   later.  I just want to clarify, there may -- if -- if

21   there are two, we don't have two.

22   A.   Okay.

23   Q.   And I'll show you the one I do have.  I want

24   to go back to that definition of seaworthiness again

♠                                                       82

1   and touch base on that with you.

2        Here, can you see that okay?

3   A.   (Deponent viewing document.)  I'm just

4   opening up mine first.  Let me scroll up.

5   Q.   It's on Page 3 of your policy.

6   A.   I know where it is.

7   Q.   I'm sure you do.

8        (Laughter.)

9   A.   It's -- it's just that it takes a little

10   while to scroll up on this thing.

11       Q.   It's like a politician saying, "We're going

12   to create jobs."

13            (Laughter.)

14            BY MS. NIEMEYER:

15       Q.   Back to K.

16            So what is the intended purpose of this

17   scheduled vessel?

18       A.   (Deponent viewing document.)  We're only

19   insuring the vessels that are scheduled on the policy.

20   In this instance, it's a single vessel.  In some

21   instances, it may be a fleet of vessels that have been

22   scheduled, because we're only covering the -- the hull

23   and liability of this particular scheduled vessel and

24   its activities.

⬆                                                        83

1        Q.   Okay.  So that's not really my question, but

2    thank you for clarifying that, because that's helpful

3    to the other people who might read this.

4             And the scheduled vessel, for clarity, is

5    Melody, which is the vessel, this catamaran, which

6    ultimately, is the source of this claim, correct?

7        A.   Correct.  Yes.

8        Q.   What is the intended purpose of Melody?

9    A.   To sail.

10   Q.   I'm sorry?

11   A.   To sail.  It's a yacht.

12   Q.   Okay.  Is there --

13   A.   Right.

14   Q.   -- is there any definition in this policy

15   that helps you understand what the intended purpose of

16   a particular vessel is?

17       A.   Yes.  I mean, the application form tells me,

18   largely, what the vessel is intending to do, right, in

19   this instance and also, therefore, the risks that

20   we're con -- we're content to bear.

21           So, in this instance, right, its intended

22   purpose has to comply with the policy, which is to

23   sail in the agreed navigational area, not exceeding

24   150 miles offshore.  That's its intended purpose,

                                                        84

1    right, the vessel, by making a voyage, right, must be

2    fit for its intended voyage, right.

3           So the insured, within the confines of the

4    policy language and the coverage afforded under the

5    policy language, right, can operate the vote -- the

6    vessel, but the vessel must be fit for its intended

7    voyage.

8           So, for example, if Mr. Andersson had decided

 9   that, I'm bored with Central/South America and the

10   Caribbean, I fancy going over to Europe and seeing

11   what the Mediterranean's like, right, the question

12   mark would -- would be the vessel be fit for that

13   intended purpose?  Does it have adequate crew for that

14   intended purpose?  Does it have the necessary

15   equipment and gear for that voyage?  And is the voyage

16   permitted under the policy?

17        So, in order for it to be seaworthy, the

18   vessel must be fit for what it's intended to do, which

19   is undertake voyages.  It could be anything from day

20   sailing to a more extended voyage, and providing it

21   complies within the terms of the policy language,

22   then, that's not an issue.

23   Q.   So is it fair to say that the vessel's

24   intended voyage is the voyage that was intended by the

                                                        85

 1   master when the vessel set out on its voyage?

 2   A.   Correct.

 3   Q.   If my intention is to leave Miami and go on a

 4   voyage to Fort Lauderdale, but because of a weather

 5   condition, I end up in the Bahamas, have I -- am I

 6   unseaworthy when I'm outside of my intended voyage and

 7   I don't have charts for that area?

8          MR. GOLDMAN:  Objection to form.

9     A.   Probably.

10    Q.   Why?

11    A.   Because as you already say, you don't have

12   charts for that area, right, and you didn't have an

13   adequate crew to operate the vessel and prevent

14   prevailing sea conditions blowing you 90 miles off --

15   off course.

16    Q.   If those sea conditions were unexpected, and

17   my intended voyage -- my crew was adequate for my

18   intended voyage, but things changed, where do you draw

19   the line on whether the vessel is seaworthy?

20         MR. GOLDMAN:  Objection to form.

21    A.   Reasonability.

22    Q.   Reasonability?

23    A.   Yes.

24    Q.   Can you -- can you go into that a little

♠                                                    86

1   further and explain what you mean by that?

2     A.   Okay.  Is -- is it a reasonable scenario,

3   whereby you were embarking on a trip from Miami to

4   Fort Lauderdale, right, which would probably have been

5   not more than, say, eight to ten miles offshore.  And

6   that weather started to blow up, and instead of going

7   ten miles in shore and seeking sa -- safe harbor, you

compatibility

er

8    just got blew out -- you got blown out to sea and

9    ended up in the Bahamas without adequate charts and --

10   and so on, then I would say, yes, your vessel was

11   unseaworthy.

12          Because why would you make that decision?

13   It's not reasonable to make the decision.  For

14   example, if I'm going from Miami to Fort Lauderdale,

15   I'm not -- why would I go 30, 40 miles offshore?

16   Q.   And that's -- that's a hypothetical, but

17   let's -- let's go to the real facts of this case.

18   A.   Okay.

19   Q.   If your intention was to sail northeast a

20   bit, and then sail east, and then follow the islands

21   up as you head north, but the conditions changed in a

22   way that you weren't able to do that without risking

23   damage to the vessel and with a crew member who got

24   sick and whose illness was helped by changing the

⌂                                                                    87

1    course of the vessel, would you expect that the person

2    should have the charts for the island that's hundreds

3    of miles away from the originally intended course?

4          MR. GOLDMAN:  Object to the form.

5    A.   I wouldn't expect somebody -- because that

6    would be an unreasonable scenario.  The reasonable

7   scenario would be, was, as I understand it from

8   Mr. Andersson's testimony, that the crew member became

9   seasick fairly quickly after his departure from Aruba.

10  The reasonable thing to do at that stage would be to

11  return to Aruba.

12      Q.   It -- I've seen a number of things in the

13  documentation on the -- on the Concept side of

14  analysis where references were made that implied that

15  this -- that the crew member was sick immediately or

16  very shortly after, but I haven't seen any document

17  that says that that's actually true.

18          Can you point me to something that says that

19  the crew member became sick immediately upon leaving

20  the harbor?

21          MR. GOLDMAN:  Object to the form.

22      A.   I will try to locate something.

23          (Deponent viewing document.)

24          MR. GOLDMAN:  As long as it's not a

&                                                        88

1   report from counsel.

2           MS. NIEMEYER:  I'm sorry, Mr. Goldman,

3   what did you say?

4           MR. GOLDMAN:  I said to Mr. Usher, "As

5   long as it's not a report from counsel."

6           THE DEPONENT:  I understand.

7    A.  (Deponent viewing document.)  You'll have to

8  be patient, Michelle.

9    Q.  I am.

10    A.  There are a whole lot of documents to locate

11  this from.

12    Q.  Take your time.

13    A.  (Deponent viewing document.)  All right.

14  Approximately ten hours out of Aruba, the wind speed

15  increased significantly from 15 to 18 knots, and there

16  was a shift in the wind direction from north to

17  northeast, wave heights increased from six to ten -- 6

18  to 8 to 10 to 12 feet.  This was when my crew member

19  became -- began to be sick.

20    Q.  And where did you find that?

21    A.  (Deponent viewing document.)  This is in

22  Mr. Andersson's response to our reservation of rights.

23    Q.  Okay.  So that's the January 15th letter?

24    A.  (Deponent viewing document.)  Correct.

89

1    Q.  About ten hours, you said?

2    A.  Yes.

3    Q.  And if you're heading east-northeast about

4  ten hours, where does that put you from Aruba?

5        MR. GOLDMAN:  Object to the form.

6    A.   I don't know what speed he was doing.

7  Probably five knots, 50 miles.

8    Q.   Have you looked at the performance

9  characteristics of this boat?

10   A.   No.

11   Q.   Is that something that would need to be done

12 to be able to tell where the boat would've been,

13 roughly, at that time frame?

14   A.   I'm not interested.

15   Q.   Is it a good idea to head straight downwind

16 in a catamaran --

17           MR. GOLDMAN:  Object to the form.

18           BY MS. NIEMEYER:

19   Q.   -- in heavy winds?

20           MR. GOLDMAN:  Object to the form.

21   A.   I'm not -- I am not a sailor.

22   Q.   Okay.  And you weren't the one who made the

23 decision here, so that's -- I'm not asking you if you

24 would do that.

                                              90

1           But you -- so you don't have sailing

2  knowledge related to that?

3    A.   No.

4    Q.   Are you aware of what would've been

5  geographically nearby to get to the closest port had a

6  decision been made to go to the closest port at that

7  time?

8      A.    No.

9      Q.    Does the country Venezuela ring a bell?

10     A.    Well, I know Venezuela's very proximate to

11 Aruba, but I think it's south of Aruba, not northeast

12 of Aruba.

13     Q.    It's east.

14           There -- did anyone at Great Lakes sit down

15 and, in detail, sit with Martin Andersson and ask him

16 to show them, with a chart, where he intended to go

17 and where he thinks his boat went?

18     A.    No.  We relied on Andrew Ball and/or Bill

19 Bailey.

20           (Deponent viewing document.)  And, actually,

21 I'm just looking at -- it was Andrew Ball who

22 responded to the -- Mr. Andersson's comments.  And the

23 reason I thought it was Bill Bailey is because it

24 looks like we sent it to Bill Bailey.

1      Q.    Was -- to your knowledge, is it a standard

2  practice for claims adjusters or for surveyors taking

3  a statement from a witness or from a -- an owner who's

4  making a claim to record that statement?

5     A.   Not necessarily.

6     Q.   How is that?

7     A.   If you're --

8     Q.   Is it --

9     A.   If you're --

10    Q.   In your understanding, how is that typically

11  done?

12    A.   It depends.  If you're doing a -- it depends

13  if you're conducting an interview under oath, or if

14  you're just taking a statement, or if you're taking a

15  recorded statement.  Obviously, if you're taking a

16  recorded statement, it must be with the full knowledge

17  of the interviewee that the statement is being

18  recorded.

19    Q.   Do you know if this was a recorded statement?

20    A.   No.

21    Q.   Do you know if there was a recorded statement

22  taken of Mr. Andersson?

23    A.   I don't recall.

24    Q.   Was there ever any statement examination

♠                                                        92

1   under oath taken of Mr. Andersson?

2     A.   I don't believe so, but I don't recall.

3     Q.   What, in your opinion, would be the greatest

4   -- the most accurate evidence of the path of the

5  vessel?

6      A.   The GPS.

7      Q.   Do you know whether Mr. Ball checked the GPS

8  when he inspected the vessel?

9      A.   Mister who?

10     Q.   Mr. Ball.

11     A.   Oh, Mr. Ball, I'm sorry.  Mr. Ball.

12          I think there was an issue of securing the

13  GPS.  I recall when I was reading the file earlier on

14  that there was an issue where they've now discovered

15  there were, like, three electrical units on board.

16  One of them was damaged by water, but one appears to

17  have been recently located that resided with the

18  salvor, and that has now been secured.

19     Q.   Is it --

20     A.   That will tell us the course --

21     Q.   -- (inaudible) --

22     A.   -- and the --

23          (Whereupon, parties speaking at the same

24  time.)

                                                    93

1          MADAM COURT REPORTER:  I'm sorry, can you

2  -- can you just, please, start your sentence over,

3  sir?  I couldn't hear the first couple words.

4     A.   I believe the GPS has now been located, and

5   that will tell us the course and the route that the

6   vessel took.

7     Q.   And I can tell you what happened at that

8   inspection, but it's not relevant to this deposition.

9          Mr. Usher, during the time frame prior to the

10  decision to deny coverage here, are you aware of any

11  effort made by Concept or by Great Lakes or their

12  agents to obtain the GPS units from the boat?

13    A.   No.  We relied on the surveyor for

14  information and comment.  I would --

15    Q.   Are you --

16    A.   -- imagine that surveyor would be looking to

17  secure the GPS.

18    Q.   When you're making a decision as important as

19  denying coverage on a navigational warranty, would it

20  be your practice to want to look at that GPS to secure

21  the track?

22    A.   If it was regularly available -- readily

23  available, I'm sure the surveyor would've looked at

24  it.  We relied on the surveyor's comment as to who had

                                                        94

1   conversed with Mr. Andersson as to where the vessel

2   was going, what the vessel was doing and how far

3   offshore it would've been.

4      Q.   So is your denial based purely on the reports

5   of Mr. Ball?

6      A.   Yes, I think so.

7      Q.   Was any other investigation undertaken, other

8   than Mr. Ball traveling to inspect the vessel and to

9   speak with Mr. Andersson?

10      A.   No.  The only reports we have are the ones

11   from Caribbean Surveyors, Andrew Ball.

12      Q.   Was there ever billing by Caribbean Surveyors

13   subsequent to the bill that related to his travel and

14   initial visit to the vessel?

15      A.   (Deponent viewing document.)  I'm going to

16   have to look at the whole file to find that out.

17           As far as I can see, there's only one fee

18   bill from Caribbean Surveyors.  I'm expecting to have

19   more because, obviously, we have to pay his expenses

20   for deposition.

21      Q.   Okay.  And my thought process on that was

22   that if there was a review done of the January 15th

23   letter, January 15th is subsequent to the date of that

24   bill, isn't it?

♠                                                            95

1      A.   Yes.  The first bill was dated the 8th of

2   January, albeit we didn't receive it until the 10th of

3    January.

4           (Deponent viewing exhibit.)  Let me just see

5    -- well, oh.

6       Q.   Okay.  And I am just going to grab that

7    document.

8           Is this the invoice you just mentioned?

9       A.   (Deponent viewing document.)  Yes.

10          MS. NIEMEYER:  Okay.  So we're going to

11   mark as Exhibit 3, the invoice which is dated

12   January 8, 2020, Invoice Number 423, and it's got the

13   Bates numbers AB000052 through, I believe, -53.  Yes.

14          (Exhibit 3 marked for identification.)

15          MADAM COURT REPORTER:  It's all set.

16          MS. NIEMEYER:  Okay.

17       BY MS. NIEMEYER:

18       Q.   I want to go to a couple of the things that

19   we've done in discovery here that you were named as a

20   corporate representative, so we'll take a look at

21   those real quick.  I have the 26 -- Rule 26

22   Disclosures that came with these productions of

23   documents.

24          And -- and one of the things I wanted to ask

                                                    96

1    you, sir, is, the -- the CF and UF files, which you

2    looked at and, I believe -- let's just confirm this;

3   you have confirmed those are business records of

4   Concept that were the underwriting and claims

5   documents or some subset of them that were produced to

6   me, correct?

7        A.   Correct.

8        Q.   Those were produced in relation to this

9   Rule 26 Disclosure, which is part of our Federal Rules

10  prediscovery, so to speak.  There were people named

11  who were likely to have discoverable information and

12  those people, Melinda Ackwith, who you mentioned is --

13  is the broker; Mr. Andersson, the insured; Mr. Bailey,

14  Mr. Ball, Ms. Delacey-Simms, Liam Gilhooly.

15           He is the underwriter, correct?

16       A.   He was the person that wrote the risk in the

17  first instance, yes.

18       Q.   Okay.  Bill Hodgens, who is the broker or the

19  owner of the brokerage.

20           Ronald Naranja was the crew member, correct?

21       A.   Yes.

22       Q.   And -- and we know now, by the way, that his

23  last name is spelled with "Naranjo" with an "O" on the

24  end, but he -- everybody thought it was Naranja for a

↟                                                      97

1   while.  Jonathan Sands was the surveyor of the

2   prepurchase survey.

3          Mark Thomas -- what was Mr. Thomas'

4   involvement in this claim?

5      A.   None.

6      Q.   Okay.  And your name was given as well.

7          And -- and you've told me you really had no

8   direct claims involvement, correct?

9      A.   That's correct.  It's my staff.

10     Q.   Okay.  You're responsible in the end?

11     A.   Correct.  I'm the boss.

12     Q.   Okay.  And then, we were given -- we were

13   told the relevant documents were this underwriting

14   file which we talked about; the claims file, which we

15   talked about.  So materials for computation of

16   damages, which is the -- it looks like, again, the

17   claim file.  The insurance agreement, the policy, we

18   have that.  And Mr. Ball has been named as an expert

19   witness.

20          Have you had a long-standing relationship

21   with Mr. Ball in your business?

22              MR. GOLDMAN:  Object to the form.

23     A.   We've had a long-standing relationship with

24   Caribbean Surveyors, primarily.  I -- I've met

1   Mr. Ball on a number of occasions, but I know

2  Mr. Bailey a lot better than I know Mr. Ball.

3      Q.   Okay.  Are there any other potential

4  witnesses that you know of who are not on this list?

5      A.   No.

6          (Pause.)

7      A.   Let me expand upon that for a moment while I

8  think.  Nobody that would have any material knowledge.

9  There will be other people in my office that touched

10  the file; for example, people that were chasing for

11  the documents.

12          (Deponent viewing document.)  And I believe

13  Alex Thomas -- let me have a look -- but they wouldn't

14  be able to add anything to it.

15      Q.   Who is Shoriff Uddin?

16      A.   He was a -- basically, a filing clerk.

17      Q.   Okay.  He's CC'd on a lot of documents.

18  That's why I'm asking.

19      A.   I placed him on the file.

20      Q.   And -- and Samantha Thomas?

21      A.   Again, a claims assistant.  She works in the

22  claims department junior to Sarah Delacey-Simms.

23      Q.   Okay.  I'm going to go to some discovery

24  responses here.  We have an answer to a first set of

1  requests for production, and I just want to take a

2  look.

3         We were told that all the documents, or

4  communications that support the contention the policy

5  doesn't cover the loss, were already produced as part

6  of those Rule 26 Disclosures.

7         Is it your understanding that that's true?

8  A.   Yes.

9  Q.   We were then told, all communications written

10 by you, received by you, or shared among you related

11 to the loss and/or the claim which are subject to this

12 lawsuit, that was the request, the response was to see

13 the document already produced.

14        Is that all there was?

15 A.   Yes.

16 Q.   Is it common practice for your people to

17 communicate internally by e-mail?

18 A.   Yes.

19 Q.   If they do so on a claim, would that -- would

20 that e-mail be included within the file?

21 A.   Yes.

22 Q.   Can you explain why there are no internal

23 communications in the claim file that was produced?

24 A.   You -- well, beyond the -- these placed just

1  on the file?

2      Q.   Not even.

3         The -- the claim file I received appears not

4  to include any communications among people at Concept,

5  only -- it only includes the communications between

6  the people at Concept and outsiders, like

7  Mr. Andersson, or like Mr. Bailey or Mr. Ball.

8         Is there --

9      A.   Well --

10      Q.   -- a separate location that those documents

11  could've been kept in your filing system?

12      A.   No.  It's -- everything will be in the claims

13  file or the underwriting file.  Those are the only

14  files we maintain.

15      Q.   Is it -- is it your company's position that

16  any of those internal communications are somehow

17  considered privileged in some way?

18      A.   No.  Only in the event that it's between

19  ourselves and the attorney.

20      Q.   Was the attorney involved in claims handling

21  before the attorney became involved in litigation?

22      A.   No.

23      Q.   Okay.  The next request is all documents

24  memorializing information obtained by you, related to

1  the underwriting of the policy that have not yet been

2  produced.  The answer was none.

3          Is it your understanding that all the

4  underwriting documents were produced as part of that

5  file that I just showed you?

6      A.   Yes.

7      Q.   The next request was for all documents

8  memorializing information obtained by you in your

9  investigation of the claim that have not yet been

10  produced in this lawsuit.  It says none at this time.

11          Are you aware of any investigation that was

12  done subsequent to Mr. Ball's viewing of the vessel

13  inspection of the vessel on the 21st of

14  December, 9 -- 2019?

15      A.   Only the exchange of correspondence, which

16  you should have, which was Mr. Ball's comments about

17  Mr. Andersson's comments in response to the

18  reservation of rights letter, which should be in the

19  claims file.

20      Q.   Do you know if the --

21      A.   Subsequently, the e-mail to the broker about

22  the refund of premium onwards to Mr. Andersson.

23      Q.   Are you aware of whether there were any kinds

24  of other witnesses, for instance, interviewed or

1   anything like that?

2       A.   There weren't any, no.

3       Q.   Was Mr. Naranjo interviewed?

4       A.   Not by us.

5       Q.   Do you know if Mr. Naranjo was interviewed by

6   Mr. Ball or Mr. Bailey?

7       A.   I don't know -- I don't think -- I certainly

8   haven't had a report or a transcript -- transcript of

9   an interview of Mr. Naranjo.

10      Q.   Would it be a normal thing to do in the

11  claims process, or even an expected one, to interview

12  the crew member who was on the vessel when the

13  incident occurred?

14      A.   I don't believe so.  I'm not sure what he

15  could add.

16      Q.   Was there any attempt to obtain information

17  from the Dominican Navy related to the claim?

18      A.   I don't know.

19      Q.   The next request was for all handwritten or

20  electronic notes taken by you regarding the

21  underwriting investigation of the claim, the decision

22  to sue the insured or the decision to deny the claim.

23  That response had some level of attorney-client

24  privilege and work-product-doctrine objection and then

1  stated that there were documents already produced as

2  part of the Rule 26.

3          Are you aware of whether there was a set of

4  documents created that are claimed to be

5  attorney-client or work product?

6      A.   (Deponent viewing document.)  I'm sure

7  there's plenty of documents that are attorney work

8  product, because there's -- I can see on our claim

9  file a copious amount of correspondence between

10 ourselves and Goldman & Hellman.

11         Any internal conversations or whatever as

12 regards to file with Concept Special Risks, because it

13 is easier to send an e-mail, because it's easier to

14 store an e-mail, because it's already in electronic

15 form, rather than making a handwritten note, scanning

16 it and putting it on the file, so, therefore, that's

17 why we communicate by e-mail.

18     Q.   Okay.  So it's your business practice to do

19 all these things electronically through e-mail so that

20 it's maintained that way, correct?

21     A.   That's correct.  And especially --

22     Q.   And --

23     A.   -- especially, of course, for the bulk of

24  this period of this file or a prolonged period of this

1  file, we of -- the office was closed because of the

2  COVID pandemic, so nobody was in the office from

3  the 17th of March onward, so all communication were

4  done by e-mail.

5       Q.   Okay.  Again, with -- with production --

6  Request for Production No. 6, which is asking for --

7  I'm going to paraphrase just to save us some time, but

8  documents related to the cause of the loss of the

9  vessel we were referred to the Rule 26 Disclosures.

10        Are you aware of whether there are any other

11  documents related to the cause of the loss that don't

12  exist within that production?

13       A.   I'm not aware of anything that has not been

14  produced.

15       Q.   Number 7, all communications to or from

16  anyone at Goldman & Hellman regarding the claim prior

17  to January 27th, 2020.  There is an objection to that

18  on attorney-client privilege.

19        The question I have to you is, you -- you've

20  told me that Goldman & Hellman did not act as claims

21  adjusters in this case; was there any activity by them

22  prior to January 27th?

23       A.   (Deponent viewing document.)  I can't see

24  anything, no.

1       Q.    Okay.  And I think we've answered -- I had

2  requested the original audio recording of the

3  statement given to Andrew Ball by Mr. Andersson.

4            And -- and let's just clarify, was it your

5  testimony that you -- that there was none or that you

6  don't know?

7       A.    I don't know.  What I said is that I couldn't

8  -- I do not recall having reviewed the file, and, very

9  recently, a transcript of any recorded interview.

10      Q.    Would that normally happen?

11      A.    I would think, normally, yes.

12      Q.    Do you -- do you get the -- now that things

13  are becoming more digitized, do you get MP4 or MP3

14  recordings of these things from your outside

15  surveyors?

16      A.    We normally -- as far as I'm aware, we

17  normally receive written transcripts, but, certainly,

18  we can receive audio, as indeed we can receive video.

19      Q.    Okay.  And you're not aware, as you sit here

20  today, of an audio recording or a -- an original

21  recording in some form, whether it was even

22  handwritten notes by Mr. Ball, of that statement that

23    was given to Mr. Ball by Mr. Andersson?

24        A.    No.  I don't recall seeing any transcripts

⬆                                                           106

1     from Mr. Ball, any -- anything from Mr. Andersson,

2     just the report from Mr. Ball.

3         Q.    Okay.  Now, the next request is for documents

4     related to -- and I'm paraphrasing again -- your

5     observations of or assessment of the extent of damage

6     suffered by the vessel.  We were referred to Rule 26

7     Disclosures.

8             To your understanding, is the -- is it

9     limited to what was produced by Mr. -- with Mr. Ball's

10    initials -- and I can show you those things, but there

11    was -- there was a large amount of documentation

12    produced with Mr. Ball's initials; do you under --

13        A.    (Deponent viewing documents.)  Yes.  There

14    was a 14-page report that we received from Mr. Ball on

15    -- let me just get the date -- December 23rd, with

16    quite a number of photographs.  And I think we

17    subsequently received, or maybe it's in this -- before

18    the photographs -- hang on.  Oh, within that report

19    was a surveyor's estimate -- estimated cost of repair,

20    which exceeded the insured value.  Hence, it would've

21    been a c -- a constructive type of loss.

22        Q.    So you did have an estimate for a cost of

23  repair?

24      A.  A -- a rough estimate.  It wasn't a detailed

1  estimate.  It was -- it says the surveyor's estimated

2  cost of repair.

3      Q.  So what was it?

4      A.  Four hundred and fifty-five thousand dollars.

5      Q.  Do you have a date on that document?

6      A.  (Deponent viewing document.)  Yeah, I told

7  you a moment ago.  December the -- December

8  the 23rd, 2019.

9      Q.  So that's the report from Mr. Ball on that

10 date, correct?

11     A.  That's correct.

12     Q.  Okay.  Now, the next request was for any and

13 all communications between you and any other person or

14 entity regarding the vessel, the claim or

15 Mr. Andersson.

16         And I know this is repetitive, but has -- to

17 your knowledge, has there been any communication

18 between anyone at Con -- at Concept or their repre --

19 their agents and other people regarding this

20 situation, the vessel, the claim or Mr. Andersson?

21     A.  Okay.  Well, I'm going to object to the form,

22   because we don't have any agents (laughs), but, no,

23   there hasn't been any other communications.

24        Q.   Okay.  Which -- and -- and forgive me for not

1    defining, but in this circumstance under American law,

2    would you consider Mr. Ball or Mr. Bailey, who were

3    hired to be the surveyors on your behalf, as your

4    agent?

5        A.   No.

6             MR. GOLDMAN:  Object to form.

7        But you can answer.

8         BY MS. NIEMEYER:

9        Q.   Well --

10       A.   No, they're independent contractors.

11       Q.   How -- what would you consider them to be in

12   relation to my client?

13       A.   Fact finders.  They're not -- they're neither

14   your client's agent, nor are they our agent.  They are

15   independent contractor.

16             (Off the record at 10:33 a.m.)

17             (Recess taken.)

18             (Back on the record at 10:39 a.m.)

19             (Exhibit 4 marked for identification.)

20       BY MS. NIEMEYER:

21       Q.   Okay.  So the next question has -- the next

22  request has to do with communications between you and

23  any representative of WR Hodgens Marine Insurance, the

24  insurance broker that issued or was involved with the

⬆                                                                      109

1   issuance of the policy.

2           Are you aware of any documents involving

3   them, other than the communication from December

4   of 2020 that we've discussed that are not included in

5   the claim file --

6       A.   No.

7       Q.   -- that was produced to me?

8       A.   No.

9       Q.   Okay.  The next has to do with any kind of

10  documentation -- and I am paraphrasing -- you have the

11  document -- related to the professional experience,

12  employment history, citizenship, location, et cetera,

13  of Mr. Bailey.  And that was objected to as harassing.

14          Do you have information related to Mr. Bailey

15  due to your business association with him?  Do you

16  have a file about Mr. Bailey?

17      A.   No.

18              MR. GOLDMAN:  I'll let him answer the

19  question, if he can.

20      A.   No.

21    Q.   Do you keep any kind of record of how many

22 jobs his company does with you or anything like that?

23    A.   No.  I mean, not separately.  That is -- I

24 mean, obviously, we have other files than Mr. Bailey

♠                                                          110

1 and/or Caribbean adjusters -- I'm sorry -- Caribbean

2 Adjusters & Marine Surveyors Limited have -- have

3 worked with us.  We know we have worked with them on a

4 number of occasions, but we don't keep a record of how

5 many times he's been appointed.

6    Q.   Do you have any kind of accounting files that

7 would break down to his company's business?

8    A.   Again, not on a archive history basis.  We've

9 been dealing with Caribbean Adjusters & Marine

10 Surveyors for probably the last 20 years, and our

11 accounts records don't go back that far.

12    Q.   And is it fair to say that a good portion of

13 his business comes from you?

14    A.   No.  We -- I -- he -- he becomes very active,

15 of course, when there's a hurricane, but, generally

16 speaking, we don't write a vast amount of business in

17 the Caribbean, so compared with other surveyors and

18 adjusters in mainland USA -- and I don't -- and I

19 would imagine he deals a lot more with other insurers

20 that are more active in the Caribbean.

21    Q.    Okay.  And now we have the same question

22  having to do with whether you have any information

23  specific to Andrew Ball.

24          Is the answer any different?

                                                        111

1    A.    No, it's the same.

2    Q.    Moving to Request for Production No. 14, are

3  you aware of any communications evidencing efforts to

4  obtain Melody's GPS units from the salvor?

5    A.    Yes, they should be in the claim file, but,

6  depending, I think, there was -- there were more

7  recent communications where the salvor discovered, so

8  I don't know when the claim file was produced, but

9  you'll have that information tomorrow.

10    Q.    Are you aware of whether anyone at -- at

11  Concept ever spoke with the salvor in this case?

12    A.    I'm not aware of it, no.  I believe the

13  Caribbean Adjusters & Surveyors may have had

14  communications with the salvor, but I don't believe

15  anybody in our office did.

16    Q.    If there were communications with them, there

17  -- they would be the ones to ask, correct?

18    A.    Correct.  And they would -- and they

19  should've been in the claim file, because I very much

20   doubt that there would be phone calls.  There might --

21   if there was an e-mail, it would be in the file.  If

22   there was a phone call, it would've been followed up

23   by an e-mail, which would be in the file (laughs).

24        Q.   Is it -- is it fair to say that, if there was

⬆                                                            112

1    no e-mail in the file, there was no attempt to contact

2    Mr. Farmer, the salvor?

3         A.   Yes, I think it would be a fair assumption.

4         Q.   And this question is essentially the same but

5    not limited to the salvor; are you aware of any

6    communications from Concept to Mr. Andersson or any

7    other person or entity seeking assistance in obtaining

8    the GPS from the salvor?

9         A.   Only -- the only person that I'm aware

10   of, that was trying to secure the GPS and so on, was

11   Caribbean Adjusters & Surveyors.  We did not make

12   direct inquiries in to try to secure it.  So there

13   would be no other communications other than those that

14   reside within the claim file.

15        Q.   Was there ever any attempt within your

16   company or by anybody at your company to follow up and

17   ensure that Caribbean Adjusters was actually trying to

18   get that GPS?

19        A.   Only that which would appear in the claim

20  file.  The only communications we had with Caribbean

21  Adjusters & Marine Surveyors was by e-mail and --

22      Q.   Okay.

23      A.   -- they would reside in the claims file.

24      Q.   If there's nothing in the claim file, is it

⬆                                                    113

1  fair to say that there was no attempt to follow up?

2      A.   Correct.

3      Q.   And the last of these questions was any and

4  all communications, which you contend constituted

5  denial of coverage for the claim.  And we were

6  referred to the Rule 26 Disclosures, which I will

7  represent to you the claim file in those disclosures

8  ends prior to the filing of suit and to the denial.

9           Is there -- was the claim still open at the

10  time when the lawsuit was filed?

11           MR. GOLDMAN:  Object to the form.

12      A.   Technically, the claim's still open.  That's

13  why we're talking about it.  Obviously, the file's

14  still open, but once the denial had been determined,

15  then, as far as we were concerned, that was -- well,

16  it did -- it did -- wasn't actually the end of the

17  investigation because, of course, the Caribbean

18  Surveyors were trying to -- still trying to secure the

19   GPS.

20      Q.   Do you have any documentation to prove that

21   Caribbean Surveyors was trying to obtain the GPS?

22      A.   I believe I've seen -- everything will be in

23   the claim file, because anything I've got was in the

24   claim file.

⬆                                                         114

1      Q.   Okay.  Are you aware of who ultimately found

2   and obtained the GPS.

3      A.   I think it's mentioned in the claim file, but

4   I can't remember exactly who secured it.  I think -- I

5   -- I remember seeing something where the salvor

6   located it and thought it was another piece of -- of

7   equipment, hadn't recognized it as a GPS, but whatever

8   I'm referring to is in the claim file.

9      Q.   Okay.  I'm not going to make representations

10   about things that happened in the course of the

11   lawsuit, but you can consult with your counsel about

12   how the GPS was obtained.

13         I'm going to move off of this document, and

14   I'll go to the next one.  Okay.  Where's my little

15   share screen?

16         (Pause.)

17         BY MS. NIEMEYER:

18      Q.   Okay.  Mr. Usher, can you see this document,

19    which is the responses of Great Lakes to Martin

20    Andersson's First Set Of Request For Admission?

21        A.   (Deponent viewing document.)  Yes.

22             MS. NIEMEYER:  And, Laurie, could you

23    mark that as Exhibit 5?

24             (Exhibit 5 marked for identification.)

                                                    115

1              MADAM COURT REPORTER:  It's all set.

2              BY MS. NIEMEYER:

3         Q.   Okay.  So, Mr. Usher, were you consulted

4    prior to the response to these request for admissions?

5         A.   I believe so.  Well, I think I signed them.

6         Q.   Mmm, let's see.  Michael Goldman signed them.

7         A.   (Deponent viewing exhibit.)  Okay.

8         Q.   And --

9         A.   Maybe I'm confusing it with another document.

10        Q.   You're confusing it with interrogatories

11   which --

12        A.   Okay.

13        Q.   -- which we'll get to next.

14        A.   I was about to say that.

15        Q.   I know.  I gotta go through all of them.

16   It's part of my job.

17             So -- okay, so there was an admission, you

18  did not deny coverage for the claim until after you

19  filed this lawsuit, and that was admitted; and I'm

20  just asking you to confirm, as the representative of

21  the company, that that's correct and that's the

22  company's admission?

23      A.   (Deponent viewing exhibit.)  I believe it's

24  true, yes.

                                                        116

1       Q.   Okay.  And anything in this request for

2   admissions that was signed by your counsel on your

3   behalf is an admission of your company, correct?

4       A.   Correct.

5       Q.   You have no reason to believe that your

6   lawyer --

7            MR. GOLDMAN:  The company that he

8   represents -- he's here as the representative, as he

9   pointed out earlier, for Great Lakes, not Concept.

10           MS. NIEMEYER:  All right.  Correction

11  taken; noted.

12           BY MS. NIEMEYER:

13      Q.   Is it -- is it fair to say that, in the

14  context of handling this claim, that Concept is a

15  legal representative of Great Lakes?

16      A.   That's correct, yes.  We are their agent.

17      Q.   And is it fair to say that, in reality, other

18   than a courtesy communication at some point and then

19   the re -- the request to seek legal opinion, Great

20   Lakes itself was not actually involved on a day-to-day

21   level with the handling of the claim?

22        A.   That's correct.

23        Q.   Okay.  There's a -- a question here asking

24   for an admission that your decision to deny the claim

⬆                                                          117

1    was based, in part, upon the erroneous belief that

2    Melody's grounding occurred on December 16th, 2019.

3            Do you see that?

4        A.   (Deponent viewing exhibit.)  Yes.

5        Q.   Are you aware that there was a mistake in the

6    date represented by Mr. Ball in his report that made

7    it appear as if the vessel traveled for 24 hours less

8    than it actually did?

9        A.   No.

10       Q.   Knowing that, would that cause you to want to

11   look at a chart and weather conditions and see whether

12   it was possible that the vessel was actually inside of

13   the navigational warranty limits?

14           MR. GOLDMAN:  Object to the form.

15       A.   We're not disputing it was within its

16   navigational limits at the time of the incident.

17     Q.   My question goes to the entire journey.

18          If -- if you learned that the journey was

19     actually a full day longer than you thought it was in

20     the beginning, would you want to look at the in -- the

21     situation in more detail to assure yourself that the

22     vessel was actually in violation?

23     A.   No.  I still would rely on the comments of

24     Caribbean Surveyors.

🔺                                                        118

1      Q.   Do you know if Caribbean Surveyors looked at

2      anything outside of the belief that the vessel had

3      traveled in a direct line across the Caribbean Sea,

4      which appears to be Mr. Ball's belief?

5      A.   We didn't independently look at it.  We

6      relied upon Mr. Ball's comments, so you can ask

7      Mr. Ball how much additional investigations he made.

8      Q.   Okay.  But you weren't -- you didn't notice,

9      or you're -- are you aware of any comment among the

10     people at -- at Concept noting the mistake in that

11     report?

12     A.   No.

13     Q.   Ultimately, if a mistake is made, that

14     mistake is your problem, not Mr. Ball's, correct?

15     A.   Ultimately, I guess.  Ultimately, it would be

16     Mr. Ball's then.

17          (Laughter.)

18          BY MS. NIEMEYER:

19     Q.   Well, I'm -- I'm not going to make opinions

20 on what you should seek legal counsel for.

21          But if -- if there was a mistake that -- that

22 involved the -- the timing of the travel, in your

23 experience, is it -- is a boat able to sail at least

24 some distance during the time when it's traveling for

⬆                                                            119

1 24 hours?

2     A.   Well, quite possibly.  It would have to be a

3 material mistake.

4     Q.   And -- and you've admitted through this

5 document that no action was taken to investigate the

6 claim after January 28th of 2020, correct?

7     A.   Beyond attempting to secure the GPS, that's

8 -- I believe we were trying to secure the GPS.

9     Q.   Are you aware of any evidence or efforts to

10 secure the GPS after January 28th of 2020?

11    A.   I -- I don't know.  No, I mean, all efforts

12 were made by -- whatever efforts were made, were made

13 by Caribbean Surveyors.  We did not make any separate

14 efforts.

15    Q.   Okay.  If you felt it was necessary to obtain

16  the GPS, why would you deny the claim?

17      A.   I beg your pardon?

18      Q.   Wouldn't you wait to deny the claim until you

19  had the information you needed?

20      A.   No.  We denied the claim following presenting

21  the information we had de -- obtained at that stage to

22  counsel and relied upon their coverage opinion.

23      Q.   Okay.  So Number 5, "Admit that you never

24  took any action in furtherance of establishing the

♠                                                    120

1   details of Melody's course after you believed the trip

2   took a full day less than it actually took."

3           Let me just clarify that your position on

4   this is that, if anyone did take that kind of action,

5   it would've been Andrew Ball?

6       A.   Yes.

7       Q.   And the claim file doesn't reflect that there

8   was any kind of action taken to clarify the course,

9   correct?

10      A.   I'm not aware of anything on the claim file,

11  no.

12      Q.   Number 9 may have been badly worded, so I'm

13  going to ask you this question on the record.  The

14  question was, "Admit that the vessel's navigational

15  [sic] warranty prevented it from seeking shelter in

16    Venezuela or Colombia," and the -- the response was

17    denied.  And perhaps this wasn't artfully constructed

18    enough.

19          You can certainly make a choice to go in

20    anywhere you want, right?

21    A.    Yeah, if it's to protect the vessel, right.

22    But at the end of the day, we would take the view,

23    then, that if it -- if the -- it entered Venezuela or

24    Colombia because the vessel was in distress, then we

⬆                                                          121

1    would not stand on the exclusion within the -- the

2    navigational limits.  It's just that we're saying, you

3    can't deliberately make trips to Venezuela.

4    Q.    So if you were to take a -- seek shelter in

5    Venezuela -- let me -- let me ask you just -- this is

6    a hypothetical, obviously, but if Mr. Andersson had

7    made the decision to go to port on one of the

8    Venezuelan islands, which would've been close to him

9    when his seas -- when his crew member became very ill,

10    that would have been acceptable?

11    A.    I believe so, yes.

12    Q.    And --

13    A.    Again, reasonability.

14    Q.    I'm sorry?

15      A.   Again, reasonability.

16      Q.   So it would be a reasonable thing, even

17 though he knew that he wasn't allowed to go to

18 Venezuela and that there could be piracy there, it

19 would be reasonable to go there with his sick crew

20 member?

21      A.   If the vessel's in distress, yes, or the

22 vessel's incapable of continuing with the rest of the

23 way, yes.

24      Q.   Okay.  How -- does the policy define when the

⌂                                                    122

1 vessel's in distress?

2       A.   No, I don't believe so.

3       Q.   Is it acceptable to bear off, in conditions

4 that could damage the vessel, to avoid the vessel

5 being in distress in that condition?

6       A.   To avoid the vessel being in distress?

7       Q.   If -- if the vessel is on a certain course

8 heading where the waves are very high and the angle of

9 the waves is bad and the wind is very strong, and

10 there's a course heading which you can change so that

11 makes it safer for the vessel, is that acceptable to

12 avoid the vessel being in distress under the worst

13 course heading?

14      A.   Depending upon the conditions.  It goes back

15   to, why is the vessel struggling.  The vessel is quite

16   capable of dealing with 12-foot seas, and it's quite

17   capable of dealing with 20-knot winds, so why is the

18   vessel suddenly in distress?

19        Q.    So if the vessel is perceived by the captain,

20   who has a pretty good level of experience, both with

21   that vessel and other catamarans, to be unsafe if it

22   sailed at a certain angle to the wind in those

23   conditions, and it has to bear off to protect the

24   vessel.

♠                                                    123

1        A.    That's different to seeking a port of safe

2    haven.

3        Q.    Okay.  How is that different?

4        A.    Because you're not seeking safe haven.  At

5    this stage, right, the assisting crew member is

6    unwell, as you rightly say, significantly unwell, and

7    whilst I'm not at sailor, I have some -- a sailor, I

8    have suffered seasickness, and it's very unpleasant

9    and very incapacitating.

10            At that stage, the appropriate action and the

11   reasonable action would've been to seek safe harbor,

12   not to go further out to sea.

13        Q.    What would you rely upon to make that

14  determination, that reasonableness determination, is

15  that a -- that's a factual question, correct?

16      A.   Correct, yes, and I would rely on an

17  experienced sailor like Mr. Ball or Mr. Bailey or

18  Mr. Wager or Mr. Kutner or one of the myriad of other

19  people that we deal with who are experienced sailors.

20      Q.   And you've named Mr. Ball as your expert, so,

21  presumably, he's the experienced sailor that you've

22  been relying upon for that issue --

23      A.   Yes.

24      Q.   -- correct?

⬆                                                    124

1       A.   That's correct.

2       Q.   When you issue insurance policies to people

3  who are going out cruising the Caribbean on their

4  catamarans, do you expect them to have the same level

5  of knowledge and capability as Mr. Ball or Mr. Bailey?

6       A.   I expect them to behave prudently.  And I

7  don't necessarily expect them to have a 500-ton

8  masters certificate, but, at the same time, I expect

9  them to be competent sailors and act prudently in the

10  event that in -- they are confronted with heavy

11  weather and that they have inadequate crew to operate

12  the vessel.  At that stage, I would expect them to

13  take prudent action.

14      Q.   Do you have any knowledge about whether or

15  not the crew member was capable of standing watch

16  during the vessel's voyage?

17      A.   Apocryphal, yes, inasmuch as he was sort of

18  described as being extremely unwell.

19      Q.   I'm not sure you answered the question.

20           Could you clarify your answer, please?

21      A.   The comments of Mr. Andersson suggested that

22  Mr. Naranjo was extremely unwell.  As a consequence, I

23  think it unlikely that he was capable to perform

24  adequately as a watchman --

⌂                                                        125

1       Q.   Do you know --

2       A.   -- at that time.

3       Q.   -- if anyone asked?

4       A.   I don't know.  You'll have to ask Mr. Ball.

5       Q.   There's a request here for an admission that

6   your surveyor represented that he asked that the

7   salvors take possession of the GPS unit and send it to

8   the surveyor for further testing.  That response is

9   that it's denied.

10           If there were a document in the claim file

11  that was produced that said that, would you still say

12  that he had not done that?

13    A.   If there's a document evidencing to the

14 contrary, then, no.

15    Q.   I know that you, personally, were not

16 involved in this claim, so I'm not sure if you can

17 answer this question, but did you have awareness that

18 Mr. Andersson is not a native English speaker?

19    A.   No.

20    Q.   Do you know if Mr. Ball had awareness of

21 that?

22    A.   No.

23    Q.   Are you aware that there was a limited time

24 presented by the salvage agreement to access any of

⬆                                                        126

1 the items aboard the vessel or the hull itself?

2    A.   No.

3    Q.   Is that a yes?

4    A.   No, it's a no.

5    Q.   You were not aware.

6    A.   I was not.

7    Q.   Had you been aware that there was a

8 restriction of time to access items from the vessel,

9 would you have acted within that time frame to obtain

10 things like the GPS from the salvor?

11    A.   Assuming the Caribbean Surveyors & Adjusters

12 were aware of a limited time window, I would expect

13   them to act, but --

14        Q.   Would that be information that should've been

15   conveyed by your claims adjuster to Caribbean

16   Surveyors so they would have that knowledge?

17        A.   Our claims adjuster to Caribbean Surveyors?

18        Q.   Correct.

19             If -- if that information was provided to

20   you, would it have been information that you would've

21   provided to Mr. Ball so that he could take that action

22   in time?

23        A.   I would've thought so.

24        Q.   Is there any reason that that wouldn't be

⬆                                                        127

1    done?

2         A.   I can't think of any.

3         Q.   Are you aware of any action that was taken by

4    Great Lakes or by Concept on Great Lakes' behalf to

5    investigate the claim, other than responding to the

6    December -- or the January 15th correspondence from

7    Mr. Andersson; was there anything else that you know

8    of that was done after December 23rd of 2019 when

9    Mr. Ball issued his report?

10        A.   Everything that we would've done would've

11   been done through the offices of Caribbean Surveyors &

12  Adjusters and would have appeared on the claim file.

13      Q.   Okay.  Was -- was Caribbean Adjusters

14  required to provide you copies of things so that it

15  could be part of the claim file?

16      A.   No, we wouldn't necessarily require copies of

17  all their documents.  Just their reports.  If their

18  reports gave rise to a document we felt that we needed

19  to see, then we would request it; otherwise, we would

20  just rely upon their report.

21      Q.   Okay.  I want to just ask you; as far as

22  things like single-handed sailing, there isn't any

23  prohibition to that in the policy, correct?

24      A.   That's correct.  The only prohibition would

  ↟                                                      128

1   be that if you were si -- on the application form, we

2   inquire as to whether you are going to engage in

3   single-handed navigation, especially at night.  If the

4   answer is yes, then it opens up a whole new

5   questioning, and the odds are that we would not issue

6   the policy.  We don't like single-handed navigation.

7       Q.   Now, you don't require, though, on this

8   policy, the approval or the reviewing of crew members,

9   correct?

10      A.   Of course we do.  It's a named-operator

11  policy.  If you want to name an operator, then they

12    have to be approved.

13         Q.   So when you issue a policy with one named

14    operator, aren't you effectively issuing a policy that

15    says that that is -- that person can sail the boat?

16         A.   That person can sail the boat on in-shore

17    navigation, but the application form forms part of the

18    policy.  It's incorporated in its entirety within the

19    policy which is why we ask the question, will the

20    vessel be sailed single-handed at night then rely on

21    the answer, no.

22         Q.   So -- but my question is a little different

23    than that.

24              You require that a named operator be named

⬆                                                        129

1     and vetted by you; you require information about their

2     sailing experience, et cetera, right?

3          A.   Correct.

4          Q.   And I'm sure this happens all the time; you

5     have somebody who has their policy insured, they --

6     their name is on it, they're the owner of the boat,

7     they're the captain of the boat, they are the named

8     operator.  They go out with their friends and their

9     friend takes watch while the captain sleeps for a few

10    hours.

11          Are you saying that you would require that

12   their friend, who's taking watch while the vessel may

13   be on autopilot, and that person is just looking for

14   ships and making sure they haven't gone off course,

15   are you saying that they would be in violation of

16   their policy any time another person is sailing with

17   them and they are the named operator?

18       A.   If they're operating the boat and they're not

19   named, all right, as you rightly say, for example, the

20   captain is asleep or whatever, they should be a named

21   operator, and their experience should be sent to us,

22   and we actually have operator forms for them to be --

23   to be completed.

24          However, should an incident occur, then they

⬆                                                          130

1   have a seven-day window to get that named operator

2   approved, retrospectively; such approval not to be

3   unreasonably withheld.

4          So we then go through a process of approval

5   as though an incident had not occurred, and we state

6   whether or not we would've approved them as an

7   operator had they been submitted to us in advance of

8   the incident.  If we would have approved them, then

9   there's no issue.

10       Q.   There was never any request for that kind of

11  information related to Ronald Naranjo, correct?

12      A.   Correct.  I'm very surprised.

13      Q.   And it wasn't raised as anything on the

14  reservation of rights or in the denial of this

15  claim --

16      A.   No.

17      Q.   -- or in the lawsuit?

18      A.   So far.

19      Q.   Does the policy prohibit the use of an

20  autopilot?

21      A.   No.

22      Q.   Are you aware of what location was considered

23  to be shore, for the purpose of calculating the

24  navigational warranty zone in this case?

♠                                                    131

1      A.   Sorry.  Could you repeat that?

2      Q.   How do you describe -- this navigational

3  warranty is 150 nautical miles from shore, right?

4  What is --

5      A.   One hundred and fifty miles.

6      Q.    -- shore?

7           MADAM COURT REPORTER:  I'm sorry,

8  I couldn't hear -- repeat what you just said,

9  Mr. Usher, the three words.  I couldn't hear them.

10      A.   One hundred and fifty miles.

11      Q.   Is miles defined?

12      A.   No.  It's just -- but it was nautical miles.

13 It would say nautical miles or NM as opposed to miles.

14      Q.   We can agree not to agree on that one.

15           The policy does not define it, correct?

16      A.   It doesn't.

17      Q.   It is a marine policy being litigated in the

18 court of admiralty, correct?

19      A.   In English.

20      Q.   Is it unreasonable to consider that nautical

21 miles, or miles, in a marine policy being considered

22 under admiralty?

23      A.   I think the policy stands as it says, which

24 says 150 miles, not nautical miles.

♠                                                      132

1       Q.   Well --

2       A.   I think it's a semantic argument, but it's

3  150 miles is what the policy says.

4       Q.   It says what it says --

5       A.   Yes.

6       Q.   -- and it's defined as it was defined.  So

7  that's not my question, though.

8            My question is; from shore, what is "shore"?

9       A.   The nearest port, if you like, or the nearest

10  island from shore.

11      Q.    Does it say in the policy what shore means?

12      A.    No.  I don't believe so.

13      Q.    So the policy doesn't restrict it to being

14  the nearest port, correct?

15      A.    No.  It says the nearest shore.

16      Q.    And so the --

17      A.    It could be an i -- it could be a mainland

18  shore or an island shore, but --

19      Q.    Okay.

20      A.    -- it's a shore.

21      Q.    It's land sticking out --

22            MR. GOLDMAN:  Did you say --

23            BY MS. NIEMEYER:

24      Q.    -- of the water, correct?

⬆                                                       133

1            MR. GOLDMAN:  Did you say "port"

2  "point"?  I heard point.  I heard --

3            MS. NIEMEYER:  No, "port."

4            MR. GOLDMAN:  -- point.

5            MS. NIEMEYER:  I said "port."

6            MR. GOLDMAN:  I think he said "point."

7            THE DEPONENT:  No, I --

8            MS. NIEMEYER:  No, he didn't.

9          THE DEPONENT:  -- didn't say "point."

10         MR. GOLDMAN:  Oh, you said "port"?

11         THE DEPONENT:  Yeah.

12         MR. GOLDMAN:  Okay.

13     BY MS. NIEMEYER:

14     Q.   So is it fair to say that land sticking out

15 of the water is shore?

16     A.   No.  It could be a reef.  That's not a shore.

17     Q.   Okay.  I'm going to move on to the next of

18 our documents here.  Now you get to see the one that

19 you signed.

20     A.   In which case, I have seen it before.

21         (Laughter.)

22     BY MS. NIEMEYER:

23     Q.   I still have to ask you.

24         I had a whole case involving a guy who didn't

⬆                                              134

1 see what he supposedly signed.

2     A.   (Deponent laughs.)

3     Q.   He signed one page.  His agent did all the

4 rest.

5     A.   That happens.

6         MS. NIEMEYER:  Okay.  So we'll mark this

7 as Exhibit 6.

8              (Exhibit 6 marked for identification.)

9                    MADAM COURT REPORTER:  All set.

10                   BY MS. NIEMEYER:

11        Q.   And this is the answers to interrogatories,

12   which -- Mr. Usher, can you confirm that that is your

13   signature?

14        A.   (Deponent viewing exhibit.)  It is, indeed.

15        Q.   All right.  So we can go pretty quickly

16   through this, and you'll even know what you're talking

17   about, having looked at it yourself and signed it.

18             It -- first of all, it asked who helped --

19   who furnished information, and the people it names

20   are; Ms. Delance -- Delacey-Simms; Mr. Goldman's son,

21   not this Mr. Goldman, Michael Goldman; and Alexander

22   Mark Thomas, who goes by Mark Thomas on his e-mail,

23   correct?

24        A.   (Deponent viewing exhibit.)  Yes.

⬆                                                    135

1         Q.   Was there anybody else, to your knowledge,

2    who provided information for discovery responses?

3         A.   No.  Other than people that might have zipped

4    -- zip-forwarded the files for transmission to the

5    attorney.

6         Q.   Okay.  Now, this is asking about the names

7    and addresses of any people who might have knowledge

8   or information beyond, potentially, what was already

9   provided related to the complaint, the answer to the

10  counterclaim, et cetera.  This list includes

11  Mr. Andersson, Mr. Bailey, Mr. Ball, Alex Cottier,

12  Sarah Delacey-Simms, Mr. Hodgens and Ronald Naranja,

13  which is Naranjo.

14           Are you aware of anyone else?

15      A.   (Deponent viewing exhibit.)  No.

16      Q.   You were asked to state the name of each and

17  every individual who's knowledge or testimony would

18  support the contention that there's no coverage in

19  this case.  You named Mr. Andersson, Mr. Ball and

20  Mr. Naranjo.

21           Would you name anybody else as you sit here

22  today?

23      A.   No.  Well, other than our attorney, of

24  course.

♠                                                    136

1       Q.   Okay.  You were asked to name each and every

2   individual involved in the decision to deny coverage

3   for the claim, and the people who you named were Sarah

4   Delacey-Simms and Steven Sensibar.

5            Are there any other people who were involved

6   in that decision?

7       A.   (Deponent viewing exhibit.)  Other than our

8    attorney, no.

9        Q.   We asked, "Identify the claims adjuster

10   responsible for the decision to pay or deny the Claim

11   that is the subject of this lawsuit," and the answer

12   was none.

13            Can you explain that?

14       A.   (Deponent viewing exhibit.)   Identify the

15   claims adjuster responsible for the decision to pay or

16   deny the claim.

17            One is repeating that -- five and six are

18   identical, effectively.  So, I mean, that -- the

19   persons that determined to deny the claim were selec

20   -- Sarah Delacey-Stimm -- Simms and Steven Sensibar.

21       Q.   Okay.  And -- and is the answer to five,

22   none, because you don't consider Ms. Delacey-Simms to

23   be a claims adjuster?  I was -- I was confused about

24   that.

                                                    137

1        A.   Yeah, I -- I don't refer to her as a claims

2    adjuster.  She's a claims handler.

3        Q.   What's the difference?

4        A.   Exactly.

5            (Pause.)

6            BY MS. NIEMEYER:

7     Q.   So -- so should she have been named in

8  Number 5?

9     A.   Well, the difference is -- no, not really,

10  because -- put it this way, Sarah Delacey-Simms --

11  neither Sarah Delacey-Simms nor Steve Sensibar are

12  qualified adjusters.  They're qualified claims

13  handlers.

14     Q.   Okay.  So was there no adjuster on the file?

15     A.   Only Caribbean -- Caribbean Adjusters &

16  Surveyors and -- who are licensed adjusters, but they

17  wouldn't have been responsible for the decision to

18  deny the claim.

19          MR. GOLDMAN:  Michelle, I suspect it was

20  Michael being careful about the terms adjuster, et

21  cetera.

22          MS. NIEMEYER:  I don't doubt that, but

23  Mr. Usher's the one who signed it, and I want to make

24  sure we're clear on it.

❦                                                          138

1          BY MS. NIEMEYER:

2     Q.   Okay.  So, to be clear, the internal

3  representative, who was a decision maker, was

4  Ms. Delacey-Simms; and at Great Lakes, Mr. Sensibar,

5  correct?

6     A.   That's correct, following legal advice.

7    Q.   And they relied upon the facts gathered and

8  filtered in whatever way it may have been by Caribbean

9  Surveyors?

10   A.   Yes.

11   Q.   Okay.

12   A.   And legal advice.

13   Q.   And legal advice.  I'm not going there

14  because that violates privilege and I know it, and I'm

15  not going to --

16   A.   Yeah.

17   Q.   -- bother with that.  I won't waste your time

18  with that.

19   A.   I'm going to stop saying it, because it is

20  wasting time.

21   Q.   Yeah.

22        (Laughter.)

23        BY MS. NIEMEYER:

24   Q.   So unless you want to give me the -- the

⬆                                                    139

1  documents with the legal advice and I'll be happy to

2  take that --

3    A.   Yeah.

4    Q.   -- you know.

5        (Laughter.)

6          BY MS. NIEMEYER:

7     Q.   So -- so this interrogatory asks for the date

8  of the last action taken in furtherance of the

9  investigation of the claim, and the action is

10 described as December 21, Mr. Ball examined the vessel

11 while it was stranded on the breakwater.

12          Is that, in your opinion, the last action

13 that was taken in -- in investigating the claim?

14    A.   (Deponent viewing exhibit.)  Well, beyond the

15 fact that we receive -- we issued a reservation of

16 rights and received a response to the reservation of

17 right, so does that qualify as investigation?  I'm not

18 sure.  We sought additional comment --

19    Q.   Okay.

20    A.   -- but I'm not sure that we did an additional

21 -- any further investigation.

22    Q.   Okay.  So -- so, to your knowledge -- and

23 this really is -- it is relevant -- whether Mr. Ball

24 just looked at that, and with the understanding he had

⬆                                              140

1  since December 21st, answered that response, as

2  opposed to, did he follow up on anything or call

3  anyone or look into something more deeply?

4     A.   Yeah.  Effectively, the only additional part

5  of the investigation, if you call it investigation, or

6   -- or pursuing further inquiries, was to ask for

7   Mr. Ball's comments on the responses that

8   Mr. Andersson made to our reservation of rights.

9       Q.   To your understanding, did Mr. Ball do any

10  further activity beyond just writing an e-mail out of

11  his head or looking back at his notes from

12  December 21st; did he do any further work to clarify

13  any facts or talk to somebody about what was being

14  represented?

15      A.   I don't know any more than was in the claim

16  file --

17      Q.   If he had done further --

18      A.   -- and the reports and comments that he made.

19            MADAM COURT REPORTER:  I'm sorry, and the

20  -- excuse me, did you say and the "remarks" and

21  comments that he made?

22            THE DEPONENT:  Correct.

23            MADAM COURT REPORTER:  Okay.  Thank you.

24            THE DEPONENT:  Sorry, I said "reports"

1   and --

2             MADAM COURT REPORTER:  Thank you.

3             THE DEPONENT:  -- comments that...

4             BY MS. NIEMEYER:

5     Q.    And if he had done further investigation,

6  like, made calls to people, gone to see something,

7  looked up information, would he have billed you for

8  that time?

9     A.    I would have thought so.

10    Q.    Did he --

11    A.    I could only find one bill on the file.

12    Q.    And I'll represent to you that only one was

13  produced to us, but, you know, that's why I'm asking.

14    A.    Well, I'm a little bit surprised, on the

15  basis, I think, his comments in response to

16  Mr. Andersson's comments, in turn, in response to our

17  reservation of rights, was made after that invoice, so

18  he didn't charge us for that.

19    Q.    Right.  Or if he did, it's not part of the

20  file?

21    A.    No, well, it would have to be part of the

22  file to raise an amount of money to pay him.

23    Q.    And is there --

24    A.    And if we had to pay him, there would have to

♠                                                      142

1  be a sanctions check, and there's only the one

2  sanctions check, so we didn't pay him any more money.

3     Q.    Okay.  I asked some questions here that

4  weren't answered.  I'm going to ask them on the record

5    here anyway.

6         Do you have any idea, in generalities or

7    specifically, how many policyholders insured by Great

8    Lakes are residents of Massachusetts?

9    A.   No.  We don't record -- we record the

10   location of the vessel, not insured.  We have a

11   record, but we don't maintain the records in that way.

12         MR. GOLDMAN:  I'll allow that answer,

13   obviously, Mr. Usher, as she's already said the next

14   two interrogatories were objected to, so she's not

15   expecting an answer from you.

16         MS. NIEMEYER:  I can accept one if he's

17   willing to give it to me.

18         MR. GOLDMAN:  He won't do it again.

19         BY MS. NIEMEYER:

20   Q.   What is the amount of premium revenue paid by

21   residents of the Commonwealth of Massachusetts for

22   policies of insurance issued by or on behalf of Great

23   Lakes?

24   A.   Again --

⬆                                                    143

1         MR. GOLDMAN:  Again, I'm directing --

2    A.   -- (inaudible) --

3         MR. GOLDMAN:  -- Mr. Usher to not answer.

4               (Whereupon, parties speaking at the same

5      time.)

6               MADAM COURT REPORTER:  Excuse me, can you

7      please -- you both spoke at the exact same time.

8          Can I have the objection and then the answer,

9      please, of what he had just said?

10              MR. GOLDMAN:  Yeah.  I just said

11     Interrogatories Numbers 9 and 10 are subject to an

12     objection.  I'm going to direct Mr. Usher to not

13     answer.  Counsel is putting them on the statements to

14     put them on the record, but she is not expecting an

15     answer.  She's not going to get an answer.

16              MS. NIEMEYER:  I am going to ask a

17     follow-up question, though.

18          BY MS. NIEMEYER:

19     Q.   Mr. Usher, to your knowledge, is it possible,

20     in the way that your systems are organized, to

21     identify the premium revenue related to residents of

22     Massachusetts?

23     A.   No.

24     Q.   Could you search by their address, for

                                                144

1      instance, and then calculate that revenue?

2      A.   No.  I can search by address, but it wouldn't

3      give me the revenue.

4      Q.   What is the amount of premium revenue paid

5   for policies of insurance issued by or on behalf of

6   Great Lakes for vessels whose port of call is located

7   in the Commonwealth of Massachusetts?

8              MR. GOLDMAN:  Same objection.

9              Same instruction to Mr. Usher not to answer.

10             BY MS. NIEMEYER:

11     Q.   And I'm going to ask the same follow-up; is

12  it possible for you to calculate the premium revenue

13  based on the location where the vessels are -- are

14  housed?

15     A.   No.

16     Q.   I'm going to share a screen, which is maybe a

17  little unusual screen, but, Mr. Usher, what I'm

18  showing you right now is -- is the folder containing

19  the Great Lakes Rule 26 production to my client.  It

20  includes, you'll see down here, the CF and UF

21  (indicating) items, which were the claims file and the

22  underwriting file that we looked at.  And then we have

23  a number of other items, which are all with AB

24  prefixes (indicating).

♠                                                    145

1              To your knowledge, is that documentation that

2   was produced by Andrew Ball?

3      A.   (Deponent viewing document.)  It would be a

4  pure guess.

5      Q.   So, in your preparation for this deposition,

6  you were not shown these documents with the AB

7  prefixes?

8      A.   No, I was not.

9      Q.   Okay.  I won't waste your time with that,

10  then, because I'm deposing Mr. Ball and we can ask him

11  about that.  We just saved a lot of time, so.

12           (Laughter.)

13           BY MS. NIEMEYER:

14      Q.   Okay.  Let me stop sharing that one.  And,

15  actually, before we start doing any sharing, I'm going

16  to go back.

17           To your understanding, did Mr. Ball and

18  Mr. Bailey, or either of them, whoever was doing the

19  work -- and it appears that Mr. Ball was, but is it

20  your understanding that, in their fact-finding

21  mission, acting on your behalf, that they followed the

22  claims-handling procedures that are established

23  between Great Lakes and Concept?

24      A.   To the -- yes, as far as I'm aware.

⌂                                                      146

1      Q.   Is there anything that they did, in your

2  mind, that does not comply with what your procedures

3   and guidelines are?

4        A.   Not that I'm aware of, no.

5        Q.   Does your company have a written policy for

6   the rescission of insurance policies?

7        A.   No.

8        Q.   Is there an understood policy that's done in

9   practice?

10       A.   We would not rescind the policy or deny

11  coverage without seeking legal opinion.

12       Q.   I -- I don't know if I've asked this yet, we

13  sort of talked about what Mr. Bailey's role may have

14  been as a -- in respect to this as opposed to

15  Mr. Ball's role.

16            Are you aware of whether there was ever a

17  bill that reflected work done by Bill Bailey as

18  opposed to work done by Mr. Ball?

19       A.   No.  The only invoice we received -- because

20  they work for the same company.  So, if Mr. Bailey did

21  do any work, it would be incorporated into the same

22  invoice.

23       Q.   Okay.

24            (Off the record at 11:34 a.m.)

                                                    147

1            (Recess taken.)

2                    (Back on the record at 11:40 a.m.)

3          BY MS. NIEMEYER:

4      Q.   Mr. Usher, if you were to be asked exactly

5  what Ms. Delacey-Simms was thinking as she expressed

6  things in her written work product, would you suggest

7  I speak to her about it?

8      A.   Yeah, I think so.  Although, almost

9  certainly, having read the claim file, I agree with

10  everything she said.

11     Q.   But you're not her, correct?

12     A.   I'm not in her brain, no.

13          (Laughter.)

14     A.   She's probably very grateful for that as

15  well.

16     Q.   You don't -- you don't look like her, think

17  like her (laughs).

18          MS. NIEMEYER:  Okay.  I was looking for

19  some -- did we mark the policy without all the extra

20  pages?  We didn't yet, did we?

21          MR. GOLDMAN:  No.

22          MS. NIEMEYER:  Okay.  I think this is it.

23  Hold on.

24

1          BY MS. NIEMEYER:

2    Q.   Yeah, can you see this?

3    A.   (Deponent viewing document.)  Yup.

4    Q.   And this is a 29-page document with the Bates

5    numbers -- this was -- this one was actually produced

6    by Andrew, AB000135.

7         Tony, I'm just going to scroll through this

8    so you can see it and ask you to confirm that this is

9    the policy that's at issue in this lawsuit.

10   A.   (Deponent viewing document.)

11   Q.   Tell me if I'm going too fast.

12   A.   (Deponent viewing document.)  No.  No,

13   because this is the language, so I'm familiar with all

14   this.

15   Q.   I know.  You could probably recite this

16   entire --

17   A.   I could do that.

18   Q.   -- policy that you wrote.

19        Okay.  And -- and the policy ends, it looks

20   like, with the instructions about where the assured

21   may serve process, et cetera, on Page 151, correct?

22   A.   (Deponent viewing document.)  That's correct.

23   Q.   That's on Page 17 of the form.  And then

24   following that, you have this -- this document that

1   says "Claims Guidance."  This was in Mr. Ball's

2   information.

3            Is that something that is provided to

4   Mr. Ball so that he knows how to -- what to expect, or

5   is it something that was provided to the insured?

6       A.   (Deponent viewing document.)  To the insured.

7       Q.   Okay.  Are you aware of the details of what

8   was done in relation to the salvage?

9       A.   I believe the ves -- the salvor took the

10  vessel and gave Mr. Andersson a thousand dollars to

11  take title.

12      Q.   And is it your understanding that

13  Mr. Andersson sought the approval of Concept to make

14  that agreement?

15      A.   Yes.

16      Q.   And had there been coverage, in your mind,

17  there would've been a requirement for him to have that

18  approval, correct?

19      A.   Well, it could always act as a prudent

20  uninsured, which, indeed, I think, was the advice that

21  was given to him.  So it -- you know, he doesn't

22  require our approval, but it -- but we would have to

23  have agreed with the action taken for there to be a

24  recovery under the policy.

1         So that is to say, if, for example, somebody

2    had come along and said, we want $250,000 to move the

3    boat, and he'd agreed, you know, to do that, there

4    might have been an issue with trying to recover that

5    under the policy.  However, as far as we were

6    concerned, acting prudently to have the vessel

7    removed, that was not an issue as far as we were

8    concerned.  He doesn't have to seek our approval to do

9    anything.

10        Q.   Now, had there been coverage, arguably, you

11   would've owned the salvage, though, right?

12        A.   Yes.

13        Q.   So then, would he have had to get your

14   approval?

15        A.   We probably would have -- well, we would've

16   declined a notice of abandonment, right.  And I don't

17   believe -- the only issue would be that, the moment he

18   transferred title to the salvor, his policy would be

19   deemed canceled, but only from that time --

20        Q.   Okay.

21        A.   -- because, you know, change in title would

22   void the policy.

23        Q.   And -- and your claims department had

24   acknowledged to Mr. Andersson that there wasn't really

1  residual value worthy of protecting, correct?

2      A.   That's correct, yes.

3              MS. NIEMEYER:  And have we marked this as

4  exhibit -- it's seven, right?

5              MADAM COURT REPORTER:  I can mark it now

6  if you'd like, ma'am.

7              BY MS. NIEMEYER:

8      Q.   Okay.  And just to confirm, Mr. Usher,

9  that -- that is the policy, correct?

10     A.   (Deponent viewing document.)  That is

11  correct, yes.

12              (Exhibit 7 marked for identification.)

13              MADAM COURT REPORTER:  It's all set.

14              (Technical difficulties.)

15              MS. NIEMEYER:  Okay.  So, hold on a sec.

16  Where did you go?  Give me a second here.  For some

17  reason, you all have disappeared.

18              (Off the record at 11:47 a.m.)

19              (Recess taken.)

20              (Back on the record at 11:48 a.m.)

21              MS. NIEMEYER:  Okay.  So let me get back

22  to that share screen is what I was looking for.

23              BY MS. NIEMEYER:

24     Q.   Okay.  Okay.  Can you see that document

1  there?

2      A.  (Deponent viewing document.)  Yes.

3      Q.   Okay.  And this is literally Document

4  Number 1 in the claims file?

5      A.  (Deponent viewing document.)  That's correct.

6      Q.   Is it your understanding that that's the

7  first notice that your company had of the loss?

8      A.  (Deponent viewing document.)  That's correct.

9      Q.   And when your company produces a document

10  with Samantha Thomas' name on it from her e-mail, is

11  the time stamp on that document Greenwich Mean Time?

12      A.   It depends on what time of year.  That would

13  be Greenwich Mean Time, I believe, yes.

14      Q.   Okay.  Do you guys have a Daylight Savings

15  Time as well?

16      A.   British Summer Time.

17      Q.   British Summer Time.

18          Is that BST?

19      A.   Correct.  Actually, anything to do with

20  summer in this country is BS anyway.

21      Q.  I was gonna say, it's cold and wet.

22      A.   It's pouring with rain at the moment.

23          (Laughter.)

24

 1        BY MS. NIEMEYER:

 2     Q.    You know, I have to tell you, my one visit to

 3  London was lovely, and there wasn't a cloud in the sky

 4  for an entire week.  It was beautiful --

 5     A.    It happens.

 6     Q.    -- 70s and 80s, gorgeous.  It was May, I

 7  think, actually, and -- and it was lovely.

 8     A.    May might be the best month.

 9     Q.    Yeah.  So -- okay.  So this is the first

10  notice that you had of the claim, and I just wanted to

11  get that in because of the date.  So that date was

12  the 18th of December, it looks like --

13     A.    (Deponent viewing document.)  Yeah.

14     Q.    -- 2019, and it was at 12:43 your time, which

15  would've been around six in the morning, roughly,

16  correct, in the islands?

17     A.    (Deponent viewing document.)  I'm guessing.

18  I --

19     Q.    Okay.

20     A.    (Deponent viewing document.)  I'm just

21  looking at when it was placed on our file, right,

22  which is -- so I'm not sure about that, because it was

23  placed in our file at 14:50, 2:50 in the afternoon,

24    so, yeah, I'm guessing.

1     Q.    Okay.

2     A.    So probably 7:43 in Dominican Republic.

3     Q.    And -- and you'll see, if you scroll down a

4     little, towards the bottom of that -- the original

5     message from Martin to Mr. Hodgens, shows as being

6     at 6:04 a.m.?

7     A.    (Deponent viewing document.)  Yeah.

8     Q.    And, you know, the question, then, is, it

9     looks like he turned it around promptly, but I wasn't

10    sure how that timing worked out on the e-mails.  Okay.

11    So I have a couple things I'm looking for and,

12    unfortunately, some of them are behind e-mails, but

13    hold on one sec.

14          So, okay, this -- I just want to document

15    here, because this is not part of the claim file.

16    This document was produced as MA000348 through -349,

17    and it's on Concept Special Risks' letterhead,

18    dated 2 March 2020.

19          Mr. Usher, can you tell me what this document

20    is?

21    A.    (Deponent viewing document.)  This is a

22    letter of denial, I think.

23    Q.    And see where it says D/L 16 December 2019?

24     A.   (Deponent viewing document.)  Yes.

1     Q.   Do you know why it says that?

2     A.   That was the date that we were given by

3 Caribbean Surveyors & Adjust -- Adjusters & Surveyors.

4     Q.   Was everything you were -- you did based upon

5 an understanding that that was the date of loss?

6     A.   As far as I'm aware, yes.

7     Q.   Okay.  Now, this letter is sent to an address

8 in New Jersey, correct?

9     A.   (Deponent viewing document.)  That's correct.

10     Q.   Do you have any understanding why the prior

11 correspondence and the package with the lawsuit that

12 was served, I guess, were sent to an address in

13 Massachusetts?

14     A.   I think that was the address on the policy,

15 is it not?

16     Q.   It was on the policy.

17     A.   This address was on the policy?  I'm trying

18 to remember.

19     Q.   Okay.  When an insured informs your company

20 of a change of address, do they typically take note of

21 that so that they --

22     A.   Yes.

23    Q.   -- know where the insured is?

24    A.   Yes.  Normally, we would issue an endorsement

1    if we were advised of a change of the address, but

2    there's no endorsement changing the address.  So

3    perhaps we were advised, because Mr. Andersson advised

4    Caribbean Marine Surveyors & Adjusters that he changed

5    address.

6    Q.   Okay.  So this is -- this is the denial

7    letter that we talked about that was issued

8    post-lawsuit, correct?

9    A.   Correct.

10    Q.   Is there a reason to issue a denial letter at

11    all, post-lawsuit?

12    A.   Yeah, I think it's courteous and, also, it

13    explains the basis of the lawsuit.  It explains the

14    basis of the lawsuit, and it also advises the insured

15    that we're not seeking damages or anything of that

16    nature or whatever and that it's his choice,

17    therefore, if he wishes to defend it.

18    Q.   And isn't the purpose of a declaratory

19    judgment action to settle an uncertainty?

20    A.   To endorse our decision that there is no

21    coverage.

22              (Technical difficulties.)

23              MADAM COURT REPORTER:  Can we please go

24  off the record quickly?

♠                                                        157

1              MS. NIEMEYER:  Sure.

2              (Off the record at 11:55 a.m.)

3              (Discussion off the record.)

4              (Back on the record at 11:56 a.m.)

5          BY MS. NIEMEYER:

6      Q.   So, Mr. Usher, is it your company's policy to

7  have the court system validate all of your challenged

8  claims decisions?

9      A.   Not all, but many.

10     Q.   What's the criteria that you use to decide

11  that?

12     A.   We look at the circumstances of the claim and

13  our basis for denial, and frequently, we'll seek the

14  court's endorsement that our decision to deny is

15  correct.

16     Q.   Okay.  And this -- this letter, as far as

17  what it specifically says, can we agree it speaks for

18  itself and it represents the position of your company?

19     A.   Yes.

20     Q.   And can we agree that Ms. Delacey-Simms was

21  the one who wrote it, and if there are questions as to

22  why she used particular wording, that that would be

23  her thing to answer?

24      A.   Yes.

                                                    158

1       Q.   All right.  I need to open this so I can see

2   it (laughs), right?

3            But this is the policy endorsement, which was

4   issued, it appears, on December 21st -- no -- it was

5   issued on March 3rd, correct?

6       A.   (Deponent viewing exhibit.)  That's correct.

7       Q.   Do you have any understanding why that

8   endorsement was issued to Mr. Andersson in Bolton,

9   Massachusetts, although his -- the correspondence with

10  the denial was sent to him at -- in Sea Girt,

11  New Jersey?

12      A.   (Deponent viewing document.)  It tells you

13  that, at this time, we were not aware that he'd moved

14  and relocated to New Jersey.

15      Q.   Okay.  So as --

16      A.   (Inaudible) therefore --

17      Q.   -- far as --

18               (Whereupon, parties speaking at the same

19  time.)

20               MADAM COURT REPORTER:  I'm sorry.

21      A.   -- (inaudible) still records his address

22  as --

23          MADAM COURT REPORTER:  I couldn't --

24     A.   -- being in Bolton, Massachusetts --

                                              159

1           MADAM COURT REPORTER:  I couldn't hear

2  the first couple of words that you just said, sir.

3  I'm going to have to have you repeat that answer.

4     A.   As far as we are concerned, our underwriting

5  file still represents his address being in Bolton,

6  Massachusetts.  The claims file, however, and I'm

7  assuming, therefore, this information came from

8  Caribbean Marine Surveyors & Adjusters, or maybe it

9  came from Goldman & Hellman, advises that he had moved

10  address.  But at the time this pol -- this policy

11  endorsement was issued, we were still only aware of

12  the address in Bolton, Massachusetts.

13     Q.   Okay.  So, at that time, is it fair to say

14  that claims and underwriting weren't talking to each

15  other?

16     A.   No, we were, but this was issued on the 3rd

17  of March, and I don't know when we discovered that

18  he'd moved addresses.

19     Q.   Okay.  We can clarify that.  So this is the

20  endorsement.

21        Am I correct in saying this is the

22 endorsement related to which there was a premium

23 refund that you were following up on with the broker?

24     A.   That's correct.

♠                                                          160

1     Q.   So the refund that the broker should have

2 paid is $6993?

3     A.   (Deponent viewing document.)  Correct.

4     Q.   And that is the full premium for the policy?

5     A.   That's correct.

6     Q.   Okay.  And just to clarify, it sounded, from

7 what you said before, like you -- you, being your

8 company -- followed up with the broker and learned

9 that the broker had received your money but had not

10 yet paid a check in December of 2020 to my client?

11     A.   That's correct.

12     Q.   Is there evidence, like proof of a wire

13 transfer or some kind of evidence, that your company

14 actually paid that money to the broker?

15     A.   Yeah, the best evidence of all, the broker

16 admits that they received the money.

17     Q.   Okay.  And that evidence is part of what

18 Mr. Goldman can provide to me at --

19     A.   Correct.

20     Q.   -- some point, correct?

21     A.    That -- that's correct.  Yes, it will be in

22 the updated claim file.

23             MS. NIEMEYER:  Okay.  I didn't close

24 this, so I'm just going to close this, but I'll --

⬆                                                          161

1 you'll see in that -- that was the document that was

2 marked as Exhibit 8.

3             Exhibit 8, I wanted to say, by the way, what

4 I just talked about was -- what do we have as

5 Exhibit 8 right now?

6             MADAM COURT REPORTER:  We don't have

7 anything as Exhibit 8.  We've marked something as

8 Exhibit 7.

9             MS. NIEMEYER:  Okay.

10             MADAM COURT REPORTER:  I don't think

11 we've marked this.

12             MS. NIEMEYER:  That endorsement we just

13 talked about has the Bates Number MA000350.  Let's

14 mark that as Exhibit 8.

15             (Exhibit 8 marked for identification.)

16             MS. NIEMEYER:  And the one that was

17 Exhibit 7 is, I believe, this one, correct, the

18 letter, with -- ending in the Number 348?

19             MADAM COURT REPORTER:  I have to go back

20  and look at the -- and read the transcript, ma'am.  If

21  you want me to take a moment, I can do that.

22              MS. NIEMEYER:  Okay.  I think I might not

23  -- not have marked it.  That's why I'm asking you.  If

24  we didn't mark it, we need to.

⬆                                                        162

1               MADAM COURT REPORTER:  Okay.  Hold on one

2  moment, because I -- I don't have time to write down

3  all the descriptions.  I just put the number

4  (indicating), so let me go find what seven was.

5               (Madam Court Reporter looking through

6  transcript.)

7               MS. NIEMEYER:  Seven's going to be the

8  policy.  I can tell from how long it is.

9               MADAM COURT REPORTER:  Yeah, seven --

10  yeah, seven was -- hold on, I'm just reading it.  The

11  cla -- you said --

12              MS. NIEMEYER:  It's going to be the

13  insurance policy.

14              MADAM COURT REPORTER:  Okay.  So seven is

15  the insurance policy.  I don't believe we marked this

16  letter.

17              MS. NIEMEYER:  Okay.  So -- so this

18  letter has the Bates Numbers MA000348 and -349, and

19  that'll be marked as Exhibit 9, and it's the denial

20  letter.

21            (Exhibit 9 marked for identification.)

22            MADAM COURT REPORTER:  All set.

23            MS. NIEMEYER:  Okay.

24

                                                    163

1        BY MS. NIEMEYER:

2    Q.   So this is demonstrating what we just talked

3  about, Mr. Usher.  This letter was sent to New Jersey

4  on the 2nd of March, and then that endorsement was

5  sent, apparently, to Massachusetts on the 3rd

6  of March.

7    A.   The endorsement was sent to the broker.

8    Q.   Okay.  Were all the communications with the

9  insured through the broker?

10   A.   Yes.  Well, on the claim, I believe there was

11 direct e-mails between Mr. Andersson and our claims

12 people, which would've --

13   Q.   Okay.

14   A.   -- resided in the claims file.  But as far as

15 the underwriting and documentation is concerned,

16 everything would go through the broker.

17            MS. NIEMEYER:  Okay.  So I'm going to

18 close that, and I will go to the next one.

19        Oh, wait a minute.  We're not going to go to

20   that one.  Okay.  This is that whole claims file.  I'm

21   going to delete th -- I'll close that right now.

22   We've already been there.  Sorry about that.  If I

23   leave it open, it's hard to see these little things.

24        (Pause.)

↥                                                          164

1        BY MS. NIEMEYER:

2        Q.   All right.  So this e-mail, which starts with

3   Page AB000232 and ends with, let's see, 247 appears to

4   be the e-mail transmitting, from Carib Surveyors, the

5   report on December 23rd that we've talked about.

6        And, you know, I just -- I just want to

7   confirm with you, sir, that this is that report that

8   we've talked about and that it's in your file as a

9   matter of course of business as a claims adjusting

10   managing general agent?

11        A.   (Deponent viewing document.)  That's correct.

12        Q.   Okay.  So this is the report that was relied

13   upon, ultimately, in denying coverage, correct?

14        A.   (Deponent viewing document.)  The report and

15   the subsequent comments following the response of

16   Mr. Andersson to our reservation of rights letter.

17        Q.   Okay.  And if I were to ask questions about

18   how this language came to be and whether there was an

19   interview or a tape or anything like that, is it fair

20   to say that Mr. Ball is the right person to ask

21   questions about that?

22       A.   That's correct.

23       Q.   And this is -- okay.  This is the breakdown

24   where it talks about the estimated cost to repair that

⬆                                                          165

1    you mentioned?

2        A.   (Deponent viewing document.)  That's correct.

3        Q.   Okay.  And Mr. Ball, it appears, as the

4    attending surveyor; does this answer your question

5    about who did what, the way this is signed?

6        A.   (Deponent viewing document.)  Yes.  It's

7    quite an unusual scenario that they both signed it,

8    but it -- that may well be the policy adopted by

9    Caribbean Surveyors and Adjusters.

10       Q.   What -- is there a difference where -- I see,

11   under Mr. Ball, he is SAMS SA; and Mr. Bailey, it says

12   SAMS AMS with a number.

13            Is there a difference?

14       A.   (Deponent viewing document.)  I don't know.

15   You have to ask them.  Well, one is the Society of

16   American Marine Surveyors, and the other one is the

17   American -- the Association of Marine Surveyors.

18    Q.   Okay.  Is SA something related to surveyors

19  that's not SAMS, then?

20    A.   I don't know.

21    Q.   And the IAMI number, what is that?

22    A.   I don't know.

23    Q.   And the MCA Master is the captain's license,

24  correct?

⬆                                                          166

1    A.   (Deponent viewing document.)  That's the

2  captain's license, yeah.

3    Q.   Two hundred ton?

4    A.   (Deponent viewing document.)  Mm-hmm.  Yes.

5    Q.   It's very sad.

6         Okay.  So is there any information on this

7  report that you know today is incorrect?

8    A.   (Deponent viewing document.)  No.

9    Q.   Have you looked at a calendar to see whether

10  December 16th, 2019, falls on a Tuesday?

11    A.   No.

12    Q.   Okay.  So I'll go to Mr. Ball for further

13  information about the details of that report.

14         Is this the responding document, the other

15  information that you said you relied upon in making a

16  decision about the claim?

17    A.   (Deponent viewing document.)  That's correct.

18     Q.   So that happened on the 31st of January 2020,

19  correct?

20     A.   (Deponent viewing document.)  That's correct.

21           MS. NIEMEYER:  And for the court

22  reporter's benefit, we'll -- we will call this

23  Exhibit 10, and it is the -- it has the Bates

24  Numbers CF000152 through -154.  It is an e-mail that

                                                    167

1  was directed to Sarah Delacey-Simms from Mr. Ball and

2  copied to a handful of people; Mr. Bailey, Mr. Thomas,

3  Samantha Thomas, and Shoriff Uddin.

4           BY MS. NIEMEYER:

5     Q.   Is it Uddin?

6     A.   (Deponent viewing document.)  Yes.

7            (Exhibit 10 marked for identification.)

8           BY MS. NIEMEYER:

9     Q.   Okay.  Again, on this particular document,

10  other than being able to tell me that this was

11  transmitted in the ordinary court of business, and

12  it's the report of your -- your -- as you call him,

13  your fact finder on-site, is it -- is it reasonable to

14  say that Mr. Ball is going to be the most appropriate

15  person to ask detailed questions about what he said in

16  this report?

17       A.   Yes.

18       Q.   Subsequent to the issuance of this report on

19  January 21st -- January 31st of 2020, was there any

20  other information that was needed for a decision to be

21  made about coverage?

22       A.   I don't believe so, no.  I'm -- because I

23  won't repeat, other than legal advice.

24       Q.   Was there, at that time, really just a need

⬆                                                    168

1   to confirm or deny factual understandings based on

2   what was already in Mr. Ball's first report?

3        A.   Mr. Ball's first report gave rise for

4   concern.  That -- in response to that, we issued our

5   reservation of rights.  Mr. Andersson responded to our

6   reservation of rights with comments, so we immediately

7   referred that to Mr. Ball for additional comments in

8   response to Mr. Andersson's comments.

9            (Pause.)

10           BY MS. NIEMEYER:

11       Q.   There's reference to the charts at the bottom

12  of this --

13       A.   (Deponent viewing exhibit.)  Yes.

14       Q.   -- and it talks about that the breakwater had

15  been seen to be marked on recently updated Raymarine

16  and Garmin charts.

17          Do you know if Mr. Ball actually looked at

18   the Garmin GPS when he inspected the vessel?

19      A.   I don't know.  You'll have to ask him.

20      Q.   Has anyone asked or looked for paper charts?

21      A.   On board the vessel?

22      Q.   On board the vessel or where -- you know, was

23   -- was there any kind of an inquiry about whether

24   there were paper charts?

⬆                                                     169

1       A.   Well, clearly, there were paper charts,

2    because, as Mr. Ball says, the breakwater is clearly

3    marked on the official paper charts.

4       Q.   Okay.

5       A.   The -- (inaudible) --

6       Q.   (Inaudible) -- sir --

7               (Whereupon, parties speaking at the same

8    time.)

9               MADAM COURT REPORTER:  Excuse me.  Excuse

10   me.

11          BY MS. NIEMEYER:

12      Q.   I -- I meant on Melody.

13              MADAM COURT REPORTER:  I'm sorry --

14          BY MS. NIEMEYER:

15      Q.   Were the --

16          MADAM COURT REPORTER:  -- Michelle,

17   I didn't hear what either of you said after "official

18   paper charts."  You were both speaking at the same

19   time, and I couldn't hear either of you.  So, I'm

20   sorry, you're going to have to start over.

21          MS. NIEMEYER:  Okay.  Was Mr. Usher

22   speaking when you said that --

23          MADAM COURT REPORTER:  The -- he said --

24          MS. NIEMEYER:  -- the "official paper

♠                                                      170

1    charts"?

2          MADAM COURT REPORTER:  He said that -- he

3    said, "Well, clearly, there were paper charts,

4    because, as Mr. Ball says, the breakwater is clearly

5    marked on the official paper charts."  You said

6    "Okay."  He started -- he was continuing, but you were

7    speaking at the same time, and I couldn't distinguish

8    either one of you.

9      A.   So, to complete the answer, Michelle, which

10   will make it easier for Laurie, all right, so,

11   clearly, official paper charts existed that had the

12   breakwater clearly marked on them.

13     Q.   Okay.

14     A.   It would appear that we do not know -- we

15   assume that the charts that Mr. Andersson had were,

16  therefore, not up to date, because, otherwise, he

17  wouldn't have been aware of the breakwater and avoided

18  it, but he didn't.  So I'm assuming, therefore, he did

19  not have the paper charts on the vessel, or, perhaps

20  that, because the other crew member was unwell, that

21  he didn't have time to refer to the paper charts.

22      Q.   Is it your understanding that it was

23  Mr. Andersson's intention to cruise anywhere in the

24  vicinity of the Dominican Republic?

✦                                                              171

1       A.   Well, I assume he was intending to cruise

2   near the Dominican Republic, because that's where he

3   was.  And if he had any kind of charts and any kind of

4   navigational equipment, he must have known where he

5   was.

6       Q.   Are you -- and -- and we discussed the

7   Garmin.  Unfortunately, the Garmin is the one of the

8   GPSes that literally fell apart from salt water

9   corrosion when they tried to open it, so, today, it's

10  not possible to see that.

11           But was the -- in reference to paper charts,

12  particularly, do you know whether Mr. Ball checked to

13  see if there were any paper charts on board the

14  vessel?

15     A.   No.  You'll have to ask Mr. Ball.

16     Q.   Okay.  And you don't know whether Mr. Ball

17 turned on that Garmin while it was on the breakwater a

18 few days after the incident?

19     A.   No, I don't know.

20     Q.   Looking at the response that was made here,

21 about the VHF radio and the fact that it is possible

22 there was damage to the VHF as -- due to the weather

23 conditions, is it still your company's position or

24 Great Lakes' position that there was an

1 unseaworthiness issue related to the VHF?

2     A.   I believe there was, but in isolation, that

3 would not have been adequate for us to deny the claim.

4     Q.   You've mentioned that the violation of a

5 warranty is something that would void the policy from

6 its inception, correct?

7     A.   That's correct.

8     Q.   Is that true of the navigational warranty or

9 just the seaworthiness warranty?

10     A.   Both.

11     Q.   Where in the policy does it say that the

12 navigational warranty would void the policy?

13     A.   (Deponent viewing document.)  Paragraph T of

14 general conditions, Page 12 of 14.

15   Q.   Hold on.  I'm actually trying to find that.

16   Okay.  Page 12 of 14, so, behind the schedule.

17       Okay.  Where are we?

18   A.   (Deponent viewing exhibit.)  Okay.  It's

19   Paragraph T.  I'll read it in for the benefit of the

20   record.  Where any term herein is referred to as a

21   warranty or any reference is made herein to the word

22   warranted, the term shall be deemed a warranty, and

23   regardless of whether the same expressly provides that

24   any breach will void this insurance agreement from

♠                                                        173

1   inception, it is hereby agreed that any such breach

2   will void this policy from inception.

3   Q.   Why does Mr. Ball raise questions about

4   whether the vessel had gone into port or whether there

5   would be clearing of customs and -- related to the

6   specific voyage in that circumstance?

7   A.   (Deponent viewing exhibit.)

8   Q.   What page of your policy form are you on, by

9   the way?

10   A.   (Deponent viewing document.)  I'm looking at

11   the general conditions section, which is --

12   Q.   Got it, T.

13   A.   -- at page --

14    Q.   All right.  So it's --

15    A.   (Deponent viewing exhibit.)  I'm looking

16 at T, but I'm looking at the whole of the general.

17    Q.   Okay.  On the -- on the exhibit, it's -- it's

18 Page 148, AB 148.

19         Okay.  So this is, obviously, a very

20 Draconian type of provision, right?

21              MR. GOLDMAN:  Object to the form.

22    A.   In what way?

23    Q.   Would you consider it Draconian when the

24 entire value of the policy is lost, based on one

                                              174

1 event?

2    A.   Mmm.  It's the policy.  What would be the

3 point in having warranties if you couldn't rely on

4 them?

5    Q.   That's one way of looking at it.

6         Are there times when you forgive the breach

7 of a warranty, based upon the conditions that the

8 warranty is breached in?

9    A.   Yes.  It's called, without prejudice

10 settlements.

11    Q.   And why -- do you have any kind of a standard

12 for when you would do that?

13    A.   Reasonability.

14    Q.    And when you say "reasonability," who decides

15    that?

16    A.    We do.

17    Q.    Is there any kind of a basis for how you

18    decide it?

19    A.    No.  It's just whether we will consider it

20    unreasonable to decline a claim on a technical basis.

21    Q.    Okay.  Let me close that one.  Let me go

22    ahead and close this one.  I believe we have already

23    gone through this to the level we need to.  And if I

24    leave it open, it's sitting there looking at me, so

♠                                                    175

1    let me get that closed and we'll go to the next one.

2         Okay.  I'm just kind of establishing the

3    timeline here.  So this document, which is CF000055

4    through -57, appears to be an e-mail from Samantha

5    Thomas to Martin Andersson, on December 27th, 2019,

6    referencing a reservation of rights letter and then

7    attaching correspondence.

8         To your understanding, is that the

9    reservation of rights letter that was issued in

10    response to or in reliance upon Mr. Ball's

11    December 23rd, report?

12    A.    (Deponent viewing document.)  That's correct.

13     Q.   And, again, related to the particular

14  language that was selected or what was decided to be

15  relied upon, is that something that Ms. Delacey-Simms

16  did?

17     A.   That's correct.

18     Q.   And would she be the appropriate person to

19  depose on that -- on the facts related to that?

20     A.   Yes.

21          MS. NIEMEYER:  Can we mark that one as

22  Exhibit Number 11?

23          (Exhibit 11 marked for identification.)

24          MADAM COURT REPORTER:  All set, ma'am.

⬆                                                    176

1          MS. NIEMEYER:  Okay.  Thank you, Laurie.

2          MADAM COURT REPORTER:  You're welcome.

3       BY MS. NIEMEYER:

4     Q.   And we'll go to the next one.  Okay.  So this

5  is an e-mail with the Bates Numbers 15 -- CF000157

6  through CF000158, and it's dated February 19th, 2020,

7  from Ms. Delacey-Simms to Mr. Andersson, suggesting he

8  contact the surveyor.

9          And if you'll look below the original message

10  on the -- it looks like also the 19th was asking when

11  Ms. Delacey-Simms would be able to return the GPS

12  unit.

13          Do you see that?

14     A.   (Deponent viewing exhibit.)  Yes.

15     Q.   Does that reflect to you that Mr. Andersson

16 understood that you had the GPS unit?

17     A.   That the surveyor had the GPS unit, yes.

18     Q.   And so he was --

19     A.   Actually, I believe we thought that the

20 surveyor may have had the GPS unit.

21     Q.   He was told by Ms. Delacey-Simms to look for

22 it with the surveyor, correct?

23     A.   Well, to -- to discuss it or contact the

24 surveyor, because the only person that we could refer

♠                                              177

1 him to that may shed light on the location of the GPS

2 was the surveyor.

3     Q.   Okay.  And, at this point, this was after

4 there had already been a reservation of rights,

5 correct?

6     A.   (Deponent viewing document.)  Yes.

7     Q.   And it appears, very shortly before you

8 retained counsel or you had retained counsel, you

9 retained counsel in January, correct?

10     A.   Yes.  Just to remind you, there's an

11 outstanding question.

12          You asked me why the surveyor might have been

13   inquiring as to Mr. Andersson going through customs?

14       Q.   Yes.

15       A.   Okay.  It may well be -- Mr. Andersson, of

16   course, is very familiar with our policy language, as,

17   indeed am I, and we moved on to something else without

18   responding as to why he may have made those inquiries.

19          (Deponent viewing exhibit.)  And, again, I

20   will refer you to general conditions, right,

21   Paragraph J; it is warranted that covered persons must

22   at all times comply with all laws and regulations,

23   governing the use and/or operation of the Scheduled

24   Vessel.  We shall not be deemed to provide cover or

⬆                                                        178

1   shall we be liable to pay any claim or provide any

2   benefit hereunder to the extent that the provision of

3   such cover, payment or such claim or provision or such

4   benefit would expose us to any of those -- any

5   sanction, prohibition, restriction under United States

6   resolutions or trade economic sanctions, laws or

7   regulations of the European Union, United Kingdom or

8   United States of America.

9          All right.  So we're warranting that he must

10   comply with all laws and regulations.  And he did not

11   go through customs, so that might be why he was

12 inquiring about that.  We have not pleaded it, it was

13 not an issue in the case, but that is why he may have

14 asked the question.

15    Q.   Okay.  So he was not -- because it -- it

16 appears in what he wrote that his understanding of the

17 navigational warranty breach would be that it would

18 only be if it was during the voyage and that the

19 voyage would end at the time when the boat went into

20 port --

21              MR. GOLDMAN:  Object to the form.

22          BY MS. NIEMEYER:

23    Q.   -- is that --

24              MR. GOLDMAN:  Is that even a question?

⬆                                                   179

1              BY MS. NIEMEYER:

2    Q.   -- is that your understanding that the voyage

3 is the -- the -- from port to port and that --

4              MR. GOLDMAN:  Object the form.

5          BY MS. NIEMEYER:

6    Q.   -- this voyage, according to Mr. Ball's

7 report, appears to be, in his opinion, not ended until

8 it ended on the breakwater?

9    A.   I don't know.  I -- you raised the issue as

10 to why Mr. Ball might have been inquiring about the

11   customs issue.

12        Q.   Okay.  He -- he raised --

13        A.   And I was --

14        Q.   -- an inquiry --

15        A.   -- inquiring as to why he might have

16   inquired.

17        Q.   I'll ask him that question.

18        A.   Sure.

19        Q.   So now I just want to take a quick look, and

20   this is -- now, we don't need -- I don't think we even

21   need to -- let's see.  This is the survey.

22             MS. NIEMEYER:  We -- did we mark the

23   survey?

24             MADAM COURT REPORTER:  No.

                                                      180

1              MS. NIEMEYER:  Okay.  I'm just --

2    Mr. Usher, based on your familiarity with the file,

3    this is of -- it's marked by Andrew Ball, but it's

4    marked as AB000054 to -90.  It's a survey on

5    November 7th of 2018 with Jonathan Sands as the

6    surveyor.

7              Can we mark that as Exhibit 12?

8              (Exhibit 12 marked for identification.)

9              MADAM COURT REPORTER:  It's all set,

10   ma'am.

11          MS. NIEMEYER:  Okay.

12          BY MS. NIEMEYER:

13     Q.   And, Mr. Usher, do you recognize that survey

14  as the survey that was associated with the

15  underwriting of the claim?

16     A.   (Deponent viewing exhibit.)  That's correct.

17     Q.   Okay.  And that purchase was about a year

18  before this voyage, correct?

19     A.   As I understand it, yes.

20     Q.   If there was any reason for you to believe,

21  at the time of that purchase, that the vessel was not

22  seaworthy, would you have insured it?

23     A.   No, if we thought the vessel was unseaworthy,

24  we wouldn't have insured it.

♠                                               181

1     Q.   Mr. Usher, have you seen this statement?

2     A.   (Deponent viewing document.)  I don't believe

3  so.

4     Q.   This e-mail, dated December 23rd, with the

5  Bates Numbers AB000214 to -216, Mr. Usher, have you

6  seen this in your review of the policy documents --

7     A.   (Deponent viewing document.)  No.

8     Q.   -- or the claims file documents?

9     A.   No.

10     Q.    Okay.  I'll ask Mr. Ball about that.

11           Mr. Usher, this -- this document -- and I'm

12   going to mark this one as exhibit --

13           MS. NIEMEYER:  I guess we're at 13?

14           MADAM COURT REPORTER:  Yes.

15           (Exhibit 13 marked for identification.)

16           MADAM COURT REPORTER:  It's all set.

17           MS. NIEMEYER:  Okay.

18       BY MS. NIEMEYER:

19     Q.    -- has the Bates Number MA000268, and it

20   appears to be an e-mail from Mr. Andersson to Samantha

21   Thomas on January 2nd of 2020.  And he's asking for a

22   form to be sent again and also saying he wants the

23   contact details for the actual insurance company that

24   he should correspond with if your company is not the

♠                                                        182

1   correct recipient.

2           Do you have any idea why there was confusion

3   about who was the insurance company or who he should

4   communicate with?

5     A.    Not in our mind.  Clearly, in Mr. Andersson's

6   mind, he thought maybe that he should be talking to

7   the insurance company instead of the MGA, which we've

8   explained within that e-mail that we are the people to

9   contact.

10      Q.    Okay.  And in this particular e-mail, it

11   says, "Our surveyor has determined that the Vessel has

12   very little residual value and it does appear that the

13   salvage costs proposed are not economical.  We

14   therefore have no objection to proceeding in the

15   manner that you suggest but the final decision rests

16   with you."

17            Does that refresh your recollection in any

18   way about whether there was any kind of approval or

19   agreement on the part of Concept to the salvage

20   structure that was being proposed?

21      A.    Yeah, it's exactly as I recall; that we had

22   no objection.

23      Q.    Okay.  And you'll -- I don't think we need to

24   mark this, but is it your understanding this is

⬆                                                            183

1   further clarification by you with Mr. Andersson about

2   who did what and the fact that your company was the

3   managing general agent?

4      A.    (Deponent viewing document.)  That's correct.

5            MS. NIEMEYER:  Okay.  I want to mark this

6   as Exhibit 14.

7            (Exhibit 14 marked for identification.)

8            MADAM COURT REPORTER:  All set.

9          BY MS. NIEMEYER:

10     Q.   And this document is a compilation of a

11 series of e-mails and their attachments.  It's

12 CF000075 through -143.

13          And this document -- Mr. Usher, do you recall

14 seeing this document dated January 6th of 2020?

15     A.   (Deponent viewing exhibit.)  Yes.  It's in

16 the claims file.

17     Q.   And would you agree that any of the

18 information that was shared through this series of

19 e-mails and the photographs from the salvage would've

20 been knowledge that was in the hands of the claim file

21 at that time --

22     A.   Yes.

23     Q.   -- and in the hands of the claims adjuster?

24     A.   Yes.

♠                                                    184

1      Q.   Was this shared with Mr. Ball?

2      A.   (Deponent viewing document.)

3          MR. GOLDMAN:  Laurie, while Mr. Usher is

4 looking at that, can you remind me, Exhibit 13, what

5 was the Bates number that that started with?

6          MADAM COURT REPORTER:  One moment.

7          (Madam Court Reporter looking through

8 transcript.)

9    A.   (Deponent viewing document.)  Well, I can't

10   see anything in the file that we sent it to Mr. Ball,

11   but you'll have to check --

12   Q.   Did you --

13   A.   -- you'll have to check with Sarah

14   Delacey-Simms.

15              MS. NIEMEYER:  Okay.  Now, Laurie, you

16   were -- you were looking for a number?

17              MADAM COURT REPORTER:  I found it, but

18   then when I started writing, I lost it again because

19   it moves my page, so give me one second.  I'll try and

20   find it again here.

21              (Madam Court Reporter looking through

22   transcript.)

23              MADAM COURT REPORTER:  It looks like

24   MA000268.

185

1              MS. NIEMEYER:  Got you.  Okay.  I just

2    wanted to make sure I didn't lose that and not have it

3    later.

4         Okay.  Let's go to this letter.  This

5    document is also going to be marked as Exhibit 15.  It

6    starts with Bates Number AB000034 and it ends

7    with -37.

8              (Exhibit 15 marked for identification.)

9              MADAM COURT REPORTER:  It's all set.

10             BY MS. NIEMEYER:

11     Q.   Mr. Usher, is this the response that we've

12     been talking about from Mr. Andersson related to the

13     reservation of rights letter?

14     A.   (Deponent viewing exhibit.)  Yes.

15     Q.   Do you know whether Mr. Andersson was ever

16     provided a copy of Mr. Ball's report so that he could

17     respond to Mr. Ball's understanding of things?

18     A.   I don't think we sent a copy of the report

19     from Andrew Ball, no.

20     Q.   If you are asking for his -- his

21     clarification of anything, why would you not send that

22     to him?

23     A.   Because Sarah Delacey-Simms outlined it in

24     her reser -- the comments of Mr. Ball that were

⬆                                                186

1     relevant and pertinent in her reservation of rights

2     letter.

3     Q.   Okay.  But Mr. Mar -- Mr. Andersson was

4     writing this letter based only upon his awareness of

5     what Ms. Delacey-Simms had to say, correct?

6     A.   That's correct.

7     Q.   Okay.  And he was never asked any further

 8  questions to follow up on anything he said at that

 9  point; is that correct?

10      A.   That's correct.

11      Q.   Now, you'll see here in the first paragraph

12  (indicating), he noticed on the correspondence that

13  his old mailing address was being used, and he

14  provides the new address above.

15           So we -- is it fair to say that you knew on

16  January 15th that Mr. Andersson lived in New Jersey?

17      A.   Yes.

18      Q.   Why did you sue in Massachusetts?

19           MR. GOLDMAN:  Object to the form.

20      A.   Because the policy was issued to

21  Massachusetts.

22      Q.   Okay.  So this correspondence was relied upon

23  in determining the facts that you needed to decide the

24  coverage decision; is that right?

♠                                                      187

 1      A.   (Deponent viewing exhibit.)  This letter was

 2  forwarded to Andrew Ball and Bill Bailey for their

 3  comments.

 4      Q.   Okay.  And those comments were what you

 5  relied upon --

 6      A.   Correct.

7      Q.    -- correct?

8            Okay.  And you'll see here (indicating),

9   Mr. Andersson, in the last paragraph, mentions that

10  there's 30 days to have access to anything related to

11  the vessel or the things that were being held by the

12  salvor under a contractual agreement to protect that.

13           It's your testimony that nothing was done to

14  look at the hull or any of the salvaged items or to do

15  anything further related to that, correct?

16     A.    It's my testimony that we didn't.  I don't

17  know about Caribbean Surveyors & Adjusters --

18     Q.    Okay.

19     A.    -- but there's also evidences that we

20  informed Caribbean Surveyors & Adjusters that there

21  was a 30-day window since this letter was forwarded in

22  its entirety to Andrew Ball and Bill Bailey for their

23  comments.

24                MS. NIEMEYER:  Okay.  The next document

♠                                                    188

1   is Exhibit 16.

2            Actually, I'm not going to mark it; it's part

3   of the -- it's part of the docket.

4                THE DEPONENT:  Okay.

5            BY MS. NIEMEYER:

6      Q.    Mr. Usher, do you recognize this as the

7     complaint that was filed by Great Lakes in this

8     lawsuit?

9         A.   (Deponent viewing document.)  Yes.

10        Q.   Did you review that before it was filed for

11    the factual accuracy of the allegations that were

12    being made?

13        A.   I believe so, yes.

14        Q.   Personally?

15        A.   Probably not.

16        Q.   Do you know who would've done that?

17        A.   Sarah Delacey-Simms.

18        Q.   Okay.  Paragraph 4; is that correct?

19        A.   (Deponent viewing document.)  No, you missed

20    that.  Great Lakes was, because it used to be called

21    Great Lakes Reinsurance (UK) PLC up until, I believe,

22    2017 -- '16 or '17, and it was registered in United

23    Kingdom with its offices in the City of London.  And

24    then they relocated, renamed the company Great Lakes

                                              189

1     Insurance SE and relocated to Germany.

2         Q.   Okay.  I'm not going to ask you to go through

3     every allegation that's made here.  We'll -- you know,

4     I'll be talking to Ms. Delacey-Simms and the fact

5     finders, and those people may be more closer to the

 6   ground on that, so to speak.

 7              MS. NIEMEYER:  Let me just -- why don't

 8   we take a short break.  I'm just going to look at my

 9   notes again, and we probably are pretty close to done.

10              (Off the record at 12:47 p.m.)

11              (Recess taken.)

12              (Back on the record at 12:51 p.m.)

13              BY MS. NIEMEYER:

14   Q.   So I just have one -- one other question for

15   you, Mr. Usher.

16              If there was anything that you could go back

17   and suggest should've been done differently in this

18   claim, is there anything you would suggest?

19   A.   As far as the claim, no.  I wish

20   Ms. Delacey-Simms had noticed the change of address so

21   that we'd updated the underwriting file, but it's not

22   material, and it has no impact on the case itself, so

23   really speaking, no.

24              MS. NIEMEYER:  Okay.  I don't have any

⬆                                                       190

 1   further questions.

 2              MR. GOLDMAN:  No questions from counsel

 3   for plaintiff.  He waives reading and signing,

 4   Counselor.

 5              MS. NIEMEYER:  I do have a question for

6  you, Steven.

7              MR. GOLDMAN:  Yes.

8              MS. NIEMEYER:  Are we having a deposition

9  tomorrow?

10              (Mr. Michael Goldman now present at

11  deposition proceeding.)

12              MR. MICHAEL GOLDMAN:  No.

13              MR. GOLDMAN:  No.

14              MS. NIEMEYER:  Can we --

15              MR. GOLDMAN:  Take it up with Michael,

16  please.

17              MS. NIEMEYER:  All right.  I -- I just --

18  I need to know if I have to go through with having a

19  court reporter show up tomorrow so that we can

20  document that our witness isn't showing up.

21              MR. GOLDMAN:  Michael tells me there is

22  no deposition tomorrow.  He reiterates it.

23              MR. MICHAEL GOLDMAN:  No, there's no depo

24  -- deposition.  If you want to make a motion to

✦                                                                191

1  compel, you don't have to go through the rigmarole of

2  appearing and -- and, you know, we're all absent.

3              Go right ahead and make your motion to

4  compel.  I'm not going to object that -- you know,

5   like I said, that you -- that you didn't go through

6   the form.  I will -- I will oppose on the substance,

7   but I'm not going to object that -- yeah, I'm not

8   going to insist that you show up with a court reporter

9   and that we don't.

10          MS. NIEMEYER:  Okay.  After this

11  deposition today, do you still take the position you

12  take?  Would you like to schedule a deposition date?

13          MR. MICHAEL GOLDMAN:  No.  We're sticking

14  to that position.  I'd like to -- we'll proceed with

15  the other depositions, but we're -- we will -- unless

16  you win a motion to compel, we're not voluntarily

17  producing Ms. Delacey-Simms.

18          MS. NIEMEYER:  Your claims adjuster,

19  okay.

20          MR. MICHAEL GOLDMAN:  That's correct.

21          MS. NIEMEYER:  Thank you for that.

22          MADAM COURT REPORTER:  Are we all set,

23  ma'am?

24          MS. NIEMEYER:  Yes, thank you.

♠                                                 192

1           MADA0M COURT REPORTER:  Okay.  This is

2   Laurie Berg, the court reporter.  I just need to do

3   orders on the record.

4           If you can please let me know how you'd like

5  to order your transcript, like what you --

6              MR. GOLDMAN:  Laurie?  Laurie --

7              MADAM COURT REPORTER:  Yes.

8              MR. GOLDMAN:  -- this is Steven Goldman.

9  I'd like a -- the only thing I want is a PDF mini,

10  nothing else, just the PDF mini and all exhibits

11  attached as PDFs --

12              MADAM COURT REPORTER:  You've got it.

13              MR. GOLDMAN:  -- either attached or in a

14  separate e-mail.  All right.  PDF format for both,

15  mini for the transcript and attach all exhibits,

16  please.  Send it to my e-mail.

17        Do you have that or shall I give it to you?

18              MADAM COURT REPORTER:  Hold on one

19  moment.

20              MR. GOLDMAN:  You wouldn't have mine.

21  You might have Michael's.

22              MADAM COURT REPORTER:  I'll take yours,

23  then, sir.

24              MR. GOLDMAN:  Mine is my name, Steven,

♠                                              193

1  with a V, at Goldman, G-O-L-D-M-A-N, and -- and that's

2  the word "and," A-N-D, Hellman, H, as in Harry, E,

3  double L, like Louis, M-A-N;

4  steven@goldmanandhellman.com.  Please include Michael

5  at michael@goldmanandhellman.com.

6         Nice and simple, hey?

7              MADAM COURT REPORTER:  Very nice and

8  simple.

9              MR. GOLDMAN:  And that's all.

10             MADAM COURT REPORTER:  Okay.

11             MR. GOLDMAN:  What is the turnaround

12 time?

13             MADAM COURT REPORTER:  The turnaround

14 time -- the normal is ten business days.

15             MR. GOLDMAN:  That will do.

16             MADAM COURT REPORTER:  Okay.

17             MR. GOLDMAN:  Michael will get in touch

18 if that's not --

19        Michael, ten days?

20             MR. MICHAEL GOLDMAN:  That's fine.

21             MR. GOLDMAN:  That's fine, he says.

22             MADAM COURT REPORTER:  Okay.

23             MR. GOLDMAN:  All right.  Are we done?

24 Can we sign off?

⬆                                            194

1              MADAM COURT REPORTER:  Hold on one

2  moment.

3              THE DEPONENT:  Laurie might have

 4  questions.

 5                MR. GOLDMAN:  Oh.

 6                MADAM COURT REPORTER:  I just need to --

 7  Michelle, can I just get your order quick?

 8                MS. NIEMEYER:  Yes, that's what I was

 9  trying to do.

10                MADAM COURT REPORTER:  Thank you.

11                MS. NIEMEYER:  I -- I also only want

12  electronic, but I'm -- I hate minuscripts.

13                MADAM COURT REPORTER:  Okay.

14                MS. NIEMEYER:  I might -- I don't even

15  like giving them to the court.  Give me the full pages

16  in PDF or however you deliver the electronic

17  transcript.

18                MADAM COURT REPORTER:  Mm-hmm.  Sounds

19  great.  I can take care of that.

20                Is the regular turnaround time okay for you,

21  the ten business days?

22                MS. NIEMEYER:  Yes, except for that last

23  page where we just talked about tomorrow's deposition.

24  If you can do that last -- just that last piece with a

♠                                                    195

 1  cover sheet so that I can attach that to my motion, I

 2  would appreciate it.

3              MADAM COURT REPORTER:  Okay.  I'll talk

4  to my office.  I'm not sure...

5          You'd need that right away?

6              MS. NIEMEYER:  Yeah.

7              MADAM COURT REPORTER:  I'm not sure how

8  they -- how we do that.

9              MS. NIEMEYER:  All right.

10             MADAM COURT REPORTER:  Just because it's

11  part of the transcript, I'm not sure --

12             MS. NIEMEYER:  Right, yeah.

13             MADAM COURT REPORTER:  -- about that.

14             MS. NIEMEYER:  Well, see what you can do.

15             MADAM COURT REPORTER:  I'll see what they

16  say.

17             MS. NIEMEYER:  If you can't -- if you

18  can't, I'll file a motion saying what happened, and

19  that will be the end of that.

20             MADAM COURT REPORTER:  Okay.

21             MS. NIEMEYER:  But I generally -- I'm

22  going to want a regular -- you know, regular size and

23  I use TextMap --

24             MADAM COURT REPORTER:  Okay.

                                              196

1              MS. NIEMEYER:  -- so I need the

2  compatible format.

3                MADAM COURT REPORTER:  Okay.  I'll let

4  them know.

5                (30(B)(6) DEPOSITION OF GREAT LAKES

6  INSURANCE SE BY BERIC ANTHONY USHER concluded at

7  12:58 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

♠                                                    197

1  COMMONWEALTH OF MASSACHUSETTS

2  MIDDLESEX, SS.

3

4          I, Laurie J. Berg, Certified Court Reporter,

5  Registered Professional Reporter, Certified Realtime

6  Reporter, Certified LiveNote Reporter, Certified

7  eDepoze Reporter and Notary Public, in and for the

8  Commonwealth of Massachusetts, do hereby certify that

9  pursuant to appropriate notice of taking deposition,

10  there remotely appeared before me the following named

11  person, to wit:  BERIC ANTHONY USHER, who was by me

12  duly sworn; that he was thereupon examined upon his

13  oath and his examination reduced to writing by me; and

14  that the deposition is a true record of the testimony

15  given by the witness.

16          IN WITNESS WHEREOF, I have hereunto set my

17  hand and seal this 2nd day of June, 2021.

18

19  My commission expires:

20  September 14, 2023

21

22

23          _____

24                  Notary Public

♠                                                      198

1  ERRATA SHEET DISTRIBUTION INFORMATION

2  DEPONENT'S ERRATA AND SIGNATURE INFORMATION

3

4  ERRATA SHEET DISTRIBUTION INFORMATION

5          The original of the errata sheet has been

6  delivered to Steven E. Goldman, Esquire.

7          When the errata sheet has been completed by

8  the deponent and signed, a copy thereof should be

9  delivered to each party of record and the ORIGINAL

10  delivered to Michelle Melin Niemeyer, Esquire, to whom

11  the original deposition transcript was delivered.

12

13  INSTRUCTIONS TO DEPONENT:

14          After reading this volume of your deposition,

15  indicate any corrections  changes to your testimony

16  and the reasons therefor on the errata sheet supplied

17  to you and sign it.  DO NOT make marks  notations on

18  the transcript volume itself.  Add additional sheets

19  if necessary.  Please refer to the above instructions

20  for errata sheet distribution information.

21

22

23

24

```
 1    PLEASE ATTACH TO THE 30(B)(6) DEPOSITION OF GREAT

 2        LAKES INSURANCE SE BY BERIC ANTHONY USHER

 3        CASE:  Great Lakes Insurance SE

 4               V. Martin Andersson

 5   DATE TAKEN:  May 21, 2021

 6

 7                       ERRATA SHEET

 8   Please refer to Page 198 for errata sheet instructions

 9   and distribution instructions.

10   PAGE  LINE  CHANGE/REASON

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   I have read the foregoing transcript of my deposition

18   and except for any corrections  changes noted above, I

19   hereby subscribe to the transcript as an accurate

20   record of the statements made by me.

21   Executed this ____ day of _____, 2021.

22

23                       _____

24                       BERIC ANTHONY USHER
```