1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

IN ADMIRALTY

*****************************

GREAT LAKES INSURANCE SE

      vs.                        4:20-cv-40020-DHH

MARTIN ANDERSSON

*****************************

    DEPOSITION BY ZOOM OF MICHAEL COOLEY, a witness called on behalf of the Plaintiff, pursuant to the Rules of Civil Procedure, before Karen D. Pomeroy, Registered Diplomate Reporter and Notary Public in and for the Commonwealth of Massachusetts, at 244 Biscayne Boulevard, Miami, Florida, on Wednesday, January 19th, 2022, commencing at 10:01 a.m.

2

1   APPEARANCES:

2   MICHAEL I. GOLDMAN, ESQUIRE

3   Goldman & Hellman

4   1731 Beacon Street, Suite 511

5   Brookline, Massachusetts 02445

6   For the Plaintiff

7

8

9   MICHELLE M. NIEMEYER, ESQUIRE

10  Michelle M. Niemeyer, PA

11  244 Biscayne Boulevard No. 3009

12  Miami, Florida 33132

13  For the Defendant

14

15

16

17

18

19

20

21

22

23

24

3

1                      INDEX

2    DEPOSITION OF MICHAEL COOLEY              PAGE

3    Examination by Mr. Goldman                4

4    Examination by Ms. Niemeyer               29

5

6

7

8

9

10

11

12

13                    EXHIBITS

14   Number                                 Page

15   Exhibit 31  Photos from Pictures E120

16              Folder, 11 pp.              32

17   Exhibit 32  Photos from Garmin Chart

18              Pictures Folder, 10 pp.     32

19   Exhibit 33  Photos from April 1 Garmin

20              and Furuno Inspection, 13 pp.   32

21   Exhibit 34  Report of Michael Cooley    32

22

23

24   Exhibits Attached

4

1              STIPULATIONS

2        It is stipulated by and between counsel for

3    the respective parties that the deposition

4    transcript is to be read and signed by the

5    deponent under the pains and penalties of

6    perjury; and that the sealing and filing thereof

7    are waived; and that all objections, except as to

8    form, and motions to strike are reserved until

9    the time of trial.

10                   * * *

11              MICHAEL COOLEY,

12    having been duly remotely sworn by the

13    reporter, was deposed and testified as

14    follows:

15              EXAMINATION

16  BY MR. GOLDMAN:

17  Q.  Good morning, Mr. Cooley.  My name is

18    Michael Goldman, and I have a little bit of a

19    spiel I need to give you before we start asking

20    questions.

21        I'm from the law firm of Goldman & Hellman,

22    and I represent Great Lakes Insurance in this

23    matter; and we're here to take your deposition

24    today.

1          In order to make sure we get a clean record,

2     the first thing we have to do is we have to

3     maintain certain courtesies.  We have to wait --

4  A.  We have to what?

5  Q.  We have to maintain certain courtesies.

6  A.  Oh, okay.

7  Q.  We have to work as hard as we can to wait

8     patiently for one person to finish speaking and

9     then to wait our turn to speak.  It's especially

10    hard to do that in this Zoom age, but we must

11    try.

12         I'll ask you to wait patiently for me to

13    finish phrasing my question, and then, when I'm

14    done, you'll answer; and I will do my best to be

15    patient and not to jump down your throat when I

16    have a follow-up question.

17         Even though we're on camera, still all of

18    your answers have to be verbal, sir.  You can't

19    nod your head or shake your head or shrug your

20    shoulders.

21         Please don't guess.  If you know the answer,

22    say so; but if you don't know the answer, just

23    say so.  If you need me to ask a better question,

24    please just say so.

6

1  This isn't meant to be an endurance test.  If

2  you need a break, just say so at any time.

3  All right.  For the record, can you please

4  state your full name, your date of birth, and

5  your current residential address.

6  A.  My name is Michael David Cooley.  Date of birth,

7  ██████████████  Address in Miami is ████

█  ████████████  Miami, Florida 33176.

9  Q.  Is that where you are now?

10  A.  No, no.  I'm at Michelle's office.

11  Q.  Oh, that's right.  Excuse me.  She said that

12  before.  Thank you.

13  Are you married?

14  A.  I'm sorry?  Am I what?

15  Q.  Are you married?

16  A.  No.

17  Q.  Do you have an employer at the moment, or are you

18  self-employed?

19  A.  I have an employer.

20  Q.  Who is your employer?

21  A.  Langer-Krell Marine Electronics.

22  Q.  How long have you been employed by Langer-Krell?

23  A.  About 34 years.

24  Q.  Congratulations.  Have you ever been a plaintiff

7

1      or a defendant in any litigation?

2  A.  No.

3  Q.  Have you ever been convicted of a crime?

4  A.  No.

5  Q.  Have you ever pled guilty to a crime?

6  A.  No.

7  Q.  Have you ever pleaded no contest to a crime?

8  A.  No.

9  Q.  Are you a high school graduate?

10 A.  Yes.

11 Q.  Where did you graduate from and what year?

12 A.  Miami Killian Senior High in Miami.  Year was

13     '74.

14 Q.  Do you have any post-high school education?

15 A.  Yes.  I went to the University of Florida and got

16     a bachelor of science electrical engineering in

17     1986.

18 Q.  Any other schooling beyond that?

19 A.  The school of hard knocks.  I spent some time in

20     the Marine Corps after high school.

21 Q.  Oorah.  You're talking to two marines over here.

22     I retired in 2006 and my brother over there

23     retired in what year, John?

24        UNIDENTIFIED SPEAKER:  2010.

8

1   BY MR. GOLDMAN:

2   Q.   2010.   Do you have any professional license?

3   A.   I have a FCC license; general radio operator

4        license.

5             I have a CMET certification and several other

6        little other certifications from various

7        manufacturers.   Garmin, Raymarine.   Little

8        certifications that I've attended their

9        courses.

10  Q.   Can you list those -- we'll get back to the first

11       ones you named.

12            Can you list those certifications from those

13       various manufacturers.

14  A.   Not from memory.   I'll have to read them.

15            That's not it.   I don't know if I brought

16       that copy of the paper with me here today.

17  Q.   If you remember, that'll be fine.

18  A.   What I remember off the top of my head is

19       Raymarine certification; Garmin certification; I

20       said CMET, Certified Marine Electronics Tech

21       certification.

22            That's all I remember off the top of my

23       head.

24  Q.   What did you have to do to get the Raymarine and

9

1      Garmin certifications?

2   A.  They had an exam they would send us, a technical

3       exam; and I had to pass that.

4   Q.  Do you remember how many years ago that was?

5   A.  Gosh, it was at least ten years.

6   Q.  Have you ever been deposed before today?

7   A.  No.

8   Q.  Have you ever testified in court?

9   A.  No.

10  Q.  All right.  Let's go look at your photos.  I've

11      got three stacks of photos.

12          Obviously I'm not doing this to testify.  I'm

13      just using this to describe what I have to try to

14      maintain -- try to make sure we're all clear what

15      we're talking about.

16          I have three sets of photos.  One came in a

17      folder called Photos E120.  One came in a folder

18      called Garmin chart pictures, and the last came

19      in a folder April 1 Garmin and Furuno inspection.

20          Do you have those three?

21  A.  I do.  I have paper copies, and they're on the

22      computer if I need to open them up.

23  Q.  Okay.  Splendid.  Could you please look at the 11

24      photos that came in the folder Photos E120.

10

1  A.  I have them here.

2  Q.  I don't mean to rush you.  Are you still looking

3      for them?

4  A.  No, I'm sorry.  I have them in my hand.

5  Q.  Oh, you do?  Okay.  Splendid.  Now, I've got

6      these photos in the order that they are appearing

7      on my computer, but I will hold them up as I go

8      through them to make sure we're talking about the

9      same ones.

10         Now I'm going to hold up what on my computer

11     appear as the first two in order.  I'll show them

12     to you.

13 A.  Okay.  Yes.  The sealed box.

14 Q.  I don't want to describe them because, again, I'm

15     not testifying.

16         Do you know who took these photos?

17 A.  I believe -- to my best memory, I believe it was

18     my coworker Danny.  He is the one who had a cell

19     phone camera there, and I believe he took the

20     photo.

21 Q.  Did he take -- to the best of your knowledge, did

22     he take all 11 photos that we are looking at

23     now?

24 A.  Yes.  To the best of my knowledge, yes.

1   Q.  Can you tell me where these photos were taken?

2   A.  It was in my repair shop at work, at

3       Langer-Krell.

4   Q.  Can you tell me what these first two photos show.

5   A.  First shows a box that came to us that later

6       proved to have a Raymarine E120 inside.

7   Q.  Was the Raymarine E120 the only thing in that

8       box?

9   A.  Yes.

10  Q.  Who mailed the box to you?

11  A.  I don't know.  Michelle brought it to me.  I

12      don't know how it got to her.

13  Q.  Do you remember if there was a sender or return

14      address on the box?

15  A.  I don't remember.  I see in one picture, there's

16      a bit of a FedEx label still on top; but I don't

17      know that we can read it.

18          It's the third picture in my collection of

19      pictures, but I don't remember who it came

20      from.

21          MR. GOLDMAN:  Let me back up for a moment.

22      Let's mark this stack of 11 photos as Exhibit 1.

23          Michelle, do you have any objection to that?

24          MS. NIEMEYER:  No.

12

1            (Discussion off the record.)

2  BY MR. GOLDMAN:

3  Q.  We are on Exhibit 31 with 11 photos.

4        Can you please look at Photos 3 through 7,

5     which I'll hold up just so you know what I'm

6     referring to.

7        Do you know which photos I'm referring to

8     now?

9  A.  Yes.

10  Q.  Is that the same box as in the first two photos

11     we looked at?

12  A.  It is, yes.

13  Q.  Do you know whose hands those are?

14  A.  Bobby Krell; my boss.

15  Q.  Can you please turn to the eighth photo.

16  A.  All right.  I'm there.

17  Q.  What is that in that photo?

18  A.  That's the back side of a Raymarine E120.

19  Q.  Holding up the ninth photo.  Can you tell me

20     what's depicted in that photo?

21  A.  A close review of the back side of the Raymarine

22     E120.

23  Q.  To make it easier, I'm going to hold up the

24     ninth, the tenth, and the eleventh photo.

13

1      Can you tell me what is depicted in those
2    three photos.
3 A.  Those are all three the front side of a Raymarine
4    E120.
5 Q.  Can you tell me in the tenth photo whose arm that
6    is with a gray sleeve?
7 A.  I don't know.  It's not me.  It's not Bobby.  It
8    might be -- I think -- and I would only guess.
9      I think it was one of the technicians that
10   came to do this investigation.  I don't know
11   their names.
12 Q.  We'll come back to those.  Let's put them aside.
13   I want to authenticate the other photos.
14     Please pick up the pack of ten photos which
15   came in the folder that said Garmin Chart
16   Pictures.
17 A.  I have them here.
18     MR. GOLDMAN:  I'm going to mark these as
19   Exhibit 32.
20 BY MR. GOLDMAN:
21 Q.  Do you know who took these photos?
22 A.  The same day, I'm very sure it would have also
23   been Danny.
24 Q.  Were you present --

14

1   A.   I'm sorry.  I can't swear that it was the same

2        day.

3            I know there were -- there were two separate

4        times we looked at this Garmin, the first time

5        and the second time, and I can't swear what date

6        this was.

7   Q.   Were you present when these photos were taken?

8   A.   Yes.

9   Q.   Looking at the first photo in the stack, can you

10       tell me what that photo shows?

11  A.   Not from looking at it but just because I know,

12       it was the Garmin GPSMAP 721xs.

13  Q.   Can you tell me what the second photo shows?

14  A.   A close-up of the chart door where you would plug

15       in a little electronic chart to give you extra

16       detail in the area covered by that chart.

17  Q.   Can you tell me what the third picture shows?

18  A.   The chart we pulled out of the Garmin.

19  Q.   Is that the chart -- is that the chip that was in

20       the Garmin when this vessel departed on its last

21       voyage?

22  A.   Well, I can't swear to that.  I can only say that

23       it's the chip that was in the Garmin when it

24       arrived in my shop.

15

1   Q.  Fair enough.  Can you please turn to the fourth

2       photo and tell me what that photo depicts.

3   A.  Yeah, that's a -- a picture of one of my showroom

4       Garmin units where we plugged that chart in; the

5       chart we recovered out of the rusty Garmin,

6       plugged it into this machine to see if it worked

7       and, lo and behold, it did work; and the area in

8       that little square box is the area where that

9       chart gives extra detail.

10  Q.  Okay.  So to make sure I understand, the Garmin

11      device that I see in the photo, that is not one

12      of the Garmin devices that was on board

13      Mr. Andersson's vessel; is that correct?

14  A.  That's correct, it is not.

15          MS. NIEMEYER:  Objection.  When you said

16      the --

17          MR. GOLDMAN:  Let's go off the record for a

18      moment.

19          (Discussion off the record.)

20  BY MR. GOLDMAN:

21  Q.  Can you please turn to the fifth photo in the

22      exhibit.

23  A.  Yes, Photo No. 5.

24  Q.  Can you tell me what -- can you tell me what that

16

1    photo depicts?

2  A.  Yes, it's just a closer-up photo of the -- my

3       shop display Garmin unit with that rusty chart

4       card plugged in and showing the area of detail

5       that card gives details in.

6  Q.  Can you turn to the sixth photo, please.

7  A.  I'm there.

8  Q.  What does this photo depict?

9  A.  This is a page in that -- my shop Garmin where I

10      can go into the menu and ask it to tell me what

11      chart is plugged into it; and this one, it shows

12      that the chart -- the little rusty chart plugged

13      in is a -- let's see.  It's hard to read.

14      Under -- let's see.

15          It's hard to read the lines here, but this

16      identifies the chart that's plugged into the

17      slot.

18  Q.  Can you tell me -- can you read for me which line

19      there identifies the chart that was plugged into

20      the slot?

21          MS. NIEMEYER:  Michael, why don't you--

22          MR. GOLDMAN:  Still can't hear you.  I'm

23      sorry.  I don't mean to be rude.  I can't hear

24      you, Michelle.

17

1      MS. NIEMEYER:  So let me just open the
2    electronic version, because Mike's having trouble
3    reading the printout because it's fairly small.
4      All right.  We're in the Garmin chart
5    pictures, and we're in the -- what was it?  The
6    fifth or the sixth?
7      MR. GOLDMAN:  I believe it's the fifth.  No,
8    the sixth.
9      MS. NIEMEYER:  Okay.  It's right here.  So
10    can you see this better?
11      THE WITNESS:  I can see it on paper now.  I
12    put on my extra glasses.
13  BY MR. GOLDMAN:
14  Q.  Okay.
15  A.  Where it says supplemental map, and it says --
16      that's the plug-in; the little map, and that's
17      HXUS030R-Southeast Caribbean; and the V is for
18      the software -- or the map version number.
19      Version 2015; version 16.50.
20  Q.  Are those numbers, version 2015 and version
21      16.50, indicative of the date of the map?
22  A.  The 2015 is.  The 16.50, I honestly don't know
23      what that means.
24  Q.  Can you please turn to the next photo, No. 7.

18

1   A.   Okay.

2   Q.   Can you tell me what that photo depicts?

3   A.   That's the inside of the rusty Garmin.  It had

4        broken open, and it's part of the inside of it.

5   Q.   Would you turn to the eighth photo, please.

6   A.   I'm there.

7   Q.   Can you tell me what that photo depicts.

8   A.   Another photo of the inside of the rusty

9        Garmin.

10  Q.   Can you turn to the ninth photo, please.

11  A.   I'm there.

12  Q.   Can you tell me what that photo depicts.

13  A.   That's -- on that shop display where we have the

14       little chart plugged in, this is zoomed into the

15       area of interest.

16  Q.   Does that chart show a breakwater outside

17       Boca Chica?

18  A.   It does not.  The little digits you see there in

19       the water, those are the depths.

20  Q.   Can you turn to the tenth photo, please.

21  A.   I'm there.

22  Q.   Can you tell me what that photo depicts.

23  A.   Zoomed even farther in the same area.  I believe

24       the little green shore area is meant to show --

19

1       meant to indicate shallow water.

2  Q.  Okay.  Thank you.  I'll turn to the third batch

3      of photos, which we will mark as Exhibit 33.

4      These were in the folder April 1 Garmin and

5      Furuno inspection.

6  A.  I have them here.

7  Q.  Can you look at those photos briefly and tell me

8      who took those photos.

9  A.  These also would have been taken by Danny.

10  Q.  Looking at the first photo, can you tell me what

11      that photo depicts.

12  A.  It looks like the box that the Raymarine unit

13      arrived in.  Although, you know, I can't swear.

14        If memory serves, there were two boxes that

15      came; one with the Garmin and Furuno unit and

16      another with the Raymarine unit, and I can't

17      swear which box it is.

18  Q.  Turning to the third photo, can you tell me who

19      that is in the photo?

20  A.  That's me.  Michael Cooley.

21  Q.  I thought so, but only you can testify.

22  A.  I understand.

23  Q.  Can you turn to the fourth photo, please, and

24      tell me what that photo depicts.

20

1   A.   That's opening the first box we received.  It had

2        the Garmin and I believe also the Furuno unit

3        inside.

4   Q.   Can you turn to the fifth photo and tell me what

5        that photo depicts?

6   A.   A close-up view of the same box; the first box we

7        received that had the Garmin and I believe the

8        Furuno unit inside.

9   Q.   Can you turn to the sixth photo, please.

10  A.   I'm there.

11  Q.   Can you tell me what that photo depicts.

12  A.   That's a close-up of the inside of the Garmin

13       GPSMAP 721 showing the inside.

14  Q.   Can you turn to the seventh photo, please.

15  A.   I'm there.

16  Q.   And can you tell me what that photo depicts.

17  A.   Another photograph of the same -- inside of the

18       same Garmin 721; white water damage.

19  Q.   Can you turn to the eighth photo, please.

20  A.   I'm there.

21  Q.   Can you tell me what that photo depicts.

22  A.   That's the other unit that was in that box with

23       the Garmin.  It's a Furuno GPS navigator.

24  Q.   Can you turn to the ninth photo, please, and tell

21

1    me what that photo depicts.

2  A.  I'm there.  That's the back side of the same

3      Furuno GPS navigator.

4  Q.  Can you turn to the tenth photo, please.  Excuse

5      me.  Can you turn to the tenth, eleventh,

6      twelfth, and thirteenth photos, please.

7  A.  I am there.

8  Q.  Looking at the tenth photo, can you tell me who's

9      in that photograph?

10 A.  I'm the one with the Furuno unit in my hands and

11     wearing the Garmin shirt.  The other three

12     people, I can't tell from the photo.

13         I believe those were the technicians that

14     came to look at the stuff.  I don't know their

15     names.

16 Q.  What are you doing with the unit in Photo

17     No. 10?

18 A.  We were connecting power to it at Danny's

19     computer.  The technicians believed that -- even

20     though we couldn't read the screen of the thing

21     very well, they believed that they could still

22     extract data from it into his computer.

23 Q.  And remind me, were they able to extract data

24     from it?

22

1   A.   No, they were not.

2   Q.   Looking at the eleventh photo, can you tell me

3        what you're doing with the device in that photo?

4   A.   Same thing.  Me on the right wearing the Garmin

5        shirt.  The other two, I can't -- I believe they

6        were technicians, and I think they simply wanted

7        a photograph showing a clear view of the front of

8        the Furuno unit.

9   Q.   Turning to the twelfth photo, can you tell me

10       what the technicians are doing with the unit in

11       that picture?

12  A.   The one with his back to us appears to be trying

13       to turn it on.  I guess that was when they

14       were -- start turning it on to see if they were

15       able to extract data from it.

16  Q.   Were they able to turn it on?

17  A.   They did turn it on, but the screen was

18       unreadable; and they were not able to extract any

19       data from it.

20  Q.   That's enough with that exhibit.  Let's move on

21       to your report, which we will mark as Exhibit 34.

22            Can you please read aloud paragraph A on --

23       excuse me.

24            Do you recognize this document?

23

1   A.   I do.

2   Q.   Can you tell me what it is?

3   A.   Let me make sure we're looking at the same thing.

4        I have one in my hand.  Report of Expert Witness

5        Michael Cooley.

6             I assume that's what you have?

7   Q.   That's what I have.

8   A.   Okay.  Yes, this is the -- this is the -- my

9        expert witness report.

10  Q.   Do you remember when you drafted this?

11  A.   Oh, the date, no, I don't remember.  It was,

12       gosh, a couple months ago.  I don't remember the

13       date.

14  Q.   Who asked you to draft this report?

15  A.   Michelle.

16  Q.   Who did you speak to in order to prepare -- did

17       you speak to anyone in order to prepare this

18       report?

19  A.   Only Michelle, telling me what to -- essentially

20       asking me to make up the report.

21  Q.   Can you tell me what documents you reviewed in

22       preparation for drafting this report?

23  A.   I -- let's see.  I saw the deposition of -- by

24       Zoom of Mark Andersson, and I saw the survey of

24

1    the -- of the vessel Melody.

2        I believe there was a pre-sale survey when he

3    was first buying the boat dated 2000.

4  Q. Have you ever spoken to Mr. Andersson?

5  A. No.

6  Q. Could you repeat that answer, please.

7  A. No, I have never spoken to Mr. Andersson.

8  Q. Thank you.  Can you please on the first page read

9    paragraph A.

10 A. I can.  Mr. Andersson had a detailed electronic

11   chart chip in the Garmin cockpit unit that

12   included all areas of the vessel's voyage

13   including Boca Chica, Dominican Republic.

14 Q. How did you determine that Mr. Andersson had a

15   detailed electronic chart chip?

16 A. Because that was the little chip that we took out

17   of the Garmin unit that, although it looked water

18   damaged, when we plugged it into our showroom

19   display, it was still functional; and it showed

20   that display with a little square indication of

21   the area covered by the chart.

22 Q. How did you use your expertise to reach that

23   conclusion?

24 A. Simply by looking at the display on my showroom

25

1    unit.

2  Q.   Can you read conclusion D out loud, please.

3  A.   D as in delta?

4  Q.   D as in delta.

5  A.   Okay.  It is more likely than not that had the

6       Garmin chartplotter become wet from -- let me

7       start over.

8            It is more likely than not that, had the

9       Garmin chartplotter become wet from rain or

10      splashing waves, the unit could have been dried

11      and the tracking data extracted from the unit's

12      memory had the unit not been placed wet with

13      saltwater in a box and stored for over a year.

14 Q.   Who did you speak to to get information about how

15      the Garmin chartplotter was stored before you

16      were able to examine it?

17 A.   No one.

18 Q.   Did anyone tell you that it was placed wet with

19      saltwater in a box?

20 A.   No.

21 Q.   How did you determine that it was stored wet with

22      saltwater in a box?

23 A.   Let me go back into my memory.  It was a long

24      time ago that the box arrived.

26

1          Well, from what Michelle had told me was that

2     simply these things had been eventually taken off

3     the boat sometime after the incident and stored

4     somewhere.

5          I guess I can't swear it was a box.

6  Q.  Did you speak to anyone else besides Michelle?

7  A.  No.

8  Q.  Just one moment.  Can you please read paragraph F

9     on the first page.

10 A.  Paragraph F.  Furthermore, it is my opinion,

11    based upon inspection and observation of the chip

12    slot in the Garmin GPS unit, that the unit

13    contained a chart for Boca Chica Harbor in the

14    Dominican Republic and that the chart did not

15    show a breakwater.

16 Q.  How did you determine that the chart in the

17    Garmin GPS did not show a breakwater?

18 A.  By looking at the -- the display when we plugged

19    that chip into my showroom unit, it showed an

20    area where there was no depths -- no spot

21    readings, no spot depths as they call them.

22         The little digits all over the chart are the

23    water depth; and in that area, it simply did not

24    show anything above water.  It simply -- there

27

1    was an area there where there were no digits, no

2    numbers.

3  Q.  Can you go back to Exhibit 32 and tell me which

4      picture shows what you just described.

5  A.  I can.  Let me find it here.  Page 9 and 10.

6          On page 9, we see Boca Chica, and all the

7      little digits in the water on the screen are

8      water depth; and you see sort of a diagonal area

9      there where there are no digits.  If there had

10     been -- well, anything -- anything extending out

11     of the water would have shown there, like

12     La Piedra and Isla La Matica.

13 Q.  Did the breakwater extend out of the water?

14 A.  Well, I think of a breakwater as something that

15     is out of the water.

16 Q.  Just a moment.  Can you tell me with -- did

17     the Furuno GP-31 GPS receiver have any charts in

18     it?

19 A.  It did not.  That model does not have a place to

20     put charts in it, no.

21 Q.  Did the Raymarine unit have any charts of

22     Boca Chica?

23 A.  The Raymarine, when it arrived, did not have any

24     charts plugged into it.

28

1       It's capable of taking charts; but when I got

2   it, it did not have any charts in it.

3   Q.  Did the Raymarine have any charts in it showing a

4   breakwater at Boca Chica?

5   A.  No.  The Raymarine, without any plug-in chart,

6   just shows a very vague outline of North America

7   islands, but no detail.

8       MR. GOLDMAN:  Can we take a break for just a

9   moment?  Go off the record.

10       THE WITNESS:  Sure.

11  (Recess was taken from 10:41 a.m. until 10:42 a.m.)

12  BY MR. GOLDMAN:

13  Q.  All right.  Looking at Photo No. 10 in Exhibit

14  32, can you tell me what device that photograph

15  depicts?

16  A.  You know, I'm trying to remember.  There were --

17  there were two -- in addition to looking at the

18  rusty Furuno chip plugged into the showroom unit,

19  we also looked at another unit with another

20  chart; and I think page 10 is a different machine

21  than page 9.  I'm trying to remember things that

22  we looked at several months ago.

23       But, yeah, page 10 was a different machine

24  than page 9; and I believe we had a different

29

1    chart plugged into it.

2  Q.  So let me understand correctly.  That is not

3       either a chart or a machine that was on board

4       Mr. Andersson's vessel; is that correct?

5  A.  That is correct, yes.

6           MR. GOLDMAN:  All right.  Now, let me go take

7       five minutes off the record and we'll move on.

8           Good time for a bathroom break, probably.

9  (Recess was taken from 10:45 a.m. until 10:48 a.m.)

10          MR. GOLDMAN:  I don't see any need to go back

11      on the record, Michelle.  I'm done.  That's it.

12          MS. NIEMEYER:  Okay.  I have a couple of

13      clarifying question, and then we're good.

14                   FURTHER EXAMINATION

15  BY MS. NIEMEYER:

16  Q.  Okay.  So, Mike, I just want to clarify for the

17      record a couple of things about the chronology

18      and some things like that.

19          Can you hear me?

20  A.  There's an echo.

21              (Discussion off the record.)

22  BY MS. NIEMEYER:

23  Q.  Okay.  So, first of all, Mr. Cooley, you

24      mentioned that there were other technicians who

30

1    came.

2         Do you recall how many times they were at

3    your shop to look at the machine?

4   A.  I'm sorry.  I'm having a real hard time

5    understanding what you're saying.

6   Q.  All right.

7   A.  I think if I mute mine -- well, I guess I can't

8    mute mine.

9         (Discussion off the record.)

10  BY MS. NIEMEYER:

11  Q.  Okay.  So do you recall how many times there were

12   inspections of the GPS unit as a group?

13  A.  Twice.  The first time when Michelle came to my

14   shop along with the two technicians whose names I

15   don't know, and the second time when Michelle

16   came to my office and those technicians did not

17   accompany her.

18  Q.  Are you sure about that?

19  A.  Those were the only two times I recall us

20   looking -- let me start over.

21        There was the first time when the box arrived

22   containing the Garmin and Furuno unit, and then

23   later a box arrived containing the Raymarine

24   unit; and then there was a third time Michelle

31

1   came back, and we looked again at the Garmin unit

2   to see if it had a chart in it.

3   Q.  Now -- give me one second.

4       You were asked how you used your expertise in

5   coming up with the opinions that were on your

6   report, and you mentioned certain aspects.

7       Was there anything that you didn't mention

8   about your inspection of those units?

9   A.  I can't think of anything that I failed to -- can

10  you repeat the question.

11      MR. GOLDMAN:  Wait a minute.  Can I suggest

12  you turn off the speakers on Mr. Cooley's device,

13  because he can hear you and he can hear us

14  through your speaker; so turn off his speakers to

15  see if that helps.

16      MS. NIEMEYER:  Good idea.  Thank you,

17  Michael.

18          (Pause in the proceedings.)

19  BY MS. NIEMEYER:

20  Q.  Mr. Cooley, I want to ask you specifically about

21  the condition of the Garmin unit and the comment

22  that you made about the condition of that unit as

23  it arrived.

24      Can you describe what you saw and what caused

32

1   you to believe it had been stored wet.  You were

2   asked a question about that.

3 A.  Yes, I can.  When we opened the box, we found the

4   Garmin had fallen apart and was totally rusted

5   out inside.

6       A machine like that is fairly water resistant

7   and it can be splashed with water, sea water,

8   whatever; and if it's not frozen or, you know,

9   subject to physical abuse, it should survive it.

10   This machine was completely rusted out inside.

11 Q.  Is that something that could have happened over a

12   very short period of time?

13 A.  It could have happened over the space of a couple

14   of weeks, being wet like that for a couple of

15   weeks.

16       MS. NIEMEYER:  I have no further questions.

17       MR. GOLDMAN:  Nothing from us.

18       MS. NIEMEYER:  Michael, just to clarify, and

19   I'm sure you know this already, the two guys that

20   Mike didn't remember their names were your guy

21   Max and his coworker.

22       MR. GOLDMAN:  Great.

23       (Cooley Exhibits Nos. 31-34 were marked for

24   identification.)

33

1   (Conclusion of proceedings at 10:58 a.m. this date.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

34

```
 1                      CERTIFICATE
 2        I, Karen D. Pomeroy, a Registered Diplomate
 3   Reporter and Notary Public in and for the
 4   Commonwealth of Massachusetts, do hereby certify that
 5   Michael Cooley, the witness whose deposition is
 6   hereinbefore set forth, was duly remotely sworn by me
 7   and that such deposition is a true and accurate
 8   record, to the best of my knowledge, skills and
 9   ability, of the testimony given by such witness.
10        I further certify that I am not related to any of
11   the parties in this matter by blood or marriage and
12   that I am in no way interested in the outcome of this
13   matter.
14        IN WITNESS WHEREOF, I have hereunto set my hand
15   and affixed my seal of office this 26th day of
16   January, 2022.
17
18
19                    _____
                                Notary Public
20
21   My Commission expires:
     June 13, 2025
22
23
24
```

35

ERRATA SHEET

CHANGES TO THE DEPOSITION OF MICHAEL COOLEY

INSTRUCTIONS TO WITNESS:  1) Please note any desired corrections to your testimony by page and line number.  2) Enter text as it appears in the transcript.  3) Enter text as it should appear.


PAGE      LINE                    CORRECTION

____      ____    _____

____      ____    _____

____      ____    _____

____      ____    _____

____      ____    _____

____      ____    _____

____      ____    _____

____      ____    _____

____      ____    _____

____      ____    _____

    I, Michael Cooley, do hereby certify that I have read the foregoing transcript of my testimony, and I further certify that said transcript is a true and accurate record of said testimony.

    Dated at _____, this ____ day of _____, 20____.


                        _____

                              Michael Cooley