315

1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2
                CASE NO. 4:20-cv-40020-DHH
3
--------------------------------x
4
GREAT LAKES INSURANCE SE,
5
       Plaintiff/Counterdefendant
6
vs.
7
MARTIN ANDERSSON,
8
       Defendant/Counterplaintiff
9
--------------------------------x
10

11

12

13          CONTINUED DEPOSITION OF ANDREW BALL

14                  Conducted Remotely

15                   Havers Lookout

16                       Havers

17           Tortola, British Virgin Islands

18                    June 29, 2021

19            10:00 a.m. to 10:22 a.m.

20

21

22

23

24  Reporter:  Laurie J. Berg, CCR, RPR, CRR, CLR, CER

316

1                    A P P E A R A N C E S

2

3          Michael I. Goldman, Esquire

4          GOLDMAN & HELLMAN

5          8751 West Broward Boulevard

6          Suite 404

7          Fort Lauderdale, Florida  33324

8          954.356.0460

9          michael@goldmanandhellman.com

10         (Present via videoconference.)

11         COUNSEL FOR PLAINTIFF/COUNTERDEFENDANT

12

13         Michelle Melin Niemeyer, Esquire

14         MICHELLE M. NIEMEYER, P.A.

15         244 Biscayne Boulevard

16         #3009

17         Miami, Florida  33132

18         305.443.1818

19         mniemeyer@paymyclaim.com

20         (Present via videoconference.)

21         COUNSEL FOR DEFENDANT/COUNTERPLAINTIFF

22

23

24

317

1                    I N D E X

2

3   DEPONENT:  ANDREW BALL

4             (Present via videoconference.)

5   EXAMINATION                            PAGE

6   (BY ATTORNEY NIEMEYER)                 319

7

8                  E X H I B I T S

9   NO.                                    PAGE

10  Exhibit 30  Handwritten Notes (two pages)   320

11

12       (Original exhibit marked electronically

13         and retained with the transcript.)

14

15

16

17

18

19

20

21

22

23

24

318

1              P R O C E E D I N G S

2

3              MADAM COURT REPORTER:   This is Laurie

4    Berg.  I am a Registered Professional Reporter and a

5    Certified Realtime Reporter with the National Court

6    Reporters Association, a Certified eDepoze Reporter,

7    as well as a Certified Court Reporter with the State

8    of New Hampshire.  I am a Notary Public in the State

9    of New Hampshire and the Commonwealth of

10   Massachusetts.

11             The attorneys participating in this

12   proceeding acknowledge that I am not physically

13   present in the proceeding room, nor am I physically

14   present with the witness, and that I will be reporting

15   this proceeding remotely via videoconference.

16             They further acknowledge that, in lieu of an

17   oath administered in person, the witness will verbally

18   declare his testimony in this matter under the penalty

19   of perjury.

20             The parties and their counsel consent to this

21   arrangement and waive any objections to this manner of

22   reporting the proceeding.

23             Will the attorneys now please indicate your

24  agreement by stating your name and your agreement on

1  the record, after which I will swear in the witness

2  and we may begin.

3           MR. GOLDMAN:  I am Michael Goldman,

4  counsel for the Plaintiff, Great Lakes Insurance SE,

5  and I agree.

6           MS. NIEMEYER:  Michelle Niemeyer, counsel

7  for Martin Andersson, and I agree.

8           (Deponent sworn.)

9           MADAM COURT REPORTER.  Thank you very

10  much.  You may begin.

11

12                ANDREW BALL

13

14       having been satisfactorily identified and

15  duly sworn remotely by the Notary Public, was examined

16  and testified as follows:

17                DIRECT EXAMINATION

18       BY MS. NIEMEYER:

19  Q.   Okay.  Welcome back, Mr. Ball.  And I'd like

20  to thank you for your candor in the last deposition

21  and for providing your handwritten notes, which is the

22  reason we're here today; just to talk about those

23   notes.

24                MS. NIEMEYER:  So I'm going to show you a

                                                          320

1    document.  Let me just go into my share-screen mode

2    here.  Okay.

3            BY MS. NIEMEYER:

4        Q.   Can you see that document?

5                MR. GOLDMAN:  Can I interrupt you with

6    something that's unrelated, but has just come up this

7    instant?

8                MS. NIEMEYER:  Sure.

9                MR. GOLDMAN:  We -- let's go off the

10   record.

11                (Off the record at 10:02 a.m.)

12                (Discussion off the record.)

13                (Back on the record at 10:02 a.m.)

14                MS. NIEMEYER:  Okay.  Let's go back on

15   the record.

16            All right.  I'm going to ask the court

17   reporter to mark this two-page document.  It's not

18   Bates-stamped, it's two pages of handwritten notes,

19   and to mark that as Exhibit 30.

20                (Exhibit 30 marked for identification.)

21                MADAM COURT REPORTER:  All set.

22            BY MS. NIEMEYER:

23    Q.   And, Mr. Ball, can you describe for us what

24  this document is?

                                                              321

1     A.   (Deponent viewing exhibit.)  So this is the

2  notes I took where I asked Mr. Andersson for his

3  statement as far as what happened in terms of his

4  incident, and it's written in my terrible, terrible

5  handwriting.  I do apologize for that.  This is the

6  document that became the typed statement, which was

7  sent to him to ask for his assent, agreement and

8  signature.

9     Q.   Mr. Ball, were these notes taken and kept by

10  you in the ordinary course of your business?

11    A.   That's correct.

12    Q.   Did you send a copy of your handwritten notes

13  to Concept when you sent the file of -- for this case

14  to Concept?

15    A.   No, I did not.  The reason that nobody had

16  this was entirely my omission, which, obviously,

17  wasn't on purpose.

18    Q.   Okay.  When you take notes during a meeting

19  with an insured, like you did with Mr. Andersson, what

20  is your goal?

21    A.   In this case, it was really just to record

22   the smaller details of what happened.  Obviously, we

23   -- we wanted to know the details pertinent to the

24   incident and to record them.  This is standard

                                                          322

1   practice for us in terms of recording the recollection

2   of what happened before memory sort of starts to fade

3   after an incident.

4        Q.   When you wrote your notes, did you fully and

5   accurately include what Mr. Andersson told you, to the

6   best of your ability?

7        A.   I believe so, yes.

8        Q.   As you mentioned, your handwriting is a

9   little difficult.

10            (Laughter.)

11            BY MS. NIEMEYER:

12       Q.   So I want to ask you to read the statement

13   word for word so that we don't make any mistakes in

14   attempting to understand what you were saying later

15   on.

16       A.   (Deponent viewing exhibit.)  Sure.

17   Absolutely, I'll -- I'll start at the top, and I'll

18   give the disclaimer that my handwriting is usually

19   better, but, of course, when people are speaking, I

20   have to write rather quickly.

21       Q.   Take your time.

22     A.   (Deponent viewing exhibit.)  So it says,

23  Varadero Aruba, departed 1730 on Saturday 14th

24  December 2019.  Two on board.  Ronald Naranja, 18

                                                 323

1  knots east.  Sea --

2               (Technical difficulties.)

3               MADAM COURT REPORTER:  Oh, hold on.  He

4  has frozen.

5               (Off the record at 10:05 a.m.)

6               (Discussion off the record.)

7               (Back on the record at 10:06 a.m.)

8     A.   (Deponent viewing exhibit.)  Okay.  So,

9  Varadero Aruba, departed 1730 on Saturday the 14th of

10  December 2019.  Two on board.  Ronald Naranja.  18

11  knots each.  Sea 4 feet.  Motored east to lighthouse.

12  Tried to sail northeast trying to steer approximately

13  50 degrees to SXM.

14               Crew seasick.  Not making way to wind.

15  Changed course -- course north to Ponce.  Weather not

16  forecast to deteriorate.  22 to 24 knots with heavier

17  swell Sunday.  Crew incapacitated.  25 to 30 Sunday,

18  Monday and squalls to 30.  Headsail only, partially

19  furled.

20               Sunday, generator working, and Monday,

21  Tuesday not working.  Ended in Santo, as in Santo

22  Domingo.  VHF receives but not send.  Called sales

23  broker on Sat phone Tuesday midday.  Recommend Boca

24  Chica for repair.  Arranged slip at Boca Chica marina

                                                              324

1  with unknown person.  Was told proceed to Boca Chica.

2  Informed marina will need guidance in marina.

3        Okay.  Arrived just after 1700.  Called.  No

4  answer.  Finally, someone answered, but no English.

5  Assured speaks minimal Spanish.  Moved at 1 to 2 knots

6  boat speed.  Looking for entrance lights while

7  standing off.  Depth sounder rapidly decreased.  Both

8  engines astern full.  Swell took vessel on rocks.

9  Electronic charts provided.  No paper charts.

10        I'm going to have to ask you to scroll down

11  there for me.

12    Q.  (Attorney complied.)  Okay.  Sorry.

13    A.  (Deponent viewing exhibit.)  Hit SOS on

14  iridium -- on iridium go.  Sorry.  VHF not

15  transmitting.  Breakwater unlit.  Not on electric

16  chart -- electronic chart.

17        Crew is Dutch.  No Spanish.  Stayed on board

18  until local diver walked out.  Sent SOS to shore with

19  light.  Spoke to iridium people.  They said wait.

20  Walked to shore with Alex Cottier.  Spoke to Navy

21  police also present.  Police walked assured to hotel.

22  Assured arranged two security as of Tuesday.  Cleared

23  immigration Wednesday and met with salvors.  Notified

24  insurers.

                                                        325

1          And then I've got some notes below there as

2  well, which aren't necessarily relevant to the

3  statement, but, since they're in the document, I think

4  I should probably read them.

5      Q.   Please do.

6      A.   (Deponent viewing exhibit.)  First it says,

7  Martin (809)449-2848.  There's a second phone number

8  for him.  It looks like (774)249-4194.

9          And if you scroll down a little bit more,

10  I've -- I've made some notes to myself as to the --

11  the various bits that I was interested in following up

12  on after the statement, which was obviously the GPS, I

13  think we talked about that, the contact details for

14  the crew, it says, crew contact.

15          I've written down Alex, which speaks to Alex

16  Cottier, the statement here, as far as typing it up,

17  and also finding out how much fuel was on board.  And,

18  obviously, that -- that's of interest to us, in terms

19  of the environmental risk, if the boat's to break

20  apart.

21     Q.   Okay.  And just -- I have just a couple

22  questions to clarify some acronyms here.

23     A.   Sure.

24     Q.   In the first line, where you said, "Departed

                                                          326

1  1730," and this isn't an acronym, but it looks like a

2  five to me.

3          Is it possible that was a five, or is that

4  your way of writing a three?

5     A.   (Deponent viewing exhibit.)  No, that's a

6  three.  I -- I generally would not work in times more

7  specific than every quarter hour, unless there --

8  unless there was something to indicate a very, very

9  specific time, we'd -- we'd work on a -- on a lower

10  resolution than that.

11     Q.   Okay.  And when you said "approximately 50

12  degrees to access SXM," what did you mean by "SXM"?

13     A.   SXM is the abbreviation for St. Martin.

14     Q.   Okay.  In about, let's see, one, two, three,

15  four, five, six, seven, eight, nine, ten, 11, the 12th

16  or 13th line, 12th line, I think, it says "Sun,"

17  which, I believe you said Sunday --

18     A.   (Deponent viewing exhibit.)  Correct.

19     Q.   -- generator working and -- and then it says

20   "Mon," and it looks like there's a dot there, like a

21   period.

22        A.   (Deponent viewing exhibit.)  There is.

23        Q.   And then it is says "Tues."

24        A.   (Deponent viewing exhibit.)  There is.

                                                            327

1         Q.   And is there --

2         A.   (Deponent viewing exhibit.)  There is.

3              Go ahead.

4         Q.   Do you see that?

5              Let me move that up so you can see the page.

6    I'm sorry.  I meant to show you that and --

7         A.   (Deponent viewing exhibit.)  All right.

8         Q.   -- what I'm talking about is right there

9    (indicating).

10        A.   (Deponent viewing exhibit.)  Right.  So -- so

11   what I've written there, that is indeed a period.  So

12   what I'm trying to indicate to myself there is that

13   Sunday, the generator was working -- and Monday.  And

14   then Tuesday, not working.

15        Q.   Okay.

16        A.   (Deponent viewing exhibit.)  There's a NW

17   after Tuesday.

18        Q.   Okay.   And there's another place where it

19  looks like it might be a period and it wasn't clear,

20  and I wanted to make sure we -- we clarified that,

21  too.  If you go about -- let's see, one, two, three,

22  four, five, six, seven, eight, nine lines up, the line

23  starts with "charts provided."

24      A.   (Deponent viewing exhibit.)  Yup.

328

1      Q.   And then it's -- right next to that, I

2  believe you said no, but it looks like there's an N,

3  period, D?

4      A.   (Deponent viewing exhibit.)  No, that -- that

5  is no.

6      Q.   Okay.  You're sure of that?

7      A.   Yup.

8      Q.   Okay.  I don't have, really, questions about

9  that, specifically, but I do want to ask you; after

10  those notes were taken and before you drafted the

11  e-mail that ultimately became the master's protest in

12  the report that you submitted, did you speak with

13  Mr. Andersson again about any of those details?

14      A.   Outside of the e-mail I sent that said, you

15  know, can you -- can you confirm that this is accurate

16  and, if so, will you sign it to show that it is.  I

17  don't believe that I did.  I think there was -- when

18  we went through the documents last time, there was a

19  response there in terms of clarifying as to who spoke

20  Spanish and how much.  Other than that, as far as I

21  recall, no.

22      Q.   Okay.  Between the 21st of December, when you

23  had this interview and you wrote these notes, and

24  December 23rd, when you wrote the typed statement, who

329

1  did you talk to about it?

2      A.   I think I probably would've been in transit

3  at that time.  If I remember correctly -- no, I

4  probably don't remember correctly.  I don't -- I don't

5  believe I would've spoken to anybody outside of our

6  office about this.

7      Q.   Okay.  And when you say outside of your

8  office, who do you mean?

9      A.   That would be Bill Bailey.

10      Q.   Do you recall what was said in any

11  conversation you had with Mr. Bailey about the

12  incident or about your notes or what happened, to your

13  knowledge, at that point?

14      A.   Not particularly.  When I'm abroad, we -- we

15  normally, as long as there is cell phone service, it

16  depends on where I am, but, when I'm abroad, we

17  normally talk a few times a day.

18          And, obviously, I try and keep him updated of

19   -- of any and all info that's happening, specifically,

20   so that we have the benefit of sort of both of our

21   minds on the case, and if he's got any additional

22   questions, he can ask.  You know, you'll notice that

23   he cosigns the reports as well and so, subsequently,

24   it has to be his work as well.

                                                          330

1          And -- and so, you know, that's, I think,

2    sort of, part of what we're -- what we're selling as

3    part of our services; you get two minds, not one.  And

4    so we do communicate very closely.  I can --

5    obviously, I can't remember specifically what I said,

6    what -- what, it was a year and a half ago, but I

7    don't think that there is anything in here that I

8    would've withheld, if I can put it that way.  We're --

9    we're -- we're pretty much a hundred percent

10   transparent with each other.

11   Q.   Does anything stand out about what you

12   discussed with Mr. Bailey in this particular case?

13   A.   No, not really.  No.  At this time, I don't

14   think we had had the opportunity to -- or, at least, I

15   hadn't had the opportunity to fully review the policy.

16   We were more interested in the incident at the time.

17          And so I don't think I was aware of any of

18   the navigational limits and the other things that have

19   come up.  So, at this particular time, it was really

20   about recording damages and recording the details of

21   the incident as best we could.  So...

22      Q.   Did you -- did you consult with the policy

23   before you wrote that written report, the master --

24   that turned into the master's protest?

1      A.   I don't believe I did, no.

2      Q.   Why not?

3      A.   Generally, when these things happen, it's --

4   it's a relatively quick response that we have.

5   Obviously, this one took a few extra days.  We had

6   flight issues, and then I had delayed flights and all

7   sorts, but the -- the -- the first angle of approach

8   for us is really to determine what happened and -- and

9   respond as quickly as we can to prevent further loss

10   and to sort of accurately quantify everything.  Once

11   we get back to the office and start preparing reports,

12   then we'll dig into the paperwork a little bit more.

13      Q.   So do you have any recollection of exactly

14   when it was, like, and -- and timing-wise, when you

15   say when you -- when you get back to the office, were

16   you back in the office at the point that you wrote the

17  e-mail that you sent to Mr. Andersson for his

18  agreement?

19      A.   I don't believe so, no.  I'd have -- I'd have

20  to go back and check the dates as to my travel and

21  when the e-mail was written.  I think we have all of

22  that in the file anyways.

23          But my recollection -- well, I mean, put it

24  this way, I -- I can see no reason that I would wait

332

1   and delay that process for my arrival back here to the

2   BVI.  You know, I had Internet in the hotel.  I had my

3   laptop in the hotel.  I had the ability to type that

4   up.

5           And the other side of it is, certainly, being

6   so close to Christmas, I'm sure I probably would've

7   been keen to keep everything moving so that I had a

8   relatively clear plate over the holidays.

9       Q.   Do you -- would you say that the -- the -- I

10  don't recall if we had -- I know that we had copies of

11  your plane tickets going to Boca Chica, but I'm not

12  sure that we had plane tickets showing your return

13  home, so it's not really clear.  I know that the date

14  of your inspection was the 21st and the date of that

15  interview.

16          What's your recollection about the travel

17  home?

18      A.   (Deponent viewing documents.)  I -- well, I

19  would've gone home as soon as a flight was available.

20  I may have had an extra day there, I think, because

21  there wasn't a flight available.  Yeah, so it's --

22  it's in the file here.  It's in -- it's in the bundle

23  that I've got (indicating) with the court documents.

24  So it references -- I don't have the -- your Bates

                                                        333

1  numbers on here, so I don't know which one it is in

2  your file.

3      Q.   Okay.  Describe it the best you can and we

4  can probably figure it out.

5      A.   (Deponent viewing documents.)  So it

6  references a flight on Sunday, the 22nd of December,

7  from Santo Domingo to Tortola.  And just in case you

8  need it, as you go through, the booking reference on

9  that is alpha, alpha, zulu, 4, bravo, uniform.

10         The next question, of course, is when I sent

11  him that document, which, again, is in the file here

12  somewhere, and I know we went through that last time.

13  If I can find it in here, I'll find the date on it.

14         All right.  So the e-mail I sent was on the

15  23rd of December, so that was after I returned.  That

16    was the day after I got back.

17        Q.    Knowing that, do you believe that you looked

18    at the policy prior to writing that master's protest?

19        A.    In that short of a time period, no, I don't.

20    The -- the -- the defining factor on that, for me, in

21    terms of my sort of personal process, would be the

22    date on the reports, which would be -- we wrote a --

23                (Technical difficulties.)

24                MADAM COURT REPORTER:  He's frozen.

                                                              334

1                 MS. NIEMEYER:  Okay.

2                 (Off the record at 10:20 a.m.)

3                 (Discussion off the record.)

4                 (Back on the record at 10:20 a.m.)

5         A.    (Deponent viewing document.)  I was aware of

6     it.  I would've written in this report on the 23rd,

7     which is why I'm looking at it.  So, as of the 23rd, I

8     was aware of it.  So, I think, the 23rd would've been

9     the day that we went through everything in the office.

10                So, yeah, I suppose I was aware of the

11    navigational limits at the time I sent that statement.

12    And, of course, I think, if you compare the notes with

13    the statement, there's not a whole lot of deviation

14    there.

15                MS. NIEMEYER:  Okay.  Okay.  I don't have

16  any further questions.

17              THE DEPONENT:  (Indicating.)

18          (Laughter.)

19              MADAM COURT REPORTER:  Okay.

20              THE DEPONENT:  Okay.

21              MADAM COURT REPORTER:  Okay.  This is

22  Laurie Berg, the court reporter.  I'm just going to

23  ask Michelle and Michael if you want the exact same

24  order that you had last time.

                                                      335

1              And we can start with Michelle, please.

2              MS. NIEMEYER:  Sort of.  I discovered

3  that my ASCII didn't load right into k -- into

4  TextMap, so we had to tweak that, and I got a

5  different version of the electronic.

6              MADAM COURT REPORTER:  Okay.

7              MS. NIEMEYER:  I don't remember what that

8  was.

9              MADAM COURT REPORTER:  That's fine.  The

10  office will know.

11              MS. NIEMEYER:  Yeah, they'll know.

12  They'll know.

13              MADAM COURT REPORTER:  Okay.

14              MS. NIEMEYER:  But it works now.

15              MADAM COURT REPORTER:  Great.

16        Okay.  And Michael?

17              MR. GOLDMAN:  What I ordered last time is

18  fine.

19              MADAM COURT REPORTER:  Okay.  Thank you.

20              (DEPOSITION OF ANDREW BALL concluded at

21  10:22 a.m.)

22

23

24

                                                   336

1  COMMONWEALTH OF MASSACHUSETTS

2  MIDDLESEX, SS.

3

4        I, Laurie J. Berg, Certified Court Reporter,

5  Registered Professional Reporter, Certified Realtime

6  Reporter, Certified LiveNote Reporter, Certified

7  eDepoze Reporter and Notary Public, in and for the

8  Commonwealth of Massachusetts, do hereby certify that

9  pursuant to appropriate notice of taking deposition,

10  there remotely appeared before me the following named

11  person, to wit:  ANDREW BALL, who was by me duly

12  sworn; that he was thereupon examined upon his oath

13  and his examination reduced to writing by me; and that

14  the deposition is a true record of the testimony given

15  by the witness.

16          IN WITNESS WHEREOF, I have hereunto set my

17  hand and seal this 11th day of July, 2021.

18

19  My commission expires:

20  September 14, 2023

21

22

23          _____

24                  Notary Public

                                                337

1  ERRATA SHEET DISTRIBUTION INFORMATION

2  DEPONENT'S ERRATA AND SIGNATURE INFORMATION

3

4  ERRATA SHEET DISTRIBUTION INFORMATION

5          The original of the errata sheet has been

6  delivered to Michael I. Goldman, Esquire.

7          When the errata sheet has been completed by

8  the deponent and signed, a copy thereof should be

9  delivered to each party of record and the ORIGINAL

10  delivered to Michelle Melin Niemeyer, Esquire, to whom

11  the original deposition transcript was delivered.

12

13  INSTRUCTIONS TO DEPONENT:

14          After reading this volume of your deposition,

15   indicate any corrections  changes to your testimony

16   and the reasons therefor on the errata sheet supplied

17   to you and sign it.  DO NOT make marks  notations on

18   the transcript volume itself.  Add additional sheets

19   if necessary.  Please refer to the above instructions

20   for errata sheet distribution information.

21

22

23

24

                                                        338

1      PLEASE ATTACH TO THE CONTINUED DEPOSITION

2                  OF ANDREW BALL

3       CASE:  Great Lakes Insurance SE

4                  V. Martin Andersson

5   DATE TAKEN:  June 29, 2021

6

7                  ERRATA SHEET

8   Please refer to Page 337 for errata sheet instructions

9   and distribution instructions.

10  PAGE  LINE  CHANGE/REASON

11  _____

12  _____

13  _____

14 _____

15 _____

16 _____

17 I have read the foregoing transcript of my deposition

18 and except for any corrections  changes noted above, I

19 hereby subscribe to the transcript as an accurate

20 record of the statements made by me.

21 Executed this ____ day of _____, 2021.

22

23                        _____

24                ANDREW BALL