```
0001
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF MASSACHUSETTS
 3                    IN ADMIRALTY
 4
 5
 6    ******************************
 7    GREAT LAKES INSURANCE SE
 8          vs.                   4:20-cv-40020-DHH
 9    MARTIN ANDERSSON
10    ******************************
11
12
13
14       DEPOSITION BY ZOOM OF OTTO A. GEIGER, a witness
15    called on behalf of the Plaintiff, pursuant to the
16    Rules of Civil Procedure, before Karen D. Pomeroy,
17    Registered Diplomate Reporter and Notary Public in
18    and for the Commonwealth of Massachusetts, at 355
19    City View Drive, Fort Lauderdale, Florida, on
20    Wednesday, March 16th, 2022, commencing at 9:02 a.m.
21
22
23
24
0002
 1    APPEARANCES:
 2    MICHAEL I. GOLDMAN, ESQUIRE
 3    Goldman & Hellman
 4    233 Harvard Street, Suite 211
 5    Brookline, Massachusetts 02446
 6    For the Plaintiff
 7
 8
 9    MICHELLE M. NIEMEYER, ESQUIRE
10    Michelle M. Niemeyer, PA
11    244 Biscayne Boulevard No. 3009
12    Miami, Florida 33132
13    For the Defendant
14
15
16
17
18
19
20
21
22
23
24
```

```
0003
 1                       INDEX
 2  DEPOSITION OF OTTO A. GEIGER                PAGE
 3  Examination by Mr. Goldman                   4
 4  Examination by Ms. Niemeyer                 29
 5
 6
 7
 8
 9
10
11
12
13                      EXHIBITS
14  Number                                     Page
15  Exhibit 44  Report of Expert Witness        40
16
17
18
19
20
21
22
23
24  Exhibit Attached
0004
 1                   STIPULATIONS
 2        It is stipulated by and between counsel for
 3    the respective parties that the deposition
 4    transcript is to be read and signed by the
 5    deponent under the pains and penalties of
 6    perjury; and that the sealing and filing thereof
 7    are waived; and that all objections, except as to
 8    form, and motions to strike are reserved until
 9    the time of trial.
10                      * * *
11                  OTTO A. GEIGER,
12    having been duly remotely sworn by the
13    reporter, was deposed and testified as
14    follows:
15                    EXAMINATION
16  BY MR. GOLDMAN:
17  Q.  Good morning, Captain Geiger.
18  A.  Good morning.
19  Q.  Is that the proper title to address you with?
20      Captain.
21  A.  Captain; Otto; any way you like.
22  Q.  Splendid.  All right.  For the record, my name's
23      Michael Goldman.  I'm from the law firm of
24      Goldman & Hellman.  I represent Great Lakes
```

```
0005
 1        Insurance in this matter, and, sir, we're here to
 2        take your deposition.
 3            As Michelle knows, I have a little speech I
 4        have to give, just to make sure we get everything
 5        right and that we get a good record.
 6            First, we have to obey certain courtesies
 7        with one another.  We have to work as hard as we
 8        can to wait patiently for everyone to finish
 9        speaking and then speak in their own turn.  Of
10        course, this is even more important in the Zoom
11        age where everyone talks over each other and we
12        get interference and no one can hear a thing.
13            I'll ask you to wait patiently until I'm done
14        phrasing my question, and I'll try my very best,
15        of course, to be patient while you give your full
16        answer.
17            Even though we can see each other, all your
18        answers have to be verbal, sir.  You can't nod
19        your head, say uh-huh, shrug your shoulders,
20        anything like that.
21            When I ask a question, please don't guess.
22        If you know the answer, say so.  And if you don't
23        know the answer, just say so.
24            If you don't understand my question or you
0006
 1        want me to clarify, just say so; and I'll phrase
 2        my question differently.  I'll try to put a
 3        better question.  The whole point is to get the
 4        clearest answers that we can.
 5            If at any point you want to take a break,
 6        just ask.  This isn't meant to be a test of
 7        stamina.  Anytime you want to get a drink, go to
 8        the bathroom, just take five minutes to collect
 9        yourself, just say so.
10            Is everybody's phone off?
11            MS. NIEMEYER:  Not mine.
12            MR. GOLDMAN:  Right.
13   BY MR. GOLDMAN:
14   Q.   All right.  First, a warm-up round.  For the
15        record, can you please state your full name, your
16        date of birth, and your current residential
17        address.
18   A.   It's Otto Armin Geiger.  Birth date is
19        ██████████████ and residential address is
20        ████████████████ Fort Lauderdale 33311.
21   Q.   Are you married?
22   A.   Yes.
23   Q.   Congratulations.  I say that either way; no
24        matter how they answer.
```

```
0007
 1            Are you employed?
 2    A.  I am.
 3    Q.  Who is your current employer?
 4    A.  Viking, LLC.
 5    Q.  What is Viking, LLC?
 6    A.  It's just a company that runs a vessel.
 7    Q.  What vessel?
 8    A.  It's a Viking Princess 75.
 9    Q.  What do they do with it?
10    A.  It's private use only.  Family use.
11    Q.  What is your role in the company?
12    A.  I'm a captain.  Captain, engineer, chief bottle
13        washer.
14    Q.  How long have you worked for them?
15    A.  In August it will be two years.
16    Q.  Have you ever been a plaintiff or a defendant in
17        any litigation?
18    A.  No.
19    Q.  Have you ever been convicted of a crime?
20    A.  No.
21    Q.  Have you ever pled guilty or pled no contest to a
22        crime?
23    A.  No.
24    Q.  Are you a high school graduate?
0008
 1    A.  Yeah.
 2    Q.  Where did you go to high school?  Excuse me for
 3        interrupting.  Go ahead; answer?
 4    A.  Hillcrest High School in South Africa.
 5    Q.  Do you have any post-high school education?
 6    A.  No, unless you count mariner certifications.
 7    Q.  Good.  We'll get to that.  Do you have any kind
 8        of professional licenses or certifications?
 9    A.  I'm not sure I understand your question.
10    Q.  Well, for instance, in order to practice law, I
11        have to go to law school and get a degree, and
12        then I also have to pass the bar exam.
13            In order to practice your trade, do you have
14        to obtain any sort of certifications or permits
15        or licenses like that?
16    A.  Correct.  I have to have a captain's license.
17    Q.  Who issued you your captain's license?
18    A.  I've got South African sailing licenses; a
19        Yachtmaster Ocean, which is celestial navigation,
20        the highest one you can get, which is equivalent
21        to a Royal Yachting Association license.
22            I also have a Royal Yachting Association
23        license which is endorsed by the MCA, which is
24        the Maritime and Coastguard Agency in the UK; and
```

```
0009
 1       that's up to 200 tons.
 2   Q.  Looking at your resumé with reference to that,
 3       what is a Viking Princess 75?
 4   A.  It's a motor yacht.  A flybridge motor yacht.
 5   Q.  Did anyone else serve on that vessel with you?
 6   A.  No.
 7   Q.  Was there any crew on the vessel while you were
 8       serving on board?
 9   A.  I'm still serving on board.
10   Q.  Is there any crew serving on the vessel
11       currently?
12   A.  No.
13   Q.  On your resumé, where it references that you're a
14       captain/engineer of a Viking 75, what does the
15       next part of that statement mean, towing a
16       31-foot center console?
17   A.  It means I tow a center console -- 31-foot center
18       console when we go away.
19   Q.  Where do you tow it from?
20   A.  From Fort Lauderdale to wherever the owner wants
21       to go.
22   Q.  Who's the owner?
23   A.  The company I gave you, Viking 5 LLC.
24   Q.  Continuing to go through your resumé.  From
0010
 1       January 2020 to July 2020, what kind of vessels
 2       did you serve aboard?
 3   A.  From January 2020 -- can you pull up the resumé
 4       so I can look at it.
 5           MR. GOLDMAN:  Let's -- I wasn't going to do
 6       it until later, but let's enter it as an exhibit.
 7           THE WITNESS:  Okay.
 8           MR. GOLDMAN:  And -- I'm sorry.  I don't have
 9       the ability to project it.
10           Do you, Michelle?
11           MS. NIEMEYER:  It should be part of our Zoom
12       capability.  Hold on.  Let me see.
13           THE WITNESS:  Wait.  I think I have a copy of
14       it.  Let me have a look here.
15           MR. GOLDMAN:  Let's go off the record for a
16       moment.
17           THE WITNESS:  Okay.  So you want January
18       2020.  Various deliveries and sea trials for the
19       major yacht brokers and private individuals.
20           Okay.  I'm prepared to answer.
21           MR. GOLDMAN:  Mr. Geiger, hold on a second.
22       I'm sorry.  I said we were going to go off the
23       record; so I don't want to start again until I
24       verify that we are back on the record.
```

```
0011
 1            Thank you, Karen.  We just got the thumbs up.
 2        So let me start my question again, Mr. Geiger.
 3        Let me state it again, and then you can answer.
 4   BY MR. GOLDMAN:
 5   Q.  From January 2020 to July 2020, what kind of
 6       vessels did you serve aboard?
 7   A.  Various catamarans; motor yachts.  Most of the
 8       vessels I move around were going in for repair or
 9       being moved to various destinations by brokers or
10       new owners.  Either they're going in for repair,
11       or they're getting relocated to a different
12       address.
13   Q.  Where did you deliver these vessels to?
14   A.  All over.  Some are local.  Like I can move them
15       between like a dock in Fort Lauderdale to a
16       different dock in Fort Lauderdale, or I'd be
17       taking vessels from Fort Lauderdale down to the
18       Caribbean or from Fort Lauderdale to Texas;
19       Fort Lauderdale up to Maine.
20            Various destinations.  I move boats
21       worldwide.
22   Q.  During any of these trips, did you ever sail
23       single-handed on a three-day voyage?
24   A.  I did a delivery of a 36-foot Hunter sailboat
0012
 1       single-handed from Cape May to Cape Cod.
 2   Q.  I didn't hear from where to where.  Can you
 3       repeat that.  It was a bad connection for a
 4       moment.
 5   A.  Cape May to Cape Cod.
 6   Q.  Now, I'm in Boston; so I know where Cape Cod is,
 7       but can you refresh my recollection, where is
 8       Cape May?
 9   A.  New Jersey.
10   Q.  How long did that trip take you?
11   A.  That one was about I think 37 hours.
12   Q.  Have you ever been deposed before today?
13   A.  No.
14   Q.  Have you ever testified in a court as an expert
15       witness?
16   A.  No.
17   Q.  Do you have any experience as a marine accident
18       investigator?
19   A.  No.  I'm not a surveyor.
20   Q.  Do you have any experience as a marine surveyor?
21   A.  No.
22   Q.  Do you have any experience as a marine insurance
23       loss adjuster?
24   A.  No.
```

0013
1   Q.   In preparation for drafting your report and for
2        this deposition, did you review any legal
3        treatises or legal publications analyzing the
4        legal requirements for a vessel to be considered
5        seaworthy?
6   A.   I haven't.  I've gone on my experience and what
7        surveys have been on the table.
8   Q.   I think -- I'm going to ask the question again
9        because -- with a different emphasis, because I
10       want to make sure we get a clear answer.
11            In preparation for drafting your report and
12       this deposition, did you review any legal
13       treatises, statements of law, legal publications,
14       law review articles analyzing what courts have
15       held to be the legal requirements for a vessel to
16       be considered seaworthy?
17  A.   No.
18  Q.   Did you read any published court decisions
19       analyzing or stating the legal requirements for a
20       vessel to be considered seaworthy?
21  A.   No.
22            MR. GOLDMAN:  Let's go off the record for
23       just a moment.
24    (Recess was taken from 9:15 a.m. until 9:17 a.m.)
0014
1             MS. NIEMEYER:  So the issue I wanted to raise
2        was, Michael, I know that you asked questions of
3        Mr. Geiger or Captain Geiger about his -- whether
4        he did legal research about the -- what
5        seaworthiness means.
6             So that everyone is talking from the same
7        point of view, if -- I think it would be
8        appropriate at this point for you to enlighten
9        him on what you expect him to under- -- to
10       take -- what meaning are you questioning him
11       about?
12            MR. GOLDMAN:  When I get to that, I will ask
13       further questions.
14            MS. NIEMEYER:  But I just -- I don't want to
15       have any lack of clarity if you're -- he's not
16       here as a legal expert, as we all know; but if
17       you're asking questions where you expect him to
18       have an understanding that's the same as yours of
19       what seaworthiness means, I want to make sure we
20       have that clarified in the record so that
21       Mr. Geiger or Captain Geiger isn't making things
22       unclear because you're not talking about the same
23       thing.
24            MR. GOLDMAN:  When I get to that, you can be

```
0015
 1        assured I will ask the questions.
 2             MS. NIEMEYER:  All right.
 3             MR. GOLDMAN:  Just one moment.
 4             (Pause in the proceedings.)
 5   BY MR. GOLDMAN:
 6   Q.  All right.  Captain Geiger, do you have in front
 7        of you your report which is titled Report of
 8        Expert Witness Otto Geiger?
 9   A.  I do.
10   Q.  Have you ever seen this document before today?
11   A.  Yes.
12   Q.  Who drafted it?
13   A.  I did.
14   Q.  Who asked you to draft it?
15   A.  Michelle Niemeyer.
16   Q.  All right.  Per our discussion, we'll be entering
17        this expert report into the record as Exhibit 44.
18             Can you please read paragraph 3 to yourself
19        and then tell me when you're done.
20   A.  Okay.  I've read it.
21   Q.  Can you tell me what the difference is between
22        beating and a close reach?
23   A.  Beating is a more direct course into the wind.
24        You're going in the direction that the wind is
0016
 1        blowing from.
 2   Q.  Turning to paragraph 5 of your report, do you
 3        know if there's anything in Mr. Andersson's
 4        testimony which states the direction of the
 5        current during any portion of his voyage?
 6   A.  I don't need to look at Mr. Andersson's report to
 7        know the direction of the current.
 8   Q.  That's not what I asked, sir.
 9   A.  Then please say your question again.
10   Q.  Is there anything in his deposition which states
11        the direction of the current during any portion
12        of his voyage?
13             Are you looking at something other than your
14        report, sir?
15   A.  No, I'm looking at my report.  Okay.
16             Could you repeat your question.
17   Q.  Is there anything that you recall in
18        Mr. Andersson's testimony which states the
19        direction or the speed of the current during any
20        portion of his voyage?
21   A.  No.
22   Q.  Are you aware that Mr. Andersson testified that
23        at some point after departing Aruba, he changed
24        course for Puerto Rico?
```

```
0017
 1   A.  Yes.
 2   Q.  Do you know when in his voyage he changed course
 3       for Puerto Rico?
 4   A.  I'm not a hundred percent sure.
 5   Q.  Do you remember how many hours after he departed
 6       he changed course for Puerto Rico?
 7   A.  As I recall, I think it's about 36 hours;
 8       somewhere around there.
 9   Q.  Can you repeat that.  You broke up.  I didn't
10       hear how many hours.
11   A.  I think around 36 hours.
12   Q.  Was that 56?  Five-six?
13   A.  Three.  Three-six.
14   Q.  Three-six.  Thirty-six.  Thank you.
15           Do you know how many miles Mr. Andersson's
16       vessel was from Aruba when he changed course for
17       Puerto Rico.
18   A.  I'm not sure offhand, but you can extrapolate it
19       by his statement of the speed he was doing and
20       the direction he was heading in.
21   Q.  Do you remember -- is there anywhere in his
22       deposition Mr. Andersson stated how fast his
23       vessel was going?
24   A.  As I recall, it was between 8 and 9 knots.
0018
 1   Q.  Can you repeat that.
 2   A.  As I recall, between 8 and 9 knots.
 3   Q.  From Aruba, do you know Mr. Andersson's bearing
 4       from Aruba when he changed course for
 5       Puerto Rico?
 6   A.  Apparently, the bearing was about 60 degrees.
 7       060.
 8   Q.  How did you determine that?
 9   A.  I think it's stated in the report.
10   Q.  Whose report?
11   A.  Mr. Andersson's.  I think his initial talk with
12       Mr. Ball.
13   Q.  Looking at paragraph 7 of your report, what is
14       the basis for your statement that recreational
15       sailors are not expected to keep a paper log
16       during their voyages?
17   A.  It's not required by law.  As my -- with modern
18       navigational practices, your log and track is
19       kept on the chartplotter.
20           It traces your every movement; your track.
21       So you know exactly where you are at any given
22       time because it's on a screen in front of you.
23           The old logbooks, you had to go and -- in old
24       days before you had GPS, you had to log your
```

0019
1    position or estimated position; but in order --
2    in case of an emergency with a ship going down,
3    you could send out a mayday or pan-pan requiring
4    assistance and give your last heading -- last
5    bearing -- your last bearing and your last
6    position as recorded by the log.  That was the
7    only reason for that.
8         But in today's day and age, everything's on a
9    screen in front of you 24 hours a day.  As long
10   as your equipment is on, your position is right
11   in front of you.
12  Q.  Have you ever read any instruction manual stating
13      that recreational sailors in the Caribbean are
14      not expected to keep paper logs?
15  A.  I haven't read an instruction that way, no, but
16      it's not done.
17  Q.  Have you ever read any educational materials
18      stating that recreational sailors in the
19      Caribbean are not expected to keep paper logs?
20  A.  I think you just asked that question.
21  Q.  I'm sorry.  I didn't understand that.  Can you
22      repeat, please.
23  A.  I think you've just asked that question.
24  Q.  So your answer to my second question is the same
0020
1    as your first?
2    A.  I do not think it is required, and I haven't read
3        papers of it.  I'm just saying what is practiced.
4    Q.  Have you ever instructed a recreational sailor
5        sailing in the Caribbean that it wasn't necessary
6        to keep paper logs?
7    A.  I have not instructed anyone to do that, no.
8    Q.  Are commercial sailors expected to keep paper
9        logs?
10   A.  Commercial vessels, I'd assume so.  I'm not a
11       hundred percent sure.
12        Although they have the same modern technology
13       that everybody else has; plus their vessels have
14       to have AIS which tracks them automatically.  By
15       law, a commercial vessel has to have AIS.
16   Q.  Do you know if the vessel's GPS or chartplotter
17       was capable of recording the speed of the wind
18       during any portion of the trip from Aruba to the
19       Dominican Republic?
20   A.  His chartplotter, maybe not; but the wind
21       instruments would be able to give a reading.
22   Q.  I'm sorry.  Can you repeat that?
23   A.  His chartplotter, I'm not sure what the
24       capabilities of his chartplotter are; but his

0021
```
 1      wind instruments would have told him the speed of
 2      the wind.
 3   Q. Was his GPS capable of telling him the speed or
 4      direction of the wind?
 5   A. A GPS tells you a fix.  It tells you where you
 6      are.  It gives you a point on the planet where
 7      you are.
 8   Q. What wind instruments did Mr. Andersson have
 9      aboard his vessel?
10   A. That will be on the surveyor's report, but more
11      than likely Raymarine.
12   Q. Do you know if the GPS, chartplotter, or any
13      other instrument on Mr. Andersson's vessel was
14      capable of recording the speed or the direction
15      of the current?
16   A. No, you don't get that.  Well, you can.  It's
17      possible.
18   Q. Were any of his devices on board his vessel
19      recording the speed or direction of the current?
20   A. It wouldn't record it, but it will tell what you
21      it is in certain plotters.
22          I just want to make a little distinction.  A
23      GPS chartplotter is a misnomer.  A GPS feeds into
24      a chartplotter.
```
0022
```
 1   Q. In your opinion, at any point in Mr. Andersson's
 2      voyage from Aruba to the Dominican Republic, were
 3      the weather conditions such that the vessel could
 4      not have returned to Aruba?
 5   A. At what point of his voyage?
 6   Q. I'm sorry.  You'll have to repeat that.
 7   A. At what point of his voyage?
 8   Q. On any point, could the vessel have returned to
 9      Aruba?
10   A. He could have turned around, yeah.
11   Q. Is there any point in the -- in the voyage when
12      it could not have returned to Aruba?
13   A. No, you could return to Aruba pretty much
14      anytime.
15   Q. Can you please read paragraph 8 of your report to
16      yourself, and then tell me when you're done.
17   A. Okay.  I'm done.
18   Q. In your report, there is -- in paragraph 8,
19      there's a sentence that begins The recommended
20      course to avoid Venezuelan pirates.
21   A. Yes, it's a recommended distance.
22   Q. Excuse me.  Can you tell me who recommends that
23      vessels stay at least 200 miles from Venezuela?
24   A. That would be recreational mariners who traverse
```

0023
```
 1        those waters.
 2            It's just prudent because of the acts of
 3        piracy and the escalation of piracy in these
 4        areas.
 5   Q.   In 2019, how many times did Venezuelan pirates
 6        attack recreational vessels that were more than
 7        20 miles from the coast of Venezuela?
 8   A.   I don't have that information on me.
 9   Q.   Do you know how many pirate attacks there were in
10        that vicinity in 2018 on recreational vessels?
11   A.   Again, I don't have that information in front of
12        me.  It is documented.  You can get it.
13   Q.   Do you know how many there were in 2017?
14   A.   Not offhand.  You want me to pull it up for you?
15   Q.   In 2019, do you know how many times Venezuelan
16        pirates attacked recreational vessels in the
17        waters surrounding Aruba?
18   A.   Not offhand.
19   Q.   Do you know that information for 2018 or 2017?
20   A.   Can I just take a break so I can go and pull up
21        this information for you?
22   Q.   No, please do not do that.
23   A.   If you're asking me the questions, then it'd be
24        better to actually pull them up so I can answer
```
0024
```
 1        your questions.
 2   Q.   Please do not refer to anything else.  Just
 3        answer from your memory.
 4            MS. NIEMEYER:  I'm going to object to this.
 5            Michael, there were some articles that were
 6        provided to you that were part of the materials
 7        that Captain Geiger reviewed, and I -- as part of
 8        the disclosure, I really don't think it's
 9        appropriate for you to tell him he's not allowed
10        to refer; and if so, I'm going to advise
11        Captain Geiger to just don't guess and if you
12        don't remember, reference those articles; and
13        that's the end of that.
14            MR. GOLDMAN:  That certainly is, and you're
15        welcome to ask him on your time.
16   BY MR. GOLDMAN:
17   Q.   Do you recall in 2019 how many times Venezuelan
18        pirates attacked recreational vessels in the
19        waters surrounding Curaco and Bonaire?
20   A.   Again, I do not have that information in front of
21        me.
22   Q.   Do you recall for 2018 or 2017?
23   A.   I do not have that information in front of me.
24   Q.   Can you please read paragraph 11 of your report,
```

```
0025
 1        and then tell me when you're done.
 2   A.   Okay.  I'm done with paragraph 11.
 3   Q.   What is a daggerboard?
 4   A.   It's a long, keel-like attachment that lowers
 5        down through the hull of a catamaran,
 6        specifically Catanas, to stop sideways slippage.
 7   Q.   Can you explain to this landlubber the difference
 8        between a daggerboard and a centerboard?
 9   A.   Well, a catamaran doesn't have a centerboard
10        because it doesn't have a center.  It has two
11        hulls.  And because it has two hulls, it doesn't
12        need a keel which a monohull needs to stay
13        balanced because of the sail so it doesn't blow
14        over.
15           So it has two hulls; so it's automatically
16        stabilized because it's got two hulls.  But that
17        means it doesn't need the keel; so it can
18        potentially lead to sideways slippage or moving
19        sideways when the wind blows.  So the
20        daggerboards, which extend up to 9 feet down into
21        the water below the vessel, stop that slippage,
22        counteracts it on a Catana because it doesn't
23        have a keel.
24           A vessel like a Leopard has a type of boot
0026
 1        underneath the vessel which acts as a sort of
 2        keel to stop it, which reduces the sideways
 3        slippage.
 4           Catanas extend much deeper in the water; so
 5        it acts as a keel while the boat is sailing.
 6        They have one on each hull.
 7   Q.   Can you look at paragraph 15 of your report, read
 8        it to yourself, and then tell me when you're
 9        done.
10   A.   Yeah, I'm done reading it.
11   Q.   To the best of your knowledge, were the
12        conditions in Boca Chica at the time of the
13        grounding the same as the conditions reported by
14        the cruise ship 60 miles away?
15   A.   They would have been the same, yes.
16   Q.   Did you check any other source to determine the
17        weather in Boca Chica at the time of the
18        grounding?
19   A.   I did not, but 60 miles away is not far enough to
20        change conditions.
21   Q.   On a voyage from Aruba to the Dominican Republic,
22        how many miles would a vessel have to travel to
23        keep within the navigational limits permitted in
24        Mr. Andersson's policy?
```

```
0027
 1   A.   I would need to pull up a chart to give you an
 2        accurate answer.
 3   Q.   Are you familiar with the International
 4        Regulations for the Prevention of Collisions at
 5        Sea?
 6   A.   Yeah.
 7   Q.   Did COLREGs apply to recreational vessels?
 8   A.   Yes.
 9   Q.   In your expert opinion, for a vessel to be
10        seaworthy, does the vessel have to have current
11        accurate charts for areas that the vessel owner
12        does not intend to navigate?
13           MS. NIEMEYER:  Objection to form.
14           Again, Michael, if you're going to on one
15        hand ask Captain Geiger if he's done legal
16        research and on the other ask questions about
17        unseaworthiness, if this is the point where you
18        reveal to him how you want to define the word
19        seaworthiness.
20           MR. GOLDMAN:  I am not revealing how I want
21        to define seaworthiness.
22           I want him to give his answer with respect to
23        what he thinks seaworthiness is.
24           MS. NIEMEYER:  I'm going to object to the
0028
 1        question.
 2           MR. GOLDMAN:  Thank you.
 3           MS. NIEMEYER:  You can answer.
 4           MR. GOLDMAN:  Let me ask it again to make
 5        sure the record's clear.
 6   BY MR. GOLDMAN:
 7   Q.   In your expert opinion, for a vessel to be
 8        seaworthy, must a vessel have current accurate
 9        charts for the areas that the vessel owner does
10        not intend to navigate?
11   A.   No.  And I would like to elaborate on that
12        because --
13   Q.   No, thank you.
14   A.   -- I am not sailing in the Caribbean and --
15   Q.   No, thank you.
16           MS. NIEMEYER:  He has --
17   A.   -- don't carry specific charts.
18   BY MR. GOLDMAN:
19   Q.   Repeat your elaboration, please, because we were
20        all speaking over one another.
21   A.   I would not be required to carry charts of the
22        Pacific if I'm sailing in the Caribbean.
23   Q.   In your expert opinion, for a vessel to be
24        seaworthy, must a vessel have current accurate
```

0029
1     charts for the areas that the vessel owner does
2     intend to navigate?
3  A. It would be prudent, yes.
4        MR. GOLDMAN:  That's all I have.  Thank you
5     very much.
6        MS. NIEMEYER:  I just have a couple of
7     follow-up questions.
8                  FURTHER EXAMINATION
9  BY MS. NIEMEYER:
10 Q. You were asked some questions about paper logs
11    and whether they were required by recreational
12    sailors, and specifically you were asked a
13    question about why -- whether you have instructed
14    recreational sailors not to keep paper logs.
15       Can you expand on that and explain why you
16    would not have instructed a recreational sailor
17    not to -- can you explain -- is there any reason
18    why you would instruct them about paper logs?
19 A. Due to the fact that the chartplotters we have
20    today record your track and every movement and on
21    your chartplotters on your vessels your position
22    is in front of you all the time, should you have
23    an emergency, you read directly off the
24    chartplotter your position, which will give you
0030
1     your latitude and longitude to the position that
2     you're currently in, having a log sort of falls
3     away.  It's more of a traditional thing than it
4     is one of necessity.
5        Like I said, in the old days, which wasn't
6     that long ago, you needed to determine your
7     position with a sextant or Loran-C positioning
8     system.  You never had it in front of you 24/7;
9     so you kept a logbook so if an emergency should
10    arise, you could refer to your last entry in your
11    log to give out your position over the radio.
12       But in today's world with modern technology,
13    your position is always changing in front of you.
14    It constantly updates your position, and you can
15    read it straight off the screen if you have an
16    emergency straight into your radio or satellite
17    phone.
18       So I don't personally instruct people not to
19    keep paper logs.  It's a matter of choice;
20    personal choice.  If they want to, they want to;
21    but I have never instructed anybody not to keep
22    them, purely because I think it's a personal
23    choice and it's not my position to say whether
24    they should keep one or not because I personally

0031
```
 1        find it to be irrelevant and obsolete in this day
 2        and age.
 3    Q.  Okay.  And you were asked some questions --
 4        several questions about whether it would be
 5        feasible for the vessel to return to Aruba at any
 6        given point during the voyage, and you offered
 7        that of course the vessel could have returned to
 8        Aruba; but the question I have for you is in your
 9        opinion, at the point in the voyage when
10        Mr. Andersson made his decision to shift his
11        course as he headed north, would it have been
12        advisable at that point in the voyage to turn
13        around and go back to Aruba as opposed to taking
14        the course that he chose to take?
15    A.  Let me just elaborate a little if I may on that
16        question.
17            You could turn around and go anywhere in the
18        Caribbean should you require it, but as Mr. Ball
19        states in his deposition, conditions at the time
20        that he left are pretty normal for the Caribbean
21        at that time of the year with the trade winds and
22        current.  It's not going to change anytime soon.
23        So his choice would be either leave the boat
24        there indefinitely in Aruba and never leave or
```
0032
```
 1        sail west to Panama and places beyond, which is
 2        the complete opposite direction that he would be
 3        going to in -- if he chose to go to Saint Martin,
 4        but due to navigational limits imposed on him by
 5        the insurance company, he has to stay within 150
 6        miles of a shoreline, makes it pretty difficult
 7        to sail against the prevailing wind and current
 8        to get to where you want to go, which is up to
 9        Saint Martin was his original intended
10        destination.  Whereas, if he wasn't required to
11        stay within those navigational limits of 150
12        nautical miles and he went due north, he could
13        island hop from island to island and pick up
14        relative shelter in the lee of the islands and
15        made a much safer passage that way.
16            I don't understand why the insurance
17        company -- I think the insurance company puts a
18        150 nautical mile navigational limit for US
19        waters because that's what their workbook, but
20        they don't seem to understand waters of the
21        Caribbean or offshore.
22            I mean, when you're in deep offshore, you're
23        highly unlikely to hit something or run into
24        something because you're just in deep ocean and
```

0033

```
 1        the swells usually flatten out in deep water; but
 2        when you go into shallow water, it becomes a
 3        little bit more of an obstacle.
 4    Q.  Okay.  So, again, would it in your opinion have
 5        been -- if you were faced with the choice that
 6        Martin Andersson was faced with at the point
 7        where he made the decision to change his course
 8        in rough conditions and with a seasick crew
 9        member, would you have -- do you believe it would
10        have been a better choice to go back to Aruba or
11        to shift his course the way he did?
12    A.  Shifting of course more northerly would have --
13        well, you would have been going across the swell
14        and wave height; so you would have made way to --
15        more or less towards your destination and made
16        the passage a lot more comfortable for yourself
17        and your crew.
18             You could turn around and run, but eventually
19        you've got to come back again; and conditions
20        aren't going to change.  There's -- you're in the
21        trade-wind belt over there; so the winds are
22        pretty constant.  Aruba, Bonaire, Curaco are very
23        well-known for their wind surfing and kite
24        surfing as a destination because the winds are
```

0034

```
 1        consistently blowing throughout the year.
 2             You're in a trade-wind belt; so you have very
 3        few days when there's no wind blowing.  So those
 4        conditions are, when he left, pretty normal,
 5        around 18 knots, for that area of the Caribbean;
 6        and the only way to get to where he was going was
 7        either heading towards the coast of Venezuela to
 8        sail south or due west, which would be going
 9        straight into the wind and the prevailing current
10        which blows through the Caribbean and then up the
11        coast of Florida, or more northerly, which would
12        have been a fairly standard, quick, easy way to
13        go or could have sailed the opposite direction of
14        where he wanted to go, which would be west.
15             So any point west he could have gone; he
16        could have turned, but that was not his intended
17        destination.
18             Why would he go backwards?  He could have.
19    Q.  Let me just ask a question for clarification.
20             I believe I heard you say west in the same
21        phrase as you said into the current and
22        conditions.
23             Did you mean to say east there?
24    A.  Well, easterly course would take you into --
```

0035
1       directly into the prevailing wind and current,
2       which would make for a very uncomfortable passage
3       and cause those who are affected by seasickness
4       to get sick because it would be a very bumpy or
5       bouncy ride.
6    Q. Is it possible for a catamaran to sail directly
7       into the wind?
8    A. No, impossible.
9    Q. What would be --
10   A. A catamaran cannot sail -- sorry.
11   Q. What would be the closest angle to the wind that
12      a catamaran could sail?  Particularly a Catana
13      like this one.
14   A. I'd say it'd probably get as close to 40 or 50
15      degrees into the wind.  Maybe slightly higher,
16      but I'd say about 40 thereabouts would be the
17      closest to the wind.
18   Q. Now, in the course of creating your opinion, did
19      you look at information and photographs related
20      to the chart that was in the -- the supplemental
21      chart that was in the Garmin chartplotter?
22   A. I looked at the photograph of the chart, yes.
23   Q. And what was your opinion when you saw that
24      photograph?
0036
1    A. Well, the chartplotter looked like it had been
2       submerged in water and damaged when they pulled
3       it out; so I think any information on that
4       chartplotter would be irrecoverable, but the
5       chart and the data on the chart is usually for
6       the entire Caribbean.
7    Q. Was it your understanding that there were
8       adequate charts or was adequate information in
9       that chart chip for a recreational sailor who
10      would be traveling in the Eastern Caribbean?
11   A. Yes, the chart chip that he had in there was full
12      of the windward and leeward islands which would
13      have covered Dominican Republic and probably
14      covered the Bahamas and Turks and Caicos as well.
15   Q. Did it also cover the area of the Caribbean
16      intended for the voyage where it would cover the
17      islands of Venezuela, the islands from Grenada
18      north all the way to Saint Martin?
19   A. Yeah, due to the fact that he left Aruba, he
20      would have had charts for that region on his
21      chartplotter.  So he would have had the entire
22      Caribbean basin.
23   Q. In your experience, is it the common or expected
24      practice of a recreational sailor to update

0037
```
 1      supplemental chart chips every time the company
 2      comes up with an update?
 3   A. You can go online and update those chips if you
 4      have a USB and a card reader.  Usually the --
 5      when you buy the chart in that form, the chip
 6      comes with a USB so you can go online to the
 7      website and pay for upgrades or whatever they
 8      adjust the charts with.
 9   Q. Is it your understanding that that would be a
10      standard practice or something that is less
11      commonly done by recreational sailors?
12   A. It's commonly done by recreational sailors.
13   Q. Would you consider the chart -- the 2015 chart
14      that was in the vessel --
15   A. Yeah, that chart itself might have been
16      manufactured in 2015 since it's dated that way,
17      but if you go online with the chart, you can
18      update charts on your chartplotter.
19          So you download the charts online, and you
20      transfer them over to your chartplotter on the
21      cloud or the memory slot, and it keeps everything
22      updated.
23          I just did that on my vessel the other day.
24      You don't need to buy a new set of charts.  You
```
0038
```
 1      use the same chart to download the current charts
 2      online.  It just updates your charts to the
 3      latest -- the latest information out there for
 4      that region.
 5   Q. Are you aware -- if the chart's then updated in
 6      the manner you're describing, would the chip
 7      itself reflect that?  Or would you have to go
 8      into the information in the chartplotter to know
 9      whether that update was made?
10   A. The information in the chartplotter would be
11      where you'd get it from.  It would show you when
12      updates were done and what the latest -- what
13      version of charts you have on -- on the
14      chartplotter.
15   Q. Okay.  So if the chartplotter no longer works
16      because it's been destroyed, it's not possible to
17      tell whether the chart was updated; is that
18      correct?
19   A. Yeah, I would think that, because you wouldn't be
20      able to turn it on to let you know what the last
21      update was and what updates are available.
22   Q. Okay.  Now --
23   A. I'm saying you need to be able to turn it on.
24   Q. Based on the -- when you gave your report, you --
```

```
0039
 1      you reviewed a number of things including
 2      Mr. Andersson's deposition, Mr. Ball's report,
 3      and a number of things which were delineated; and
 4      you see the report before you.
 5           Is that report your opinion as an expert
 6      sailor with a great deal of sailing experience in
 7      catamarans about the status of the conditions, et
 8      cetera, during the voyage and what you believe to
 9      be the truth?
10  A.  I'm sorry.  Could you repeat the question.
11  Q.  Yeah.  And I'll -- I'll retract that question.
12           Having reviewed the things you reviewed, is
13      the written report which we've been looking at an
14      expression of your opinion as an expert based on
15      what you reviewed?
16  A.  Of my report?
17  Q.  Your report.
18  A.  Yes.
19  Q.  Is it your opinion?
20  A.  Yes, it's my opinion from having sailed those
21      waters and being based down there and having
22      taken boats from the Caribbean to South America
23      and from delivering boats from South Africa to
24      the Caribbean and to the US, it's my view that
0040
 1      the conditions in my report are fairly accurate
 2      as to the way I'm reading it and why it got to
 3      where it got.
 4           MS. NIEMEYER:  Okay.  I have no further
 5      questions.
 6           MR. GOLDMAN:  I have nothing.  I think we're
 7      done.
 8           (Geiger Exhibit No. 44 was marked for
 9      identification.)
10  (Conclusion of proceedings at 10:01 a.m. this date.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
0041
 1                    CERTIFICATE
 2      I, Karen D. Pomeroy, a Registered Diplomate
 3  Reporter and Notary Public in and for the
 4  Commonwealth of Massachusetts, do hereby certify that
 5  Otto A. Geiger, the witness whose deposition is
 6  hereinbefore set forth, was duly remotely sworn by me
 7  and that such deposition is a true and accurate
 8  record, to the best of my knowledge, skills and
 9  ability, of the testimony given by such witness.
10      I further certify that I am not related to any of
11  the parties in this matter by blood or marriage and
12  that I am in no way interested in the outcome of this
13  matter.
14      IN WITNESS WHEREOF, I have hereunto set my hand
15  and affixed my seal of office this 28th day of March,
16  2022.
17
18
19                    _____
                                Notary Public
20
21  My Commission expires:
    June 13, 2025
22
23
24
0042
 1                    ERRATA SHEET
 2      CHANGES TO THE DEPOSITION OF OTTO A. GEIGER
 3  INSTRUCTIONS TO WITNESS:  1) Please note any desired
    corrections to your testimony by page and line
 4  number.  2) Enter text as it appears in the
    transcript.  3) Enter text as it should appear.
 5
 6  PAGE    LINE              CORRECTION
 7  ____    ____  _____
 8  ____    ____  _____
 9  ____    ____  _____
10  ____    ____  _____
11  ____    ____  _____
12  ____    ____  _____
13  ____    ____  _____
14  ____    ____  _____
15  ____    ____  _____
16  ____    ____  _____
17      I, Otto A. Geiger, do hereby certify that I have
18  read the foregoing transcript of my testimony, and I
19  further certify that said transcript is a true and
20  accurate record of said testimony.
```

```
21       Dated at _____, this _____ day
22   of _____, 20_____.
23
                   _____
24                         Otto A. Geiger
```