0001

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
IN ADMIRALTY

*****************************
GREAT LAKES INSURANCE SE
vs. 4:20-cv-40020-DHH
MARTIN ANDERSSON
*****************************

DEPOSITION BY ZOOM OF CRAIG SETZER, a witness called on behalf of the Plaintiff, pursuant to the Rules of Civil Procedure, before Karen D. Pomeroy, Registered Diplomate Reporter and Notary Public in and for the Commonwealth of Massachusetts, at 952 Tulip Circle, Weston, Florida, on Friday, March 25th, 2022, commencing at 8:59 a.m.

0002

APPEARANCES:

MICHAEL I. GOLDMAN, ESQUIRE
Goldman & Hellman
233 Harvard Street, Suite 211
Brookline, Massachusetts 02446
For the Plaintiff

MICHELLE M. NIEMEYER, ESQUIRE
Michelle M. Niemeyer, PA
244 Biscayne Boulevard No. 3009
Miami, Florida 33132
For the Defendant

0003

INDEX

| DEPOSITION OF CRAIG SETZER | PAGE |
|---|---|
| Examination by Mr. Goldman | 4 |
| Examination by Ms. Niemeyer | 28 |

EXHIBITS

| Number | | Page |
|---|---|---|
| Exhibit 45 | Curriculum Vitae of Craig Setzer | 32 |
| Exhibit 46 | Setzer Report of Expert Witness | 32 |
| Exhibit 47 | Weather Conditions 12/14-18/19 | 32 |

Exhibits Attached

0004

STIPULATIONS

It is stipulated by and between counsel for the respective parties that the deposition transcript is to be read and signed by the deponent under the pains and penalties of perjury; and that the sealing and filing thereof are waived; and that all objections, except as to form, and motions to strike are reserved until the time of trial.

* * *

CRAIG SETZER,

having been duly remotely sworn by the reporter, was deposed and testified as follows:

EXAMINATION

BY MR. GOLDMAN:

Q. Good morning, Mr. Setzer. Would you please state your full name, date of birth, and residential address for the record.

A. It is Edwin Craig Setzer. Date of birth is [redacted] And I live at [redacted] Weston 33327.

Q. Okay. Well, my name is Michael Goldman. I'm from the law firm of Goldman & Hellman, and I

0005

represent Great Lakes Insurance in this matter and, as you know, we're here to take your deposition today.

And as Michelle has heard me say several times now, I have a bit of a speech to give just to make sure we get everything right and to make sure that we get a good record.

First, we have to obey certain courtesies.

We have to work as hard as we can to speak slowly and clearly and to wait patiently for everyone to finish and then to speak in our own turn.

Of course, this is even more vital in our Zoom age.

I'll ask you to wait patiently until I'm done phrasing my question, and I'll do my very best, of course, to patiently wait for you to give your full answer.

All your answers have to be verbal. You can't nod your head. You can't say uh-huh. You can't shrug your shoulders.

Please don't guess. If you know the answer, say so. And if you don't know the answer, just say so.

0006

Similarly, if you don't understand my question, please don't struggle with it. Ask me to ask you a better question. It doesn't help if we get -- if I ask lousy questions, we'll get lousy answers; and nobody needs that.

If at any point you want to take a break, just ask. It's not meant to be an endurance test.

Is everybody's cell phone off?

A. Yes.

Q. Turning off my beeps. Just a moment.

Mr. Setzer, what's your date of birth?

A. [redacted]

Q. Are you married?

A. No.

Q. Are you employed?

A. Not presently.

Q. Who was your last employer? Or let me rephrase that better.

When were you last employed?

A. My last day of employment was February 1st of 2022.

Q. Who was your employer?

A. CBS Television Stations.

Q. Why did you cease being employed there?
A. New management came in, and we didn't see eye to eye on hurricane coverage; and I decided it was time to protect my brand and also try some new things.
Q. Excellent. Good luck to you in those.
A. Thank you.
Q. Have you ever been a plaintiff or a defendant before in any litigation?
A. No.
Q. Have you ever been convicted of a crime?
A. No.
Q. Have you ever pled guilty to a crime?
A. No.
Q. Have you ever pled no contest to a crime?
A. No.
Q. Are you a high school graduate?
A. Yes.
Q. Where did you graduate from?
A. Parkway Central Senior High School in Chesterfield, Missouri.
Q. Do you have any post-high school education?
A. I do.
Q. What did you do immediately after?



A. I went to the University of Oklahoma for three years pursuing a degree in meteorology.
Q. Did you get your degree in meteorology?
A. I did.
Q. Do you have any formal schooling after the University of Oklahoma?
A. I attended part time St. Louis University for two years and then after that, completed my degree at Metropolitan State College in Denver.
Q. What degree did you get there in Denver?
A. Bachelor of science degree in meteorology.
Q. What degree did you get from the University of Oklahoma?
A. I didn't get a degree. I was doing coursework at the University of Oklahoma.
Q. Do you have any degrees beyond a bachelor's degree?
A. No.
Q. Let's turn to what we're going to mark as Exhibit 45, which is your curriculum vitae.
Do you have that in front of you, sir?
A. Yes, I do.
Q. Who drafted this document?
A. I did.

0009

Q. In the category of your curriculum vitae that lists professional experience, do any of the items on those lists involve working aboard a sailing vessel?
A. No.
Q. Does anything on that list involve even being present ever on a sailing vessel?
A. On that list, no.
Q. In any of those positions where it says professional experience, did you ever perform any evaluation on the handling characteristics or capabilities of a sailing vessel?
A. No.
Q. Do you know if you were ever even aboard a sailing vessel at any time between the present day and the year 2000?
A. Could you rephrase or be more specific on that question. You dropped that a little bit.
Q. Between the present day and January 1st, 2000, have you ever even been aboard a sailing vessel?
A. Yes.
Q. When was the last time?
A. The last time was December of 2021.
Q. What vessel were you aboard?

0010

A. I was aboard a 46-foot Beneteau.
Q. Were you captain, crew, or passenger on that vessel?
A. I was crew and helmsman and tactician.
Q. Where was the vessel located at that time?
A. Fort Lauderdale.
Q. What was the vessel doing? Or why were you there with the vessel?
A. I was participating in a near-shore sailboat race.
Q. What was the distance of the race?
A. Approximately ten miles. However, to start the race, ten miles was traveled to get to the starting point.
Q. And what was the name of the race?
A. Hillsborough -- I'm not sure. It was based out of the Hillsborough Inlet Sailing Club.
Q. How many people were aboard the vessel?
A. Five.
Q. And can you just remind me. I know you already said it, but can you tell me again what your position was aboard the vessel.
A. I was the helmsman, tactician, and crew.
Q. What does the tactician aboard a sail vessel

0011

do?
A. During a sailboat race, you have to choose courses or tactical maneuvers to position yourself better with respect to the other boats; so the tactician makes decisions on -- as to where the boat would go.
Q. What was the weather like that day that you were on that sailing boat?
A. It was mostly sunny. The winds were light at the start, and they became southeasterly averaging about 10 knots.
Q. On that day, was your vessel generally sailing with the wind or against it?
A. The vessel was sailing on different points of sail; so for a time, the vessel was sailing upwind; and then for a time, the vessel was sailing downwind.
Q. What was the vessel's maximum speed when it was sailing upwind?
A. Upwind, the maximum speed was 7 knots.
Q. And what was its maximum speed when sailing downwind?
A. The downwind speed was approximately 10 knots.
Q. Was the vessel ever sailing -- and you'll have to

0012

forgive me, my only experience at sea is aboard an amphibious assault ship. There was no sailing involved.

Was the vessel ever sailing at an angle to the wind? Neither upwind nor downwind.
A. Yes.
Q. And what was its maximum speed when sailing at an angle to the wind?
A. The point where it was sailing at an angle to the wind was when it was rounding a mark; so it never achieved an optimal speed because it was only on that crosswind or off-wind point of sail for a short time, but it was approximately 6 knots.
Q. Just one moment. And that was in -- did you say December 2021 you were in that race?
A. That's correct.
Q. When were you on a sailing vessel before that?
A. I believe the time before that was in August of 2021.
Q. Why were you aboard a sailing vessel?
A. It was another off-shore race or near-shore race.
Q. Where was the race?
A. Same area location approximately.

Hillsborough Inlet off of the Broward/Palm

0013

Beach County Line.
Q. What was the distance of the race?
A. Approximately ten miles.
Q. What kind of vessel were you on board?
A. I was on a 46-foot Beneteau.
Q. And what was your role on the vessel?
A. I was tactician and crew. I did not do any helm work.
Q. I should have asked this question before, so I'll ask with respect to both incidents, what did you do as crew aboard the vessel, for both?
A. For crew, it was basically sail trim.
Q. That's in both cases?
A. Yes.
Q. When was the last time you were on a sailboat before that?
A. I believe it was July of 2021.
Q. How many times did -- that year were you on board a sailboat?
A. Probably a total of four, because the sailing last year with the pandemic was somewhat limited.
Q. On any of those times in 2021, did you sail a vessel single-handed?

0014

A. When you say single-handed, you mean that I was the sole occupant aboard the vessel?
Q. Yes, that is what I mean. Thank you for clarifying.
A. No.
Q. On any of those times that you were on a sailing vessel in 2021, did you ever sail with only you and one other person aboard?
A. No.
Q. On any of those times that you were on a sailing vessel in 2021, did you ever sail beyond the sight of land?
A. No.
Q. When was the last time you were on a sailing vessel and sailed beyond the sight of land?
A. It was probably 2012 when I did a Miami-to-Nassau, Bahamas, race.
Q. What kind of vessel were you on?
A. I was on a 58-foot Beneteau.
Q. How many people were on board the vessel with you?
A. There was a total of eight.
Q. And what was your job on the vessel?
A. I was helmsman and crew.

0015

Q. What were your responsibilities as helmsman?
A. Maintaining a proper course for the boat; a proper heading as it would be called; asking for any sail trim -- in other words, adjustment of the sail to maintain the efficiency of the boat -- and to properly steer the boat to keep it in an optimal course, let's say.
Q. And what was your job as -- serving as crew?
A. I did some sail trim and -- and I think that was about it. Sail trim.
MR. GOLDMAN: Let me pause for just one moment.
(Pause in the proceedings.)
BY MR. GOLDMAN:
Q. Turning to the second page of your resumé, looking at the section that says Litigation Expert Witness Experience, in any one of the cases listed there, did you give an opinion about the handling characteristics or capabilities of a sailing vessel?
A. No.
Q. Did you give an opinion about the effects of weather on the handling characteristics or capabilities of a sailing vessel?

0016

A. No.
Q. Looking below that at Licenses, Endorsements, Qualifications, and Certifications, can you describe for me what instruction you received as part of the US Coast Guard OUPV Captain's license course.
A. That was the Coast Guard -- the US Coast Guard-approved class taught by a school called Sea School in Fort Lauderdale, and it met the basic requirements to get a -- what's commonly known as a 6-pack license.
Q. What is a 6-pack license?
A. Where you can take a vessel for hire but have no more than six passengers.
Q. Did you receive any sort of diploma or certification for completing the course?
A. I received a diploma; I passed the course.
Q. Is that the sort of thing -- let me give some background so you'll understand my question.
As a lawyer, I have to take continuing legal education courses every year or every two years. Is there anything like that that you have to do to maintain that license?
A. For the Coast Guard license, you have -- it's not

current.

So you have to certify every few years -- I'm not aware of the time frame -- your sea time; log your hours at sea.

Q. Is your captain's license current?

A. No.

Q. When did it expire?

A. I never completed the captain's portion of it. I completed the course. I didn't go and get the license.

That's why it says it was a license course completion. There was no license conferred.

Q. Am I correct then that with respect to the next two items, the auxiliary sail endorsement course and the auxiliary towing endorsement course, you completed the course but didn't receive the certification?

A. I didn't receive the license with that.

Q. So do you have any current licenses with respect to those three items on your resumé?

A. I do not.

Q. Do you have a current private pilot's license from the FAA?

A. I do.

Q. When was it last renewed?

A. January of 2022.

Q. What did you have to do to renew it?

A. Fly with a certified flight instructor, get checked out, and also make my medical -- complete the medical side of the provision of the license.

Q. Is your FAA license for unmanned aircraft systems current?

A. Yes.

Q. Can you describe for me what sort of unmanned aircraft systems?

A. Basically just a small drone.

Q. What did you have to do to become licensed for small drones?

A. So you have to complete a provision under the FAA called Part 107, which is the rules and regulations for drone operation.

By being licensed to operate a drone as opposed to being a recreational flier, you can fly a drone for hire or for compensation.

Q. All right.

A. And if I could make one correction for the record, if you don't mind.

Q. Please do.

0019

A. I may have said the FAA single pilot license was '22. It was January of 2021. It was last year.
Q. Do they have to be renewed annually?
A. It's every two years. It's biannually.
Q. Thank you for clearing that up. Appreciate it.
At any time in your sailing career, have you ever sailed on a three-day voyage?
A. Yes.
Q. When was the last time you did?
A. Probably in 2002.
Q. Were you the navigator aboard that vessel?
A. Yes.
Q. Where did you sail from?
A. From Port of Miami to Grand Bahama and then to the Abacos.
Q. What was the total length of the voyage?
A. The initial leg of the voyage was probably 100 miles. The subsequent legs were within sight of land, and they were less than a hundred miles.
Q. How long did it take you to traverse that first leg?
A. Took approximately 12 hours.
Q. What kind of vessel was that?
A. It was a 35-foot Beneteau.

0020

Q. What were your responsibilities aboard the vessel as the navigator?
A. I was the ship's owner; so I was responsible for all of the responsibilities to captain, in this case, or skipper. I was responsible for navigation and handling of the vessel.
Q. Did you have any paper charts aboard the vessel?
A. I did.
Q. Did you have a GPS aboard the vessel?
A. I did.
Q. Before you left, did you make sure that your -- the maps in your GPS were up to date?
A. Because I would do usually an annual update just so that I knew it was updated, it was probably updated in the Spring; and the voyage was during the month of July.
Q. Have you ever sailed on a voyage that long single-handed?
A. I have not.
Q. Have you ever been deposed in any case that wasn't listed on your resumé?
A. I have not.
Q. Let me ask it again just to make sure I'm a

hundred percent sure.

Have you ever been deposed in any case, not just those where you were testifying as an expert, but even in cases where you yourself were a party or just a witness?

A. Like as in a family law matter?

Q. For instance. Not restricted to that, but as an example, yes.

A. I have been deposed in a family law matter.

Q. Can you tell me what that matter was?

A. It was a divorce.

Q. And I'm guessing yours?

A. Yes.

Q. I'm sorry about that. How long ago were you divorced?

A. Eleven years ago.

Q. I shouldn't have said I'm sorry. It's none of my business. Who knows. Excuse me. I apologize for that.

A. Not necessary.

Q. Before you drafted your conclusions for Mr. Andersson in this matter, did you do any research to determine the speed and direction of the current during Mr. Andersson's voyage?

A. I did not.

Q. All right. Let's turn to the next exhibit, which we're going to mark as 46; and it is the one that says Report of Expert Witness Craig Setzer.

Do you have it before you?

A. I do.

Q. Have you seen this document before today?

A. I have.

Q. Can you tell me what it is.

A. It is the report that meets the Federal Rules of Civil Procedure 26(a)(2)(B) which I believe is required disclosures in a federal matter.

I'm not a lawyer; so I may not be saying that correctly.

Q. Do you know what the Melody's top speed was?

A. I'm sorry. Could you ask that again, please.

Q. Do you know what the Melody's top speed was?

A. I do not.

Q. Do you know what point of sail was Melody's theoretically fastest point of sail?

A. I do not.

Q. Do you know what the Melody's average speed was during its trip from Aruba to the Dominican Republic?

0023

A. I do not.
Q. Do you know what time the Melody departed Aruba on December 14?
A. So am I confined to just addressing everything with respect to this question on Exhibit 46?
Q. Let's enter your report as an exhibit, and you can refer to that to refresh your recollection because we're going to go through that as well.
So let's turn to this document that says Eastern Caribbean Marine Weather Conditions and mark it as Exhibit 47.
Have you ever seen that document before today?
A. I have.
Q. Can you tell me what it is?
A. It is my report on the sailing conditions, the weather conditions, and the sail course provisions of the case that I'm working on.
Q. Did you draft this report?
A. I did.
Q. You can use this report to refresh your recollection if you'd like, but can you tell me, do you remember what time did Melody depart Aruba on December 14th?

0024

A. It was in the evening of December 14th.
Q. Between midnight on the 14th -- excuse me, between the time it departed on midnight on the 14th, do you know what the Melody's maximum speed was?
A. I do not.
Q. Do you know what its minimum speed was?
A. I do not.
Q. Do you know its average speed over that time?
A. I do not.
Q. Between midnight on the 14th and 5:00 a.m. on the 15th, do you know what Melody's maximum speed was?
A. I do not.
Q. Do you know what its minimum speed was?
A. I do not.
Q. Do you know what its average speed was?
A. No.
Q. Going back to the first period of time, there's one more thing I want to ask.
Between departing Aruba and midnight on the 14th, do you know how many miles the Melody traveled?
A. I'm sorry. Ask that again, please.

Q. Going back to the first period of time, from the departure on the 14th until midnight on the 14th, do you know how many miles the Melody sailed?
A. I do not.
Q. Between midnight on the 14th and 6:00 a.m. on the 16th [sic], do you know how many miles Melody sailed?
A. I do not.
Q. Between 6:00 a.m. on the 15th and noon on the 15th, do you know what Melody's maximum speed was?
A. No.
Q. Do you know what Melody's minimum speed was?
A. No.
Q. Do you know what Melody's average speed was?
A. No.
Q. Do you know how many miles Melody traveled in that time period?
A. No.
Q. Between noon on the 15th and 6:00 p.m. on the 15th, do you know what Melody's maximum speed was?
A. No.
Q. Do you know what Melody's minimum speed was?

A. No.
Q. Do you know what Melody's average speed was?
A. I do not.
Q. Do you know how many miles Melody traveled in that time period?
A. I do not know.
Q. Is there any period of time during the voyage until its termination in the Dominican Republic that you can tell me Melody's maximum speed?
A. No.
Q. Is there any period of time during that voyage that you can tell me Melody's minimum speed?
A. No.
Q. Is there any period of time during that voyage that you can tell me Melody's average speed?
A. No.
Q. Is there any period of time on that voyage that you can tell me how many miles Melody traveled?
A. No.
Q. What time did Melody run aground in the Dominican Republic?
A. During the evening of the 17th.
Q. On a voyage from Aruba to the Dominican Republic, how many miles would a vessel have to travel to

0027

keep within the navigational limits permitted by Mr. Andersson's policy?
A. Approximately 610.
Q. Based on your expert knowledge and opinion, is there any reason that Mr. Andersson's vessel could not have sailed back to Aruba?
A. I am unaware of any reason.
Q. Based on your expert knowledge and opinion, is there any reason that Mr. Andersson's vessel could not have sailed to Curacao?
A. Based on the angle of the wind, it would have been a more difficult point of sail.
Q. Would it have been possible?
A. Yes.
Q. Based on your expert knowledge and opinion, is there any reason that Mr. Andersson's vessel could not have sailed to Bonaire?
A. Again, it would have been a more difficult point of sail.
Q. Would it have been possible?
A. Yes.
MR. GOLDMAN: Michelle, if you don't mind, I'm going to take five minutes, use the head, look over my notes, and then we will continue.

0028

Everyone okay with a break?
MS. NIEMEYER: Yes, that's fine.
(Recess was taken from 9:31 a.m. until 9:37 a.m.)
BY MR. GOLDMAN:
Q. Are you aware of any facts on the record indicating that Mr. Andersson's vessel ever reached a speed of 8.3 knots?
A. No.
MR. GOLDMAN: That's all I have for today. This deposition is done.
Michelle.
MS. NIEMEYER: Okay. I have some follow-up questions.

FURTHER EXAMINATION

BY MS. NIEMEYER:
Q. Hold on. And so I will not forget, I'm going to ask the follow-up right now to the last question, which is are you aware of any evidence that the vessel did not reach or exceed a speed of 8.3 knots?
A. No.
Q. Okay. I'm going to go back to there were some questions about your Coast Guard license courses and whether you obtained the Coast Guard license.

0029

Is there any reason to obtain a Coast Guard license if you have no intention to use your business -- your boat for business purposes to take passengers for hire?
A. No. I took the Coast Guard class just to better my knowledge of navigation, boat -- boating environments; just to -- just to increase my awareness of the necessities of being a boater.
Q. Okay. So -- so it was a -- an extra level of knowledge that you obtained in your sailing skills; correct?
A. That's correct.
Q. And I want to ask, because it wasn't asked, about your sailing skills.
Do you -- you talked a little bit about the races you had sailed particularly in this recent time which has been limited by the COVID epidemic.
How many years have you been sailing on offshore sailboat races?
A. So the first crew offshore, which would be a passage where you go from one point out of the sight of land to another point, began in 2001 when I would take the vessel into international

0030

waters from -- my vessel from Miami to Bimini; but I did sailboat racing starting in 1996 in the Tampa Bay area.
Q. And were you regular crew on sailboats?
A. I was, and I felt that the best way to learn the -- how to better handle a sailboat was to race it, because then you could optimize the performance; you learned about many different conditions because, as opposed to some sailors, you go no matter what the weather if there's a race, and so you learn in varying conditions.
Q. Had you done offshore races where -- where the vessel was taking long passages with people sleeping; that kind of thing?
A. Yes.
Q. And how many races like that would you say you've done?
A. I've probably done a half a dozen.
Q. Okay. And have you ever done a -- a delivery or some kind of passage like that that doesn't have the full contingent of crew a racing sailboat would have?
A. Yes.
Q. When have you done those?

0031

A. I've done some deliveries from Key West back to Miami and just a return voyage from the Bahamas to Miami.
Q. Okay. And what's your understanding about the -- the minimum number of sailors necessary on a boat to toggle offshore?
A. I don't have a -- an understanding. I don't know that there is a set rule or anything that I'm aware of.
The previous owner to my boat single-handed the boat throughout much of the Caribbean.
Q. Okay. Now, you were asked some questions about whether you had knowledge of the specific speed the vessel was going, an average speed the vessel was going, et cetera, during specific time frames; and did you review the deposition of Mr. Andersson, the plaintiff in this case?
A. I did.
Q. Okay. And you understand he was asked those kinds of questions.
In your experience with -- as a sailor, would you know the answers to those questions?
A. I don't think I would know the answer with the granularity to which the questions were being

0032

asked.
I would have an approximation of the boat's characteristics and its approximate speeds at different points of sail given different conditions.
Q. Okay. And you gave an estimate -- or you gave an opinion that you believed that it's possible that the vessel, in this case the 47-foot Catana catamaran, could have sailed in compliance with the navigational limits that are in the insurance policy; correct?
A. That's correct.
Q. Does your opinion give your best estimate based on the conditions, the characteristics of the boat, and the testimony that you were able to review?
A. Yes.
MS. NIEMEYER: Okay. I have no further questions.
MR. GOLDMAN: That was great. Let's call it a day.
(Setzer Exhibits Nos. 45-47 were marked for identification.)
(Conclusion of proceedings at 9:43 a.m. this date.)

0033

CERTIFICATE

I, Karen D. Pomeroy, a Registered Diplomate Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that Craig Setzer, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true and accurate record, to the best of my knowledge, skills and ability, of the testimony given by such witness.

I further certify that I am not related to any of the parties in this matter by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 30th day of March, 2022.

____________________________
Notary Public

My Commission expires:
June 13, 2025

0034

ERRATA SHEET

CHANGES TO THE DEPOSITION OF CRAIG SETZER

INSTRUCTIONS TO WITNESS: 1) Please note any desired corrections to your testimony by page and line number. 2) Enter text as it appears in the transcript. 3) Enter text as it should appear.

| PAGE | LINE | CORRECTION |
|---|---|---|
| ____ | ____ | ________________________________________ |
| ____ | ____ | ________________________________________ |
| ____ | ____ | ________________________________________ |
| ____ | ____ | ________________________________________ |
| ____ | ____ | ________________________________________ |
| ____ | ____ | ________________________________________ |
| ____ | ____ | ________________________________________ |
| ____ | ____ | ________________________________________ |
| ____ | ____ | ________________________________________ |
| ____ | ____ | ________________________________________ |

I, Craig Setzer, do hereby certify that I have read the foregoing transcript of my testimony, and I further certify that said transcript is a true and accurate record of said testimony.

Dated at ____________________________, this ____ day of ___________________, 20____.

_________________________________
Craig Setzer