UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
IN ADMIRALTY

GREAT LAKES INSURANCE SE,       :
                                :        **Case No. 4:20-cv-40020-DHH**
                                :
        **Plaintiff,**           :
                                :
vs.                             :
                                :
MARTIN ANDERSSON                :
                                :
        **Defendant.**           :
_____ :

<u>**GREAT LAKES INSURANCE SE'S MEMORANDUM OF LAW IN  OPPOSITION TO
MARTIN ANDERSSON'S MOTION FOR SUMMARY JUDGMENT**</u>

COMES NOW the Plaintiff, GREAT LAKES INSURANCE SE (hereinafter "GLI"), by and through its undersigned counsel, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1 of the United States District Court for the District of Massachusetts, and for its memorandum of law in opposition to the motion for summary judgment filed by Defendant MARTIN ANDERSSON (hereinafter "ANDERSSON"), respectfully states as follows:

<u>**No Disputes of Fact Prevent Awarding Summary Judgment to the Plaintiff
With Respect to the Unseaworthiness of ANDERSSON's Vessel**</u>

As detailed below, nothing in the summary judgment motion filed by ANDERSSON prevents awarding summary judgment to one of the parties on any of the issue of the seaworthiness of ANDERSSON's vessel.  The following material facts remain undisputed:

1.  ANDERSSON's application, filled out by ANDERSSON's agent, W.R. Hodgens Marine Insurance, Inc. (hereinafter "W.R. Hodgens") and executed by ANDERSSON, represented to GLI that "the waters to be navigated" during the period of the Policy were Florida, the

Bahamas, and the Caribbean.  ECF no. 98-2, p. 4.[1]  This is established beyond dispute by the Request for Quote (ECF no. 98-1) and the Application (ECF no. 98-2).

2.  ANDERSSON never had any paper charts of Florida, the Bahamas, the Dominican Republic, Puerto Rico, or St. Croix.  ECF no. 110, p. 3.  This is established beyond dispute by ANDERSSON's testimony:

> 9 Q. Did you have any charts on board?
> 10 A. Yes.
> 11 Q. What charts did you have on board?
> 12 A. Leeward and Windward Islands and Aruba and -- ABC
> 13 islands.

> ECF no. 98-4, p. 22.

3.  The Raymarine GPS contained no supplemental charts, provided no detail for the Dominican Republic, and did not show a breakwater in the harbor at Boca Chica.  ECF No. 98-8, p. 5, ECF no. 98-9, pp. 28-29.  This is established beyond dispute by the testimony of ANDERSSON's expert, Cooley.  ECF No. 98-9.  Cooley testified as follows:

> 21 Q. Did the Raymarine unit have any charts of
> 22 Boca Chica?
> 23 A. The Raymarine, when it arrived, did not have any
> 24 charts plugged into it.
> 1 It's capable of taking charts; but when I got
> 2 it, it did not have any charts in it.
> 3 Q. Did the Raymarine have any charts in it showing a
> 4 breakwater at Boca Chica?
> 5 A. No. The Raymarine, without any plug-in chart,
> 6 just shows a very vague outline of North America
> 7 islands, but no detail.

> ECF no. 98-9, pp. 28-29.

---

[1] Moreover, the Policy is clear that W.R Hodgens acted at all times as the agent of ANDERSSON.  ECF no. 98-3, p. 13.  The Policy states, "**9. General Conditions & Warranties**… h. If you have used a broker to effect coverage, it is hereby agreed that your brokers or any substituted brokers (whether surplus line approved or otherwise), shall be deemed to be exclusively the agents of you and not of use in any matters relates to, connected with or affecting this insurance…"  *Id*.  Therefore, as a legal matter, the representations of W.R. Hodgens are the representations of ANDERSSON.  *Id*.

4. The only charts on the Garmin GPS were on a chip which was only current as of 2015. ECF no. 98-9, p. 17. This is established beyond dispute by the testimony of Cooley:

> 15 Where it says supplemental map, and it says --
> 16 that's the plug-in; the little map, and that's
> 17 HXUS030R-Southeast Caribbean; and the V is for
> 18 the software -- or the map version number.
> 19 Version 2015; version 16.50.
> 20 Q. ***Are those numbers, version 2015 and version***
> 21 ***16.50, indicative of the date of the map?***
> 22 A. ***The 2015 is***. The 16.50, I honestly don't know
> 23 what that means.

ECF no. 98-9, p. 17 [emphasis added].

4. The Neither the Raymarine GPS nor the Garmin GPS showed the breakwater on which ANDERSSON's vessel ran aground. ECF no. 98-8, pp. 4-5, ECF no. 98-9, pp. 26-28, ECF no. 98-10.

5. Charts available in December 2018, when the Policy was issued, showed the breakwater on which ANDERSSON's vessel ran aground. ECF no. 98-7, pp. 4-5.

These undisputed facts establish that, at the inception of the Policy and at the time of the grounding, ANDERSSON had no current, updated, accurate charts for the whole of Florida, the Bahamas, or the Caribbean. ECF No. 98, pp. 1-4. These undisputed facts establish that, at the inception of the Policy and at the time of the grounding, ANDERSSON had no current, updated, accurate charts showing the breakwater on which the Vessel ran aground. *Id*. As the caselaw establishes, the total absence of current, updated, accurate charts rendered the Vessel unseaworthy at the inception of the Policy and at the time of the grounding. *Id*, at pp. 5-13. Therefore, under federal admiralty law and the express terms of the Policy, the Policy is void from its inception and affords no coverage for ANDERSSON's loss. *Id*.

Moreover, the record in this case shows that ANDERSSON's summary judgment motion misstates the undisputed facts as follows:

1. "The boat also had basic charts on the Raymarine GPS chartplotter[.]"  ECF no. 107, p. 2.

   This statement of fact is a misleading half-truth.  The undisputed facts show that the Raymarine GPS contained no detailed charts.  ECF no. 98-8, p. 4, ECF no. 98-9, p. 17, ECF no. 98-10.  Rather, all the Raymarine GPS showed was a general outline of the Caribbean.  *Id*.  Moreover, without detailed charts, the Raymarine GPS did not show the breakwater on which the Vessel ran aground.  ECF no. 98-8, p. 5, ECF no. 98-9, p. 28.

2. "The boat also had… a supplemental Eastern Caribbean chart ship in the Garmin GPS chartplotter[.]" ECF no. 107, p. 2.

   This statement of fact is a misleading half-truth.  The undisputed facts show that the Garmin GPS contained a supplemental chart chip, but that the supplemental chart chip dated from 2015.  ECF no. 98-8, p. 4, ECF no. 98-9, p. 26, ECF no. 98-10.  Moreover, the undisputed facts show that, since the supplemental chart chip was from 2015 and had never been updated, it did not show the breakwater in the harbor at Boca Chica.  *Id*.

3. "[T]he boat was lifted by a wave and went aground on an unmarked breakwater." ECF no. 107, p. 5.

   The undisputed facts show that the breakwater was absolutely marked and visible on all current charts.  ECF no. 98-8, p. 4, ECF no. 98-9, p. 26, ECF no. 98-10.  The breakwater was only "unmarked" on out-of-date charts, such as the supplemental chart chip in ANDERSSON's Garmin GPS which contained data only current as of 2015.  *Id*.

4. The breakwater "was shown in a sense" through lack of depth information.  ECF no. 107, p. 5.

   There is no "sense" in which the breakwater was shown on the Garmin GPS, and this statement by ANDERSSON is pure sophistry.  The Garmin GPS, which was only current as of 2015, showed no depth information.  ECF no. 107-20, p. 9.  Current, accurate charts available at the inception of the Policy and at the time of the loss clearly show the breakwater.  ECF no. 98-7, pp. 4-5.

**<u>No Disputes of Fact Prevent Awarding Summary Judgment to the Plaintiff</u>**
**<u>With Respect to the Breach of the Navigational Limits Warranty</u>**[2]

With respect to the Policy's navigational limits, there is one simple, inescapable problem for ANDERSSON.  ANDERSSON's proposed inclusion of Aves Island within the navigational limits is an absurd and unreasonable reading of the terms of the Policy because Aves Island does not always rise above sea level.  Under New York law, "[a] court should not interpret a contract in a manner that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'" _In re Lipper Holdings_, LLC, 1 A.D.3d 170; 766 N.Y.S.2d 561 (Mem) (1st Dep't 2003).

Under Fed.R.Evid. 201, this Court can take judicial notice of the fact that Aves Island sometimes becomes wholly submerged during hurricanes.[3]  Under New York law, it is impermissible to interpret the Policy's navigational limits in a way that leads to an absurd result. _Dreni v. PrinterOn America Corporation_, 2021 WL 4066635, p. 7 (S.D.N.Y.2021), _Lipper Holdings, LLC v. Trident Holdings, LLC_, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561 (1st Dep't 2003), _Mionis v. Bank Julius Baer & Co._, 301 A.D.2d 104, 109, 749 N.Y.S.2d 497 (1st Dep't 2002)

In the present case, accepting ANDERSSON's proposed reading, which includes Aves Island, would lead to the absurd result that the Policy's navigational limits would depend on the constantly varying weather.  At the very moment when ANDERSSON's vessel is at sea, a hurricane might cause the submersion of Aves Island and the immediate adjustment of the Policy's

---

[2] Although the pending motion filed by GLI (ECF no. 97) only requests summary judgment based on ANDERSSON's breach of the express and implied seaworthiness warranties, the absence of disputes of material facts means that this Court can award summary judgment to GLI _sua sponte_ on any of the bases raised in GLI's declaratory judgment action. _Federal Refinance Co., Inc. v. Klock_, 352 F.3d 16, 32 (1st Cir.2003), _Goldstein v. Fidelity and Guar. Ins. Underwriters, Inc._, 86 F.3d 749, 750 (7th Cir.1996), _Andrews v. DuBois_, 888 F.Supp. 213, 220 (D.Mass.1995), _Gerber v. Longboat Harbour North Condominium, Inc._, 757 F.Supp. 1339, 1340 (M.D.Fla.1991), _Doe v. U.S. Civil Service Commission_, 483 F.Supp. 539, 571 (S.D.N.Y.1980).
[3] https://earthobservatory.nasa.gov/images/6667/aves-island.  Under Fed.R.Evid. 201, this Court can take judicial notice of facts publicly available from government agencies, such as NASA.  _United States v. Aerojet Rocketdyne Holdings, Inc._, 381 F.Supp.3d 1240 (E.D.Cal.2019).

navigational limits.   It cannot be reasonable to interpret the Policy's express navigational limits as being reduced due to the vagaries of an unpredictable event, in precisely those situations in which the exigency of dealing with a hurricane makes it absolutely vital to seek the shelter of shore.  If ANDERSSON's interpretation were accepted, a vessel which is otherwise within the Policy's navigational limits would suddenly find itself in violation of those limits at the precise moment that an uncontrollable exigency causes Aves Island to disappear below the waves.

Therefore, the only reasonable interpretation of the express terms of the Policy's navigational limits warranty is that Aves Island, which is sometime above the water and sometime below, cannot be included.

When Aves Island is properly excluded from the Policy's navigational limits, all that remains is the totally undisputed facts stated in the expert report and the deposition of Andrew Ball (hereinafter "Ball"), that it remains physically impossible that ANDERSSON's vessel maintained the constant speed of 11.2 knots necessary to navigate from Aruba to the Dominican Republic within the known time without deviating from the Policy's navigational limits.  ECF no. 107, p. 121, Ball's expert report is attached hereto as Exhibit 1.  Therefore, the facts are undisputed that ANDERSSON violated the Policy's navigational limits.  Under its express terms, this voids the Policy from inception, with the result that the Policy affords no coverage for the loss.

## GLI Could Not Waive Any Defenses

It is a rule universally recognized that an insurer might, by its acts or omissions, sometimes waive certain defenses.  However, under New York law, there is no rule whatsoever stating that an insurer waives all coverage defenses not specifically listed in its first reservation of rights letter.  Rather, the correct rule under New York law is that, even where an issue is not raised in communications with the insured, waiver does not apply where the issue is the existence or

nonexistence of coverage.  _See cases analyzed infra_.  Only issues ancillary to coverage can be

waived.  _Id_.  Since the unseaworthiness of ANDERSSON's vessel goes directly to the heart of the

"existence or nonexistence of coverage," no act by GLI can waive the issue.

 For instance, all policies of insurance contain provisions which require timely notice of a

loss.  _See_, _e.g._, _Weintraub v. Great Northern Insurance Company_, --- F.Supp.3d ----; 2021 WL

5562945 (S.D.N.Y.2021).  These provisions have nothing whatsoever to do with the coverage

afforded by the policy.  _Id_.  Such clauses merely impose a duty that is ancillary to coverage, a duty

to give the insurer prompt notice of a loss so that the insurer can investigate the loss and protect

its own rights.  _Id_.  Since these provisions have absolutely nothing to do with the scope of coverage,

they can sometimes be waived.  _Id_.  However, the cases analyzed below demonstrate that

absolutely nothing, no action or inaction by the insurer, can create coverage where the policy

affords none.  _See cases analyzed infra_.

 Moreover, counsel for ANDERSSON is selectively quoting the caselaw in a way that is

misleading.  ANDERSSON's summary judgment motion quotes this passage from _Juliano_:

"[U]nder the law applicable to insurance policies, an insurer may be barred from raising defenses

not asserted in communications to the insured denying coverage."  ECF no. 107, p. 11, _quoting_,

_Juliano v. Health Maintenance Organization of New Jersey, Inc._, 221 F.3d 279, 288 (2d Cir.2000).

However, counsel for ANDERSSON fails to mention that there is a crucial modifying sentence

which immediately follows, which drastically narrows the applicability of the quoted sentence,

and makes it wholly irrelevant to the present circumstances.  Notwithstanding the first quoted

sentence, the Second Circuit went on to write that, "even when insurance coverage is denied, where

the issue is the existence or nonexistence of coverage (e.g., the insuring clause and exclusions),

**_the doctrine of waiver is simply inapplicable_**."  _Id_ [emphasis added].

The _Juliano_ case arose out of a claim for health insurance coverage.  _Id_, at 282.  In its initial denial of coverage, the health insurer stated nothing except that the requested coverage was "not a covered benefit under the [USH] plan." _Id_, at 283.  It was not until four months later that the health insurer informed the insured that coverage was only afforded for care that was "medically necessary" under the express terms of the policy.  _Id_.  On summary judgment, the insured argued that the health insurer had waived the policy's "medically necessary" verbiage by failing to include any such refence in its first denial letter.  _Id_, at 287.  The district court disagreed and gave judgment to the health insurer.  _Id_.  As noted above, the Second Circuit's decision affirming the district court recognized that some defenses were subject to waiver, such as the requirement of timely notice. _Id_, at 288, _citing_, _State of N.Y. v. AMRO Realty Corp._, 936 F.2d 1420, 1431 (2d Cir.1991).  But, since the issue in _Juliano_ was "the existence or nonexistence of coverage," the "medically necessary" requirement could not be waived, notwithstanding the fact that this coverage issue was not raised in the very first denial letter.  _Id_.

When both sentences are read together, it is clear that _Juliano_ stands for the exact opposite of the proposition asserted by ANDERSSON.  _Juliano_ clearly states that the rule of waiver does not apply to the "existence or nonexistence of coverage."  _Id_, at 288.  Since the second sentence in the _Juliano_ decision follows immediately after the first sentence, it is a total mystery how counsel for ANDERSSON could have missed it.  In fact, since the present case is one that clearly involves "the existence or nonexistence of coverage" due to a breach of the express and implied seaworthiness warranties, it is a total mystery how counsel for ANDERSSON could conclude that the quoted sentence from _Juliano_ supports ANDERSSON's claim for coverage.[4]  Still, whatever

---

[4] Of course, it is inconceivably that ANDERSSON's counsel intended to deliberately mislead the Court. "For Brutus is a honorable man[.]" _Julius Caesar_, Act 3, Scene 2, line 82 (Julius Caesar (1953) - Mark Antony's Forum speech (starring Marlon Brando) - YouTube).

innocent explanation there is, counsel for ANDERSSON made a very serious mistake in misrepresenting the holding of the _Juliano_ case.

Similarly, the case of _State of N.Y. v. AMRO Realty Corp._ had absolutely nothing to say about the waiver of defenses pertaining to "the existence or nonexistence of coverage" under the policy. 936 F.2d 1420 (2d Cir.1991). Rather, _AMRO_ dealt solely with whether the insurer had waived the defense of late notice. _Id_, at 1429. Even though the insured waited several years to notify the insurer of the possible pollution liability, the Second Circuit found that the insurer waived the late notice defense by not raising it in a timely manner. Since the present case is one that clearly involves "the existence or nonexistence of coverage," it is a total mystery how counsel for ANDERSSON could conclude that the cited case supports ANDERSSON's claim for coverage.[5]

The only other case cited by ANDERSSON, _Luria_, is equally irrelevant. _Luria Bros. & Co., Inc. v. Alliance Assur. Co., Ltd._, 780 F.2d 1082; 1986 A.M.C. 1539 (2d Cir.1986). The _Luria_ case arose out of a vessel which initially suffered extensive damage from a fire. _Id_, at 1085. The loss was reported to the insurer and fully investigated. _Id_. But, due to various breaches of warranty, the insured and the insurer agreed that the policy afforded no coverage for the loss. _Id_. However, in order to get the vessel to a repair yard in Japan, the insurer agreed to extend very limited coverage for the single voyage. _Id_, at 1086. After the vessel sank on its voyage to Japan, the insurer denied coverage based on the contention that the insured breached the federal admiralty law duty of _uberrimae fidei_ ("utmost good faith") when it did not truthfully disclose the poor condition of the vessel when it sought to obtain the supplemental coverage for the single voyage

---

[5] Of course, it is inconceivably that ANDERSSON's counsel intended to deliberately mislead the Court. "For Brutus is a honorable man[.]" _Julius Caesar_, Act 3, Scene 2, line 82 (Julius Caesar (1953) - Mark Antony's Forum speech (starring Marlon Brando) - YouTube).

to Japan.  *Id*, at 1087.  On these facts, the Second Circuit held that the insurer had waived the material misrepresentation defense because it knew about the poor condition of the vessel, not when it first denied coverage, but ***at the time that the policy was issued***.  *Id*.  In fact, the insurer specifically knew that it was insuring a damaged vessel for a voyage to a repair yard.  *Id*. Therefore, the insurer could not disclaim coverage based on the contention that the insured had misrepresented material facts when obtaining the policy of insurance.  *Luria* would only be relevant to the present matter if ANDERSSON were contending that GLI knew his vessel had inadequate charts and that GLI knew it was being asked to insure this unseaworthy condition.[6]

The binding *Flack* decision from the Court of Appeals of New York makes ANDERSSON's false description of the caselaw perfectly clear.  *Albert J. Schiff Associates, Inc. v. Flack*, 417 N.E.2d 84 (N.Y.1980).[7]  *Flack* arose out of two policies of professional liability insurance purchased by an insurance agent.  *Id*, at 85.  The policies only covered the insurance agent when acting in its professional capacity, but also specifically excluded coverage for certain claims such as fraud.  *Id*.  In its initial declination of coverage, the insurer referenced only the policy's exclusions, but did not reference the policy's verbiage specifically stating that the policy only covered the insured when acting in its professional capacity.  *Id*.  Just as ANDERSSON presently contends, the trial court held that the insurer, by failing to reference the policy's coverage for the insured when acting in a professional capacity, waived this coverage defense.  *Id*.

For the precise reason stated in the *Juliano* decision, the Court of Appeals of New York reversed the trial court and held that the insurer could not waive a policy clause which specifically

---

[6] Of course, in relying on this case, it is inconceivably that ANDERSSON's counsel intended to deliberately mislead the Court.  "For Brutus is a honorable man[.]"  *Julius Caesar*, Act 3, Scene 2, line 82 (Julius Caesar (1953) - Mark Antony's Forum speech (starring Marlon Brando) - YouTube).

[7] As there is no entrenched rule of federal admiralty law pertaining to waiver, the Policy's choice of law clause requires that ANDERSSON's waiver defense be resolved under New York law.  ECF no. 98-3, p. 17.

stated what types of risks were covered. _Id_, at 86. The Court of Appeals of New York held that waiver cannot "create coverage, for the underlying coverage must be subsisting if the forfeiture is to serve any purpose. So, where the issue is the existence or nonexistence of coverage (e.g., the insuring clause and exclusions), the doctrine of waiver is simply inapplicable." _Id_, at 87. The Court of Appeals of New York specifically distinguished such coverage issues from secondary clauses, such as those which require timely notice of a loss. _Id_. The Court of Appeals of New York reasoned that, to allow waiver of a coverage defense pertaining to the existence or nonexistence of coverage would grant more coverage than the insured originally bargained for. _Id_.

Multiple cases since _Flack_ and _Juliano_ confirm that issues concerning "the existence or nonexistence or coverage" cannot be waived. For instance, the Second Circuit addressed this issue directly in the case of _In re Balfour MacLaine Intern. Ltd._, 85 F.3d 68; 1996 A.M.C. 2266 (2d Cir.1996). _Balfour_ arose out of a policy of marine insurance on a cargo of coffee. _Id_. When the loss occurred in 1990, the marine insurer did not immediately assert as a defense that the insured had failed to prove that the loss of the coffee did not occur during the period of the policy's coverage, despite having full knowledge of this defense. _Id_, at 82.[8] **_Five years later_**, the marine insurer attempted to raise this issue at the bench trial, but the district court ruled that this issue had been waived. _Id_. On appeal, the Second Circuit reversed the district court and held that since the issue of proof of when the loss occurred pertained to the scope of the policy's coverage, this issue could not be waived by its late assertion. _Id_. To do otherwise would give the insured coverage for a period of time that was not bargained for.

---

[8] Under federal admiralty law and New York law, the insured always bears the initial burden of showing and proving those facts which give rise to coverage. _Ingersoll Mill. Mach. Co. v. M/V Bodena_, 829 F.2d 293; 1988 A.M.C. 223 (2d Cir.1987), _Morrison Grain Co., Inc. v. Utica Mut. Ins. Co._, 632 F.2d 424; 1982 A.M.C. 658 (5th Cir.1980).

Similarly, in the case of _National Union Fire Ins. Co. of Pittsburgh, Pennsylvania v._ _Travelers Indem. Co._ concerned a policy of "all risks" coverage for a paper manufacturing plant. 210 F.Supp.2d 479 (S.D.N.Y.2002).  The insurer originally denied coverage based only on the insurance policy's one exclusion for "peril's insured elsewhere."  _Id_, at 482.  But, during the ensuing litigation, the insurer also sought to deny coverage based on the policy's other provisions which limited the types of covered losses and the types of covered property.  _Id_.  The Southern District of New York held that waiver could not apply because all of these new issues pertained to the existence or nonexistence of coverage.  _Id_, at 485.  "If the rule were otherwise, the insured would be allowed to extend its coverage beyond what was originally bargained for."  _Id_, _citing_, _Flack_, _supra_.

In the present matter, the Policy clearly states that it is void from inception, meaning that no coverage is ever afforded, if the Vessel is ever unseaworthy, either at the inception of the Policy or at any time during the life of the Policy.  Moreover, the same legal rule is implied by federal admiralty law at the inception of the Policy.  _Employers Ins. Of Wausau v. Occidental Petroleum_ _Corp._, 978 F.2d 1422; 1993 A.M.C. 1460 (5th Cir.1992), _Certain Underwriters at Lloyd's, London_ _Subscribing to Policy 200-451-8464 v. Johnston_, 124 F.Supp.2d 763, 771; 1999 A.M.C. 1452 (D.P.R.1999).  Under the Policy's express and implied terms, there was never any coverage for ANDERSSON's vessel if it was ever unseaworthy.  Therefore, as this is an issue that goes directly to the "existence or nonexistence of coverage," it cannot be waived.  Unlike the insured in _Luria_, ANDERSSON never bargained for a policy that would cover an unseaworthy vessel.  To hold otherwise would be to force GLI to afford coverage for a vessel that that was unseaworthy.  To hold otherwise would be to grant ANDERSSON coverage that was never bargained for.

## **ANDERSSON's Vessel Was Unseaworthy Due to Total Lack of Updated, Accurate Charts**

ANDERSSON's vessel was unseaworthy, meaning that it was unfit for its intended use, at the inception of the Policy and at the time of the grounding, because the facts are undisputed that it had no paper charts of Florida, the Bahamas, the Dominican Republic, Puerto Rico, or St. Croix. and did not have up-to-date electronic charts.  ECF no. 110, p. 3.  ANDERSSON's vessel never had any charts showing the breakwater in Boca Chica.  Ex 8, p. 4, Ex 9, pp. 26-28, Ex 10.  These deficiencies rendered the Vessel unfit for its intended use at the inception of the Policy and at the time of the loss.

Under federal admiralty law, every policy of marine insurance contains an implicit warranty that the insured vessel is seaworthy at the inception of the policy.  _Employers Ins. of Wausau v. Occidental Petroleum Corp._, 978 F.2d 1422; 1993 A.M.C. 1460 (5th Cir.1992).  "[F]ederal maritime law implies two warranties of seaworthiness in a time hull insurance policy.  The first of these warranties—the implied warranty of seaworthiness at the inception of the policy—is absolute in nature.  The second one, which applies only after the policy attaches, is a modified, negative warranty, under which the insured promises not to knowingly send a vessel to sea in an unseaworthy condition.  Although the second implied warranty of seaworthiness requires knowledge on the part of the insured, the first does not.  The insured breaches this first warranty if the vessel is in fact unseaworthy when the policy becomes effective."  _Id_, at 1431-32, _McAdam v. State Nat. Ins. Co., Inc._, 28 F.Supp.3d 1110, 1122 (S.D.Cal.2014), _Axis Reinsurance Co. v. Resmondo_, 2009 A.M.C. 2597 (M.D.Fla.2009), _Royal Indem. Co. v. Deep Sea Intern._, 619 F.Supp.2d 14, 26; 2007 A.M.C. 1872 (S.D.N.Y.2007), _The Connecticut Indem. Co. v. Palivoda_, 2005 A.M.C. 2047 (M.D.Fla.2005), _Certain Underwriters at Lloyd's, London Subscribing to Policy 200-451-8464 v. Johnston_, 124 F.Supp.2d 763, 771; 1999 A.M.C. 1452 (D.P.R.1999), _Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)_, 952 F.Supp. 1046, 1068; 1997 A.M.C.

1099 (S.D.N.Y.1997), *aff'd*, 134 F.3d 103; 1998 A.M.C. 964 (2d.Cir.1998).  To show a breach of the first implied warranty of seaworthiness, there is no need to show that the insured is at fault for the unseaworthy condition or that the unseaworthy condition played any role whatsoever in the loss.  *Id*.  Under the first implied warranty of seaworthiness, if a vessel is unseaworthy at the inception of the policy of marine insurance, coverage is absolutely barred.  *Id*.

In addition, the Policy also contains its own express warranty of continuing seaworthiness. The Policy states, "It is warranted that the Scheduled Vessel is seaworthy at all times during the duration of this insuring agreement.  Breach of this warranty will void this insuring agreement from its inception."  Ex 3, p. 12.  By it terms, breaching this express warranty of seaworthiness does not require GLI to show that the ANDERSSON was at fault for the unseaworthy condition or that the unseaworthy condition caused the loss.  *Id*.  Under the Policy's express warranty of seaworthiness, if ANDERSSON's vessel was unseaworthy, coverage is absolutely barred.  *Id*.

Based on the express and implied seaworthiness warranties, the only question before this Court is this: did the total lack of updated, accurate charts render ANDERSSON's vessel unseaworthy at any time?  If the answer is "yes," then coverage is absolutely barred under the express and implied terms of the Policy.

The federal courts have long held that a vessel which lacks adequate, up-to-date charts is unseaworthy as a matter of law.  *Union Oil Company of California v. M/V Point Dover*, 756 F.2d 1223, 1229 (5th Cir.1985), *Director General of India Supply Mission for and on Behalf of President of Union of India v. Steamship Maru*, 459 F.2d 1370, 1372; 1972 A.M.C. 1694 (2d Cir.1972).  This rule has been recognized as far back as 1937.  *The Maria*, 91 F.2d 819; 1937 A.M.C. 934 (4th Cir.1937).  *The Maria* began exactly like the present case, with a vessel which became stranded on shoals off the mouth of Cape Fear.  *Id*, at 820.  The trial court found that the

vessel had not been equipped with accurate sailing charts or other navigational equipment correctly setting out the position of a lightship and a buoy marking the shoals.  *Id*.  On appeal, the Fourth Circuit wrote, "Our view of the law, now that the point has been definitely raised, is that charts, light lists, and similar navigational data are essential equipment for the safe navigation of a ship, ***that she is unseaworthy without them***, and it is the duty of her owner to supply them."  *Id*, at 824 [emphasis added].

The next year, the Second Circuit applied this rule in *The W.W. Bruce*, 94 F.2d 834; 1938 A.M.C. 232 (2d Cir.1938).  *The W.W. Bruce* began when two vessels collided in Craighill Channel in Chesapeake Bay.  *Id*, at 835.  Since the vessel lacked the necessary up-to-date charts, the Second Circuit held that the vessel was unseaworthy, and that the vessel owner could not seek indemnification from the owner of the cargo.  *Id*, at 837.

Two years later, this rule was repeated by the District of Oregon in *The Iowa*, which concerned a vessel that ran aground on Peacock Spit at the mouth of the Columbia River.  34 F.Supp. 843; 1941 A.M.C. 111 (D.Or.1940).  The facts found at trial established that, even though the master of the vessel had many years of experience navigating these waters, the vessel remained unseaworthy because it lacked up-to-date charts showing the river's aids and hazards to navigation. *Id*, at 847.

In 1972, this issue arose in another grounding which occurred in the channel of Freeport, Grand Bahama Island.  *Steamship Maru*, *supra*.  It was established at trial that the vessel's charts were almost twenty years old and inaccurate.  *Id*, at 1372.  Therefore, the Second Circuit held that the vessel was unseaworthy.  *Id*.

The next year, the Western District of Kentucky applied this rule in a subrogation case arising out of an allision on the Ohio River.  *Protection Maritime Ins. Co. Ltd., of London, England*

_v. U.S._, 368 F.Supp. 690 (W.D.Ky.1973).  The vessel at issue was a tug that was pushing barges down the Ohio River when it struck an underwater mooring cell.  _Id_, at 690-91.  The district court held that the insurer could not recover because the absence of current, accurate charts rendered the vessel unseaworthy.  _Id_, at 692.

The District of Puerto Rico reached the same conclusion in 1978 in another case involving a vessel which lost its way and "ran out of water[.]"  _Commonwealth of Puerto Rico v. The S.S. Zoe Colocotroni_, 456 F.Supp. 1327, 1332; 1979 A.M.C. 21 (D.P.R.1978).  The district court held that the vessel was unseaworthy due to the lack of paper charts of the area where the vessel was navigating.  _Id_, at 1333, _aff'd in part_, _vacated in part_, 682 F.2d 652, 1981 A.M.C. 2185 (1st Cir.1980), _cert. denied_, 450 U.S. 912, 101; 1981 A.M.C. 2099 (1981).

In 1980, this issue was addressed by the Southern District of New York in a case involving a cargo vessel whose chart was a single month out of date.  _In the Matter of Complaint of The Thebes Shipping Inc._, 486 F.Supp. 436; 1908 A.M.C. 1686 (S.D.N.Y.1980).  Based on this fact, a chart which was a single month out of date, the district court found that the vessel was unseaworthy, and that the vessel owner was therefore not entitled to limitation of liability.  _Id_.

This issue arose again the next year in the case of _In the Matter of Complaint of Delphinus Maritima_, a case which concerned a vessel overloaded with cargo.  523 F.Supp. 583; 1981 A.M.C. 2362 (S.D.N.Y.1981).  At the time of the grounding, there was no large-scale map of the waters surrounding Bermuda.  _Id_, at 590.  Therefore, the Southern District of New York held that "[t]he vessel was unseaworthy in that it failed to have a large scale map of Bermuda on board."  _Id_, at 594.

Similarly, the case of _Traylor Bros., Inc. v. Tug Robert Greene_ arose out of allision between a tug, which was pulling barges, and a cofferdam on the Mississippi River.  1986 WL 12229

(E.D.La.1986).  The tug's chart was three years old and had not been updated to show the cofferdam.  *Id*.  Therefore, the Eastern District of Louisiana held that "the M/V ROBERT GREENE was unseaworthy because of its lack of updated charts."  *Id*, at p. 4, *citing*, *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140; 1971 A.M.C. 2131 (5th Cir.1971).

The Eastern District of Louisiana issued the same ruling in the case of *In re TT Boat Corp.*, 1999 A.M.C. 2766; 1999 WL 223165 (E.D.La.1999).  *TT Boat Corp*. arose out of a tug which allided with a fixed oil drilling platform.  *Id*, at p. 1.  At the time of the allision, the vessel was only equipped with an out-of-date version of Chart 11358, which did not show the fixed oil drilling platform.  *Id*, at p. 3.  However, the then current version of Chart 11358 did show the fixed oil drilling platform.  *Id*.  Therefore, the Eastern District of Louisiana held that, "[w]ithout a current 11358 on board, the GULF CAJUN was unseaworthy when it began its voyage."  *Id*, at p. 5.

Finally, the same conclusion was reached in the case of *Matter of Complaint of Supreme Towing Co., Inc.*, 2010 WL 11561150 (E.D.La.2010).  *Supreme Towing* began with a tug, the M/V CAPTAIN BRENNAN, which was equipped with a paper chart issued in 1982 and an electronic chart in the vessel's GPS system issued in 2004.  *Id*, at p. 3.  Just like ANDERSSON's GPS in the present matter, the GPS aboard the M/V CAPTAIN BRENNAN was never updated with current charts.  *Id*.  When the vessel struck an oil well, the owner of the vessel filed a limitation of liability petition in the federal court.  *Id*.  At the time of the allision, the vessel's GPS chart was three years out of date.  *Id*.  Based on the undisputed evidence that the M/V CAPTAIN BRENNAN had an outdated paper chart and an outdated GPS chart, the Eastern District of Louisiana denied the limitation petition because these deficiencies rendered the tug unseaworthy.  *Id*, at p. 22.

In the light of this clear caselaw, the present matter is entirely resolved by these indisputable facts:

1.  The electronic chart in the Garmin had not been updated since 2015, was four years out of date, and did not show the breakwater on which ANDERSSON's vessel ran aground.

2.  The Raymarine contained no detailed charts for any part of Florida, the Bahamas, or the Caribbean and did not show the breakwater on which ANDERSSON's vessel ran aground.

3.  ANDERSSON's vessel had no paper charts for Florida, the Bahamas, Puerto Rico, or the Dominican Republic and had no paper chart showing the breakwater on which ANDERSSON's vessel ran aground.

4.  Current, accurate charts showed the breakwater on which ANDERSSON's vessel ran aground.

Applied to the present matter, the inescapable conclusion is that ANDERSSON's vessel was not fit for its intended purposes; that is, to navigate in the waters for which it was insured (Florida, the Bahamas, and the Caribbean Sea).

WHEREFORE, GLI asks that this Court find that ANDERSSON's vessel was unseaworthy at the inception of the Policy and at the time of the loss, that the Policy is therefore void from its inception, and that this Court award all such further relief as may be appropriate in the premises.

Dated: July 21, 2022
Brookline, Massachusetts

GOLDMAN & HELLMAN
Attorneys for Plaintiff
233 Harvard Street
Suite 211
Brookline, MA 02446
Tel (617) 566-4200
Cel (617) 671-8657
Fax (617) 566-4292

By:        /s/ Michael I. Goldman
        MICHAEL I. GOLDMAN ESQ.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Court using the CM/ECF System which will provide and electronic notice to all counsel, of record.

Dated: July 21, 2022
Brookline, Massachusetts

GOLDMAN & HELLMAN
Attorneys for Plaintiff
233 Harvard Street
Suite 211
Brookline, MA 02446
Tel (617) 566-4200
Cel (617) 671-8657
Fax (617) 566-4292


By: _____/s/ Michael I. Goldman_____
MICHAEL I. GOLDMAN ESQ.