**CARIBBEAN MARINE SURVEYORS LTD.**

BVI OFFICE - NANNY CAY, TORTOLA
+1 (284) 346-2091
info@caribsurveyors.com

FAX: +1 (800) 851-2754
WWW.CARIBSURVEYORS.COM

GRENADA OFFICE - CLARKE'S COURT
+1 (473) 457-1576
grenada@caribsurveyors.com

Monday August 16th, 2021

Michael I. Goldman Esq.,
Goldman & Hellman
233 Harvard St., Suite 211
Brookline, MA 02446

## INCIDENT ASSESSMENT

| | |
|---|---|
| Vessel Name: | Melody |
| Port of Registry: | St John, USVI |
| Assured: | Martin Andersson |
| HIN: | CAT47120B000 |
| Vessel Description: | 2000 model Catana 471 FRP sloop rigged catamaran with twin auxiliary diesel engines. Approximate dimensions 47'L x 25'B x 5'D (measurements not taken). |
| Policy #: | CSRYP/172119 |

The purpose of this report is to summarise and comment upon information provided by Insurers and the Assured following the stranding of the vessel Melody in the Dominican Republic on December 17th, 2019. This information includes, but is not limited to:
- Knowledge and interpretation of details observed during the post-incident survey, on site in the Dominican Republic on Saturday December 21st, 2019.
- The signed statement provided following the incident on December 23rd, 2019.
- The original Condition & Evaluation for Purchase Survey of the vessel prior to the Assured's purchase, dated November 7th, 2018.
- Court documents filed by The Assured's attorneys on December 5th, 2020.
- Transcripts of a partial deposition by The Assured, on June 4th, 2021.

NAVIGATIONAL LIMITS

I refer to our report on "Failure to Remain Within Policy Navigational Limits" dated September 4th, 2020 to detail the finer points of this and update based on the new information provided from the Transcripts from the Partial Deposition previously noted as follows:

The deposition transcript mainly and repeatedly states that Mr. Andersson was unaware of his exact position or course. It further states that no logbook or paper charting was being undertaken. It is the duty of a prudent mariner to ensure that up-to-date charts and



publications such as Almanacs and Cruising Guides are kept on board. The Assured has reported that there were no paper charts on board for the Dominican Republic.

The deposition provides no data to support his claim of remaining within the navigation limits and completing the voyage within the established timeline. In the parts of the voyage that the Assured can remember in his deposition, the vessel never attained the average of 11.2 knots required to cover the allotted distance whilst remaining within the navigational limits of the policy.

In summary, it is not possible for the vessel to have travelled from Aruba to The Dominican Republic in three days while remaining within the navigation limits of the policy.

PASSAGE PLANNING AND EMERGENCY ACTION

In the recent deposition, The Assured states that he checked the weather along his intend route using websites prior to his departure and that no prohibitive weather was forecast. He later states that the weather was so bad that he felt unsafe turning the vessel around to run from it and head to a close-by safe port because "the wind and the waves could have easily pushed the boat sideways and capsized it" in his Deposition on page 201.

Data obtained from the National Buoy Data Center of the National Oceanic and Atmospheric Administration utilizing the Caribbean Valley Station (42060) indicates wind speeds of up to 17kts and wave heights of up to 2.3m with an average period of approximately 6 seconds between December 14th and December 17th, 2019. This station is 63 nautical miles West Southwest (towards Aruba) from Montserrat, which is close to St Maarten. These are not the actual conditions for this vessel but confirm the assured's statements that the winds were about 17 knots gusting 25 knots. This is normal and customary weather for this area at this time of the year. This vessel is designed for ocean cruising. With a partly reefed mainsail and partly reefed jib, the vessel would have been completely safe from capsize in these weather conditions. We can see no weather in the Caribbean at this time which could have impacted his decision to return to Aruba or other safe downwind destination.

The Catana 471 was designed as an offshore cruising catamaran. If maintained properly, there is no reason that it should be unable to navigate the weather conditions reported by NOAA in a safe fashion with even the most inexperienced helmsman. The vessel will have been provided with stability information in order to aid with sail planning and at all times there would have been the option to proceed under power alone. The Assured reported departing Aruba with approximately 200 gallons of diesel on board, which would indicate full tanks. The vessel would be most at risk whilst heading across the wind, however the conditions would have to be close to those of a Tropical Storm prior to posing a risk to a seaworthy vessel and crew. When heading downwind (a reversed course to that reported, back to the point of departure) this risk is greatly reduced, and there is no way this should have posed a risk to the vessel or crew in the reported conditions.



The Assured notes in his deposition that he is not aware of what leeway is. It is defined as the sideways drift of a ship to leeward of the desired course. In addition the Caribbean Current pushes from the east to the west at an average of about 1 nautical mile per hour. One of the Assured's statement was that the initial course was to St Maarten would have been "sailing to the wind" and putting the bow as close to the wind as possible, and this fits with his statement of sailing as close to the wind as possible on page 174 of his recent Deposition. The combination of leeway and set applied to that heading over the distance of this voyage would have pushed the vessel off course and ended it up somewhere around the Dominican Republic.

It appears that poor passage planning and the failure of the Assured to understand basic planning relating to leeway and set, directly lead to the destination in the Dominican Republic as we would expect with this vessel and these weather conditions.



SUMMARY
1. The vessel sailed outside the navigational limits.
2. The passage planning was completely inadequate.
3. The conditions reported would not have rendered the vessel anywhere near a state where it was unsafe to return to a nearby safe port, provided it was well maintained and had adequate crew.
4. The voyage was unseaworthy from the outset and the situation worsened as the voyage continued.

**SURVEYOR'S CERTIFICATION**

I certify that, to the best of my knowledge and belief: The statements of fact contained in this report are true and correct. The reported analysis, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions. I have no present or prospective interest in the vessel that is the subject of this report, and I have no personal interest or bias with respect to the parties involved. My compensation is not contingent upon the reporting of a predetermined value or direction in value that favours the cause of the client, the amount of the value estimate, the attainment of a stipulate result, or the occurrence of a subsequent event. I have made a personal inspection of the vessel that is the subject of this report. This report should be considered as an entire document. No single section is meant to be used except as part of the whole. This report does not constitute a warranty, either expressed, or implied, nor does it warrant the future condition of the vessel. It is a statement of the condition of the vessel at the time of survey only.

ATTENDING SURVEYOR:

Andrew G. Ball
SAMS SA   |   IAMI# 04122   |   MCA Master 200GT