UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
IN ADMIRALTY

GREAT LAKES INSURANCE SE,

    Plaintiff,

                                    CASE NO. 4:20-cv-40020-DHH

vs.

MARTIN ANDERSSON,

    Defendant.
_____/

**REPLY MEMORANDUM OF MARTIN ANDERSSON**

    COMES NOW Defendant MARTIN ANDERSSON (hereinafter "ANDERSSON"), by and through his undersigned counsel and pursuant to F.R.C.P. 56 and Local Rule 56.1 of the United States District Court for the District of Massachusetts and files his Reply Memorandum to GLI's summary judgment opposition filed on July 21, 2022 (DE 114). Further thereto, Andersson respectfully states:

**I.    INTRODUCTION**

    Perhaps one of the most difficult tasks a litigation attorney can encounter is responding to written memoranda littered with personal attacks and obfuscation. It feels like driving down the road after one's windshield has been sprayed with mud by a large truck. Suddenly, the road disappears and one can only see dirt! In addressing dangerous mud spatter one must keep a clear mind, apply wiper fluid, and use windshield wipers to get a clear view again. Paraphrasing the sage advice of the Honorable Susan C. del Pesco, for whom the undersigned clerked after law school: "When a brief is full of personal attacks, look very carefully. Most lawyers won't do that unless they have nothing else to go on." The purpose of this memorandum is to apply wiper fluid (the facts) and windshield wipers (the law) to the mud GLI has slung in its desperate attempt to

avoid facing the impact of its bad coverage decision. Once one has a clear view, it is obvious the only just result in this matter is partial summary judgment for Andersson.

## II. LEGAL AND FACTUAL ARGUMENT

In opposing Andersson's Motion for Partial Summary Judgment, GLI throws mud and ignores the clear facts raised by Andersson's motion and the admissions of GLI's own witnesses.[1] Then GLI travels into a fantasy land of its own making and attempts to evade the reality of its expert's mistake by arguing that an island is not land. While creative, these arguments do not hold water, and just further serve to highlight the need for the coverage aspect of this matter to be disposed of by summary judgment.

### A. GLI's Opposition Offers No Evidence to Oppose Andersson's Recitation of Undisputed Facts

Where there can be cross-motions for summary judgment, each motion must stand on its own. D. Mass. L.R. 56.1 clearly requires supporting evidence to be attached to the opposition, stating in pertinent part: "A party opposing the motion **shall** include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation. **Copies of all referenced documentation shall be filed as exhibits to the motion or opposition**." (emphasis added). Attaching the relevant evidence is not an option. The Court's consideration of GLI's factual arguments should end there, as GLI has provided supporting evidence for exactly none of its factual arguments.[2] Instead, GLI cites to its own, separate motion for summary judgment and its

---

[1] Shakespeare is not precedent, but in the spirit of levity in such a grave situation it must be said that GLI "doth protest too much, methinks." *Hamlet*, Act III, Scene ii.

[2] Both D. Mass. L. R. 56.1 and the Federal Rules permit summary judgment to be granted in Andersson's favor based upon GLI's failure to oppose the facts raised by Andersson with attached evidence. The Federal Rules are a bit more lenient but leave the decision to the court – a decision this Court has clearly expressed through Local Rule 56.1. See Fed. R. Civ. Proc. 56(c)(3). If a party fails to properly support or address a fact, this Court may "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show the movant is entitled to it." Fed. R. Civ. Proc. 56(e)(3).

attachments (DE 98 and related attachments) as well as to Andersson's opposition to that motion (DE 107) as if those arguments are "evidence" in support of GLI's factual allegations herein. See DE 114 at 2-4. The only evidence cited and attached to GLI's opposition is the expert opinion of Andrew Ball filed as DE 114-1, which GLI cites in support of its argument that the navigational warranty was violated. Mr. Ball conceded in his own deposition that his distance calculations and resulting expert opinion were rendered in error due to his omission of Aves Island from his distance calculations. Ball testified new calculations would need to be made in light of that error. DE 107-12 at 116/19-24. No corrected calculations were ever provided so Mr. Ball's opinion is, by his own admission, irrelevant.

With no admissible evidence to counter Andersson's statement of undisputed material facts, all the facts as stated by Andersson should be accepted by this court as undisputed.[3]

### B.   Under New York law, warranty arguments raised by GLI that are not included in their reservation of rights letter are waived.

GLI's reservation of rights letter states coverage could be avoided on two limited arguments: 1) first, GLI recited the navigational warranty from the policy and stated: "A direct course from Aruba to St. Martin takes the Vessel far beyond these bounds, proceeding further West to Santo Domingo would do the same," after which GLI quoted provision (t) of the policy's "General Conditions and Warranties" section.[4] This provision states, "[w]here any term herein is referred to as a "warranty" or where any reference is made herein to the word "warranted", the term shall be deemed a warranty and regardless of whether the same expressly provides that any breach will void this insuring agreement from inception, it is hereby agreed that any such breach

---

[3] Andersson refers the Court to the Concise Statement of Material Facts and the related attachments contained in and attached to DE 107.
[4] The location of this quote in the policy is not stated in the letter, but can be easily verified in the policy itself. See DE 110-13 at 15.

will void this policy from inception." Finally, the letter quotes the policy definition of the term, "Seaworthy" and argues that the vessel was not seaworthy for three reasons: 1) the lack of a functional VHF radio on board the Vessel was a contributing factor to the loss; 2) "the procedure into a port in the dark with no local paper charts, no local cruising guide, no local knowledge, and what appear to be defective, outdated, or absent electronic charts"; and 3) "the crew was reported to have been seasick shortly after leaving Aruba which became worse until arrival at Santo Domingo. The surveyor is of the opinion that as a result, the crew were subsequently ineffective on arrival in Santo Domingo." No further communication was made by GLI to inform Andersson of its basis for denial until after the filing of this lawsuit. GLI's arguments rely heavily on the first and second warranties of seaworthiness arising under the common law of admiralty but the reservation of rights letter does not mention these common law warranties. Under New York law, having failed to raise these common law warranties in its reservation of rights letter, they have been waived.

There is no dispute that New York law applies to issues relating to the construction and application of GLI's policy to the facts of this case. GLI makes great hay of implying Andersson's brief has hidden important precedent from the Court. This mud on the windshield obstructs the real situation: both the navigational warranty and the warranty of seaworthiness are categorized in the GLI policy under the heading "General Conditions and Warranties" for a clear reason. Conditions and warranties are not the same as coverage provisions or exclusions.

Andersson's memorandum of law quoted *Doe v. Cigna Life Insurance Company of New York*, 00-cv-1018S(F) at *19 (W.D.N.Y. Sep. 11, 2003), which internally quoted *Juliano v. Health Maintenance Organization of New Jersey,* 221 F.3d 279, 288 (2d Cir. 2000) for the premise that GLI's arguments not raised in the reservation of rights letter have been waived. Although counsel

could have continued the quote through to its end as GLI argued it should, the selection was made in the interest of brevity, not to mislead the Court as GLI argues over six pages of its opposition. See DE 114 at 6-12. GLI repeats the phrase "existence or nonexistence of coverage" nine times, like a magic mantra, willing it to have legal significance it does not have. Meanwhile, all the cases cited by GLI follow that phrase with the qualifier "(e.g., the insuring clause and exclusions)."

One of the most basic aspects of interpreting an insurance policy is understanding that the policy is read as a whole, and that insurance policies have different sections with different purposes. The Court's interpretation of a policy is informed by that structure.

GLI's decision to collectively list "General Conditions and Warranties" under one heading has meaning. These provisions are treated differently than insuring agreements or exclusions. When courts refer to "the existence or nonexistence of coverage (e.g., the insuring clause and exclusions)," they are referring to the parts of the insurance policy that express what coverage is given by the policy (insuring clauses) and what coverage is taken away by the policy (exclusions). For example, in this case Andersson is seeking coverage under Coverage A, which only covers losses for: . So, by its own terms, the coverage is for:

1) accidental physical loss or damage;
2) to the Scheduled Vessel;
3) the damage must have occurred during the period of the insuring agreement; and
4) the damage must have occurred within the limits set out in the insuring agreement.

DE 107-24 at 6.[5] Under the law of New York, the burden is on the insured to prove the claim falls within the bounds of the coverage provided by the insuring agreement. Andersson has met that burden. There is no dispute there was accidental physical loss of or damage to Melody; Melody

---

[5] Specific information identifying the Scheduled Vessel, the limits of the policy (in this case navigational limits) and the term of the policy are set out in the Policy Schedule attached to the policy. See DE 107-24 at 2-3.

was the Scheduled Vessel, the damage occurred during the period of the insuring agreement, and the damage occurred within the limits set forth in the insuring agreement (within wading distance from shore in the Dominican Republic).

The next step is the consideration of whether an exclusion applies. The burden of proving the application of an exclusion, which acts to eliminate coverage, is on the insurer. In the GLI policy, there are several exclusions applicable to Coverage A, none of which apply to Andersson's claim. See DE 107-24 at 7-8.

Separate and apart from the coverage and exclusion provisions of the policy described above and treated as an exception to the waiver rule under New York law, the policy contains several warranties and conditions, many of which could have the effect of completely eliminating coverage as if the policy never existed. None of these conditions or warranties are the type of provisions describing "the existence or nonexistence of coverage (e.g. the insuring clause and exclusions)" as discussed in the caselaw relied upon by GLI. Instead, they depend on issues known to the insured and/or within the insured's control like representations made by the insured, actions of the insured, the timeliness of the claim, or factual issues relating to aspects of the vessel such as equipment. This policy contains numerous conditions and warranties relating to the use of the vessel, the maintenance of the vessel, representations made in the application, the sale of the vessel, the agency to be accorded brokers, the disposition of abandoned property, compliance with laws and regulations, the maintenance of fire equipment, the impact of settlement of a claim without the insurer's agreement, the impact of nondisclosure or misrepresentation of facts, the impact of war, contamination, capture, or other like scenarios, the impact of action taken to protect damaged or endangered property, racing or speed trials, time allowed to comply with recommendations in a survey, depreciation of equipment in the case of a partial loss, and many other issues. See DE

107-24 at 13-17. Although these conditions and warranties can have the effect of limiting or eliminating coverage, conditions and warranties are not exempted from the New York waiver law limiting insurers to the denial arguments expressed to their insureds through a reservation of rights or denial letter. NY's waiver law eliminates GLI's warranty arguments made under admiralty common law. That said, and as expressed below, GLI's warranty arguments fail anyway.

      **C.    Both the navigational warranty argument raised by GLI in its reservation of rights letter and the broader navigational warranty argument raised later through GLI's expert witness Mr. Ball must fail, as they are not supported by evidence.**

The navigational warranty argument raised by GLI in its reservation of rights letter is limited to the position that a direct course from Aruba to Sint Maarten or from Aruba to the Dominican Republic violates the policy's navigational warranty. Andersson does not disagree that if those were the facts the navigational warranty would have been violated. However, those are not the facts. GLI does not dispute Andersson set out upon a planned course that should have kept him within the policy's navigational limits.[6] Andersson has provided a detailed timeline and evidence proving that he probably did, in fact, comply with the navigational limits set forth in the policy. If the Court honors New York's waiver law, this consideration ends here.

GLI has provided no evidence to contradict Andersson's argument with regard to the navigational warranty. The best evidence of the actual route taken by the vessel would be the track which would have been saved on the hard drive of the Garmin GPS chartplotter.[7] Andersson has provided detailed testimony through both his incomplete deposition and his affidavit about the timeline of the voyage and retained two experts, Captain Geiger and Mr. Setzer, who reviewed the

---

[6] For the specific fact references to the timeline and facts relied upon by Andersson in his motion, Andersson refers to and restates herein his Concise Statement of Material Facts, DE 107 at 1-9.

[7] Due to GLI's failure to remove that device from the vessel as it had informed Andersson through its surveyor Mr. Ball that it would do, the device was subsequently broken and damaged by saltwater corrosion and the information is not available to the parties.

detailed information about the voyage and rendered opinions that Melody could have covered the distance required to avoid violating the navigational warranty given the weather, sea conditions, and characteristics of the boat. Both agreed that it was possible for Andersson to have remained within the warranty's limits. The only "evidence" GLI has presented to contradict the evidence presented by Andersson is a report prepared by its expert witness, Mr. Ball, who conceded his conclusions were invalid because he failed to consider Aves Island. Aves Island is marked on charts and its existence results in the eastern boundary of the navigational limit being much further to the west than Ball believed. Ball indicated he would have to re-do his calculations taking that information into account, but no revised report was ever provided.

GLI raised for the first time in its opposition a theory that, because a NOAA photograph posted on its website shows Aves Island can sometimes be swamped in a hurricane, Aves Island cannot be considered land. This argument has zero basis in law or fact. First, the policy does not define "land," which means under New York law the Court should apply the term using common language meeting the reasonable expectations of the parties. GLI has offered no evidence on that front. Nowhere in the policy does it say land is only land if it is dry during a hurricane. The complete lunacy of this proposed interpretation can be seen if one considers how many locations in the coastal United States, including in some cases areas located many miles inland, have been underwater during a hurricane. GLI's proposed interpretation would quite literally eliminate parts of Massachusetts and Rhode Island, lower Manhattan, much of the Jersey Shore, barrier islands located in New Jersey, Delaware, Maryland, Virginia, North and South Carolina, Georgia, Mississippi, Alabama, Louisiana and Florida from being considered "land." Several of the islands of the Bahamas, which only stand a few feet above sea level, and which are no doubt also used in navigational warranty computations, would not be "land." The Brickell Avenue financial district

located in the City of Miami and much of Miami Beach would likewise not be "land." Although laudable for its creativity, this argument cannot be taken seriously by the Court. Summary judgment must be granted to Andersson and against GLI with regard to Count I of GLI's Complaint and Count I of Andersson's Counterclaim.

### D. GLI's arguments regarding the warranty of seaworthiness are not supported by the facts or the law.

GLI's reservation of rights letter, raises seaworthiness arguments related to: 1) the lack of a working VHF radio, 2) the policy's warranty of seaworthiness provision and specifically, the allegation that the vessel was unseaworthy due to a lack of detailed charts for the Dominican Republic, and 3) the condition of the crew which GLI argued was insufficient due to Andersson's crew member becoming seasick. GLI's positions veer far beyond these arguments including two admiralty common law warranties of seaworthiness, neither of which is mentioned by the reservation of rights letter and are therefore waived.

#### 1. GLI's Complaint does not plead any facts supportive of a warranty of seaworthiness claim.

One need only reference the Complaint to see GLI did not raise the warranty arguments listed in its reservation of rights letter. In fact, GLI did not allege ANY facts supportive of its Count II asserting the warranty of seaworthiness was breached. See DE 1 at 2-3 and 5-7. This alone should be sufficient to grant summary judgment on GLI's Second Cause of Action.

Fed. R. Civ. Proc. 8(a)(2) requires the pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief," which the Complaint fails to do by lacking any factual allegation regarding what GLI contends constitutes unseaworthiness. GLI has not raised any argument related to the VHF in its Opposition, and so that aspect of the reservation of rights letter's commentary should not be considered here. This is likely because GLI's marine

surveyor and expert informed GLI in correspondence dated January 31, 2020 that the VHF could have been broken by the severe conditions. See DE 107-23.

Like the VHF argument, the argument raised in GLI's reservation of rights letter relating to the condition of the crew was not brought up by GLI in either its Complaint or in its opposition to Andersson's Motion for Partial Summary Judgment. Having failed to raise the issue, it cannot be considered now. If the court were to consider this issue, Andersson has provided undisputed facts showing that the course change Andersson made resulted in an improvement in the crew member's condition, as well as evidence that the crew member was able to maintain watches allowing Andersson to sleep. The speculation raised by the reservation of rights letter was unfounded.

> **2. GLI's arguments regarding the common law admiralty warranties of seaworthiness have been waived, but even if they had not been, they do not eliminate coverage.**

The warranty of seaworthiness set forth in reservation of rights letter and contained in the General Conditions and Warranties section of the policy states: "It is warranted that the Scheduled Vessel is seaworthy at all times during the duration of this insuring agreement. Breach of this warranty will void this insuring agreement from its inception." "Seaworthy" is defined as: "fit for the Scheduled Vessel's intended purpose. Seaworthiness applies not only to the physical condition of the hull, but to all its parts, equipment and gear and includes the responsibility of assigning an adequate crew. For the Scheduled Vessel to be seaworthy, it and its crew must be **reasonably** proper and suitable for its intended use." (emphasis added). The policy does not define "intended use." Applying the New York waiver law, GLI should be limited to seaworthiness arguments supported by this policy language and including its requirement of reasonableness.

GLI wants this Court to hold a vessel must have on board detailed charts for every possible location where the insured is allowed by the policy to travel. In this case, the policy insures for Florida, the Caribbean, and the Bahamas. GLI argues Andersson should be expected to have detailed charts of all these areas on board at the policy's inception or the vessel is automatically unseaworthy and coverage is void from its inception. This is not reasonable by any standard nor is it consistent with the law.

The burden is on GLI to prove the warranty applies to avoid coverage. *American Home Assur. Co. v. Merck Co., Inc.*, 462 F. Supp. 2d 435, 442 (S.D.N.Y. 2006) ("the insurer bears the burden of proving the applicability of any exclusions or limitations on coverage, since disclaiming coverage on the basis of an exclusion is an affirmative defense.");[8] *Bamundo, Zwal & Schermerhorn, LLP v. Sentinel Ins. Co.*, No. 13-cv-6672 (RJS), at *6-7 (S.D.N.Y. Mar. 26, 2015). GLI raises two types of warranties of seaworthiness under federal admiralty law, referring to them as the "first warranty" and the "second warranty" of seaworthiness. The first warranty requires the vessel be seaworthy (fit for its intended purpose) at the inception of an insurance policy. The second warranty requires the shipowner to assure the vessel is seaworthy for any given voyage at the time when it leaves port.

The first warranty does not require knowledge on the part of the shipowner and, contrary to GLI's arguments, does not appear from the caselaw to apply to charts. Although GLI has cited several decisions finding that a vessel failing to have updated charts on board was unseaworthy, the vast majority of the cases cited by GLI either were not decided in an insurance context or were not considering the question of seaworthiness beyond a specific voyage. In most of those cases, the ship owner was seeking to avoid liability under federal admiralty statutes to limit liability to

---

[8] A condition eliminating coverage from the policy's inception is the most extreme limitation on coverage.

the value of the vessel or otherwise escape responsibility for harm caused by the ship, and a condition to receiving statutory, or at times contractual, protections was proving the ship was seaworthy during the voyage. See, e.g. *Employers Ins. of Wausau v. Occidental Petroleum Corp.,* 978 F.2d 1422 (5th Cir. 1992)(subrogation action addressing the two warranties of seaworthiness); *McAdam v. State Nat. Ins. Co., Inc.,* 28 F.Supp.3d 1110, 1122 (S.D. Cal. 2014)(considering warranties of seaworthiness where vessel's rudder snapped off); *Axis Reinsurance Co. v. Resmondo,* Case No. 08-cv-569 (M.D. Fla. Jun. 1, 2009)(denying summary judgment where there was a factual issue as to whether a gimbal ring that caused the sinking was broken before or after the policy became effective); *Royal Indem. Co. v. Deep Sea Intern.,* 619 F.Supp.2d 14, 26 (S.D.N.Y. 2007)(denying summary judgment where vessel sank in deep water due to leaking through the hull); *The Connecticut Indemnity Co. v. Palovida*, Case No. 04-cv-1044 (M.D. Fla. Jul. 25, 2005)(warranty of seaworthiness applied where crew was incapable of operating a paddlewheel boat and it sank); *Certain* Underwriters *at Lloyd's, London Subscribing to Policy 200-451-8464 v. Johnston*, 124 F.Supp.2d 763 (D.P.R. 1999)(fraud discovered in the application process found to cover up deficiencies in the vessel's condition); *Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F.Supp.1046 (S.D.N.Y. 1997)(Cargo ship sank due to structural problems caused by corrosion). None of the cases cited by GLI regarding the first warranty of seaworthiness in an insurance context involved a lack of updated charts at the inception of the policy.

GLI's argument that there should have been updated charts on board Melody at the policy's inception for every location the application stated the vessel might travel is, in the language of the policy, not reasonable. The reasonable application of this warranty would be to look at the condition of the vessel at the inception of the policy and consider whether it is fit for its intended

12

use. Melody was a 47' catamaran intended for island cruising and some extended sailing in that context. Was the hull sound? Did the engines work? Was the rigging secure? Were there any issues that needed to be addressed before the boat could safely sail? In short, is the boat safe, not leaking, with appropriate propulsion and steering, and crewed by a competent Master? Captain Geiger observed, "… the vessel proved its seaworthiness by making it through very rough conditions to the Dominican Republic, where it was swept by a wave onto a reef in Boca Chica, Dominican Republic. That incident was caused by the conditions at the time, not the vessel or its crew." DE 107-7 at para. 1.

      Most of the cases cited by GLI in support of this premise involve commercial shipping interests and focus on the particular voyage. The majority of these cases are not insurance cases placing the burden of proof on the insurer. Many are admiralty cases involving ship owners seeking to avoid financial responsibility for injuries or loss of cargo, or to place that responsibility on the cargo owners through contractual agreements or federal statutes. All of these cases address situations where the ship owner has the burden of proving the vessel was seaworthy at the outset of the voyage. See e.g. *Union Oil Company of California v. M/V Point Dover*, 756 F.2d 1223 (5th Cir. 1985)(limitation of liability action involving vessel chartered to transport supplies to drilling platforms that damaged the pipeline at one of the platforms it was serving due to lack of current chart information); *Director General of India Supply Mission for and on Behalf of President of Union of India v. Steamship Maru*, 459 F.2d 1370(2nd Cir. 1972)(action by shipper seeking recovery of losses under 46 U.S.C. §1304(2)(a) – COGSA -- which required the shipper to prove both unseaworthiness and that it caused the damage); *The Maria,* 91 F.2d 819(4TH Cir. 1937)(action by shipper to recover value of lumber under the Harter Act, 46 U.S.C. §192, focusing inquiry on whether the vessel had the correct charts for its intended course at the inception of the

voyage); *The W.W. Bruce,* 94 F.2d 834 (2nd Cir. 1938)(court found vessel unseaworthy for not having updated chart showing re-numbered buoys in channel that was part of its planned voyage, resulting in a collision for which both vessels were found to be at fault); *The Iowa*, 34 F.Supp. 843, 847 (D. Or. 1940)(owner of ship petitioned for exoneration and limitation of liability related to grounding in which ship was lost with all hands and stating that the vessel would have been unseaworthy had the vessel not had updated navigation information on board, but stating there was no proof the information was not there); *Steamship Maru*, 459 F.2d at 1372 (finding vessel unseaworthy because charts of the area of the vessel's voyage were 20 years old in context of a COGSA claim); *Protection Maritime Ins. Co., Ltd., of London, England v. United States,* 368 F. Supp. 690 (W.D. Ky. 1973)(denying insurer's subrogation claim against the United States for damages when vessel struck a mooring cell in river which was the vessel's intended course, where charts were not updated to show the mooring cell); *Puerto Rico v. SS Zoe Colocotroni*, 456 F.Supp. 1327 (D. P.R. 1978)(Subrogation case involving oil spill found vessel was unseaworthy due to failure to have detailed charts of planned destination); *In the Matter of Complaint of Thebes Shipping Inc.*, 486 F.Supp. 436 (S.D.N.Y. 1980)(limitation of liability action for oil spill from tanker – Court found vessel was unseaworthy because one month old chart showed opposite current to the newer one resulting in navigational error and grounding in course of planned voyage); *In the Matter of Complaint of Delphinus Maritima*, 523 F.Supp. 583 (S.D.N.Y. 1981)(in ship owner's petition for exoneration or limitation, Court found the vessel was unseaworthy where Bermuda was port of refuge on its planned transatlantic course and, in attempting to approach Bermuda to correct loading deficiencies, cargo vessel went aground due to lack of detailed chart of Bermuda); *Traylor Bros., Inc. v. Tug Robert Greene,* 1986 WL 12229 (E.D. La. 1986)(tug owner held responsible for allision with bridge on its planned route where vessel did not have

current charts); *In re TT Boat Corp.,* 1999 WL 223165 (E.D. La. 1999)(case involving responsibility for an allision with a fixed oil platform; the cited ruling has absolutely nothing to do with charts); *Matter of Supreme Towing Co., Inc.,* 2010 WL 11561150 (E.D. La. 2010)(tug allided with an oil rig in its planned voyage; rig was on updated chart with notice to mariners and Court found vessel was unseaworthy).

Pursuant to the second warranty, the owner of the vessel must assure the vessel is seaworthy at the outset of the voyage. *Employers Ins. of Wausau v. Occidental Petro*, 978 F.2d 1422, 1431-32 (5th Cir. 1992) ("The second one, which applies only after the policy attaches, is a modified, negative warranty, under which the insured promises not to knowingly send a vessel to sea in an unseaworthy condition."). Andersson did not knowingly send the vessel to sea in an unseaworthy condition. Andersson purchased updated paper charts for everywhere he intended to visit as well as an Eastern Caribbean overview chart. The boat also had at least basic charts on the Raymarine GPS chartplotter located in the cabin of the boat and a supplemental Eastern Caribbean chart chip in the Garmin GPS chartplotter located in the starboard steering station. [DE 107-1 at para. 11-12; DE 107-2 at 22/9-13]. Since the vessel must be seaworthy for its intended purpose, Andersson does not dispute that the second warranty would require the vessel to have current charts for the planned voyage. Andersson had that. DE 107-1 at para. 11. However, due to conditions outside of Andersson's control, ie: a wind shift with significantly worse wind and wave conditions and his crew member's seasickness, Andersson was forced to change course. DE 107-1 at para. 29-39.

Contrary to GLI's assertions of "fact," it is likely the Raymarine GPS had detailed charts for the Dominican Republic. GLI's quotations of Mr. Cooley's deposition testimony do not support its argument that the Raymarine GPS chartplotter had no detailed chart chip before or during the voyage, only that there was none in the unit when it arrived at Cooley's location for inspection.

15

Meanwhile, there is evidence proving Mr. Ball took possession of a chart chip from the Raymarine unit and the vessel had electronic charts of the entire Caribbean. See DE 107-14 and 107-6 at 322/8-325/20; DE107-2 at 24/2-17; DE 107-5 at 251/17 to 252/4. There is also evidence the Garmin GPS chip could have been updated but the means to determine whether it was updated is no longer accessible to the parties due to the post-loss saltwater corrosion to the unit. See DE 107-5 at31/20-32/15. Due to the inability to access the hard drive of the Garmin and the missing Raymarine chip, GLI's argument that there were no updated electronic charts for Boca Chica, Dominican Republic cannot be proven or disproven. Chart chips are commonly updated by recreational sailors. See e.g. 107-3 at 36/23 – 38/21; DE107-8 at20/1-17; DE 107-5 at 167/16-168/14. Finally, although Andersson failed to recognize it as a reef, the Garmin chart chip in its 2015 form[9] did show the breakwater area by containing no depth readings. Captain Geiger testified to this and that although the newer chart version had a green area on it, it also did not provide any sort of caution, danger, reef or other warning. See DE 107-3 at 15/6-13 and DE 107-7 at para. 16. If the reef was on the chart but Andersson failed to recognize its significance, then there was not a lack of seaworthiness, there was negligence on the part of the Captain.[10] Finally, GLI attempts to paint Andersson's statement that the breakwater was "unmarked" as a misrepresentation. Andersson's statement described what he saw at the time of the incident. There were no markers, buoys, or signs on the reef warning of its presence. The reef was "unmarked." Andersson also stated he did not see the reef on the GPS. See DE 107-1 at para. 44.

---

[9] Again, because the Garmin GPS hard drive was destroyed by saltwater corrosion, it is not possible to determine whether that chip was updated at some time after its 2015 issuance and before Andersson bought the boat in December of 2018.

[10] For additional citations to evidentiary support, Andersson refers the Court to his Concise Statement of Material Facts in DE 107 and the attachments thereto.

In addition to the language quoted above, the policy's general condition (t) extends the reach of a warranty beyond the time of the loss itself:

> t. Where any term herein is referred to as a 'warranty' or where any reference is made herein to the word 'warranted', the term shall be deemed a warranty and regardless of whether the same expressly provides that any breach will void this insuring agreement from inception, it is hereby agreed that any such breach will void this policy from inception.

DE 107-24 at 15. According to the GLI policy and its arguments, any breach of a warranty at any time renders the policy void from its inception.

> GLI's condition "t," taken to its extreme, would render the policy illusory.
>
> … [E]xclusionary policy language should not be enforced when it defeats the main object of the purchased coverage, or virtually nullifies the coverage sought for anticipated risk. However, exclusions by their nature modify the scope of coverage provided in an insurance policy and "[a]n insurance policy is not illusory if it provides coverage for some acts; it is not illusory simply because of a potentially wide exclusion" (*Associated Community Bancorp, Inc. v. St. Paul Mercury Ins. Co.,* 118 A.D.3d 608, 989 N.Y.S.2d 15 1st Dept.2014 [internal quotation marks omitted] [alteration in original] ).

*Lend Lease (Us) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 136 A.D.3d 52, 60 (N.Y. App. Div. 2015). In this case, if a warranty were breached at any time, the breach was caused by unexpected circumstances out of Andersson's control, specifically the unexpected wind shift and worsened wind and wave conditions coupled with Naranjo's seasickness. Using a potential warranty violation forced by unexpected conditions out of the Captain's control to void the policy from its inception would be the definition of illusory coverage. What GLI seeks through its breach of warranty arguments is not a "potentially wide exclusion" as is referenced in New York caselaw finding coverage not to be illusory, but a complete elimination of the existence of the policy.

EVERY boat that sinks or is significantly damaged becomes unseaworthy at some point in the process of that loss, and the purpose of having hull coverage is to reduce the risk of loss or damage to the vessel. If the policy's warranty of seaworthiness were strictly applied, no loss would

ever be paid because every damaged vessel would have become unseaworthy, rendering the policy void from inception. GLI's corporate representative discussed this situation in his deposition:

> 72:9   Q.  Okay.  Now, at some point, every boat that
> 72:10  sinks is unseaworthiness at some point in its voyage,
> 72:11  correct?  It's unseaworthy; it sank --
> 72:12    A.  Correct.
> 72:13    Q.  -- is that correct?
> 72:14       So when -- is there a line you draw where you
> 72:15  decide when something has to be seaworthy to satisfy
> 72:16  the warranty of seaworthiness?
> 72:17    A.  Yes.  It has to be seaworthy at the --
> 72:18  throughout the policy and -- and -- and/or **until the**
> **72:19  time of the incident**.
> 72:20    Q.  How do you define what the incident is?  Is
> 72:21  there policy language that tells you when, in a chain
> 72:22  of events, something has happened that would now
> 72:23  change that seaworthiness situation?
> 72:24    A.  Yeah, an external event.
> 73:1    Q.  Can weather be an external event?
> 73:2    A.  Yes.

DE 107-4 at 72/9-73/2, emphasis added. There is no definition or other policy provision that creates this line-drawing at an "incident" or a requirement of an "external event" in the insuring agreement, but the practice does create a logical way to draw a line at the event causing the unseaworthy condition to avoid coverage being swallowed whole, in other words, by including the concept of reasonableness. In this case, Andersson changed course due to an unexpected incident outside of his control (in this case the confluence of two factors: 1- an unexpected wind shift from east to northeast and the simultaneous worsening of wind and wave conditions, and 2- the unexpected seasickness of the crew). See DE 107-1. He had no choice but to change from his planned course, ultimately deviating to the Dominican Republic. See DE 107-1 at para. 29-45. The point at which the line should be drawn, or the "incident" as GLI's corporate representative described it, would be the time of those unexpected circumstances, the time when Andersson

deviated from his planned course due to those conditions. Up to that time there is no doubt the vessel had the necessary charts.

All the cases cited by GLI involve the lack of updated charts for the area of the subject vessel's planned voyage. Only one of the cases cited by GLI involves circumstances where the vessel was forced to change from its planned course due to circumstances out of the Captain's control. In that case, *In the Matter of Complaint of Delphinus Maritima*, 523 F.Supp. 583 (S.D.N.Y. 1981), the vessel had embarked on a transatlantic voyage and diverted to Bermuda to correct problems with the loading of its cargo. There were no detailed charts on board showing a reef off Bermuda, and the ship went aground. In finding the vessel was unseaworthy for its voyage, the Court pointed out that on such a transatlantic voyage, the only two ports of refuge are Bermuda and the Azores Islands. In other words, the Court considered Bermuda a necessary part of the vessel's planned route. This is quite different from the case at hand, where the combination of an unexpected wind shift, significantly worse wind and wave conditions, and the resulting seasickness of Andersson's crew forced him to change course and arrive in the Dominican Republic, almost 700 km from his planned course.

GLI has failed to provide any evidence on the issue of seaworthiness, nor does the law support its claims, so this Court must grant partial summary judgment to Andersson on Count II of the Complaint and Count I of the Counterclaim

### III.    CONCLUSION

For the reasons described herein, Defendant Martin Andersson respectfully requests that this Court grant it partial summary judgment against GLI disposing of GLI's Complaint and granting summary judgment on Count I of the Counterclaim, retaining jurisdiction over the

calculation of damages and the remaining aspects of the Counterclaim including Count III the dismissal of which is currently on appeal.

                                            Respectfully Submitted,

                                            /s/ *Michelle Niemeyer*_____
                                            Michelle Melin Niemeyer
                                            Counsel for Defendant Martin Andersson
                                            Michelle M. Niemeyer, P.A.
                                            244 Biscayne Blvd. #3009
                                            Miami, FL 33132
                                            Telephone:    (305) 443-1818
                                            Email:         mniemeyer@paymyclaim.com

                                            Harvey Heafitz, Esq.
                                            Attorney for Defendant Martin Andersson
                                            Davigian, Grillo & Semple LLP
                                            365 Boston Post Road, Suite 200
                                            Sudbury, MA 01778
                                            Telephone:    (978) 443-3773
                                            Email:         Harvey@dgslawllp.com


## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 5, 2022 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send an electronic Notice of Filing to all counsel of record.

                                            /s/ *Michelle Niemeyer*_____
                                            Michelle Melin Niemeyer
                                            Counsel for Defendant Martin Andersson
                                            Michelle M. Niemeyer, P.A.
                                            244 Biscayne Blvd. #3009
                                            Miami, FL 33132
                                            Telephone:    (305) 443-1818
                                            Email:         mniemeyer@paymyclaim.com