UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
IN ADMIRALTY

|  |  |  |
|---|---|---|
| **GREAT LAKES INSURANCE SE,** )<br>    Plaintiff ) |  |  |
|  ) |  |  |
|  ) | CIVIL ACTION |  |
| v. ) | NO. 20-40020-TSH |  |
|  ) |  |  |
| **MARTIN ANDERSSON,** )<br>    Defendant. ) |  |  |
|  ) |  |  |
|  ) |  |  |

**MEMORANDUM OF DECISION AND ORDER ON
MOTIONS FOR SUMMARY JUDGMENT**
March 21, 2023

**HILLMAN, S.D.J.**

Plaintiff Great Lakes Insurance, SE ("GLI") brought this declaratory judgment action under admiralty law against its insured, Martin Andersson ("Andersson") to determine coverage under a marine insurance policy with respect to a 2019 sailing accident that totaled Andersson's insured vessel, *The Melody*. Andersson ("Andersson") filed counterclaims for breach of contract (Count I) and equitable estoppel (Count II).[1] GLI has moved for summary judgment on its declaratory judgment claims and Andersson moves for partial summary judgment as to his breach of contract claim. For the following reasons, GLI's motion for summary judgment is **denied** and Andersson's motion for partial summary judgment is **granted**.

---

[1] The Court dismissed Count III of Andersson's counterclaim, which contained a cause of action for bad faith insurance claims settlement practices under M.G.L. c. 176D, due to the Policy's New York choice of law clause. (Docket No. 50). That matter is currently on appeal (21-1648).

**Background[2]**

Defendant Andersson purchased an insurance policy ("the Policy") for his vessel, the *Melody*, from Plaintiff Great Lakes Insurance Company ("GLI") in November 2018. The Policy purported to cover damage to the *Melody*'s hull from December 2018 to December 2019. The *Melody* ran aground in Boca Chica, Dominican Republic in December 2019, before the Policy expired. Andersson notified GLI of the accident and sought coverage under the Policy. GLI brought suit requesting declaratory relief as to whether the loss was covered under the Policy. Before judgement could be rendered, GLI denied coverage, claiming that Andersson failed to keep the *Melody* "seaworthy" as defined by federal admiralty law and the Policy. Andersson brought counterclaims alleging, among other things, that GLI breached the Policy because the *Melody* was seaworthy at all relevant times. Both parties have filed for summary judgement on the issue.

*The Insurance Agreement*

Plaintiff and Defendant entered a time-hull Policy in November 2018. The Policy purported to cover damage to the *Melody*'s hull for one year for activities classified as private use/pleasure. Andersson alleges that during his conversations with GLI that he intended to pick up the *Melody* in Grenada after repairs, sail to Aruba, and then to Sint Maarten. For reasons disputed by the parties[3], the policy application listed Florida, the Bahamas, and the Caribbean under "all waters to be navigated during this policy period." Accordingly, the Policy purported to cover any hull damage the *Melody* sustained while in those areas, so long as Andersson had not breached the Policy.

---

[2] Unless otherwise noted, the following facts are undisputed. These facts are drawn from the various statements of undisputed material facts, each party's response to the same, and the documents attached thereto.
[3] GLI claims this was the information provided by Andersson; Andersson claims the broker put the locations in with little input from him and that Andersson's language barrier prohibited him from correcting it.

The Policy provision most relevant pertains to the *Melody*'s "seaworthiness." Provision 9(b) states, "It is warranted that the . . . Vessel is seaworthy at all times during the duration of [the Policy]. Breach of this warranty will void this insuring agreement from its inception." The Policy defines seaworthy as "fit for the . . . Vessel's intended purpose," including adequate physical condition of the hull, sufficient parts, gear and equipment, and an adequate crew. Finally, the policy states that in order for a vessel to be seaworthy, "it and its crew must be reasonable proper and suitable for its intended use." According to GLI's interpretation of the Policy, this provision intends to convey that if the covered vessel is unseaworthy at any point during the Policy, the Policy is void from its inception and provides no coverage.

*The Melody's Final Voyage*

On December 14, 2019, Andersson left Aruba for Sint Maarten in the *Melody*. Before departure, Andersson checked weather forecasts, and all seemed well. According to Andersson, he intended to first sail around the southeastern tip of Aruba, then shift northeast to clear the Venezuelan Islands. Once clear of the Venezuelan islands, Andersson intended to head east toward Grenada, then north toward his final destination of Sint Maarten. There is no dispute that this was Andersson's intended course when he left Aruba; however, his course changed drastically within ten hours of departure.

As Andersson rounded the southeastern tip of Aruba and he attempted to shift northeasterly, winds picked up and his crewmember became seasick. Andersson attempted to navigate the *Melody's* course more northerly to avoid damage from the waves and to quell his crewmember's sickness. As the wind picked up, the *Melody* was pushed into a northwesterly direction, eventually pushing the boat near to the Dominican Republic. At this time, Andersson realized his radio transmitter was broken so he called the agent that sold him the *Melody* who

3

suggested that he dock in Boca Chica, Dominican Republic for repairs. As Andersson waited for an escort into the harbor, the *Melody* ran aground on a breakwater in the harbor. The *Melody*, now more than 400 miles from where she intended to land, sustained damage to the hull and was a total loss.

It is undisputed that the *Melody* had updated paper charts on board for the Leeward Islands, Windward Islands, and Aruba.[4] The *Melody* also had charts for the Dominican Republic in the Garmin GPS onboard, but those charts were out-of-date and did not show the breakwater. Charts available in December 2018 show the breakwater upon which the *Melody* ran aground.[5] The Raymarine GPS contained no supplemental charts, provided no detail for the Dominican Republic, and did not show a breakwater in the harbor at Boca Chica. Finally, neither party disputes that the *Melody* lacked up-to-date paper charts for Florida, the Bahamas, and the Western Caribbean. GLI brought suit requesting a declaratory judgement that the Policy was void from its inception based on the *Melody*'s lack of up-to-date charts for these areas, rendering her unseaworthy. Andersson responded with a counterclaim for breach of contract, claiming that the *Melody* was seaworthy because it had all charts for its intended course, and that GLI was required by the Policy to cover the *Melody*'s loss. Both parties have filed for summary judgement. A finding on seaworthiness is dispositive of both claims.

## **Standard of Review**

Summary judgement is appropriate where, "the pleadings, deposition, answers to interrogatories and admission on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a

---

[4] The Leeward and Windward Island maps include all Caribbean islands east of Puerto Rico and, most relevantly, all islands on Andersson's intended course from Aruba to Sint Maarten.
[5] While Andersson disputes the assertion that the Garmin was never updated, it is undisputed that his Garmin charts failed to show the breakwater, whereas available, updated Garmin charts did show the breakwater.

matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2022). A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case. *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009). When considering a motion for summary judgement, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Id.*

"The presence of cross-motions neither dilutes nor distorts this standard of review." *Scottsdale Ins. Co. v. Torres*, 561 F .3d 74, 77 (1st Cir. 2009) (*quoting Specialty Nat'l Ins. Co. v. OneBeacon Ins. Co.*, 486 F.3d 727, 732 (1st Cir. 2007)). Rather, "[c]ross motions simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Scottsdale Ins. Co. v. Torres*, 561 F.3d at 77 (*quoting Littlefield v. Acadia Ins*. Co., 392 F.3d 1, 6 (1st Cir. 2004)); *Reich v. John Alden Life Ins. Co*., 126 F.3d 1, 6 (1st Cir. 1997) ("When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn.").

## Discussion

GLI and Andersson have each moved for summary judgement in this case. The dispositive issue for both motions is whether GLI has proven the *Melody* was unseaworthy as required by federal maritime law and the Policy.

*Implied Warranties of Seaworthiness*

Under federal admiralty law, there are two warranties of seaworthiness implied in every policy of marine insurance. *See Saskatchewan Gov. Ins. v. Spot Pack Inc.*, 242 F.2d 385, 388 (5th Cir. 1992); *Employers Ins. v. Occidental Petroleum Corp.*, 978 F.2d 1422, 1431 (5th Cir. 1992). The first implied warranty ("First Warranty") requires that the covered vessel be seaworthy at the

instant the policy attaches. If the vessel is in fact *not* seaworthy at the time the policy begins, then the policy is void from its inception, regardless of fault or causation. *Occidental* at 1432. Under the First Warranty, the vessel itself must be in "suitable condition to . . . encounter all common perils and dangers . . .." *Id*. Where an insurer asserts that a covered vessel is unseaworthy and therefore afforded no coverage, the insurer bears the burden of proving such unseaworthiness. *Continental Ins. Co. v. Lone Eagle Shipping (Liberia)*, 952 F.Supp. 1046, 1067 (S.D.N.Y. 1997). Case law concerning the First Warranty considers the issue based on whether the physical condition of the vessel and its equipment were sufficient for the vessel's intended use under the policy. *Id.*[6]

The second implied warranty of seaworthiness ("Second Warranty") is treated as a "modified, negative warranty, under which the insured promises not to *knowingly* send a vessel to sea in an unseaworthy condition." *Occidental*, 978 F.2d at 1431 (emphasis added). Under the Second Warranty, it is not required that the vessel always remain seaworthy, or even that it be seaworthy at the start of each voyage. *Id.* at 1434. The Second Warranty is a promise by the insured that at no point, through his bad faith or neglect, will he allow the boat to embark on a voyage in an unseaworthy condition. *Id.* Several cases considering this warranty have held that a lack of up-to-date maps for the vessel's *intended journey* constitutes a breach of Second Warranty of seaworthiness. Specifically, these cases have held that where an insured party leaves port without up-to-date maps for every part of their intended journey, and this lack of maps causes damage to the vessel, the warranty is breached, and no coverage is owed to the insured. *See The Maria,* 91 F.2d 819 (4th Cir. 1937).

---

[6] No cases were found that considered whether a lack of up-to-date charts for all areas covered by the policy constitute a breach of this First Warranty.

In deciding whether Andersson breached the First Warranty of Seaworthiness, the Court must determine whether GLI has proved the *Melody* was unseaworthy when the Policy commenced. *See Occidental*, 978 F.2d at 1431. Under the First Warranty, "seaworthiness" is generally defined as reasonable fitness for the vessel's intended use. *Walker v. Harris*, 335 F.2d 185, 191 (5th Cir. 1964). In support of its contention, GLI asserts that the *Melody* lacked updated maps for Florida, the Bahamas, or the Dominican Republic onboard the day the policy commenced. Accordingly, GLI urges the Court to find that Andersson's policy was void from its inception.

GLI's lack of charts assertion fails because where courts have found a party in breach of the First Warranty, it has invariably been due to a deficiency in the physical condition of the vessel that was not disclosed when the insurance policy commenced. *See, e.g., Certain Underwriters at Lloyd's v. Johnston*, 124 F.Supp. 2d 763 (D.P.R. 1999) (breach of First Warranty found where record of inspection at inception of policy showed mass physical damage). Further, no case cited by GLI other than *Johnston* found the insured in breach of the First Warranty, either because the case was decided on another issue, or because the Warranty did not apply in the situation.[7] Finally, there are no cases in which the court held that a lack of up-to-date maps voids an insurance policy from its inception under the First Warranty; the Court found none where the argument was even made. Accordingly, the Court finds that Andersson did not breach the First Warranty because the *Melody* was seaworthy when the Policy commenced.

---

[7] GLI cites the following cases relating to the First Warranty: *Employers Ins. v. Occidental Petroleum*, 978 F.2d 1422 (5th Cir. 1992) (warranty not applicable); *McAdam v. State Nat'l Ins. Co.*, 28 F.Supp. 3d 1110 (D. S. Cal. 2014) (warranty not applicable); *Axis Reinsurance v. Resmondo*, 2009 U.S. Dist. LEXIS 46441 (issues of fact precluded decision); *Conn. Indem. Co. v. Palivoda*, 2005 U.S. Dist. LEXIS 24511 (breach of voyage policy, not First Warranty); *Continental Ins. Co. v. Lone Eagle Shipping (Liber.)*, 952 F.Supp. 1046 (S.D.N.Y. 1997) (warranty not applicable).

To decide whether Andersson breached the Second Warranty of Seaworthiness, the Court must determine whether GLI has proven that Andersson embarked on the *Melody*'s final voyage with knowledge she was unseaworthy. Like the First Warranty, the Second Warranty requires that the covered vessel be physically fit for its intended purpose. *Occidental*, 978 F.2d at 1434. However, the Second Warranty concerns the condition of the vessel *at embarkation of each trip* and expressly requires that the vessel be equipped with adequate, up-to-date maps for everywhere the vessel intends to sail. *Id.* As GLI does not allege any physical defect in the *Melody*, the Court need only consider whether her lack of maps for Florida, the Bahamas, and the Dominican Republic rendered her unseaworthy at embarkation.

Several courts have held that where a vessel lacks up to date charts and sustains damages as a result of the deficient charts, she is unseaworthy. *See, e.g.*, *The Iowa*, 34 F.Supp. 843 (D.OR 1940). However, in all but one case cited by GLI, the court found the vessel at issue unseaworthy because it lacked up to date charts *for the course it intended to travel*.[8] In all of those cases, the court made express findings that the vessel embarked on its intended course and had either outdated charts for the intended waters or no charts at all. *Id.* More importantly, each of those instances required knowledge on the part of the captain that his maps were not sufficient for the intended journey. *Id.*

The case *In re Complaint of Delphinus Maritima, S.A.* is informative. *See* 523 F.Supp. 583 (S.D.N.Y. 1981). *Delphinus* concerned a vessel that ran aground in Bermuda on its voyage from Newport, Virginia to ports in the Middle East. *Id.* at 586. The vessel did not intend to sail to

---

[8] *Union Oil Co. v. M/V Point Dover*, 756 F.2d 1223 (5th Cir. 1985) (no violation of Second Warranty because it was not shown up to date chart available); *Director of General India Supply Mission v. S.S. Maru,* 459 F.2d 1370 (2d. Cir. 1972) (no violation of Second Warranty because negligence clause made it inapplicable); *The Maria*, 91 F.2d 819 (4th Cir. 1937) (Second Warranty violated where vessel lacked charts for harbor it sailed from); *The W.W. Bruce*, 94 F.2d 834 (2d Cir. 1938) (vessel found unseaworthy because it lacked charts for channel it intended to navigate); *The Iowa*, 34 F. Supp. 843 (Oregon DC 1940) (vessel found unseaworthy where captain relied on his own expertise and no charts).

Bermuda on its course but diverted mid-trip when its cargo came loose. *Id.* In reliance on his belief that he would not sail to Bermuda, the captain had not acquired updated charts for the area. *Id.* at 591. The *Delphinus* Court found the lack of adequate maps for Bermuda, among other issues, rendered the vessel unseaworthy. *Id.* at 592. Significantly, the Court emphasized in its holding that Bermuda is one of only two ports of refuge available on the planned voyage, making it reasonably foreseeable that the vessel may divert there. *Id.* at 591. Accordingly, the Court expanded the charts required for a vessel to remain seaworthy to include not only charts for the vessel's intended voyage, but also charts for reasonably foreseeable diversions, such as notable points of refuge along the planned voyage. *Id.*

Unlike in *Delphinus*, GLI does not assert that the Dominican Republic is a point of refuge on a voyage from Aruba to Sint Maarten, much less that it is the *sole* point of refuge. Instead, GLI asserts that because Andersson lacked charts for the Dominican Republic (along with Florida and the Bahamas), and because that area was covered on his Policy, the *Melody* was unseaworthy regardless of where she intended to sail when she embarked. Under the Second Warranty however, this is not enough to constitute a breach by Andersson because the warranty specifically concerns the *trip at issue*, not the Policy's coverage area. This is further supported by the undisputed fact that Dominican Republic was not the only point of refuge along the *Melody*'s trip from Aruba to Sint Maarten, nor that it was reasonably foreseeable under the circumstances on the record the *Melody* would end up there. Accordingly, the Court finds that Andersson did not breach the Second Warranty of seaworthiness.

GLI contends that Andersson also breached this Policy's Express Warranty of continuing seaworthiness because the *Melody* did not have up-to-date maps for Florida, the Bahamas, and the Western Caribbean on board at the time the policy became effective. Under GLI's

interpretation of the express warranty, no matter where the *Melody* ran aground – in fact regardless of whether she did – the policy was void from its inception because Andersson did not have updated maps of Florida onboard. Essentially, GLI argues that because the express terms of the Policy require that the *Melody* be seaworthy for its intended use "at all times," and because Florida was listed in the Policy as an intended destination, regardless of where the *Melody* actually sailed, Andersson was required to have those charts on board. Federal admiralty law and the Policy's express terms do not support such an interpretation.

As the instant case concerns the Policy's express warranty, little case law is available on the contours of the warranty. However, one recently decided case, *Acadia Ins. Co. v. Hansen*, considered an insurance policy with an express warranty similar to GLI's which stated that the insurance company, "shall not be liable for any loss . . . arising out of the failure of the [insured] to exercise due diligence to maintain the vessel in a seaworthy condition . . . after attachment of this policy." 2022 U.S. Dist. LEXIS 75760 (E.D.N.Y. 2022). Although the vessel had intended to sail around Hurricane Sandy throughout its voyage, the hurricane became unavoidable, and the captain was forced to sail through it. *Id.* at 91. The vessel ultimately sank as it was not equipped to handle such a storm. *Id.* The *Acadia* Court explained that "[c]onsistent with the definition of seaworthiness, an express warranty of seaworthiness 'require[s] a vessel to be able "adequately to perform the particular services required of her *on the voyage she undertakes*."'" *Id.* at 87 (emphasis added). The court clarified that the applicable measure for a breach of express warranty of seaworthiness is whether the vessel was fit for its *voyage intended* when it embarked. *Id.* at 91. Accordingly, the Court held that although the vessel was not fit for the deviated voyage it took, it was seaworthy for its intended course, and did not breach the express warranty of seaworthiness. *Id.*

While distinguishable from the instant case, *Acadia* makes clear that an express warranty of continuing seaworthiness primarily concerns whether, at the time the covered vessel left port, it was seaworthy, or reasonably equipped for its intended course. *Id.* GLI's contention that missing charts for *any* area covered by the policy renders the vessel unseaworthy is plainly incompatible with this holding, and no cases found support GLI's position. In terms of public policy, GLI's position becomes even weaker when it is taken to its natural extreme. Under GLI's interpretation of the Policy's Express Warranty, it would not matter where or if the *Melody* ran aground; GLI could avoid coverage based solely on the fact that Andersson failed to get updated charts of Florida.

## Conclusion

For the reasons set forth above, Andersson's Motion for Summary Judgment (Docket No. 107) is ***granted*** as to Count I of the Counterclaim (breach of contract). GLI's Motion for Summary Judgment (Docket No. 97) is ***denied***.

**SO ORDERED.**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**SENIOR DISTRICT JUDGE**