Martin Andersson
215 Stockton Blvd.
Sea Girt, New Jersey 08750

January 15, 2020

Sarah Delancey-Simms LLB(Hons), LLM, FCILEx
Marine Claims Manager
Concept Special Risks Ltd
Unity House, 2 Station Court
Station Road, Guiseley
Leeds LS08EY
United Kingdom

RE: Policy No. CSRYP/172119 Reservation of Rights dated December 27, 2019
D/L: 16 December 2019

Dear Ms. Delancey-Simms:

    I am writing to update you on the status of the salvage and to follow up with you regarding your reservation of rights letter dated December 27, 2019. I noticed on that correspondence you used my old mailing address. Although the vessel's home port did not change, my wife and I moved from Massachusetts to New Jersey last summer. The new address is above.

    First, I would like to thank you for providing your written agreement to the sale of the vessel to the salvor in exchange for salvaging the vessel, as that course of action made it possible for me to negotiate a contract whereby the salvor paid me US$1,000.00, committed to remove the vessel and any remaining debris, and provided an indemnity and hold harmless agreement should there be any damage caused by the salvage. Without this agreement the salvor was requesting a payment of $70,000 for the salvage.

    I retained a Dominican maritime attorney to prepare the salvage agreement with the goal of limiting any potential liability that could arise to the extent possible under Dominican law. English and Spanish versions of the agreement are attached. Pursuant to Dominican law, if any dispute were to arise, the binding agreement is the Spanish version. I left the Dominican Republic on Saturday, January 11 after the agreement was executed in the afternoon on January 10. Ownership of the vessel transferred to the salvor upon execution of the agreement. Salvage operations were to begin immediately. The agreement requires the salvor to document the salvage and to maintain the vessel in a secure location for 30 days so that you may have access to it in the event you may have any further need to inspect the vessel in the adjustment of the insurance claim.

    Your letter raises issues related to the navigational limits in the policy and the seaworthiness of the vessel that need to be addressed.

Andersson_CF000145

1. **The Navigational Limits**

Your letter states: "Our investigation determined that at the time of the loss, you were in breach of your navigational limits." This is not true. At the time of the loss, the vessel was close to shore awaiting a guide to assist with entry into the port.

It was my understanding and intention that the vessel would remain well within 150 nautical miles of the shore at all times during the planned voyage from Aruba to St. Maarten. Our planned route was to leave Aruba and turn northeast at the eastern tip of the island. Then after going northeast for 6-12 hours we would turn east to sail towards Grenada while keeping at least 50 miles away from shore. Then when about 100 miles from Grenada we would turn northeast along the Windward islands and continue up along the Leeward islands to St Martin.

Leaving Aruba, the wind direction made it impossible for us to sail as easterly a course as we planned, and we were forced to sail a more NE course. When we left Aruba, the conditions were good and only the direction of the course was affected. Approximately 10 hours out of Aruba, the wind speed increased significantly from 15 to 18 knots to 25+ knots and there was a shift in the wind direction from N to NE. Wave heights increased from 6' to 10 – 12'. This was when my crew member began to be sick. It was clear that turning in an easterly direction as planned could put the vessel in danger, as well as put my then-sick crew member into worse sea conditions.

In order to avoid the storm conditions and protect the safety of the vessel as well as to get my sick crew member to shore for medical treatment, I made the decision to sail northward to the Dominican Republic. I cannot verify the exact path of the voyage, as the Garmin GPS was removed from the vessel by the marine surveyor retained by Great Lakes. To my knowledge, the Raytheon chartplotter remains with the salvor on the vessel, and should be accessible for inspection for the next 25 days. I do not know whether it is still working after the grounding and salvage.

We arrived to the southern coast of the Dominican Republic without incident and made the decision to dock at the Boca Chica marina. As the rougher conditions had subsided on the more northerly course, my crew member was feeling much better by the time we arrived at the Dominican Republic and would have been capable of assisting me if needed. It was dark and there were no lights warning about the breakwater or anything else. We requested and were promised an escort from the marina into the harbor, and while we were waiting for the escort to arrive we were swept by a wave onto a manmade breakwater sitting approximately a foot above the level of the water that had not been visible to us. The breakwater was not marked by any navigational markers nor did it show up on our two GPS chartplotters.

2. **The Seaworthiness of the Vessel**

In your letter, you raise three different issues related to the seaworthiness of the vessel. The policy defines seaworthy as meaning: "fit for the Scheduled Vessel's intended purpose.

Seaworthiness applies not only to the physical condition of the hull, but to all its parts, equipment and gear and includes the responsibility of assigning an adequate crew. For the Scheduled Vessel to be seaworthy, it and its crew must be reasonably proper and suitable for its intended use." I will address each of your concerns separately.

    a. **The seasickness of my crew member did not render the vessel unseaworthy.**

Your correspondence implies that the fact my crew member became sick rendered the vessel unseaworthy. First, I would like to be clear that at the time when we left Aruba my crew member was not sick. In addition to his not being sick, I was not aware of any tendency on his part to become seasick. By the time he became sick we were already far from shore and the conditions had become treacherous to the east. Heading in that direction would have both endangered the vessel and likely worsened the crew member's condition.

Finally, I am named as the operator of the vessel on the policy. The policy does not require additional crew. I am capable of sailing Melody singlehanded. My crew member's condition had improved as we approached the Dominican Republic, but even had he been incapacitated, the vessel would not have been unseaworthy.

    b. **The failure of the VHF transmitter did not render the vessel unseaworthy.**

First, and to the best of my knowledge, the VHF transmitter worked when we left Aruba. I tested the VHF radio on Saturday the 14th before leaving Aruba and both the receiver and the transmitter were working properly. The receiver was working throughout the trip. I believe something may have broken causing the transmitter not to function properly during the rough conditions we encountered. As we approached the Dominican Republic, we realized that the VHF radio's transmitter was not working. This did not affect our ability to communicate, however, because the vessel also had a satellite phone. I was able to contact my broker for a recommendation on a good marina to bring the boat to with the intention of immediately repairing the VHF transmitter and servicing the generator. I was able to communicate with the marina on the satellite phone, and it was while awaiting their escort into the harbor that we were pushed onto the unmarked breakwater.

    c. **We had and were using two different chartplotters, neither of which showed the breakwater.**

Like our communication systems, we had duplicative electronic charts. The boat had both a Raymarine E120 Chartplotter with Foruno GP-31 GPS receiver and a Garmin 721 xs GPS chartplotter. Both were in use at the time of the grounding. The shallow breakwater we were pushed onto did not show up on either chart and was not marked by navigational markers. We took the extra precaution of requesting an escort into the harbor, and it was while awaiting that escort that the vessel was pushed onto the breakwater by a wave.

3. <u>**What are our Next Steps?**</u>

Please be advised and do not forget that my negotiation with the salvor included his agreement to store and make the vessel (or its remains) accessible to Great Lakes for inspection(s) related to the claim for 30 days so, if you wish to have additional access, we need to request access and make it happen before February 10. It was not clear when I left for New Jersey whether the salvor would ultimately be able to salvage the vessel in one piece or whether it would need to be removed in parts. Please let me know if you need any additional information from me. I look forward to your response.

Sincerely,

*[signature]*

Martin Andersson