**Samantha Thomas**

| | |
|---|---|
| **From:** | Andrew Ball <andrew@caribsurveyors.com> |
| **Sent:** | 31 January 2020 13:16 |
| **To:** | Sarah Delacey-Simms |
| **Cc:** | Bill Bailey; Mark Thomas; Samantha Thomas; Shoriff Uddin |
| **Subject:** | Re: RE Policy No. CSRYP172119 MELODY.pdf |

Good Morning Sarah,

Our comments are as follows:

1) We don't think that the Assured understands that the navigational limits within the policy pertain to his entire voyage and not just the location at the time of loss. The vessel was arguably still in the process of completing a voyage from Aruba and ending in Boca Chica. The Assured reported that he stopped in Santo Domingo to determine the location best for repairs before proceeding on to Boca Chica. He reported that he did not go ashore or clear customs. The vessel cleared customs following the loss in Boca Chica. As the the vessel did not touch shore or clear customs between Aruba and Boca Chica, we would argue that this was one voyage. During the course of this voyage, the vessel strayed outside of the navigational limits defined in the policy. While the original intent of the voyage may have been to stay within the navigational limits, it did not. Some of the reasons for the vessel straying outside of limits, such as weather conditions and the ability and fitness of the crew pertain to the further discussion regarding the vessels potential seaworthiness.

2) With regards to potential seaworthiness of the crew: The mate was reported to have become sick when leaving Aruba and reported to be incapacitated. It would not have been possible to maintain a proper watch as per COLREGS with a single crew member on watch for the planned voyage to St Martin. The Master would either have needed to come off watch to sleep or would have been medically unfit due to fatigue. We don't see any verbiage pertaining to singlehanding within the policy wording. Regardless, attempting to singlehand a voyage of more than 8 hours in fair conditions would, in opinion, effectively render the Master and therefore the vessel unseaworthy. Conditions were reported to be less than fair. We see no reason, beyond convenience of the Master, that the vessel could not have returned to Aruba when the crew member became incapacitated. This would have improved seakeeping conditions and was also likely to be the closest safe harbour based on the reported timeline.

3) The passage planning tactics of the Master raise his competence into question. While sailing directly from Aruba to St Martin certainly isn't impossible, the prevailing current and weather conditions generally negate completing this voyage in one tack, which seemed to be the Master's plan. While we appreciate the freedom of a private yacht owner to "sail to the wind", it does not negate the responsibility to remain informed and make intelligent decisions for the wellfare of the crew and vessel. Beyond the issues of navigational limits of the policy, there were further issues in terms of information caused by the course changes. When the vessel arrived in the Dominican Republic, it did not have updated or accurate charts on board. This was, at least in part, contributory to this loss. While it may have taken longer and required additional tacking, we see no reason beyond the incapacitated crew member (which the Assured argues is a non-issue) and the communications failure (which the Assured argues is a non issue) that the vessel could not have completed its original voyage, as originally planned, to St Martin. It is clear to us that this passage was poorly planned and executed.

4) With regards to comments about the marking of the breakwater being marked. It is well marked on updated charts. In terms of its visibility, no lights were seen, however the shore beyond the breakwater is well lit due to the tourist traffic. It would be difficult not to see the breakwater between the vessel and the light on shore if keeping a proper watch.

5) The vessel was seen to be in generally good repair, other than incident related damages. The Assured's assertion that the VHF transmitter was likely to be working when he left Aruba is believable. The conditions reported during the voyage could likely have caused potential issues with the masthead antenna or the connections and wiring within the mast. This would also result in the reported ability to receive but not transmit. We would opine that a

1

VHF radio is required while offshore in order to assure the potential seaworthiness of the vessel by facilitating bridge to bridge communications and notifying other vessels in the area of an emergency. USCG regulations are not our specialty. I have done some research but I can't find any requirement for recreational vessels of this type and size to be fitted with a VHF under USCG regulations. I am not aware of a handheld VHF being stowed on board, however I cannot definitively say that there wasn't one. A prudent mariner would carry a handheld on board as a supplement and this, in fact, would be a coding requirement if this was a commercial vessel. We are relatively confident that there was not a handheld on board as it was not reported as utilised while trying to establish communications with the shore.

6) As previously mentioned. The breakwater has been seen to be marked on both recently updated Raymarine and Garmin charts. It is marked on official paper charts. The fact that it was not noted on the charts on board shows that they are either out of date or defective. As the systems are not approved ECDIS systems with independent power supplies, we would argue that the absence of paper charts to supplement the electronic charts affects the vessel's potential seaworthiness negatively.

Best Regards,

**Andrew Ball**
Caribbean Marine Surveyors Ltd.
Caribbean Adjusters and Marine Surveyors Ltd.
www.caribsurveyors.com
IAMI #04122 SAMS SA MCA Master 200GT MECAL A3
Caribbean Marine Surveyors Ltd are Licensed Loss Adjusters in the BVI

E: andrew@caribsurveyors.com
E2: andrew@caribbeanmarinesurveyors.com
P: +1 (284) 346-2091
C: +1 (284) 346-6242

Emergency after hours/weekends only:
E: mayday.caribsurveyors@gmail.com
C: +1 (284) 346-3999

This electronic transmission is strictly confidential and intended solely for the addressee. It may contain information which is covered by legal, professional or other privilege. If you have received this transmission in error, please notify us and delete the received data as soon as possible.

       On 27 Jan 2020, at 2:14 PM, bill@caribsurveyors.com wrote:


       William Bailey
       SAMS AMS461, MIIMS 993, MECAL A1, Licenced Marine Loss Adjuster
       Caribbean Marine Surveyors Ltd. Caribbean Adjusters & Marine Surveyors (Grenada) Limited
       Box 281 Road Town, Clarkes Court Marina
       Tortola, Grenada
       British Virgin Islands VG1110 West Indies

       Cell phone office (1) 284 346 2091 (1) 473 457 1576
       Fax office 1 800 851 2754 grenada@caribsurveyors.com
       Cell phone Bill (1) 284 346 1576
       (1) 284 499 1576


       Click Here to Leave a Review

Andersson_CF000153

-----Original Message-----
From: Sarah Delacey-Simms <Sarah.Delacey-Simms@special-risks.co.uk>
Sent: Monday, January 27, 2020 12:35 PM
To: 'Bill Bailey' <bill@caribsurveyors.com>
Cc: Mark Thomas <Mark.Thomas@special-risks.co.uk>; Samantha Thomas <Samantha.Thomas@special-risks.co.uk>; Shoriff Uddin <Shoriff.Uddin@special-risks.co.uk>
Subject: FW: RE Policy No. CSRYP172119 MELODY.pdf

Bill,

Please see the attached.
Would you be kind enough to provide your comments?

Kind regards
Sarah


Sarah Delacey-Simms LLB (Hons), LLM, FCILEx Claims Manager

Concept Special Risks Ltd
Unity House, 2 Station Court, Station Road Guiseley, LEEDS, LS20 8EY United Kingdom
_____

Our Company Registration No is 952756 Registered in England & Wales.
Registered Office Address: Unity House, 2 Station Court, Station Road, Guiseley, LS20 8EY
Authorised and Regulated by the Financial Conduct Authority Firm No 312098.

This message, including attachments, is intended for the above-mentioned addressees only. It may contain confidential information the review, dissemination or disclosure of which is strictly prohibited. Should you receive this message in error, please delete it and notify the sender to the e-mail address indicated above.

-----Original Message-----
From: Martin Andersson <mandersson031@gmail.com>
Sent: 16 January 2020 20:04
To: Sarah Delacey-Simms <Sarah.Delacey-Simms@special-risks.co.uk>
Subject: RE Policy No. CSRYP172119 MELODY.pdf

Dear Ms. Delancey-Simms,
Please find enclosed the response letter to your letter of December 27, 2019.
Sincerely,
Martin Andersson



Sent from my iPad