UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
IN ADMIRALTY

GREAT LAKES INSURANCE SE,    :
    :    **Case No. 4:20-cv-40020-DHH**
    :
    **Plaintiff,**    :
    :
**vs.**    :
    :
**MARTIN ANDERSSON**    :
    :
    **Defendant.**    :
_____:

## GREAT LAKES INSURANCE SE'S REFILED MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT UNDER FED.R.CIV.P 56
(Leave to file excess pages granted on June 23, 2023, ECF no. 156)

COMES NOW the Plaintiff, GREAT LAKES INSURANCE SE, by and through its undersigned counsel, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1 of the United States District Court for the District of Massachusetts, and for its memorandum of law in support of its motion for summary judgment, respectfully states as follows:

### Statement of Undisputed Facts
### (The Loss, The Investigation, and The Coverage Decision)

On November 15, 2018, W.R. Hodgens Marine Insurance Inc., acting as agent for Defendant MARTIN ANDERSSON (hereinafter "ANDERSSON") submitted a request for a quote to Concept Special Risks Ltd., the underwriting and claims handling agent acting for Plaintiff GREAT LAKES INSURANCE SE (hereinafter "GLI"). The Request for Quote is attached hereto as Exhibit 1 (Andersson_UF000001 – Andersson_UF000002). The Request for Quote disclosed that ANDERSSON was seeking first-party and third-party liability coverage for his 2000 47' Catana sailing catamaran (hereinafter "the Vessel"). Ex 1, p. 1 (Andersson_UF000001). As to the intended navigation of the Vessel, ANDERSSON disclosed "Fl and Bahamas and Carib no

1

box." Ex 1, p. 2 (Andersson_UF000002).[1]  In response, Concept Special Risks Ltd. (hereinafter "Concept") sent a Quotation which offered terms for a policy of marine insurance.  The Quotation of November 19, 2018 is attached hereto as Exhibit 2 (Andersson_UF000012 – Andersson_UF000013).  The Quotation included this navigational limit: "Warranted that the Scheduled Vessel is confined to Florida, the Bahamas and the Caribbean Sea…"  Ex 2, p. 1 (Andersson_UF000012).

On December 21, 2018, W.R. Hodgens sent Concept an Application Form and a request to bind coverage in accordance with the terms of the Quotation.  The Email of December 21, 2018, along with the Application Form, is attached hereto as Exhibit 3 (Andersson_UF000051 – Andersson_UF000057).  The Application Form required ANDERSSON to truthfully disclose "ALL WATERS TO BE NAVIGATED DURING THIS POLICY PERIOD."  Ex 3, p. 4 (Andersson_UF000054).[2]  In response, ANDERSSON disclosed "FL Bah + Carib."  Ex 3, p. 4 (Andersson_UF000054).

In reliance on the material facts disclosed by ANDERSSON, Concept issued on behalf of GLI a policy of marine insurance bearing number CSRYP/172119 (hereinafter "the Policy").  ECF no. 1-2.  The Policy, along with the Claims Guidance, is attached hereto as Exhibit 4 (Aundersson_UF000083 – Andersson_UF000105).  The Policy afforded $365,000.00 in first-party property damage coverage for the vessel named "Melody," a 2000 47' Catana with Yanmar twin 55hp engines (hereinafter "the Vessel").  Ex 4, p. 1 (Andersson_UF000083).

---

[1] In maritime parlance, "the box" refers the "the hurricane box," which includes most of the Caribbean Sea.  *See*, the Website of ANDERSSON's agent, W.R. Hodgens (https://www.yachtinsure.com/news-hurricanes-navigation-box-insurance.html).

[2] Under the federal admiralty law doctrine of *uberrimae fidei* ("utmost good faith"), every applicant for a policy of marine insurance is under a duty to truthfully disclose all material facts to the underwriter, even if not asked.  *QBE Seguros v. Morales-Vázquez*, 986 F.3d 1 (1st Cir.2021).

The Policy stated: "**Named Operator:** Martin Andersson."   Ex 4, p. 1 (Andersson_UF000083).

The Policy stated: "**Navigational Limits:** Warranted that the Scheduled Vessel is confined to Florida, the Bahamas, and the Caribbean Sea…"  Ex 4, p. 2 (Andersson_UF000084).

The Policy stated: "**1. Definitions**… k. 'Seaworthy' means fit for the Scheduled Vessel's intended purpose.  Seaworthiness applies not only to the physical condition of the hull, but to all its parts, equipment and gear and includes the responsibility of assigning an adequate crew.  For the Scheduled Vessel to be seaworthy, it and its crew must be reasonably proper and suitable for its intended purpose."  Ex 4, p. 3 (Andersson_UF000085).

The Policy stated: "**9. General Conditions & Warranties**… b. It is warranted that the Scheduled Vessel is seaworthy at all times during the duration of this insuring agreement.  Breach of this warranty will void this insuring agreement from its inception."   Ex 4, p. 12 (Andersson_UF000094).

The Policy stated: "**9. General Conditions & Warranties**… t. Where any term herein is referred to as a 'warranty' or where any reference is made herein to the word 'warranted', the term shall be deemed a warranty and regardless of whether the same expressly provides that any breach will void this insuring agreement from inception, it is hereby agreed that any such breach will void this policy from inception."  Ex 4, p. 14 (Andersson_UF000096).

The Policy stated: "**Your Duties In The Event Of A Loss**… 1. Immediately take all possible steps to minimise the loss and protect the Scheduled Vessel from further loss.  Failure to do so may invalidate your insurance coverage or reduce the amount of the claim hereunder."  Ex 4, p. 16 (Andersson_UF000098).

The Policy stated: "**Your Duties In The Event Of A Loss**… 5. Give us an opportunity to examine the damaged property before it is repaired or discarded."   Ex 4, p. 16 (Andersson_UF000098).

The Policy stated: "**11. Service of Suit, Choice Of Law And Forum**… **It is hereby agreed that any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice but where no such well established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the State of New York.**"   Ex 4, p. 17 (Andersson_UF000099) [emphasis in original].[3]

The Claims Guidance stated: "**Will Insurers arrange repairs or recovery in the event of a loss?**   This is an indemnity policy which means that the insured makes repair and recovery arrangements and Insurers will refund the agreed amount."  Ex 4, p. 19 (Andersson_UF000101).

On December 14, 2019, the Vessel departed Aruba bound for St. Maarten.  ECF no. 9, p. 6.  The first email from W.R. Hodgens to Concept reporting the loss that is the subject of this litigation (hereinafter "the Grounding"), dated December 18, 2019, is attached hereto as Exhibit 5 (Andersson_CF000001).  That same day, ANDERSSON sent an email to Concept giving his first account of the details of the Grounding.  ANDERSSON's email of December 18, 2019 is attached hereto as Exhibit 6 (Andersson_CF000004).  The transcript of ANDERSSON's deposition is attached hereto as Exhibit 7, p. 22.  On December 17, 2019, The Vessel ran aground in the harbor of Boca Chica in the Dominican Republic.  Ex 6.

---

[3] As recently found by the United States Court of Appeals for the First Circuit, as to any issue for which there is no entrenched rule of federal admiralty law, this choice of law clause applies to the Policy's expressly written terms and conditions.  *Great Lakes Insurance SE v. Andersson*, 66 F.4th 20 (1st Cir.2023).

In response to ANDERSSON's first report of the Grounding, Concept instructed ANDERSSON that he was to "act as a prudent uninsured and Immediately take all possible steps to minimize the loss and protect the [Vessel] from further loss."  Concept's email to Andersson of December 18, 2019 is attached hereto as Exhibit 8, p. 5 (Andersson_CF000002 – Andersson_CF00006).[4]

That same day, Concept appointed an independent surveyor and adjuster, Andrew Ball (hereinafter "Ball") of Caribbean Marine Surveyors Ltd., to investigate the causes and circumstances of the Grounding.  Concept's email to Ball of December 18, 2019, as well as Ball's response, is attached hereto as Exhibit 9 (Andersson_CF000008).

On December 19, 2019, ANDERSSON reported to Concept that he had begun making arrangements with a salvage company to have the Vessel hauled from the water.  ANDERSSON's email to Concept of December 19, 2019 is attached hereto as Exhibit 10 (Andersson_CF000013).

That day, Ball notified ANDERSSON that he would arrive in the Dominican Republic later than evening.  Ball's email to ANDERSSON of December 20, 2019 is attached hereto as Exhibit 11 (Andersson_AB000193).  At the same time that he was making his travel arrangements, Ball was maintaining constant communication with ANDERSSON and advising on ANDERSSON's efforts to obtain a salvor.  Ex 11, p. 2 (Andersson_AB000194).

On December 21, 2019, ANDERSSON reported to Concept that he had arranged for two security guards to be onboard the Vessel to prevent theft and looting.  ANDERSSON's email to Concept of December 21, 2019 is attached hereto as Exhibit 12 (Andersson_CF000016).

---

[4] The duty to act as a "prudent uninsured" is established by federal admiralty law.  *Reliance Ins. Co. v. The Escapade*, 280 F.2d 482, 488; 1961 A.M.C. 2410 (5th Cir.1960), *American Home Assur. Co. v. Fore River Dock & Dredge, Inc.*, 321 F.Supp.2d 209, 220; 2004 A.M.C. 245 (D.Mass.2004).

Between December 21, 2019 and December 23, 2019, ANDERSSON provided Ball with a recorded statement pertaining to the facts and circumstances of the loss.  Ball's email to ANDERSSON of December 23, 2019 is attached hereto as Exhibit 13 (Andersson_AB000220 – Andersson_AB000225).  By the time that Ball had arrived, Ronald Naranjo had already left the Dominican Republic.  Affidavit of Ball, attached hereto as Exhibit 14.  According to that statement, ANDERSSON reported the following facts to Ball:

- The Vessel departed St. Maarten bound for Aruba with two people aboard, ANDERSSON and Ronald Naranjo (hereinafter "Naranjo"), at approximately 1730 on December 14, 2019.

- Shortly after departure from Aruba, ANDERSSON changed to a more northerly course because the Vessel was not making good headway to windward and because Naranjo was becoming seasick.

- By December 15, 2019, Naranjo was "incapacitated" by seasickness.[5]

- The Vessel contained no local cruising guides for Boca Chica in the Dominican Republic.

- Naranjo did not begin to recover from seasickness until after 1700 on December 16, 2019.

- The Vessel ran aground on a breakwater in the harbor of Boca Chica.

- The breakwater did not appear on any of the Vessel's electronic charts.

- The Vessel had no paper charts aboard.

- ANDERSSON arranged for security guards to stay onboard the Vessel and prevent looting.

- ANDERSSON met with a salvor to deal with the wreck.

    Ex 13, pp. 5-6.

Based on the facts gathered in the course of his investigation, Ball sent to Concept his first report on December 23, 2019.  Ball's report of December 23, 2019 is attached hereto as Exhibit

---

[5] Naranjo's incapacitation is confirmed by ANDERSSON's first responsive pleading in this matter.  ECF no. 9, p. 7.

14 (Andersson_AB000234 – Andersson_AB000247).  The report contained the following relevant

facts:

- Although the Vessel departed Aruba bound for St. Maarten, ANDERSSON shifted to a more northerly course because the Vessel was not making good headway to windward and because Naranjo was becoming seasick.  Ex 14, p. 2.

- Naranjo was incapacitated by seasickness, and his condition worsened throughout the voyage.  Ex 14, p. 2 and p. 6.

- Naranjo was beginning to recover by 1700 on December 16, 2019.  Ex 14, p. 2. Therefore, Naranjo was incapacitated by seasickness from the evening of December 14, 2019 until the evening of December 16, 2019.  Ex 14, p. 2.

- The Vessel ran aground on a breakwater in the harbor of Boca Chica that was not shown on the Vessel's electronic charts.  Ex 14, p. 3.

- The Vessel had no paper charts aboard.  Ex 14, p. 3.

- ANDERSSON arranged for two security guards to protect the Vessel from looting.  Ex 14, p. 3 and page 7.

- The breakwater was clearly shown on currently available electronic charts.  Ex 14, pp. 4-5.

- Ball asked the salvor arranged by ANDERSSON to take possession of the Vessel's GPS and send it to him for further testing.  Ex 14, p. 6.

Based on the facts gathered in the course of his investigation, Ball concluded that the loss

was caused by the Vessel's "unseaworthy condition due to lack of geographical information."  Ex

14, p. 7.  Moreover, Ball concluded that the Vessel likely ventured outside the Policy's 150 nautical

mile navigational limit.  Ex 14, p. 7.

On December 23, 2019, Concept advised ANDERSSON to keep security aboard the Vessel

as long as he saw fit.  Concept' email to ANDERSSON of December 23, 2019 is attached hereto

as Exhibit 15 (Andersson_CF000025).

On December 23, 2019, ANDERSSON informed Concept that the Vessel's Raymarine GPS was broken before the Vessel arrived at Boca Chica.  ANDERSSON's email to Concept of December 23, 2019 is attached hereto as Exhibit 16 (Andersson_CF000026).

On December 24, 2019, Concept advised ANDERSSON of his ongoing duty to protect the Vessel, which "may include arranging a salvage company to assist," and reminded him that "this is your responsibility."  Concept's email to ANDERSSON of December 24, 2019 is attached hereto as Exhibit 17 (Anderson_CF000053).

On December 26, 2019, ANDERSSON sent an email to Concept giving notice that he had received an offer from a local company to have the Vessel scrapped and asking for confirmation that he was free to make decisions as to the disposition of the Vessel.  ANDERSSON's email to Concept of December 26, 2019 is attached hereto as Exhibit 18, p. 1 (Andersson_CF000054 – Andersson_CF000055).  In response, Concept informed ANDERSSON that, since coverage had yet to be confirmed, he was free to accept the offer on a without prejudice basis.  Ex 18, p. 2 (Andersson_CF000055).  Simultaneously, Concept sent to ANDERSSON a reservation of rights letter detailing the possible coverage issues arising out of the facts uncovered in Ball's investigation.  The Reservation of Rights Letter of December 27, 2019 (hereinafter "the ROR Letter") is attached hereto as Exhibit 19 (Andersson_CF000056 – Andersson_CF000057).  The ROR Letter detailed all the coverage issues which were later raised in GLI's declaratory judgment action; the breach of the Vessel's navigational limits warranty and the breach of the Vessel's seaworthiness warranty.  Ex 19, pp. 1-2 (Andersson_CF000056 – Andersson_CF000057), ECF no. 1.  In addition, the ROR Letter stated that Naranjo's incapacitation might also have rendered the Vessel unseaworthy.  Ex 19, p. 2 (Andersson_CF000057).  Finally, the ROR Letter expressly

reserved GLI's right to amend its coverage position in the future.   Ex 19, p. 2 (Andersson_CF000057).

Therefore, as of December 27, the date on which ANDERSSON was expressly advised that he was free to handle the wreck of the Vessel, ANDERSSON knew of the coverage issue raised by his alleged breach of the Policy's navigational limits warranty.

Although he disagreed with Concept's decision regarding coverage, ANDERSSON informed Concept that he would proceed with getting the Vessel safely to salvage. ANDERSSON's email to Concept of December 28, 2019 is attached hereto as Exhibit 19 (Andersson_CF000064).

On January 2, 2020, ANDERSSON informed Concept by email that he had arranged for a salvor to deal with the wreck of the Vessel, and further asked if it was acceptable to GLI that he ownership of the Vessel be transferred to the salvor.  ANDERSSON's email to Concept of January 2, 2020 is attached hereto as Exhibit 20 (Andersson_CF000068).  Concept advised ANDERSSON that same day that GLI had no objection to transferring ownership of the Vessel to the salvor. Concept's email to ANDERSSON of January 2, 2020 is attached hereto as Exhibit 21 (Andersson_CF000073).   The log of text messages between ANDERSSON and the savlor, produced by ANDERSSON as part of his Fed.R.Civ.P. 26 mandatory disclosures, is attached hereto as Exhibit 22, p. 2 (MA000002 – MA000005).

On January 6, 2020, ANDERSSON sent an email to Concept with photographs of the Vessel's two GPS devices (hereinafter "the Raymarine" and "the Garmin"), disclosing that the Raymarine was damaged and that the condition of the Garmin was unknown.   ANDERSSON's email to Concept of January 6, 2020 is attached hereto as Exhibit 23 (Andersson_CF000116 – Andersson_CF000119).   These photos were taken either by ANDERSSON or by the salvor.

Therefore, ANDERSSON knew that the salvor had possession of the Raymarine and Garmin, not Ball.

On January 10, 2019, ANDERSSON executed the salvage agreement he had arranged with the salvor.  The Marine Salvage Service Agreement is attached hereto as Exhibit 24.

In response to the ROR Letter, ANDERSSON sent a letter to Concept detailing his objections to GLI's coverage decision.  ANDERSSON's letter of January 15, 2020 is attached hereto as Exhibit 26 (Andersson_CF000145 – Andersson-CF000148).  The letter of January 15, 2020 stated, in relevant part:

- ANDERSSON retained an attorney in the Dominican Republic to prepare the salvage agreement.

- ANDERSSON objected to GLI's invocation of the navigational limits warranty, asserting that weather prevented him from keeping his intended course within the navigational limits and that his diversion was made for the purpose of getting medical attention for Naranjo.

- The letter affirmed ANDERSSON's awareness that only operators named on the Policy's declarations page were permitted to operate the Vessel.  Nonetheless, ANDERSSON further stated that Naranjo's incapacitation did not render the Vessel unseaworthy because "I am capable of sailing Melody singlehanded."

- Neither the Vessel's Raymarine nor the Vessel's Garmin contained charts showing the breakwater on which the Vessel ran aground.

- ANDERSSON had made arrangements with the savlor to store the Vessel for approximately thirty (30) more days.

Ex 26.

The facts of this letter are especially vital to note because, earlier in these proceedings, counsel for ANDERSSON alleged that "It would be completely irrational to believe Andersson would not have slept during the entire voyage…  It does not take an expert to understand that it would not be possible for one person to sail singlehandedly for three full days and nights without sleep."  ANDERSSON's Opposition to GLI's Motion to Amend, ECF no. 58, p. 5.  As these

documents prove, GLI did investigate this matter and based its coverage decisions on ANDERSSON's own statements that Naranjo was "incapacitated" by seasickness so badly that ANDERSSON had to change course to get medical attention and that, under such circumstances, he was "capable of sailing Melody singlehanded."  Ex 26.  When counsel for ANDERSSON accused GLI and the undersigned of being thoughtless and irrational, she did not disclose to the Court these communications from ANDERSSON.  ECF no. 58, p. 5.

Following the receipt of ANDERSSON's letter of January 15, 2020, Concept sent the letter to its adjuster for comments.  Concept's email to Ball dated January 27, 2020 and Ball's comments in reply are attached hereto as Exhibit 27 (Andersson_CF000152 – Andersson CF000154).  Ball's email to Concept described in detail the facts and circumstances which triggered the potential coverage issues first outlined in his report of December 23, 2019:

- The course change took the Vessel outside the Policy's navigational limits.

- None of the circumstances reported by ANDERSSON would have prevented the Vessel from returning to Aruba.

- The Vessel did not have current, accurate charts, thus rendering the Vessel unseaworthy in his opinion.

Ex 27.

On February 20, 2020, ANDERSSON sent an email to Ball asking when he could expect his GPS to be returned.[6]  ANDERSSON's email to Ball of February 20, 2020, as well as Ball's reply of that same day, is attached hereto as Exhibit 28 (Andersson_AB000284 – Andersson_AB000285).  Ball informed ANDERSSON that the salvor still had possession of the GPS.  Ex 28.

---

[6] From the correspondence, it is not clear which GPS device ANDERSSON was referring to, the Raymarine or the Garmin.

On February 21, 2020, ANDERSSON sent a text message to the salvor requesting information from the two GPS devices aboard the Vessel.  Ex 22, pp. 4-5.  On March 9, 2020, March 13, 2020, March 18, 2020, and March 20, 2020, ANDERSSON sent multiple text messages to the salvor requesting that the savlor either send the GPS devices to ANDERSSON or that the salvor retain the GPS devices until any trial.  Ex 23, pp. 4-5.

Finally, based on the facts revealed in Ball's investigation, as well as Ball's opinions as to the coverage issues raised by those facts, Concept referred this matter to the law firm of Goldman & Hellman for an outside coverage opinion.  Following that referral, GLI caused to be filed the present declaratory judgment action on February 27, 2020, asserting that the Policy afforded no coverage for the Grounding due to ANDERSSON's breach of the Policy's navigational limits warranty and breach of the Policy's express and implied seaworthiness warranties.  ECF no. 1.

## **Burden of Proof**

"Summary judgment is appropriate when there are no genuinely disputed material facts and the moving party is entitled to judgment as matter of law."  *New Hampshire Ins. Co. v. Dagnone*, 475 F.3d 35, 37; 2007 A.M.C. 334 (1st Cir.2007) (affirming the district court's award of summary judgment to the marine insurer based on the vessel owner's breach of a lay-up warranty).  "A fact is material if it 'might affect the outcome of the suit' under governing law[.]"  *Markel American Ins. Co. v. Diaz-Santiago*, 674 F.3d 21; 2013 A.M.C. 2303 (1st Cir.2012), *quoting*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the burden of proving it is entitled to summary judgment.  *Atlantic Specialty Insurance Company v. Karl's Boat Shop, Inc.*, 480 F.Supp.3d 322, 329 (D.Mass.2020), *Northern Assur. Co. of America v. Keefe*, 845 F.Supp.2d 406, 411; 2012 A.M.C. 958 (D.Mass.2012), *St. Paul Fire and Marine Ins. Co. v. Halifax Trawlers, Inc.*, 495 F.Supp.2d 232,

236; 2007 A.M.C. 2183 (D.Mass.2007), *Underwriters at Lloyd's v. LaBarca*, 106 F.Supp.2d 205 (D.P.R.2000), *aff'd, LaBarca, infra*.   Once the moving party carries its burden, the non-moving party has the burden of producing evidence creating a "genuine issue" of dispute.   *Id*.

Under Fed.R.Civ.P. 56, the party moving for summary judgment bears the burden of showing that there are no disputes of material fact and that it is entitled to judgment as a matter of law.   *Patel v. 7-Eleven, Inc.*, 618 F.Supp.3d 42, 45-46 (D.Mass.2022).

Under M.G.L.A. §93A and §176D, the insured bears the burden of proving that the insurer acted in bad faith.   *McLellan v. Hanover Ins. Grp., Inc.*, 2020 WL 5821084, at *2 (Mass. Dist. Ct. Sept. 21, 2020).   "To establish a claim of bad faith, a plaintiff must produce factual evidence of the defendant's knowledge and intent."   *Clarendon National Insurance Company v. Philadelphia Indemnity Insurance Company*, 954 F.3d 397, 409 (1st Cir.2020).

### Legal Analysis (Allegation of Bad Faith Handling of the Claim)

"Massachusetts courts have emphasized that [M.G.L.A. ch. 93A, §9(3A) and ch. 176D, §3(9)] do[] not 'penalize insurers who delay in good faith when liability is not clear and requires further investigation.'"   *State Farm Fire and Casualty Company v. Pike*, 389 F.Supp.3d 94 (D.Mass.2019), *quoting*, *Scott v. Vermont Mut. Ins. Co.*, 2011 WL 4436984, at 6 (D.Mass.2011).   Scott, 2011 WL 4436984, at 8.   "Therefore, '[l]iability under c. 176D and 93A does not attach merely because an insurer concludes that it has no liability under an insurance policy and that conclusion is ultimately determined to have been erroneous.'"   *Id*, *quoting*, *Pediatricians, Inc. v. Provident Life & Accident Ins. Co.*, 965 F.2d 1164, 1173 (1st Cir.1992).   "A plausible, reasoned legal position that may ultimately turn out to be mistaken – or simply, as here, unsuccessful – is

13

outside the scope of the punitive aspects of the combined application of c. 93A and c. 176D." *Id*, *quoting*, Guity v. Commerce Ins. Co., 631 N.E.2d 75, 77 (Mass.App.Ct.1994).

"Whether liability is reasonably clear depends on 'whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff.'" *Id*, *quoting*, *Nyer v. Winterthur Int'l*, 290 F.3d 456, 461 (1st Cir.2002). "'Whether the defendant's liability in this case became 'reasonably clear' calls for an objective standard of inquiry into the facts and the applicable law.'" *Id*, *quoting*, Bobick v. U.S. Fidelity & Guar. Ins. Co., 781 N.E.2d 8, 10 (Mass.App.Ct.2003). "'Relevant evidence may include insurance industry practices in similar circumstances, expert testimony that the insurer violated sound claims practices, the defendant' own evaluation of the plaintiff's claim, and advice given to the insurance company on the probability of success at trial.'" *Id*, *quoting*, *O'Leary-Alison v. Metropolitan Prop. & Cas. Ins. Co.*, 752 N.E.2d 795, 798 (fn. 3) (Mass.App.Ct.2001). Moreover, proving bad faith requires that the insured prove that the insurer acted with both knowledge and intent. *Clarendon*, at 409.

For instance, this Court was called upon to apply M.G.L.A. ch. 176D in a case arising out of a liability policy covering a company that managed kitchen machinery. *Public Service Mut. Ins. Co. v. Cape Cod Distributors, Inc.*, 2012 WL 745019 (D.Mass.2012). When an employee was injured on the job, his employer sought liability coverage from the insurer. *Id*, at p. 2. The insurer investigated the claim and determine that the liability policy afforded no coverage based on certain express exclusions. *Id*, at p. 3. In the subsequent litigation, the district court found against the insurer and held that the express exclusions did not apply to the specific facts of the case and that the liability policies therefore afforded coverage. *Id*, at pp. 8-15.

Once coverage was established, the district court was called upon to determine whether the insurer's denial was a breach of the Massachusetts statute.  *Id*, at p. 16.  The district court began with the rule that should decide the present case, "[a]n insurer who takes a plausible, reasoned legal position that may ultimately turn out to be mistaken-or simply unsuccessful-is outside the scope of the punitive aspects of the combined application of c. 92A and c. 176D."  *Id*.  Therefore, since merely being wrong is not adequate to prevail on a bad faith claim under Massachusetts law, the district court denied the insured's motion.  *Id*, at p. 17.

Neither is it bad faith for the insurer to file a declaratory judgment for the purpose of determining coverage.  *New Hampshire Ins. Co. v. Rinkem, Inc.*, 2015 WL 12964338 (D.Mass.2015), *Public Service*, *supra*.

To give another example, the First Circuit dealt with this precise issue in an admiralty case and reached the same conclusion, that the mere fact that the marine insurer was wrong about coverage did not suffice to show that the marine insurer acted in bad faith.  *Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, 169 F.3d 43; 2001 A.M.C. 1320 (1st Cir.1999).  The facts of the *Ferrara* case illustrate GLI's good faith in handling the present matter.  *Ferrara* concerned a policy of marine insurance covering a fishing vessel.  *Id*, at 46.  Following a fire which destroyed the vessel, the marine insurer immediately appointed investigators, who examined the vessel five days later.  *Id*, at 47.  The investigators then spent a month examining the physical evidence from the fire.  *Id*.  During that time, the investigators removed a suspicious electrical panel without the insured's permission, although the panel was available to the insured.  *Id*.  Based on the investigators' evidence that the fire had be deliberately set, the marine insurer denied coverage based on the limitation to fortuitous losses.  *Id*, at 50.  Following a trial to resolve disputed facts as to the cause of the loss, the trial court ruled as a matter of law that the loss caused by arson was

a fortuitous event covered by the policy.  *Id*, at 49.  However, despite finding that the marine insurer's coverage decision was wrong, the district court refused to find that the marine insurer acted in bad faith under M.G.L.A. ch 176D, §3.  *Id*.

On appeal, the First Circuit affirmed the district court's judgment that, as a matter of law, there was insufficient evidence to find that the marine insurer acted in bad faith.  *Id*, at 56.  First, the court held that, when making a coverage decision, an insurer is entitled to rely on the opinions of the experts which it appointed to investigate the claim.  *Id*.  Therefore, even though the district court later disagreed with the investigators' conclusions, the marine insurer did absolutely nothing wrong when it based its decision on those conclusions.  *Id*.  Second, the court held that the unauthorized removal of the electrical panel also failed to show bad faith because no evidence was presented that the removal was undertaken for any improper purpose.  *Id*, at 57.  Therefore, the First Circuit affirmed the district court's summary judgment decision and held that there was insufficient evidence as a matter of law to hold that the marine insurer acted in bad faith.  *Id*.

Applying the principles described above, the question before this court cannot be whether GLI's coverage evaluation was correct.  *Id*.  Although GLI is still contesting that issue (ECF no. 134), the question of the merits is irrelevant.  *Id*.  Rather, the only question now is whether GLI properly handled ANDERSSON's claim, whether GLI had a reasonable basis for its decision to deny coverage, and whether GLI intended to act improperly.  *Clarendon*, at 409.

The facts which are exhaustively detailed above show that GLI acted throughout this matter, from investigation to denial, with the utmost propriety and promptitude.  The first notice that GLI received of the Grounding came in an email from ANDERSSON's agent, W.R. Hodgens, received at 12:43pm on December 18, 2019.  Ex 5.  Within twenty-one minutes, GLI had responded, asking for additional information about the loss and asking for the submission of a

standard claim form.  Ex 8.  Eighteen minutes after receiving some of this information from ANDERSSON, GLI advised him of his legal duty to act as "prudent uninsured" to mitigate his damages and informed him that it would be appointing an adjuster.  Ex 8.

Eighteen minutes after that, GLI contacted the adjuster with instructions to investigate ANDERSSON's claim.  Ex. 9.

Over the course of the next ?? days, Ball proceeded to investigate the facts of the loss… In particular, Ball's file and affidavit show that he did specifically inquire into the handling of the Vessel on its final voyage.  In the course of that investigation, it was ANDERSSON who informed Ball that Naranjo was incapacitated by seasickness.  Furthermore, it was ANDERSSON who informed Ball that he was capable of handling MELODY singlehanded.

This point needs special emphasis because it relates to allegations made by ANDERSSON and his counsel in his opposition to GLI's motion to amend.  Based on the facts which ANDERSSON provided in the course of the investigation, GLI had no reason whatsoever to guess that Naranjo had operated the vessel.  Throughout that investigation, it was ANDERSSON himself who insisted that Naranjo was incapacitated by seasickness early in the voyage, that his condition worsened throughout the voyage, and the ANDERSSON was capable throughout the voyage of handling the Vessel singlehanded.

Finally, with respect to its legal options, the undisputed facts show nothing except the most straightforward and honest handling of ANDERSSON's claim.  First, having obtained all the facts concerning the causes and circumstances of the loss, GLI's independent adjuster produced a report which exhaustively detailed those facts and communicated his opinion that these facts triggered multiple coverage issues; breach of the navigational limits warranty and the unseaworthiness of

the Vessel due to the inadequate charts.[7]  Second, GLI informed ANDERSSON of those coverage issues and expressly reserved its rights under the Policy.  Third, following the receipt of the independent adjuster's recommendations, GLI sought the opinion and recommendation of outside coverage counsel.  Fourth, in possession of outside coverage counsel's opinion and recommendation, GLI elected to vindicate its rights under the Policy by filing the present declaratory judgment action.  ECF no. 1.

The totally undisputable evidence shows that GLI acted with the utmost propriety throughout its investigation and analysis of ANDERSSON's claim.  Therefore, there is zero evidence showing the GLI had any knowledge or intent to act in bad faith or in breach of its duties under M.G.L.A. ch. 176D, §9.

### GLI's Good Faith – Proceedings Before this Court

Although the Massachusetts statute says nothing about the conduct of the insurer in the litigation, completeness requires noting that the record is entirely devoid of any evidence that GLI has acted in bad faith during this litigation.  GLI has provided ample support for the legal contentions it has advanced.

As stated in his counterclaim, ANDERSSON alleges that GLI delayed informing him of its coverage decision for the deliberate purpose of filing the present declaratory judgment action. There are two dispositive problems with this claim.  First, the undisputed facts show GLI informed

---

[7] The assertion that a vessel lacking updated charts is unseaworthy is amply supported by the caselaw.  *Union Oil Company of California v. M/V Point Dover*, 756 F.2d 1223, 1229 (5th Cir.1985), *Director General of India Supply Mission for and on Behalf of President of Union of India v. Steamship Maru*, 459 F.2d 1370, 1372; 1972 A.M.C. 1694 (2d Cir.1972), *The W.W. Bruce*, 94 F.2d 834; 1938 A.M.C. 232 (2d Cir.1938) *The Maria*, 91 F.2d 819; 1937 A.M.C. 934 (4th Cir.1937), *Commonwealth of Puerto Rico v. The S.S. Zoe Colocotroni*, 456 F.Supp. 1327, 1332; 1979 A.M.C. 21 (D.P.R.1978), *aff'd in part, vacated in part*, 682 F.2d 652, 1981 A.M.C. 2185 (1st Cir.1980), *cert. denied*, 450 U.S. 912, 101; 1981 A.M.C. 2099 (1981), *Matter of Complaint of Supreme Towing Co., Inc.*, 2010 WL 11561150 (E.D.La.2010), *In re TT Boat Corp.*, 1999 A.M.C. 2766; 1999 WL 223165 (E.D.La.1999), *Traylor Bros., Inc. v. Tug Robert Greene*, 1986 WL 12229 (E.D.La.1986), *In the Matter of Complaint of Delphinus Maritima*, 523 F.Supp. 583; 1981 A.M.C. 2362 (S.D.N.Y.1981), *In the Matter of Complaint of The Thebes Shipping Inc.*, 486 F.Supp. 436; 1908 A.M.C. 1686 (S.D.N.Y.1980), *Protection Maritime Ins. Co. Ltd., of London, England v. U.S.*, 368 F.Supp. 690 (W.D.Ky.1973), *The Iowa*, 34 F.Supp. 843; 1941 A.M.C. 111 (D.Or.1940).

ANDERSSON of the facts and policy terms impacting coverage on December 27, 2019.  Two months later, after referral of this matter to outside coverage counsel, GLI filed the present declaratory judgment action.  ECF no. 1.  ANDERSSON had two months in which to decide to challenge GLI's coverage determination.  Second, under Massachusetts law, there is absolutely nothing whatsoever improper in an insurer electing to vindicate its legal rights by filing a declaratory judgment action.  In fact, Massachusetts law specifically contemplates that the filing of a declaratory judgment action by an insurer against its insured is a proper way to seek guidance as to whether the disputed policy affords coverage.  *Clarendon*, *supra*.  Therefore, without more, there is no basis for finding that the filing of declaratory judgment action is improper in any way.

The first motion filed by GLI in this matter was its motion to strike ANDERSSON's jury demand.  ECF no. 13.  GLI supplied this Court with ample caselaw to support its decision, and this Court granted the motion.  *Great Lakes Insurance SE v. Andersson*, 525 F.Supp.3d 205 (D.Mass.2021).

The next motion filed by GLI was its motion to enforce the Policy's choice of law clause and to dismiss those of ANDERSSON's claim arising under Massachusetts law.  ECF no. 30. Although the First Circuit eventually ruled against GLI on the interpretation of the words of its choice of law clause, GLI's motion to enforce the choice of law clauses relied on multiple cases expressly disagreeing with the First Circuit's interpretation, including a case specifically addressing that argument and enforcing GLI's choice of law clause.  *Bominflot, Inc. v. The M/V HENRICH S*, 465 F.3d 144; 2006 AMC 2510 (4th Cir.2006), *Arndt v. Twenty-One Eighty-Five, LLC*, 448 F.Supp.3d 1310 (S.D.Fla.2020), *American S.S. Owners' Mut. Protection and Indem. Ass'n, Inc. v. Dann Ocean Towing, Inc.*, 2012 WL 1565141 (D.Md.2012), *Great Lakes Insurance SE v. Tico Time*, 2011 WL 1044154 (S.D.Tex.2011).  Moreover, this Court initially agreed with

GLI's interpretation. *Great Lakes Insurance SE v. Andersson*, 544 F.Supp.3d 196, 199-200 (D.Mass.2021). Surely, this Court was not acting in bad faith when it agreed with GLI's interpretation of the express terms of the choice of law clause and held that GLI's choice of law clause barred the enforcement of the Massachusetts bad faith statute. *Id.*

Third, GLI filed a motion to amend its declaratory judgment action on June 28, 2021, asking leave to add a cause of action based on ANDERSSON's breach of the Policy's named operator warranty. ECF no. 56. As detailed exhaustively above, GLI was diligent in its investigation of the facts of the loss. *Id.* GLI appointed an adjuster who took a statement from ANDERSSON in order to determine the facts and circumstances of the Vessel's final voyage. *Id.* At the time that this statement was taken by Ball, Naranjo had already left the Dominican Republic. Ex ??, p. ??. In addition, GLI had no reason to suspect that ANDERSSON would be less than wholly truthful about the facts of his last voyage. Pertaining to the operation of the Vessel during that voyage, ANDERSSON gave the following information:

- ANDERSSON reported that Naranjo was "incapacitated" by seasickness shortly after the Vessel departed Aruba. Ex 12, pp. 5-6.

- ANDERSSON reported that Naranjo's condition worsened throughout the voyage. Ex 13, p. 2 and p. 6.

- In response to GLI's ROR letter, ANDERSSON asserted that Naranjo's condition was so severe that he had to change course in order get medical attention for Naranjo. Ex 26.

- In response to GLI's ROR letter, ANDERSSON asserted that he was capable of handling the Vessel "singlehanded." Ex 26.

In opposition to GLI's motion to amend, counsel for ANDERSSON alleged that, due to the distance of the voyage from Aruba to the Dominican Republic, GLI should have known that ANDERSSON must have slept, and that Naranjo must has operated the Vessel during those times. ECF no. 58. However, opposing counsel did not inform this Court of contrary facts: (1)

ANDERSSON himself had informed GLI that Naranjo was "incapacitated" by seasickness so severe that ANDERSSON felt it necessary to divert course, (2) ANDERSSON himself had informed GLI that Naranjo's condition only worsened throughout the voyage, and (3) ANDERSSON himself had informed GLI that he was a sufficiently skillful and experienced sailor that he was "capable of sailing Melody singlehanded." Ex 26, p. 3. Based on these facts, GLI had no reason to suspect that Naranjo was not incapacitated throughout most of the voyage, nor any reason to suspect that the Vessel must have been operated by Naranjo during those periods when ANDERSSON must have slept.

Finally, in requesting summary judgment on the merits, GLI amply supported its motion with caselaw holding that, under federal admiralty law, a vessel that lacks current, updated charts is unseaworthy. *See footnote 7 above*.

Just as it properly conducted its investigation, GLI has properly supported its legal contentions. Therefore, there is no basis for contending that GLI has ever had any "knowledge or intent" to act in bad faith throughout this litigation.

## Conclusion

There is simply nothing in the record before this Court showing that GLI ever acted in bad faith. GLI did everything necessary to investigate the causes and circumstances of loss, maintained constant communication with ANDERSSON, properly informed him of the coverage issues, and sought the legal opinion of outside coverage counsel. On these undisputed facts, there can be no finding that GLI acted with the requisite "knowledge and intent" to breach M.G.L.A. §93A and §176D.

WHEREFORE, GLI asks that this Court award it summary judgment with respect to ANDERSSON's bad faith claim under Massachusetts law, and award all such further relief as may be appropriate in the premises.

Dated: June 9, 2023
Brookline, Massachusetts

THE GOLDMAN MARITIME LAW GROUP
Attorneys for Plaintiff
233 Harvard Street
Suite 211
Brookline, MA 02446
Tel (617) 566-4200
Cel (617) 671-8657
Fax (617) 566-4292

By: _____/s/ Michael I. Goldman_____
MICHAEL I. GOLDMAN ESQ.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Court using the CM/ECF System which will provide and electronic notice to all counsel, of record.

Dated: June 9, 2023
Brookline, Massachusetts

GOLDMAN & HELLMAN
Attorneys for Plaintiff
233 Harvard Street
Suite 211
Brookline, MA 02446
Tel (617) 566-4200
Cel (617) 671-8657
Fax (617) 566-4292

By: _____/s/ Michael I. Goldman_____
MICHAEL I. GOLDMAN ESQ.