**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**IN ADMIRALTY**

| | |
|---|---|
| _____ ) | |
| ) | |
| **GREAT LAKES INSURANCE SE,** ) | |
|     **Plaintiff/Counter-defendant** ) | |
| ) | **CIVIL ACTION** |
| **v.** ) | **NO. 20-40020-TSH** |
| ) | |
| **MARTIN ANDERSSON,** ) | |
|     **Defendant/Counter-plaintiff.** ) | |
| ) | |
| _____ ) | |

<u>**MEMORANDUM OF DECISION AND ORDER ON**</u>
<u>**CROSS MOTIONS FOR SUMMARY JUDGMENT**</u>
**March 28, 2024**

**HILLMAN, S.D.J.**

Plaintiff Great Lakes Insurance, SE ("GLI") brought this declaratory judgment action under admiralty law against its insured, Martin Andersson ("Andersson") to determine coverage under a marine insurance policy with respect to the loss of Andersson's insured vessel, *The Melody,* which was totaled when it struck a breakwater in the Dominican Republic in December 2019. Andersson filed counterclaims for breach of contract (Count I), equitable estoppel (Count II) and bad faith insurance claims settlement practices under Mass. Gen. L. c. 176D and c. 93Am §9 (Count III).

<u>**Procedural Background**</u>

The Court dismissed Count III of Andersson's counterclaim on June 21, 2021, due to the policy's choice of law clause. Andersson appealed and the decision was reversed and remanded

by the First Circuit, holding that because Andersson's counterclaim is based on a statute and not on the insurance policy, it does not fall withing the policy's choice of law provision. On the parties' first cross-motions for summary judgment, this Court granted summary judgment in favor of Andersson as to Counts I and II on March 21, 2023, which GLI appealed. The First Circuit affirmed the Court's decision on December 22, 2023. This matter is currently before the Court on the GLI's motion for summary judgment and Andersson's cross-motion for summary judgment on Count III of Andersson's counterclaim.

## Factual Background

The following material facts, relevant to the counterclaim, are undisputed except where noted. GLI issued an insurance policy to Andersson effective December 21, 2018, through December 21, 2019, which insured Andersson's vessel, Melody, a 47' Catana Sail catamaran, for a hull value of $365,000.[1] Andersson, an experienced sailor,[2] planned a voyage from Aruba to Sint Maarten,[3] which he expected to last approximately five days, on the Melody with one crewman, Ron Naranjo. The intended route was around the southeastern tip of Aruba, then northeast to clear the Venezuelan Islands. Andersson then planned to head east toward Grenada and then north to Sint Maarten. Andersson prepared for the journey with the following navigation and safety devices on board: a VHF radio, a satellite phone, radar, up to date paper charts for the areas he intended to sail, and Garmin GPS with electronic charts for the "entire Caribbean Sea."[4] See Andersson Affidavit, Docket No. 167-1, p.2, ¶ 11-12; Andersson Deposition, Docket No.

---

[1] The parties have stipulated that vessel was a constructive total loss and the total contract damages are $365,000 for the hull and $10,594.30 in "sue and labor" expenses for a total of $375,594.30.

[2] Andersson had been sailing for 30 years, beginning when he was 16 years old in the Swedish Navy.

[3] The island is commonly referred to by its English name, Saint Martin, however, the Court will use its Dutch name as it was used in the pleadings.

[4] Andersson had updated paper charts onboard for the Leeward Islands, the Windward Islands, and Aruba, all of which were on his intended course from Aruba to Sint Maarten. The vessel also had electronic charts on its Garmin GPS for the Dominican Republic which were outdated and did not show the breakwater. More current charts that were available, but not on board, in December 2018 did show the breakwater.

157-7, p. 6, pp. 22-24. Andersson and Naranjo departed customs in Aruba around 5:30 p.m. on the evening of December 14, 2019, after confirming that all of his electronics and systems were in working order and that there was no issue with the weather forecast.

After rounding the southeastern tip of Aruba and attempting to head northeast, the winds increased which caused Naranjo to become seasick. Andersson headed more northward, attempting to avoid damage from the waves and ease Naranjo's seasickness. Eventually, the winds pushed Andersson northwesterly toward the Dominican Republic, at which point he realized the VHF radio transmitter and the generator were broken. He called the agent who sold him the vessel and was directed to the harbor of Boca Chica, where he waited outside the harbor for a guide into the inner harbor for the repairs. At this point, a wave lifted the vessel from behind and pushed it forward into shallow water. Andersson could not reverse the vessel quickly enough to avoid being pushed onto a breakwater which was partially submerged.

The vessel went aground at approximately 6:30 p.m. on December 17, 2019. Andersson reported the claim to his insurance agent at 6:03 a.m. on December 18, 2019. The claim was received from the agent by Concept Special Risks, GLI's managing general agent, at 12:43 p.m. in England, about 40 minutes later. As GLI's Managing General Agent, Concept handles all underwriting activities and all claims investigations on GLI's behalf. In an email to Bill Bailey and copied to Andrew Ball, both of Caribbean Marine Surveyors, Ltd., Concept asked Bailey to "handle this urgent matter." Concept then informed Andersson it had assigned Caribbean Marine to assist and provided him with Ball's contact information. Ball is a surveyor and not an insurance adjuster. Concept told Andersson by email that he should "act as a prudent uninsured and immediately take all possible steps to minimize the loss and protect the Scheduled Vessel from further loss."

On December 19, 2019, as arrangements were made for Ball to inspect the damaged vessel, Andersson asked if he could complete a claim form after Ball's inspection. Andersson was told not to worry about the claim form and was sent a list of duties to be performed after a loss. On December 21, 2019, Ball inspected the vessel with Andersson and subsequently met with Andersson to interview him about what happened. Ball took handwritten notes, but the interview was not recorded by audio or video. Ball returned home to the British Virgin Islands.

On December 23, 2019, Ball sent an email to Andersson asking for the crew member's contact information and the amount of fuel that was left in the tanks. He also asked for Andersson's permission to remove the GPS from the vessel for the investigation. Ball also asked Andersson to review a typed statement he had drafted, which purported to memorialize the December 21 interview. The typed statement was based on Ball's one-page, handwritten notes from his interview with Andersson.

Also on December 23, 2019, Ball sent a report to Concept, reflecting his opinion that the navigational warranty on Andersson's policy was violated and suggested there was a violation of the warranty of seaworthiness due to the lack of local charts (for the Dominican Republic) and the condition of the crew. Ball recommended in the report that the GPS should be obtained from the salvor to determine if the charts in the GPS were updated. Andersson was not provided a copy of Ball's report. On December 24, 2019, Andersson sent a video to Concept and indicated, "The [Santo Domingo] Navy is pushing me for an answer on when the insurance company will get back with information about moving the boat." Concept responded that arranging for salvage is Andersson's responsibility and referred him to Bill Bailey for advice.

On December 26, 2019, Andersson asked for GLI's agreement for him to transfer ownership of the vessel to a salvage company in exchange for salvage. Concept sent a two-page

4

reservation of rights letter in response on December 27, 2019, and told Andersson he may accept the salvor's offer. The reservation was based on alleged breach of the warranty of navigation and the warranty of seaworthiness. The reservation of rights letter stated that the investigation was "ongoing" and reserved the insurer's right to extend coverage "until our investigation is complete at which time a determination of coverage will be made."

On December 28, Andersson informed Concept he would respond to the reservation of rights letter after conferring with his lawyer and would also handle the salvage. Andersson found a salvor willing to take title to the vessel for a nominal amount in exchange for the salvage. The salvor agreed to maintain the vessel and its components for 30 days and to give access to the insurer for the investigation. On January 2, 2020, Andersson provided draft terms of his agreement with the salvor to Concept and asked Concept whether the terms would be acceptable to GLI. The information provided by Andersson included the identity of the salvor and the provision requiring the salvor to hold the vessel for 30 days for the insurance investigation. Concept responded that GLI had no objection to these terms.

On January 3, 2020, Andersson asked Concept for the contact details for "the actual insurance company" and was told by Concept that it was the managing general agent for the insurer and was therefore the correct contact. Andersson retained a lawyer in the Dominican Republic to draft the contract with the salvor. Once title to the vessel was transferred on January 10, 2020, Andersson was able to leave the Dominican Republic.

On January 16, 2020, Andersson sent an email to GLI and attached his January 15 response letter addressing the issues raised in the reservation of rights letter. In this correspondence, Andersson informed GLI of his move from Massachusetts to New Jersey and provided his new address. Also, in the email, Andersson described his intended voyage and

pointed out that the best evidence of the track of the voyage would be the Garmin GPS, and stated his belief that the Garmin GPS is in Ball's possession. He also suggested the Raymarine GPS unit could be obtained from the salvor. Andersson addressed the seaworthiness issues, making it clear his crew member did not become sick immediately after departure and reminded GLI of the 30-day window during which it could access the vessel.

Neither GLI nor Concept ever obtained the GPS from the salvor. Following his December 21, 2019, meeting with Andersson, Ball had no further involvement or communication with any salvor related to the loss. On January 27, 2020, eleven days after receiving Andersson's letter, GLI asked Bailey for his response to the letter from Andersson. On January 28, 2020, having not received a response, Andersson asked for confirmation that his letter was received. Receipt was confirmed by Concept, replying that it "asked our surveyors for comments." On January 31, 2020, Ball provided comments to Concept regarding the Andersson's January 16 letter. Ball concedes that took no actions to further investigate the claim. He did not contact the crew member, did not obtain or inspect the GPS, nor did he re-interview Andersson about the facts raised in the letter. On February 19, 2020, Andersson emailed Concept to ask if they would return his GPS. Concept told Andersson to ask the surveyor. On February 27, 2020, GLI filed this lawsuit in the District of Massachusetts. On March 2, 2020, GLI sent Andersson a denial letter.

Mr. Usher, GLI's corporate representative, repeatedly acknowledged that the denial was "based purely on the reports of Mr. Ball" and that no other investigation was undertaken "other than Mr. Ball travelling to inspect the vessel and to speak with Mr. Andersson." Despite conceding that the GPS would provide the most accurate evidence of the vessel's journey, Usher was unaware of any effort made by Concept, Great Lakes, or their agents to ensure they obtained the GPS from the Melody. Usher Deposition., Docket No. 152-2, p. 92, lines 3-6, p. 93, lines 9-

6

13. When asked what a reasonable time for the claim decision to be made after the investigation was complete, Usher testified it should normally be done within a week. One week after Concept received Andersson's January 16 letter was January 23, 2020.

Finally, when asked whether it was common practice for GLI to sue its insureds before denying claims, Mr. Usher's answer was, "Simultaneous." According to Mr. Usher, this practice of suing insureds at the same time as denying coverage was a normal procedure, explaining, "I mean, we don't always, but frequently, we issue … a declaratory judgment action … simultaneously with a denial letter. Sometimes it's just a denial letter." When asked why, he responded: "Because we would rather be the plaintiff and control the forum as regards jury."

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

### Standards of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case.'" *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (*quoting Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the non-moving party and makes all reasonable inferences in favor thereof. *Sensing*, 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. "'Once the moving

party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences". *Id.*  (citation to quoted case omitted). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).

"Cross-motions for summary judgment require the district court to 'consider each motion separately, drawing all inferences in favor of each non-moving party in turn.' " *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (citation to quoted case omitted). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferré Dev., Inc.,* 241 F.3d 103, 107 (1st Cir. 2001). The Court need only "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Id*. And while each motion for summary judgment will be decided on its own merits, because both the Defendants and the Plaintiff's respective motions for summary judgment were filed simultaneously, the Court will consider both motions at the same time, applying the same standard to each motion. *See P.R. American Ins. Co. v. Rivera-Vázquez*, 603 F.3d 125, 133 (1st Cir. 2010).

*Chapter 93A § 9 and Chapter 176D, § 3(9)*

Andersson and GLI have both moved for summary judgment on Count III of Andersson's counterclaim.[5] Andersson's bad faith claim is primarily based on GLI's alleged failure to investigate the claim (c. 176D§3(9)(d)). Andersson also cites to GLI's failure to issue any sort of denial letter within a reasonable time after it stopped investigating the claim (c. 176D§3(9)(n)); GLI's failure to implement any standards for the prompt investigation of claims (c. 176D§3(9)(c)); GLI's failure to affirm or deny coverage of Andersson's claim within a reasonable time (c. 176D§3(9)(e)); GLI's failure to effect a prompt settlement of Andersson's claim in which GLI's liability has become reasonably clear (c. 176D§3(9)(f)); and GLI's forcing Andersson to engage in litigation to get paid (c. 176D§3(9)(g).

"General Laws c. 93A § 2(a) states that '[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.' General Laws c. 176D, § 3, in turn, prohibits 'unfair or deceptive acts or practices in the business of insurance[.]' " *Bobick v. U.S. Fid. & Guar. Co.*, 439 Mass. 652, 658 (2003). Because Chapter 93A incorporates Chapter 176D, an insurer who violates the latter statute "by definition, has violated the prohibition in [Chapter] 93A § 2, against the commission of unfair or deceptive acts or practices." *Id*. at 659 (quoting *Hopkins v. Liberty Mut. Ins. Co.*, 434 Mass. 556, 564 (2001)). The purpose of the statutory scheme is to "encourage the settlement of insurance claims ... and discourage insurers from forcing claimants into unnecessary litigation to obtain

---

[5] Massachusetts law is clear that summary judgment may be appropriately entered in insurance coverage disputes under chapter 176D. *See River Farm Realty Tr. v. Farm Fam. Cas. Ins. Co*., 943 F.3d 27, 36–37 (1st Cir. 2019), *citing Bobick v. U.S. Fid. & Guar. Co*., 439 Mass. 652 (2003); *Silva v. Steadfast Ins*. Co., 87 Mass.App.Ct. 800, 35 N.E.3d 401, 408 (2015). It is also clear that the boundaries of what are viable claims under chapter 176D are matters of law for the court to decide. *Id*., *citing Silva*, 35 N.E.3d at 408 (stating, in the context of assessing a grant of summary judgment to the insurer on the plaintiff's chapter 176D claim, that "the boundaries of what may qualify for consideration as a [G.L.] c. 93A violation is a question of law" (alteration in original) (*quoting Chervin. Travelers Ins. Co*., 448 Mass. 95, 858 N.E.2d 746, 759 (2006))).

relief." *Clegg v. Butler*, 424 Mass. 413, 419 (1997) (internal citation omitted). As in this case, a

consumer asserting a section nine claim "may recover for violations of G.L. c. 176D, § 3, cl. 9,

without regard to whether the violation was unlawful under G.L. c. 93A, § 2." *Polaroid Corp. v.

Travelers Indem. Co.*, 610 N.E.2d 912, 917 (Mass. 1993).[6] "To be held unfair and deceptive

under c. 93A, practices involving even worldly-wise businesspeople do not have to attain the

antiheroic proportions of immoral, unethical, oppressive or unscrupulous conduct, but need only

be within any recognized or established common law or statutory concept of unfairness." *VMark

Software, Inc. v. EMC Corp.*, 37 Mass. App. Ct. 610, 620 (1994).

M.G.L. Ch 176D § 3(9)(d) defines an "unfair claims settlement practice" to include

"refusing to pay claims without conducting a reasonable investigation based upon all available

information." In other words, insurers must investigate claims thoroughly before making a

determination of an insurer's liability. *Clegg v. Butler*, 424 Mass. at 421 (where an insurer fails to

interview parties and persons with knowledge of the facts and otherwise performs an inadequate

investigation, the insurer violates General Laws Ch 176D § 3(9)(c) and 3(9)(d)). Where the

insurer's violation of Chapter 175D is found to be "willful or knowing (or ... both)," the plaintiff

will be entitled to "double or treble damages." *Rhodes v. AIG Domestic Claims, Inc.*, 461 Mass.

486, 495 (2012).

---

[6] GLI would have the Court apply a higher standard under c. 93A, one that only applies between business entities. *See Baker v. Goldman Sachs & Co.*, 771 F.3d 37, 49–51 (1st Cir.2014); *Zabin v. Picciotto*, 73 Mass.App.Ct. 141, 896 N.E.2d 937, 963 (2008) (holding that the conduct must rise to the level of an "extreme or egregious" business wrong, "commercial extortion," or similar level of "rascality" that raises "an eyebrow of someone inured to the rough and tumble of the world of commerce."). Furthermore, the Supreme Judicial Court observed,  and the First Circuit acquiesced, the rhetoric of "rascality" is "uninstructive." *Cambridge Plating Co., Inc. v. Napco, Inc.*, 85 F.3d 752, 769 (1st Cir. 1996), *citing Massachusetts Employers Ins. Exch. v. Propac–Mass, Inc.*, 420 Mass. 39, 648 N.E.2d 435, 438 (1995).

**<u>Discussion</u>**

M.G.L. Ch 176D §3(9)(d) defines an "unfair claims settlement practice" to include "refusing to pay claims without conducting a reasonable investigation based upon all available information." In other words, insurers must investigate claims thoroughly before making a determination of an insurer's liability. *Clegg v. Butler*, 424 Mass. 413, 421 (1997). Where an insurer fails to interview parties and persons with knowledge of the facts and otherwise performs an inadequate investigation, the insurer violates General Laws Ch 176D §3(9)(d). *Capitol Specialty Ins. Corp. v. Higgins,* 953 F.3d 95, 109-110 (1st Cir. 2020).

Here, GLI took no action to investigate the facts of the claim beyond the vessel inspection and interview with Mr. Andersson conducted by Mr. Ball on December 21, 2019. GLI did not attempted to retrieve either of the GPS units from the vessel as Ball had suggested, and as Andersson had authorized. When Andersson sent GLI a letter on January 16, 2020, he explained his intended course and the reasons he believed GLI's reservation of rights position was unfounded. Andersson told them his belief the GPS was in the possession of GLI's surveyor, as well as addressing GLI's concerns about seaworthiness such as its mistaken belief that there were no paper charts on board. Andersson indicated in the letter that the Garmin GPS track would be the best evidence of his course and Usher, in hindsight, agreed. GLI never followed up with Andersson regarding these facts Andersson provided, did not attempt to contact any other witnesses to clarify the facts, especially Naranjo, whose seasickness and the questions of when it and how it progressed, what he was capable of doing throughout the journey, and when or if he recovered before arriving at the Dominican Republic were potentially relevant to both the navigational warranty issue and GLI's position regarding the seaworthiness warranty issue.

Had GLI used minimal effort and expense, it could have instructed Ball to investigate further into the weather during the voyage, the wind direction and speed, the shifting of the wind direction relative to the course of the vessel, the performance characteristics of the vessel, and whether Andersson's determining that heading straight downwind in a catamaran in strong winds (which would have been required to return to Aruba) would have proven disastrous and possibly cause him to capsize. [7] GLI could also have obtained statements Alex Cottier, the local dive shop operator who first waded out to the vessel on the breakwater on the night of the accident, or Shaun Farmer, the salvor. Despite knowing virtually nothing about the events leading up to the accident, GLI through Concept elected to end the investigation and close its claims file.

Other than consulting their attorneys to obtain approval to deny the claim, no additional investigation was undertaken by Concept, GLI or its counsel before filing the declaratory judgment action. GLI's decision to file a lawsuit seeking declaratory judgment on the policy without making any further inquiry into the underlying facts breached its statutory duty under G.L. c. 176D, § 3(9)(d), to conduct "a reasonable investigation based upon all available information" before rejecting a claim. The decision to file suit without first providing notice of its denial of the claim to Andersson was motivated, in part, by GLI's desire to gain strategic advantage by winning the race to the courthouse and filing the declaratory judgment under admiralty law.

Inherent in an insurance contact is the insurer's duty of good faith in its dealings with its insured. *Sarnifil, Inc. v. Peerless, Ins. Co.*, 418 Mass. 295, 303-304. As discussed above, GLI's

---

[7] For example, the parties only learned during discovery that Ball's handwritten notes existed which contradicted facts in his typed report, including showing that Andersson had sailed as far eastward as Ponce, Puerto Rico before turning north (potentially showing Andersson may not have violated the navigational warranty). In addition, Ball withdrew his expert opinion regarding the navigational warranty after he recognized in his deposition that his distance measurements failed to include Aves Island. The navigational warranty required the insured to stay within 150 miles from land and Aves Island is land, as Ball conceded.

conduct during this investigation is a knowing and willful breach of its duty of good faith to Andersson and there are sufficient grounds to merit a doubling of the damages. Andersson, having prevailed on his G.L. c. 93A claim' is also entitled to recover its reasonable attorney's fees and costs.

### Conclusion

1. GLI's Motion for Summary Judgment (Docket No. 150) is **denied**;

2. Andersson's Motion for Summary Judgement (Docket No. 152) is **granted**;

3. $375,594.30 has been stipulated by the parties to be the amount of breach of contract damages and that amount must now be entered as a judgment as damages for Count I of Andersson's counterclaim;

4. Pre-judgment interest shall be calculated from the date Andersson should have been notified of GLI's decision, January 23, 2020;

5. Damages will be doubled;

6. Andersson is entitled to attorney's fees and costs related to this claim;

7. GLI's Motion to Consider Evidence of Factual Misrepresentations (Docket No. 173) is **denied**.


/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**SENIOR DISTRICT JUDGE**

**SO ORDERED.**